**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
---------------------------------------------x
                                             :
In re                                        :      Chapter 11
                                             :
HALCÓN RESOURCES                             :      Case No. 16-11724 (___)
CORPORATION, et al.,                         :
                                             :      Joint Administration Requested
          Debtors.¹                          :
---------------------------------------------x
```

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§
105, 361, 362, 363, 364 AND 507 AND FED. R. BANKR.
P. 2002, 4001, 6003, 6004 AND 9014 FOR INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II)
AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING**

Halcón Resources Corporation ("**Holdings**") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

**Relief Requested**

1.      By this Motion, pursuant to sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001–2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Halcón Resources Corporation (0684); Halcón Holdings, Inc. (5102); HK Resources, LLC (9194); The 7711 Corporation (4003); Halcón Gulf States, LLC (2976); Halcón Louisiana Operating, L.P. (9727); Halcón Field Services, LLC (0280); Halcón Energy Properties, Inc. (5292); Halcón Operating Co., Inc. (3588); Halcón Williston I, LLC (9550); Halcón Williston II, LLC (9676); Halcón Resources Operating, Inc. (4856); HRC Energy Louisiana, LLC (1433); HRC Energy Resources (WV), Inc. (2713); HRC Production Company (3501); Halcón Energy Holdings, LLC (0538); HRC Energy, LLC (5010); HK Energy, LLC (8956); HK Louisiana Operating, LLC (4549); HK Oil & Gas, LLC (0502); HK Energy Operating, LLC (8107); HRC Operating, LLC (5129). The Debtors' mailing address is 1000 Louisiana Street, Suite 6700, Houston, Texas 77002.

for the District of Delaware (the "**Local Rules**"), the Debtors request entry of interim (the

"**Interim Order**") and final orders (the "**Final Order**"): (i) authorizing the Debtors to obtain

senior secured, superpriority, postpetition financing (ii) granting adequate protection to the

Prepetition Secured Parties (as defined herein); (iii) authorizing the Debtors to use cash collateral

(as defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**"); (iv) authorizing

the Debtors to maintain and renew existing letters of credit under, and to the extent permitted by,

the Revolving Credit Facility (as herein defined); (v) modifying the automatic stay imposed

under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate

the terms of the Interim Order; and (vi) scheduling a hearing to consider the relief requested

herein on a final basis (the "**Final Hearing**").

       2.        A proposed form of order granting the relief requested herein on an

interim basis is annexed hereto as **Exhibit A** (the "**Interim Order**").[2]

### Bankruptcy Rule 4001 and Local Rule 4001–2 Concise Statements

       3.        Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(ii), the

Debtors submit the following concise statement of the material terms of the Interim Order.[3]

| Summary of Material Terms | | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The Prepetition Secured Parties (as defined in this Motion). | ¶ 14 |

---

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Interim Order.

[3] Any summary of the terms of the Interim Order contained in this Motion is qualified in its entirety by reference to the provisions of the Interim Order. To the extent the Motion and the Interim Order, DIP Credit Agreement, or Swap Agreements are inconsistent, the Interim Order, DIP Credit Agreement, or Swap Agreements, as applicable, shall control. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

| Summary of Material Terms | | Location |
|---|---|---|
| **Purposes for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii) | In accordance with the terms and conditions set forth in the Interim Order, the Debtors are authorized to use Cash Collateral, through and including the Termination Date (as defined in paragraph 15 of the Interim Order) for the purposes set forth in the Budget (as defined below), including for working capital and general corporate purposes (including fees, costs and expenses related to the chapter 11 cases (the "**Chapter 11 Cases**") and the DIP Documents, capital expenditures and any interest payments under the Second Lien Notes.) | ¶ 15 |
| **Terms of Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The Debtors may use Cash Collateral pursuant to the terms of the Interim Order and Final Order and a 13-week budget (the "**Budget**") setting forth the Debtors' projected receipts and disbursements for such period is attached as **Exhibit 1** to the Interim Order. | ¶ Exh. A |
| **Termination Events**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Debtors' right to use the Cash Collateral pursuant to the Interim Order terminates without further notice or court proceeding on the earlier to occur of (i) the Termination Date (as defined in paragraph 15 of the Interim Order) and (ii) the occurrence of any of the following events after five (5) Business Days' prior written notice to the Debtors by the DIP Agent or any of the Prepetition Agents (each a "**Cash Collateral Event of Default**"):<br><br>• any Debtor shall have asserted, in a pleading filed with the Court (or another court of competent jurisdiction), a claim or challenge against any of the Prepetition Secured Parties in any way contrary to or inconsistent with any of the Debtors' acknowledgements, stipulations, and releases contained herein;<br><br>• any of the Debtors shall have failed to comply with any other term hereof and the same is not remedied within five (5) days' receipt of written notice of such non-compliance by any of the Prepetition Agents;<br><br>• any of the Debtors shall have filed a motion seeking to incur any postpetition financing or create any postpetition liens or security interests other than those granted or permitted pursuant hereto;<br><br>• if any of the Debtors seeks, or if there is entered, any modification of the Interim or Final Order that adversely affects any lien, claim, right, or other protection (including without limitation Adequate Protection) granted to or for the benefit of any Prepetition Agent or Prepetition Secured Party without the prior written consent of such Prepetition Agent or Prepetition Secured Party, and no such consent shall be implied by any other action, inaction, or acquiescence by any Prepetition Agents or Prepetition Secured Party;<br><br>• if the Final Order shall not have been entered on or before | ¶¶ 9, 15 |

| Summary of Material Terms | Location |
|---|---|
| | sixty (60) days following the entry of the Interim Order; or<br><br>• the entry of an order (x) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (y) appointing a chapter 11 trustee in the Chapter 11 Cases, or (z) appointing an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code). | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Order provides (and the Final Order shall provide) a "**Carve-Out**" of certain statutory fees and allowed professional fees of the Debtors and any statutory committee of creditors (a "**Committee**") appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code, all as detailed in the Interim Order. | ¶ 7(b) |
| **Adequate Protection**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) | The adequate protection provided to the Prepetition Secured Parties includes:<br><br>• <u>Adequate Protection Liens</u>. (a) As security for the payment of the Second Lien Adequate Protection Obligations, the Second Lien Indenture Trustee (for itself and for the benefit of the Second Lien Noteholders) and (b) as security for the payment of the Third Lien Adequate Protection Obligations, the Third Lien Indenture Trustee (for itself and for the benefit of the Third Lien Noteholders) shall be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "**Adequate Protection Liens**"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens, and subject further to the Intercreditor Agreement.<br><br>• <u>507(b) Claims</u>. The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims granted in respect of the DIP Obligations, (iii) as to the 507(b) Claims of the Second Lien Noteholders and the Second Lien Indenture Trustee, the First Lien 507(b) Claims and (iv) as to the 507(b) Claims of the Third Lien Indenture Trustee and the Third Lien Noteholders, the First Lien 507(b) Claims and the Second Lien 507(b) Claims; such subordination referenced in (iii) and (iv) only to the extent | ¶¶ 13(b), 16, 17 |

| Summary of Material Terms | Location |
|---|---|

set forth in the applicable Intercreditor Agreement. The Second Lien Indenture Trustee, the Second Lien Noteholders, the Third Lien Indenture Trustee, and the Third Lien Noteholders shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Carve-Out is funded. The order of priority of all 507(b) Claims shall be governed by the Intercreditor Agreement.

- Interest.  The Debtors shall be authorized and directed to pay, as adequate protection, to the Second Lien Indenture Trustee all accrued and unpaid interest (including interest accrued prior to the Petition Date) on the outstanding amounts under the Second Lien Notes constituting Prepetition Second Lien Obligations at the applicable non-default rate set forth in the Second Lien Debt Documents, and to pay all other accrued and unpaid fees and disbursements owing to the Second Lien Indenture Trustee under the Second Lien Debt Documents, as and when such interest, fees and disbursements become due and payable (but for the commencement of the Cases) in accordance with the terms of the Second Lien Debt Documents (which payments and pricing shall be without prejudice to the rights of the Second Lien Indenture Trustee or Second Lien Noteholders to assert a claim for the payment of additional interest calculated at any other rates applicable pursuant to the Second Lien Indentures, and without prejudice to the rights of the Debtors or other party in interest to contest any such additional claims), in each case subject to Section 506(b) of the Bankruptcy Code.

- Fees and Expenses.  The Debtors shall pay all reasonable fees and expenses of advisors to (i) until such time as the Prepetition Revolver Obligations shall have been refunded, refinanced, replaced and paid in full, the Revolving Credit Agreement Agent and Revolving Credit Agreement Lenders, (ii) the Second Lien Indenture Trustee, (iii) the Third Lien Indenture Trustee, including Stroock & Stroock & Lavan LLP and local counsel, and (iv) the ad hoc committee of Third Lien Noteholders (the "**Ad Hoc Committee of Third Lien Noteholders**"), including Latham & Watkins LLP, local counsel and Houlihan Lokey Capital, Inc.  None of the fees and expenses payable shall be subject to separate approval by the Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses within ten (10) Business Days of the receipt of an invoice detailing such fees and expenses (redacted to protect privileges), and this Court shall resolve

01:18968084.1

| Summary of Material Terms | Location |
|---|---|
| any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. | |

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| **Cross-Collateralization** Local Rule 4001–2(a)(i)(A) | The Interim Order does not provide for cross-collateralization, other than priming liens and replacement liens as adequate protection**.** | N/A |
| **Stipulations** Local Rule 4001–2(a)(i)(B) | In the Interim Order, the Debtors stipulate to certain facts, including, among other things:<br><br>• the Debtors were truly and justly indebted and liable to the Prepetition Secured Parties on account of the Prepetition Obligations, without defense, counterclaim or offset of any kind;<br><br>• the liens and security interests granted by the Debtors to the Prepetition Secured Parties to secure the Prepetition Obligations are (i) valid, binding, perfected, enforceable liens on and security interests in the Debtors' real and personal property constituting Collateral (as defined in the Revolving Credit Facility Documents, and hereinafter referred to as the "**Prepetition Collateral**") and (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law (except as set forth in the Intercreditor Agreement) and (iii) subject to the Carve-Out, are subordinate only to other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to the extent such liens are permitted under the Prepetition Debt Documents to be senior to the liens securing the Prepetition Obligations;<br><br>• as of the Petition Date, the Debtors were party to the Swap Agreements (as defined in the Revolving Credit Agreement) and the Debtors' obligations under the Prepetition Swap Agreements constituted Prepetition Revolver Obligations secured by the Prepetition Collateral; | ¶ 4 |

| | | |
|---|---|---|
| **Stipulations,** *con't*<br>Local Rule<br>4001–2(a)(i)(B) | • no payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Revolving Credit Agreement Agent, the Revolving Credit Agreement Lenders, the Third Lien Indenture Trustee or the Third Lien Noteholders (each as defined below) by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Revolving Credit Agreement Documents or Prepetition Swap Agreements is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;<br><br>• (1) no portion of any of the Prepetition Obligations shall be subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, except with respect to subordination as set forth in the Intercreditor Agreement,  and (2) the Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former, current and future DIP Agents, DIP Lenders (including, without limitation, any Secured Swap Provider (as such term is defined in the DIP Credit Agreement)) and Prepetition Secured Parties, affiliates of the DIP Agent and DIP Lenders and the Prepetition Secured Parties, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Agent, each DIP Lender and each Prepetition Secured Party and their respective affiliates (collectively, the "**Releasees**"), **solely in their capacity as DIP Agent, DIP Lenders, Secured Swap Providers, and Prepetition Secured Parties**, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, reasonable attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition Debt Documents, the Prepetition Swap Agreements and/or the transactions contemplated hereunder or thereunder including, without limitation, *con't…* | ¶ 4 |

| Stipulations, *con't*<br>Local Rule<br>4001–2(a)(i)(B) | …(x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties, *provided, that*, the releases set forth in this section shall be limited to such claims arising prior to or including the date of the entry of the Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction of the payment of the Prepetition Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of the Interim Order;<br><br>• no portion of any of the Prepetition Obligations shall be subject to contest, attack, avoidance, impairment, disallowance, defense, counterclaim, recharacterization, reduction, recoupment, setoff, recovery or, except as set forth in the Intercreditor Agreement, subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;<br><br>• the Prepetition Agents, together with the Debtors, are party to that certain Intercreditor Agreement, dated as of May 1, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Intercreditor Agreement**"), to set forth the relative lien priorities and other rights and remedies of the Prepetition Secured Parties with respect to, among other things, the Prepetition Collateral; and pursuant to section 4.02 of that Intercreditor Agreement, the liens on the Prepetition Collateral held by the Second Lien Noteholders and the Third Lien Noteholders are subordinate to the DIP Liens and the Adequate Protection Liens to the extent provided therein; and<br><br>• the aggregate value of the Prepetition Collateral securing the Prepetition Revolver Obligations substantially exceeds the aggregate amount of the Prepetition Revolver Obligations. | ¶ 4 |
| --- | --- | --- |
| **Effect of Stipulations**<br>Local Rule<br>4001–2(a)(i)(B) | The stipulations contained in the Interim Order are binding upon the Debtors and any successors.<br><br>Parties in interest have until the earlier of (a) sixty (60) days from entry of the Interim Order and (b) confirmation of the Plan to investigate the stipulations set forth in the Interim Order. | ¶ 20 |
| **Section 506(c) Waiver**<br>Local Rule<br>4001–2(a)(i)(C) | Subject to entry of a Final Order, and except to the extent of the Carve-Out, the Debtors waive any right to surcharge against the DIP Collateral or the Prepetition Collateral. | ¶ 10 |

| | | |
|---|---|---|
| **Liens on Chapter 5 Causes of Action** Local Rule 4001–2(a)(i)(D) | The Interim Order <u>does not</u> provide for liens on the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code (collectively, the "**Avoidance Actions**"). | ¶ 8(a) |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** Local Rule 4001–2(a)(i)(E) | The Interim Order provides that the Prepetition Revolver Obligations, including the Prepetition Revolver Letters of Credit and the Prepetition Swap Agreements entered into with Consenting Prepetition Secured Swap Providers shall be refunded, refinanced, replaced and paid in full (including all amounts that would constitute "Secured Obligations" under and as defined in the Revolving Credit Agreement) by the Debtors from the proceeds of the initial borrowing of the DIP Loans and, upon such payment, the commitments of all Revolving Credit Agreement Lenders under the Revolving Credit Agreement shall be terminated. Upon such refunding, refinancing, replacement and repayment in full of the Prepetition Revolver Obligations, all security interests in, and liens on, Prepetition Collateral granted to secure the Prepetition Revolver Obligations shall be immediately, and without the necessity of further action, deemed to be included among the DIP Liens granted pursuant to this Order to secure the DIP Obligations. | ¶ 13(a) |
| **Disparate Treatment of Professionals Under Carve Out** Local Rule 4001–2(a)(i)(F) | The Interim Order contains no provision for disparate treatment for professionals retained by the Committee, if any, with respect to the Carve-Out; *provided that* up to $50,000 will be made available to any Committee for investigation costs, as described in paragraph 21 of the Interim Order. | N/A |
| **Non-Consensual Priming Liens** Local Rule 4001–2(a)(i)(G) | The Interim Order does not provide for non-consensual priming of any existing secured lien. | N/A |
| **Section 552(b)(1) Waiver** Local Rule 4001–2(a)(i)(H) | Subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties. | ¶ 11 |

## Jurisdiction

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware dated February 29, 2012.  This is a core proceeding pursuant

to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of

a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

5.  On the date hereof (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

6.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

7.  The Debtors are pleased to be before the Court with a prepackaged chapter 11 plan of reorganization (the "**Plan**") that has been accepted by each class of voting creditors and interest holders, which will enable them to leave their business intact and substantially de-levered, providing for the reduction of approximately $1.8 billion of the Debtors' existing net debt and approximately $200.0 million of the Debtors' annual cash interest expense upon the completion of the restructuring.  Through extensive negotiations over the past several months, the Debtors built consensus around the terms of a comprehensive financial restructuring, which culminated in the Debtors entering into a Restructuring Support Agreement, dated June 9, 2016 (together with all exhibits and attachments thereto, the "**Restructuring Support Agreement**") with holders of (i) approximately 83% of the outstanding principal amount of the Debtors' senior secured third lien notes, (ii) approximately 61% of the outstanding principal amount of the Debtors' senior unsecured notes, (iii) 100% of the outstanding principal amount of the Debtors'

01:18968084.1

10

senior unsecured convertible note, and (iv) approximately 63% of the Debtors' perpetual convertible Series A preferred stock (collectively, the "**Consenting Creditors**").

8.        In addition to the support of the Consenting Creditors, the Debtors are commencing these chapter 11 cases with the support of holders of over 51% of the outstanding principal amount of the Debtors' senior secured second lien notes, which will be reinstated under the Plan, and a commitment from the lenders under their senior revolving credit agreement to provide debtor-in-possession financing that will convert to an exit credit facility upon emergence from chapter 11.

9.        In accordance with the terms of the Restructuring Support Agreement, the Debtors commenced solicitation of the Plan on June 20, 2016, and the Plan received overwhelming and wide-spread support.  Specifically, the Debtors received sufficient levels of support from each voting class of impaired creditors and interest holders to support confirmation of the Plan.  Pursuant to the Plan, the Debtors are proposing a restructuring, with the support of each of the voting classes of claims and interests and certain other interested parties, that, among other things, provides the following:

- An agreement with the Debtors' first lien revolving credit agreement lenders to provide financing during the chapter 11 cases in the form of a $600 million debtor-in-possession financing facility that will convert to an exit facility upon emergence from chapter 11;

- Reinstatement of the Debtors' senior secured second lien notes;

- Conversion of the Debtors' senior secured third lien notes into a pro rata share of approximately 76.5% of the equity in Reorganized Holdings (as defined in the Plan), together with a cash payment of approximately $33.8 million;

- Conversion of the Debtors' senior unsecured notes into a pro rata share of approximately 15.5% of the equity in Reorganized Holdings, warrants to purchase an additional 4.0% of the new equity in Reorganized Holdings, and approximately $37.6 million in cash;

- Conversion of the Debtors' convertible note into approximately 4.0% of the equity in Reorganized Holdings, warrants to purchase an additional 1.0% of the new equity in Reorganized Holdings, and $15.0 million in cash;

- Payment in full, in the ordinary course, of the Debtors' trade and other general unsecured creditors;

- Full and final satisfaction of the Debtors' perpetual convertible Series A preferred stock for $11.1 million in cash to be distributed pro rata to the holders of such interests; and

- Full and final satisfaction of the Debtors' existing common equity for approximately 4.0% of the equity in Reorganized Holdings to be distributed pro rata to the holders of such interests.

10.    Additional information regarding the circumstances leading to the commencement of these chapter 11 cases and information regarding the Debtors' business and capital structure is set forth in the *Declaration of Stephen W. Herod in Support of the Debtors' Chapter 11 Petitions and Related Requests for Relief* (the "**Herod Declaration**"), which has been filed contemporaneously herewith and is incorporated herein by reference.

## The Debtors' Prepetition Secured Indebtedness

11.    Below is a summary of the Debtors' prepetition secured indebtedness impacted by the relief requested in this Motion.

### A.    *The Revolving Credit Facility*

12.    Holdings, as borrower, and each of the other Debtors, as guarantors, are parties to that certain *Senior Revolving Credit Agreement*, dated as of February 8, 2012, with the lenders and issuing banks party thereto from time to time (the "**Revolving Credit Agreement Lenders**"), JPMorgan Chase Bank, N.A., as administrative agent (the "**Revolving Credit Agreement Agent**"), and certain other parties thereto (as amended, modified, or supplemented from time to time, the "**Revolving Credit Agreement**" or "**Revolving Credit Facility**").  The

Revolving Credit Agreement provides for a $1.5 billion revolving credit facility, subject to a borrowing base that is determined based on the estimated value of the Debtors' oil and natural gas reserves, total indebtedness, and other relevant factors consistent with customary oil and natural gas lending criteria. Advances under the Revolving Credit Agreement are secured by liens on substantially all of the Debtors' properties and assets. The Revolving Credit Agreement matures on August 1, 2019.

13.    The Debtors' obligations under the Revolving Credit Agreement (the "**Prepetition Revolver Obligations**") are secured pursuant to that certain *Guaranty and Collateral Agreement*, dated as of February 8, 2012, between and among, Holdings, each of the grantors party thereto, and JPMorgan Chase Bank, N.A., as administrative agent (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Guaranty and Collateral Agreement**"). Pursuant to the Guaranty and Collateral Agreement, each of the Debtors granted a first-priority lien on substantially all of their property, including all accounts, chattel paper, commercial tort claims, deposit accounts (other than payroll, withholding tax and other fiduciary deposit accounts), documents, general intangibles (including, without limitation, rights in and under any swap agreements), goods (including all inventory and equipment), pledged securities, and proceeds of any collateral (collectively, the "**Prepetition Collateral**"),[4] in favor of the Revolving Credit Agreement Agent and the Revolving Credit Agreement Lenders (collectively, the "**Revolving Credit Agreement Secured Parties**"). As set forth in the *Declaration of Timothy R. Coleman in Support of Debtors' Motion for Interim and Final (I) Authority to Obtain Postpetition Financing; (II) Authority to Use Cash Collateral; (III) Authority to Grant Security Interests and Superpriority Claims; (IV) Authority to Provide Adequate*

---

[4] The Prepetition Collateral does not include any of the assets of Debtor HK TMS, LLC or any of the Company's future unrestricted subsidiaries.

*Protection; and (V) Modification of the Automatic Stay*, which will be filed contemporaneously herewith (the "**PJT Declaration**"), the Debtors' primary assets that serve as Prepetition Collateral are their oil and gas reserves (the "**Oil and Gas Properties**"), which have a risked reserve value of between $1,674 million and $1,843 million.

14.    On March 17, 2016, the Debtors entered into the *Thirteenth Amendment to the Revolving Credit Agreement* (the "**Thirteenth Amendment**"), which, among other things, reduced the borrowing base to $700.0 million and scheduled the Debtors' next semi-annual borrowing base redetermination for September 1, 2016.  Additionally, the Thirteenth Amendment provided for amounts under the Revolving Credit Agreement to bear interest at specified margins over the base rate of 1.50% to 2.50% for ABR-based loans or at specified margins over LIBOR of 2.50% to 3.50% for Eurodollar-based loans, based on utilization of the facility.

15.    On May 26, 2016, the Debtors entered into that certain Waiver to their Revolving Credit Agreement (the "**May 26 Waiver Agreement**"), which, among other things, temporarily limited the borrowings under their Revolving Credit Facility in connection with the Debtors' proposed Plan.  Pursuant to the May 26 Waiver Agreement, the Debtors agreed that, until the termination date (discussed below), they would not request, nor would they be permitted to request, a borrowing which would result in the aggregate exposure on the Revolving Credit Agreement to exceed $450.0 million.  The termination date under the May 26 Waiver Agreement was the earlier of (i) 60 days from the effective date of the May 26 Waiver Agreement, or (ii) the termination or expiration of the Restructuring Support Agreement.

16.    On July 21, 2016, the Debtors entered into that certain Consent and Waiver to the Senior Revolving Credit Agreement and Intercreditor Agreement (the "**July 21**

**Consent and Waiver Agreement**"), in which, among other things, the Revolving Credit Agreement Agent and certain of the Revolving Credit Agreement Lenders waived any Default or Event of Default (each such term as defined in the Revolving Credit Agreement), if any, as applicable, resulting from the payment of the Designated Interest Prepayments (as defined in the July 21 Consent and Waiver Agreement), the failure to make the Missed Interest Payments (as defined in the July 21 Consent and Waiver Agreement), the Second Lien Modifications (as defined in the July 21 Consent and Waiver Agreement), the Debtors' entry into and performance under the Restructuring Support Agreement and the solicitation of the Plan.

17.    As of the Petition Date, the aggregate principal amount outstanding Prepetition Revolver Obligations owed to the Revolving Credit Agreement Secured Parties totaled approximately $450.0 million in unpaid principal, plus any applicable interest, fees, and other expenses.

**B.    *The Prepetition Swap Agreements***

18.    As is customary in the Debtors' industry, in the ordinary course of business, Holdings enters into financial derivative contracts primarily to hedge the Debtors' exposure to commodity price risks (collectively, the "**Swap Agreements**" and the activities related thereto, the "**Hedging Activities**") with certain DIP Lenders (which term, for the avoidance of doubt, includes affiliates of such lenders under the DIP Credit Agreement) (collectively, the "**Lender Swap Parties**") pursuant to an established hedging policy (as discussed below, the "**Hedge Policy**").

19.    The Debtors intend to provide superpriority administrative claims status and DIP Liens (as defined below) to secure any obligations under any Swap Agreement (as defined in the DIP Credit Agreement) entered into prior to the Petition Date and to which a Secured Swap Provider (as defined in the DIP Credit Agreement) that has signed a consent

01:18968084.1

agreement and waiver of its right to terminate any Prepetition Swap Agreement (a "**Prepetition Swap Waiver**"), subject to the terms and conditions of such waiver and consent, is a counterparty (each such Secured Swap Provider described in this paragraph, a "**Consenting Prepetition Secured Swap Provider**" and each such Swap Agreement described in this paragraph and which is set forth on **Exhibit 3** of the Interim Order, a "**Prepetition Swap Agreement**").  Each Prepetition Swap Agreement is subject to the same priorities and protections provided to the DIP Loans.

20.    The Prepetition Swap Agreements, which obligations are guaranteed on a joint and several basis by each of the Guarantors (as defined in the Revolving Credit Agreement) and the obligations (including, without limitation, any contingent obligations and mark to market movements) of the Company and the Guarantors under and with respect to the Prepetition Swap Agreements (and each transaction thereunder) (such obligations, the "**Prepetition Swap Obligations**") constitute Prepetition Revolver Obligations secured by the Prepetition Collateral (as defined below).  The Debtors did not post collateral specific to any of their Prepetition Swap Agreements as they are secured by the Prepetition Collateral pursuant to the terms of Revolving Credit Agreement and the Prepetition Swap Agreements.

21.    As of the Petition Date, the Debtors had significant Prepetition Swap Agreements consist of swaps, swaptions, costless put/call "collars," and extendable costless collars.[5]  Agreements like the Swap Agreements are common in the Debtors' industry and are routinely used in the ordinary course of business to mitigate exposure to fluctuating commodity prices.  As a measure of governance and control, companies in the Debtors' industry use risk

---

[5] For additional information regarding these types of arrangements, see the Debtors' *Motion (I) Authorizing Debtors to (A) Continue Performing Under Prepetition Swap Agreements and (B) Enter Into and Perform Under New Postpetition Swap Arrangements and (II) Authorizing Protections for Consenting Lender Swap Parties* filed contemporaneously herewith.

management guidelines like the Hedge Policy to ensure that such agreements are closely

monitored and are in the best interests of all the company's stakeholders.

22.     The Prepetition Swap Agreements provide the Debtors with cash flow

protections that add to, and preserve, value across all of the Debtors' operations.  However, the

Debtors could lose the benefit of these protections if the Lender Swap Parties move to terminate

their agreements or take other adverse action permitted under the Bankruptcy Code.  The

commodity and financial instrument trading market has been historically and consistently

resistant to conducting business with hedging entities in financial distress.  Counterparties have

prospectively sought to terminate swap agreements and discontinue hedging activity out of fear

that their partner is operating outside of the ordinary course of business with respect to the

sophisticated transactions necessary to conduct the hedging business or because of a perception

that the hedging partner presents an unacceptable level of risk exposure without adequate credit

support.  As a result of the safe-harbor protections provided under the Bankruptcy Code with

respect to the automatic stay, hedging counterparties that may not have otherwise had a right to

terminate may exercise termination rights as a result of a debtor's petition for chapter 11 relief.

For this reason, the Debtors anticipated that, as a result of their bankruptcy petitions and absent

an alternative arrangement, they would face an untenable risk of their Lender Swap Parties

terminating of the Swap Agreements and curtailing the Debtors' ability to engage in Hedging

Activities.

23.     The Debtors also intend to provide superpriority administrative claims

status and DIP Liens (as defined below) to secure any obligations under any Swap Agreement

(as defined in the DIP Credit Agreement) that is entered into after the Petition Date (a

"**Postpetition Swap Agreement**") and to which a Secured Swap Provider (as defined in the DIP

Credit Agreement) is a counterparty (each such Secured Swap Provider described in this paragraph, a "**Postpetition Secured Swap Provider**").  Each Postpetition Swap Agreement would be subject to the same priorities and protections provided to the DIP Loans.

**C.**     *The Second Lien Notes*

24.     On May 1, 2015, Holdings issued, in a private placement, $700.0 million in aggregate principal amount of 8.625% Senior Secured Notes due 2020 (the "**8.625% Second Lien Notes**") pursuant to that certain *Indenture* (as amended, modified, or supplemented from time to time, the "**8.625% Second Lien Note Indenture**"), with each of the other Debtors as named guarantors therein, and U.S. Bank National Association as indenture trustee and collateral trustee (in such capacities, the "**8.625% Second Lien Note Indenture Trustee**").

25.     Pursuant to a separate private placement, Holdings issued $112.8 million in aggregate principal amount of 12.0% Senior Secured Notes due 2022 (the "**12.0% Second Lien Notes**" and together with the 8.625% Second Lien Notes, the "**Second Lien Notes**" and the holders of Second Lien Notes, the "**Second Lien Noteholders**") pursuant to the that certain *Indenture* dated December 21, 2015, (as amended, modified, or supplemented from time to time, the "**12.0% Second Lien Note Indenture**" and together with the 8.625% Second Lien Note Indenture, the "**Second Lien Note Indentures**") with each of the other Debtors as named guarantors therein, and U.S. Bank National Association, as indenture trustee and collateral trustee (in such capacities, the "**12.0% Second Lien Note Indenture Trustee**", and together with its capacity as 8.625% Second Lien Note Indenture Trustee, the "**Second Lien Indenture Trustee**").   The 8.625% Second Lien Notes are *pari passu* with the 12.0% Second Lien Notes.

26.     Pursuant to that certain *Second Lien Security Agreement*, dated as of May 1, 2015 (the "**Second Lien Security Agreement**"), between and among, Holdings, each of the grantors party thereto, and the Second Lien Indenture Trustee, as collateral trustee, the

obligations under the Second Lien Notes (the "**Prepetition Second Lien Obligations**") are secured by second-priority liens on the Prepetition Collateral.

27.    As of the Petition Date, the aggregate amount outstanding Prepetition Second Lien Obligations owed to the Second Lien Facility Agent and the Second Lien Noteholders (collectively, the "**Second Lien Secured Parties**") is approximately $812.8 million, plus any applicable interest, fees, and other expenses.[6]

**D.    *The Third Lien Notes***

28.    On September 10, 2015, Holdings issued approximately $1.02 billion in aggregate principal amount of 13.0% Third Lien Senior Secured Notes due 2022 (the "**Third Lien Notes**" and the holders of Third Lien Notes, the "**Third Lien Noteholders**") pursuant to that certain *Indenture* (as amended, modified, or supplemented from time to time, the "**Third Lien Note Indenture**"), with each of the other Debtors as named guarantors therein, and U.S. Bank National Association as indenture trustee and collateral trustee (in such capacities, the "**Third Lien Indenture Trustee**" and together with the Third Lien Noteholders, the Second Lien Secured Parties, and the Revolving Credit Agreement Secured Parties, the "**Prepetition Secured Parties**").  The Third Lien Notes mature on February 15, 2022.

---

[6] As described in the Herod Declaration, prior to the Petition Date, the Debtors entered into an agreement with the holders of approximately 51% in aggregate principal amount of the Second Lien Notes (the "**Second Lien Support Agreement**"), subject to the occurrence of the Effective Date of the Plan, to commence a solicitation for consents to a proposed amendment to certain provisions of the Second Lien Note Indentures on or reasonably following the Effective Date (the "**Proposed Second Lien Amendment**").  If agreed to by the requisite holders of Second Lien Notes, the Proposed Second Lien Amendment would, among other things, tighten certain covenants and restrictions under the Second Lien Indentures with respect to the Debtors' ability to incur additional indebtedness, grant new liens and make payments on account of junior indebtedness.  In exchange for agreeing to the support the Plan, the Debtors have agreed to pay to those holders of Second Lien Notes that agree to the Proposed Second Lien Amendment and are either parties to the Second Lien Support Agreement or do not object to or otherwise take any action in contravention to the Plan a consent fee equal to 1.25% of the aggregate principal amount of such holder's outstanding Second Lien Notes subject to the occurrence of the Effective Date of the Plan and, with respect to the 8.625% Second Lien Notes, the effectiveness of the Second Lien Amendment (the "**Consent Fee**").

29.    Pursuant to that certain *Third Lien Security Agreement*, dated as of September 10, 2015 (the "**Third Lien Security Agreement**"), between and among, Holdings, each of the grantors party thereto, and the Third Lien Indenture Trustee, as collateral trustee, the obligations under the Third Lien Notes (the "**Prepetition Third Lien Obligations**" and, together with the Prepetition Revolver Obligations (including the Prepetition Swap Obligations) and the Prepetition Second Lien Obligations, the "**Prepetition Obligations**") are secured by third-priority liens on the Prepetition Collateral.

30.    As of the Petition Date, the aggregate amount outstanding Prepetition Third Lien Obligations owed to the Third Lien Indenture Trustee and the Third Lien Noteholders (collectively, the "**Third Lien Secured Parties**") under the Third Lien Notes is approximately $1.02 billion, plus any applicable interest, fees, and other expenses.

**E.    *The Intercreditor Agreement***

31.    Pursuant to the terms of that certain *Intercreditor Agreement*, dated as of May 1, 2015 (as amended, modified, or supplemented from time to time, including, without limitation, pursuant to that certain Priority Confirmation Joinder dated as of May 1, 2015, the "**Intercreditor Agreement**"), between the Revolving Credit Agreement Agent and the Second Lien Indenture Trustee, liens in favor of the Second Lien Notes on the Prepetition Collateral are subordinated to liens on the Prepetition Collateral that secure the Revolving Credit Agreement.

32.    Additionally, under to the terms of the Intercreditor Agreement, the security interest in those assets that secure the Third Lien Notes and the guarantees are contractually subordinated to liens that secure the Senior Revolving Credit Agreement, the Second Lien Notes and certain other permitted indebtedness.  Consequently, the Third Lien Notes and the guarantees are effectively subordinated to the Revolving Credit Agreement, the Second Lien Notes and such other indebtedness to the extent of the value of such assets. The

01:18968084.1

Third Lien Notes are fully and unconditionally guaranteed on a senior basis by the Guarantors

and by certain future subsidiaries of the Debtors.

## Negotiation of the DIP Facility

33.     As detailed in the Herod Declaration, prior to the commencement of the

Chapter 11 Cases, the Debtors took the initiative and confronted the considerable challenges

facing the oil and gas industry.  In response to deteriorating commodity prices, the Debtors,

among other things, reduced their spending and completed a series of transactions in 2015 that

resulted in the reduction of their long-term debt by approximately $1.0 billion and reduced their

annual interest burden by approximately $53.5 million.

34.     Despite the efforts of the Debtors and their senior management to actively

manage their capital structure to restructure and reduce their interest expense and debt

obligations and increase liquidity, the significant and sustained drop in commodity prices and the

related decrease in the Debtors' revenues and cash flows from operations, caused uncertainty

regarding the viability of the Debtors' current leveraged capital structure over the long term.

Accordingly, the Debtors began to explore potential transactions that would allow the Debtors to

deleverage their capital structure and better position the Reorganized Debtors for long-term

success.

35.     The Debtors commenced negotiations with the existing Revolving Credit

Agreement Lenders on potential debtor-in-possession and exit financing as well as the

consensual use of cash collateral.  After arms' length and good faith negotiations, the Debtors

were able to secure a commitment from substantially all of their Revolving Credit Agreement

Lenders (in such capacity, the "**DIP Lenders**") to provide DIP Financing during the Chapter 11

Cases in the form of a $600 million revolving debtor-in-possession facility (the "**DIP Facility**")

pursuant to a debtor-in-possession credit agreement (the "**DIP Credit Agreement**"), including a

"roll up" of the Prepetition Revolver Obligations (including the Prepetition Swap Obligations ),

that will convert to an exit credit facility (the "**Exit Facility**") upon emergence from chapter 11

while maintaining a strong relationship with their existing lenders under the Revolving Credit

Facility.

   36. As a condition to the lending, the DIP Agent, on behalf of the DIP

Lenders, the Consenting Prepetition Swap Providers, and the Postpetition Swap Providers shall

receive the following security interests in and liens upon (the "**DIP Liens**") the following

property (collectively, the "**DIP Collateral**"):

  a. <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and post-petition property in which the Debtors have an interest, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is expressly permitted by Section 546(b) of the Bankruptcy Code (collectively, the "**Unencumbered Property**"), including without limitation, any and all unencumbered cash, hydrocarbons and other inventory generated or produced after the Petition Date, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, vehicles, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of the Debtors and the proceeds of all of the foregoing; *provided that*, the Unencumbered Property shall exclude the Avoidance Actions.

  b. <u>Liens Priming the Liens of the Prepetition Secured Parties</u>. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties (including the applicable Adequate Protection Liens granted to such Prepetition Secured Parties).

  c. <u>Liens Junior to Certain Existing Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-

perfected junior lien on, and security interest in, all tangible and intangible prepetition and post-petition property in which the Debtors have an interest (other than the property described in paragraph (b)), whether now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Non-Primed Liens**"), which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to the Non-Primed Liens.

37.    The Company's primary strategic consideration when considering a potential financing was the identification of a source of exit financing that would ensure a smooth transition out of chapter 11—a difficult proposition for many oil and gas companies in the current economic market.  Adding to that difficulty was the fact that the obligations owed to the Prepetition Secured Parties were secured by substantially all of the Debtors' real and personal property, such that either (a) the liens of the Prepetition Secured Parties would have to be primed to obtain postpetition financing, or (b) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Secured Parties. Additionally, because the lenders to the Revolving Credit Facility includes fourteen of the largest lenders in the oil and gas sector—including JPMorgan Chase Bank, N.A., Wells Fargo Bank, N.A., Barclays Bank plc, Bank of America, N.A., BMO Financing Harris, Inc., Capital One National Association, Royal Bank of Canada,  BNP Paribas, Goldman Sachs Bank USA, Credit Suisse AG, Cayman Islands Branch, among others—there were limited other financial institutions outside of the existing capital structure that the Debtors identified as financial institutions that could provide a debtor-in-possession financing facility that would convert into an exit facility upon emergence.

38.    The Company approached one lender experienced in distressed lending and DIP financings that it also believed could provide a competing reserve-based lending facility

upon emergence from chapter 11.  The Third Party Lender contacted—a money-centered bank active in the oil and gas sector—indicated that it was not interested in providing an exit facility and thus would not be interested in continuing discussions.

39. The material terms and conditions of the DIP Facility are summarized in paragraph 3 of this Motion.  The Debtors and the DIP Lenders have agreed upon the Budget (attached to the Interim Order as Exhibit 1), which projects cash flow for the next thirteen weeks. The DIP Loan Documents permit the Debtors to draw on the DIP Facility to make any disbursement specifically provided for in the Budget.

**Proposed Adequate Protection for Prepetition Secured Parties**

40. Pursuant to this Motion and the Interim and Final Orders, the Debtors intend to provide the Prepetition Secured Parties with adequate protection pursuant to sections 361, 363(c)(2), 363(e), and 364(d)(1) of the Bankruptcy Code.  The proposed treatment of the Prepetition Secured Parties grants them more than sufficient adequate protection to protect them from any diminution in value of their interests in the Prepetition Collateral.

41. Until the Roll-Up occurs, the Revolving Credit Agreement Secured Parties are entitled to adequate protection on account of their valid, perfected and enforceable interests in the Prepetition Collateral—including the Cash Collateral—in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral, including without limitation, for any such diminution resulting from the sale, lease or use by the Debtors of the Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Revolving Credit Agreement Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "**Revolving Credit Agreement Adequate Protection Obligations**"). As such, the Debtors propose to provide adequate protection to the Revolving Credit Agreement

01:18968084.1

Secured Parties by paying the reasonable fees and expenses of the Revolving Credit Agreement Secured Parties.  The obligation to pay such fees and expenses shall constitute an allowed superpriority administrative claim pursuant to section 507(b) of the Bankruptcy Code (the "**Revolving Credit Agreement 507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations.[7]

         42.     On account of their interests in the Prepetition Collateral, including the Cash Collateral, the Debtors propose to provide the Second Lien Secured Parties and the Third Lien Secured Parties with adequate protection in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Cash Collateral and any other Prepetition Collateral, the priming of the Second Lien Indenture Trustee's and the Third Lien Indenture Trustee's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "**Adequate Protection Obligations**").  The proposed adequate protection includes (a) the granting of the Adequate Protection Liens; (b) the payment to the Second Lien Indenture Trustee all accrued and unpaid interest (including interest accrued prior to the Petition Date) on the outstanding amounts under the Second Lien Notes that constitute Prepetition Second Lien Obligations; (c) the payment of reasonable fees and expenses of the Second Lien Indenture Trustee, the Third Lien Indenture Trustee, and the Ad Hoc Committee of

---

[7] In addition, because the Revolving Credit Facility is oversecured, the Debtors are required to pay the reasonable fees and expenses of the Revolving Credit Facility Lenders and the Revolving Credit Agreement Agent pursuant to section 506(b) of the Bankruptcy Code.

Third Lien Noteholders.  Further, all Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims granted in respect of the DIP Obligations and (iii) the Revolving Credit Agreement 507(b) Claims.

**The Debtors' Need to Use Cash Collateral and Prepetition Collateral**

43.    The orderly continuation of the Debtors' operations and the preservation of their going concern value are largely dependent upon their ability to convert Prepetition Collateral into Cash Collateral and use it to support the Debtors' business operations.  For example, Cash Collateral will be used to fund the Debtors' payments to vendors and employees, payments to their joint interest billing partners to maintain their working interests in oil and gas properties,  and to satisfy the other ordinary costs of operation, including rent, taxes, and insurance.  Absent authority to use Cash Collateral, even for a limited period of time, the continued operation of the Debtors' business would suffer, causing immediate and irreparable harm to the Debtors, their respective estates, and their creditors.  Accordingly, the use of Cash Collateral is critical to preserve and maintain the going concern value of the Debtors.

44.    The terms of the Prepetition Debt Documents give each of the Prepetition Secured Parties security interests in the Prepetition Collateral, including Cash Collateral.  The Revolving Credit Agreement Secured Parties, in accordance with the terms of the Prepetition Revolving Credit Agreement Documents, have consented to the Debtors' use of Cash Collateral, entry into the DIP Credit Agreement, and the proposed adequate protection as set forth herein.  Similarly, in accordance with the terms of the Restructuring Support Agreement and the Second

Lien Support Agreement, the Second Lien Lenders and the Third Lien Lenders have consented to the Debtors' use of the Cash Collateral.

45.     The terms and conditions of the Debtors' use of Cash Collateral and the DIP Facility are commercially reasonable.  As set forth in the PJT Declaration, such terms and conditions were negotiated extensively and at arm's length by well-represented, independent parties in good faith.  The Debtors have negotiated the best terms available to obtain the funding they need to maintain sufficient liquidity and preserve their assets over the course of their Chapter 11 Cases.  PJT determined that the terms governing the Debtors' use of Cash Collateral and the DIP Facility are consistent with the terms generally provided in other similar chapter 11 cases.  PJT has extensive experience in providing financial advisory and investment banking services to financially distressed companies and representing both debtors and lenders in the procurement and provision, respectively, of postpetition financing.

## **The Proposed Roll-Up**

46.     Pursuant to Local Rule 4001-2(a)(i), the Debtors are required to disclose that they are seeking approval of the payment of prepetition secured debt from the proceeds of postpetition secured debt—specifically that the proceeds of the DIP Facility approved on an interim basis are to be used to (i) refund, refinance, replace and repay in full the Prepetition Revolver Obligations and (ii) refund, refinance, replace and repay in full all outstanding letters of credit under the Revolving Credit Agreement (collectively, the "**Roll-Up**").  The Prepetition Swap Agreements held by the Consenting Prepetition Secured Swap Providers—all of whom are Revolving Credit Agreement Lenders and DIP Lenders—are subject to the Roll-Up as well.

47.     Importantly, and as further described in the PJT Declaration, the Prepetition Revolver Obligations are unquestionably oversecured, and indeed, the Debtors provided that the Prepetition Revolver Obligations would be paid in full pursuant to the Plan

(and as described in the Disclosure Statement).  As described above, the Debtors' Oil and Gas Properties have a risked reserve value of between $1,674 million and $1,843 million, and the Prepetition Secured Parties have properly perfected liens well in excess of 90% of those Oil and Gas Properties.  Further, the Debtors enter these cases with a positive balance currently estimated to be approximately $152.0 million on their Prepetition Swaps thanks to a successful hedging strategy.  In total, as described in the PJT Declaration, PJT estimates the full value of the enterprise to be between $1.6 billion and $1.8 billion, well in excess of the $450 million outstanding on the Revolving Credit Facility.

48. Approval of the Roll-Up within four Business Days of the Petition Date is a condition precedent to the DIP Credit Agreement (and thus the Debtors' ability to use Cash Collateral and obtain the Exit Facility), which provides significant benefits to the Debtors and their estates.  These benefits include (i) the agreement by Consenting Prepetition Secured Swap Providers to not terminate the Prepetition Swap Agreements (as they are otherwise permitted to do postpetition by section 560 of the Bankruptcy Code); (ii) the agreement by Consenting Prepetition Secured Swap Providers (all of whom are DIP Lenders) to permit the Debtors to enter into additional Swap Agreement postpetition; (iii) the waiver of provisions in the Revolving Credit Facility that could otherwise require the Debtors to pay interest at the default interest rate on account of the Prepetition Revolver Obligations during the course of these Chapter 11 Cases pursuant to section 506(b) of the Bankruptcy Code, and (iv) perhaps most significantly, the conversion of the DIP Facility into a reserve-based lending Exit Facility that will provide the Debtors' the needed liquidity to confirm the Plan and successfully exit these Chapter 11 Cases.  For these reasons, and as further discussed below, the Debtors assert that the

Roll-Up is justified in these limited circumstances and in the best interests of their creditors and estates.

**Basis for Relief Requested**

**A.    *DIP Facility Should be Authorized***

49.    Approval of the DIP Credit Agreement (which includes provisions permitting used of Cash Collateral) will provide the Debtors with immediate access to financing and allow them to pay current and ongoing operating expenses, including postpetition wages and salaries, and utility and vendor costs, and pay their joint interest billing partners, among other things, in all cases subject to the Budget.  Unless these expenditures are made, the Debtors may be forced to cease operations, which would result in irreparable harm to their businesses.  The credit provided under the DIP Facility will enable the Debtors to continue to satisfy the needs of their customers, pay their employees, and operate their businesses in the ordinary course, and in an orderly and reasonable manner, which will preserve and enhance the value of their estates for the benefit of all parties in interest.  Further, it will provide confidence to the Debtors' creditors and business partners that will enable and encourage them to continue their critical relationships with the Debtors.  Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtors' employees and customers.

50.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).  Section 364(d) of the Bankruptcy Code allows a debtor to

01:18968084.1

obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien,

provided that (a) the debtor is unable to obtain such credit otherwise, and (b) there is adequate

protection of the interest of the holder of the lien on the property of the estate on which such

senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).

       51.     Despite their efforts, the Debtors were unable to (a) procure sufficient

financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an

administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a

superpriority administrative expense claim pursuant to section 364(c)(1), or (iv) without granting

priming liens pursuant to section 364(d), or (b) obtain postpetition financing or other financial

accommodations from any alternative prospective lender or group of lenders on more favorable

terms and conditions than those for which approval is sought herein.  Given that substantially all

of the Debtors' assets are encumbered, no entity was willing to provide postpetition financing

other than the DIP Lenders.  Given the critical need for use of Cash Collateral and postpetition

financing, the Debtors determined that they could not obtain postpetition financing without

priming the Prepetition Secured Parties.

       52.     Having determined that financing is available only under sections 364(c)

and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Lenders

extensively and at arm's length.  Provided that a debtor's business judgment does not run afoul

of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor

considerable deference in acting in accordance therewith.  *See, e.g., Bray v. Shenandoah Fed.*

*Sav. & Loan Ass'*n (*In re Snowshoe Co.*), 789 F.2d 1085, 1089-90 (4th Cir. 1986); *In re Ames*

*Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the

court's discretion under section 364 is to be utilized on grounds that permit reasonable business

judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); see also *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985); *Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp.* (*In re Funding Sys. Asset Mgmt. Corp.*), 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

53.     Section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor's "evidence of a credit quest" adequately established that some degree of priming loan was necessary for the debtor to obtain funding).

54.     The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of their sound business judgment.  The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively and at arm's length.  Further, consummation of the DIP Facility is in the best interest of the Debtors' estates, their creditors, and all parties in interest in these chapter 11 cases and is consistent with the Debtors' exercise of their fiduciary duty.  Accordingly, the DIP Lenders and all obligations

incurred in connection with the DIP Facility should be afforded the benefits of section 364(e) of the Bankruptcy Code.

**B.**    ***Use of Cash Collateral Should be Authorized***

55.    A debtor's use of property of the estate, including cash collateral, is governed by Bankruptcy Code section 363.  Pursuant to section 363(c)(2), a debtor may use cash collateral if  "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363]." 11 U.S.C. § 363(c)(2).  Bankruptcy Code section 363(e) further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

56.    The Bankruptcy Code does not expressly define "adequate protection." Section 361 of the Bankruptcy Code, however, provides a non-exhaustive list of examples of adequate protection, including replacement liens and administrative priority claims.  *See* 11 U.S.C. § 361.  Generally, courts decide what constitutes adequate protection on a case-by-case basis.  *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (*citing* 2 Collier on

Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

57.    In *Swedeland*, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland*, 16 F.3d at 564; *see also Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988). The Third Circuit has held that adequacy, "depends directly on how effectively it compensates the secured creditor for loss of value" caused by the priming lien granted to the new lender. *In re Swedeland*, 16 F.3d at 564 (quoting *In re Am. Mariner Inds., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

58.    Consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Secured Parties with more than sufficient adequate protection to protect them from any diminution in value of their interests in the Prepetition Collateral during the pendency of these Chapter 11 Cases.

59.    The Debtors need access to the cash generated from their business activities in order to fund their ongoing operations. As described above and in the PJT Declaration, if the Debtors are prohibited from using their cash, the Debtors' ability to continue

01:18968084.1

as a going concern would be jeopardized.  The preservation of the Debtors' business as a going

concern in and of itself provides "adequate protection" for purposes of the Bankruptcy Code.

*See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that whether

the value of a debtor's property will increase as a result of the use of collateral is part of

considering whether a party is adequately protected).

      60.    Accordingly, the adequate protection provided for in the Interim Order is

fair and reasonable under the circumstances, satisfies the requirements of sections 363(c)(2) and

363(e) of the Bankruptcy Code, and is in the best interests of the Debtors, their estates, and all

parties in interest and should be approved.  Courts in this district have approved similar adequate

protection packages in recent chapter 11 cases.  *See, e.g.*, *In re Offshore Grp. Inv. Ltd.*, No. 15-

12422 (BLS) (Bankr. D. Del. Jan. 8, 2016) (Docket No. 158); *In re Samson Res. Corp.*, No. 15-

11934 (CSS) (Bankr. D. Del. Sept. 25, 2015) (Docket No. 111) (Interim Order); *In re*

*Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 1, 2015) (Docket No. 307); *In re*

*Entegra Power Grp. LLC*, No. 14-11859 (PJW) (Bankr. D. Del. Sept. 3, 2014) (Docket No. 106);

*In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 6, 2014) (Docket

No. 855).

## The Proposed Roll-Up Is Appropriate

      61.    Repayment of the Prepetition Revolver Obligations (including the letters

of credit issued thereunder and the Prepetition Swap Agreement Obligations) in accordance with

the Interim and Final Orders is necessary, as the Revolving Credit Agreement Secured Parties

have not otherwise consented to the use of Cash Collateral or the subordination of the Revolving

Credit Agreement Agent's liens on Prepetition Collateral to the DIP Liens.  Additionally, the

DIP Credit Parties are not willing to enter into the DIP Facility unless the Prepetition Revolver

Obligations are paid in full.

01:18968084.1

62.     Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender where, as here, the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully secured.  As the United States District Court for the District of Delaware recently observed:

> [P]repetition secured claims can be paid off through a "roll-up." Most simply, a [roll up] is the payment of a pre-petition debt with the proceeds of a post-petition loan.  Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. As a result, the entirety of the prepetition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. In both a refinancing and a rollup, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash.

*Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 2015 U.S. Dist. LEXIS 19684, 20-21 (D. Del. Feb. 9, 2015) (quoting *In re Capmark Fin. Group, Inc.*, 438 B.R. 471, 511 (Bankr. D. Del. 2010)).  *See also, e.g., In re UniTek Global Servs., Inc.*, Case No. 14-12471 (PJW) (Bankr. D. Del. Dec. 2, 2014), *In re Coldwater Creek Inc.*, Case No. 14-10867 (BLS) (Bankr. D. Del. June 12, 2014); *In re Quantum Foods, LLC*, Case No. 14-10318 (KJC) (Bankr. D. Del. Mar. 20, 2014); *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, Case No. 14-10193 (KG) (Bankr. D. Del. Feb. 4, 2014); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (CSS) (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011).

63.     Importantly, such payments will not prejudice the Debtors or their estates because the Debtors intend to pay such amounts in full, as described in their Plan and Disclosure Statement.  Further, payment of such amounts is subject to the rights of parties in interest under paragraphs 20 and 21 of the Interim Order to assert a Challenge and, if successful, unwind the

01:18968084.1

repayment of the Prepetition Revolver Obligations and obtain the repayment of such amounts idi

the repayment resulted in the payment of any portion of the Prepetition Secured Obligations

determined to be an unsecured claim or other amount not allowable under section 502 of the

Bankruptcy Code.

64.    The Bankruptcy Court for the District of Delaware recently approved a

roll-up of a prepetition asset-based lending facility pursuant to an interim order at the first-day

hearing where, as with the Roll-Up, the secured obligations being rolled up were oversecured,

and where the rolled-up debt was subject to challenge. *In re Pacific Sunwear of California, Inc.*,

Case No. 16-10882 (LSS) (Bankr. D. Del. April 7, 2016).  As Judge Silverstein stated in the

hearing considering the *PacSun* roll-up:

> Also, as noted in the colloquia of counsel, Wells Fargo has the first
> [lien] on all the current assets and they are, it has been represented
> to me, over-secured.  So in that event I don't see the harm in letting
> this [roll-up of prepetition obligations] go out on first day.  I do
> think, based on the declarations, that the Debtors have shown that
> they need the DIP financing. They have negotiated better terms in
> terms of availability and for additional borrowing, as well as a
> reduced availability block. The Debtors' judgment is that this
> package is a better one for them then continuing under the current
> ABL or any, perhaps, re-negotiated ABL.

*In re PacSun*, Hr'g Tr. 65:7-17 (April 8, 2016).

65.    The proposed Roll-Up in this case provides an even more compelling

argument for approval on a first-day basis.  Not only are the Revolving Credit Agreement

Secured Parties significantly oversecured and not only do the Debtors need access to the Cash

Collateral and DIP financing to continue ongoing operations, but as described above and in the

Herod Declaration, these Chapter 11 Cases are prepackaged, with the Debtors in possession of

the statutorily required votes from impaired creditor classes for approval of their Plan.  The Plan

and Disclosure Statement that were sent to all impaired parties entitled to vote—parties that have

approved the Plan by an overwhelming majority—included a description of the proposed

treatment of the Prepetition Revolver Obligations, which stated that holders of Class 3 Revolving

Credit Agreement Claims would be repaid in full in the amount of $450,000,000 on the Effective

Date of the Plan, "which amount shall be reduced by any portion of the Revolving Credit

Agreement Claims that are repaid or otherwise 'rolled up' into a DIP Financing…." *See*

*Disclosure Statement* § VI.C.3; Plan § 4.3(b).  As such, any parties that could be prejudiced by

the Roll-Up (though for the reasons described above, no such parties exist) have had notice of a

potential roll-up of the Prepetition Revolver Obligations for well over a month.

   66. Indeed, the Debtors would be irreparably harmed without the ability to

enter into the DIP Facility, including the Roll-Up, and virtually all of their creditor constituencies

would suffer.  As described above, these Chapter 11 Cases are remarkable in that they feature a

prepackaged reorganization of a publicly-held oil and gas exploration and production company,

that provides meaningful recoveries to all creditor constituencies, as well as equity.  The Plan is

supported by the overwhelming majority of all the groups, as evidenced by the Restructuring

Support Agreement and the Second Lien Support Agreement and the voting tabulations provided

to the Court.  Further, this reorganization features not only a fully-supported Plan, but includes a

fully-funded reserve-based revolving Exit Facility that includes excellent terms and ensures the

ability of the Debtors to successfully emerge from chapter 11.  Unusually, the Lender Swap

Parties have agreed, subject to the approval of this Court, to permit the Debtors to continue their

valuable Hedging Activities in chapter 11 and not terminate the Prepetition Swap Agreements, a

concession that improves the Debtors' ability to protect themselves in this difficult commodity

environment.  Further, the DIP Facility prevents the Debtors from having to incur unnecessary

interest expenses to the detriment of their creditors while being granted the ability to use their Cash Collateral.

67.     However, all of these concessions—the Exit Facility, the continued Hedging Activities, the reduction in interest costs, and the ability to use Cash Collateral—are fully subject to the approval of the DIP Facility, including the Roll-Up.  Without the DIP Facility, and these valuable concessions, these Chapter 11 Cases will instantly shift from a near-complete certainty to complete and total uncertainty.

68.     In light of the disclosure already provided to all impaired creditors as well as the Prepetition Secured Lenders pursuant to the Plan, Disclosure Statement or through prepetition negotiations regarding the Restructuring Support Agreement, the oversecured status of the Revolving Credit Agreement Secured Parties, the various benefits afforded by the Debtors' entry into the DIP Facility as described above, the Debtors submit that the Roll-Up is appropriate and should be approved pursuant to the Interim Order.

### The Proposed Interim Order Should Be Granted

69.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is authorized to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and (i) authorize the Debtors to use the Cash Collateral in order to (a) maintain and finance their ongoing operations and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (ii) schedule a Final Hearing on the relief requested herein.

01:18968084.1

70.    Absent authorization from the Court to use Cash Collateral on an interim basis pending a Final Hearing, the Debtors and their creditors will be immediately and irreparably harmed.  As set forth above, the Debtors' ability to use Cash Collateral on the terms described herein is critical to their ability to operate their business in the ordinary course. Accordingly, the Interim Order should be granted.

### The Scope of the Carve-Out Is Appropriate

71.    The Adequate Protection Liens are subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted.  *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of fees of the Clerk of the Bankruptcy Court or the Office of the United States Trustee for the District of Delaware and professional fees of the Debtors and a Committee (if any).

### The Automatic Stay Should Be Modified on a Limited Basis

72.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the replacement liens described above to the Prepetition Secured Parties, and to perform such acts as may be requested to assure the perfection and priority of such liens.  Stay modifications of this kind are ordinary and standard

features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Bankruptcy Rule 4001(a)(3) Should Be Waived

73.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides, "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  The use of Cash Collateral is essential to prevent irreparable damage to the Debtors' operations.  Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## Bankruptcy Rule 6003 Has Been Satisfied

74.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  The Debtors' estates would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

## Request for Bankruptcy Rule 6004 Waivers

75.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  The relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by

Bankruptcy Rule 6004(h), to the extent such stay applies.

## Reservation of Rights

76.     Nothing contained herein is intended or shall be construed as (i) an

admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any

party in interest's rights to dispute the amount of, basis for, or validity of any claim of any Utility

Company under applicable nonbankruptcy law; (iii) a waiver of any claims or causes of action

which may exist against any creditor or interest holder; or (iv) an assumption, adoption, or

rejection of any agreement, contract, or lease between the Debtors and any third party under

section 365 of the Bankruptcy Code.  The Debtors reserve all of their rights under the

Bankruptcy Code.

## Notice

77.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the District of Delaware (Attn: Natalie Cox, Esq. and Mark Kenney, Esq.);

(ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) Simpson

Thatcher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Elisha D. Graff,

Esq.), counsel to JPMorgan Chase Bank, N.A., as administrative agent under the Revolving

Credit Facility Agreement; (iv) Foley & Lardner LLP, 321 North Clark Street, Suite 2800,

Chicago, IL 60654 (Attn: Mark L. Prager, Esq.) and 90 Park Avenue, New York, NY 10016

(Attn: Richard J. Bernard, Esq.), counsel to the trustee for the Second Lien Notes; (v) Stroock &

Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 (Attn: Jayme T. Goldstein,

Esq.), counsel to the trustee for the Third Lien Notes; (vi) Arent Fox LLP, 1675 Broadway, New

York, NY 10019 (Attn: Andrew Silfen, Esq. and Leah M. Eisenberg, Esq.), counsel to the trustee

for the Unsecured Notes; (vii) Latham & Watkins LLP, 885 Third Avenue, New York, NY

10022 (Attn: Richard A. Levy, Esq. and J. Michael Chambers, Esq.), counsel to the Consenting

Third Lien Noteholders; (viii) O'Melveny & Myers LLP, 7 Times Square, New York, NY 10036

(Attn: John J. Rapisardi, Esq. and Joseph Zujkowski, Esq. ), counsel to the ad hoc group of

Second Lien Noteholders; (ix) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of

the Americas, New York, NY 10019 (Attn: Andrew N. Rosenberg, Esq. and Samuel E. Lovett,

Esq.), counsel to the Consenting Unsecured Noteholders; (x) Jones Day, 2727 North Harwood

Street, Dallas, TX 75201 (Attn: Gregory M. Gordon, Esq. and Dan Prieto, Esq.), counsel to the

Convertible Noteholder; (xi) the Securities and Exchange Commission; (xii) the Internal

Revenue Service; and (xiii) the United States Attorney's Office for the District of Delaware.

78.     Notice of this Motion and any order entered hereon will be served in

accordance with Local Rule 9013-1(m).  Based on the urgency of the circumstances surrounding

this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no

further notice is required.  No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

01:18968084.1

WHEREFORE the Debtors respectfully request entry of the Interim Order

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate

Dated: July 27, 2016
      Wilmington, Delaware

/s/ Jaime Luton Chapman
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Jaime Luton Chapman (No. 4936)
Patrick A. Jackson (No. 4976)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253

-and-

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer
Joseph H. Smolinsky
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

01:18968084.1

**<u>EXHIBIT A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                            :
In re                                       :        Chapter 11
                                            :
HALCÓN RESOURCES                            :        Case No. 16-11724 (__)
CORPORATION, et al.¹                        :
                                            :
         Debtors.                           :        Jointly Administered
                                            :
-----------------------------------------------------------x        Re: Docket No. ___
```

### INTERIM ORDER PURSUANT TO
### 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 364,
### AND 507 AND BANKRUPTCY RULES 2002, 4001 AND
### 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR
### SECURED, SUPERPRIORITY, POST-PETITION FINANCING,
### (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING
### LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE
### PROTECTION TO PREPETITION SECURED PARTIES AND (V) SCHEDULING
### A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)

Upon the motion, dated July 27, 2016 (the "**Motion**"),[2] of Halcón Resources

Corporation (the "**Company**" or "**DIP Borrower**") and certain of its subsidiaries and affiliates

as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter

11 cases (the "**Chapter 11 Cases**") commenced on July 27, 2016 (the "**Petition Date**") for

interim and final orders pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2),

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Halcón Resources Corporation (0684); Halcón Holdings, Inc. (5102); HK Resources, LLC (9194); The 7711 Corporation (4003); Halcón Gulf States, LLC (2976); Halcón Louisiana Operating, L.P. (9727); Halcón Field Services, LLC (0280); Halcón Energy Properties, Inc. (5292); Halcón Operating Co., Inc. (3588); Halcón Williston I, LLC (9550); Halcón Williston II, LLC (9676); Halcón Resources Operating, Inc. (4856); HRC Energy Louisiana, LLC (1433); HRC Energy Resources (WV), Inc. (2713); HRC Production Company (3501); Halcón Energy Holdings, LLC (0538); HRC Energy, LLC (5010); HK Energy, LLC (8956); HK Louisiana Operating, LLC (4549); HK Oil & Gas, LLC (0502); HK Energy Operating, LLC (8107); HRC Operating, LLC (5129).  The Debtors' mailing address is 1000 Louisiana Street, Suite 6700, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion or the DIP Credit Agreement, as applicable.

364(c)(3), 364(d)(1), 364(e), 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (this "**Court**") seeking:

(I)　　authorization for the DIP Borrower and the other Debtors to obtain a post-petition revolving credit facility in the aggregate principal amount of up to $600,000,000 (the "**DIP Facility**", all extensions of credit, including the issuance of letters of credit, under the DIP Facility, the "**DIP Loans**"), and to otherwise incur the DIP Obligations (as defined in paragraph 5(e) below) on the terms and conditions set forth in this interim order (this "**Order**") and the Senior Secured Debtor-in-Possession Revolving Credit Agreement (substantially in the form attached hereto as **Exhibit 2**, and as hereafter amended, supplemented or otherwise modified, the "**DIP Credit Agreement**", and together with the Commitment/Fee Letters (as defined in paragraph 6(e)(iii) below) and all other agreements, documents and instruments executed and delivered in connection with the DIP Credit Agreement, as hereafter amended, supplemented or otherwise modified, the "**DIP Documents**"), among the DIP Borrower, each subsidiary of the DIP Borrower that guarantees the DIP Obligations (as defined in paragraph 5(e) below) (collectively, the "**DIP Facility Guarantors**"), the lenders party thereto from time to time (collectively, together with Consenting Prepetition Secured Swap Providers (as defined below), the Postpetition Secured Swap Providers (as defined below), the Issuing Banks (as defined in the DIP Credit Agreement), the other Secured Parties (as defined in the DIP Credit Agreement), the "**DIP Lenders**"), JPMorgan Chase Bank, N.A. ("**JPMorgan**"), as administrative agent and collateral agent for the DIP Lenders (in such capacity, the "**DIP Agent**") and JPMorgan and

Wells Fargo Bank, National Association, each in their capacity as joint lead arranger (collectively, the "**DIP Arrangers**");

(II)     Authorization for the DIP Facility Guarantors to guarantee on a secured and joint and several basis the DIP Obligations;

(III)     authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(IV)     authorization for the Debtors to (a) use proceeds of the initial borrowing under the DIP Facility as required pursuant to the DIP Credit Agreement to refund, refinance, replace and repay in full the Revolving Credit Agreement Loans (as defined in paragraph 4(a) below) arising under the Senior Reserve-Based Revolving Credit Agreement, dated as of February 8, 2012 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Revolving Credit Agreement**", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified as of the Petition Date, the "**Revolving Credit Agreement Documents**"), among the Company in its capacity as borrower thereunder, the lenders party thereto from time to time (together with the other "Secured Parties" (as defined in the Revolving Credit Agreement Documents), the "**Revolving Credit Agreement Lenders**") and JPMorgan as administrative agent and collateral agent for the Revolving Credit Agreement Lenders (in such capacities, the "**Revolving Credit Agreement Agent**"), which refunding, refinancing and repayment may be effectuated by converting or rolling-over on a cashless basis Revolving Credit Agreement Loans into DIP Loans on a dollar for dollar basis and deeming them made

- 3 -

thereunder, (b) issue letters of credit under the DIP Facility and refund, refinance, replace and repay all outstanding letters of credit issued under the Revolving Credit Agreement and outstanding on the Petition Date (the "**Revolving Credit Agreement Letters of Credit**"), which refunding, refinancing, replacement and repayment may be effectuated by converting or rolling-over on a cashless basis the Revolving Credit Agreement Letters of Credit into letters of credit issued under the DIP Facility and deeming them issued thereunder, (c) provide superpriority administrative claims status and DIP Liens (as defined below) to secure any obligations under any Swap Agreement (as defined in the DIP Credit Agreement) that is entered into after the Petition Date (a "**Postpetition Swap Agreement**") and to which a Secured Swap Provider (as defined in the DIP Credit Agreement) is a counterparty (each such Secured Swap Provider described in this clause (c), a "**Postpetition Secured Swap Provider**") and (d) provide superpriority administrative claims status and DIP Liens (as defined below) to secure any obligations under any Swap Agreement (as defined in the DIP Credit Agreement) entered into prior to the Petition Date and to which a Secured Swap Provider (as defined in the DIP Credit Agreement) that has signed a consent agreement and waiver of its right to terminate any Prepetition Swap Agreement (a "**Prepetition Swap Waiver**"), subject to the terms and conditions of such waiver and consent, is a counterparty (each such Secured Swap Provider described in this clause (d), a "**Consenting Prepetition Secured Swap Provider**" and each such Swap Agreement described in this clause (d) and which is set forth on **Exhibit 3**, a "**Prepetition Swap Agreement**"), in each case of clause (c) and (d) subject to the same priorities and protections provided to the DIP Loans;

(V)    authorization for the Debtors to (a) use the cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**") pursuant to section 363 of the

Bankruptcy Code, subject to the Budget (as defined in the DIP Credit Agreement) a form of which is attached hereto as **Exhibit 1**, and which Budget shall be subject to the consent of the Requisite Third Lien Noteholders (as defined in the Restructuring Support Agreement), which consent shall not be unreasonably withheld, and all other Prepetition Collateral (as defined in paragraph 4(c) below), and (b) provide adequate protection to the following parties with respect to the applicable prepetition secured debt obligations of:

(a) the Revolving Credit Agreement Lenders under the Revolving Credit Agreement and the Revolving Credit Agreement Documents;

(b) the noteholders (collectively, the "**Second Lien Noteholders**") under (i) the Indenture, dated as of May 1, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Prepetition 2020 Second Lien Indenture**") and (ii) the Indenture, dated as of December 21, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Prepetition 2022 Second Lien Indenture**" and together with the Prepetition 2020 Second Lien Indenture, the "**Second Lien Note Indentures**", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified as of the Petition Date, the "**Second Lien Debt Documents**"; and the notes issued under the Second Lien Note Indentures, the "**Second Lien Notes**"), in each case among the Company as issuer thereunder, the subsidiaries party thereto and U.S. Bank National Association, as trustee for the Second Lien Noteholders (in such capacity, the "**Second Lien Indenture Trustee**"); and

(c) the noteholders (collectively, the "**Third Lien Noteholders**") under the Indenture, dated as of September 10, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Third Lien Note Indenture**", and together with all security, pledge and guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified as of the Petition Date, the "**Third Lien Debt Documents**"; the Third Lien Debt Documents, collectively with the Revolving Credit Agreement Documents and the Second Lien Debt Documents, the "**Prepetition Debt Documents**"), among the Company as issuer thereunder, the subsidiaries party thereto and Wilmington Savings Fund Society, as successor indenture trustee for the Third Lien Noteholders (in such capacity, the "**Third Lien Indenture Trustee**" and, together with the Second Lien Indenture Trustee and the Revolving Credit Agreement Agent, the "**Prepetition Agents**"; and the Prepetition Agents, collectively with the Third

Lien Noteholders, the Second Lien Noteholders and the Revolving Credit Agreement Lenders, the "**Prepetition Secured Parties**");

(VI)    authorization for the DIP Agent to exercise remedies under, and in accordance with, the DIP Documents upon the occurrence and during the continuance of a DIP Event of Default (as defined below);

(VII)    authorization for the Debtors to perform their obligations under, and pay the fees set forth in the Commitment/Fee Letters (as defined in paragraph 6(e)(iii) below) and the DIP Credit Agreement, including with respect to the proposed exit financing facility referenced in the Commitment/Fee Letters;

(VIII)    subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral (as defined in paragraph 8 below) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and the waiver by the Debtors of the equities of the case exception of section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral and DIP Collateral;

(IX)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of this Order (a) authorizing the DIP Borrower, on an interim basis, to access up to $500,000,000 of the aggregate principal amount of the DIP Facility (including through the issuance or deemed issuance of letters of credit), the collective proceeds of which shall be used for working capital and general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents, capital expenditures and any interest payments under the Second Lien Notes, as and to the extent set forth in this Order and in accordance with the Budget and the DIP Documents) and to refund, refinance, replace and repay in full the Revolving Credit Agreement Loans and the Revolving Credit Agreement Letters of Credit in an aggregate

principal or face amount of $450,000,000, as set forth in paragraph (IV) above, (b) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral and (c) granting adequate protection to the Prepetition Secured Parties;

(X)   to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "**Final Hearing**") for this Court to consider entry of a final order (the "**Final Order**") authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for the DIP Borrower to access the full remaining balance of the DIP Facility, for the Debtors to continue to use the Cash Collateral and the other Prepetition Collateral and for the Debtors to grant adequate protection to the Prepetition Secured Parties; and

(XI)   waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Order and providing for the immediate effectiveness of this Order.

The Interim Hearing having been held by this Court on [●], and upon the record made by the Debtors at the Interim Hearing, including without limitation, the admission into evidence of the *Declaration of Stephen W. Herod, of Halcón Resources Corporation*, *in Support of Chapter 11 Petitions and First Day Pleadings* and *Declaration of Timothy R. Coleman in Support of the Motion*, filed on the Petition Date, and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.   *Jurisdiction*. This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*. Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on (i) the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent; (iv) counsel to the Revolving Credit Agreement Agent; (v) counsel to the Second Lien Indenture Trustee and counsel for the ad hoc committee of Second Lien Noteholders; (vi) counsel to the Third Lien Indenture Trustee.; (vii) counsel to HALRES, LLC; (viii) the Securities and Exchange Commission; (ix) the Internal Revenue Service; (x) the United States Attorney's Office for the District of Delaware; and (xi) any other party entitled to notice pursuant to Local Rule 9013-1(m). Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), and no further notice of the relief sought at the Interim Hearing is necessary or required.

3.    *Approval of Motion*. The relief requested in the Motion is granted on an interim basis as set forth herein. Except as otherwise expressly provided in this Order, any objection to the entry of this Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

4.    *Debtors' Stipulations*. Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraphs 20 and 21), the Debtors, on behalf of themselves and their respective estates, admit, stipulate, and agree that:

(a)    as of the Petition Date, the Debtors party to or otherwise obligated under the Revolving Credit Agreement Documents were truly and justly indebted and liable on a joint and several basis to the Revolving Credit Agreement Lenders, without defense, objection, counterclaim or offset of any kind, in the aggregate principal amount of not less

than $449,195,800.00 in respect of loans (such loans, the "**Revolving Credit Agreement Loans**") and other extensions of credit made, and Revolving Credit Agreement Letters of Credit issued pursuant to, the Revolving Credit Agreement Documents, plus all accrued and unpaid interest thereon and any fees and expenses (including fees and expenses of attorneys and outside consultants) related thereto as provided in the Revolving Credit Agreement Documents, plus all other outstanding amounts (including, without limitation, any contingent or unliquidated indemnification or reimbursement obligations) that would constitute Secured Obligations under and as defined in the Revolving Credit Agreement (collectively, the "**Prepetition Revolver Obligations**");

(b)      as of the Petition Date, the Company was party to the Prepetition Swap Agreements, which obligations are guaranteed on a joint and several basis by each of the Guarantors (as defined in the Revolving Credit Agreement) and the obligations (including, without limitation, any contingent obligations and mark to market movements) of the Company and the Guarantors under and with respect to the Prepetition Swap Agreements (and each transaction thereunder) (such obligations, the "**Prepetition Swap Obligations**") constitute Prepetition Revolver Obligations secured by the Prepetition Collateral (as defined below).  The Company and Guarantors are truly and justly indebted and/or liable under the Prepetition Swap Agreements on the Prepetition Swap Obligations without objection, defense, counterclaim or offset of any kind.  The Prepetition Revolver Obligations constitute legal, valid, binding  and non-avoidable obligations against each of the Debtors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or

WEIL:\95784106\18\51351.0003

transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Revolving Credit Agreement Agent or Revolving Credit Agreement Lenders by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Revolving Credit Agreement Documents or Prepetition Swap Agreements is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;

(c)    the liens, security interests, and mortgages granted by the Debtors to the Revolving Credit Agreement Agent (for the ratable benefit of the Revolving Credit Agreement Lenders) to secure the Prepetition Revolver Obligations are (i) legal, valid, binding, perfected, enforceable, first priority (in each case, subject to permitted exceptions under the Revolving Credit Agreement) liens on and security interests in the Debtors' real or personal property constituting Collateral (as defined in the Revolving Credit Agreement Documents, and hereinafter referred to as the "**Prepetition Collateral**") to secure the Prepetition Revolver Obligations (including, without limitation, the Prepetition Swap Obligations) and (ii) not subject to avoidance, recharacterization, offset, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law or other challenge and (iii) after giving effect to this Order and subject to the Carve-Out (as defined below), subject and subordinate only to other valid and unavoidable liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to the extent such liens are permitted under the Revolving Credit Agreement Documents to be senior to the liens securing the Prepetition Revolver Obligations;

(d)        as of the Petition Date, the Debtors party to or otherwise obligated under the Second Lien Debt Documents were truly and justly indebted to the Second Lien Noteholders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $848,435,270.67 in respect of notes issued to the Second Lien Noteholders pursuant to the Second Lien Debt Documents, plus accrued and unpaid interest thereon and fees and expenses, if any (including fees and expenses of attorneys and advisors to the Second Lien Indenture Trustee), as provided in the Second Lien Debt Documents, plus all other amounts that would constitute Obligations under, and as defined in, the Second Lien Note Indentures (collectively, the "**Prepetition Second Lien Obligations**");

(e)        the liens and security interests granted to the Second Lien Indenture Trustee (for the ratable benefit of the Second Lien Noteholders) to secure the Prepetition Second Lien Obligations are (i) valid, binding, perfected, enforceable, second priority (in each case, subject to permitted exceptions under the Second Lien Note Indentures) liens on and security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination (except as set forth in the Intercreditor Agreement (as defined in paragraph 4(k) below)) pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) after giving effect to this Order, the Carve-Out and the liens and security interests granted to secure the DIP Loans and the Adequate Protection Obligations (as defined in paragraph 17 below), (B) prior to repayment in full of the Prepetition Revolver Obligations, liens securing the Prepetition Revolver Obligations and (C) other valid and unavoidable liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section

WEIL:\95784106\18\51351.0003

546(b) of the Bankruptcy Code to the extent such liens are senior to the liens securing the Prepetition Second Lien Obligations);

(f)        as of the Petition Date, the Debtors party to or otherwise obligated under the Third Lien Debt Documents were truly and justly indebted to the Third Lien Noteholders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $1,044,437,220.00 in respect of the notes issued to the Third Lien Noteholders pursuant to the Third Lien Debt Documents, plus accrued and unpaid interest thereon and fees and expenses (including fees and expenses of attorneys and advisors of the Third Lien Indenture Trustee) as provided in the Third Lien Debt Documents, plus all other outstanding amounts that would constitute Obligations under, and as defined in, the Third Lien Note Indenture (collectively, the "**Prepetition Third Lien Obligations**" and, together with the Prepetition Revolver Obligations and the Prepetition Second Lien Obligations, the "**Prepetition Obligations**"); *provided that*, in the event of a final determination that the Third Lien Noteholders are undersecured as of the Petition Date, payments received for accrued and unpaid interest pursuant to this paragraph 4(f), if any, may be recharacterized and applied as payments of principal.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Third Lien Indenture Trustee or the Third Lien Noteholders by or on behalf of any of the Debtors prior to the Petition Date under or in connection with the Third Lien Notes is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;

(g)      the liens and security interests granted to the Third Lien Indenture Trustee (for the ratable benefit of the Third Lien Noteholders) to secure the Prepetition Third Lien Obligations are (i) valid, binding, perfected, enforceable, third priority (in each case, subject to permitted exceptions under the Third Lien Note Indenture) liens on and security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination (except as set forth in the Intercreditor Agreement and as a result of the value of the Prepetition Collateral pursuant to section 506(a) of the Bankruptcy Code) pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) after giving effect to this Order, the Carve-Out and the liens and security interests granted to secure the DIP Loans and the Adequate Protection Obligations (as defined in paragraph 17 below), (B) (I) prior to repayment in full of the Prepetition Revolver Obligations, liens securing the Prepetition Revolver Obligations and (II) prior to repayment in full of the Prepetition Second Lien Obligations, liens securing the Prepetition Second Lien Obligations and (C) other valid and unavoidable liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code to the extent such liens are senior to the liens securing the Prepetition Third Lien Obligations) and are permitted by the Third Lien Documents;

(h)      none of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Documents, the Revolving Credit Agreement Documents, and/or the Prepetition Debt Documents;

(i)      (1) no portion of any of the Prepetition Obligations shall be subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, except with respect to subordination as set forth in the Intercreditor Agreement, and (2) the Debtors, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former, current and future DIP Agents, DIP Lenders (including, without limitation, any Secured Swap Provider (as such term is defined in the DIP Credit Agreement)) and Prepetition Secured Parties, affiliates of the DIP Agent and DIP Lenders and the Prepetition Secured Parties, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Agent, each DIP Lender and each Prepetition Secured Party and their respective affiliates (collectively, the "**Releasees**"), **solely in their capacity as DIP Agent, DIP Lenders, Secured Swap Providers, and Prepetition Secured Parties**, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, reasonable attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition Debt Documents, the

- 14 -

Prepetition Swap Agreements and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and/or the Prepetition Secured Parties, *provided, that*, the releases set forth in this section shall be limited to such claims arising prior to or including the date of the entry of this Order.  The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction of the payment of the Prepetition Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Order;

(j)     no portion of any of the Prepetition Obligations shall be subject to contest, attack, avoidance, impairment, disallowance, defense, counterclaim, recharacterization, reduction, recoupment, setoff, recovery or, except as set forth in the Intercreditor Agreement, subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(k)     The Prepetition Agents, together with the Debtors, are party to that certain Intercreditor Agreement, dated as of May 1, 2015 (as amended, supplemented or otherwise modified as of the Petition Date, the "**Intercreditor Agreement**"), that set forth the relative lien priorities and other rights and remedies of the Prepetition Secured Parties with respect to, among other things, the Prepetition Collateral; and pursuant to section 4.02 of that Intercreditor Agreement, the liens on the Prepetition Collateral held by the Second Lien Noteholders and the Third Lien Noteholders are subordinate to the DIP Liens and the

WEIL:\95784106\18\51351.0003

Adequate Protection Liens to the extent provided therein.

(l)    The aggregate value of the Prepetition Collateral securing the Prepetition Revolver Obligations substantially exceeds the aggregate amount of the Prepetition Revolver Obligations.

5.    *Findings Regarding the DIP Loans.*

(a)    Good cause has been shown for the entry of this Order.

(b)    The Debtors have an immediate need to enter into the DIP Facility, obtain the DIP Loans, avoid termination of their Prepetition Swap Obligations with Consenting Prepetition Secured Swap Providers, have the ability to enter into Secured Swap Agreements with Postpetition Secured Swap Providers and to use the Prepetition Collateral, including the Cash Collateral (as defined below), in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents, capital expenditures and any interest payments under the Second Lien Notes, as and to the extent set forth in this Order and in accordance with the Budget and the DIP Documents) and refund, refinance, replace and repay in full the Prepetition Revolver Obligations, a critical step to permit the Debtors to obtain this financing.  Repayment in full of the Prepetition Revolver Obligations with the initial proceeds of the DIP Loans is appropriate because (i) the aggregate value of the Prepetition Collateral securing the Prepetition Revolver Obligations substantially exceeds the aggregate amount of the Prepetition Revolver Obligations; (ii) it is a condition to closing under the DIP Credit Agreement that the initial proceeds of the DIP Loans be used to repay in full the Prepetition Revolver Obligations so that the Debtors'

- 16 -

assets that secure the Prepetition Revolver Obligations will be available to secure on a first lien basis the DIP Obligations (as defined in paragraph 5(e) below); (iii) the DIP Credit Agreement will convert into an exit financing facility subject to the terms set forth in the DIP Credit Agreement and in the agreement for the exit financing facility which is attached as an exhibit to the Commitment/Fee Letters which provides the Debtors assurance of sufficient capital after their emergence from bankruptcy protection; (iv) the refunding, refinancing, replacement and repayment of the Revolving Credit Agreement Loans with DIP Loans will make possible savings on account of interest that otherwise would or could accrue on the Revolving Credit Agreement Loans at the default rate applicable thereunder, but for such refunding, refinancing, replacement and repayment; (v) the Company will be permitted to continue hedging against commodity pricing and other risk; and (vi) the Plan (as defined below) has been approved in advance of the Petition Date by the requisite majority of each of the Debtors' impaired classes of creditors and the proposed treatment of the Prepetition Revolver Obligations was disclosed in the Debtors' disclosure statement that accompanied the Plan.  The inclusion of the Prepetition Swap Obligations as DIP Obligations hereunder is appropriate because the Consenting Prepetition Secured Swap Providers to the Prepetition Swap Agreements have agreed not to terminate the Prepetition Swap Agreements subject to such relief being granted, among other conditions, and such obligations are secured to the same extent as the other Prepetition Revolver Obligations.  In accordance with the terms of the Intercreditor Agreement, the DIP Facility and all DIP Obligations constitute "Priority Lien Obligations" as defined in, and for all purposes under, the Intercreditor Agreement.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the

WEIL:\95784106\18\51351.0003

DIP Documents and are unable to obtain adequate unsecured credit allowable under section 364(b) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting priming liens under section 364(d)(1) of the Bankruptcy Code and the Superpriority Claims (as defined in paragraph 7(a) below) and refund, refinance, replace and repay in full the Prepetition Revolver Obligations, in each case on the terms and conditions set forth in this Order and the DIP Documents.

(d)     The terms of the DIP Loans pursuant to the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents, the use of the Prepetition Collateral (including the Cash Collateral), and the grant of adequate protection hereunder have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, the DIP Arrangers, and the other Prepetition Secured Parties, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Documents, any Prepetition Swap Agreements with a Consenting Prepetition Secured Swap Provider, any Postpetition Swap Agreements with a Postpetition Secured Swap Provider or cash management agreements to which any Debtor and any DIP Lender are party, this Order and the DIP Loans (collectively, the "**DIP Obligations**") shall be deemed to have been extended by the DIP Agent and DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise. Any such reversal, modification, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder or any obligations previously incurred under a Prepetition Swap Agreement with a Consenting Prepetition Secured Swap Provider or a Postpetition Swap Agreement with a Postpetition Secured Swap Provider, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Lenders hereunder arising prior to the effective date of any such reversal, modification, or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the interim relief set forth in this Order, the Debtors' estates and their business operations will be immediately and irreparably harmed and the Debtors' proposed plan of reorganization [Docket No. [_]] (the "**Plan**"), which is the culmination of extensive negotiations among the Debtors and their creditors and has been approved by a statutory majority of all of their impaired classes of creditors, will be in jeopardy since there will be no committed financing for the Debtors' emergence from bankruptcy. The borrowing of the DIP Loans and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' chapter 11 estates.

6.     *Authorization of the DIP Loans and the DIP Documents*.

(a)     The Debtors are hereby authorized (i) to enter into and perform under the DIP Documents and, (ii) to borrow under the DIP Credit Agreement up to an aggregate

principal amount of $500,000,000 of the DIP Loans (including issuance of letters of credit or the deemed issuance of the Revolving Credit Agreement Letters of Credit as letters of credit issued under the DIP Facility), the proceeds of which shall be used for, subject to the terms of this Order, the DIP Documents and the Budget, working capital and other general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents, capital expenditures and any interest payments under the Second Lien Notes), including without limitation, to pay interest, fees and expenses in connection with the DIP Loans and the Adequate Protection Obligations (as defined in paragraph 17 below) and to refund, refinance, replace and repay in full the Revolving Credit Agreement Loans.

(b)     Upon the closing of the DIP Facility, all Revolving Credit Agreement Loans shall be deemed "Loans" made under, and as defined in, the DIP Credit Agreement and all Revolving Credit Agreement Letters of Credit shall be deemed "Letters of Credit" issued under, and as defined in, the DIP Credit Agreement.

(c)     Upon the closing of the DIP Facility, all Prepetition Swap Agreements (including, without limitation, the Prepetition Swap Obligations) with Consenting Prepetition Secured Swap Providers or Postpetition Swap Agreements are hereby deemed DIP Obligations.  The Debtors are hereby authorized to satisfy and perform all obligations under or in connection with Secured Swap Agreements that constitute DIP Obligations.

(d)     Upon the closing of the DIP Facility, the mortgages and deposit account control agreements that provide liens on and security interests in the real property and personal property assets of the Debtors, shall remain in full force and effect and shall be

effective to provide liens on and security interests in the DIP Collateral and shall constitute DIP Documents for all purposes hereunder.

(e)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and empowered to perform all acts and to execute and deliver all instruments and documents that the DIP Agent determines to be reasonably required or necessary for such Debtor's performance of its obligations under the applicable DIP Documents, including without limitation:

(i)    the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent and the required DIP Lenders may agree) and no further approval of this Court shall be required for any amendment, waiver, consent or other modification to and under the DIP Documents that does not materially and adversely affect the Debtors or which does not (A) shorten the scheduled maturity of the DIP Loans, (B) increase the principal amount of, or the rate of interest payable on, the DIP Loans, or (C) change any DIP Event of Default, add any covenants or amend the covenants therein, in any such case to be materially more restrictive; *provided*, *however*, that a copy of any such amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on counsel for the Prepetition Agents, counsel to the ad hoc committee of Second Lien Noteholders, and counsel to the statutory committee of unsecured creditors (the "**Committee**"), if any, appointed in the Chapter 11 Cases within three (3) Business Days of its effectiveness;

(iii)    the non-refundable payment to the DIP Agent, the DIP Arrangers and the DIP Lenders, as the case may be, of the commitment, underwriting, arranger and administrative agency fees set forth in the applicable DIP Documents as described in the Motion and/or referred to in one or more commitment and fee letters executed among the Debtors and the respective DIP Agent and/or DIP Arrangers (collectively, the "**Commitment/Fee Letters**"); and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(f)     Each Debtor is authorized and directed to perform its respective obligations under the applicable Commitment/Fee Letters, including in connection with the commitment by the DIP Arrangers to provide up to $600,000,000 of proposed exit financing facilities on the terms, and subject to the conditions, set forth in the applicable Commitment/Fee Letters and the DIP Documents.

(g)     Upon the execution thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents.  No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents, the Secured Swap Agreements with Consenting Prepetition Secured Swap Providers or Postpetition Secured Swap Providers or this Order shall be voidable, avoidable, restrained or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(h)     All borrowings under the DIP Facility and all use of Cash Collateral shall be in compliance with the Budget (as the same may be modified from time to time consistent with and subject to the terms of the DIP Credit Agreement and the terms hereof), and the Debtors shall not use any portion of the proceeds of the DIP Facility or any Cash Collateral, directly or indirectly, in excess of the amounts set forth in the Budget, except (and to the extent of) any variance permitted under the DIP Credit Agreement.  The Budget may be updated and amended from time to time in accordance with the DIP Credit Agreement, *provided that* (i) such updated or amended Budget shall be provided promptly to counsel for

the Prepetition Agents and any Committee, (ii) the Debtors shall consult with the Third Lien

Noteholders party to the Restructuring Support Agreement, dated as of June 9, 2016, in

advance regarding such update or amendment, and such update or amendment shall be

subject to the consent of the Requisite Third Lien Noteholders (as defined in the

Restructuring Support Agreement), which consent shall not be unreasonably withheld, and

(iii) and the Debtors shall be required always to comply with the Budget as set forth in DIP

Credit Agreement.

       7.     *Superpriority Claims.*

       (a)     Except to the extent expressly set forth in this Order in respect of the

Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations

shall constitute allowed senior administrative expense claims (the "**Superpriority Claims**")

against the Debtors on a joint and several basis (without the need to file a proof of claim or

request for payment) with priority over any and all administrative expenses, adequate

protection claims and all other claims against the Debtors, now existing or hereafter arising,

of any kind whatsoever, including without limitation, all administrative expenses of the kind

specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all

administrative expenses or other claims arising under sections 105, 326, 328, 330, 331,

503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not

such expenses or claims may become secured by a judgment lien or other non-consensual

lien, levy or attachment, which allowed claims shall be payable from and have recourse to all

pre- and post-petition property of each of the Debtors.   Other than the Carve-Out, no priority

claims are, or will be, senior to, prior to, or *pari passu* with the Superpriority Claims, or any

of the DIP Obligations, or with any other claims of the DIP Agent or the DIP Lenders arising

- 23 -

hereunder or under the other DIP Documents or under any Prepetition Swap Agreement or Postpetition Swap Agreement, or otherwise in connection with the DIP Facility.

(b)     For purposes hereof, the "**Carve-Out**" shall mean (i) fees owing to the United States Trustee incurred in connection with the Chapter 11 Cases, in an unlimited amount, (ii) professional fees, expenses, and disbursements incurred by professional persons employed by the Debtors or any Committee (including any fees and expenses of the members of any Committee) ("**Professional Fees and Expenses**") incurred on and after the Petition Date and before the occurrence of a Carve-Out Trigger Date (defined in this paragraph 7 below), in an unlimited amount and (c) Professional Fees and Expenses incurred after the occurrence of a Carve-Out Trigger Date, in an amount not to exceed $5,000,000 (the "**Post-Trigger Date Carve-Out**"). For the purposes hereof, a "**Carve-Out Trigger Date**" means the first business day after the DIP Agent provides a written notice to the DIP Borrower and its counsel that an Event of Default under (and as defined in) the DIP Credit Agreement (a "**DIP Event of Default**") (or an event which with the giving of notice would constitute a DIP Event of Default) has occurred.

(c)     Upon the occurrence of the Carve-Out Trigger Date, the DIP Borrower shall deposit into an interest-bearing escrow account at a financial institution acceptable to the DIP Agent (the "**Carve-Out Account**") an amount equal to the sum of (a) all fees and expenses required to be paid pursuant to clause 7(b)(i); (b) all billed and unpaid Professional Fees and Expenses (including outstanding holdbacks) incurred on or after the Petition Date and prior to the Carve-Out Trigger Date; (c) all unbilled Professionals Fees and Expenses incurred on or after the Petition Date and prior to the Carve-Out Trigger Date and (d) $5,000,000. The failure of the Carve-Out Account to satisfy in full the amount set forth in the

- 24 -

Carve-Out shall not affect the priority of the Carve-Out.  To the extent funded from the DIP Facility, the Carve-Out shall be added to and made part of the DIP Facility. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for Professional Fees and Expenses that are paid and the Carve-Out Account shall not be replenished for any such amounts so paid.

(d)    The DIP Agent and the DIP Lenders shall retain automatically perfected and continuing first priority security interests in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefiting from the Carve-Out (the "**Residual Carve-Out Amount**"). Subject to the terms of the Intercreditor Agreement, (i) the Second Lien Indenture Trustee and Second Lien Noteholders shall retain automatically perfected and continuing second priority security interests and (ii) the Third Lien Indenture Trustee and Third Lien Noteholders shall retain automatically perfected and continuing third priority security interests in the Residual Carve-Out Amount. Promptly (but in no event later than five (5) Business Days) following the satisfaction in full of all obligations benefiting from the Carve-Out, the DIP Borrower shall deliver the Residual Carve-Out Amount, if any, to the DIP Agent.

8.    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests in and liens and mortgages upon all property identified in clauses (a), (b) and (c) below (collectively, the "**DIP Collateral**") are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders, subject only to

the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and

for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "**DIP**

**Liens**"):

        (a) <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of

the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

lien on, and security interest in, all tangible and intangible prepetition and post-petition

property in which the Debtors have an interest, whether existing on or as of the Petition Date

or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable

liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after

the Petition Date to the extent such postpetition perfection is expressly permitted by section

546(b) of the Bankruptcy Code (collectively, the "**Unencumbered Property**"), including

without limitation, any and all unencumbered cash, hydrocarbons and other inventory

generated or produced after the Petition Date, accounts receivable, inventory, general

intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds,

fixtures, machinery, equipment, vehicles, deposit accounts, patents, copyrights, trademarks,

tradenames, rights under license agreements and other intellectual property, capital stock of

the subsidiaries of the Debtors and the proceeds of all of the foregoing; *provided that* the

Unencumbered Property shall exclude any of the Debtors' claims and causes of action arising

under chapter 5 of the Bankruptcy Code  (collectively, the "**Avoidance Actions**").

        (b) <u>Liens Junior to Certain Existing Liens</u>.  Pursuant to section 364(c)(3) of

the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien

on, and security interest in, all tangible and intangible prepetition and post-petition property

in which the Debtors have an interest (other than the property described in paragraph 8(b), as

to which the DIP Liens will be as described in such clause), whether now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Non-Primed Liens**"), which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to the Non-Primed Liens.

(c) Liens Priming the Liens of the Prepetition Secured Parties.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties (including the applicable Adequate Protection Liens granted to such Prepetition Secured Parties).

(d) Liens Senior to Certain Other Liens. Other than Excepted Liens (as defined in the DIP Credit Agreement) incurred after the Petition Date, no claim or lien, security interest or mortgage having a priority senior to or *pari passu* with those granted by this Order to the DIP Agent and the DIP Lenders other than the Carve-Out shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the DIP Liens shall not be (i) subject or subordinate to (A) any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens, security interests or mortgages arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien, security interest or

mortgage under sections 363 or 364 of the Bankruptcy Code or otherwise. The DIP Liens and Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such Chapter 11 Cases or proceedings, "**Successor Cases**"), and/or upon the dismissal of any of the Chapter 11 Cases. The DIP Liens and the Adequate Protection Liens shall not be subject to section 510 of the Bankruptcy Code (other than as set forth in the Intercreditor Agreement), to the "equities of the case" exception of section 552 of the Bankruptcy Code, or to section 506(c) of the Bankruptcy Code, or sections 549, 550 or 551 of the Bankruptcy Code.

(e)    However, notwithstanding any provision in this Order to the contrary, in no event shall any enclosed structure (having two walls and a roof) or manufactured mobile home (both a "**Building**") be included in the definition of DIP Collateral, in each case until such time as the DIP Agent notifies the applicable Debtors that such property shall be included in the definition of DIP Collateral, upon the DIP Agent's determination and DIP Lenders' determination that all applicable Flood Insurance Regulation requirements have been satisfied. Upon such notice by the DIP Agent and the DIP Lenders, any and all Buildings shall automatically be included in the definition of DIP Collateral, and shall be encumbered pursuant to this Order without any further action by any party. As used herein, "Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.*), as the same may be

amended or recodified from time to time and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

9.      *Remedies after Event of Default.*

(a)      <u>DIP Event of Default</u>.  The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (a) immediately upon the occurrence and during the continuance of a DIP Event of Default, all rights and remedies under the applicable DIP Documents, other than those rights and remedies against the applicable DIP Collateral as provided in clause (b) below, and (b) upon the occurrence and during the continuance of a DIP Event of Default, and the giving of five (5) Business Days' prior written notice to the Debtors (with a copy to counsel to the Debtors, counsel to the Prepetition Agents and counsel to any Committee), all rights and remedies against the DIP Collateral provided for in the applicable DIP Documents and this Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender); *provided that*, during the foregoing five (5) Business Day period, the only issue that may be raised by any party in opposition to the exercise of rights and remedies shall be whether a DIP Event of Default has in fact occurred and is continuing, and other than as set forth in the prior clause of this proviso, the Debtors hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Documents or this Order. In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition

- 29 -

Collateral.  Neither the DIP Agent's nor any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall constitute a waiver of such DIP Agent's or any DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Credit Agreement.  For the avoidance of doubt, nothing in this Paragraph 9(a) shall limit or impair the rights of a Consenting Prepetition Secured Swap Provider or a Postpetition Secured Swap Provider to terminate, liquidate or accelerate any Secured Swap Agreement in accordance with the terms thereof or to exercise and rights of netting, offset or other remedies thereunder, including without limitation, the right to offset obligations under any Secured Swap Agreement against any other DIP Obligations or Prepetition Revolver Obligations, as applicable, upon the occurrence of an "Event of Default" or "Termination Event" (as defined in the Secured Swap Agreement), *provided*, *that*, for the further avoidance of doubt, any exercise of remedies following a DIP Event of Default to liquidate or foreclose on DIP Collateral shall be subject to the five (5) Business Day notice period described in this paragraph 9(a).

(b)      Cash Collateral Event of Default.  Subject to the provisions set forth in section 4.02 of the Intercreditor Agreement restricting the Second Lien Indenture Trustee, the Second Lien Noteholders, the Third Lien Indenture Trustee, and the Third Lien Noteholders, upon the occurrence and during the continuance of a Cash Collateral Event of Default (as defined below), and the giving of five (5) Business Days' prior written notice to the Debtors by the DIP Agent or any of the Prepetition Agents (with a copy to counsel to the U.S. Trustee, Debtors, counsel to the other Prepetition Agents, counsel to the ad hoc committee of Second Lien Noteholders, and counsel to any Committee), the Debtors' right to use

- 30 -

Prepetition Collateral (including Cash Collateral) shall terminate, subject to the Debtors' rights to seek an emergency hearing on whether a Cash Collateral Event of Default has in fact occurred and is continuing.   The occurrence of any of the following events shall constitute a "**Cash Collateral Event of Default**":

(i)     any Debtor shall have asserted, in a pleading filed with the Court (or another court of competent jurisdiction), a claim or challenge against any of the Prepetition Secured Parties in any way contrary to or inconsistent with any of the Debtors' acknowledgements, stipulations, and releases contained herein;

(ii)    any of the Debtors shall have failed to comply with any other term hereof and the same is not remedied within five (5) days' receipt of written notice of such non-compliance by any of the Prepetition Agents;

(iii)   any of the Debtors shall have filed a motion seeking to incur any postpetition financing or create any postpetition liens or security interests other than those granted or permitted pursuant hereto;

(iv)    if any of the Debtors seeks, or if there is entered, any modification of this Order that adversely affects any lien, claim, right, or other protection (including without limitation Adequate Protection) granted to or for the benefit of any Prepetition Agent or Prepetition Secured Party without the prior written consent of such Prepetition Agent or Prepetition Secured Party, and no such consent shall be implied by any other action, inaction, or acquiescence by any Prepetition Agents or Prepetition Secured Party;

(v)     if the Final Order shall not have been entered on or before sixty (60) days following the entry of this Order; or

(vi)    the entry of an order (x) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (y) appointing a chapter 11 trustee in the Chapter 11 Cases, or (z) appointing an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code).

10.     *Limitation on Charging Expenses against Collateral.*   Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case

- 31 -

may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Agents, as applicable, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.

11.    *Limitations under Section 552(b) of the Bankruptcy Code*. The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and effective upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Collateral or any of the DIP Collateral or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral.

12.    *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or (except as provided in paragraph 20 of this Order) to the Prepetition Secured Parties pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

13. *Prepetition Revolver Obligations.*

(a)    Subject to the provisions of this paragraph 13, the Prepetition Revolver Obligations shall be refunded, refinanced, replaced and paid in full (including all amounts that would constitute "Secured Obligations" under and as defined in the Revolving Credit Agreement) by the Debtors from the proceeds of the initial borrowing of the DIP Loans and, upon such payment, the commitments of all Revolving Credit Agreement Lenders under the Revolving Credit Agreement shall be terminated. Upon such refunding, refinancing, replacement and repayment in full of the Prepetition Revolver Obligations, all security

- 32 -

interests in, and liens on, Prepetition Collateral granted to secure the Prepetition Revolver Obligations shall be immediately, and without the necessity of further action, deemed to be included among the DIP Liens granted pursuant to this Order to secure the DIP Obligations. Upon the closing of the DIP Facility, (x) the Revolving Credit Agreement Letters of Credit shall be deemed issued and outstanding under the DIP Facility, and neither the Revolving Credit Agreement Agent nor any Revolving Credit Agreement Lender shall have any further obligations or liabilities with respect to such Revolving Credit Agreement Letters of Credit to either the Debtors or the beneficiaries thereof and (y) the Prepetition Swap Obligations with Consenting Prepetition Secured Swap Providers shall constitute DIP Obligations for all purposes hereunder, including for purposes of receiving the benefit of the DIP Collateral and Superpriority Claims subject to the terms of the DIP Credit Agreement.

(b)      *Adequate Protection for the Revolving Credit Agreement Agent and Revolving Credit Agreement Lenders*.    Until such time as the Prepetition Revolver Obligations shall be refunded, refinanced, replaced and paid in full by the Debtors, and the Prepetition Swap Agreements and the Prepetition Swap Obligations with Consenting Prepetition Secured Swap Providers become DIP Obligations, the Revolving Credit Agreement Agent and the Revolving Credit Agreement Lenders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their valid, perfected and enforceable interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral, including without limitation, for any such diminution resulting from the sale, lease or use by the Debtors of the Cash Collateral and any other Prepetition Collateral, the priming of the Revolving Credit Agreement Agent's liens on the Prepetition

Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "**Prepetition First Lien Adequate Protection Obligations**").  As adequate protection for the Prepetition First Lien Adequate Protection Obligations, until such time as the Prepetition Revolver Obligations shall be refunded, refinanced, replaced and paid in full by the Debtors and the Prepetition Swap Agreements, including without limitation, the Prepetition Swap Obligations, with Consenting Prepetition Secured Swap Providers become DIP Obligations, the Debtors shall pay all reasonable fees and expenses of (i) the Revolving Credit Agreement Agent, Revolving Credit Agreement Lenders, and the Consenting Prepetition Secured Swap Providers payable under section 12.03 of the Revolving Credit Agreement (including, without limitation, reasonable fees and disbursements of counsel and financial advisors to the Revolving Credit Agreement Agent) and incurred in connection with (A) the enforcement by the Revolving Credit Agreement Agent, Revolving Credit Agreement Lenders, and the Consenting Prepetition Secured Swap Providers of the rights, benefits and privileges granted in this Order or the Final Order in favor of the Revolving Credit Agreement Agent, Revolving Credit Agreement Lenders, and Consenting Prepetition Secured Swap Providers and (B) any discovery or litigation in connection with any pending or threatened "Claims and Defenses" (as defined in paragraph 20 below) which shall have been raised or asserted against the Revolving Credit Agreement Lenders, Revolving Credit Agreement Agent, Consenting Prepetition Secured Swap Providers, or the Prepetition Revolver Obligations, until the resolution thereof by a final, non-appealable order.  None of the fees and expenses payable pursuant to this paragraph 13(b) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness as such standard is used in

section 506(b) of the Bankruptcy Code, of such fees and expenses within ten (10) Business Days of the receipt of an invoice detailing such fees and expenses, and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Promptly following the completion of the ten (10) Business Day objection period, if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph 13(b) in the Court, the Debtors shall pay the fees and expenses provided for in this paragraph 13(b). The Debtors' obligation to pay such fees and expenses shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**First Lien 507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations.

(c)    *Payment of Fees and Expenses for the Revolving Credit Agreement Agent and Revolving Credit Agreement Lenders Pursuant to Section 506(b) of the Bankruptcy Code*.    Subject to the provisions of paragraph 20, upon the refunding, refinancing, replacement and repayment in full by the Debtors of the Prepetition Revolver Obligations, the Debtors shall pay all reasonable fees and expenses of the Revolving Credit Agreement Agent and Revolving Credit Agreement Lenders payable under Section 12.03 of the Revolving Credit Agreement (including, without limitation, reasonable fees and disbursements of counsel and financial advisors to the Revolving Credit Agreement Agent) incurred in connection with (A) the Final Hearing, (B) the enforcement by the Revolving

Credit Agreement Agent and Revolving Credit Agreement Lenders of the rights, benefits and privileges granted in this Order or the Final Order in favor of the Revolving Credit Agreement Agent and Revolving Credit Agreement Lenders and (C) any discovery or litigation in connection with any pending or threatened "Claims and Defenses" (as defined in paragraph 20 below) which shall have been raised or asserted against the Revolving Credit Agreement Lenders, Revolving Credit Agreement Agent or the Prepetition Revolver Obligations, until the resolution thereof by a final, non-appealable order in accordance with section 506(b) of the Bankruptcy Code.  None of the fees and expenses payable pursuant to this paragraph 13(a) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses within ten (10) Business Days of the receipt of an invoice detailing such fees and expenses, and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Promptly following the completion of the ten (10) Business Day objection period, if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph 13(c) in the Court, the Debtors shall pay the fees and expenses provided for in this paragraph 13(a).

(d)     Nothing in this Order or the DIP Documents shall prejudice the rights, remedies and privileges of the Revolving Credit Agreement Agent, the Secured Swap Parties, and the Revolving Credit Agreement Lenders granted in the Bankruptcy Code or as set forth in the Revolving Credit Agreement Documents to the extent the Prepetition Revolver Obligations are not refunded, refinanced, replaced or repaid as contemplated by the DIP

- 36 -

Credit Agreement or, after repayment, are required to be disgorged or otherwise avoided or reinstated, and all of the Revolving Credit Agreement Agent's, Revolving Credit Agreement Lenders', and Secured Swap Parties' rights and remedies under the Bankruptcy Code and the Revolving Credit Agreement Documents (including the Intercreditor Agreement) are hereby fully preserved, including their right to seek additional or further adequate protection.

14.    *Cash Collateral*. Substantially all of the Debtors' cash as of the Petition Date, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any account or accounts with any Prepetition Secured Party and any cash proceeds of the disposition of any Prepetition Collateral, constitute proceeds of the Prepetition Collateral and, therefore, are Cash Collateral of the Prepetition Secured Parties (subject in all cases to the Intercreditor Agreement), within the meaning of section 363(a) of the Bankruptcy Code.

15.    *Use of Prepetition Collateral (Including Cash Collateral).* The Debtors are hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date (as defined below) for working capital and general corporate purposes (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents, capital expenditures and any interest payments under the Second Lien Notes, as and to the extent set forth in this Order and in accordance with the Budget and the DIP Documents) in accordance with the terms and conditions of this Order and subject to compliance with the Budget; *provided that*, (a) the Prepetition Secured Parties are granted adequate protection as set forth herein and (b) except on the terms of this Order, the Debtors are not authorized to use the Cash Collateral.  As used herein, "**Termination Date**" means the earlier to occur of (a) the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Facility and (b) the acceleration of any DIP Loans and the termination of any

- 37 -

Commitments (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement.

16.     *Adequate Protection for the Second Lien Indenture Trustee and Second Lien Noteholders.* The Second Lien Indenture Trustee and the Second Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their valid, perfected and enforceable interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Second Lien Indenture Trustee's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "**Second Lien Adequate Protection Obligations**"). As adequate protection, the Second Lien Indenture Trustee and the Second Lien Noteholders are hereby granted the following:

(a)     Second Lien Adequate Protection Liens. As security for the payment of the Second Lien Adequate Protection Obligations, the Second Lien Indenture Trustee (for itself and for the benefit of the Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "**Second Lien Adequate Protection Liens**"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens, and subject further to the Intercreditor Agreement, *provided that*, such Second Lien Adequate Protection Liens on Unencumbered Property shall automatically and without further order of this Court be deemed to be released on the Effective Date (as such term is defined in the Plan).

(b)     Second Lien 507(b) Claims. The Second Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**Second Lien 507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority

Claims granted in respect of the DIP Obligations, and (iii) the First Lien 507(b) Claims; such subordination referenced in (iii) only to the extent set forth in the applicable Intercreditor Agreement. The Second Lien Indenture Trustee and the Second Lien Noteholders shall not receive or retain any payments, property or other amounts in respect of the Second Lien 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Carve-Out amount is funded. The order of priority of all 507(b) Claims shall be governed by the Intercreditor Agreement. In addition to, and notwithstanding anything to the contrary contained in this Order, any Second Lien Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in the Chapter 11 Cases in the manner set forth in such plan if holders of more than 66 2/3% (by amount) of the Second Lien Adequate Protection Obligations consent to such treatment.

(c)    Interest, Fees and Expenses. The Debtors are authorized and directed to pay, as adequate protection, to the Second Lien Indenture Trustee all accrued and unpaid interest (including interest accrued prior to the Petition Date) on the outstanding amounts under the Second Lien Notes constituting Prepetition Second Lien Obligations at the applicable non-default rate set forth in the Second Lien Debt Documents, and to pay all other accrued and unpaid fees and disbursements owing to the Second Lien Indenture Trustee under the Second Lien Debt Documents, as and when such interest, fees and disbursements become due and payable (but for the commencement of the Chapter 11 Cases) in accordance with the terms of the Second Lien Debt Documents, in each case subject to section 506(b) of the Bankruptcy Code. As additional adequate protection to the Second Lien Indenture Trustee and the Second Lien Noteholders, the Debtors shall pay, subject to the standard set forth in section 506(b) of the Bankruptcy Code, to the Second Lien Indenture Trustee all reasonable fees and expenses of counsel payable to the Second Lien Indenture Trustee under the Second Lien Note Indentures. None of the fees and expenses payable pursuant to this paragraph 16(c) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses within ten (10) Business Days of the receipt of an invoice detailing such fees and expenses, and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. Promptly following the completion of the ten (10) Business Day objection period, if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph 16(c) in the Court, the Debtors shall pay the professional fees and expenses provided for in this paragraph 16(c) promptly after receipt of monthly invoices therefor, and the Second Lien Indenture Trustee shall promptly provide copies of such invoices (redacted to protect privileges) to the counsel to the Committee and to the U.S. Trustee.

17.    *Adequate Protection for the Third Lien Indenture Trustee and Third Lien Noteholders.* The Third Lien Indenture Trustee and the Third Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection

of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal

to the aggregate diminution in value of their valid, perfected and enforceable interests in the

Prepetition Collateral, including without limitation, any such diminution resulting from the sale,

lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other

Prepetition Collateral, the priming of the Third Lien Indenture Trustee's liens on the Prepetition

Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of

the Bankruptcy Code (such diminution in value, the "**Third Lien Adequate Protection**

**Obligations**" and collectively, together with the First Lien Adequate Protection Obligations and

the Second Lien Adequate Protection Obligations, the "**Adequate Protection Obligations**"). As

adequate protection, the Third Lien Indenture Trustee and the Third Lien Noteholders are hereby

granted the following:

(a)    Third Lien Adequate Protection Liens. As security for the payment of the Third Lien Adequate Protection Obligations, the Third Lien Indenture Trustee (for itself and for the benefit of the Third Lien Noteholders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "**Third Lien Adequate Protection Liens**" and, together with the Second Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the Second Lien Adequate Protection Liens, (iv) the Non-Primed Liens, and subject further to the Intercreditor Agreement, *provided that*, such Third Lien Adequate Protection Liens on Unencumbered Property shall automatically and without further order of this Court be deemed to be released on the Effective Date (as such term is defined in the Plan).

(b)    Third Lien 507(b) Claims. The Third Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**Third Lien 507(b) Claims**", together with the First Lien 507(b) Claims and the Second Lien 507(b) Claims, the "**507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims granted in respect of the DIP Obligations, (iii) the First Lien 507(b) Claims and (iv) the Second Lien 507(b) Claims; such subordination referenced in (iii) and (iv) only to the extent set forth in the applicable Intercreditor Agreement. The Third Lien

Indenture Trustee and the Third Lien Noteholders shall not receive or retain any payments, property or other amounts in respect of the Third Lien 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Carve-Out amount is funded. The order of priority of all 507(b) Claims shall be governed by the Intercreditor Agreement.  In addition to, and notwithstanding anything to the contrary contained in this Order, any Third Lien Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in the Chapter 11 Cases in the manner set forth in such plan if holders of more than 66 2/3% (by amount) of the Third Lien Adequate Protection Obligations consent to such treatment.

(c)    Fees and Expenses. As additional adequate protection, the Debtors shall also pay all reasonable fees and expenses of advisors to (i) the Third Lien Indenture Trustee, including Stroock & Stroock & Lavan LLP and local counsel, and (ii) the ad hoc committee of Third Lien Noteholders, including Latham & Watkins LLP, local counsel and Houlihan Lokey Capital, Inc.   None of the fees and expenses payable pursuant to this paragraph 17(c) shall be subject to separate approval by this Court (but the U.S. Trustee, the Debtors and the Committee may object to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses within ten (10) Business Days of the receipt of an invoice detailing such fees and expenses (redacted to protect privileges), and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Promptly following the completion of the ten (10) Business Days objection period if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph 17(c) in the Court, the Debtors shall pay the reasonable professional fees and expenses provided for in this paragraph 17(c).

18.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    The DIP Agent and each of the Prepetition Agents, as applicable, are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens or the applicable Adequate Protection Liens granted to them hereunder, in each case, subject to the terms of the DIP Documents. Whether or not the DIP Agent or any of the Prepetition Agents, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens and the

applicable Adequate Protection Liens, such DIP Liens and such Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or, other than as set forth in the Intercreditor Agreement, subordination as of the date of entry of this Order.

(b)    A certified copy of this Order may, in the discretion of the applicable DIP Agent or Prepetition Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)    The Debtors shall execute and deliver to the DIP Agent or the applicable Prepetition Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the applicable DIP Agent or Prepetition Agent, as the case may be, may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the applicable Adequate Protection Liens.

(d)    Subject to entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, and any such provision shall have no force and effect with respect to the granting of the DIP Liens or the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment

and/or sale thereof by any Debtor in favor of the DIP Lenders or Prepetition Secured Parties in accordance with the terms of the DIP Documents or this Order.

19.    *Preservation of Rights Granted Under the Order*.

(a)    Other than the DIP Liens, the Superpriority Claims, any Excepted Liens (as defined in the Revolving Credit Agreement) and Permitted Liens (as defined in the Second Lien Note Indentures or the Third Lien Note Indenture) under the Prepetition Debt Documents, and subject to the terms of the Intercreditor Agreement, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the Prepetition Agents shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or, except as set forth in the Intercreditor Agreement, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute a DIP Event of Default under the DIP Credit Agreements and a termination of the right to use the Cash Collateral (i) if any of the Debtors seeks, or if there is entered, any modification of this Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent or (ii) an order is entered converting or dismissing any of the Chapter 11 Cases.

(c)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection

Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders or to the Prepetition Secured Parties, as the case may be, prior to the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order, the DIP Documents (with respect to all DIP Obligations), the Adequate Protection Obligations and uses of the Cash Collateral.

(d)      Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases, or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in the Chapter 11 Cases, in any Successor Cases, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Adequate Protection Obligations, the Superpriority Claims,

WEIL:\95784106\18\51351.0003

the 507(b) Claims, and the other administrative claims granted pursuant to this Order, and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by this Order and the DIP Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash and all Adequate Protection Obligations are indefeasibly paid in full in cash or otherwise satisfied in accordance with paragraph 13(b), 16(b), or 17(b) as applicable.

20. *Effect of Stipulations on Third Parties.*

(a) The stipulations and admissions contained in this Order, including without limitation, in paragraphs 4 and 14 of this Order, shall be binding upon the Debtors under all circumstances. The stipulations and admissions contained in this Order, including without limitation, in paragraphs 4 and 14 of this Order, shall be binding upon all parties in interest unless (a) any party-in-interest (including the Committee, if any) (a "**Challenge Party**") that successfully seeks and obtains standing to do so has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in this paragraph 20) (a "**Challenge**") by no later than the earlier to occur of (a) sixty (60) days after entry of this Order and (b) confirmation of the Plan; *provided that* any such deadline is subject to extension as may be specified by this Court for cause shown, or if the applicable Prepetition Agent agrees to such an extension with respect to any Claims and Defenses in respect of the Prepetition Revolver Obligations, the Prepetition Second Lien Obligations or the Prepetition Third Lien Obligations, as applicable, (i) challenging the validity, enforceability, priority or extent of (A) the Prepetition Revolver Obligations or the liens on Prepetition Collateral securing the Prepetition Obligations, (B) the Prepetition Second Lien Obligations or the liens on the Prepetition Collateral securing the Prepetition

Second Lien Obligations or (C) the Prepetition Third Lien Obligations or the liens on Prepetition Collateral securing the Prepetition Third Lien Obligations or (ii) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Claims and Defenses**") against any of the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, each in their capacity as such, in connection with any matter related to the Prepetition Revolver Obligations, the Prepetition Second Lien Obligations, the Prepetition Third Lien Obligations or the Prepetition Collateral and (b) an order is entered and becomes final in favor of the Challenge Party sustaining any such Challenge; *provided that*, subject to this paragraph 20, as to the Debtors, all such Claims and Defenses, are hereby irrevocably waived, released and relinquished as of the Petition Date.

(b)     If no such Challenge is timely filed in respect of the Prepetition Revolver Obligations, the Prepetition Second Lien Obligations, the Prepetition Third Lien Obligations, as the case may be, (x) the Prepetition Revolver Obligations, the Prepetition Second Lien Obligations and the Prepetition Third Lien Obligations, as the case may be, shall constitute allowed claims, not subject to counterclaim, setoff, subordination (except as set forth in the applicable Intercreditor Agreement), defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, recovery, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Revolver Obligations, the Prepetition Second Lien Obligations and the Prepetition Third Lien Obligations, as the case may be, shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the

priority specified in paragraphs 4(c), 4(e), and 4(g) as applicable, not subject to setoff, subordination (except as set forth in the Intercreditor Agreement), defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery and (z) the Prepetition Revolver Obligations, the Revolving Credit Agreement Lenders, the Revolving Credit Agreement Agent, the Prepetition Second Lien Obligations, the Second Lien Indenture Trustee, the Second Lien Noteholders, the Prepetition Third Lien Obligations, the Third Lien Indenture Trustee and the Third Lien Noteholders, each in their capacity as such, as the case may be, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations, the Prepetition Second Lien Obligations and the Prepetition Third Lien Obligations, as the case may be, shall not be subject to any other or further challenge, except with respect to the value of the Prepetition Collateral, by any party-in-interest (including any Committee and, with respect to the value of the Prepetition Collateral relative to the amount of Prepetition Third Lien Obligations only, the Debtors), and such party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors). Nothing in this Order shall confer standing on any party in interest to assert any Claims or Defenses or otherwise bring any cause of action.

(c)     If any Challenge is timely filed, the stipulations and admissions contained in paragraphs 4 and 14 of this Order shall nonetheless remain binding and preclusive (as provided in the third sentence of this paragraph 20) on all parties-in-interest (including the Committee, if any), except as to any such findings and admissions that were expressly and successfully challenged in such Challenge.

(d)     In the event that there is a timely successful Challenge by a final non-appealable order, pursuant and subject to the limitations contained in this paragraph 20, to the repayment of the Prepetition Obligations pursuant to this Order based upon a successful challenge to the validity, enforceability, extent, perfection or priority of the Prepetition Obligations or the liens securing the same, the Court shall have the power to unwind or otherwise modify (which might include the disgorgement or reallocation of interest, fees, principal or other incremental consideration paid in respect of the Prepetition Obligations or the avoidance of liens and/or guarantees with respect to the Debtors) to the extent that such payment resulted in the payment of any portion of the Prepetition Obligations determined by this Court to be an unsecured claim or other amount not allowable under section 502 of the Bankruptcy Code; *provided* *that* the proceeds of any disgorgement or unwinding of the Prepetition Revolver Obligations shall be paid directly to the DIP Agent and promptly applied to prepay the DIP Loans (and permanently reduce the Commitments (as defined in the DIP Credit Agreement) by an equal amount).

21.     *Limitation on Use of DIP Loans, DIP Collateral and Prepetition Collateral*. The Debtors shall use the DIP Loans and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, none of the DIP Loans, the DIP Collateral, the Prepetition Collateral (including the Cash Collateral) or the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Debt Documents, the Secured Swap Agreements or the liens or claims granted under this Order, the DIP Documents or the Revolving Credit Agreement Documents, (b) assert any Claims and Defenses or any other causes of action

WEIL:\95784106\18\51351.0003

against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Debt Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents; *provided that*, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the Cash Collateral or proceeds of the DIP Loans may be used by any Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations or investigate any Claims and Defenses against the Prepetition Secured Parties.

22.    *Insurance*. To the extent any Prepetition Secured Party is listed as loss payee under the Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and subject to the terms of the DIP Documents, distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment of the DIP Obligations until paid in full, and second, to the payment of the Prepetition Second Lien Obligations and the Prepetition Third Lien Obligations, subject to and in accordance with the Intercreditor Agreement.

23.    *Order Governs*. In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

24.      *Binding Effect; Successors and Assigns*. The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* *that*, except to the extent expressly set forth in this Order, the DIP Documents, or the Intercreditor Agreement, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Loans or the Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

25.      *Limitation of Liability*. In determining to make any loan under the DIP Credit Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute). Furthermore, nothing in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or

allow the imposition upon the DIP Agent, the DIP Lenders or any Prepetition Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

26.     *Intercreditor Agreement*. Nothing in this Order shall amend or otherwise modify the terms or enforceability of the Intercreditor Agreement, including without limitation, the turnover provisions contained therein, the DIP Obligations shall benefit from the rights thereunder as "Priority Lien Obligations" and the Intercreditor Agreement shall each remain in full force and effect. The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement.

27.     *Commitment/Fee Letters.* The Commitment/Fee Letters are authorized to be filed in redacted form satisfactory to the DIP Agent and unredacted copies shall be provided solely to (i) the U.S. Trustee, (ii) counsel to any Committee, (iii) this Court and (iv) any other party as may be ordered by this Court after notice and a hearing, or agreed by the Debtors and the DIP Agent (collectively, the "**Limited Notice Parties**"). The Limited Notice Parties shall at all times keep the Commitment/Fee Letters strictly confidential and shall not disclose the contents of the Commitment/Fee Letters to any party whatsoever, including but not limited to their respective clients. Any pleadings filed in these Chapter 11 Cases that reference or disclose information that is redacted from the Commitment/Fee Letters shall be filed under seal or redacted accordingly.

28.     *Proofs of Claim.* None of the DIP Agent or DIP Lenders shall be required to file proofs of claim in any of the Chapter 11 Cases or any Successor Cases for any claim allowed herein, and none of Prepetition Secured Parties shall be required to file proofs of claim or request for payment of an administrative expense in any of the Chapter 11 Cases or any Successor Cases for any claim in respect of the Prepetition Obligations.  Notwithstanding any order entered by the

- 51 -

Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of itself and the DIP Lenders, the Revolving Credit Agreement Agent, on behalf of the Revolving Credit Agreement Lenders, and the Second Lien Indenture Trustee, on behalf of the Second Lien Noteholders, and the Third Lien Indenture Trustee, on behalf of the Third Lien Noteholders respectively, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim or request for payment of an administrative expense and/or aggregate proofs of claim or request for payment of administrative expenses in each of the Chapter 11 Cases or any Successor Cases for any claim allowed herein; for avoidance of doubt, any such proof of claim or request for payment of an administrative expense, in each case, may (but is not required to) be filed as one consolidated proof of claim or request for payment of administrative expense against all of the Debtors, rather than as separate proofs of claim or request for payment of administrative expense against each Debtor.  Any proof of claim or request for payment of administrative expense filed by the DIP Agent, or any Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Agent, DIP Lenders or the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to (i) the DIP Agent, DIP Lenders, Consenting Prepetition Secured Swap Providers, or the Postpetition Secured Swap Providers with respect to the Secured Obligations (as defined in the DIP Credit Agreement) or the Prepetition Swap Obligations, or (ii) the Prepetition Secured Parties with respect to the Prepetition Obligations.

29.     *No Waiver*.  The failure of the DIP Lenders or the Prepetition Secured Parties to

WEIL:\95784106\18\51351.0003

seek relief or otherwise exercise their rights and remedies under this Order, the DIP Documents

or the Revolving Credit Agreement Documents or otherwise, as applicable, shall not constitute a

waiver of any of the DIP Lenders' or Prepetition Secured Parties' rights hereunder, thereunder,

or otherwise.  Except as expressly provided herein, the entry of this Order and the entry of the

Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly,

or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the

DIP Lenders or the Prepetition Secured Parties under the Bankruptcy Code or under non-

bankruptcy law against any other person or entity in any court.

30.    *No third-party rights*.  Except as explicitly provided for herein, this Order does

not create any rights for the benefit of any third party, creditor, equity holder or any direct,

indirect, third party or incidental beneficiary.

31.    *Effectiveness.* This Order shall constitute findings of fact and conclusions of law

and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of

this Order.

32.    *Final Hearing*. The Final Hearing is scheduled for [          ], 2016, at [         ]

a.m./p.m., prevailing Eastern Time, before this Court.

33.    *Retention of Jurisdiction*. This Court shall have and retain exclusive jurisdiction

to enforce the terms of this Order and to adjudicate any and all matters arising from or related to

the interpretation or implementation of this Order, including with respect to any and all disputes

or matters under, arising out of or in connection with either the DIP Loans or the DIP

Documents.

34.    *Final Hearing Notice*. The Debtors shall promptly serve copies of this Order

(which shall constitute adequate notice of the Final Hearing) on the parties having been given

notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 Attention: Joseph Smolinsky, Esq. and Gary Holtzer, Esq., attorneys for the Debtors; (b) Fox Rothschild LLP, 919 North Market St., Wilmington, DE 19899 Attention: Jeff Schlerf, Esq. and Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Elisha Graff, Esq. and Nicholas Baker, Esq., attorneys for the DIP Agent and Revolving Credit Agreement Agent; (c) Foley & Lardner LLP, 90 Park Avenue, New York, New York, 10016, Attention: Richard J. Bernard, Esq. and Derek L. Wright, Esq. attorneys for the Second Lien Indenture Trustee; (d) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attention: Jayme T. Goldstein, Esq. and Frank A. Merola, Esq., attorneys for the Third Lien Indenture Trustee; (e) O'Melveny & Meyers LLP, Times Square Tower, 7 Times Square, New York, New York 10036 Attention John J. Rapisardi, attorneys for the ad hoc committee of Second Lien Noteholders; (d) Latham & Watkins LLP, 885 Third Avenue, New York, NY 10022 Attention Richard A. Levy, Esq. and J. Michael Chambers, Esq., attorneys for the ad hoc committee of Third Lien Indenture Trustee; (f) counsel to any Committee; and (g) the Office of the U.S. Trustee for the District of Delaware, and shall be filed with the Clerk of the Bankruptcy Court, in each case to allow actual receipt by the foregoing no later than August [●], 2016 at 12:00 p.m., prevailing Eastern time.

WEIL:\95784106\18\51351.0003

Dated: _____, 2016
      Wilmington, Delaware

                                                      _____
                                                UNITED STATES BANKRUPTCY JUDGE

WEIL:\95784106\18\51351.0003

**<u>EXHIBIT 1</u>**

**DIP Budget**

**Halcón Resources Corp.**

*DIP Budget - 13 Week*

| (USD 000's) | Fcst 7/29 | Fcst 8/5 | Fcst 8/12 | Fcst 8/19 | Fcst 8/26 | Fcst 9/2 | Fcst 9/9 | Fcst 9/16 | Fcst 9/23 | Fcst 9/30 | Fcst 10/7 | Fcst 10/14 | Fcst 10/21 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | | | | | | | | | | | | | | |
| Total Receipts | $ 19,743 | $ 1,464 | $ 25,823 | $ 1,464 | $ 45,938 | $ 1,178 | $ 25,537 | $ 1,178 | $ 43,407 | $ 2,930 | $ 25,124 | $ 1,686 | $ 27,385 | $ 222,858 |
| Total Expenses Directly Paid | $ (20,632) | $ (14,607) | $ (6,728) | $ (7,622) | $ (24,141) | $ (14,601) | $ (5,931) | $ (6,823) | $ (9,545) | $ (24,488) | $ (12,149) | $ (10,217) | $ (9,328) | $ (166,814) |
| Total Operating Disbursements | $ (20,632) | $ (14,607) | $ (6,728) | $ (7,622) | $ (24,141) | $ (14,601) | $ (5,931) | $ (6,823) | $ (9,545) | $ (24,488) | $ (12,149) | $ (10,217) | $ (9,328) | $ (166,814) |
| Net Operating Cash Flow | $ (888) | $ (13,143) | $ 19,096 | $ (6,157) | $ 21,797 | $ (13,423) | $ 19,606 | $ (5,645) | $ 33,862 | $ (21,558) | $ 12,974 | $ (8,531) | $ 18,057 | $ 56,044 |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| Profesional Fee | $ (3,543) | $ - | $ (1,702) | $ - | $ - | $ - | $ (1,432) | $ - | $ - | $ - | $ - | $ (3,443) | $ - | $ (10,120) |
| Utility Deposit | - | - | (200) | - | - | - | - | - | - | - | - | - | - | (200) |
| Total Restructuring Disbursements | $ (3,543) | $ - | $ (1,902) | $ - | $ - | $ - | $ (1,432) | $ - | $ - | $ - | $ - | $ (3,443) | $ - | $ (10,320) |
| Net Cash Flow | $ (4,431) | $ (13,143) | $ 17,193 | $ (6,157) | $ 21,797 | $ (13,423) | $ 18,174 | $ (5,645) | $ 33,862 | $ (21,558) | $ 12,974 | $ (11,974) | $ 18,057 | $ 45,724 |
| Interest Payment & Fees | $ - | $ (38,338) | $ (1,402) | $ (6,770) | $ (1,000) | $ - | $ (1,654) | $ - | $ - | $ - | $ - | $ (1,654) | $ - | $ (50,817) |
| Revolver Borrowing (Payment) | 338,000 | - | - | - | - | - | - | - | - | - | - | - | - | 338,000 |
| Total Net Cash Flow | $ 333,569 | $ (51,481) | $ 15,791 | $ (12,927) | $ 20,797 | $ (13,423) | $ 16,520 | $ (5,645) | $ 33,862 | $ (21,558) | $ 12,974 | $ (13,628) | $ 18,057 | $ 332,908 |
| Beginning Cash Balance | $ 5,152 | $ 338,720 | $ 287,240 | $ 303,031 | $ 290,104 | $ 310,901 | $ 297,477 | $ 313,997 | $ 308,353 | $ 342,215 | $ 320,656 | $ 333,631 | $ 320,003 | $ 5,152 |
| Net Cash Flow | 333,569 | (51,481) | 15,791 | (12,927) | 20,797 | (13,423) | 16,520 | (5,645) | 33,862 | (21,558) | 12,974 | (13,628) | 18,057 | 332,908 |
| Ending Cash Balance | $ 338,720 | $ 287,240 | $ 303,031 | $ 290,104 | $ 310,901 | $ 297,477 | $ 313,997 | $ 308,353 | $ 342,215 | $ 320,656 | $ 333,631 | $ 320,003 | $ 338,059 | $ 338,059 |

**EXHIBIT 2**

**DIP Credit Agreement**

*EXECUTION VERSION*

**SENIOR SECURED DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT**

**DATED AS OF**
**[●], 2016**

**AMONG**

**HALCÓN RESOURCES CORPORATION,**
**A DEBTOR-IN-POSSESSION,**
**AS BORROWER,**

**JPMORGAN CHASE BANK, N.A.,**
**AS ADMINISTRATIVE AGENT,**

**[●]**
**AS SYNDICATION AGENT,**

**[●],**
**AS DOCUMENTATION AGENT,**

**AND**

**THE LENDERS PARTY HERETO**

**[●],**
**AS [LEAD ARRANGER[S] AND BOOKRUNNER[S]]**

# TABLE OF CONTENTS

**Page**

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above ............................................................................... 2
Section 1.02    Certain Defined Terms ............................................................................. 2
Section 1.03    Types of Loans and Borrowings ............................................................. 28
Section 1.04    Terms Generally; Rules of Construction ................................................ 28
Section 1.05    Accounting Terms and Determinations; GAAP ..................................... 29

## ARTICLE II
## THE CREDITS

Section 2.01    Commitments ........................................................................................... 29
Section 2.02    Loans and Borrowings ............................................................................ 29
Section 2.03    Requests for Borrowings ........................................................................ 30
Section 2.04    Interest Elections .................................................................................... 31
Section 2.05    Funding of Borrowings ........................................................................... 32
Section 2.06    Termination and Reduction of Aggregate Maximum Credit Amounts ..... 33
Section 2.07    [Reserved] ............................................................................................... 33
Section 2.08    Letters of Credit ..................................................................................... 33
Section 2.09    Priority and Liens ................................................................................... 38
Section 2.10    Payment of Obligations ......................................................................... 38
Section 2.11    No Discharge; Survival of Claims ......................................................... 38
Section 2.12    Conversion to Exit Facility Agreement .................................................. 38

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01    Repayment of Loans ............................................................................... 39
Section 3.02    Interest .................................................................................................... 39
Section 3.03    Alternate Rate of Interest ....................................................................... 40
Section 3.04    Prepayments. .......................................................................................... 40
Section 3.05    Fees ......................................................................................................... 42

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ............. 42
Section 4.02    Presumption of Payment by the Borrower ............................................. 43
Section 4.03    Certain Deductions by the Administrative Agent ................................... 44
Section 4.04    [Reserved]. ............................................................................................. 44
Section 4.05    Payments and Deductions to a Defaulting Lender. ................................ 44

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01    Increased Costs ...................................................................................... 46
Section 5.02    Break Funding Payments ....................................................................... 47
Section 5.03    Taxes ....................................................................................................... 47
Section 5.04    Mitigation Obligations; Replacement of Lenders .................................. 50

i

ARTICLE VI
CONDITIONS PRECEDENT

Section 6.01    Conditions Precedent to Closing Date ..................................................... 51
Section 6.02    Each Credit Event ............................................................................... 54

ARTICLE VII
REPRESENTATIONS AND WARRANTIES

Section 7.01    Organization; Powers ......................................................................... 55
Section 7.02    Authority; Enforceability ................................................................... 55
Section 7.03    Approvals; No Conflicts .................................................................... 55
Section 7.04    Financial Condition; No Material Adverse Effect ............................. 56
Section 7.05    Litigation. .......................................................................................... 56
Section 7.06    Environmental Matters ...................................................................... 56
Section 7.07    Compliance with the Laws; No Defaults ........................................... 57
Section 7.08    Investment Company Act ................................................................... 58
Section 7.09    Taxes ................................................................................................. 58
Section 7.10    ERISA ............................................................................................... 58
Section 7.11    Disclosure; No Material Misstatements ............................................ 59
Section 7.12    Insurance ........................................................................................... 59
Section 7.13    Restriction on Liens .......................................................................... 59
Section 7.14    Subsidiaries ....................................................................................... 59
Section 7.15    Location of Business and Offices ...................................................... 60
Section 7.16    Properties; Titles, Etc ....................................................................... 60
Section 7.17    Maintenance of Properties ................................................................. 61
Section 7.18    Gas Imbalances, Prepayments .......................................................... 61
Section 7.19    Marketing of Production .................................................................... 61
Section 7.20    Swap Agreements .............................................................................. 62
Section 7.21    Use of Loans and Letters of Credit ................................................... 62
Section 7.22    [Reserved]. ........................................................................................ 62
Section 7.23    Money Laundering ............................................................................ 62
Section 7.24    Foreign Corrupt Practices ................................................................. 62
Section 7.25    Anti-Corruption Laws; Sanctions; OFAC ......................................... 63
Section 7.26    EEA Financial Institutions ................................................................ 63

ARTICLE VIII
AFFIRMATIVE COVENANTS

Section 8.01    Financial Statements; Other Information ........................................... 63
Section 8.02    Notices of Material Events ................................................................ 67
Section 8.03    Existence; Conduct of Business ........................................................ 67
Section 8.04    Payment of Obligations ..................................................................... 67
Section 8.05    Performance of Obligations under Loan Documents ......................... 67
Section 8.06    Operation and Maintenance of Properties ......................................... 67
Section 8.07    Insurance ........................................................................................... 68
Section 8.08    Books and Records; Inspection Rights .............................................. 68
Section 8.09    Compliance with Laws ...................................................................... 68
Section 8.10    Environmental Matters ...................................................................... 69
Section 8.11    Further Assurances ............................................................................ 70

ii

Section 8.12    Reserve Reports ...................................................................................... 70
Section 8.13    Title Information ...................................................................................... 71
Section 8.14    Additional Collateral; Additional Guarantors ........................................ 72
Section 8.15    ERISA Compliance .................................................................................. 72
Section 8.16    [Reserved] ................................................................................................ 72
Section 8.17    Unrestricted Subsidiaries ......................................................................... 72
Section 8.18    Marketing Activities ................................................................................ 73
Section 8.19    Keepwell .................................................................................................. 73
Section 8.20    Carve Out ................................................................................................ 73

ARTICLE IX
NEGATIVE COVENANTS

Section 9.01    Financial Covenants ................................................................................ 74
Section 9.02    Indebtedness ............................................................................................ 74
Section 9.03    Liens......................................................................................................... 75
Section 9.04    Dividends and Distributions .................................................................... 76
Section 9.05    Investments, Loans and Advances ........................................................... 76
Section 9.06    Unrestricted Subsidiaries ......................................................................... 77
Section 9.07    Nature of Business; International Operations .......................................... 77
Section 9.08    Reserved ................................................................................................... 78
Section 9.09    Proceeds of Loans .................................................................................... 78
Section 9.10    ERISA Compliance .................................................................................. 78
Section 9.11    Sale or Discount of Receivables .............................................................. 78
Section 9.12    Merger, Etc............................................................................................... 79
Section 9.13    Sale of Properties; Termination of Swap Agreements ............................ 79
Section 9.14    Environmental Matters ............................................................................ 79
Section 9.15    Transactions with Affiliates .................................................................... 80
Section 9.16    Subsidiaries .............................................................................................. 80
Section 9.17    Negative Pledge Agreements; Dividend Restrictions .............................. 80
Section 9.18    Gas Imbalances, Take-or-Pay or Other Prepayments ............................. 80
Section 9.19    Swap Agreements .................................................................................... 80
Section 9.20    Superpriority Claims ............................................................................... 81

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.01    Events of Default .................................................................................... 81
Section 10.02    Remedies................................................................................................. 85

ARTICLE XI
THE AGENTS

Section 11.01    Appointment; Powers............................................................................... 86
Section 11.02    Duties and Obligations of Administrative Agent.................................... 86
Section 11.03    Action by Administrative Agent .............................................................. 87
Section 11.04    Reliance by Administrative Agent ........................................................... 87
Section 11.05    Subagents ................................................................................................ 87
Section 11.06    Resignation of Agents ............................................................................. 88
Section 11.07    Agents as Lenders ................................................................................... 88
Section 11.08    No Reliance.............................................................................................. 88

iii

Section 11.09   Administrative Agent May File Proofs of Claim ..........................................89
Section 11.10   Authority of Administrative Agent to Release Collateral and Liens ...........89
Section 11.11   The Arrangers, the Syndication Agent and the Documentation Agent.......................89

ARTICLE XII
MISCELLANEOUS

Section 12.01   Notices ............................................................................................................90
Section 12.02   Waivers; Amendments......................................................................................90
Section 12.03   Expenses, Indemnity; Damage Waiver .....................................................92
Section 12.04   Successors and Assigns....................................................................................94
Section 12.05   Survival; Revival; Reinstatement..................................................................97
Section 12.06   Counterparts; Integration; Effectiveness..........................................................98
Section 12.07   Severability .....................................................................................................98
Section 12.08   Right of Setoff.................................................................................................98
Section 12.09   GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
                PROCESS.........................................................................................................99
Section 12.10   Headings...........................................................................................................100
Section 12.11   Confidentiality ..............................................................................................100
Section 12.12   Interest Rate Limitation ................................................................................100
Section 12.13   EXCULPATION PROVISIONS .....................................................................101
Section 12.14   Collateral Matters; Swap Agreements ........................................................101
Section 12.15   No Third Party Beneficiaries .......................................................................102
Section 12.16   USA Patriot Act Notice..................................................................................102
Section 12.17   Flood Insurance...............................................................................................102
Section 12.18   No Fiduciary Duty ..........................................................................................102
Section 12.19   Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...............103

## ANNEXES, EXHIBITS AND SCHEDULES

| | |
|---|---|
| Annex I | List of Maximum Credit Amounts |
| | |
| Exhibit A | Form of Note |
| Exhibit B | Form of Borrowing Request |
| Exhibit C | Form of Interest Election Request |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | Security Instruments |
| Exhibit F | Form of Assignment and Assumption |
| Exhibit G-1 | Form of U.S. Tax Compliance Certificate (Foreign Lenders; not partnerships) |
| Exhibit G-2 | Form of U.S. Tax Compliance Certificate (Foreign Participants; not partnerships) |
| Exhibit G-3 | Form of U.S. Tax Compliance Certificate (Foreign Participants; partnerships) |
| Exhibit G-4 | Form of U.S. Tax Compliance Certificate (Foreign Lenders; partnerships) |
| Exhibit H | Form of Interim Order |
| Exhibit I | Form of Perfection Certificate |
| Exhibit J | Form of Reserve Report Certificate |
| Exhibit K | Form of Exit Facility Agreement |
| Exhibit L | Disclosure Statement |
| Exhibit M | Approved Plan |
| | |
| Schedule 1.02(a) | Existing Letters of Credit |
| Schedule 1.02(b) | Existing Secured Swap Agreements |
| Schedule 7.05 | Litigation |
| Schedule 7.14 | Subsidiaries and Partnerships; Unrestricted Subsidiaries |
| Schedule 7.18 | Gas Imbalances |
| Schedule 7.19 | Marketing Contracts |
| Schedule 7.20 | Swap Agreements |
| Schedule 9.02 | Indebtedness |
| Schedule 9.03 | Liens |
| Schedule 9.05 | Investments |

01:18968086.1

**THIS SENIOR SECURED DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT** (this "<u>Agreement</u>') dated as of [●], 2016 is among Halcón Resources Corporation, a corporation duly formed and existing under the laws of the State of Delaware (the "<u>Borrower</u>"), which is a debtor and debtor-in-possession in a Chapter 11 Case (as defined below); each of the Lenders and other parties from time to time party hereto; and JPMorgan Chase Bank, N.A. (in its individual capacity, "<u>JPMorgan</u>"), as administrative agent and collateral agent for the Lenders (in such capacity, together with its successors in such capacity, the "<u>Administrative Agent</u>").

## R E C I T A L S

A.      Reference is made to that certain (a) Senior Revolving Credit Agreement, dated as of February 8, 2012 (as amended, supplemented, restated or otherwise modified prior to the date hereof, the "<u>Existing Credit Agreement</u>"), among the Borrower, the lenders and other parties from time to time party thereto (the "<u>Existing Lenders</u>") and JPMorgan, as administrative agent (in such capacity, the "<u>Existing Administrative Agent</u>") and (b) Restructuring Support Agreement, dated as of June 9, 2016, among the Borrower, certain subsidiaries of the Borrower and certain of the holders of the Third Lien Notes, the Unsecured Notes, the Convertible Notes and the Preferred Equity (as amended, supplemented or otherwise modified in a manner satisfactory to the Majority Lenders, the "<u>Restructuring Support Agreement</u>").

B.      Pursuant to the Restructuring Support Agreement, the Borrower and the other parties thereto agreed to a restructuring of the Borrower and its Subsidiaries pursuant to the Approved Plan (as defined below).

C.      In furtherance of the Approved Plan and the provisions of the Restructuring Support Agreement, on [●], 2016 (the "<u>Petition Date</u>"), the Borrower and certain of its Subsidiaries (collectively, the "<u>Debtors</u>") filed voluntary petitions to commence cases (the "<u>Chapter 11 Cases</u>") under title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the [District of Delaware] (the "<u>Bankruptcy Court</u>") and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

D.      In connection with the Chapter 11 Cases and the Approved Plan, the Borrower has requested that the Lenders provide a senior secured debtor-in-possession reserve-based revolving credit facility (the "<u>DIP Facility</u>") which would, upon the satisfaction of certain conditions, convert into a senior secured exit reserve-based credit facility (the "<u>Exit Facility</u>" and, together with the DIP Facility, the "<u>Facilities</u>"), in each case in an aggregate principal amount not to exceed $600.0 million.

E.      The Lenders have agreed to provide the Facilities upon the terms and conditions set forth herein, including without limitation, (i) in the case of the DIP Facility, so long as all outstanding loans and letters of credit under the Existing Credit Agreement are refunded, refinanced and replaced in whole with Loans and Letters of Credit under this Agreement and (ii) in the case of the Exit Facility and the consummation of the Approved Plan, so long as all outstanding Loans and Letters of Credit under this Agreement are, pursuant to Section 2.12, refunded, refinanced and replaced in whole with Loans and Letters of Credit under, and as defined in, the Exit Facility Agreement.

F.      To provide guarantees and security for the repayment of the Loans, the reimbursement of any draft drawn under the Letters of Credit and the payment of the other Secured Obligations of the Borrower hereunder and under the other Loan Documents, the Debtors are providing to the Administrative Agent and the Lenders, pursuant to this Agreement, the Guaranty Agreement, the DIP Order and Hedging Order, the following (each as more fully described herein, in the DIP Order and the

Hedging Order and subject to the qualifications set forth herein, in the DIP Order and in the Hedging Order):

(i)       a guarantee from each of the Guarantors of the due and punctual payment and performance of the Secured Obligations of the Borrower hereunder;

(ii)      with respect to the Secured Obligations of the Loan Parties hereunder and under the other Loan Documents, the Superpriority Claims (as defined below);

(iii)     pursuant to Bankruptcy Code Section 364(c)(2), a perfected first priority lien on, and security interest in, all present and after-acquired property of the Debtors not subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or to a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b) (but excluding the Borrower's and the Guarantors' rights in respect of avoidance actions under the Bankruptcy Code and the proceeds thereof);

(iv)     pursuant to Bankruptcy Code Section 364(c)(3), a perfected junior lien on, and security interest in, all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable lien or security interest in existence on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to the Petition Date as permitted by Bankruptcy Code Section 546(b); and

(v)      to the extent applicable, pursuant to Bankruptcy Code Section 364(d)(1), a perfected first priority priming lien on, and security interest in, all Pre-Petition Collateral.

G.      All of the claims and the Liens granted hereunder and pursuant to the Guaranty Agreement and the DIP Order in the Chapter 11 Cases to the Administrative Agent, the Lenders and the other Secured Parties shall be subject to the Carve-Out, but in each case only to the extent provided in <u>Section 8.20</u>, the Guaranty Agreement and the DIP Order.

H.      Pursuant to the terms of the DIP Order, all Secured Obligations will be secured by valid perfected Liens on substantially all of Borrower's and each Guarantor's assets, having the priorities set forth in the DIP Order.

I.      In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    <u>Terms Defined Above</u>.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>13-week Projection</u>" has the meaning assigned to such term in the definition of "Budget".

2

"2020 Second Lien Notes" means, the Borrower's 8.625% Senior Secured Notes due 2020 pursuant to the 2020 Second Lien Notes Indenture.

"2020 Second Lien Notes Indenture" means, the Indenture, dated as of May 1, 2015, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented or otherwise modified as of the Petition Date.

"2020 Unsecured Notes" means, the Borrower's 9.75% Senior Notes due 2020 pursuant to the 2020 Unsecured Notes Indenture.

"2020 Unsecured Notes Indenture" means, the Indenture, dated as of July 16, 2012, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented or otherwise modified as of the Petition Date.

"2021 Unsecured Notes" means, the Borrower's 8.875% Senior Notes due 2021 pursuant to the 2021 Unsecured Notes Indenture.

"2021 Unsecured Notes Indenture" means, the Indenture, dated as of November 6, 2012, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented or otherwise modified as of the Petition Date.

"2022 Second Lien Notes" means the Borrower's 12.0% Second Lien Senior Secured Notes due 2022 pursuant to the 2022 Second Lien Notes Indenture.

"2022 Second Lien Notes Indenture" means, the Indenture, dated as of December 21, 2015, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented or otherwise modified as of the Petition Date.

"2022 Unsecured Notes" means, the Borrower's 9.25% Senior Notes due 2022 pursuant to the 2022 Unsecured Notes Indenture.

"2022 Unsecured Notes Indenture" means, the Indenture, dated as of August 13, 2013, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented or otherwise modified as of the Petition Date.

"ABR" means, when used in reference to any Loan or Borrowing, whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adequate Protection Obligations" shall have the meaning assigned to such term in the DIP Order.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

3

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agents" means, collectively, the Administrative Agent, the Syndication Agent and the Documentation Agent; and "Agent" shall mean either the Administrative Agent, the Syndication Agent or any Documentation Agent, as the context requires.

"Aggregate Maximum Credit Amounts" at any time shall equal the sum of the Maximum Credit Amounts, as the same may be reduced or terminated pursuant to Section 2.06.

"Aggregate Operating Expenditures" means disbursements other than disbursements on account of professional fees, deposits made to utilities pursuant to an order of the Bankruptcy Court, checks outstanding on the Petition Date that are re-issued in accordance with an order of the Bankruptcy Court, adequate protection and fees paid to the holders of the Second Lien Notes in accordance with the DIP Order and interest and fees paid in accordance with this Agreement.

"Aggregate Total Receipts" means all cash or other collections received from operations in the ordinary course of business (including, under any Swap Agreements), other than cash proceeds or collections from the sale or other Disposition of assets, casualty events (including insurance proceeds or condemnation awards), extraordinary receipts or the proceeds of any Loans.

"Agreement" means this Senior Secured Debtor-In-Possession Revolving Credit Agreement, including the Schedules and Exhibits hereto, as the same may be amended, supplemented or modified from time to time.

"Alternate Base Rate" means, for any day, a rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.0% and (c) the Adjusted LIBO Rate for an Interest Period of one month on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.0%.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  In no event shall the Alternate Base Rate be negative.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Margin" means, for any day, with respect to any ABR Loan or Eurodollar Loan or the Commitment Fee Rate, as the case may be, the rate per annum set forth in the Commitment Utilization Percentage grid below based upon the Commitment Utilization Percentage then in effect:

| Level | Commitment Utilization Percentage | Eurodollar Loans | ABR Loans | Commitment Fee Rate |
|-------|-----------------------------------|------------------|-----------|---------------------|
| 1 | ≥ 90% | 3.75% | 2.75% | 0.50% |
| 2 | ≥ 75% < 90% | 3.50% | 2.50% | 0.50% |

4

| 3 | $\geq$ 50% < 75% | 3.25% | 2.25% | 0.50% |
| 4 | $\geq$ 25% < 50% | 3.00% | 2.00% | 0.50% |
| 5 | < 25% | 2.75% | 1.75% | 0.50% |

Each change in the Applicable Margin or Commitment Fee Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change; provided, however, that if at any time the Borrower fails to deliver a Reserve Report pursuant to Section 8.12(a), then the "Applicable Margin" and "Commitment Fee Rate" mean the rate per annum set forth on the grid when the Commitment Utilization Percentage is at its highest level.

"Applicable Percentage" means, with respect to any Lender, the percentage of the Aggregate Maximum Credit Amounts represented by such Lender's Maximum Credit Amount as such percentage is set forth on Annex I.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender or (b) any other Person whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means Netherland, Sewell & Associates, Inc. and any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Approved Plan" means (i) the plan of reorganization in the form attached hereto as Exhibit M or (ii) any Cash Pay Plan, in each case, as such plan may be modified, amended or supplemented; provided that the consent of the Administrative Agent and the Majority Lenders shall be required in respect of any such modification, amendment or supplement solely to the extent that such modification, supplement or amendment: (a) adversely impacts the Administrative Agent's or Lenders' interests, economic recovery, rights or treatment in comparison to the Approved Plan (without giving effect to any such modification, supplement or amendment), (b) alters the debt capital structure of the Loan Parties as set forth in the Approved Plan, (c) allows for the incurrence of Indebtedness upon or in conjunction with the effective date of the Approved Plan not otherwise contemplated under the Approved Plan (without giving effect to any such modification, supplement or amendment) or (d) changes the priority or treatment of any Indebtedness from that set forth in the Approved Plan (without giving effect to any such modification, supplement or amendment).

"Ares" means Ares Management LLC together with any funds or managed accounts affiliated with, or managed by, Ares Management LLC or any Affiliates thereof (but excluding any operating portfolio companies of the foregoing Persons).

"Arrangers" means, [●].

5

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability Period" means the period from and including the Closing Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products" means treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Borrower or any Restricted Subsidiary.

"Bankruptcy Code" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower substantially in the form of Exhibit B for a Borrowing in accordance with Section 2.03.

6

"Budget" means (a) initially, a 13-week forecast of receipts and disbursements (for the 13 weeks commencing on the Petition Date) of the Debtors on a consolidated basis, broken down by week, including (i) individual line items for "Aggregate Total Receipts," "Aggregate Operating Expenditures," and "Aggregate Professional Expenses," and (ii) anticipated uses of the DIP Facility for such period (a "13-week Projection"), and (b) thereafter, at the end of the then 13-week period (or such earlier time as may be agreed to by the Administrative Agent and the Borrower) while the DIP Facility is outstanding, an updated 13-week Projection for the subsequent 13-week period (which in each case the form of which must be satisfactory to the Administrative Agent in its reasonable discretion and the substance of which must be reasonably acceptable to the Financial Advisor). Such updated 13-week Projection shall, upon approval of the Financial Advisor, become the Budget for all purposes herein.

"Budget Certificate" has the meaning assigned to such term in Section 8.01(r).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Building" has the meaning assigned to such term in Section 12.17.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Carve Out" has the meaning assigned to such term in the DIP Order.

"Carve Out Account" has the meaning assigned to such term in the DIP Order.

"Carve Out Trigger Date" means the first Business Day after the Administrative Agent provides a written notice to the Borrower and its counsel that an Event of Default (or an event which with the giving of notice would constitute an Event of Default) has occurred and that the Post-Trigger Date Carve Out has been invoked.

"Cash Equivalent" means cash held in US dollars and all Investments of the type identified in Section 9.05(c) through Section 9.05(f).

"Cash Pay Plan" has the meaning assigned to such term in Section 10.01(n).

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Restricted Subsidiaries.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person (other than a Permitted Holder) or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission (or any successor Governmental Authority) (other than a group of Permitted Holders) thereunder as in effect on

7

the Closing Date) of Equity Interests representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower and (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were not (i) directors of the Borrower on the Closing Date, (ii) nominated or appointed by the board of directors of the Borrower nor (iii) approved by the board of directors of the Borrower as director candidates prior to their election.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b)), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III (but not Basel II), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, issued, adopted, promulgated or implemented.

"Closing Date" means the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be modified from time to time pursuant to (a) Section 2.06 and (b) assignments by or to such Lender pursuant to Section 12.04(b) and (c) Section 3.04(c)(iv). The total Commitments of all of the Lenders on the Closing Date is $600.0 million; provided, that it is understood that no Lender shall be required to make Loans or participate in Letters of Credit in an aggregate outstanding principal or face amount in excess of such Lender's Maximum Credit Amount in effect at such time.

"Commitment Fee Rate" has the meaning assigned to such term in the definition of "Applicable Margin".

"Commitment Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the total Commitments of all Lenders in effect on such day.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Confirmation Order" means an order, in form and substance reasonably satisfactory to the Administrative Agent, confirming the Approved Plan (it being understood and agreed that the Confirmation Order shall be deemed reasonably satisfactory to the Administrative Agent so long as (a) the Bankruptcy Court approves the Approved Plan (and does not modify, amend or supplement the

8

Approved Plan to the extent such modification, amendment or supplement would require the consent of the Administrative Agent and the Majority Lenders as set forth in the definition of "Approved Plan" and such consent has not been obtained), (b) the Confirmation Order does not adversely affect the Secured Parties and (c) the Confirmation Order contains orders, findings of fact and law and other customary provisions related to the Exit Facility and the Collateral satisfactory to the Administrative Agent).

"Consolidated Restricted Subsidiaries" means any Restricted Subsidiaries that are Consolidated Subsidiaries.

"Consolidated Subsidiaries" means, as to any Person, each Subsidiary of such Person (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of such Person in accordance with GAAP.

"Consolidated Unrestricted Subsidiaries" means any Unrestricted Subsidiaries that are Consolidated Subsidiaries.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person. "Controlling" and "Controlled" have meanings correlative thereto.

"Convertible Note" means the Borrower's 8.0% Convertible Note due 2020 pursuant to the Amended and Restated Convertible Promissory Note, dated as of March 9, 2015, among the Borrower, as maker, and Halres, LLC, as payee, as amended, supplemented or otherwise modified as of the Petition Date.

"Credit Event" has the meaning assigned to such term in Section 6.02.

"Debtors" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender, as reasonably determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans or participations in Letters of Credit within three (3) Business Days of the date required to be funded by it hereunder, unless with respect to the Loans, the subject of a good faith dispute, (b) notified the Borrower, the Administrative Agent, the Issuing Bank or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement, unless the reason such Lender is not complying with such obligations is due to a good faith dispute with regard to such obligations, (c) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, (d) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or

9

acquiescence in any such proceeding or appointment, provided that a Lender shall not be a Defaulting Lender solely by virtue of (i) the ownership or acquisition of any Equity Interest in such Lender or parent company thereof by a Governmental Authority or agency thereof or (ii) due to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or its parent company under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation), or (e) has, or has a direct or indirect parent company that has, become the subject of a Bankruptcy Event or Bail-In Action.

"DIP Collateral" has the meaning assigned to such term in the DIP Order.

"DIP Facility" has the meaning assigned to such term in the recitals hereto.

"DIP Order" means the Interim Order and, upon entry thereof, the Final Order.

"Disclosure Statement" means the disclosure statement, in the form attached hereto as Exhibit L, or otherwise in form and substance reasonably acceptable to the Administrative Agent and the Majority Lenders, in respect of the Approved Plan.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer, casualty, condemnation or other disposition thereof, but excluding any issuance by a Person of its own Equity Interests.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Indebtedness or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans, LC Exposure or other Secured Obligations outstanding and all of the Commitments are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Restricted Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"ECP" means any Person who qualifies as an "eligible contract participant" under Section 2(e) of the Commodity Exchange Act.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

10

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety the environment or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which the Borrower or any Restricted Subsidiary is conducting or at any time has conducted business, or where any Property of the Borrower or any Restricted Subsidiary is located, including without limitation, the Oil Pollution Act of 1990 ("OPA"), as amended, the Clean Air Act, as amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements.  The term "oil" shall have the meaning specified in OPA, the terms "hazardous substance" and "release" (or "threatened release") have the meanings specified in CERCLA, the terms "solid waste" and "disposal" (or "disposed") have the meanings specified in RCRA and the term "oil and gas waste" shall have the meaning specified in Section 91.1011 of the Texas Natural Resources Code ("Section 91.1011"); provided, however, that (a) in the event either OPA, CERCLA, RCRA or Section 91.1011 is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of the Borrower or any Restricted Subsidiary is located establish a meaning for "oil," "hazardous substance," "release," "solid waste," "disposal" or "oil and gas waste" which is broader than that specified in either OPA, CERCLA, RCRA or Section 91.1011, such broader meaning shall apply.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for

11

which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of obligations that are not more than sixty (60) days  delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not more than sixty (60) days delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of its Restricted Subsidiaries to provide collateral to the depository institution; (f) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any Restricted Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (g) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (h) judgment and attachment Liens not giving rise to an Event of Default, provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; (i) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into in the ordinary course of business covering only the Property under any such operating lease; (j) Liens listed on the exhibits to the Security Instruments with respect to the Oil and Gas Properties of Borrower and each of its Restricted  Subsidiaries, so long as such Liens (1) do not reduce the Net Revenues Interest (or "NRI" or terms of similar effect) attributable to any well, unit or lease included in the Oil and Gas Properties of Borrower and its Restricted Subsidiaries, materially below that shown on such exhibits to the Security Instruments or (2) increase the Working Interest (or "WI" or terms of similar effect) attributable to any well, unit or lease included in the Oil and Gas Properties of Borrower and its Restricted Subsidiaries, materially above that shown on such exhibits to the Security Instruments; and (k) Liens pursuant to

12

merger agreements, stock purchase agreements, asset sale agreements and similar agreements (1) limiting the transfer of properties and assets pending the consummation of the  subject transaction, or (2) in respect of earnest money deposits, good faith deposits, purchase price adjustment and indemnity escrows and similar deposit or escrow arrangements made or established thereunder; provided, further that Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order thereunder (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Agreements for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) income, branch profits or franchise taxes imposed on (or measured by) its net income by any jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 5.04(b)), any United States federal withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such federal withholding Tax pursuant to Section 5.03, (c) Taxes attributable to such Lender's failure to comply with Section 5.03(e) and (d) any United States federal withholding Tax that is imposed under FATCA.

"Existing Administrative Agent" has the meaning assigned to such term in the recitals hereto.

"Existing Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Existing Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of May 1, 2015, among the Existing Administrative Agent, U.S. Bank National Association, as trustee, and the Borrower.

"Existing Lenders" has the meaning assigned to such term in the recitals hereto.

"Existing Letters of Credit" means the letters of credit described on Schedule 1.02(a) that were issued under the Existing Credit Agreement and that shall be deemed refunded, refinanced, replaced and issued under this Agreement.

13

"<u>Existing Loans</u>" means the Loans under, and as defined in, the Existing Credit Agreement and that shall be deemed refunded, refinanced, replaced and made under this Agreement.

"<u>Existing Secured Swap Agreements</u>" means the Swap Agreements described on <u>Schedule 1.02(b)</u> which shall be secured pursuant to this Agreement and the DIP Order.

"<u>Exit Facility</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Exit Facility Agreement</u>" means the Credit Agreement governing the Exit Facility substantially in the form attached hereto as <u>Exhibit K</u>.

"<u>Facilities</u>" has the meaning assigned to such term in the recitals hereto.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement between the United States and any other such jurisdiction that facilitates the implementation of the foregoing.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; <u>provided</u> that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>Final Order</u>" means the final order of the Bankruptcy Court authorizing and approving the Debtors' entry into and performance under the DIP Facility on a final basis, including the granting of the Liens and Superpriority Claims in respect of the DIP Facility in favor of the Administrative Agent and the Secured Parties, in substantially the form of the Interim Order, with such changes as the Administrative Agent reasonably approves.

"<u>Final Order Entry Deadline</u>" means, as to the Final Order, entry thereof by the Bankruptcy Court on or before the date that is (a) forty-five (45) days following the entry of the Interim Order or (b) if the Bankruptcy Court schedules a joint hearing to consider entry of the Final Order and Confirmation Order, sixty (60) days following entry of the Interim Order, unless such date is extended with the consent of the Administrative Agent and the Majority Lenders.

"<u>Financial Advisor</u>" means, (a) RPA Advisors, LLC or (b) any other Person from time to time retained by or on behalf of the Administrative Agent to provide financial advisory services.

"<u>Financial Officer</u>" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"<u>Financial Statements</u>" means the financial statement or statements of the Borrower and its Consolidated Subsidiaries referred to in Section 7.04(a).

14

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"Franklin" means Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts (but excluding any operating portfolio companies of the foregoing Persons).

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.05.

"Gas Balancing Obligations" means those obligations set forth on Schedule 7.18.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Borrower, any Restricted Subsidiary, any of their Properties, any Agent, the Issuing Bank or any Lender.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantors" means, collectively:

(a)     as of the Closing Date, each of the Debtors; and

(b)     each other Domestic Subsidiary that becomes a Debtor and guarantees the Secured Obligations pursuant to Section 8.14(b).

"Guaranty Agreement" means the Guaranty and Collateral Agreement executed by the Guarantors and the Administrative Agent, of even date herewith, as the same may be amended, modified or supplemented from time to time.

"Hedging Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit [  ] and otherwise reasonably satisfactory in form and substance to the Secured Swap Providers.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans or on other Secured Obligations under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

15

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Impacted Interest Period" has the meaning assigned to such term in the definition of "LIBO Rate".

"Indebtedness" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Indebtedness is assumed by such Person; (g) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Indebtedness or Property of others; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments for periods in excess of 120 days prior to the day of delivery, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services whether or not such goods or services are actually received or utilized by such Person; (k) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment.  The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP; provided, however, the contingent obligations of Borrower or any Subsidiary of Borrower pursuant to any purchase and sale agreement, stock purchase agreement, merger agreement or similar agreement shall not constitute "Indebtedness" within this definition so long as none of the same contains an obligation to pay money over time.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning assigned to such term in Section 12.03(b).

"Information" has the meaning assigned to such term in Section 12.11.

"Interest Election Request" means a request by the Borrower substantially in the form of Exhibit C to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of

16

such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three thereafter, as the Borrower may elect in its Borrowing Request or Interest Election Request, as applicable, given with respect thereto; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which would extend beyond the Maturity Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit H and otherwise reasonably satisfactory in form and substance to the Administrative Agent and the Majority Lenders.

"Interim Period" means the time period commencing on the date of the Bankruptcy Court's entry of the Interim Order and ending on the Final Order Entry Deadline.

"Interpolated Rate" means, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available for Dollars) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness of, or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory, goods, supplies or services sold by such Person in the ordinary course of business); or (c) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Issuing Bank" means JPMorgan, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in

17

which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Availability Requirements" shall have the meaning assigned to such term in Section 2.08(a).

"LC Commitment" means an amount equal to $60.0 million. For the avoidance of doubt, the LC Commitment is part of, and not in addition to, the aggregate Commitments.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lender Parent" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary of such Person.

"Lenders" means JPMorgan, the Persons listed on Annex I[1] and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means any letter of credit issued or deemed issued pursuant to this Agreement, including, for avoidance of doubt, the Existing Letters of Credit.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any applicable Interest Period (and with respect to clause (c) of the definition of "Alternate Base Rate", for an Interest Period of one month), the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for dollars) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as shall be selected by the Administrative Agent in its reasonable discretion), in each case (the "LIBO Screen Rate") as of the Specified Time on the Quotation Day for such Interest Period; provided that, (a) if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement and (b) if the LIBO Screen Rate shall not be available at such time for a period equal in length to such Interest Period (an "Impacted Interest Period"), then the LIBO Rate shall be the Interpolated Rate at such time; provided further, that, if any Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement. Notwithstanding the foregoing, to the extent that "LIBO Rate" or

---

[1] To be the Lenders under the Existing Credit Agreement.

18

"Adjusted LIBO Rate" is used in connection with an ABR Borrowing, such rate shall be determined as modified by the definition of Alternate Base Rate.

"LIBO Screen Rate" has the meaning assigned to such term in the definition of "LIBO Rate."

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties. The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower and its Restricted Subsidiaries shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidity" means, as of any date of determination, the sum of (without duplication) (a) the unused Commitments then available to be drawn in accordance with this Agreement and (b) the aggregate amount of unrestricted cash and cash equivalents of the Borrower or any of other Loan Parties at such time (it being understood that unrestricted cash shall (i) exclude any cash and cash equivalents which are subject to a Lien in favor of any Person unless such Liens are subordinated to a Lien in favor of the Administrative Agent pursuant to the Existing Intercreditor Agreement or otherwise in a manner satisfactory to the Administrative Agent and (ii) include all cash and cash equivalents held in a controlled account subject to a Lien in favor of the Administrative Agent).

"Loan Documents" means this Agreement, the Notes, if any, the Letter of Credit Agreements, the Letters of Credit and the Security Instruments.

"Loan Party" means, collectively, the Borrower and each Guarantor.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, at any time while no Loans or LC Exposure is outstanding, Lenders having more than fifty percent (50%) of the Aggregate Maximum Credit Amounts; and at any time while any Loans or LC Exposure are outstanding, Lenders holding more than fifty percent (50%) of the outstanding aggregate principal amount of the Loans or participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Material Adverse Effect" means a material adverse effect on (a) the business, financial condition, operations, performance, properties of the Borrower and the Guarantors, taken as a whole ((i) other than, in the case of the Debtors, (A) any events leading up to the filing of the Chapter 11 Cases and that were disclosed in the Disclosure Statement, (B) the filing of the Chapter 11 Cases and (C) those events which normally result from the commencement and continuation of a proceeding under Chapter 11 of the Bankruptcy and (ii) in the case of the Debtors, taking into account the effect of the automatic stay under the Bankruptcy Code), (b) the ability of the Loan Parties to perform their respective material obligations under the Loan Documents or (c) the ability of the Administrative Agent and the Lenders to enforce the Loan Documents.

"Material Domestic Subsidiary" means, as of any date, any Domestic Subsidiary that (a) is a Wholly-Owned Subsidiary and (b) together with its Restricted Subsidiaries, owns Property having a fair market value of $1.0 million or more.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Restricted Subsidiaries incurred after the Petition Date in an aggregate principal amount exceeding $10.0 million.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means the earlier of (a) the date that is three (3) months following the Petition Date; provided that such date may be extended in three-month increments at the request of the Borrower in its sole discretion, but in no event beyond the date that is twelve (12) months after the Petition Date and (b) the effective date of the Approved Plan that is confirmed pursuant to the Confirmation Order.

"Maximum Credit Amount" means, as to each Lender, (a) during the Interim Period, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts-Interim Period", as the same may be modified from time to time pursuant to any assignment permitted by Section 12.04(b)[2] and (b) thereafter upon entry of the Final Order on or before the Final Order Entry Deadline, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts-Final Order", as the same may be modified from time to time pursuant to any assignment permitted by Section 12.04(b).[3]

"Milestones" means the following milestones to be completed in each case in accordance with the applicable timing referred to below (or such later dates as may be approved by the Majority Lenders):

(a) within four (4) Business Days following the Petition Date, entry of the Interim Order;

(b) on or prior to the Final Order Entry Deadline, entry of the Final Order;

(c) within 105 days following the Petition Date, entry by the Bankruptcy Court of an order approving the Disclosure Statement;

(d) within 105 days following the Petition Date, entry by the Bankruptcy Court of the Confirmation Order;

(e) within 120 days following the Petition Date, the Approved Plan or a Cash Pay Plan shall be effective; and

---

[2] NTD: Interim Period Commitment to equal the sum of $50.0 million plus the amount of loans and letters of credit outstanding under the Existing Credit Agreement on the Closing Date (expected to be approximately $450.0 million).

[3] NTD: For the avoidance of doubt, the Interim Period "Commitment" is capped at $500M and upon the Final Order conditions being satisfied such "Commitment" increases to $600M for full access to the revolver.

20

(f) until the Exit Facility Conversion Date, use of reasonable best efforts to obtain Bankruptcy Court approval and confirmation of the Approved Plan and the consummation of the transactions therein as soon as reasonably practicable.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means any Property owned by the Borrower or any Guarantor which is subject to the Liens existing and to exist under the terms of the Security Instruments.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in section 3(37) or 4001(a)(3) of ERISA.

"Net Cash Proceeds" means in connection with any issuance or sale of Equity Interests, incurrence or issuance of Indebtedness, debt securities or instruments, the incurrence of loans, any Disposition of Property, any Unwind of Swap Agreements, or Casualty Event, the aggregate cash proceeds (including any cash subsequently received upon the sale or other Disposition or collection of any non-cash consideration received in any sale) received from such issuance, incurrence, Disposition, Unwind or Casualty Event, as applicable, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Recourse Debt" means any Indebtedness of any Unrestricted Subsidiary, in each case in respect of which: (a) the holder or holders thereof (i) shall have recourse only to, and shall have the right to require the obligations of such Unrestricted Subsidiary to be performed, satisfied, and paid only out of, the Property of such Unrestricted Subsidiary and/or one or more of its Subsidiaries (but only to the extent that such Subsidiaries are Unrestricted Subsidiaries) and/or any other Person (other than Borrower and/or any Restricted Subsidiary) and (ii) shall have no direct or indirect recourse (including by way of guaranty, support or indemnity) to the Borrower or any Restricted Subsidiary or to any of the Property of Borrower or any Restricted Subsidiary (other than Equity Interests of such Unrestricted Subsidiary), whether for principal, interest, fees, expenses or otherwise; and (b) the terms and conditions relating to the non-recourse nature of such Indebtedness are in form and substance reasonably acceptable to the Administrative Agent.

"Notes" means the promissory notes of the Borrower as requested by a Lender and described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues,

21

profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or Property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and any other Loan Document.

"Participant" has the meaning set forth in Section 12.04(c).

"Participant Register" has the meaning set forth in Section 12.04(c).

"Perfection Certificate" means a perfection certificate substantially in the form of Exhibit I.

"Permitted Holders" means Ares, Franklin and each of their respective Affiliates (but excluding any operating portfolio companies of the foregoing persons).

"Permitted Sale of Hydrocarbons" has the meaning assigned to such term in Section 9.13(a).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate.

"Post-Trigger Date Carve Out" has the meaning assigned to such term in the definition of "Carve Out".

"Pre-Petition Collateral" means the Loan Parties' assets constituting Collateral (as defined in the Existing Intercreditor Agreement).

22

"Preferred Equity" means the Borrower's 5.75% Series A Convertible Perpetual Preferred Stock pursuant to the Certificate of Designations, Preferences, Rights and Limitations, dated as of June 17, 2013, by the Borrower, as amended, supplemented or otherwise modified as of the Petition Date.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective. Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Professional Fees and Expenses" has the meaning assigned to such term in the definition of "Carve Out".

"Projected Production" means, as of any date of determination, the internally forecasted production of each of crude oil, natural gas liquids and natural gas, calculated on a barrel of oil equivalent basis, of the Borrower and its Restricted Subsidiaries, for each month for the period of the next 24 months commencing on the first day of the calendar month immediately following such date of determination.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proved Reserves" means oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves."

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each of the Borrower, any Restricted Subsidiary and any Guarantor that has total assets exceeding $10.0 million at the time such Swap Obligation is incurred or such other person as constitutes an ECP under the Commodity Exchange Act or any regulations promulgated thereunder.

"Quotation Day" means, with respect to any Eurodollar Loan for any Interest Period, two (2) Business Days prior to the commencement of such Impacted Interest Period.

"Redemption" means with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Indebtedness; provided, however, the term "Redemption" shall not include early termination of a Swap Agreement due to an ISDA "Termination Event" to the extent the amount due at such termination exceeds $10.0 million. "Redeem" has the correlative meaning thereto.

"Register" has the meaning assigned to such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

23

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Remedial Work" has the meaning assigned to such term in Section 8.10(a).

"Required Lenders" means (a) at any time while no Loans or LC Exposure are outstanding, Lenders having at least sixty-six and two thirds percent (66-2/3%) of the Aggregate Maximum Credit Amounts; and (b) at any time while any Loans or LC Exposure are outstanding, Lenders holding at least sixty-six and two thirds percent (66-2/3%) of the outstanding aggregate principal amount of the Loans or participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Reserve Report" means a report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions consistent with SEC reporting requirements at the time.

"Reserve Report Certificate" has the meaning assigned to such term in Section 8.12(c).

"Residual Carve Out Amount" has the meaning assigned to such term in Section 8.20(b).

"Responsible Officer" means, as to any Person, the Chief Executive Officer, the President, the Chief Operating Officer, any Financial Officer or Executive Vice President-Finance and Administration of such Person.  Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution or return of capital (whether in cash, securities or other Property) with respect to any Equity Interests in any Person, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of (a) any such Equity Interests or (b) any option, warrant or other right to acquire any such Equity Interests.

"Restricted Subsidiary" means any Subsidiary of the Borrower that is not an Unrestricted Subsidiary and for all purposes under this Agreement and the other Loan Document shall include all Debtors.

"Restructuring Support Agreement" has the meaning assigned to such term in the recitals hereto.

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans, its LC Exposure and all other reimbursement obligations under the DIP Facility at such time.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

24

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Second Lien Notes" means, collectively (a) the 2020 Second Lien Notes and (b) the 2022 Second Lien Notes.

"Secured Obligations" means any and all amounts owing or to be owing by the Borrower, any Restricted Subsidiary or any Guarantor (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising (including interest and fees accruing after the maturity of the Loans and LC Disbursements or the termination of the Secured Swap Agreements and interest accruing after the filing of any petition for bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding); provided that solely with respect to any Loan Party that is not an "eligible contract participant" under the Commodity Exchange Act, Excluded Swap Obligations of such Loan Party shall in any event be excluded from "Secured Obligations" owing by such Loan Party): (a) to the Administrative Agent, the Issuing Bank or any Lender under any Loan Document, (b) to any Secured Swap Provider, (c) to any Bank Products Provider and (d) all renewals, extensions and/or rearrangements of any of the above.

"Secured Parties" means, collectively, the Administrative Agent, the Issuing Bank, the Lenders, each Bank Products Provider, each Secured Swap Provider and any other Person owed Secured Obligations. "Secured Party" means any of the foregoing individually.

"Secured Swap Agreement" means a Swap Agreement between (a) any Loan Party and (b) a Secured Swap Provider, which shall include, for the avoidance of doubt, the Existing Secured Swap Agreements.

"Secured Swap Provider" means, with respect to any Swap Agreement, (a) a Lender or an Affiliate of a Lender who is the counterparty to any such Swap Agreement with a Loan Party and (b) any Person who was a Lender or an Affiliate of a Lender at the time when such Person entered into any such Swap Agreement who is a counterparty to any such Swap Agreement with a Loan Party; provided that any such Secured Swap Provider that ceases to be a Lender or an Affiliate of a Lender shall continue to be a "Secured Swap Provider" for the purpose of the Loan Documents to the extent that such Secured Swap Provider entered into a Secured Swap Agreement with the Borrower or any of its Subsidiaries prior to the date hereof or at the time such Secured Swap Provider was a Lender (or Affiliate of a Lender) hereunder and such Secured Swap Agreement remains in effect and there are remaining obligations under such Secured Swap Agreement (but excluding any transactions, confirms, or trades entered into after such Person ceases to be a Lender or an Affiliate of a Lender).

25

"Security Instruments" means (a) the Guaranty Agreement, (b) mortgages, (c) deeds of trust, (d) the other agreements, instruments or certificates described or referred to in Exhibit E, and (e) any and all other agreements, instruments or certificates previously entered into or filed with respect to the Existing Credit Agreement or now or hereafter executed and delivered by the Borrower or any other Person (other than Swap Agreements with the Lenders or any Affiliate of a Lender or participation or similar agreements between any Lender and any other lender or creditor with respect to any Secured Obligations pursuant to this Agreement) in connection with, or as security for the payment or performance of the Secured Obligations, the Loans, the Notes, if any, this Agreement, or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Specified Time" means 11:00 A.M., London time.

"Statutory Reserve Rate" means a fraction (expressed as a decimal) not to exceed the number one, the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any basis, marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority of the Board or any other Governmental Authority having jurisdiction for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means: (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, manager or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Borrower or one or more of its Subsidiaries or by the Borrower and one or more of its Subsidiaries and (b) any partnership of which the Borrower or any of its Restricted Subsidiaries is a general partner. Unless otherwise indicated herein, each reference to the term "Subsidiary" shall mean a Subsidiary of the Borrower.

"Superpriority Claim" means a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and/or 726 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction, collar or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more interest rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these

26

transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Commitments.

"Testing Date" has the meaning assigned to such term in Section 9.01(b).

"Testing Period" has the meaning assigned to such term in Section 9.01(b).

"Third Lien Indenture" means that certain Indenture, dated as of September 10, 2015, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, in each case as amended, supplemented or otherwise modified as of the Petition Date.

"Third Lien Notes" means the Borrower's 13.0% Third Lien Senior Secured Notes due 2022 pursuant to the Third Lien Indenture.

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of its obligations under this Agreement, each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Borrower on Mortgaged Properties and other Properties pursuant to the Security Instruments and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Secured Obligations and the other obligations under the Guaranty Agreement by such Guarantor and such Guarantor's grant of the security interests and provision of collateral thereunder, and the grant of Liens by such Guarantor on Mortgaged Properties and other Properties pursuant to the Security Instruments.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"Unrestricted Subsidiary" means any Subsidiary of the Borrower designated as such on Schedule 7.14 or which the Borrower has designated in writing to the Administrative Agent to be an Unrestricted Subsidiary pursuant to Section 9.06.

"Unsecured Notes" means, collectively (a) the 2020 Unsecured Notes, (b) the 2021 Unsecured Notes and (c) the 2022 Unsecured Notes.

"Unwind" means, with respect to any transaction under a Swap Agreement, the early termination, unwind or cancelation of any transaction under such Swap Agreement. "Unwound" shall have a meaning correlative to the foregoing.

"U.S. Person" has the meaning given in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned such term in Section 5.03(e)(i)(B)(3).

"Variance Report" means a report in a form reasonably satisfactory to the Administrative Agent detailing any variance (whether plus or minus and expressed as a percentage) between (i) the "Aggregate Total Receipts" of the Borrower and its Subsidiaries during the relevant Testing Period against the "Aggregate Total Receipts" set forth in the Budget for the relevant Testing Period, (b) the "Aggregate Operating Disbursements" made during the relevant Testing Period by the Borrower and its Subsidiaries against the "Aggregate Operating Disbursements" set forth in the Budget for the relevant Testing Period and (c) the "Aggregate Professional Expenses" of the Borrower and its Subsidiaries during the relevant Testing Period against the "Aggregate Professional Expenses" set forth in the Budget for the relevant Testing Period.

"Wholly-Owned Subsidiary" means any Restricted Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Borrower or one or more of the Wholly-Owned Subsidiaries or by the Borrower and one or more of the Wholly-Owned Subsidiaries.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    Types of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (e.g., a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained herein), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time

28

period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05    Accounting Terms and Determinations; GAAP.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the Financial Statements except for changes in which Borrower's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); provided that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

## ARTICLE II
## THE CREDITS

Section 2.01    Commitments.    Subject to the terms and conditions set forth herein, including without limitation, entry of the DIP Order, (a) the Existing Loans under the Existing Credit Agreement shall be deemed refunded, refinanced, replaced and made hereunder and, on and after the Closing Date, shall constitute Loans for all purposes hereunder and under the Loan Documents and (b) on and after the Closing Date, each Lender agrees to make Loans to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment or (ii) the total Revolving Credit Exposures exceeding the lesser of the total Commitments and the Aggregate Maximum Credit Amounts. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02    Loans and Borrowings.

(a)    Borrowings; Several Obligations.    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Types of Loans.    Subject to the terms of this Agreement, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    Minimum Amounts; Limitation on Number of Borrowings.    At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1.0 million and not less than $1.0 million.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral

29

multiple of $1.0 million and not less than $1.0 million; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.08(e). Borrowings of more than one Type may be outstanding at the same time, provided that there shall not at any time be more than a total of eight (8) Eurodollar Borrowings outstanding. Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)    Notes.    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the accounts maintained pursuant to this Section 2.02(d) shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement. Any Lender may request that Loans made by it be evidenced by a Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender and substantially in the form of Exhibit A dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement or (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, payable to such Lender in a principal amount equal to its Maximum Credit Amount as in effect on such date, and otherwise duly completed. Thereafter, the Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 12.04) be represented by one or more Notes in such form payable to the payee named therein (or, if such Note is a registered note, to such payee and its registered assigns). In the event that any Lender's Maximum Credit Amount increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or otherwise), the Borrower shall deliver or cause to be delivered on the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Maximum Credit Amount after giving effect to such increase or decrease, and otherwise duly completed. The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender. Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03    Requests for Borrowings.    To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone, fax (or transmit by electronic communication, if arrangements for doing so have been approved by the Administrative Agent) (a) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, on the date of the proposed Borrowing; provided that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e). Each such telephonic (or electronic communication) Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower.

Each such telephonic, electronic communication, and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)       the aggregate amount of the requested Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(v)      the amount of the then effective Aggregate Maximum Credit Amount, the current total Revolving Credit Exposures (without regard to the requested Borrowing) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Borrowing); and

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. Each Borrowing Request shall constitute a representation that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed the lesser of the total Commitments and the Aggregate Maximum Credit Amounts.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    Interest Elections.

(a)    Conversion and Continuance. Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    Interest Election Requests. To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone, fax (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic (or electronic communication) Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower.

31

(c)    Information in Interest Election Requests.    Each telephonic, electronic communication and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and Section 2.04(c)(iv) shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Notice to Lenders by the Administrative Agent.    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.    Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing:  (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05    Funding of Borrowings.

(a)    Funding by Lenders.    Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.    The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent in New York, New York and designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

32

(b)      Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to 10:00 A.M. New York City time on the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to the requested Borrowing.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06      Termination and Reduction of Aggregate Maximum Credit Amounts.

(a)      Scheduled Termination of Commitments.  Unless previously terminated, the Commitments shall terminate on the Maturity Date.  If at any time the Aggregate Maximum Credit Amounts are terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)      Optional Termination and Reduction of Aggregate Credit Amounts.

(i)      The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts; provided that (A) each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $5.0 million and not less than $10.0 million and (B) the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the total Commitments.

(ii)      The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Maximum Credit Amounts under Section 2.06(b)(i) at least three (3) Business Days prior to the effective date of such termination or reduction or such shorter time as the Administrative Agent may agree in writing, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; provided that a notice of termination of the Aggregate Maximum Credit Amounts delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit or debt facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Maximum Credit Amounts shall be permanent and may not be reinstated. Each reduction of the Aggregate Maximum Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07      [Reserved].

Section 2.08      Letters of Credit.

33

(a)    General.  Subject to the terms and conditions set forth herein, including without limitation, entry of the DIP Order, (i) the Existing Letters of Credit under the Existing Credit Agreement shall be replaced and deemed made hereunder and, on and after the Closing Date, shall constitute Letters of Credit for all purposes hereunder and under the Loan Documents and (ii) on and after the Closing Date, the Borrower may request the issuance of dollar denominated Letters of Credit for its own account or for the account of any of its Restricted Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period; provided that, in addition to the conditions set forth in Section 6.02, the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if (x) the LC Exposure would exceed the LC Commitment or (y) the total Revolving Credit Exposures would exceed the lesser of the total Commitments and the Aggregate Maximum Credit Amounts (collectively, the "LC Availability Requirements").  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension unless otherwise consented to by the Issuing Bank) a notice:

(i)    requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)    specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)    specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.08(c));

(iv)    specifying the amount of such Letter of Credit;

(v)    specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)    specifying the amount of the then effective Aggregate Maximum Credit Amount, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the pro forma total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation that, after giving effect to the requested issuance, amendment, renewal or extension, as applicable, the LC Availability Requirements will be satisfied on the date of such issuance, amendment, renewal or extension.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.

(c)     Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date.

(d)     Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)     Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 12:00 noon, New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that if such LC Disbursement is equal to or greater than $1.0 million, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such LC Disbursement be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, mutatis mutandis, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this Section 2.08(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

35

(f)     <u>Obligations Absolute</u>.    The Borrower's obligation to reimburse LC Disbursements as provided in <u>Section 2.08(e)</u> shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply substantially with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>Section 2.08(f)</u>, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; <u>provided</u> that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its reasonable discretion, either accept and make payment upon such documents without responsibility for further investigation, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     <u>Disbursement Procedures</u>.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)     <u>Interim Interest</u>.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under <u>Section 2.08(e)</u>), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to ABR Loans.  Interest accrued pursuant to this <u>Section 2.08(h)</u> shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to <u>Section 2.08(e)</u> to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

36

(i)     Replacement of the Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall also be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit. Subject to the appointment and acceptance of a successor Issuing Bank which is acceptable to the Borrower, any Issuing Bank may resign as an Issuing Bank at any time upon thirty (30) days' prior written notice to the Administrative Agent, the Borrower and the Lenders, in which case, such Issuing Bank shall be replaced in accordance with this Section 2.08(i) above.

(j)     Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.08(j), (ii) the LC Exposure exceeds the LC Commitment at any time, (iii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c) or (iv) the Borrower is required to cash collateralize a Defaulting Lender's LC Exposure pursuant to Section 4.05, then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to 105% of (A) in the case of an Event of Default, the LC Exposure (net of any cash collateral already held at the applicable time by the Administrative Agent with respect to such LC Exposure), (B) in the case of the LC Exposure exceeding the LC Commitment, the amount of such excess, (C) in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon and (D) in the case that the Borrower is required to cash collateralize a Defaulting Lender's LC Exposure, the amount required by Section 4.05.  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this Section 2.08(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantor's obligations under this Agreement and the other Loan Documents.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Interest or profits, if any, on such deposit shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent

37

not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to <u>Section 3.04(c)</u>, then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

Section 2.09    <u>Priority and Liens</u>.  The Loan Parties hereby covenant, represent and warrant that, upon entry of the DIP Order and the Hedging Order, the Secured Obligations of the Loan Parties hereunder and under the other Loan Documents, the Secured Swap Agreements, the DIP Order and the Hedging Order, shall have the priority and liens set forth in the DIP Order and Hedging Order, subject to the Carve-Out as further described therein.

Section 2.10    <u>Payment of Obligations</u>.  Upon the maturity (whether by acceleration or otherwise) of any of the Secured Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Secured Obligations without further application to or order of the Bankruptcy Court.

Section 2.11    <u>No Discharge; Survival of Claims</u>. Subject to <u>Section 2.12</u>, the Borrower and each Guarantor agrees that (a) any Confirmation Order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the Secured Obligations of the Loan Parties to the Secured Parties under this Agreement and the related Loan Documents, other than after the payment in full in cash to the Secured Parties of all Secured Obligations under the DIP Facility (and the cash collateralization of all outstanding Letters of Credit in amount and subject to documentation satisfactory to the Issuing  Bank) and the related Loan Documents on or before the effective date of a plan of reorganization and termination of the Commitments and (b) to the extent its Secured Obligations hereunder and under the other Loan Documents are not satisfied in full, (i) its Secured Obligations arising hereunder shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent, the Lenders and the Secured Swap Providers pursuant to the DIP Order and the Hedging Order and the Liens granted to the Administrative Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a Confirmation Order.

Section 2.12    <u>Conversion to Exit Facility Agreement</u>.  Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in the Exit Facility Agreement, automatically and without any further consent or action required by the Administrative Agent or any Lender, (a) each Loan and Letter of Credit hereunder shall be deemed refunded, refinanced, replaced and issued as a Loan and Letter of Credit under the Exit Facility Agreement, (b) in connection therewith the Borrower, in its capacity as reorganized Halcón Resources Corporation, and each Guarantor, in its capacity as a reorganized Debtor, to the extent such Person is required under the Exit Facility Agreement to continue to be a guarantor in respect thereof, shall assume all obligations in respect of the Loans and Letters of Credit hereunder and all other obligations in respect hereof, (c) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (d) this Agreement shall terminate and be superseded, refunded, refinanced and replaced by, and deemed amended and restated in its entirety substantially in the form of, the Exit Facility Agreement (with such changes and insertions reasonably satisfactory to the Administrative Agent, the Lenders and the Borrower thereto incorporated as necessary to make such technical changes necessary to effectuate the intent of this <u>Section 2.12</u> or otherwise), and the Commitments hereunder shall terminate. Notwithstanding the foregoing, all obligations of the Borrower and the other Loan Parties to the Agent,

38

the Arrangers, the Issuing Bank and the Lenders under this Agreement and any other Loan Document (except, for the avoidance of doubt, the Exit Facility Agreement) which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.   Each of the Loan Parties, the Administrative Agent, the Lenders and the Issuing Bank shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this <u>Section 2.12</u> and as are required to complete the Schedules to the Exit Facility Agreement.

**ARTICLE III**
**PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES**

Section 3.01     <u>Repayment of Loans</u>.   The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date; <u>provided</u> that each Loan made during the Interim Period shall become due and payable, and the Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each such Loan, on the first Business Day following the Final Order Entry Deadline unless a Final Order approving the DIP Facility shall have been entered by the Bankruptcy Court on or before the Final Order Entry Deadline.

Section 3.02     <u>Interest</u>.

(a)     <u>ABR Loans</u>.   The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)     <u>Eurodollar Loans</u>.   The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)     <u>Post-Default Rate</u>.   Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, then all Loans and other amounts outstanding, shall bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the rate applicable interest rate plus (or, in the event there is no applicable rate, two percent (2%) <u>plus</u> the Applicable Margin then in effect applicable to ABR Loans as provided in <u>Section 3.02(a)</u>), but in no event to exceed the Highest Lawful Rate.

(d)     <u>Interest Payment Dates</u>.   Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; <u>provided</u> that (i) interest accrued pursuant to <u>Section 3.02(c)</u> shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     <u>Interest Rate Computations</u>.   All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in

39

each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means (including, without limitation, by means of an Interpolated Rate) do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(b)    the Administrative Agent shall have received notice from the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective (and such Borrowing shall be automatically converted into ABR Loans on the last day of the applicable Interest Period), and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made either (x) as an ABR Borrowing or (y) subject to the prior written consent of the Borrower, at an alternate rate of interest determined by the Majority Lenders as their cost of funds.

Section 3.04    Prepayments.

(a)    Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay, without premium or penalty (except with respect to any amounts due under Section 5.02) any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone and/or fax (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 noon, New York City time, one (1) Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02 and any amounts due under Section 5.02.

(c)    Mandatory Prepayments.

40

(i)      <u>Upon Optional Termination and Reduction</u>.  If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to <u>Section 2.06(b)</u>, the total Revolving Credit Exposures exceeds the Aggregate Maximum Credit Amounts, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining excess to be held as cash collateral as provided in <u>Section 2.08(j)</u>.

(ii)      [Reserved].

(iii)      [Reserved].

(iv)      <u>Upon any Dispositions, Swap Unwinds and Issuances of Indebtedness</u>. The Borrower shall prepay the Loans as follows:

(A)      upon any Disposition by any Loan Party (including, for avoidance of doubt, any Disposition of Property to an Unrestricted Subsidiary, but excluding (x) a Permitted Sale of Hydrocarbons, (y) a Disposition to a Loan Party or from a non-Loan Party to a non-Loan Party and (z) any Disposition permitted under <u>Section 9.13(c)</u>) of any of its Oil and Gas Properties or other Property or any Unwind of a Swap Agreement by any Loan Party, the Borrower shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of the Net Cash Proceeds of such Disposition or Unwind (it being understood that neither the Aggregate Maximum Credit Amounts nor the Commitments shall be permanently reduced by an amount equal to the amount of such prepayment; <u>provided</u> that if the Net Cash Proceeds received from such Disposition or Unwind when aggregated with any other Disposition or Unwind which has occurred since the Closing Date, exceeds $50.0 million, the Commitments shall be permanently reduced on a dollar for dollar basis equal to the amount of such excess), and

(B)      upon the incurrence or issuance of any Indebtedness (other than any Indebtedness that is permitted under <u>Section 9.02</u>) by any Loan Party, the Borrower shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of the Net Cash Proceeds, if any, received in respect of such Indebtedness (it being understood that the Aggregate Maximum Credit Amounts and the Commitments shall be permanently reduced by an amount equal to the amount of such prepayment).

(v)      <u>Application of Prepayments to Types of Borrowings</u>.  Each prepayment of Borrowings pursuant to this <u>Section 3.04(c)</u> shall be applied, <u>first</u>, ratably to any ABR Borrowings then outstanding, and, <u>second</u>, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(vi)      <u>Interest to be Paid with Prepayments</u>. Each prepayment of Borrowings pursuant to this <u>Section 3.04(c)</u> shall be applied ratably to the Loans included in the prepaid Borrowings. Prepayments pursuant to this <u>Section 3.04(c)</u> shall be accompanied by accrued interest to the extent required by <u>Section 3.02</u>.

(d)      <u>No Premium or Penalty</u>.  Prepayments permitted or required under this <u>Section 3.04</u> shall be without premium or penalty, except as required under <u>Section 5.02</u>.

41

Section 3.05     Fees.

(a)     Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.  Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.15% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, provided that in no event shall such fee be less than $125 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; provided that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.  Any other fees payable to the Issuing Bank pursuant to this Section 3.05(b) shall be payable within ten (10) days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Administrative Agent.

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01     Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     Payments by the Borrower.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without defense, deduction,

42

recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon, but shall be considered received on the date paid for purposes of Section 10.01.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the Persons entitled thereto promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)     Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)     Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal and accrued interest on their respective Loans and participations in LC Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02     Presumption of Payment by the Borrower.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made

43

such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03    Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(b), Section 2.08(d), Section 2.08(e) or Section 4.02 then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 4.04    [Reserved].

Section 4.05    Payments and Deductions to a Defaulting Lender.

(a)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(b), Section 2.08(d), Section 2.08(e) or Section 4.02 then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid in cash.

(b)    If a Defaulting Lender as a result of the exercise of a set-off shall have received a payment in respect of its Revolving Credit Exposure which results in its Revolving Credit Exposure being less than its Applicable Percentage of the aggregate Revolving Credit Exposures, then no payments will be made to such Defaulting Lender until such time as all amounts due and owing to the Lenders have been equalized in accordance with each Lender's respective *pro rata* share of the aggregate Revolving Credit Exposures.  Further, if at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan or a reimbursement of an LC Disbursement while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its *pro rata* share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Percentage of all Loans then outstanding.  After acceleration or maturity of the Loans, subject to the first sentence of this Section 4.05(b), all principal will be paid ratably as provided in Section 10.02(c).

(c)    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)    Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 3.05.

(ii)    The Commitment, the Maximum Credit Amount, the outstanding principal balance of the Loans and participation interests in Letters of Credit of such Defaulting Lender shall not be included in determining whether all Lenders or the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 12.02),

44

provided that any waiver, amendment or modification requiring the consent of each affected Lender and which affects such Defaulting Lender, shall require the consent of such Defaulting Lender.

(iii)    If any LC Exposure exists at the time a Lender becomes a Defaulting Lender then:

(A)    all or any part of such LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (1) the sum of all Non-Defaulting Lenders' Revolving Credit Exposures plus such Defaulting Lender's LC Exposure does not exceed the total of all Non-Defaulting Lenders' Commitments, (2) the sum of each Non-Defaulting Lender's Revolving Credit Exposure plus its reallocated share of such Defaulting Lender's LC Exposure does not exceed such Non-Defaulting Lender's Commitment, and (3) the conditions set forth in Section 6.02 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, then the Borrower shall, within one (1) Business Day following notice by the Administrative Agent, cash collateralize such Defaulting Lender's LC Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with the procedures set forth in Section 2.08(e) for so long as such LC Exposure is outstanding;

(C)    if the Borrower cash collateralizes any portion of such Defaulting Lender's LC Exposure pursuant to this Section 4.05 then the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.05(b) with respect to such Defaulting Lender's LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(D)    if the LC Exposure of the Non-Defaulting Lenders is reallocated pursuant to Section 4.05, then the fees payable to the Lenders pursuant to Section 3.05(a) and Section 3.05(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Applicable Percentages; or

(E)    if any Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to Section 4.05(c)(iii), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all commitment fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Commitment that was utilized by such LC Exposure) and letter of credit fees payable under Section 3.05(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until such LC Exposure is cash collateralized and/or reallocated.

(d)    So long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 4.05, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.08(d) (and Defaulting Lenders shall not participate therein).

(e)    If (i) a Bankruptcy Event or a Bail-In Action with respect to a Lender Parent of any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) the Issuing Bank has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Issuing Bank shall not be

45

required to issue, extend, renew or increase any Letter of Credit, unless the Issuing Bank shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Issuing Bank to defease any risk to it in respect of such Lender hereunder.

(f)     In the event that the Administrative Agent, the Borrower and the Issuing Bank each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the LC Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans or participations in Letters of Credit of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01    <u>Increased Costs</u>.

(a)     <u>Eurodollar Changes in Law</u>.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)     shall subject any Lender or Issuing Bank to any Taxes (other than (A) Indemnified Taxes or Other Taxes indemnified under <u>Section 5.03</u> and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitment, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or Issuing Bank of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or Issuing Bank such additional amount or amounts as will compensate such Lender or Issuing Bank for such additional costs incurred or reduction suffered.

(b)     <u>Capital and Liquidity Requirements</u>.  If any Lender or the Issuing Bank determines that any Change in Law regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or Section 5.01(b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

(d)     Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.04(b), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 5.03     Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law. If a withholding agent shall be required under applicable law (as determined in the good faith discretion by the applicable withholding agent) to deduct any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions, (ii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions

47

(including deductions applicable to additional sums payable under this <u>Section 5.03</u>), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made.

(b)     <u>Payment of Other Taxes by the Borrower</u>.  The Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for such Other Taxes.

(c)     <u>Indemnification by the Borrower</u>.  The Borrower and Guarantors shall jointly and severally indemnify the Administrative Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 5.03</u>) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent or a Lender as to the amount of such payment or liability under this <u>Section 5.03</u> shall be delivered to the Borrower and shall be conclusive absent manifest error.

(d)     <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by the Borrower or a Guarantor to a Governmental Authority pursuant to this <u>Section 5.03</u>, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     <u>Foreign Lenders</u>.  (i) Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments under this Agreement or any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by a Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by such Borrower or the Administrative Agent as will enable such Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 5.03(e)(i)(A)</u>, <u>(i)(B)</u> and <u>(i)(D)</u> below) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be

48

requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E (or any successor thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E (or any successor thereto) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI (or any successor thereto);

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that (A) such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with a U.S. trade or business conducted by such Foreign Lender or are effectively connected but are not includible in the Foreign Lender's gross income for U.S. federal income tax purposes under an income tax treaty (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or W-8BEN-E (or any successor thereto); or

(4)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership), executed originals of IRS Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN or W-8BEN-E (or any successor thereto), U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such beneficial owner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to

comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)        Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the Borrower or Guarantors have not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower and Guarantors to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 5.03(f).

(g)        Tax Refunds. If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 5.03, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 5.03 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This Section 5.03 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(h)        For purposes of this Section 5.03, the term Lender shall include the Issuing Bank.

Section 5.04        Mitigation Obligations; Replacement of Lenders.

50

(a)    <u>Designation of Different Lending Office</u>.  If any Lender requests compensation under <u>Section 5.01</u>, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 5.03</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 5.01</u> or <u>Section 5.03</u>, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If (i) any Lender requests compensation under <u>Section 5.01</u>, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 5.03</u>, (iii) any Lender becomes a Defaulting Lender or (iv) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that requires the consent of all the Lenders (or the affected Lenders and such Lender is an affected Lender) pursuant to <u>Section 12.02</u> and with respect to which Lenders holding at least eighty-five percent (85%) of the outstanding aggregate principal amount of the Loans or participation interests in Letters of Credit have consented, then the Borrower may, at its sole expense, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in <u>Section 12.04(b)</u>), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that (1) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (2) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (3) in the case of any such assignment resulting from a claim for compensation under <u>Section 5.01</u> or payments required to be made pursuant to <u>Section 5.03</u>, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

Section 6.01    <u>Conditions Precedent to Closing Date</u>.  The obligations of the Lenders to make (or to be deemed to have made) Loans and of the Issuing Bank to issue (or to be deemed to have issued) Letters of Credit on the Closing Date shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 12.02</u>):

(a)    <u>Credit Agreement</u>.  The Loan Documents shall be in form and substance reasonably satisfactory to the Borrower, the Administrative Agent and the Lenders and in connection therewith the Administrative Agent shall have received from each party hereto counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(b)    <u>Loan Documents</u>.

51

(i)        Execution of Security Instruments.  The Administrative Agent shall have received from each party thereto counterparts (in such number as may be requested by the Administrative Agent) of the Security Instruments, including the Guaranty Agreement and Perfection Certificate, described on Exhibit E that have been executed and delivered by a Responsible Officer of each Loan Party party thereto.

(ii)       Filings, Registrations and Recordings.  Each Security Instrument and any other document (including any Uniform Commercial Code financing statement) required by any Security Instrument or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the DIP Collateral, prior and superior in right to any other Person shall be in proper form for filing, registration or recordation.

(iii)      Pledged Stock; Stock Powers; Pledged Notes. The Administrative Agent shall have received (A) the certificates representing the shares of Equity Interests pledged pursuant to the Guaranty Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (B) each promissory note (if any) pledged to the Administrative Agent pursuant to the Guaranty Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(c)       Chapter 11 Cases. (i) The Chapter 11 Cases shall have been commenced and (ii) the motion to approve the Interim Order and the Final Order, and all "first day orders" entered at the time of commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the Administrative Agent.

(d)       Interim Order.  The Administrative Agent shall have received a signed copy of the Interim Order which shall have been entered by the Bankruptcy Court on or before the fourth Business Day after the Petition Date, and such Interim Order shall not have been vacated, reversed, modified amended or stayed.

(e)       Fees.  All fees required to be paid to the Arrangers, the Administrative Agent and the Lenders on or before the Closing Date shall have been paid. All reasonable and documented out-of-pocket fees and expenses (including reasonable and documented fees and expenses of outside counsel) required to be paid to the Administrative Agent and the Lenders on or before the Closing Date shall have been paid.

(f)       Initial Budget.  The Administrative Agent shall have received the initial Budget for the 13-week period following the Closing Date, which shall be in a form satisfactory to the Administrative Agent in its reasonable discretion and in substance reasonably acceptable to the Administrative Agent and the Financial Advisor, together with a Budget Certificate.

(g)       Business Plan.  The Administrative Agent shall have received and be reasonably satisfied with the business plan of the Borrower for the period through the 2020 fiscal year of the Borrower.

(h)       No Conflicts. The Administrative Agent shall be satisfied in its reasonable judgment that (except as authorized by the Interim Order, and after giving effect to that certain Consent and Waiver to Senior Revolving Credit Agreement and Intercreditor Agreement, dated as of July 21, 2016, by and among the Borrower, each of the Guarantors party thereto, each of the Existing Lenders and swap counterparties party thereto and the Existing Administrative Agent) there shall not occur as a result

52

of, and after giving effect to, the initial extension of credit under the DIP Facility, a default under any of the Borrower's, the Guarantors' or their respective subsidiaries' debt instruments and other material agreements which, (i) in the case of the Debtors' debt instruments and other material agreements, would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis or (ii) would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(i)  No MAE.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that since March 31, 2016, no event has occurred that would reasonably be expected result in a Material Adverse Effect.

(j)  No Litigation.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that there does not exist any action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened against any Loan Party in any court or before any arbitrator or Governmental Authority (other than the Chapter 11 Cases and any action, suit, investigation or proceeding arising from the commencement and continuation of the Chapter 11 Cases or the consequences that would normally result from the commencement and continuation of a chapter 11 case) that is not stayed and would reasonably be expected to result in a Material Adverse Effect.

(k)  Approvals and Consents.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that all necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated hereunder have been obtained (without the imposition of any materially adverse conditions that are not reasonably acceptable to the Administrative Agent) and remain in effect; and no material applicable law or regulation shall prevent the Loan Parties' performance of their obligations under the DIP Facility or the transactions contemplated hereby.

(l)  Patriot Act.  Each Lender who has requested the same at least ten (10) Business Days prior to the Closing Date shall have received, at least three (3) Business Days prior to the Closing Date, "know your customer" and similar information.

(m)  Existing Credit Agreement.  All outstanding accrued and unpaid interest and fees outstanding under the Existing Credit Agreement on the Petition Date shall have been paid in full in cash.

(n)  Perfected Security Interest.  The Administrative Agent for the benefit of the Secured Parties shall have a valid and perfected security interest in substantially all of the assets of the Loan Parties pursuant to the Interim Order.

(o)  Closing Date Liquidity.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that after giving effect to any Loans made (or deemed made) and Letters of Credit issued (or deemed issued) as of the Closing Date and any payments required to be made on the Closing Date, the Borrower has Liquidity of not less than $300.0 million on the Closing Date.

(p)  Restructuring Support Agreement.  The Administrative Agent shall have received the Restructuring Support Agreement, which shall be in full force and effect.

(q)  Secretary's Certificates.  The Administrative Agent shall have received a certificate of a Responsible Officer of each Loan Party setting forth (i) resolutions of its board of directors

53

or other appropriate governing body with respect to the authorization of such Loan Party to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of such Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of such Loan Party, certified by a Responsible Officer as being true and complete.  The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from such Loan Party to the contrary.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02) at or prior to 2:00 p.m., New York City time, on the date that is sixty (60) days after the Petition Date or, if the Petition Date has not occurred by August 16, 2016, August 16, 2016 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

Section 6.02    Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing or of the Issuing Bank to issue, amend, renew or extend any Letter of Credit (each such obligation, a "Credit Event"), is subject to the satisfaction of the following conditions:

(a)    After giving effect to the funding of such Loan (or the issuance, renewal or extension of such Letter of Credit), there shall exist no Default or Event of Default under the Loan Documents.

(b)    The representations and warranties of the Loan Parties in the Loan Documents shall be true and correct in all material respects (other than any such representation and warranty that by its terms refers to a specified earlier date, in which case, on and as of the date of such Loan or extension of Letter of Credit, such representation and warranty shall continue to be true and correct in all material respects as of such specified earlier date).

(c)    The making of such Loan (or the issuance, renewal or extension of any Letter of Credit) shall not violate any Governmental Requirement and shall not be enjoined, temporarily, preliminarily or permanently.

(d)    (i) During the Interim Period, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Majority Lenders or (ii) for any Credit Event occurring on or after the Final Order Entry Deadline, the Final Order, shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the Majority Lenders.

(e)    The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit (or an amendment, extension or renewal of a Letter of Credit) in accordance with Section 2.08(b), as applicable.

Each request for such Borrowing or for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in <u>Sections 6.02(a)</u> through <u>(d)</u>.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

Section 7.01    <u>Organization; Powers</u>.    Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, each of the Borrower and the Restricted Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02    <u>Authority; Enforceability</u>.    Subject to entry of the DIP Order and subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, the Transactions are within the Borrower's and each Guarantor's constituent powers and have been duly authorized by all necessary corporate, limited liability company or partnership, and, if required, stockholder action (including, without limitation, any action required to be taken by any class of directors of the Borrower, whether interested or disinterested, in order to ensure the due authorization of the Transactions).   Each Loan Document to which a Loan Party is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to entry of the DIP Order and subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and further subject to other applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    <u>Approvals; No Conflicts</u>.    Subject to entry of the DIP Order and the Hedging Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect other than (i) the recording and filing of the Security Instruments as required by this Agreement and the applicable DIP Order and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any Restricted Subsidiary or any order of any Governmental Authority, (a) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any Restricted Subsidiary or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Restricted Subsidiary and (b) will not result in the creation or imposition of any Lien on any Property of the Borrower or any Restricted Subsidiary (other than the Liens created by the Loan Documents).

Section 7.04    Financial Condition; No Material Adverse Effect.

(a)    The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2015, reported on by Deloitte & Touche LLP, independent public accountants, and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2016.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since March 31, 2016, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of the Borrower and its Restricted Subsidiaries has been conducted only in the ordinary course consistent with past business practices.

(c)    Neither the Borrower nor any Restricted Subsidiary has on the date hereof any material Indebtedness (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments (other than the Gas Balancing Obligations and the Swap Agreements listed on Schedule 7.20) which are not referred to or reflected or provided for in the Financial Statements.

(d)    The Borrower has heretofore furnished to the Lenders its *pro forma* consolidated balance sheet as of the Closing Date after giving *pro forma* effect to the transactions contemplated by this Agreement, including the repayment of the Existing Credit Agreement.  Such *pro forma* balance sheet presents fairly, in all material respects, the *pro forma* balance sheet of the Borrower and its Consolidated Subsidiaries as of such date in accordance with GAAP.

Section 7.05    Litigation.

(a)    Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and except as set forth on Schedule 7.05, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any Restricted Subsidiary (i) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases or (ii) that involve any Loan Document or the Transactions.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

Section 7.06    Environmental Matters.  Except as could not be reasonably expected to have a Material Adverse Effect (or with respect to (b), (c), (d) and (e) below, where the failure to take such actions could not be reasonably expected to have a Material Adverse Effect):

56

(a)      neither any Property of the Borrower or any Restricted Subsidiary nor the operations conducted thereon violate any order or requirement of any court or Governmental Authority or any Environmental Laws.

(b)      no Property of the Borrower or any Restricted Subsidiary nor the operations currently conducted thereon or, to the knowledge of the Borrower, by any prior owner or operator of such Property or operation, are in violation of or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or to any remedial obligations under Environmental Laws.

(c)      all notices, permits, licenses, exemptions, approvals or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Property of the Borrower and each Restricted Subsidiary, including, without limitation, past or present treatment, storage, disposal or release of a hazardous substance, oil and gas waste or solid waste into the environment, have been duly obtained or filed, and the Borrower and each Restricted Subsidiary are in compliance with the terms and conditions of all such notices, permits, licenses and similar authorizations.

(d)      all hazardous substances, solid waste and oil and gas waste, if any, generated at any and all Property of the Borrower or any Restricted Subsidiary have in the past been transported, treated and disposed of in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and, to the knowledge of the Borrower, all such transport carriers and treatment and disposal facilities have been and are operating in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws.

(e)      the Borrower has taken all steps reasonably necessary to determine and has determined that no oil, hazardous substances, solid waste or oil and gas waste, have been disposed of or otherwise released and there has been no threatened release of any oil, hazardous substances, solid waste or oil and gas waste on or to any Property of the Borrower or any Restricted Subsidiary except in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment.

(f)      to the extent applicable, all Property of the Borrower and each Restricted Subsidiary currently satisfies all design, operation, and equipment requirements imposed by the OPA, and the Borrower does not have any reason to believe that such Property, to the extent subject to the OPA, will not be able to maintain compliance with the OPA requirements during the term of this Agreement.

(g)      neither the Borrower nor any Restricted Subsidiary has any known contingent liability or Remedial Work in connection with any release or threatened release of any oil, hazardous substance, solid waste or oil and gas waste into the environment.

Section 7.07    Compliance with the Laws; No Defaults.

(a)      Each of the Borrower and each Restricted Subsidiary is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and, subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property

57

and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     No Default has occurred and is continuing.

Section 7.08     <u>Investment Company Act</u>.    Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09     <u>Taxes</u>.    Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP, (b) to the extent otherwise excused or prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court or (c) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.   The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of the Borrower, adequate.   No Tax Lien has been filed and, to the knowledge of the Borrower, no claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10     <u>ERISA</u>.    Except to the extent excused by the Bankruptcy Code or as a result of the filing of the Chapter 11 Cases:

(a)     Except as could not reasonably be expected to result in a Material Adverse Effect, the Borrower, the Subsidiaries and each ERISA Affiliate have complied in all respects with ERISA and, where applicable, the Code regarding each Plan.

(b)     Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is, and has been, established and maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

(c)     Except as could not reasonably be expected to result in a Material Adverse Effect, no act, omission or transaction has occurred which could result in imposition on the Borrower, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under section 409 of ERISA.

(d)     Except as could not reasonably be expected to result in a Material Adverse Effect, full payment when due has been made of all amounts which the Borrower, the Subsidiaries or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof.

(e)     Neither the Borrower nor any of the Subsidiaries sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Borrower or a Subsidiary in its sole discretion at any time without any material liability other than the payment of accrued benefits under such plan.

58

(f)    Neither the Borrower, the Subsidiaries nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 7.11    <u>Disclosure; No Material Misstatements</u>.    None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower or any Restricted Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that actual results may vary from the projected financial information).    Other than as set forth in the DIP Order, there is no fact peculiar to the Borrower or any Restricted Subsidiary which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower or any Restricted Subsidiary on the date hereof in connection with the transactions contemplated hereby.    No statements or conclusions exist in any Reserve Report which are based upon or include misleading information or which fail to take into account material information regarding the matters reported therein to the extent such misstatement, misleading information or failure could reasonably be expected to have a Material Adverse Effect.

Section 7.12    <u>Insurance</u>.    The Borrower has, and has caused all its Restricted Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and its Restricted Subsidiaries.    The Administrative Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Administrative Agent has been named as loss payee with respect to Property loss insurance.

Section 7.13    <u>Restriction on Liens</u>.    Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, neither the Borrower nor any of the Restricted Subsidiaries is a party to any material agreement or arrangement (other than Capital Leases creating Liens permitted by <u>Section 9.03(c)</u>, but then only on the Property subject of such Capital Lease, and), or, other than as a result of the Chapter 11 Cases, subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Lenders on or in respect of their Properties to secure the Secured Obligations and the Loan Documents.

Section 7.14    <u>Subsidiaries</u>.    Except as set forth on <u>Schedule 7.14</u> or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall be a supplement to <u>Schedule 7.14</u>, the Borrower has no Subsidiaries and the Borrower has no Foreign Subsidiaries.    <u>Schedule 7.14</u>, as may be supplemented from time to time, identifies each Subsidiary as either Restricted or Unrestricted, and each Restricted Subsidiary on such schedule is a Wholly-Owned Subsidiary.

59

Section 7.15    <u>Location of Business and Offices</u>.  The Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Halcón Resources Corporation; and the organizational identification number of the Borrower in its jurisdiction of organization is 3761452 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to <u>Section 8.01(n)</u> in accordance with <u>Section 12.01</u>).  The Borrower's principal place of business and chief executive offices are located at the address specified in <u>Section 12.01</u> (or as set forth in a notice delivered pursuant to <u>Section 8.01(n)</u> and <u>Section 12.01(c)</u>).  Each Restricted Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on <u>Schedule 7.14</u> (or as set forth in a notice delivered pursuant to <u>Section 8.01(n)</u>).

Section 7.16    <u>Properties; Titles, Etc.</u>  Other than as a result of the Chapter 11 Cases and subject to any necessary order or authorization of the Bankruptcy Court:

(a)    Each of the Borrower and the Restricted Subsidiaries has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report and good title to all its other personal Properties, in each case, free and clear of all Liens except Liens permitted by <u>Section 9.03</u>.  After giving full effect to the Excepted Liens, the Borrower or the Restricted Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such Property.

(b)    All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)    The rights and Properties presently owned, leased or licensed by the Borrower and the Restricted Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Restricted Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)    All of the Properties of the Borrower and the Restricted Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except for any such failure to maintain such Properties, individually or in the aggregate, that could not reasonably be expected to result in a Material Adverse Effect.

(e)    The Borrower and each Restricted Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Restricted Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower and its Restricted

Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17    Maintenance of Properties.    Subject to any necessary order or authorization of the Bankruptcy Court and except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and its Restricted Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries.    Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of the Borrower or any Restricted Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Restricted Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such Restricted Subsidiary.    Subject to any necessary order or authorization of the Bankruptcy Court, all pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of its Restricted Subsidiaries that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of its Restricted Subsidiaries, in a manner consistent with the Borrower's or its Restricted Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this Section 7.17 could not reasonably be expected to have a Material Adverse Effect).

Section 7.18    Gas Imbalances, Prepayments.    Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of its Restricted Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding a volume equal to 2% of the total proved reserves (on an mcf equivalent basis) set forth in the most recently delivered Reserve Report in the aggregate.

Section 7.19    Marketing of Production.    Except for contracts listed and in effect on the date hereof on Schedule 7.19, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Restricted Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of production from the Borrower's or its Restricted Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

61

Section 7.20    Swap Agreements.    Schedule 7.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(f), sets forth, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.21    Use of Loans and Letters of Credit.    The proceeds of the Loans and the Letters of Credit shall be used (or shall be deemed to be used) to (a) refund, refinance and replace the Existing Loans and Existing Letters of Credit outstanding on the Petition Date, (b) to provide for working capital and other general corporate purposes, including capital expenditures and any interest payments under the Second Lien Notes as and to the extent set forth in the Interim Order and/or the Final Order, as applicable, and in accordance with the Budget and (c) for fees and expenses related to the Transactions in accordance with the Budget.  Notwithstanding anything to the contrary, no portion of the Loans or the DIP Collateral (including any cash collateral) shall be used (i) to challenge the validity, perfection, priority, extent or enforceability of the obligations under the DIP Facility, the Exit Facility or the facility under the Existing Credit Agreement, (ii) to investigate or assert any other claims or causes of action against the Administrative Agent, the Arrangers, any other agent or any Lender with respect to any holder of any such obligations, except as agreed by the Administrative Agent and provided in the DIP Order with respect to any investigation regarding the facility under the Existing Credit Agreement or (iii) for any act which has the effect of materially or adversely modifying or compromising the rights and remedies of the Administrative Agent or the Lenders or any such party with respect to the DIP Facility, the Exit Facility or any Loan Document (as defined in the Existing Credit Agreement). The Borrower and its Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.22    [Reserved].

Section 7.23    Money Laundering.    The operations of the Borrower and its Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements including those of the Bank Secrecy Act, as amended by the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), and the applicable anti-money laundering statutes of jurisdictions where the Borrower and its Subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws"), and no material action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Borrower, threatened.

Section 7.24    Foreign Corrupt Practices.    Neither the Borrower nor any of its Subsidiaries, nor to the knowledge of any Loan Party, any director, officer, agent, or employee of the Borrower or any of its Subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a material violation by such Persons of the FCPA, including without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in

62

contravention of the FCPA; and, the Borrower and its Subsidiaries have conducted their business in material compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 7.25    Anti-Corruption Laws; Sanctions; OFAC.

(a)    The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

(b)    The Borrower, its Subsidiaries, their respective officers and employees and, to the knowledge of the Borrower, its directors and agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.

(c)    None of (i) the Borrower, any Subsidiary or to the knowledge of any Loan Party any of their respective directors, officers or employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. The Borrower will not directly or, to its knowledge, indirectly use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person currently subject to any applicable Sanctions.

Section 7.26    EEA Financial Institutions.    Neither the Borrower nor any of its Restricted Subsidiaries is an EEA Financial Institution.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full and all Letters of Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

Section 8.01    Financial Statements; Other Information.    The Borrower will furnish to the Administrative Agent and each Lender:

(a)    Annual Financial Statements.    As soon as available, but in any event in accordance with then applicable law and not later than ninety (90) days after the end of each fiscal year of the Borrower, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized national standing to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)    Quarterly Financial Statements.    As soon as available, but in any event in accordance with then applicable law and not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures

63

for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)   _Monthly Operating Reports_.  Substantially concurrently with the filing thereof with the Bankruptcy Court, the monthly operating report of the Debtors required to be filed with the Bankruptcy Court.

(d)   _Certificate of Financial Officer -- Compliance_.  Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer in substantially the form of Exhibit D hereto (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) certifying that the Borrower has been in compliance with Section 9.01 at such times as required therein and in connection therewith, setting forth reasonably detailed calculations demonstrating compliance with Section 9.01 and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(e)   _Certificate of Financial Officer -- Consolidating Information_.  If, at any time, all of the Consolidated Subsidiaries of the Borrower are not Consolidated Restricted Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all Consolidated Unrestricted Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Borrower.

(f)   _Certificate of Financial Officer – Swap Agreements_.  Concurrently with any delivery of any Reserve Report or at such other times as may be reasonably requested by the Administrative Agent, a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of the calendar month preceding the delivery of such Reserve Report, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), any new credit support agreements relating thereto not listed on Schedule 7.20, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(g)   _Certificate of Insurer – Insurance Coverage_.  Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(h)   _Other Accounting Reports_.  Promptly upon receipt thereof, a copy of each other material report or opinion submitted to the Borrower or any of its Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower or any such Subsidiary, and a copy of any response by the Borrower or any such Subsidiary, or the Board of Directors of the Borrower or any such Subsidiary, to such material report or opinion.

(i)        SEC and Other Filings; Reports to Shareholders.  Promptly after the same become publicly available, and upon the request of the Lenders, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC, or with any national securities exchange and distributed by the Borrower to its shareholders.  Documents required to be delivered pursuant to Sections 8.01(a), 8.01(b) and this 8.01(i) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which the Administrative Agent receives notice from the Borrower, electronically or in writing, that such documents have been posted to EDGAR and/or on its home page on the worldwide web (or such other free, publicly-accessible internet database that may be established and maintained by the SEC as a substitute for, or successor to, EDGAR).

(j)        Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

(k)        Lists of Purchasers.  Concurrently with the delivery of the annual financial statements in accordance with Section 8.01(a), a list of Persons who purchased at least 70% of the aggregate production of Hydrocarbons from the Borrower and its Restricted Subsidiaries during the year presented in such annual financial statements.

(l)        Notice of Sales of Oil and Gas Properties.  In the event the Borrower or any Restricted Subsidiary intends to sell, transfer, assign or otherwise dispose of at least $10.0 million worth of any Oil and Gas Properties or any Equity Interests in any Restricted Subsidiary in accordance with Section 9.13, prior written notice of such disposition, the price thereof and the anticipated date of closing.

(m)        Notice of Casualty Events.  Prompt written notice, and in any event within three (3) Business Days after the Borrower obtains knowledge of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event in respect of Property having a fair market value prior to such Casualty Event in excess of $10.0 million.

(n)        Information Regarding Borrower and Guarantors.  Prompt written notice (and in any event within ten (10) days after the occurrence) of any change (i) in the Borrower or any Guarantor's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Borrower or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower or any Guarantor's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Borrower or any Guarantor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in the Borrower or any Guarantor's federal taxpayer identification number.

(o)        Production Report and Lease Operating Statements.  Within sixty (60) days after the end of each fiscal quarter, a report setting forth, for each calendar month during the then current fiscal year to the end of such fiscal quarter on a production date basis, the volume of production and sales attributable to production for which cash activity has been recorded (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(p)      Notices of Certain Changes.  Promptly, but in any event within thirty (30) days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other organic document of the Borrower or any Restricted Subsidiary.

(q)      Swap Agreement Projections.  No later than forty-five (45) days after the end of each fiscal quarter, the Borrower shall either (i) certify, represent and warrant that the internally forecasted production from the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries for all months in which the Borrower or one of its Restricted Subsidiaries has Swap Agreements equals or exceeds their prior month's production of each of crude oil and natural gas, calculated separately, or (ii) deliver an additional detailed forecasted production of each of crude oil and natural gas, calculated separately, for the next 48 months or if any Swap Agreements have a tenor in excess of 48 months, for a period corresponding to the tenor of such Swap Agreements.

(r)      13-Week Projections; Variance Reports. (i) On the third Business Day after each Testing Date, the Borrower shall provide to the Administrative Agent and the Lenders (A) an updated 13-week Projection solely for reporting purposes, covering the subsequent thirteen-weeks and (B) a Variance Report and (ii) no later than one week prior to the end of the thirteen-week period covered by the then effective Budget the Borrower shall provide to the Administrative Agent and the Lenders, (A) an updated Budget and (B) a certificate of a Financial Officer of the Borrower stating that such Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower to be reasonable at the time made and from the best information then available to the Borrower in connection therewith (such certificate a "Budget Certificate").

(s)      Motions, etc. To the extent reasonably practicable at least one day prior to, and in any event no later than the day after, such filing or distribution, copies of all pleadings and motions to be filed by or on behalf of the Borrower or any of the Guarantors with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases, or to be distributed by or on behalf of the Borrower or any of the Guarantors to any official committee appointed in the Chapter 11 Cases (other than emergency pleadings or motions where, despite such Debtor's commercially reasonable efforts, such one-day notice is impracticable); provided that copies of pleadings and motions to be so filed by or on behalf of the Borrower or any of the Guarantors to the extent directly relating to this Agreement or any other Loan Documents, including, without limitation, any amendment, modification or supplement to this Agreement (or a waiver of the provisions thereof) or any other matter adversely affecting the liens, claims or rights of the Lenders under this Agreement or any other Loan Document in any material respect shall be delivered to the Administrative Agent and counsel to the Administrative Agent at least one day prior to such filing.

(t)      Other Requested Information.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary (including, without limitation, any Plan and any reports or other information required to be filed by the Borrower or any of the Subsidiaries under ERISA in respect of any Plan), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

(u)      Delivery of Information Electronically.  Notices to the Administrative Agent and the Lenders under this Section 8.01 may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent, including broadcast email to the Lenders that the available information has been made available to the Lenders on either the Borrower's IntraLinks page or the Borrower's website as notified by the Borrower from time to time.

66

Section 8.02    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    other than the Chapter 11 Cases, the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to the Lenders that could reasonably be expected to be adversely determined and result in liability not subject to the automatic stay in the Chapter 11 Cases and in excess of $10.0 million or otherwise fully covered by insurance, subject to normal deductibles; and

(c)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03    Existence; Conduct of Business.  The Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.12.

Section 8.04    Payment of Obligations.  The Borrower will, and will cause each Restricted Subsidiary to, pay its obligations, including Tax liabilities of the Borrower and all of its Subsidiaries before the same shall become delinquent or in default, except where (x) such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court or (y) (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any Property of the Borrower or any Subsidiary.

Section 8.05    Performance of Obligations under Loan Documents.  Except where such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court, the Borrower will pay the Loans according to the reading, tenor and effect thereof, and the Borrower will, and will cause each Restricted Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06    Operation and Maintenance of Properties.  Subject to any necessary order or authorization of the Bankruptcy Court, except for matters that could not reasonably be expected to result in a Material Adverse Effect, the Borrower, at its own expense, will, and will cause each Restricted Subsidiary to:

67

(a)    operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom.

(b)    keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Oil and Gas Properties and other Properties, including, without limitation, all equipment, machinery and facilities.

(c)    promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

(d)    promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties.

(e)    to the extent the Borrower is not the operator of any Property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07    Insurance.  The Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide that the insurer will use commercially reasonable efforts to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent, but in any event not less than ten (10) days prior notice of such cancellation.

Section 8.08    Books and Records; Inspection Rights.  The Borrower will, and will cause each Restricted Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each Restricted Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.

Section 8.09    Compliance with Laws.  Subject to any necessary order or authorization of the Bankruptcy Court:

68

(a)     The Borrower will, and will cause each Restricted Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     The Borrower will maintain in effect and enforce policies and procedures regarding compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 8.10     <u>Environmental Matters</u>.

(a)     Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower shall at its sole expense: (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not dispose of or otherwise release, and shall cause each Subsidiary not to dispose of or otherwise release, any oil, oil and gas waste, hazardous substance, or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' Properties or any other Property to the extent caused by the Borrower's or any of its Subsidiaries' operations except in compliance with applicable Environmental Laws, the disposal or release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all notices, permits, licenses, exemptions, approvals, registrations or other authorizations, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or its Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "<u>Remedial Work</u>") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other release of any oil, oil and gas waste, hazardous substance or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; and (v) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and its Subsidiaries' obligations under this <u>Section 8.10(a)</u> are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)     The Borrower will promptly, but in no event later than five (5) days after the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any landowner or other third party against the Borrower or its Subsidiaries or their Properties of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower reasonably anticipates that such action will result in liability (whether individually or in the aggregate) in excess of $25.0 million, not otherwise subject to the automatic stay as a result of the Chapter 11 Cases or not fully covered by insurance, subject to normal deductibles.

(c)     The Borrower will, and will cause each Subsidiary to, provide environmental audits and tests in accordance with American Society of Testing Materials standards upon request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of

Default (or as otherwise required to be obtained by the Administrative Agent or the Lenders by any Governmental Authority), in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11    Further Assurances.

(a)    The Borrower at its expense will, and will cause each Restricted Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower or any Restricted Subsidiary, as the case may be, in the Loan Documents, including the Notes, if requested, or to further evidence and more fully describe the collateral intended as security for the Secured Obligations or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Administrative Agent, to ensure that the Administrative Agent, on behalf of the Secured Parties, has a perfected security interest in substantially all assets of the Loan Parties.  In addition, at the Administrative Agent's written request upon the occurrence and during the continuance of an Event of Default, the Borrower, at its sole expense, shall enter into any Security Instruments to evidence the Liens on the DIP Collateral and provide any information so requested to identify any DIP Collateral, including an updated Perfection Certificate, a customary "lease to well" reconciliation schedule, list or similar item, exhibits to Mortgages in form and substance reasonably satisfactory to the Administrative Agent (which such exhibits shall be in recordable form for the applicable jurisdiction) or any other information requested in connection with the identification of any DIP Collateral, including without limitation, delivery of collateral documents, including mortgages, for recordation with the applicable recording offices.

(b)    The Borrower hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged Property without the signature of the Borrower or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Mortgaged Property or any part thereof shall be sufficient as a financing statement where permitted by law.

Section 8.12    Reserve Reports.

(a)    On or before April 1st and October 1st of each year, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Borrower and its Subsidiaries as of the immediately preceding December 31st and June 30th, as applicable. The Reserve Report as of December 31st of each year shall be prepared by one or more Approved Petroleum Engineers, and the June 30th Reserve Report of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with the procedures used in the immediately preceding December 31st Reserve Report.

(b)    [Reserved].

(c)    With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a Reserve Report Certificate substantially in the form of Exhibit J from a Responsible Officer certifying that in all material respects: (i) the information contained in the

70

Reserve Report and any other information delivered in connection therewith is true and correct in all material respects, (ii) the Borrower or its Restricted Subsidiaries owns good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by Section 9.03, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any Restricted Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties have been sold since the date of the last Reserve Report was delivered except as set forth on an exhibit to the certificate, which exhibit shall list all of its Oil and Gas Properties sold other than Hydrocarbons sold in the ordinary course of business and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties (the certificate described herein, the "Reserve Report Certificate").

Section 8.13    Title Information.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), to the extent requested by Administrative Agent, the Borrower will deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least 85% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(b)    If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within ninety (90) days (or such longer period of time as may be acceptable to the Administrative Agent in its sole discretion) of notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, either (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information, (ii) substitute acceptable Mortgaged Properties with no title defects or exceptions except for Excepted Liens (other than Excepted Liens described in clauses (e), (g) and (h) of such definition) having an equivalent value or (iii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least 85% of the total value of the Oil and Gas Properties evaluated by such Reserve Report.

(c)    If the Borrower is unable to cure any title defect requested by the Administrative Agent or the Lenders to be cured within the required period of time or the Borrower does not comply with the requirements to provide acceptable title information covering 85% of the Oil and Gas Properties evaluated in the most recent Reserve Report, such default shall not be a Default, but instead the Administrative Agent and/or the Required Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Lenders. To the extent that the Administrative Agent or the Required Lenders are not satisfied with title to any Mortgaged

Property after the required period of time has elapsed, such unacceptable Mortgaged Property shall not count towards the 85% requirement.

Section 8.14    Additional Collateral; Additional Guarantors.

(a)    [Reserved].

(b)    In the event that any Unrestricted Subsidiary becomes a Debtor or is a Material Domestic Subsidiary, the Borrower shall promptly cause such Restricted Subsidiary to guarantee the Secured Obligations pursuant to the Guaranty Agreement.  In connection with any such guaranty, the Borrower shall, or shall cause such Subsidiary to, (A) execute and deliver a supplement to the Guaranty Agreement executed by such Subsidiary, (B) pledge all of the Equity Interests of such new Subsidiary (including, without limitation, delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(c)    In the event that the Borrower or any Domestic Subsidiary becomes the owner of a Foreign Subsidiary which has total assets in excess of $10.0 million, then the Borrower shall promptly, or shall cause such Domestic Subsidiary to promptly, guarantee the Secured Obligations pursuant to the Guaranty Agreement.  In connection with any such guaranty, the Borrower shall, or shall cause such Domestic Subsidiary to, (i) execute and deliver a supplement to the Guaranty Agreement, (ii) pledge 65% of all the voting Equity Interests of such Foreign Subsidiary and 100% of the nonvoting Equity Interests of such Foreign Subsidiary (including, without limitation, delivery of original stock certificates evidencing such Equity Interests of such Foreign Subsidiary, together with appropriate stock powers for each certificate duly executed in blank by the registered owner thereof) and (iii) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(d)    [Reserved].

Section 8.15    ERISA Compliance.  The Borrower will promptly furnish and will cause the Subsidiaries to promptly furnish to the Administrative Agent (i) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Plan, other than a Multiemployer Plan, or any trust created thereunder, and (ii) promptly upon becoming aware of the occurrence of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan, other than a Multiemployer Plan, or any trust created thereunder, a written notice signed by the President or the principal Financial Officer or the Subsidiary, as the case may be, specifying the nature thereof, what action the Borrower or the Subsidiary is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto if such action could reasonably be expected to result in liability to the Borrower, the Guarantors or their respective Subsidiaries (whether individually of in the aggregate) in excess of $10.0 million.

Section 8.16    [Reserved].

Section 8.17    Unrestricted Subsidiaries.  The Borrower:

(a)    will cause the management, business and affairs of each of the Borrower and its Restricted Subsidiaries to be conducted in such a manner (including, without limitation, by keeping separate books of account, furnishing separate financial statements of Unrestricted Subsidiaries to

72

creditors and potential creditors thereof and by not permitting Properties of the Borrower and its respective Restricted Subsidiaries to be commingled) so that each Unrestricted Subsidiary that is a corporation will be treated as a corporate entity separate and distinct from Borrower and the Restricted Subsidiaries.

(b)     will not, and will not permit any of the Restricted Subsidiaries to, incur, assume, guarantee or be or become liable for any Indebtedness of any of the Unrestricted Subsidiaries.

(c)     will not permit any Unrestricted Subsidiary to hold any Equity Interest in, or any Indebtedness of, the Borrower or any Restricted Subsidiary.

Section 8.18    <u>Marketing Activities</u>.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries that the Borrower or one of its Restricted Subsidiaries has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business and (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (i.e. corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 8.19    <u>Keepwell</u>.  The Borrower will, and will cause each Guarantor to, provide such funds or other support as may be needed from time to time by the Borrower or any Guarantor, as applicable, to honor all of its obligations under this Agreement and any other Loan Document in respect of Swap Obligations (<u>provided</u>, <u>however</u>, that each Qualified ECP Guarantor shall only be liable under this <u>Section 8.19</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 8.19</u>, or otherwise under this Agreement or any other Loan Document, as it relates to the Borrower, any Restricted Subsidiary or any Guarantor, as applicable, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of the Loan Parties under this Section shall remain in full force and effect until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents and all Secured Swap Agreements have been paid in full and all Letters of Credit have expired or terminated and all LC Disbursements shall have been reimbursed.  The Borrower intends that this <u>Section 8.19</u> constitute, and this <u>Section 8.19</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit the Borrower and any Guarantor, as applicable, for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 8.20    <u>Carve Out</u>.

(a)     Upon the occurrence of the Carve Out Trigger Date, the Borrower shall deposit amounts into a Carve Out Account as set forth in the DIP Order.  The Secured Parties shall retain automatically perfected and continuing first priority security interests in any residual interest in the Carve Out Account available following satisfaction in full of all obligations benefiting from the Carve Out (the "<u>Residual Carve Out Amount</u>").  Promptly (but in no event later than five (5) Business Days) following

the satisfaction in full of all obligations benefiting from the Carve Out, the Borrower shall deliver the Residual Carve Out Amount, if any, to the Administrative Agent.

# ARTICLE IX
# NEGATIVE COVENANTS

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents have been paid in full and all Letters of Credit have expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and agrees with the Lenders that:

Section 9.01    <u>Financial Covenants</u>.

(a)    <u>Minimum Liquidity</u>.  The Borrower and its Restricted Subsidiaries shall not permit Liquidity to be less than $125.0 million for any period of two (2) consecutive Business Days.

(b)    <u>Budget Variance and Capital Expenditures</u>.  As of the Friday after the second full calendar week ending after the Petition Date and on each second Friday thereafter (each a "<u>Testing Date</u>" and each such period, commencing on the Petition Date and ending on the relevant Testing Date, a "<u>Testing Period</u>"; <u>provided</u> that the initial Testing Period shall be deemed to include the full calendar week in which the Petition Date occurs), the Borrower shall not permit (i) the Aggregate Total Receipts of the Borrower and its Subsidiaries during such Testing Period to be less than 85% of the Aggregate Total Receipts as set forth in the Budget for such Testing Period or (ii) the Aggregate Operating Expenditures made by the Borrower and its Subsidiaries during such Testing Period to be greater than 115% of the Aggregate Operating Expenditures as set forth in the Budget for such Testing Period.

(c)    <u>Equity Cure</u>.  In the event that the Borrower fails to comply with <u>Section 9.01(a)</u>, then until the expiration of the fifth (5th) Business Day following such failure to comply, the Borrower shall be permitted to cure such failure to comply by requesting that such financial covenant be recalculated by increasing Liquidity for the period of such two (2) consecutive Business Days by an amount equal to cash equity contributions (which if in the form of preferred equity shall be on terms and conditions reasonably acceptable to the Administrative Agent) received by Borrower from its equity holders needed to bring the Borrower in compliance with <u>Section 9.01(a)</u>.  If, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the financial covenant set forth in <u>Section 9.01(a)</u>, the Borrower shall be deemed to have satisfied the requirements of such applicable financial covenant as of the relevant earlier required date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of any such covenant that had occurred shall be deemed cured for purposes of this Agreement and the other Loan Documents.  The Borrower may not exercise the equity cure right described in this <u>Section 9.01(c)</u> more than (i) twice in any period of four (4) consecutive fiscal quarters or (ii) more than four (4) times in the aggregate. The proceeds of such equity issuance or capital contributions shall be counted as Liquidity solely for the purpose of compliance with the financial covenant set forth in <u>Section 9.01(a)</u> and shall not be included for any other purpose hereunder.

Section 9.02    <u>Indebtedness</u>.  The Borrower will not, and will not permit any Restricted Subsidiary to, incur, create, assume or suffer to exist any Indebtedness, except:

(a)    the Loans, any Notes or other Secured Obligations arising under the Loan Documents, the Secured Swap Obligations or any guaranty of or suretyship arrangement for the Loans,

any Notes or other Secured Obligations arising under the Loan Documents, and any deferred put premiums associated with Swap Agreements entered into with an Approved Counterparty,

(b)      Indebtedness outstanding on the Petition Date and set forth on <u>Schedule 9.02</u>,

(c)      accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than sixty (60) days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP,

(d)      Indebtedness (including guarantees) under Capital Leases, <u>provided</u> that the aggregate amount of such Indebtedness and Indebtedness incurred pursuant to <u>Section 9.02(j)</u> does not exceed $15.0 million,

(e)      Indebtedness associated with worker's compensation claims, performance, bid, surety or similar bonds or surety obligations required by Governmental Requirements or third parties in connection with the operation of the Oil and Gas Properties,

(f)      intercompany Indebtedness between the Borrower and any Restricted Subsidiary or between Restricted Subsidiaries to the extent permitted by <u>Section 9.05(g)</u>; <u>provided</u> that such Indebtedness is not held, assigned, transferred, negotiated or pledged to any Person other than the Borrower or one of its Wholly-Owned Subsidiaries, and, <u>provided</u> <u>further</u>, that any such Indebtedness owed by either the Borrower or a Guarantor shall be subordinated to the Secured Obligations on terms set forth in the Guaranty Agreement,

(g)      endorsements of negotiable instruments for collection in the ordinary course of business,

(h)      [Reserved],

(i)      Indebtedness incurred to finance insurance premiums,

(j)      Indebtedness incurred solely for the purpose of financing the acquisition, construction or improvement of any fixed or capital assets, including Indebtedness assumed in connection with the acquisition of such assets; <u>provided</u> that (i) the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (ii) the aggregate amount of such Indebtedness and Indebtedness incurred pursuant to <u>Sections 9.02(d)</u> does not exceed the $15.0 million, and

(k)      Indebtedness (other than Indebtedness for borrowed money) in an aggregate amount not to exceed $5.0 million at any time outstanding.

Section 9.03    <u>Liens</u>.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)      Liens securing the payment of any Secured Obligations,

(b)      (i) Liens existing on the Petition Date and set forth on <u>Schedule 9.03</u> and (ii) Excepted Liens,

(c)      Liens securing (i) Capital Leases permitted by Section 9.02(c) but only on the Property under lease and (ii) Indebtedness for any fixed or capital assets pursuant to Section 9.02(j) but only on the fixed or capital assets financed by such Indebtedness,

(d)      Liens securing Indebtedness permitted by Section 9.02(i) or other obligations related to the payment of insurance premiums; provided that such Liens do not extend to any Property of the Borrower or its Restricted Subsidiaries other than Property of the type customarily subject to such Liens (including rights under the insurance policies purchased by such premiums),

(e)      Liens in respect of Adequate Protection Obligations, and

(f)      Liens securing obligations (other than Indebtedness for borrowed money) in an aggregate amount not to exceed $2.0 million at any time outstanding.

Section 9.04      Dividends and Distributions.

(a)      Restricted Payments.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except (i) the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock), (ii) Subsidiaries may declare and pay dividends or any other distributions to the Borrower or any Guarantor with respect to their Equity Interests and (iii) Restricted Payments in connection with stock option plans or other benefit plans for management or employees of the Debtors that have been approved by an order of the Bankruptcy Court reasonably satisfactory to the Administrative Agent.

Section 9.05      Investments, Loans and Advances.  The Borrower will not, and will not permit any Restricted Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)      Investments existing on the Closing Date and set forth on Schedule 9.05,

(b)      accounts receivable arising in the ordinary course of business,

(c)      direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof,

(d)      commercial paper maturing within one year from the date of creation thereof rated in one of the two highest grades by S&P or Moody's,

(e)      deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100.0 million (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively,

(f)      deposits in money market funds investing primarily in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e),

76

(g)      Investments (i) made by the Borrower in or to the Guarantors, and (ii) made by any Restricted Subsidiary in or to the Borrower or any Guarantor,

(h)      subject to the limits in Section 9.07, Investments in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America and Canada,

(i)      loans or advances to employees, officers or directors in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries, in each case only as permitted by applicable law, including Section 402 of the Sarbanes Oxley Act of 2002, but in any event not to exceed $2.5 million in the aggregate at any time,

(j)      Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Borrower or any Restricted Subsidiary as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower or any of its Restricted Subsidiaries; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(j) exceeds $5.0 million, and

(k)      Investments in assets useful in the business of the Debtors to the extent permitted by the Budget, but in any event not to exceed $10.0 million in the aggregate at any time.

Section 9.06      Unrestricted Subsidiaries.

(a)      Unless designated as an Unrestricted Subsidiary on Schedule 7.14 as of the date hereof, any Person that becomes a Subsidiary of the Borrower or any of its Restricted Subsidiaries shall be classified as a Restricted Subsidiary and, for avoidance of doubt, all Debtors shall be Restricted Subsidiaries for purposes hereunder.

(b)      The Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary if after giving effect to such designation, (i) the representations and warranties of the Borrower and its Restricted Subsidiaries contained in each of the Loan Documents are true and correct on and as of such date as if made on and as of the date of such redesignation (or, if stated to have been made expressly as of an earlier date, were true and correct as of such date), (ii) no Default would exist and (iii) the Borrower complies with the requirements of Section 8.14, Section 8.17 and Section 9.16.  Any such designation shall be treated as a cash dividend in an amount equal to the fair market value of the Borrower's direct and indirect ownership interest in such Subsidiary.

(c)      The Borrower shall not permit the aggregate principal amount of all Non-Recourse Debt outstanding at any one time to exceed the amount outstanding on the Closing Date.

Section 9.07      Nature of Business; International Operations.  Neither the Borrower nor any Restricted Subsidiary will allow any material change to be made in the character of its business (a) as an independent oil and gas exploration, development and production company, and (b) activities incidental to the foregoing.  From and after the date hereof, the Borrower and its Domestic Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States or Canada.

77

Section 9.08    Reserved.

Section 9.09    Proceeds of Loans.

(a)    The Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

(b)    The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.10    ERISA Compliance.  The Borrower will not, and will not permit any Subsidiary to, at any time:

(a)    Engage, or permit any ERISA Affiliate to engage, in any transaction in connection with which the Borrower, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code, if either of which would have a Material Adverse Effect.

(b)    Fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any such Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto, if such failure could reasonably be expected to have a Material Adverse Effect.

(c)    Contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to (i) any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability other than the payment of accrued benefits under such plan, or (ii) any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 9.11    Sale or Discount of Receivables.  Except for (a) receivables obtained by the Borrower or any Restricted Subsidiary out of the ordinary course of business or (b) the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing

78

transaction, neither the Borrower nor any Restricted Subsidiary will discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.12    Merger, Etc.    The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property (except as permitted by Section 9.13) to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve.

Section 9.13    Sale of Properties; Termination of Swap Agreements.    The Borrower will not, and will not permit any Restricted Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property except for:

(a)    the sale of Hydrocarbons and geological and seismic data in the ordinary course of business ("Permitted Sale of Hydrocarbons");

(b)    [Reserved];

(c)    the sale or transfer of Property that is no longer necessary for the business of the Borrower or such Restricted Subsidiary or is replaced by Property of at least comparable value and use;

(d)    the sale, transfer or other disposition of Equity Interests in Unrestricted Subsidiaries;

(e)    the sale or other Disposition (including Casualty Events) of any Oil and Gas Property or any interest therein or any Restricted Subsidiary owning Oil and Gas Properties or the Unwind of Swap Agreements; provided that (i) 75% of the consideration received in respect of any such sale or other disposition with a purchase price exceeding $5.0 million shall be cash or other Oil and Gas Properties, (ii) the consideration received in respect of any such sale or other disposition shall be equal to or greater than the fair market value of the asset subject of such sale or other disposition, and if such fair market value is greater than $10.0 million, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to the fair market value and that the board of directors of the Borrower has reasonably determined such, and (iii) if any such sale or other disposition is of a Restricted Subsidiary owning Oil and Gas Properties, such sale or other disposition shall include all the Equity Interests owned by the Borrower and its Restricted Subsidiaries of such Restricted Subsidiary;

(f)    sales and other transfers of Properties between the Borrower and any Restricted Subsidiary or between any Restricted Subsidiary and any other Restricted Subsidiary;

(g)    if no Event of Default then exists, sales and other dispositions of Properties not otherwise permitted above having a fair market value not to exceed $1.0 million; and

(h)    Dispositions to the extent permitted by the Budget, but in any event not to exceed $10.0 million in the aggregate at any time.

Section 9.14    Environmental Matters.    The Borrower will not, and will not permit any Restricted Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts,

79

conditions and circumstances, if any, pertaining to such Property where such violations or remedial obligations could reasonably be expected to have a Material Adverse Effect.

Section 9.15   Transactions with Affiliates.  The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors) unless such transactions are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

Section 9.16   Subsidiaries.  The Borrower will not, and will not permit any Restricted Subsidiary to, create or acquire any additional Restricted Subsidiary or redesignate an Unrestricted Subsidiary as a Restricted Subsidiary unless the Borrower gives written notice to the Administrative Agent of such creation or acquisition and complies with Section 8.14(b) and Section 8.14(c).  The Borrower shall not, and shall not permit any Restricted Subsidiary to, sell, assign or otherwise dispose of any Equity Interests in any Restricted Subsidiary except (i) in connection with the issuance of director qualifying shares, (ii) in connection with any transactions permitted under Section 9.12, Section 9.13(e) or Section 9.13(f), and (iii) other sales, assignments or other dispositions of any Equity Interests in Restricted Subsidiaries having an aggregate fair market value not to exceed $ 5.0 million during any fiscal year.

Section 9.17   Negative Pledge Agreements; Dividend Restrictions.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding after the Petition Date which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Lenders or restricts any Restricted Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which requires the consent of or notice to other Persons in connection therewith; provided, however, the preceding restrictions will not apply to encumbrances or restrictions arising under or by reason of (a) this Agreement or the Security Instruments, (b) any leases, licenses or similar contracts as they affect any Property or Lien subject to a lease or license, (c) any contract, agreement or understanding creating Liens on Capital Leases permitted by Section 9.03(c) (but only to the extent related to the Property on which such Liens were created), and (d) any restriction with respect to a Subsidiary imposed pursuant to an agreement entered into for the direct or indirect sale or disposition of all or substantially all of the equity or Property of such Subsidiary (or the Property that is subject to such restriction) pending the closing of such sale or disposition to the extent such sale is permitted under this Agreement.

Section 9.18   Gas Imbalances, Take-or-Pay or Other Prepayments.  The Borrower will not allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Restricted Subsidiary that would require the Borrower or such Restricted Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed a volume equal to 2% of the total proved reserves (on an mcf equivalent basis) set forth in the most recently delivered Reserve Report in the aggregate.

Section 9.19   Swap Agreements.  The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Swap Agreements with any Person other than:

(a)    Swap Agreements in respect of commodities (i) with an Approved Counterparty and (ii) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other

80

Swap Agreements) do not exceed, as of the date such Swap Agreement is executed, (A) 85% of the Projected Production for each month during the period during which such Swap Agreement is in effect for crude oil, natural gas liquids and natural gas, for the period of 24 months following the date such Swap Agreement is executed and (B) 85% of the reasonably anticipated Hydrocarbon production from the total Proved Reserves of the Borrower and its Restricted Subsidiaries (as forecast based upon the most recently delivered Reserve Report), each month during the period during which such Swap Agreement is in effect for crude oil, natural gas liquids and natural gas, calculated on a barrel of oil equivalent basis, for the period of 25 to 66 months following the date such Swap Agreement is executed,

(b)    Swap Agreements in respect of interest rates with an Approved Counterparty, as follows: (i) Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated and netted with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from fixed to floating) do not exceed 50% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a fixed rate and (ii) Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated and netted with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed 75% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a floating rate.  In no event shall any Swap Agreement (other than a Secured Swap Agreement) contain any requirement, agreement or covenant for the Borrower or any Restricted Subsidiary to post collateral or margin to secure their obligations under such Swap Agreement or to cover market exposures, and

(c)    If, after the end of any calendar month, the aggregate volume of all Swap Agreements in respect of commodities for which settlement payments were calculated in such calendar month (other than basis differential swaps on volumes hedged by other Swap Agreements) exceeded, or will exceed, 100% of actual production of crude oil, natural gas and natural gas liquids, calculated separately, in such calendar month, then the Borrower shall within twenty (20) Business Days following the last day of such calendar month terminate, create off-setting positions, allocate volumes to other production the Borrower or any Subsidiary is marketing, or otherwise Unwind existing Swap Agreements such that, at such time, future hedging volumes will not exceed 100% of reasonably anticipated projected production from proved, developed producing Oil and Gas Properties for each of crude oil, natural gas and natural gas liquids, calculated separately, for the then-current and any succeeding calendar month.

Section 9.20    <u>Superpriority Claims</u>.  The Borrower will not, and will not permit any Restricted Subsidiary to, incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Secured Parties against the Debtors except with respect to the Carve-Out.

**ARTICLE X**
**EVENTS OF DEFAULT; REMEDIES**

Section 10.01    <u>Events of Default</u>.  The occurrence of one or more of the following events shall constitute an "<u>Event of Default</u>":

(a)    The Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise.

81

(b)    The Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

(c)    Any representation or warranty made or deemed made by or on behalf of the Borrower or any Restricted Subsidiary in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made.

(d)    The Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.02(a), Section 8.03 (with respect to Borrower's or any Restricted Subsidiary's existence only) or in Article IX.

(e)    The Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b), or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier to occur of (A) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (B) a Responsible Officer of the Borrower or such Restricted Subsidiary otherwise becoming aware of such default.

(f)    The Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness prior to the longer of (i) three (3) Business Days after the same shall become due and payable or (ii) the expiration of any applicable grace period.

(g)    Any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Restricted Subsidiary to make an offer in respect thereof.

(h)    [Reserved].

(i)    [Reserved].

(j)    One or more post-petition judgments for the payment of money in an aggregate amount in excess of the greater of $25.0 million (to the extent not covered by independent third party insurance provided by reputable insurers as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed (including as a result of the automatic stay under the Chapter 11 Cases), or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Restricted Subsidiary to enforce any such judgment.

(k)    The Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and

enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Borrower or any Restricted Subsidiary or any of their Affiliates shall so state in writing.

        (l)      A Change in Control shall occur other than a Change in Control triggered in connection with the transactions contemplated by the Approved Plan.

        (m)     (i) The entry of an order dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) the entry of an order appointing a chapter 11 trustee in the Chapter 11 Cases, (iii) the entry of an order in the Chapter 11 Case appointing an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) and (iv) the filing of any pleading by any Loan Party seeking, or otherwise consenting to, any of the matters set forth in <u>clauses (i)</u> through <u>(iii)</u> above.

        (n)     (A) An amendment, supplement or other modification shall have been made to, or a consent or waiver shall have been granted with respect to any departure by any person from the provisions of, the Approved Plan (without giving effect to such amendment, supplement, modification, consent or waiver), in each case, in a manner that is not permitted pursuant to the definition thereof (it being agreed an amendment, supplement or other modification to the Approved Plan to provide for both the payment in full and in cash of all Loans and all claims under the Existing Credit Agreement on the Closing Date (including cash collateralizing letters of credit) and for third party releases in favor of the Administrative Agent, the Lenders and any other secured parties under the Existing Credit Agreement, this Agreement or other Loan Documents (such a plan of reorganization, a "<u>Cash Pay Plan</u>") shall not constitute an Event of Default), (B) the Approved Plan is withdrawn without the consent of the Administrative Agent and Majority Lenders unless within 30 days following its withdrawal the Loan Parties file a Cash Pay Plan for confirmation; <u>provided</u> that during such 30 day period the Borrower shall not have the ability to request a Loan, (C) any plan other than the Approved Plan or a Cash Pay Plan is filed by, or with the support of, a Loan Party without the consent of the Majority Lenders, (D) the Loan Parties shall have commenced or participated in furtherance of any solicitation in respect of a proposed plan or reorganization other than the Approved Plan or a Cash Pay Plan, (E) the Bankruptcy Court shall terminate or reduce the period pursuant to Section 1121 of the Bankruptcy Code during which the Loan Parties have the exclusive right to file a plan of reorganization and solicit acceptances thereof, (F) the Bankruptcy Court shall grant relief that is inconsistent with the Approved Plan in any material respect and that is adverse to the Administrative Agent's, the Arrangers' or the Secured Parties' interests or inconsistent with the Loan Documents or (G) any of the Loan Parties or any of their affiliates shall file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with the Approved Plan and such motion or pleading has not been withdrawn prior to the earlier of (y) three (3) Business Days of the Borrower receiving notice from the Administrative Agent and (z) entry of an order of the Bankruptcy Court approving such motion or pleading.

        (o)     The entry of the Final Order shall not have occurred on or before the Final Order Entry Deadline, or there shall be a breach by any Loan Party of any material provisions of the Interim Order (prior to entry of the Final Order) or the Final Order, or the Interim Order (prior to entry of the Final Order) or Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of Administrative Agent and Majority Lenders.

(p)     The entry of an order in the Chapter 11 Cases charging any of the DIP Collateral under Section 506(c) of the Bankruptcy Code against the Lenders under which any person takes action against the DIP Collateral or that becomes a final non-appealable order, or the commencement of other actions that is adverse to the Administrative Agent, the Arrangers, the Lenders or their respective rights and remedies under the DIP Facility in any of the Chapter 11 Cases or inconsistent with the Loan Documents.

(q)     The entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) against any asset with a value in excess of $25.0 million.

(r)     The payment of any pre Petition Date claims (other than as permitted by the Interim Order, the Final Order, the Hedging Order or pursuant to an order entered in the Chapter 11 Cases that is supported, or not objected to, by the Administrative Agent).

(s)     Any lien securing or Superpriority Claim in respect of the obligations under the DIP Facility shall cease to be valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim Order and the Final Order, as applicable.

(t)     The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP Facility or as otherwise permitted under the Loan Documents, entitled to superpriority under Section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the DIP Facility, or there shall arise or be granted by the Bankruptcy Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out) or (B) subject to the Existing Intercreditor Agreement, any Lien on the DIP Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except as expressly provided herein or in the Interim Order or the Final Order, whichever is in effect.

(u)     The Loan Parties or any of their Restricted Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent, the Arrangers or any of the Lenders relating to the DIP Facility or the Existing Credit Agreement.

(v)     Failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone.

(w)     After the entry thereof by the Bankruptcy Court, the Confirmation Order shall cease to be in full force and effect, or any Loan Party shall fail to satisfy in full all obligations under the DIP Facility (or convert the DIP Facility into the Exit Facility) on or prior to the effective date of the Approved Plan or fail to comply in any material respect with the Confirmation Order, or the Confirmation Order shall have been revoked, remanded, vacated, reversed, rescinded or modified or amended in any manner that (1) is adverse to the Secured Parties' interests, rights or treatment or inconsistent with the Loan Documents, (2) alters the debt capital structure of the Loan Parties as set forth in the Approved Plan, (3) allows for the incurrence of indebtedness upon or in conjunction with the effective date of the Approved Plan not otherwise contemplated under the Approved Plan (without giving effect to any such modification or supplement) or (4) changes the priority or treatment of any indebtedness from that set forth in the Approved Plan (without giving effect to any such modification or supplement).

(x)       Except as otherwise consented to by the Majority Lenders, the Borrower or any Restricted Subsidiary shall have sold or otherwise Disposed of all or a material portion of the DIP Collateral pursuant to the Bankruptcy Code other than as permitted pursuant to (x) the Interim Order or the Final Order, (y) the Approved Plan or (z) the Loan Documents.

(y)       Any payment of or grant of adequate protection with respect to any Indebtedness existing prior to the Petition Date other than in accordance with the DIP Order without the consent of the Majority Lenders and approval of the Bankruptcy Court.

Section 10.02    Remedies.

(a)       In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, and without further order of the Bankruptcy Court, the Administrative Agent, at the direction of the Majority Lenders, shall, by notice to the Borrower (with a copy to counsel for any statutory committee appointed in the Cases and to the United States Trustee for the [District of Delaware]), take either or both of the following actions, at the same or different times:  (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Notes, if any, and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Loans, the Notes, if any, and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.08(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower and each Guarantor.

(b)       In the case of the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity; provided that prior to any exercise thereof against the DIP Collateral, the Administrative Agent shall provide five Business Days' prior notice thereof to the Borrower (with a copy to counsel for any statutory committee appointed in the Cases and to the United States Trustee for the [District of Delaware]).

(c)       All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied: first, to reimbursement of expenses and indemnities provided for in this Agreement and the Security Instruments; second, to accrued interest on the Loans; third, to fees; fourth, pro rata to principal outstanding on the Loans and Secured Obligations referred to in clauses (b) and (c) of the definition of "Secured Obligations"; fifth, to any other Secured Obligations; sixth, to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure; and any excess shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

(d)       In the case of the occurrence of an Event of Default which results in the Commitments terminating then the Aggregate Maximum Credit Amount shall automatically and concurrently be reduced to $0.

## ARTICLE XI
## THE AGENTS

Section 11.01    Appointment; Powers.    Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. Each Lender (and each Person that becomes a Lender hereunder pursuant to Section 12.04) hereby authorizes and directs the Administrative Agent to enter into the Security Instruments on behalf of such Lender, in each case, as needed to effectuate the transactions permitted by this Agreement and agrees that the Administrative Agent may take such actions on its behalf as is contemplated by the terms of such applicable Security Instrument. Without limiting the provisions of Sections 11.02 and 12.03, each Lender hereby consents to the Administrative Agent and any successor serving in such capacity and agrees not to assert any claim (including as a result of any conflict of interest) against the Administrative Agent, or any such successor, arising from the role of the Administrative Agent or such successor under the Loan Documents so long as it is either acting in accordance with the terms of such documents and otherwise has not engaged in gross negligence or willful misconduct.

Section 11.02    Duties and Obligations of Administrative Agent.    The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and its Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein. For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03    Action by Administrative Agent.  The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 5.04(b), Section 8.13(c) or Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 5.04(b), Section 8.13(c) or Section 12.02) specifying the action to be taken and (a) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action, provided that no indemnity shall be provided for any liabilities or losses determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent.  The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders.  If a Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interests of the Lenders.  In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law.  If a Default has occurred and is continuing, neither the Syndication Agent nor any Documentation Agent shall have any obligation to perform any act in respect thereof.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 5.04(b), Section 8.13(c) or Section 12.02), and otherwise no Agent shall be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.

Section 11.04    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Bank hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of the Note, if any, as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05    Subagents.  The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all its duties and exercise

its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this <u>Article XI</u> shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06    <u>Resignation of Agents</u>.    Subject to the appointment and acceptance of a successor Agent as provided in this <u>Section 11.06</u>, any Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower. Upon any such resignation, the Majority Lenders shall have the right, with the consent of the Borrower (unless an Event of Default has occurred and is continuing), which consent shall not be unreasonably withheld or delayed, to appoint a successor from among the Lenders. If no successor shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Agent from among the Lenders, or an Affiliate of any such bank. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Agent's resignation hereunder, the provisions of this <u>Article XI</u> and <u>Section 12.03</u> shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Section 11.07    <u>Agents as Lenders</u>.    Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 11.08    <u>No Reliance</u>.    Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder. The Agents shall not be required to keep themselves informed as to the performance or observance by the Borrower or any of its Subsidiaries of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent nor the Arrangers shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of such Agent or any of its Affiliates. In this regard, each Lender acknowledges that Simpson, Thacher & Bartlett LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document. Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09   <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of its Subsidiaries, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 12.03</u>) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 12.03</u>.

Except as specifically contemplated herein, nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or other Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or other Secured Party or to authorize the Administrative Agent to vote in respect of the claim of any Lender or other Secured Party in any such proceeding.

Section 11.10   <u>Authority of Administrative Agent to Release Collateral and Liens</u>.  Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to release any collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents.  Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all (a) releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of <u>Section 9.13</u> or is otherwise authorized by the terms of the Loan Documents, (b) releases from the Guaranty Agreement of any Subsidiary that is sold or otherwise disposed of as permitted by the terms of <u>Section 9.13</u> or as otherwise specifically authorized by the terms of the Loan Documents and (c) other releases of collateral that may be specifically authorized by the terms of the Loan Documents.

Section 11.11   <u>The Arrangers, the Syndication Agent and the Documentation Agent</u>.  The Arrangers, the Syndication Agent and the Documentation Agent shall have no duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than their duties, responsibilities and liabilities in their capacity as Lenders hereunder.

89

## ARTICLE XII
## MISCELLANEOUS

Section 12.01    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing (i) delivered by hand or overnight courier service, mailed by certified or registered mail, (ii) sent by telecopy or (iii) sent by email, as follows:

(A)    if to the Borrower, to it at 1000 Louisiana St., Suite 6905, Houston, TX 77002, Attention: Mark J. Mize, Phone No. (832) 538-0303, Fax No. (832) 538-0220; and

(B)    if to the Administrative Agent, to it at 1 Chase Tower, 10 South Dearborn, IL1-0010, Chicago, Illinois 60603 Attention: Leonida Mischke, Phone No. (312) 385-7055, Fax No. (312) 385-7096, and for all other correspondence other than borrowings, continuation, conversion and Letter of Credit requests 712 Main, 12th Floor, Houston, Texas 77002, Attention of Ronald Dierker (Fax No. (713) 216-7794); and

(C)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02    Waivers; Amendments.

(a)    No failure on the part of the Administrative Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the

90

Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)        Subject to <u>Section 4.05</u>, neither this Agreement nor any provision hereof nor any Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; <u>provided</u> that no such agreement shall (i) increase the Maximum Credit Amount or Commitment of any Lender without the written consent of such Lender affected thereby, (ii) [reserved], (iii) reduce the principal amount of the Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Secured Obligations hereunder or under any other Loan Document, without the written consent of each Lender) directly and adversely affected thereby (except in connection with any amendment or waiver of the applicability of any post-default increase in interest rates, which shall be effective with the written consent of the Majority Lenders), (iv) postpone the scheduled date of payment or prepayment of the principal amount of the Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Secured Obligations hereunder or under any other Loan Document, reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date, or extend the expiry date of any Letter of Credit beyond the then current Maturity Date without the written consent of each Lender affected thereby, (v) change <u>Section 4.01(b)</u> or <u>Section 4.01(c)</u> in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender directly and adversely affected thereby, (vi) waive or amend <u>Section 3.04(c)</u>, <u>Section 6.01</u> or <u>Section 8.14</u> or change the definition of the terms "Applicable Percentage", "Domestic Subsidiary", "Foreign Subsidiary", "Material Domestic Subsidiary" or "Subsidiary", without the written consent of each Lender directly and adversely affected thereby, (vii) release any Guarantor (except as set forth in the Guaranty Agreement or pursuant to a transaction permitted hereby) or release a substantial portion of the collateral (other than as provided in <u>Section 11.10</u>) without the written consent of each Lender (other than any Defaulting Lender) or other Secured Swap Provider directly and adversely affected thereby, (viii) modify the terms of <u>Section 10.02(c)</u> or <u>Section 12.14</u> without the written consent of (A) each Lender directly and adversely affected thereby and the consent of each Person that is directly and adversely affected hereby and (B) a party to a Swap Agreement secured by the Security Instruments which is not a Lender (or an Affiliate of a Lender) at the time of, or after giving effect to, such agreement; <u>provided</u> that any waiver, amendment or modification to any Security Instrument that results in the Secured Swap Obligations secured by such Security Instrument no longer being secured thereby on an equal and ratable basis with the principal of the Loans, or any amendment, modification or change to the definition of the terms "Existing Secured Swap Agreement," "Secured Swap Agreement" or "Secured Swap Provider," shall also require the written consent of each Secured Swap Provider directly and adversely affected thereby, or (ix) change (A) any of the provisions of this <u>Section 12.02(b)</u> without the written consent of each Lender or other Secured Swap Provided directly and adversely affected thereby, (B) the definitions of "Majority Lenders", "Required Lenders" or reduce the voting rights of any Lender, without the written consent of each directly and adversely affected Lender, (C) any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Document, without the written consent of each Lender directly and adversely affected thereby; <u>provided</u> <u>further</u> that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Issuing Bank, as the case may be. Notwithstanding the foregoing, any supplement to <u>Schedule 7.14</u> (Subsidiaries) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders.

91

(c)     Notwithstanding anything to the contrary contained in the Loan Documents, the Administrative Agent and the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender in order to (i) correct, amend, cure or resolve any minor ambiguity, omission, defect, typographical error, inconsistency or other manifest error therein, (ii) add a guarantor or collateral or otherwise enhance the rights and benefits of the Lenders, (iii) make minor administrative or operational changes not adverse to any Lender or (iv) adhere to any local Governmental Requirement or advice of local counsel.

Section 12.03   Expenses, Indemnity; Damage Waiver.

(a)     The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent (limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of (x) one (1) counsel to such Persons, taken as a whole, one (1) local counsel in each relevant jurisdiction and one (1) regulatory counsel to all such Persons with respect to a relevant regulatory matter, taken as a whole, and (y) solely in the event of a conflict of interest, one (1) additional counsel (and, if necessary, one (1) regulatory counsel and one (1) local counsel in each relevant jurisdiction or for each matter) to each group of similarly situated affected indemnified persons), the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, including all IntraLinks expenses, and the cost of environmental invasive and non-invasive assessments and audits and surveys and appraisals, in connection with the syndication of this Agreement, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein or conducting of title reviews, mortgage matches and collateral reviews, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Issuing Bank or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(B)     THE BORROWER SHALL INDEMNIFY EACH AGENT, THE ISSUING BANK, EACH ARRANGER, EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE (LIMITED IN THE CASE OF LEGAL FEES AND EXPENSES TO THE REASONABLE AND DOCUMENTED OUT-OF-POCKET FEES, DISBURSEMENTS AND OTHER CHARGES OF (X) ONE (1) COUNSEL TO SUCH INDEMNITES, TAKEN AS A WHOLE, ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION AND ONE (1) REGULATORY COUNSEL TO ALL SUCH

INDEMNITEES WITH RESPECT TO A RELEVANT REGULATORY MATTER, TAKEN AS A WHOLE, AND (Y) SOLELY IN THE EVENT OF A CONFLICT OF INTEREST, ONE (1) ADDITIONAL COUNSEL (AND, IF NECESSARY, ONE (1) REGULATORY COUNSEL AND ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION OR FOR EACH MATTER) TO EACH GROUP OF SIMILARLY SITUATED AFFECTED INDEMNITEES), INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (ii) THE FAILURE OF THE BORROWER OR ANY RESTRICTED SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING, WITHOUT LIMITATION, (A) ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR (B) THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (v) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vi) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ITS SUBSIDIARIES BY THE BORROWER AND ITS SUBSIDIARIES, (vii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS, (viii) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES, (ix) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (x) THE PAST OWNERSHIP BY THE BORROWER OR ANY SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xi) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES, (xii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF ITS SUBSIDIARIES, OR (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING THAT MAY BE BROUGHT BY THE BORROWER, ANY GUARANTOR, ANY OF

THEIR RESPECTIVE AFFILIATES OR ANY OTHER PERSON OR ENTITY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or the Issuing Bank under <u>Section 12.03(a)</u> or <u>(b)</u>, each Lender severally agrees to pay to such Agent or the Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or the Issuing Bank in its capacity as such.

(d)    All amounts due under this <u>Section 12.03</u> shall be payable not later than five (5) days after written demand therefor.

Section 12.04    <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this <u>Section 12.04</u>. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in <u>Section 12.04(c)</u>) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in <u>Section 12.04(b)(ii)</u>, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)    the Borrower, <u>provided</u> that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee, and provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto

94

by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

        (B)    the Administrative Agent, <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender or an Affiliate of a Lender immediately prior to giving effect to such assignment.

        (ii)    Assignments shall be subject to the following additional conditions:

        (A)    except in the case of an assignment to a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5.0 million unless each of the Borrower and the Administrative Agent otherwise consent, <u>provided</u> that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

        (B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

        (C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

        (D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

        (E)    the assignee must not be a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), a Defaulting Lender or an Affiliate or a Subsidiary of the Borrower or any other Loan Party.

        (iii)    Subject to <u>Section 12.04(b)(iv)</u> and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of <u>Section 5.01</u>, <u>Section 5.02</u>, <u>Section 5.03</u> and <u>Section 12.03</u>).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 12.04</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>Section 12.04(c)</u>.

        (iv)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Credit Amount of, and principal amount of (and stated interest on) the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Issuing Bank(s) and the Lenders shall treat each Person whose name is

95

recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and, at its election, forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)     (i)  Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Participant may have consent rights with respect to any amendment, modification or waiver described in clauses (i), (iii), (iv), (v), (vi) and (vii) of the proviso to Section 12.02(b) that affects such Participant and for which such Lender would have consent rights.  In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03.  Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(e) (it being understood that the documentation required under Section 5.03(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 4.01(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the

Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 5.01 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05    Survival; Revival; Reinstatement.

(a)     All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.  The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)     To the extent that any payments on the Secured Obligations or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Secured Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent, the Lenders and the other Secured Parties to effect such reinstatement.

97

Section 12.06    Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)    **This Agreement and the other Loan Documents represent the final agreement among the parties hereto and thereto and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.  To the extent there are any inconsistencies between the terms of this Agreement or any Loan Document and the DIP Order, the provisions of the DIP Order shall govern.**

(c)    Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07    Severability.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including without limitations obligations under Swap Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any Restricted Subsidiary against any of and all the obligations of the Borrower or any Restricted Subsidiary owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured; provided that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.  The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 10.02(c) and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, Issuing Bank(s) and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender, Issuing Bank(s) and their respective Affiliates under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender, Issuing Bank(s) or their respective Affiliates may have.  Each Lender and Issuing Bank agrees to notify the Borrower and the

Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09    <u>GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS</u>.

(a)    THIS AGREEMENT AND THE NOTES, IF ANY, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY, AND CITY OF NEW YORK, BOROUGH OF MANHATTAN. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM *NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM OBTAINING JURISDICTION OVER ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c)    EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN <u>SECTION 12.01</u> OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO <u>SECTION 12.01</u> (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)    EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES (<u>PROVIDED</u>, THAT THIS WAIVER SHALL NOT LIMIT RECOVERY BY AN INDEMNITEE PURSUANT TO <u>SECTION 12.03</u> FOR INDEMNIFICATION OF EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES PAID TO, OR ASSERTED BY, A THIRD PARTY); (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO

99

ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS <u>SECTION 12.09</u>.

Section 12.10    <u>Headings</u>.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11    <u>Confidentiality</u>.   Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 12.11</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement or any credit insurance provider, in each case, relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this <u>Section 12.11</u> or (ii) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower.  For the purposes of this <u>Section 12.11</u>, "<u>Information</u>" means all information received from the Borrower or any Restricted Subsidiary relating to the Borrower or any Restricted Subsidiary and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower or a Restricted Subsidiary; <u>provided</u> that, in the case of information received from the Borrower or any Restricted Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this <u>Section 12.11</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 12.12    <u>Interest Rate Limitation</u>.   It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the

principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (ii) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans, until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this <u>Section 12.12</u> and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this <u>Section 12.12</u>.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect.  Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

　　　　Section 12.13　<u>EXCULPATION PROVISIONS</u>.　EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

　　　　Section 12.14　<u>Collateral Matters; Swap Agreements</u>.　The benefit of the Security Instruments and of the provisions of this Agreement relating to any collateral securing the Secured Obligations shall also extend to and be available on a *pro rata* basis to any Person under any Swap Agreement between the

Borrower or any Restricted Subsidiary and such Person if either (a) at the time such Swap Agreement was entered into, such Person was a Lender or Affiliate of a Lender hereunder or (b) such Swap Agreement was in effect on the Closing Date and such Person or its Affiliate was a Lender on the Closing Date, in each case, after giving effect to all netting arrangements relating to such Swap Agreements.  Except as set forth in this Agreement, no Person shall have any voting rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements.

Section 12.15    No Third Party Beneficiaries.  This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever.  There are no third party beneficiaries.

Section 12.16    USA Patriot Act Notice.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

Section 12.17    Flood Insurance.  Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, in no event is or will any enclosed structure (having two walls and a roof) or manufactured mobile home (each, a "Building") be included as Collateral nor included in the definition of "Mortgaged Property", and no Building is hereby nor shall be encumbered by a Mortgage, this Agreement or any other Loan Document.

Section 12.18    No Fiduciary Duty.  Each Lender and their Affiliates (collectively, solely for purposes of this Section 12.18, the "Lenders"), may have economic interests that conflict with those of the Borrower and its Subsidiaries and their stockholders and/or their affiliates.  The Borrower, for itself and on behalf of its Subsidiaries, agrees that nothing in this Agreement or the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and the Borrower or its Subsidiaries, their stockholders or their affiliates, on the other.  The Borrower, for itself and on behalf of its Subsidiaries, acknowledges and agrees that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrower and its Subsidiaries, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of the Borrower or its Subsidiaries, their stockholders or their affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise Borrower or its Subsidiaries, their stockholders or their affiliates on other matters) or any other obligation to the Borrower or any of its Subsidiaries except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of the Borrower or any of its Subsidiaries, their management, stockholders, creditors or any other Person.  The Borrower, for itself and its Subsidiaries, acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Borrower, for itself and its Subsidiaries, agrees that it will not claim that any Lender has rendered advisory services

of any nature or respect, or owes a fiduciary or similar duty to such Borrower or Subsidiary, in connection with such transaction or the process leading thereto.

Section 12.19 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[SIGNATURES BEGIN NEXT PAGE]

01:18968086.1

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                                    **HALCÓN RESOURCES CORPORATION**

By: _____
     Name:
     Title:

ADMINISTRATIVE AGENT
AND LENDER:

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent and Lender

By: _____
  Name:
  Title:

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as a Lender


By: _____
      Name:
      Title:

BANK OF AMERICA, N.A., as a Lender

By: _____
      Name:
      Title:

BMO HARRIS FINANCING, INC., as a Lender

By: _____
    Name:
    Title:

BARCLAYS BANK PLC, as a Lender

By: _____
     Name:
     Title:

BNP PARIBAS, as a Lender

By: _____
      Name:
      Title:

CAPITAL ONE, NATIONAL ASSOCIATION, as a Lender

By: _____
     Name:
     Title:

COMERICA BANK, as a Lender

By: _____
     Name:
     Title:

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as a Lender

By: _____
    Name:
    Title:

CREDIT SUISSE LOAN FUNDING, LLC, as a
Lender

By: _____
Name:
Title:

GOLDMAN SACHS BANK USA, as a Lender

By: _____
     Name:
     Title:

ING CAPITAL LLC, as a Lender

By: _____
     Name:
     Title:

NATIXIS, as a Lender

By: _____
Name:
Title:

ROYAL BANK OF CANADA, as a Lender

By: _____
     Name:
     Title:

SUNTRUST BANK, as a Lender

By: _____
　　　Name:
　　　Title:

Annex I

**LIST OF MAXIMUM CREDIT AMOUNTS**

| MAXIMUM CREDIT AMOUNTS-INTERIM PERIOD | | |
|---|---|---|
| Lender | Applicable Percentage | Maximum Credit Amount |
| JPMorgan Chase Bank, N.A. | 10.4772% | [●] |
| Wells Fargo Bank, N.A. | 10.4772% | [●] |
| Barclays Bank plc | 9.8263% | [●] |
| BMO Harris Financing, Inc. | 9.8263% | [●] |
| Bank of America, N.A. | 6.7357% | [●] |
| Capital One, National Association | 6.7357% | [●] |
| Natixis | 6.7357% | [●] |
| Royal Bank of Canada | 6.7357% | [●] |
| SunTrust Bank | 6.7357% | [●] |
| BNP Paribas | 5.7734% | [●] |
| ING Capital LLC | 5.7734% | [●] |
| Goldman Sachs Bank USA | 5.6376% | [●] |
| Credit Suisse AG, Cayman Islands Branch | 5.0886% | [●] |
| Comerica Bank | 3.4415% | [●] |
| Total: | 100.0000% | $[●] |

| MAXIMUM CREDIT AMOUNTS-FINAL ORDER | | |
|---|---|---|
| Lender | Applicable Percentage | Maximum Credit Amount |
| JPMorgan Chase Bank, N.A. | 10.4772% | [●] |
| Wells Fargo Bank, N.A. | 10.4772% | [●] |
| Barclays Bank plc | 9.8263% | [●] |
| BMO Harris Financing, Inc. | 9.8263% | [●] |
| Bank of America, N.A. | 6.7357% | [●] |
| Capital One, National Association | 6.7357% | [●] |
| Natixis | 6.7357% | [●] |
| Royal Bank of Canada | 6.7357% | [●] |
| SunTrust Bank | 6.7357% | [●] |
| BNP Paribas | 5.7734% | [●] |
| ING Capital LLC | 5.7734% | [●] |
| Goldman Sachs Bank USA | 5.6376% | [●] |
| Credit Suisse AG, Cayman Islands Branch | 5.0886% | [●] |
| Comerica Bank | 3.4415% | [●] |
| Total: | 100.0000% | [●] |

## EXHIBIT 3

**Prepetition Swap Agreements**

**Schedule I**

**Subject Swap Agreement ISDAs**

1.  ISDA Master Agreement, dated as of August 23, 2013, between Bank of Montreal and Halcón Resources Corporation

2.  ISDA Master Agreement, dated as of August 15, 2014, between Barclays Bank PLC and Halcón Resources Corporation

3.  ISDA Master Agreement, dated as of December 12, 2013, between Comerica Bank and Halcón Resources Corporation

4.  ISDA Master Agreement, dated as of September 24, 2012, between ING Capital Markets LLC and Halcón Resources Corporation

5.  ISDA Master Agreement, dated as of October 11, 2012, between J. Aron & Company and Halcón Resources Corporation

6.  ISDA Master Agreement, dated as of February 8, 2012, between JPMorgan Chase Bank, National Association and Halcón Resources Corporation

7.  ISDA Master Agreement, dated as of February 26, 2013, between Merrill Lynch Commodities, Inc. and Halcón Resources Corporation

8.  ISDA Master Agreement, dated as of November 25, 2013, between Natixis and Halcón Resources Corporation

9.  ISDA Master Agreement, dated as of April 10, 2012, between Wells Fargo Bank, National Association and Halcón Resources Corporation, as amended as of November 5, 2012