**Exhibit A**

**Restructuring Support Agreement**

**EXECUTION VERSION**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of June 9, 2016, is entered into by and among (i) Halcón Resources Corporation ("*Holdings*" and, together with certain of its subsidiaries that are parties hereto and listed on Schedule 1 hereto, the "*Company*"), (ii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "*Third Lien Noteholders*" and, together with their respective successors and permitted assigns and any subsequent Third Lien Noteholder that becomes party hereto in accordance with the terms hereof, the "*Consenting Third Lien Noteholders*"), of the 13.0% Senior Secured Third Lien Notes due 2022 (the "*Third Lien Notes*") issued under that certain Indenture, dated as of September 10, 2015, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time (the "*Third Lien Indenture*"), (iii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "*Unsecured Noteholders*" and, together with their respective successors and permitted assigns and any subsequent Unsecured Noteholder that becomes party hereto in accordance with the terms hereof, the "*Consenting Unsecured Noteholders*"), of the Unsecured Notes (as defined below) issued under the Unsecured Indentures (as defined below), (iv) the undersigned beneficial holder, or investment advisor or manager for the account of the beneficial holder (together with its successors and permitted assigns and any subsequent holder of the Convertible Note (as defined below) that becomes party hereto in accordance with the terms hereof, the "*Convertible Noteholder*"), of the 8.0% Senior Unsecured Convertible Note due 2020 (the "*Convertible Note*") and (v) the undersigned beneficial holders (the "*Preferred Holders*" and, together with their respective successors and permitted assigns and any subsequent Preferred Holder that becomes party hereto in accordance with the terms hereof, the "*Consenting Preferred Holders*," and together with the Consenting Third Lien Noteholders, the Consenting Unsecured Noteholders and the Convertible Noteholder, the "*Consenting Creditors*")) of the 5.75% Series A Convertible Perpetual Preferred Stock (the "*Preferred Stock*") issued by Holdings.  The Company, each Consenting Creditor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "*Parties*" and individually as a "*Party*."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the term sheet attached hereto as <u>Exhibit A</u> (the "*Term Sheet*," including any schedules and exhibits attached thereto, which is expressly incorporated herein and made part of this Agreement, and as may be modified in accordance with <u>Section 9</u> hereof);

**WHEREAS,** the Parties have agreed to a restructuring of the Company in accordance with the Definitive Documents (the "*Restructuring*"), which is anticipated to be effected through the Plan (as defined below) through a solicitation of votes for the Plan (the "*Solicitation*") pursuant to the Bankruptcy Code (as defined below) (and to the extent required, applicable non-bankruptcy law) and the commencement by the Company of voluntary cases (the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

**WHEREAS,** as of the date hereof, the Consenting Third Lien Noteholders hold, in the aggregate, 80.2% of the aggregate outstanding principal amount of the Third Lien Notes;

**WHEREAS,** as of the date hereof, the Consenting Unsecured Noteholders hold, in the aggregate, 56.6% of the aggregate outstanding principal amount of the Unsecured Notes;

**WHEREAS**, as of the date hereof, the Convertible Noteholder holds 100% of the aggregate outstanding principal amount of the Convertible Note;

**WHEREAS**, as of the date hereof, the Consenting Preferred Holders hold, in the aggregate, approximately 63.3% of the outstanding Preferred Stock; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    <u>Certain Definitions.</u>

As used in this Agreement, the following terms have the following meanings:

(a)    "***8.875% Senior Unsecured Notes***" means the 8.875% Senior Unsecured Notes due 2021 issued pursuant to that certain Indenture (as amended, supplemented or otherwise modified from time to time, the "***8.875% Senior Unsecured Note Indenture***") dated as of November 6, 2012, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time.

(b)    "***9.25% Senior Unsecured Notes***" means the 9.25% Senior Unsecured Notes due 2022 issued pursuant to the Indenture (as amended, supplemented or otherwise modified from time to time, the "***9.25% Senior Unsecured Note Indenture***") dated as of August 13, 2013, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time.

(c)    "***9.75% Senior Unsecured Notes***" means the 9.75% Senior Unsecured Notes due 2020 issued pursuant to the Indenture (as amended, supplemented or otherwise modified from time to time, the "***9.75% Senior Unsecured Note Indenture***") dated as of July 16, 2012, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as indenture trustee, as amended, modified, or otherwise supplemented from time to time.

(d)    "***Bankruptcy Rules***" means The Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the

United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

(e)      "*Closing*" means the consummation of the Plan.

(f)      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases, which order will be in form and substance reasonably satisfactory to the Company and the Requisite Creditors.

(g)      "*Consenting Class*" means the Third Lien Noteholders, the Unsecured Noteholders, the Convertible Noteholder or the Preferred Holders, as applicable.

(h)      "*Convertible Noteholder New Warrants*" means warrants to be issued by Reorganized Holdings and distributed to the Convertible Noteholder on the Effective Date under the Plan.

(i)      "*Definitive Documents*" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet and/or that are otherwise necessary or desirable to implement, the Restructuring in accordance with the Term Sheet, including the Plan, the agreements and other documents to be filed in the supplement to the Plan (collectively, the "*Plan Supplement*"), the Disclosure Statement and this Agreement (together with any voting and solicitation related materials), and any motion seeking the approval thereof, the Confirmation Order, any documents relating to the New Common Shares and the New Warrants (as applicable), the DIP Financing, any exit financing, use of cash collateral, organizational documents, shareholder related agreements or other related documents, all of which definitive documents shall contain terms and conditions consistent in all respects with this Agreement and shall otherwise be reasonably satisfactory in form and substance to the Company and the Requisite Third Lien Noteholders, the Requisite Unsecured Noteholders and the Convertible Noteholder (except (i) for the loan agreements with respect to DIP Financing and exit financing, which also must be satisfactory to Requisite Third Lien Noteholders and (ii) as otherwise provided in Section 5(b)(iii)).

(j)      "*DIP Financing*" means funding for the Chapter 11 Cases that the Company may elect to seek, by means of debtor-in-possession financing pursuant to section 364 of the Bankruptcy Code.

(k)      "*Disclosure Statement*" means the disclosure statement in respect of the Plan, in form and substance reasonably satisfactory to the Requisite Creditors, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law including, without limitation, all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.  References to "Disclosure Statement" hereunder shall include all amendments, restatements and other modifications made thereto following the Commencement Date in accordance with this Agreement.

(l)        "*Effective Date*" means the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Plan shall have become effective.

(m)        "*Local Counsel*" means Delaware counsel retained by the Third Lien Noteholders, Unsecured Noteholders and Convertible Noteholder.

(n)        "*New Common Shares*" means the common shares, par value $0.0001 per share, of Reorganized Holdings to be issued under the Plan.

(o)        "*New Warrants*" means the Unsecured Noteholder New Warrants and the Convertible Noteholder New Warrants.

(p)        "*Note Claims*" means all claims arising under the Notes.

(q)        "*Notes*" means the Third Lien Notes, the Unsecured Notes and the Convertible Note.

(r)        "*Noteholder Counsel*" means Latham & Watkins LLP, as counsel to the Third Lien Noteholders, Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Unsecured Noteholders and Jones Day, as counsel to the Convertible Noteholder.

(s)        "*Noteholders Financial Advisors*" means Houlihan Lokey Capital, Inc., as financial advisor to the Third Lien Noteholders.

(t)        "*Plan*" means the plan of reorganization for the Company pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (as applicable), to be implemented in the Chapter 11 Cases, which Plan will be: (i) consistent in all respects with the Term Sheet and this Agreement; (ii) included in the solicitation package sent with the Disclosure Statement; (iii) filed with the Bankruptcy Court on the Commencement Date; and (iv) otherwise reasonably satisfactory in form and substance to the Requisite Creditors. References to "Plan" hereunder shall include all amendments, restatements and other modifications made thereto following the Commencement Date in accordance with its terms and this Agreement.

(u)        "*Reorganized Holdings*" means Holdings after giving effect to consummation of the Restructuring under the Plan.

(v)        "*Requisite Creditors*" means, as of the date of determination, each of (i) the Requisite Third Lien Noteholders, (ii) the Requisite Unsecured Noteholders, (iii) the Convertible Noteholder and (iv) the Requisite Preferred Holders.

(w)        "*Requisite Preferred Holders*" means, as of the date of determination, Consenting Preferred Holders holding at least a majority in aggregate liquidation preference value or number of shares of the outstanding Preferred Stock held by the Consenting Preferred Holders as of such date.

(x)    "***Requisite Third Lien Noteholders***" means, as of the date of determination, Consenting Third Lien Noteholders holding at least a majority in aggregate principal amount outstanding of the Third Lien Notes held by the Consenting Third Lien Noteholders as of such date; provided that Requisite Third Lien Noteholders shall include (i) Ares, for so long as it, together with its affiliated funds that are Consenting Third Lien Noteholders, holds greater than 20% in aggregate principal outstanding amount of the Third Lien Notes, and (ii) Franklin, for so long as it, together with its affiliated funds that are Consenting Third Lien Noteholders, holds greater than 20% in aggregate principal outstanding amount of the Third Lien Notes.

(y)    "***Requisite Unsecured Noteholders***" means, as of the date of determination, Consenting Unsecured Noteholders holding at least a majority in aggregate principal amount outstanding of the Unsecured Notes held by the Consenting Unsecured Noteholders as of such date; provided, that any Unsecured Notes acquired by Ares and Franklin after the date of this Agreement shall not be included in either the numerator or denominator of the foregoing calculation except for any Unsecured Notes acquired by them from other Consenting Unsecured Noteholders.

(z)    "***Securities Act***" means the Securities Act of 1933, as amended.

(aa)    "***Support Effective Date***" means the date on which (A) counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) Consenting Third Lien Noteholders holding at least 66 2/3% in aggregate principal amount outstanding of the Third Lien Notes, (iii) Consenting Unsecured Noteholders holding at least 50% in aggregate principal amount outstanding of the Unsecured Notes, (iv) Convertible Noteholder and (v) Consenting Preferred Holders holding at least 50% of the outstanding Preferred Stock and (B) all accrued fees, costs and expenses pursuant to outstanding invoices of each of (i) Noteholder Counsel, (ii) Local Counsel, if applicable, and (iii) Houlihan Lokey Capital, Inc. as financial advisor to the Third Lien Noteholders, under their respective engagement letters or other contractual arrangements have been paid in full in immediately available funds by the Company.

(bb)    "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 5 hereof and (ii) the Effective Date.

(cc)    "***Unsecured Indentures***" means the 8.875% Senior Unsecured Note Indenture, the 9.25% Senior Unsecured Note Indenture, and the 9.75% Senior Unsecured Note Indenture.

(dd)    "***Unsecured Noteholder New Warrants***" means warrants to be issued by Reorganized Holdings and distributed to the Unsecured Noteholders on the Effective Date under the Plan.

(ee)    "***Unsecured Notes***" means the 8.875% Senior Unsecured Notes, the 9.25% Senior Unsecured Notes, and the 9.75% Senior Unsecured Notes.

2.      Bankruptcy Process; Plan of Reorganization

(a)      Term Sheet. The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet sets forth certain of the material terms and conditions of the Restructuring transactions contemplated by the Plan (the "**Restructuring Transactions**"), as supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Term Sheet and this Agreement, this Agreement shall control, subject however to the provisions of footnote 5 of the Term Sheet relating to certain Creditor Termination Event dates.

(b)      Commencement of the Chapter 11 Cases.  Provided the Support Effective Date has occurred and, unless waived by the Company, (i) the holders of at least 66⅔% of the outstanding principal amount and greater than one half in number of each of the Third Lien Notes, Unsecured Notes and Convertible Note and (ii) holders of at least 66⅔% of the outstanding shares of Preferred Stock, that have submitted ballots vote to support the Plan, the Company hereby agrees that, as soon as reasonably practicable, but in no event later than 11:59 p.m. prevailing Eastern Time on August 2, 2016 (the "**Outside Petition Date**"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases (the date on which such filing occurs, the "**Commencement Date**").

(c)      Filing of the Plan.  On the Commencement Date, the Company shall file the Plan along with the Disclosure Statement, each in form and substance reasonably satisfactory to the Requisite Creditors.

(d)      Confirmation of the Plan.  The Company shall use reasonable best efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code and this Agreement, and each Consenting Creditor shall use its reasonable best efforts to cooperate fully in connection therewith as provided herein.

(e)      Amendments and Modifications of the Plan and Disclosure Statement. The Plan and Disclosure Statement may be amended from time to time following the Commencement Date in accordance with Section 9.  Each of the Parties agrees to negotiate in good faith all amendments and modifications to the Plan and Disclosure Statement as are reasonably necessary to obtain Bankruptcy Court confirmation of the Plan pursuant to a final order of the Bankruptcy Court; provided that the Consenting Creditors shall have no obligation to agree to, or negotiate in good faith with respect to, any modification that (i) is inconsistent with the Plan or the Term Sheet, (ii) creates any new material obligation on any Party that was not reflected in the Plan filed on the Commencement Date, or (iii)  modifies, impairs or otherwise adversely affects the treatment or rights of such Party under the Plan and other Definitive Documents (it being agreed that, for the avoidance of doubt, any change to the Plan that results in actual or potential diminution of the value of the property to be received by a Consenting Class under the Plan shall be deemed to adversely affect such Consenting Class) whether such change is made directly to the treatment of a Consenting Class or to the treatment of another Consenting Class or otherwise; provided, further, that the consent of the Consenting Preferred Holders shall not be required in respect of any amendment, modification or supplement

to the Plan or Disclosure Statement that relates solely to matters following the Effective Date. Notwithstanding the foregoing, the Company may amend, modify or supplement the Plan and Disclosure Statement, from time to time, without the consent of any Consenting Creditor, to cure any non-substantive ambiguity, defect (including any technical defect) or inconsistency, provided that any such amendments, modifications or supplements do not adversely affect the rights, interests or treatment of such Consenting Creditors under such Plan and Disclosure Statement.

3.    **Agreements of the Consenting Creditors.**

(a)    <u>Treatment</u>.  Subject to the terms and conditions hereof, each Consenting Creditor irrevocably agrees to the treatment of its Note Claims and/or Preferred Stock contemplated in the Term Sheet under the Plan in the Chapter 11 Cases.

(b)    <u>Voting, Support</u>.  Subject to the terms and conditions hereof, each Consenting Creditor agrees that, for so long as the Support Period is in effect for such Consenting Creditor, such Consenting Creditor shall:

(i)    (A) timely vote or cause to be voted its Note Claims and/or Preferred Stock to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the Solicitation, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period with respect to such Consenting Creditor, including, without limitation, if the Support Period expires following the Plan voting deadline, and (C) timely vote (or cause to be voted) its Note Claims and/or Preferred Stock against any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company other than the Plan (each, a "<u>Alternative Restructuring</u>"), (D) not directly or indirectly, through any person or entity, (x) seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, and the confirmation and consummation of the Plan and the Restructuring, without prejudice to the termination rights set out under Section 5 hereof, (y) object to or otherwise contest the amount, priority, secured status, or allowance of the Third Lien Note Claim, Unsecured Note Claim, or Convertible Note Claim;

(ii)    in their capacities as holders of Notes and/or Preferred Stock, support and take such commercially reasonable actions necessary or reasonably requested by the Company to obtain the approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring; and

(iii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith

appropriate additional or alternative provisions to address any such impediment; <u>provided that</u> there shall be no obligation to negotiate in good faith with respect to any additional or alternative provisions of the types described in Section 2(e)(i)-(iii).

(c)    <u>Transfers</u>.

(i)    Each Consenting Creditor agrees that, for so long as the Support Period is in effect for such Consenting Creditor, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "**_Transfer_**"), directly or indirectly, in whole or in part, any of its Note Claims and Preferred Stock, as applicable, or any option thereon or any right or interest therein (including grant any proxies, deposit any Notes or Preferred Stock into a voting trust or entry into a voting agreement with respect to any such Notes or Preferred Stock), unless the transferee thereof either (i) is a Consenting Creditor or its affiliate, provided that such affiliate shall agree in writing to be bound by this Agreement as if an original Party hereto, or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as <u>Exhibit B</u> (a "**_Joinder Agreement_**"), and delivering an executed copy thereof within two (2) business days of such execution, to Noteholder Counsel and Weil, Gotshal & Manges LLP ("**_Weil_**"), as counsel to the Company, in which event (a) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder to the extent of such transferred rights and obligations and (b) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Creditor agrees that any Transfer of any Note Claim and/or Preferred Stock that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Creditor shall have the right to enforce the voiding of such Transfer. Notwithstanding anything contained herein to the contrary, for so long as the Support Period is in effect for a Consenting Creditor, such Consenting Creditor may offer, sell or otherwise Transfer any or all of its Note Claims, Preferred Stock and/or any other interests to any entity that, as of the date of Transfer, controls, is controlled by or is under common control with such Consenting Creditor; <u>provided</u>, <u>however</u>, that such entity shall automatically be subject to the terms of this Agreement and deemed a Party hereto and shall have executed a joinder hereto.

(ii)    Notwithstanding <u>Section 3(c)(i)</u>: (A) a Consenting Creditor may Transfer its Notes or Preferred Stock to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party to, and bound by, this Agreement; provided that (1) such Qualified Marketmaker must Transfer such right, title or interest within five (5) business days following its receipt thereof, (2) any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Notes or Preferred Stock is to a transferee that is or becomes a Consenting Creditor effective as of the time of such transfer and (3) such transferor Consenting Creditor shall be solely responsible for the transferee Qualified

Marketmaker's failure to comply with the requirements of this <u>Section 3</u>; and (B) to the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in Notes or Preferred Stock that such Consenting Creditor, in its capacity as a Qualified Marketmaker, acquires from a holder of the Notes or Preferred Stock who is not a Consenting Creditor without the requirement that the transferee be or become a Consenting Creditor. For these purposes, a "***Qualified Marketmaker***" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Company, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(d)    <u>Additional Claims or Equity Interests</u>.  To the extent any Consenting Creditor (i) acquires additional Note Claims or (ii)  acquires any Preferred Stock entitled to vote on the Plan, then, in each case, each such Consenting Creditor shall promptly notify Weil and Noteholder Counsel and each such Consenting Creditor agrees that such Note Claims or Preferred Stock shall be subject to this Agreement, and that, for so long as the Support Period is in effect for such Consenting Creditor, it shall vote (or cause to be voted) any such additional Note Claims or Preferred Stock entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with <u>Section 3(b)</u> hereof.

## 4.    **Agreements of the Company.**

(a)    <u>Covenants</u>.  The Company agrees that, for the duration of the Support Period, the Company shall, and shall cause each of its subsidiaries included in the definition of Company, to:

(i)    (A) act in good faith and use reasonable best efforts to support and complete successfully the Solicitation in accordance with the terms of this Agreement, including all milestones, and applicable law; (B) use reasonable best efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan, if any; (C) not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, this Agreement, the Plan, and any other Definitive Documents executed by the Company or consummation of the Restructuring; (D) not directly or indirectly seek or solicit any discussions relating to, or enter into any agreements relating to, any alternative proposal other than the Restructuring, nor shall the Company solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing; and (E) support and take all reasonable actions necessary and appropriate to facilitate approval of the Disclosure Statement, confirmation and consummation of the Plan and the Restructuring in accordance with, and within the time frames contemplated by, this Agreement and the Definitive Documents;  <u>provided</u> that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan.

(ii)      provide draft copies of all material motions or applications and other documents (including all "first day" and "second day" motions and orders, the Plan, the Disclosure Statement, ballots and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed Confirmation Order) the Company intends to file with the Bankruptcy Court to the Noteholder Counsel, if reasonably practical, at least three (3) business days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, a proposed Confirmation Order or cash collateral and/or adequate protection order) at least three (3) business days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing) and, without limiting any of the other terms of this Agreement, shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(iii)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(iv)      (A) unless otherwise agreed by the Company and the applicable firm, on the date that is at least one (1) calendar day prior to the Commencement Date, pay to (i) Noteholder Counsel, (ii) Local Counsel, and (iii) Noteholder Financial Advisors, in each case, all then accrued unpaid reasonable and documented fees and expenses, outstanding and payable in connection with this matter and (B) continue to pay all outstanding reasonable and documented fees and expenses incurred after the Commencement Date on a current basis by (i) Noteholder Counsel, (ii) Local Counsel, and (iii) Noteholder Financial Advisors, under their respective engagement letters or other contractual arrangements, in connection with the Restructuring without the need to file any interim or final fee applications with the Bankruptcy Court subject to the Company obtaining Bankruptcy Court approval of any such payments.

(b)      Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the termination of this Agreement and the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 5.      Termination of Agreement.

(a)      This Agreement shall terminate upon the receipt of written notice to the other Parties, delivered in accordance with Section 19 hereof, from (i) the Requisite Third Lien Noteholders, the Requisite Unsecured Noteholders, the Convertible Noteholder or the Requisite Preferred Holders, as applicable at any time after and during the continuance of any Creditor Termination Event or Convertible/Preferred Termination Event (as defined below), as applicable; provided that termination by the Requisite Third Lien Noteholders, the Requisite

Unsecured Noteholders, the Convertible Noteholder, or the Requisite Preferred Holders shall only be effective as to the applicable Consenting Class. In addition, this Agreement shall terminate as to all Consenting Creditors upon the receipt of written notice, delivered in accordance with Section 19 hereof, from the Company to the Consenting Creditors at any time after the occurrence and during the continuance of any Company Termination Event (defined below). Notwithstanding the foregoing, this Agreement shall be automatically terminated upon the occurrence of a Creditor Termination Event set forth in Sections 5(b)(x) or (xiv), unless written notice of waiver of such Creditor Termination Event is delivered in accordance with Section 19 hereof by the Requisite Third Lien Noteholders, the Requisite Unsecured Noteholders, the Convertible Noteholder and the Requisite Preferred Holders; provided that automatic termination of this Agreement shall only be effective as to the applicable Consenting Class that does not deliver written notice of waiver of such Creditor Termination Event. No Party may exercise any of its respective termination rights as set herein, if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the Creditor Termination Event or Company Termination Event specified herein.

(b) A "***Creditor Termination Event***" shall mean any of the following:

(i) the breach by the Company of (a) any covenant contained in this Agreement or (b) any other obligations of the Company set forth in this Agreement, in each case, in any material respect and, in either respect, such breach remains uncured five (5) days following the Company's receipt of written notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(ii) any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured five (5) days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(iii) any term or condition of any of the Definitive Documents and any amendments, modifications, or supplements thereto, whether filed with the Bankruptcy Court or otherwise finalized, shall be (whether due to an order of the Bankruptcy Court or otherwise) inconsistent in any respect with the Term Sheet or, if not addressed by the Term Sheet, shall not be in form and substance (A) reasonably satisfactory to the Requisite Third Lien Noteholders, Requisite Unsecured Noteholders and other than with respect to the documents referenced in clause (B) hereof, the Convertible Noteholder, and (B) in the case of the loan agreements with respect to the DIP Financing and exit financing (including, any amendment or amendment and restatement of the Company's Senior Revolving Credit Facility), satisfactory to Requisite Third Lien Noteholders, and such event remains unremedied five (5) days following the Company's receipt of notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(iv) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring or any

material portion hereof, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within ten (10) calendar days after such issuance;

(v)     the Company shall not have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code on or before June 20, 2016;

(vi)    [reserved];

(vii)   the Company shall not have (A) kept the Requisite Third Lien Noteholders and Requisite Unsecured Noteholders reasonably informed of the progress of, and all material developments in, the negotiation of the covenants, conditions and other material terms of the proposed exit financing, or (B) obtained a firm commitment for exit financing on terms acceptable to the Requisite Third Lien Noteholders and reasonably acceptable to the Requisite Unsecured Noteholders prior to the Effective Date;

(viii)  the Chapter 11 Cases shall not have been filed as of 11:59 p.m. Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors;

(ix)    the Company shall not have filed the Plan and Disclosure Statement with the Bankruptcy Court within one (1) business day of the Commencement Date;

(x)     the Company shall not have filed a motion with the Bankruptcy Court seeking authorization to assume this Agreement (the "***RSA Assumption Motion***") within one (1) business day of the Commencement Date;

(xi)    an order approving the use of cash collateral and/or DIP Financing on an interim basis in form and substance consistent with this Agreement and otherwise in form and substance reasonably satisfactory to the Requisite Creditors (the "***Interim Cash Collateral Order***") shall not have been entered by the Bankruptcy Court on or before four (4) business days after the Commencement Date;

(xii)   an order approving the use of cash collateral and/or DIP Financing on a final basis in form and substance substantially identical to the Interim Cash Collateral Order (or as otherwise modified in a manner reasonably acceptable to the Requisite Creditors) shall not have been entered by the Bankruptcy Court on or before 35 days after the Commencement Date;

(xiii)  the Company files any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement and such motion or pleading has not been withdrawn with prejudice within five (5) days following the Company's receipt of written notice pursuant to Sections 5(a) and 19 hereto (as applicable);

(xiv)   the Company shall not have obtained an order of the Bankruptcy Court approving the RSA Assumption Motion on or before the first business day after thirty-five (35) calendar days after the Commencement Date or the assumption of this Agreement shall not have become effective on or before the first business day after thirty-five (35) calendar days after the Commencement Date;

(xv)   the orders approving Disclosure Statement and confirming the Plan shall not have been entered by the Bankruptcy Court on or before the first business day after forty-five (45) calendar days after the Commencement Date;

(xvi)   the Effective Date shall not have occurred on or before the first business day after sixty (60) calendar days after the Commencement Date;

(xvii)  the Company loses the exclusive right to file and/or solicit acceptance of a chapter 11 plan;

(xviii)  upon the filing by the Company of any motion or other request for relief seeking, or the Bankruptcy Court entering an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, or (D) the effect of which would render the Plan incapable of consummation on the terms set forth herein;

(xix)   except pursuant to a termination under <u>Section 5(c)</u>, at the option of any non-terminating Consenting Class, if this Agreement is terminated as to Requisite Third Lien Noteholders, the Requisite Unsecured Noteholders, the Convertible Noteholder, or the Requisite Preferred Holders;

(xx)   if any necessary consents and waivers, as applicable, under the Company's Senior Revolving Credit Facility have not been obtained by the Commencement Date in form and substance reasonably satisfactory to the Requisite Third Lien Noteholders and Requisite Unsecured Noteholders;

(xxi)   if the Company (x) seeks to sell any material assets, (y) enters into any material contractual obligations, or (z) enters into any material settlements, in each case, outside the ordinary course of business unless the Company obtains the prior written consent of Requisite Third Lien Noteholders;

(xxii)   if any of the orders approving the use of cash collateral and the granting of adequate protection, the Plan, or the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the prior written consent of the Requisite Creditors;

(xxiii) if the Company files any motion, application, or adversary proceeding challenging the amount, scope, extent, validity, enforceability, perfection, priority of, or seeking avoidance of, the Note Claims, or (with respect to the Third Lien Notes) the liens securing such Note Claims, or any other cause of action against and/or seeking to restrict the rights of the Consenting Creditors, either directly or through the

respective agents or indenture trustees (or if the Company supports any such motion, application, or adversary proceeding commenced by any third party or consents to the standing of any such third party); or

(xxiv) if giving effect to the Restructuring Transactions would breach or otherwise violate the Second Lien Note Indentures, unless waived by the requisite holders of Second Lien Notes.

(c)     A "*Convertible/Preferred Termination Event*" means that the Company shall not have obtained votes accepting the Plan from holders of Unsecured Notes sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code, and as a result (i) the Convertible Noteholder would receive no distribution under the Plan, in which case the Convertible Noteholder shall be entitled to terminate this Agreement as to itself, and (ii) the Preferred Holders would receive no distribution under the Plan, in which case each Consenting Preferred Holder shall be entitled to terminate this Agreement as to itself.

(d)     A "*Company Termination Event*" shall mean any of the following:

(i)     the breach in any material respect by one or more of the Consenting Creditors in any Class, of any of the undertakings, representations, warranties or covenants of the Consenting Creditors set forth herein in any material respect which remains uncured five (5) days after the receipt of written notice of such breach pursuant to Section 5(a) and 19 hereof (as applicable), but only if the non-breaching Consenting Creditors in such Class hold less than 66⅔% of the aggregate principal amount of claims in such Class, and only with respect to such breaching Class;

(ii)     the board of directors, managers, members or partners, as applicable, of a Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; provided, that the Company provides notice of such determination to the Consenting Creditors within five (5) days after the date thereof;

(iii)     the Company shall not have obtained votes accepting the Plan from holders of Third Lien Notes, Unsecured Notes, Convertible Note and the Preferred Stock sufficient to satisfy the conditions for acceptance set forth in section 1126(c) of the Bankruptcy Code on or before July 29, 2016;

(iv)     any Consenting Third Lien Noteholder or Consenting Unsecured Noteholder files any motion or pleading with the Bankruptcy Court that is not substantially consistent with this Agreement and such motion or pleading has not been withdrawn for a period of five (5) days following such Party's receipt of written notice pursuant to Sections 5(a) and 19 hereof (as applicable) that such motion or pleading is materially inconsistent with this Agreement, unless such motion or pleading (A) does not seek, and could not result in, relief that would have any adverse impact on the Restructuring or (B) is supported by less than half of Third Lien Noteholders and less than half of Unsecured Noteholders, in each case holding 33 1/3% or less of the

aggregate principal amount of the Third Lien Notes and Unsecured Notes, respectively, that have voted on the Plan;

(v)    the Effective Date shall not have occurred on or before the first business day after sixty (60) calendar days after the Commencement Date;

(vi)    the issuance (other than at the request or with the acquiescence of the Company) by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(vii)    except pursuant to a termination under <u>Section 5(c)</u>, if the Consenting Third Lien Noteholders, Consenting Unsecured Noteholders, Convertible Noteholder or Consenting Preferred Holders give a notice of termination of this Agreement;

(viii)    (A) if any necessary consents and waivers, as applicable, under the Company's Senior Revolving Credit Facility have not been obtained by the Commencement Date in form and substance satisfactory to the Company or (B) if applicable, the Company shall not have obtained a firm commitment for DIP Financing and exit financing in form and substance satisfactory to the Company prior to the Commencement Date;

(ix)    if the Company shall not have obtained a firm commitment for exit financing in form and substance satisfactory to the Company prior to the Effective Date; or

(x)    if the Company shall have obtained an acceptable proposal for DIP Financing or exit financing, and within three (3) business days of notification to the Consenting Third Lien Noteholders and the Consenting Unsecured Noteholders (A) such Consenting Third Lien Noteholders or Consenting Unsecured Noteholders do not consent to such DIP Financing or exit financing in accordance with the terms hereof (in the case of the Consenting Unsecured Noteholders, on the basis that the proposed DIP Financing or exit financing is not reasonably satisfactory in form and substance to the Consenting Unsecured Noteholders), and the Company and the Consenting Third Lien Holders and/or Consenting Unsecured Noteholders, as applicable, are unable to resolve such objection within three (3) business days following receipt of the objection or (B) the Company does not receive a consent or notice of objection from the Consenting Third Lien Noteholders or the Consenting Unsecured Noteholders.

(e)    <u>Mutual Termination</u>**.**  This Agreement may be terminated by mutual agreement of the Company and the Requisite Creditors upon the receipt of written notice delivered in accordance with <u>Section 19</u> hereof.

(f)    <u>Effect of Termination</u>.  Upon the termination of this Agreement in accordance with this <u>Section 5</u>, and except as provided in <u>Section 13</u> hereof, this Agreement shall forthwith

become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Third Lien Indenture, the Unsecured Notes, the Convertible Note or the Certificate of Designations, Preferences, Rights and Limitations pursuant to which the Preferred Stock was created (as applicable) and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Upon any such termination of this Agreement, any and all consents and ballots tendered by the Consenting Creditors prior to such termination shall be deemed, for all purposes, automatically null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan and this Agreement or otherwise, and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company allowing such change or resubmission), and the Company shall not oppose any such change or resubmission.  The Consenting Creditors shall have no liability to the Company or to each other in respect of any termination of this Agreement in accordance with the terms of this Section 5 and Section 19 hereof.

(g)     If the Restructuring Transactions are not consummated pursuant to the Plan concurrently with the date of termination of this Agreement, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

## 6.     Definitive Documents; Good Faith Cooperation; Further Assurances.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable best efforts with respect to the pursuit, approval, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or securities of the Company in favor of the Plan, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. Any Third Lien Noteholder who, after giving effect to the Restructuring Transactions, would otherwise own a majority of the New Common Shares, agrees to cooperate in good faith with the Company to modify the treatment of its Third Lien Notes so that it would receive less than a majority of the New Common Shares but would receive additional cash consideration / Plan consideration of a different form that had, as of the Effective Date, equivalent value to the New Common Shares that such Third Lien Noteholder would otherwise be entitled to receive under the Plan.

7. **Representations and Warranties.**

(a)     Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

        (i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

        (ii)     the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

        (iii)     the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

        (iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)     Each Consenting Creditor severally (and not jointly), represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the aggregate principal amount of Notes or number of shares of Preferred Stock set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof), or is the nominee, investment manager, or advisor for one or more beneficial holders thereof, and does not beneficially own any other Notes or Preferred Stock, and/or (ii) has, with respect to the beneficial owners of such Notes or Preferred Stock, (A) sole investment or voting discretion with respect to such Notes or Preferred Stock, (B) full power and authority to vote on and consent to matters concerning such Notes or Preferred Stock or to exchange, assign and transfer such Notes or Preferred Stock, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

17

(c)     Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in Section 22(c) hereof, in each case, to the other Parties.

(d)     The Company hereby represents and warrants to each Consenting Creditor that will receive New Common Shares or New Warrants, as applicable, in connection with the Restructuring, that such shares, upon issuance, shall be duly authorized, validly issued, fully paid and non-assessable and such warrants shall be duly authorized and validly issued.

(e)     The Company hereby represents and warrants to each Consenting Creditor that as of the date hereof there are recorded mortgages in respect of at least 94% of the PV 10 of the Company's proved reserves as of December 31, 2015 as estimated by the Company's independent reserve engineers using March 31, 2016 strip pricing.

## 8.     Disclosure; Publicity.

(a)     Within one business day following the Support Effective Date, subject to the provisions set forth in Section 8(b) hereof, the Company shall disseminate a Current Report on Form 8-K or a press release disclosing the existence of this Agreement and the terms hereof, with such redactions as may be reasonably requested by any Consenting Creditor's counsel to maintain the confidentiality of the items identified in Section 8(b) hereof, except as otherwise required by law.  In the event that the Company fails to make the foregoing disclosures in compliance with the terms specified herein, any such Consenting Creditor may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 8 hereof), and the Company hereby irrevocably waives and releases any claims against the Consenting Creditors arising as a result of such disclosure by a Consenting Creditor in compliance with this Agreement.

(b)     The Company shall submit drafts to Noteholder Counsel of any press releases, public documents and any and all filings with the SEC that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure.  Except as required by applicable law, and notwithstanding any provision of any other agreement between the Company and such Consenting Creditor to the contrary, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Consenting Creditor), other than advisors to the Company, the principal amount or percentage of any Notes, any other securities of the Company or any other claims against the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's prior written consent; provided, however, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Notes held by all the Consenting Creditors collectively.  Notwithstanding the provisions in this Section 8, any Consenting Creditor may disclose such Consenting Creditor's individual holdings to any Person.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditor (provided that the

holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

### 9.    **Amendments and Waivers.**

(a)    Other than as set forth in Section 9(b), this Agreement and the Definitive Documents, including any exhibits or schedules hereto or thereto (including the Term Sheet), may not be waived, modified, amended or supplemented except with the written consent of the Company and Requisite Creditors; provided that (i) Requisite Creditors shall not unreasonably withhold consent to waivers, modifications, amendments and supplements to any of the Definitive Documents (other than this Agreement), as long as such Definitive Documents (other than this Agreement), as so altered, are consistent with the Term Sheet, and (ii) any waivers, modifications, amendments and supplements to the loan agreements with respect to DIP Financing and exit financing shall be satisfactory to the Requisite Third Lien Noteholders.

(b)    Notwithstanding Section 9(a):

(i)    any waiver, modification, amendment or supplement to this Agreement that would have the effect of changing this Section 9 shall require the written consent of all of the Parties;

(ii)    any waiver, modification, amendment or supplement to this Agreement that would have the effect of changing the definition of Requisite Creditors, Requisite Third Lien Noteholders, Requisite Unsecured Noteholders, Convertible Noteholder, or Requisite Preferred Holders shall require the written consent of each Consenting Creditor included in such definition;

(iii)    any waiver, modification, amendment or supplement to this Agreement or the Definitive Documents that has the effect of treating or affecting any Consenting Creditor in a manner that is disproportionately adverse, on an economic or non-economic basis, to the manner in which any of the other Consenting Creditors are treated (after taking into account each of the Consenting Creditors' respective holdings and interests in the Company and the recoveries contemplated by the Term Sheet (as in effect on the date hereof)) shall require the written consent of such Consenting Creditor and the Company; and

(iv)    any waiver, modification, amendment or supplement to this Agreement or the Definitive Documents that materially, adversely affect the rights of a Consenting Class shall require the consent of each Consenting Creditor in such Consenting Class, and the Company (it being agreed that, for the avoidance of doubt, (A) any change to this Agreement or the Plan that results in a diminution of the value of the property to be received by a Consenting Class under the Plan shall be deemed to materially, adversely affect such Consenting Class, whether such change is made directly to the treatment of a Consenting Class or to the treatment of another Consenting Class or otherwise, and (B) any change to this Agreement or the Plan that (x) reduces the Unsecured Noteholder Cash Distribution or the percentage of Unsecured Noteholder New Common Shares, (y) changes the duration, strike price or equity percentage of the

Unsecured Noteholder New Warrants, or (z) modifies the Requisite Unsecured Creditors' consent rights with respect to the board of directors set forth in the Term Sheet, in each case, shall be deemed to materially, adversely affect the Consenting Class of Unsecured Noteholders).

(c)     In the event that a Consenting Creditor does not consent to a waiver, modification, amendment or supplement to this Agreement ("**_Non-Consenting Creditor_**") requiring the consent of such Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 66⅔% of the principal outstanding amount of Notes or Preferred Stock of the affected Class of which such Non-Consenting Creditor is a member, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to the Company and all other Consenting Creditors of the Consenting Class who have so consented.

## 10.   **Effectiveness.**

This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties on the Support Effective Date, provided that the Support Effective Date occurs within five (5) business days of the date hereof; provided, however, that signature pages executed by Consenting Creditors shall be delivered to (a) other Consenting Creditors in a redacted form that removes such Consenting Creditors' holdings of the Notes and (b) the Company, Weil and Noteholder Counsel in an unredacted form (to be held by Weil and Noteholder Counsel on a professionals' eyes only basis).

## 11.   **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the State of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in New York as described herein. Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring Transactions, (i) any claim that it is not personally subject to the jurisdiction of the courts in New York as described

herein for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 12.    **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

## 13.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 13, and Sections 5(f), 8, 10, 11, 12, 14, 15(b), 16, 17, 18, 19, 21, and 22 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination; provided, further, that the representations and warranties contained in this Agreement shall not survive the expiration of the Support Period.

## 14.    **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**15.**     **Successors and Assigns; Severability; Several Obligations.**

    (a)     This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Notes or claims arising under the Notes other than in accordance with the express terms of this Agreement.

    (b)     If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably satisfactory manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

**16.**     **No Third-Party Beneficiaries.**

    Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

**17.**     **Prior Negotiations; Entire Agreement.**

    This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Creditor shall continue in full force and effect for the duration of such confidentiality agreement.

**18.**     **Counterparts.**

    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

**19.**     **Notices.**

    All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(1)      If to the Company, to:

Halcón Resources Corporation
1000 Louisiana Street
Suite 6700
Houston, Texas 77002
Fax:  (832) 538-0220
Attn: David S. Elkouri
Email: delkouri@halconresources.com

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Fax: (212) 310-8007
Attention:  Gary T. Holtzer, Esq
                     (gary.holtzer@weil.com)
                     - and -
                     Joseph H. Smolinsky, Esq
                     (joseph.smolinsky@weil.com)
                     - and -
                     Ted S. Waksman, Esq.
                     (ted.waksman@weil.com)

(2)      If to a Consenting Creditor, or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Creditor's signature (or as directed by any transferee thereof), as the case may be, with copies to:

With respect to any Consenting Unsecured Noteholder:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Fax: (212) 492-0158
Attention:  Andrew N. Rosenberg
                     (arosenberg@paulweiss.com)
                     - and -
                     Samuel E. Lovett
                     (slovett@paulweiss.com)

With respect to any Consenting Third Lien Noteholder:

Latham & Watkins LLP

330 North Wabash Ave.
Suite 2800
Fax: (312) 993-9767
Attention:   Richard Levy
              (Richard.levy@lw.com)
              - and -
              Peter Knight
              (peter.knight@lw.com)
              -and-
              James Ktsanes
              (james.ktsanes@lw.com)

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

## 20.    Creditors' Committee.

Notwithstanding anything herein to the contrary, if any Consenting Creditor is appointed to and serves on an official committee of unsecured creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Creditor's exercise of its fiduciary duties to any person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement. All Parties agree they shall not oppose the participation of any of the Consenting Creditors or any trustee under the Third Lien Indenture or the Unsecured Indentures on any official committee of unsecured creditors formed in the Chapter 11 Cases.

## 21.    Qualification on Consenting Noteholders Representations.

The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Creditor that is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Creditor that are not held through accounts managed by such investment manager.

## 22.    No Solicitation; Representation by Counsel; Adequate Information.

(a)      This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Noteholders or the Preferred Holders.  The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditor has received the Disclosure Statement and related ballots and solicitation materials, each as approved or ratified by the Bankruptcy Court.

(b)      Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal

24

decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act, (ii) understands that the securities to be acquired by it (if any) pursuant to the Restructuring Transactions have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iii) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring Transactions and understands and is able to bear any economic risks with such investment.

(d)    The Company (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any other party and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the Consenting Creditors' express representations, warranties, and covenants in this Agreement, and has entered into this Agreement voluntarily and of its own choice and not under coercion or duress.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**<u>HALĆON PARTIES</u>**

**HALĆON RESOURCES CORPORATION**

By: _____
       Name:  Floyd Wilson
       Title:   Chairman of the Board and Chief
                 Executive Officer

**HALCÓN HOLDINGS, INC.**

By: _____
     Name: Floyd Wilson
     Title:   Chief Executive Officer

**HK RESOURCES, LLC**

By: _____

Name: Floyd Wilson

Title:   Chief Executive Officer

**THE 7711 CORPORATION**

By: _____

Name: Floyd Wilson

Title: Chief Executive Officer

**HALCÓN GULF STATES, LLC**

By: _____

     Name:  Floyd Wilson

     Title:   Chief Executive Officer

**HALCÓN LOUISIANA OPERATING, L.P.**

By:   Halcón Gulf States, LLC,
      its general partner

By: _____
      Name:  Floyd Wilson
      Title:   Chief Executive Officer

**HALCÓN FIELD SERVICES, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   President and Chief Executive Officer

**HALCÓN ENERGY PROPERTIES, INC.**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HALCÓN OPERATING CO., INC.**

By: _____
      Name:  Floyd Wilson
      Title:   Chief Executive Officer

**HALCÓN WILLISTON I, LLC**

By: _____
       Name:  Floyd Wilson
       Title:   Chief Executive Officer

**HALCÓN WILLISTON II, LLC**

By: _____
     Name:  Floyd Wilson
     Title:   Chief Executive Officer

**HALCÓN RESOURCES OPERATING, INC.**

By: _____

     Name:  Floyd Wilson

     Title:   Chief Executive Officer

**HRC ENERGY LOUISIANA, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**HRC ENERGY RESOURCES (WV), INC.**

By: _____

Name: Floyd Wilson
Title:   Chief Executive Officer

**HRC PRODUCTION COMPANY**

By: _____
      Name:  Floyd Wilson
      Title:   Chief Executive Officer

**HALCÓN ENERGY HOLDINGS, LLC**

By: _____
     Name: Floyd Wilson
     Title:   Chief Executive Officer

**HRC ENERGY, LLC**

By: _____
      Name:  Floyd Wilson
      Title:   Chief Executive Officer

**HK ENERGY, LLC**

By: _____

Name:  Floyd Wilson
Title:   Chief Executive Officer

**HK LOUISIANA OPERATING, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**HK OIL & GAS, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**HK ENERGY OPERATING, LLC**

By: _____
     Name:  Floyd Wilson
     Title:   Chief Executive Officer

**HRC OPERATING, LLC**

By: _____
      Name:  Floyd Wilson
      Title:   Chief Executive Officer

**CONSENTING CREDITOR**

ARES DYNAMIC CREDIT ALLOCATION FUND, INC.

By:    Ares Capital Management II LLC, its Adviser

By: _____
    Name: **Darryl Schall**
    Title: **Vice President**

Principal Amount of Third Lien Notes:    $__          ____

Principal Amount of Unsecured Notes: $_____N/A_____

Principal Amount of Convertible Note: $_____N/A_____

Number of Shares of Preferred Stock: _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

ARES STRATEGIC INVESTMENT PARTNERS LTD.

BY:    ARES STRATEGIC INVESTMENT MANAGEMENT LLC, AS
       INVESTMENT MANAGER

By: _____
    Name:  **Darryl Schall**
    Title:  **Vice President**


Principal Amount of Third Lien Notes:    $__          ____

Principal Amount of Unsecured Notes:  $_____N/A_____

Principal Amount of Convertible Note:  $_____N/A_____

Number of Shares of Preferred Stock:  _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

FUTURE FUND BOARD OF GUARDIANS

BY:    ARES ENHANCED LOAN INVESTMENT STRATEGY ADVISOR IV, L.P., ITS
       INVESTMENT MANAGER (ON BEHALF OF THE ASIP II SUB-ACCOUNT)

BY:    ARES ENHANCED LOAN INVESTMENT STRATEGY ADVISOR IV GP, LLC,
       ITS GENERAL PARTNER

By: _____
     Name:  **Darryl Schall**
     Title:  **Vice President**

Principal Amount of Third Lien Notes:    $__        ____

Principal Amount of Unsecured Notes:  $_____N/A_____

Principal Amount of Convertible Note:  $_____N/A_____

Number of Shares of Preferred Stock:  _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

ASIP (HOLDCO) IV S.À.R.L.

BY:  ASIP OPERATING MANAGER IV LLC, ITS INVESTMENT MANAGER

By: _____
     Name:  **Darryl Schall**
     Title:  **Vice President**

Principal Amount of Third Lien Notes:     $__         ____

Principal Amount of Unsecured Notes:  $_____N/A_____

Principal Amount of Convertible Note:  $_____N/A_____

Number of Shares of Preferred Stock:  _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

## CONSENTING CREDITOR

ARES MULTI-STRATEGY CREDIT FUND V (H), L.P.

BY:  ARES MSCF V (H) MANAGEMENT LLC, ITS MANAGER

By: _____

Name:  **Darryl Schall**

Title:  **Vice President**

Principal Amount of Third Lien Notes:     $__        _____

Principal Amount of Unsecured Notes: $_____N/A_____

Principal Amount of Convertible Note: $_____N/A_____

Number of Shares of Preferred Stock:  _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

TRANSATLANTIC REINSURANCE COMPANY

BY:  ARES ASIP VII MANAGEMENT, L.P., ITS PORTFOLIO MANAGER

BY:  ARES ASIP VII GP, LLC, ITS GENERAL PARTNER

By: _____
Name: **Darryl Schall**
Title: **Vice President**

Principal Amount of Third Lien Notes:    $__          _____

Principal Amount of Unsecured Notes: $_____N/A_____

Principal Amount of Convertible Note: $_____N/A_____

Number of Shares of Preferred Stock: _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

RSUI INDEMNITY COMPANY

BY:  ARES ASIP VII MANAGEMENT, L.P., ITS PORTFOLIO MANAGER

BY:  ARES ASIP VII GP, LLC, ITS GENERAL PARTNER

By: _____
Name:  **Darryl Schall**
Title:  **Vice President**


Principal Amount of Third Lien Notes:   $___          _____

Principal Amount of Unsecured Notes: $_____N/A_____

Principal Amount of Convertible Note: $_____N/A_____

Number of Shares of Preferred Stock: _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

ARES SPECIAL SITUATIONS FUND III, L.P.

BY:    ASSF OPERATING MANAGER III, LLC, ITS MANAGER

By: _____
Name:  **Darryl Schall**
Title:  **Vice President**

Principal Amount of Third Lien Notes:    $__            ____

Principal Amount of Unsecured Notes:  $_____N/A_____

Principal Amount of Convertible Note:  $_____N/A_____

Number of Shares of Preferred Stock:  _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

ARES SPECIAL SITUATIONS FUND IV, L.P.

BY: ASSF OPERATING MANAGER IV, L.P., ITS MANAGER


By: _____
    Name: **Darryl Schall**
    Title: **Vice President**


Principal Amount of Third Lien Notes:    $__         ____

Principal Amount of Unsecured Notes: $_____N/A_____

Principal Amount of Convertible Note: $_____N/A_____

Number of Shares of Preferred Stock: _____N/A_____

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067**

Phone: (310) 201-4169
Attention: Darryl Schall
Email: Dschall@aresmgmt.com

**CONSENTING CREDITOR**

_____AF IV US BD Holdings, L.P. _____

By: _____

Name: **Daniel Nguyen**

Title: **Chief Financial Officer**

Principal Amount of Third Lien Notes:    $\_            \_

Principal Amount of Unsecured Notes: $\_            \_\_\_\_

Principal Amount of Convertible Note: $\_\_\_\_\_N/A_____

Number of Shares of Preferred Stock: _____N/A\_\_\_\_

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California, 90067 US**


Phone: 310 201-4204
Attention: Daniel Nguyen
Email: Nguyen@aresmgmt.com

**CONSENTING CREDITOR**

**FRANKLIN ADVISERS, INC. as investment manager on behalf of certain funds and accounts**

By: _Ge Vyles_

Name: _Glenn Voyles_

Title: _VP_

Principal Amount of Third Lien Notes:   $_____

Principal Amount of Unsecured Notes: $_____

Principal Amount of Convertible Note: $_____

Number of Shares of Preferred Stock: _____

Notice Address:
One Franklin Pkwy
San Mateo, CA 94403


Fax: 650-312-2070
Attention: Bryant Dieffenbacher; Christopher Chen
Email: bryant.dieffenbacher@franklintempleton.com;
        chris.chen@franklintempleton.com

**CONSENTING CREDITOR**

**TYRUS CAPITAL EVENT MASTER FUND LIMITED**
by its agent, Tyrus Capital S.A.M.

By: *[signature]*

Name: Mark Madden

Title: Director

Principal Amount of Third Lien Notes: ███████

Principal Amount of Unsecured Notes: ███████

Principal Amount of Convertible Note: ███████

Number of Shares of Preferred Stock: ███████

Notice Address:
c/o Tyrus Capital S.A.M.
4 Avenue de Roqueville
98000 Monaco


Fax: +377 9999 5090
Attention: Head of Legal
Email: opsteam@tyruscap.mc; legal@tyruscap.mc

**CONSENTING CREDITOR**

**EACH ENTITY LISTED ON EXHIBIT A HERETO**

**By: Putnam Investment Management, LLC, as investment manager**

By: _Norman P. Boucher_

Name: Norman P. Boucher

Title: Portfolio Manager

Principal Amount of Third Lien Notes: ███████████

Principal Amount of Unsecured Notes: ██████████

Principal Amount of Convertible Note: ██████████

Number of Shares of Preferred Stock: █████████

Notice Address:
c/o Putnam Investments
One Post Office Square
Boston, MA 02109
Attention: Office of the General Counsel

Fax: (617) 760-1625
Attention: Stephen M. Gianelli
Email: stephen_gianelli@putnam.com

A copy of the Agreement and Declaration of Trust of each Consenting Creditor listed on Exhibit A hereto is on file with the Secretary of the Commonwealth of Massachusetts and notice is hereby given that this instrument is executed on behalf of the Trustees of each such Consenting Creditor as Trustees and not individually and that the obligations of this instrument are not binding on any of the Trustees or officers or shareholders individually, but are binding only on the assets or property of each such Consenting Creditor with respect to its obligations hereunder. Furthermore, notice is given that the assets and liabilities of each series of each such Consenting Creditor that is a series company are separate and distinct and that the obligations of or arising out of this instrument are several and not joint and are binding only on the assets or property of each series with respect to its obligations hereunder.

<u>Exhibit A</u>

Putnam Investment Management, LLC

| Consenting Creditor | |
|---|---|
| Putnam High Yield Trust | |
| Putnam High Income Securities Fund | |
| Putnam Variable Trust - Putnam VT High Yield Fund | |
| Putnam Variable Trust - Putnam VT Global Asset Allocation Fund | |
| Putnam Premier Income Trust | |
| Putnam Master Intermediate Income Trust | |
| Putnam Asset Allocation Funds - Putnam Dynamic Asset Allocation Growth Fund | |
| Putnam Asset Allocation Funds - Putnam Dynamic Asset Allocation Balanced Fund | |
| Putnam Asset Allocation Funds - Putnam Dynamic Asset Allocation Conservative Fund | |
| Putnam Variable Trust - Putnam VT Diversified Income Fund | |
| Putnam Funds Trust - Putnam Dynamic Risk Allocation Fund | |
| Putnam Funds Trust - Putnam Absolute Return 700 Fund | |
| Great-West Funds, Inc. - Great-West Putnam High Yield Bond Fund | |

CONSENTING CREDITOR

EACH ENTITY LISTED ON EXHIBIT A HERETO

By: The Putnam Advisory Company, LLC, as investment manager

By: _____

Name: Norman P. Boucher

Title: Portfolio Manager

Principal Amount of Third Lien Notes: ███████████

Principal Amount of Unsecured Notes: ███████████

Principal Amount of Convertible Note: ███████████

Number of Shares of Preferred Stock: ███████████

Notice Address:
c/o Putnam Investments
One Post Office Square
Boston, MA 02109
Attention: Office of the General Counsel

Fax: (617) 760-1625
Attention: Stephen M. Gianelli
Email: stephen_gianelli@putnam.com

Exhibit A

The Putnam Advisory Company, LLC

| Consenting Creditor | |
|---|---|
| Putnam High Yield Fixed Income Fund, LLC | |
| Putnam World Trust - Putnam Global High Yield Bond Fund | |
| LGT Multi Manager Bond High Yield (USD) | |
| Putnam Total Return Fund, LLC | |
| IG Putnam U.S. High Yield Income Fund | |
| Mackenzie Corporate Bond Fund | |
| Mackenzie North American Corporate Bond Fund | |
| Investors Canadian High Yield Income Fund | |
| Counsel Portfolio Services Inc - Counsel Fixed Income | |
| The International Investment Fund - Putnam Global Alpha Fund | |
| Counsel North American High Yield Bond Fund | |

**CONSENTING CREDITOR**

**EACH ENTITY LISTED ON EXHIBIT A HERETO**

**By: Putnam Fiduciary Trust Company, as investment manager**

By: _____

Name: Norman P. Boucher

Title: Portfolio Manager

Principal Amount of Third Lien Notes: ███████████

Principal Amount of Unsecured Notes: ███████████

Principal Amount of Convertible Note: ███████████

Number of Shares of Preferred Stock: ███████

Notice Address:
c/o Putnam Investments
One Post Office Square
Boston, MA 02109
Attention: Office of the General Counsel

Fax: (617) 760-1625
Attention: Stephen M. Gianelli
Email: stephen_gianelli@putnam.com

Exhibit A

Putnam Fiduciary Trust Company

| Consenting Creditor | |
|---|---|
| | |
| Putnam Total Return Trust | |
| Putnam Retirement Advantage GAA Balanced Portfolio | |
| Putnam Retirement Advantage GAA Conservative Portfolio | |
| Putnam Retirement Advantage GAA Growth Portfolio | |
| Putnam Retirement Advantage GAA Income Strategies Portfolio | |

**CONSENTING CREDITOR**

**Loomis, Sayles & Company, L.P., as investment manager,**
on behalf of one or more discretionary accounts holding the Notes
(each such account, separately and not jointly, a "Noteholder")
By: Loomis, Sayles & Company, Incorporated
Its General Partner

By: _____

Name: Mari Shimokawa

Title: V.P. & Deputy Chief Compliance Officer

Principal Amount of Third Lien Notes: ███████████

Principal Amount of Unsecured Notes: ███████████

Principal Amount of Convertible Note: ███████████

Number of Shares of Preferred Stock: ███████████

Notice Address:
One Financial Center
27th Floor
Boston, MA 02111

Fax: [•]
Attention: Peter S. Sheehan
Email: psheehan@loomissayles.com

**CONSENTING CREDITOR**

**MANULIFE ASSET MANAGEMENT as investment adviser on behalf of:**

John Hancock Focused High Yield Fund
John Hancock Funds III - Core High Yield
Fund
Manulife High Yield Bond Fund
John Hancock Global Short Duration Credit
Fund
Manulife Global Tactical Credit Fund
Manulife US Fixed Income Trust
Manulife US Tactical Credit Fund
Manulife Global - US Special Opportunities
Fund

By_____

Name: **Diane Landers**

Title: **Chief Operating Officers**

Principal Amount (Aggregate) of Third Lien: Not  <u>$</u>

Principal Amount (Aggregate) of Unsecured Notes:  <u>$</u>

Principal Amount of Convertible Note:

Number of Shares of Preferred Stock:

<u>Notice Address</u>:
Manulife Asset Management (US) LLC
197 Clarendon Street, Boston, MA 02116

Fax: 617.375.1666
Attention: Diane Landers
Email: <u>dlanders@manulifeam.com</u>

**CONSENTING CREDITOR**

**HALRES LLC**

By: _____
Name: Floyd C. Wilson
Title:   President

Principal Amount of Third Lien Notes:        $

Principal Amount of Unsecured Notes:         $

Principal Amount of Convertible Note:         $

Number of Shares of Preferred Stock:

Notice Address:

3811 Turtle Creek Blvd., Suite 1000
Dallas, Texas 75219

Fax:  214.599.0200
Attention:  Mark A. Welsh IV
Email:  mwelsh@encapinvestments.com

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer Diversified High Income Trust**
By:  Pioneer Investment Management, Inc., its adviser

By: _____

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes:  $_____  _____

Principal Amount of Unsecured Notes:  $_____  _____

Principal Amount of Convertible Note:  $_____  _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

**CONSENTING CREDITOR**

**Pioneer Funds – U.S. High Yield**
By:  Pioneer Investment Management, Inc., its adviser

By: _____

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes:  $_____  _____

Principal Amount of Unsecured Notes:  $_____  _____

Principal Amount of Convertible Note:  $_____  _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

**CONSENTING CREDITOR**

**Pioneer High Income Trust**
By:  Pioneer Investment Management, Inc., its adviser

By: _Will Taylor_

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes:  $_____   _____

Principal Amount of Unsecured Notes:  $_____   _____

Principal Amount of Convertible Note:  $_____   _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

**CONSENTING CREDITOR**

**Pioneer High Yield Fund**
By:  Pioneer Investment Management, Inc., its adviser

By: _Will Taylor_____

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes:  $_____    _____

Principal Amount of Unsecured Notes:  $_____    _____

Principal Amount of Convertible Note:  $_____    _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

**CONSENTING CREDITOR**

**ING Partners, Inc. – VY Pioneer High Yield Portfolio**
By:  Pioneer Investment Management, Inc., its adviser

By: _William Taylor_

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes: $_____  _____

Principal Amount of Unsecured Notes: $_____  _____

Principal Amount of Convertible Note: $_____  _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109

Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer Funds – Global High Yield**
By:  Pioneer Investment Management, Inc., its adviser

By: _____

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes: $_____    _____

Principal Amount of Unsecured Notes: $_____    _____

Principal Amount of Convertible Note: $_____    _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer Multi-Asset Income Fund**
By:  Pioneer Investment Management, Inc., its adviser

By: _____

Name: William Taylor

Title: Vice President

Principal Amount of Third Lien Notes:  $_____    _____

Principal Amount of Unsecured Notes:  $_____    _____

Principal Amount of Convertible Note:  $_____    _____

Number of Shares of Preferred Stock:

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

**CONSENTING CREDITOR**

**Credit Suisse Securities USA, LLC**

By:

Name: Kevin Lowe

Title: Managing Director

Principal Amount of Third Lien Notes:    $_____

Principal Amount of Unsecured Notes: $_____

Principal Amount of Convertible Note: $_____

Number of Shares of Preferred Stock:    _____

Notice Address:   11 Madison Ave
New York, NY 10010


Fax:  (212) 322-9355
Attention:  Charles O'Reilly
Email:  Charles.O'Reilly@csg.com



**CONSENTING CREDITOR**

**Equitec Specialists, LLC**

By:

Name: Christopher Kuehner

Title: Compliance Officer

Principal Amount of Third Lien Notes:    $_____

Principal Amount of Unsecured Notes:  $_____

Principal Amount of Convertible Note:  $_____

Number of Shares of Preferred Stock: _____          ___

Notice Address:

Equitec Specialist, LLC
8 Spruce Street  #50C
New York, NY  10038


Fax: 212-747-1114
Attention: Dan Katzner
Email: dkatzner@eqtc.com

**CONSENTING CREDITOR**

**CANADA PENSION PLAN INVESTMENT BOARD**

By: _R. Scott Lawrence_
Name: Scott Lawrence
Title:   Managing Director, Head of Relationship Investments


Principal Amount of Third Lien Notes:        $

Principal Amount of Unsecured Notes:        $

Principal Amount of Convertible Note:        $

Number of Shares of Preferred Stock:

Notice Address:

One Queen Street East, Suite 2500
Toronto, Ontario M5C 2W5

Fax:
Attention:
Email:

**CONSENTING CREDITOR**

**Thornburg Investment Income Builder Fund**

By

Name: Jason Brady

Title: Portfolio Manager, President & CEO

Principal Amount of Third Lien Notes:    $_____

Principal Amount of Unsecured Notes:  $_____

Principal Amount of Convertible Note:  $_____

Number of Shares of Preferred Stock:

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506


Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**CONSENTING CREDITOR**

**Thornburg Strategic Income Fund**

By:

Name: Jason Brady

Title: Portfolio Manager, President & CEO

Principal Amount of Third Lien Notes:    $_____

Principal Amount of Unsecured Notes:  $_____

Principal Amount of Convertible Note:  $_____

Number of Shares of Preferred Stock:

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506


Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**CONSENTING CREDITOR**

**Delaware Public Employees' Retirement System**

By:

Name: Jason Brady

Title: Portfolio Manager, President & CEO

Principal Amount of Third Lien Notes:    $_____

Principal Amount of Unsecured Notes:  $_____

Principal Amount of Convertible Note:  $_____

Number of Shares of Preferred Stock:

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506


Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**CONSENTING CREDITOR**

**Arlington County Employees' Retirement System**

By:

Name: Jason Brady

Title: Portfolio Manager, President & CEO

Principal Amount of Third Lien Notes:    $_____

Principal Amount of Unsecured Notes: $_____

Principal Amount of Convertible Note: $_____

Number of Shares of Preferred Stock:

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506

Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**CONSENTING CREDITOR**

_____

Floyd C. Wilson


Principal Amount of Third Lien Notes:      $

Principal Amount of Unsecured Notes:      $

Principal Amount of Convertible Note:      $

Number of Shares of Preferred Stock:

Notice Address:

c/o Halcón Resources Corporation
1000 Louisiana Street, Suite 6700
Houston, Texas 77002
Fax: 713.589.8020
Attention: Floyd C. Wilson
Email: fwilson@halconresources.com

**CONSENTING CREDITOR**

James W. Christmas

Principal Amount of Third Lien Notes:        $

Principal Amount of Unsecured Notes:        $

Principal Amount of Convertible Note:        $

Number of Shares of Preferred Stock:

Notice Address:

1089 Oceanfront
Long Beach, New York 11561

Fax:
Attention:
Email: jchristmas@halconresources.com

 

**Delaware Investments®**
A member of Macquarie Group

2005 Market St.
Philadelphia, PA 19103-7094

**Consenting Creditor**

**Delaware Investment Advisers, a series of Delaware Management Business Trust, on behalf of each of the accounts on Appendix A for which it is designated as investment adviser, severally and not jointly**

By: *Wayne A. Anglace*
Name: Wayne A. Anglace
Title:   Vice President/Portfolio Manager

**Delaware Investments Fund Advisers, a series of Delaware Management Business Trust, on behalf of each of the accounts on Appendix A for which it is designated as investment adviser, severally and not jointly**

By: *Wayne A. Anglace*
Name: Wayne A. Anglace
Title:   Vice President/Portfolio Manager

**Delaware Management Company, a series of Delaware Management Business Trust, on behalf of each of the accounts on Appendix A for which it is designated as investment adviser, severally and not jointly**

By: *Wayne A. Anglace*
Name: Wayne A. Anglace
Title:   Vice President/Portfolio Manager

Notice Address:
c/o Delaware Investments
2005 Market Street
Philadelphia, PA 19103
Attn:  Wayne Anglace, with a copy to General Counsel
Fax:  215-255-1640
Email: wayne.anglace@delinvest.com

901184-2

Appendix A

| Account | Shares of Preferred Stock | Investment Adviser |
|---|---|---|
| Delaware Investments Dividend and Income Fund, Inc. | | Delaware Management Company, a series of Delaware Management Business Trust ("DMC") |
| Delaware VIP Diversified Income Series, a series of Delaware VIP Trust | | DMC |
| Delaware Divided Income Fund, a series of Delaware Group Equity Funds V | | DMC |
| Delaware Enhanced Global Dividend and Income Fund | | DMC |
| Delaware Diversified Income Fund, a series of Delaware Group Adviser Funds | | DMC |
| Delaware Foundation Conservative Allocation Fund, a series of Delaware Group Foundation Funds | | DMC |
| Delaware Foundation Moderate Allocation Fund, a series of Delaware Group Foundation Funds | | DMC |
| Delaware Foundation Growth Allocation Fund, a series of Delaware Group Foundation Funds | | DMC |
| Optimum Fixed Income Fund, a series of Optimum Fund Trust | | DMC |
| LVIP Delaware Foundation Conservative Allocation Fund, a series of Lincoln Variable Insurance Products Trust | | Delaware Investments Fund Advisers, a series of Delaware Management Business Trust ("DIFA") |
| LVIP Delaware Foundation Moderate Allocation Fund, a series of Lincoln Variable Insurance Products Trust | | DIFA |
| LVIP Delaware Foundation Aggressive Allocation Fund, a series of Lincoln Variable Insurance Products Trust | | DIFA |
| Munson Healthcare Operating Fund - Convertibles | | Delaware Investment Advisers, a series of Delaware Management Business Trust ("DIA") |
| Munson Healthcare Pension Plan - Convertibles | | DIA |
| Munson Healthcare Foundation - Convertibles | | DIA |
| Presbyterian Villages of Michigan Foundation | | DIA |
| Midland First United Methodist Church Foundation | | DIA |
| Hurley Hospital Post Retirement | | DIA |
| Bronson Healthcare Group Self Funded Liability Account | | DIA |
| Bronson Healthcare Group Post Retirement Medical | | DIA |
| Bronson Healthcare Group Long Term Reserve | | DIA |
| Bronson Healthcare Group Pension Plan | | DIA |
| Delaware Diversified Income Trust, a separate fund established under the Delaware Investments Collective Investment Trust | | DIA |
| Bronson Battle Creek Retirement Plan | | DIA |

## SCHEDULE 1

**Restructuring Subsidiaries**

| |
|---|
| Halcón Holdings, Inc. |
| HK Resources, LLC |
| The 7711 Corporation |
| Halcón Gulf States, LLC |
| Halcón Louisiana Operating, L.P. |
| Halcón Field Services, LLC |
| Halcón Energy Properties, Inc. |
| Halcón Operating Co., Inc. |
| Halcón Williston I, LLC |
| Halcón Williston II, LLC |
| Halcón Operating Inc. |
| HRC Energy Louisiana, LLC |
| HRC Energy Resources (WV), Inc. |
| HRC Production Company |
| Halcón Energy Holdings, LLC |
| HRC Energy, LLC |
| HK Energy, LLC |
| HK Louisiana Operating, LLC |
| HK Oil & Gas, LLC |
| HK Energy Operating, LLC |
| HRC Operating, LLC |

## EXHIBIT A

**TERM SHEET**

EXECUTION VERSION

# HALCÓN RESOURCES CORPORATION
## TERM SHEET

### JUNE 9, 2016

This Term Sheet[1] sets forth the principal terms of the Restructuring of the Company to be implemented pursuant to a joint prepackaged plan of reorganization, consistent with the terms set forth herein, to be filed in cases commenced by the Company under chapter 11 of the Bankruptcy Code.  As reflected in the restructuring support agreement dated June 9, 2016, by and among the Company and the Consenting Creditors (the "***Restructuring Support Agreement***"), to which this Term Sheet is an exhibit, the Restructuring is supported by the Company, the Consenting Third Lien Noteholders, the Consenting Unsecured Noteholders, the Convertible Noteholder, and the Consenting Preferred Holders.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY AND THE REQUISITE CREDITORS, EXCEPT AS REQUIRED BY LAW AND AS CONTEMPLATED BY THE RESTRUCTURING SUPPORT AGREEMENT.

| **Transaction Overview** |
| --- |

| | |
| --- | --- |
| **The Company:** | Holdings, together with certain of its subsidiaries that are parties to the Restructuring Support Agreement, namely: Halcón Holdings, Inc., HK Resources, LLC, The 7711 Corporation, Halcón Gulf States, LLC, Halcón Louisiana Operating, L.P., Halcón Field Services, LLC, Halcón Energy Properties, Inc., Halcón Operating Co., Inc., Halcón Williston I, LLC, Halcón Williston II, LLC, Halcón Resources Operating Inc., HRC Energy Louisiana, LLC, HRC Energy Resources (WV), Inc., HRC Production Company, Halcón Energy Holdings, LLC, HRC Energy, LLC, HK Energy, LLC, HK Louisiana Operating, LLC, HK Oil & Gas, LLC, HK Energy Operating, LLC, and HRC Operating, LLC.  For purposes of this Term Sheet and the Restructuring, the Company does not include HK TMS, LLC ("***TMS***") and SBE Partners, LP ("***SBE***") and any of the Company's and Consenting Creditors' respective claims against, and/or interests in, TMS and SBE will not be affected, impaired or otherwise impacted in any way or manner by the Restructuring. |
| **Claims and Interests to be Restructured:** | <u>Revolving Credit Agreement Claims</u>:  consisting of, as of the date hereof, approximately $120.0 million in aggregate unpaid principal amount, which includes undrawn letters of credit, plus interest, fees and other expenses, arising under or in connection with that certain Senior Revolving Credit Agreement, dated as of February 8, 2012, by and among Holdings, as borrower, each of the guarantors named therein, JP Morgan Chase Bank, N.A., as administrative agent, Wells Fargo Bank, N.A., as syndication agent, and the lenders party thereto (as rolled into a debtor-in-possession financing facility or amended, modified or otherwise supplemented from time to time, the  "***Revolving    Credit    Facility***"  or  the  "***Revolving    Credit    Agreement***") |

---

[1] Capitalized terms used but not otherwise herein defined have the meanings ascribed to them in either <u>Annex A</u> attached hereto or the Restructuring Support Agreement (as defined below).  To the extent of any direct conflict between this Term Sheet and the Restructuring Support Agreement, the Restructuring Support Agreement will govern and control.

(the "***Revolving Credit Agreement Claims***").

<u>Second Lien Note Claims</u>:  consisting of approximately $812.8 million in aggregate unpaid principal, plus interest, fees and other expenses, of (a) the 8.625% Senior Secured Notes (the "***8.625% Second Lien Notes***") under that certain indenture, dated as of May 1, 2015, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as trustee (as amended, modified, or otherwise supplemented from time to time, the   "***8.625% Second Lien Note Indenture***") and (b) the 12.0% Senior Secured Notes (the "***12.0% Second Lien Notes***" and, together with the 8.625% Second Lien Notes, the "***Second Lien Notes***") under that certain indenture, dated as of December 21, 2015, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time, the "***12.0% Second Lien Note Indenture***" and, together with the 8.625% Second Lien Note Indenture, the "***Second Lien Note Indentures***") (the "***Second Lien Note Claims***").

<u>Third Lien Note Claims</u>:  consisting of approximately $1.02 billion in aggregate unpaid principal, plus interest, fees and other expenses, of the Third Lien Notes under the Third Lien Note Indenture (the "***Third Lien Note Claims***").

<u>Unsecured Note Claims</u>:  consisting of approximately $650.0 million in aggregate unpaid principal, plus interest, fees and other expenses, of: (a) the 8.875% Senior Unsecured Notes under the 8.875% Senior Unsecured Note Indenture; (b) the 9.25% Senior Unsecured Notes under the 9.25% Senior Unsecured Note Indenture; and (c) the 9.75% Senior Unsecured Notes under the 9.75% Senior Unsecured Note Indenture (the "***Unsecured Note Claims***").

<u>Convertible Note Claims</u>:  consisting of approximately $290.0 million in aggregate unpaid principal, plus interest, fees and other expenses of the Convertible Note issued on February 8, 2012, pursuant to that certain Securities Purchase Agreement, effective December 21, 2011, by and between HALRES LLC (formerly Halcón Resources LLC) and RAM Energy Resources, Inc. ("***Securities Purchase Agreement***") (the "***Convertible Note Claims***").

<u>General Unsecured Claims</u>: consisting of any Claim against the Company (other than the Unsecured Note Claims, the Convertible Note Claims or any Intercompany Claims) that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court (the "***General Unsecured Claims***").

<u>Preferred Stock Interests</u>: consisting of $222.5 million, including undeclared dividends, in the Preferred Stock issued by Holdings pursuant to that certain Certificate of Designations, Preferences, Rights and Limitations of 5.75% Series A Convertible Perpetual Preferred Stock, dated June 17, 2013 (the "***Preferred Stock Interests***").

<u>Existing Equity Interests</u>: consisting of any Interests in Holdings (other than the Preferred Stock), including common stock, and any options, warrants or rights to acquire any Interests in Holdings issued pursuant to the Holdings Certificate of Incorporation (the "***Existing Equity Interests***").

2

| **Transaction Overview** |
|---|

| **Restructuring Summary:** | Creditors and interests holders will receive the following treatments under the Plan: |
|---|---|

    i.    <u>The Revolving Credit Agreement Claims</u>:  On the Effective Date, the Company will obtain a credit facility pursuant to an amendment or an amendment and restatement of the Revolving Credit Agreement (or any replacement financing) in the aggregate principal amount of approximately $700,000,000, or such lower amount as determined by the Company based on prevailing market conditions, but in no event less than $600,000,000 (the "***Amended Revolving Credit Agreement***").  The Amended Revolving Credit Agreement shall be in form and substance (a) reasonably satisfactory to the Requisite Unsecured Noteholders, and (b) satisfactory to the Requisite Third Lien Noteholders.  The proceeds from the Amended Revolving Credit Agreement, plus cash on hand, will be used by the Company to (1) provide additional liquidity for working capital and general corporate purposes; (2) pay all reasonable and documented Restructuring Expenses; (3) fund Plan distributions; and (4) fund the administration of the Chapter 11 Cases.

    ii.    <u>Second Lien Note Claims</u>.  The legal, equitable, and contractual rights of the Second Lien Notes will be unaltered by the Restructuring or the Plan.  On the Effective Date, the Second Lien Notes will be reinstated and unimpaired.

    iii.    <u>Third Lien Note Claims</u>.  On the Effective Date, Third Lien Noteholders will receive their pro rata share (based on the total amount of Allowed Third Lien Note Claims) of: (a) New Common Shares, which New Common Shares will represent, after giving effect to the Restructuring, in the aggregate, 76.5% of the total outstanding shares of Reorganized Holdings (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) (the "***Third Lien New Common Shares***") and (b) Cash in the amount of $33.8 million (the "***Third Lien Cash Distribution***").

    iv.    <u>Unsecured Note Claims</u>.  On the Effective Date, Unsecured Noteholders will receive their pro rata share (based on the total amount of Allowed Unsecured Note Claims) of: (a) New Common Shares, representing, after giving effect to the Restructuring, in the aggregate, 15.5% of the total outstanding shares of Reorganized Holdings (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) (the "***Unsecured Noteholder New Common Shares***"); (b) Cash in the amount of $37.6 million (the "***Unsecured Noteholder Cash Distribution***"); and (c) the Unsecured Noteholder New Warrants to purchase, after giving effect to the Restructuring, 4.0% of the total outstanding shares of Reorganized Holdings as of the Effective Date, subject to dilution by the Management Incentive Plan, exercisable for a four (4) year period commencing on the Effective Date at an exercise price based on a $1.33 billion equity value.

    v.    <u>Convertible Note Claims</u>.  Subject to the limitations sets forth below, on the Effective Date, the Convertible Noteholder will receive: (a) New Common Shares, representing, after giving effect to the Restructuring, in the aggregate, 4.0% of the total outstanding shares of Reorganized Holdings (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) (the "***Convertible Noteholder New Common Shares***"); (b) Cash in the amount of $15.0 million (the "***Convertible***

3

*Noteholder Cash Distribution*"); and (c) the Convertible Noteholder New Warrants to purchase 1.0% of the total outstanding shares of Reorganized Holdings as of the Effective Date, subject to dilution by the Management Incentive Plan, exercisable for a four (4) year period commencing on the Effective Date at an exercise price based on a $1.33 billion equity value.

vi.   General Unsecured Claims.  Subject to the limitations set forth below, as a part of the Restructuring, except to the extent that a holder of a General Unsecured Claim agrees to different treatment, the Company or Reorganized Company, as applicable, will continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

vii.  Preferred Stock Interests.  Subject to the limitations set forth below, on the Effective Date, Preferred Holders will receive their pro rata share (based on the total amount of Allowed Preferred Stock Interests) of Cash in the amount of $11.1 million representing a recovery of 5.0% of the liquidation preference per share of the Preferred Stock (the "*Preferred Stock Cash Distribution*").

viii. Existing Equity Interests.  Subject to the limitations set forth below, on the Effective Date, Existing Equity Interests will be cancelled and the holders of Existing Equity Interests will receive their pro rata share of New Common Shares representing in the aggregate 4.0% of the total outstanding shares of Reorganized Holdings (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants).

The Plan will provide that, in the event the classes of Unsecured Note Claims, Convertible Note Claims or Preferred Stock Interests vote to reject the Plan (any such class, a "*Rejecting Class*") then: (i) any class of claims or interests junior in priority to such Rejecting Class will not receive or retain any value under the Plan; (ii) any New Warrants that were to be distributed to such junior classes of creditors will be cancelled and will not be issued under the Plan; (iii) the New Common Shares that were to be distributed to such junior classes of creditors or interest holders will be reallocated and distributed as set forth in this Term Sheet, and (iv) the Cash that was to be distributed to such junior classes of creditor or interest holders will remain property of the Company and will vest in the Reorganized Company on the Effective Date.   In the event the Unsecured Note Claims is a Rejecting Class: (a) no Convertible Noteholder New Warrants will be issued under the Plan; (b) the New Common Shares that were to be distributed to the Convertible Noteholder and Existing Equity Interests shall be reallocated and distributed pro rata to the Third Lien Noteholders; and (c) if the Company elects not to terminate the Restructuring Support Agreement, then the distributions to be received by the General Unsecured Claims shall be modified so as to comply with section 1129(b) of the Bankruptcy Code, subject to the Consenting Third Lien Noteholders' rights under Section 9 of the Restructuring Support Agreement.[2]   In the event the Preferred Stock Interests is a Rejecting Class, the Preferred Holders will not receive or retain any distributions on account of their Preferred Stock Interests.

---

[2] In the event the Unsecured Note Claims is a Rejecting Class, and it is determined by the Company in consultation with the Requisite Third Lien Noteholders that the votes of the holders of General Unsecured Claims must be solicited to comply with the requirements of section 1125 of the Bankruptcy Code, then the relevant milestones set forth in the Restructuring Support Agreement with respect to the approval of the Disclosure Statement, confirmation of the Plan and the Effective Date shall be extended by 60 calendar days.

WEIL:\95739370\10\51351.0003

|  | The solicitation of votes on the Plan from Third Lien Noteholders, Unsecured Noteholders and the Convertible Noteholder will be made pursuant to Section 4(a)(2) and Regulation D of the Securities Act and, with respect to Third Lien Note Claims and Unsecured Note Claims, the Company will only solicit votes on the Plan from Eligible Third Lien Noteholders or Eligible Unsecured Noteholders. |
|---|---|
|  | At least five (5) business days prior to the Commencement Date, and on the same date, the Company will pay cash interest with respect to the (i) Third Lien Noteholders through the later of May 15, 2016 and the date on which interest and/or dividends are paid on the Unsecured Notes, the Convertible Note or the Preferred Stock and (ii) Unsecured Noteholders through the later of May 15, 2016 and the date on which interest and/or dividends are paid on the Third Lien Notes, the Convertible Note or the Preferred Stock.  The Unsecured Noteholder Cash Distribution (i) accounts for the cash interest paid to holders of the 8.875% Senior Unsecured Notes on May 16, 2016, and (ii) assumes that additional cash interest shall be paid to the holders of the 9.25% Senior Unsecured Notes and 9.75% Senior Unsecured Notes prior to the Commencement Date in the amount of $11.1 million, of which $4.2 million is attributable to the period from and after April 1, 2016 through May 15, 2016 (the "*Unsecured Interest Payment*").   The Third Lien Noteholder Cash Distribution assumes that additional cash interest shall be paid to the Third Lien Noteholders prior to the Commencement Date in the amount of $33.1 million, of which $16.2 million is attributable to the period from and after April 1, 2016 through May 15, 2016 (the "*Third Lien Interest Payment*").   From and after the Support Effective Date, the Company shall not make any interest or dividend payments on account of the Convertible Note, Preferred Stock or otherwise, except as provided above.  The Convertible Noteholder agrees that, from and after the Support Effective Date, so long as the Restructuring Support Agreement remains in effect as to it (i) no further interest payments shall be made on the Convertible Note and (ii) the Convertible Noteholder waives any default that may arise under the Convertible Note on account of the Company failing to pay interest on any other debt or obligation.  The Company shall accrue interest through the Commencement Date on the Third Lien Notes, Unsecured Notes, Convertible Note and Preferred Stock in accordance with the terms thereof, and all such interest, to the extent not paid as set forth above, shall be deemed part of the Third Lien Note Claims, Unsecured Note Claims, Convertible Note Claims, and Preferred Stock Interests, as applicable. |
| **Implementation:** | The Company will commence the Chapter 11 Cases and implement the Restructuring pursuant to the Plan as provided in the Restructuring Support Agreement. |
| **Use of Cash Collateral/ DIP Financing:** | The Company will seek authority promptly upon commencement of the Chapter 11 Cases to use cash collateral to fund the administration of the Chapter 11 Cases.  In connection with the Company's use of cash collateral and DIP Financing (if applicable), subject to Bankruptcy Court approval, the Company will provide "adequate protection" (as such term is defined in sections 361 and 363 of the Bankruptcy Code) to the Revolving Credit Agreement Lenders, the Second Lien Noteholders and the Third Lien Noteholders on the terms reasonably satisfactory to the Company and the Requisite Creditors, including, without limitation, customary stipulations as to amount, validity and priority of claims, adequate protection liens, superpriority claims, postpetition reimbursement of fees, 506(c), 552(b) "equities of the case" and marshaling waivers, and reimbursement of reasonable fees and expenses of counsel in accordance with existing fee letters; provided that any adequate protection to the Third Lien Noteholders shall not be cash pay (other than ordinary course expense reimbursements, including, without limitation, the |

5

| | reasonable fees and expenses of counsel).[3] |
|---|---|
| | Any order approving the use of cash collateral and/or DIP Financing will be reasonably satisfactory to the Company and the Requisite Creditors. |

| **Classification and Treatment of Claims and Interests** | |
|---|---|
| **Administrative, Priority Tax, and Other Priority Claims:** | On or as soon as practicable after the Effective Date, each holder of an administrative, priority tax or other priority claim will be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br><br>Unimpaired – Presumed to Accept |
| **Other Secured Claims:** | On the Effective Date, to the extent any Other Secured Claims exist, all such Other Secured Claims of the Company allowed as of the Effective Date will be satisfied by either (a) payment in full in Cash, (b) reinstatement pursuant to section 1124 of the Bankruptcy Code or (c) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.<br><br>Unimpaired – Presumed to Accept |
| **Revolving Credit Agreement Claims:** | On the Effective Date, each holder of Allowed Revolving Credit Agreement Claims will receive, in full and final satisfaction of such Allowed Revolving Credit Agreement Claims, its pro rata share of the commitments and/or loans made pursuant to the Amended Revolving Credit Agreement and will receive its benefits and be bound by the obligations therein.<br><br>Unimpaired – Presumed to Accept |
| **Second Lien Note Claims:** | The legal, equitable, and contractual rights of the holders of Allowed Second Lien Notes Claims are unaltered by the Plan.  On the Effective Date, or as soon as practicable thereafter, the holders of Allowed Second Lien Notes Claims will have their Allowed Claims reinstated.<br><br>Unimpaired – Presumed to Accept |
| **Third Lien Note Claims:** | On the Effective Date, each holder of an Allowed Third Lien Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Third Lien Note Claim, its pro rata share (based on the total amount of Allowed Third Lien Note Claims) of: (i) the Third Lien Note New Common Shares and (ii) the Third Lien Cash Distribution.<br><br>Impaired – Entitled to Vote |

---

[3] The Company may elect to seek funding for the Chapter 11 Cases by means of DIP Financing, which DIP Financing may include a "roll-up" of some or all of the Revolving Lender Credit Facility, but, for the avoidance of doubt, no "roll-up" of any Second Lien Note Claims or Third Lien Note Claims.  The terms of any DIP Financing shall be (a) in form and substance reasonably satisfactory to the Requisite Unsecured Noteholders, and (b) in form and substance satisfactory to the Company and the Requisite Third Lien Noteholders.

6

| **Unsecured Note Claims:** | On the Effective Date, each holder of an Allowed Unsecured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its pro rata share (based on the total amount of Allowed Unsecured Note Claims) of: (i) the Unsecured Noteholder Cash Distribution; (ii) the Unsecured Noteholder New Common Shares; and (iii) the Unsecured Noteholder New Warrants; provided, however, that if the Unsecured Note Claims is a Rejecting Class, then: (a) no Convertible Noteholder New Warrants will be issued under the Plan; (b) the New Common Shares that were to be distributed to the Convertible Noteholder and Existing Equity Interests shall be reallocated and distributed pro rata to the Third Lien Noteholders; and (c) if the Company elects not to terminate the Restructuring Support Agreement, then the distributions to be received by the General Unsecured Claims shall be modified so as to comply with section 1129(b) of the Bankruptcy Code, subject to the Consenting Third Lien Noteholders' rights under Section 9 of the Restructuring Support Agreement.<br><br>Impaired – Entitled to Vote |
|---|---|
| **Convertible Note Claims:** | On the Effective Date, the Convertible Noteholder will be entitled to receive, in full and final satisfaction of such Allowed Convertible Note Claims: (i) the Convertible Noteholder Cash Distribution; (ii) the Convertible Noteholder New Common Shares; and (iii) the Convertible Noteholder New Warrants; provided, however, that if the Unsecured Note Claims is a Rejecting Class then: (a) the Convertible Noteholder New Warrants will not be issued under the Plan; (b) the New Common Shares that would have been distributed to the Convertible Noteholder under the Plan will be reallocated and distributed to the Third Lien Noteholders; and (c) the Cash that was to be distributed to the Convertible Noteholder pursuant to the Convertible Noteholder Cash Distribution will remain property of the Company and will vest in the Reorganized Company on the Effective Date; provided, further, however, that if the Unsecured Note Claims is not a Rejecting Class and the Convertible Noteholder Claims is a Rejecting Class, then: (x) the Convertible Noteholder Warrants will not be issued under the Plan; (y) the New Common Shares that would have been distributed to the Convertible Noteholder under the Plan will be reallocated and distributed to the Third Lien Noteholders and the Unsecured Noteholders pro rata based on their respective holdings of New Common Shares; and (z) the Cash that was to be distributed to the Convertible Noteholder pursuant to the Convertible Noteholder Cash Distribution will remain property of the Company and will vest in the Reorganized Company on the Effective Date.<br><br>Impaired – Entitled to Vote |
| **General Unsecured Claims:** | On the Effective Date, except to the extent that a holder of a General Unsecured Claim agrees to different treatment, the Company or Reorganized Company, as applicable, will continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced; provided, however, that if the Unsecured Note Claims is a Rejecting Class then the distributions to be received by the General Unsecured Claims shall be modified so as to comply with section 1129(b) of the Bankruptcy Code, subject to the Consenting Third Lien Noteholders' rights under Section 9 of the Restructuring Support Agreement.<br><br>Unimpaired – Presumed to Accept (subject to the proviso above and in Footnote 2 relating to the Unsecured Note Claims being a Rejected Class) |

| | |
|---|---|
| **Intercompany Claims:** | All Intercompany Claims will be paid, adjusted, reinstated or discharged as determined by the Company, subject to the consent of the Requisite Third Lien Noteholders and Requisite Unsecured Noteholders, which consent shall not be unreasonably withheld.<br><br>Unimpaired – Presumed to Accept |
| **Intercompany Interests:** | On the Effective Date, or as soon as practicable thereafter, all Intercompany Interests will be reinstated.<br><br>Unimpaired – Presumed to Accept |
| **Preferred Interests:** | On the Effective Date, each holder of an Allowed Preferred Stock Interest will be entitled to receive, in full and final satisfaction of such Allowed Preferred Stock Interest, its pro rata share (based on the total amount of Allowed Preferred Stock Interests) of the Preferred Stock Cash Distribution; provided, however, that if the Unsecured Note Claims, the Convertible Note Claims or the Preferred Stock Interests is a Rejecting Class, then the Preferred Holders will not receive or retain any value under the Plan and the Cash to be distributed pursuant to the Preferred Stock Cash Distribution will remain property of the Company and will vest in the Reorganized Company on the Effective Date.<br><br>Impaired – Entitled to Vote |
| **Existing Equity Interests:** | On the Effective Date, (a) all Existing Equity Interests will be cancelled, and (b) the holders of Existing Equity Interests will receive New Common Shares representing, in the aggregate, 4.0% of the total outstanding shares of Reorganized Holdings (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants); provided, however, that if: (i) the Unsecured Note Claims is a Rejecting Class, then Existing Equity Interests will not receive or retain any value under the Plan and the New Common Shares that would have been distributed to Existing Equity Interests under the Plan will be reallocated and distributed pro rata to the Third Lien Noteholders; (ii) the Unsecured Note Claims is not a Rejecting Class and the Convertible Noteholder Claims is a Rejecting Class, then Existing Equity Interests will not receive or retain any value under the Plan and the New Common Shares that would have been distributed to Existing Equity Interests under the Plan will be reallocated and distributed pro rata to the Third Lien Noteholders and the Unsecured Noteholders based on their respective holdings of New Common Shares; and (iii) the Unsecured Note Claims and the Convertible Note Claims are not Rejecting Classes and the Preferred Stock Interests is a Rejecting Class, then Existing Equity Interests will not receive or retain any value under the Plan and the New Common Shares that would have been distributed to Existing Equity Interests under the Plan will be reallocated and distributed pro rata to the Third Lien Noteholders, the Unsecured Noteholders and the Convertible Noteholder based on their respective holdings of New Common Shares.<br><br>The Plan will provide that the holders of Existing Warrants will have until the Warrant Record Date to exercise their respective rights under the Existing Warrants to purchase common stock of the Company and to have such common stock interests treated as Existing Equity Interests under the Plan. To the extent a holder of Existing Warrants does not exercise its Existing Warrants prior to the Warrant Record Date, such Existing Warrants will be cancelled and the holders of such Existing Warrants |

8

|  | will not receive or retain any value under the Plan on account of such no-exercised Existing Warrants.<br><br>Impaired – Deemed to Reject |
| --- | --- |
| **Section 510(b) Claims:** | Any holder of a claim against the Company that is described in section 510(b) of the Bankruptcy Code will not receive a distribution under the Plan and such section 510(b) claims will be extinguished.<br><br>Impaired – Deemed to Reject |

|  |
| --- |
| **General Provisions** |

| **New Common Shares and New Warrants** | The Boards of Directors of the Company and the Reorganized Company and Reorganized Holdings shall each use their reasonable best efforts to have the New Common Shares and New Warrants listed on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the Effective Date. |
| --- | --- |
| **Executory Contracts and Unexpired Leases:** | The Company reserves the right to reject certain executory contracts and unexpired leases subject to the reasonable consent of the Requisite Third Lien Noteholders. All executory contracts and unexpired leases not expressly rejected will be deemed assumed pursuant to the Plan. |
| **Management Incentive Plan:** | A post-Restructuring management incentive plan (“***Management Incentive Plan***”) under which 10% of the New Common Shares will be reserved for issuance as awards under the Management Incentive Plan, as described below. All awards issued under the Management Incentive Plan will be dilutive of all other New Common Shares issued pursuant to the Plan.<br><br>• Participants: All employees of the Company and its subsidiaries.<br><br>• Pool: 10% of the total share capital of the Company (subject to dilution by the New Warrants to the same extent other New Common Shares are diluted):<br> o 7.5% of the pool (“***Exit Awards***”) to be granted on the Effective Date with such awards to be allocated to employees as determined by the Chief Executive Officer.<br> o 2.5% of the pool to be allocated, in such form and with such terms and conditions as determined by the Compensation Committee of the New Board following the Effective Date.<br><br>• Exit Awards:<br> o Options<br>  ▪ 5% of the pool will be in the form of stock options (“***Options***”) granted on the Effective Date.<br>  ▪ The exercise price per share of the Options will be equal to the greater of (1) the per share value based on a Reorganized Company equity value of $650 million or (2) the weighted average trading prices of the New Common Shares for the seven (7) trading dates commencing on the first trading day immediately following the Effective Date (assuming the |
| --- | --- |

9

shares are then publicly traded).
- The Options will vest subject to continued employment over 3 years in equal annual installments.
  - o Restricted Stock and Restricted Stock Units
    - 2.5% of the pool will be granted in the form of Restricted Stock or Restricted Stock Units (collectively, the "**RSUs**") on the Effective Date.
    - 50% of the RSUs (i.e., 1.25% of the pool) will be vested in full at grant.
    - 50% of the RSUs (i.e., 1.25% of the pool) will vest on the first anniversary of the Effective Date, subject to continued employment.

- Accelerated Vesting:
  - o Notwithstanding the foregoing, if, prior to the vesting dates set forth above, any one of the following shall occur then any Options and/or RSUs (as applicable) granted to an employee as set forth above shall immediately vest in full: (i) with respect to management employees who are party to employment agreements with the Company as of June 1, 2016, upon (a) termination of the employee by the Company without Cause, (b) resignation by the employee for Good Reason, and (c) the death or disability of the employee; and (ii) with respect to all other employees, upon the death or disability of the employee. If, prior to the vesting dates set forth above, an employee is terminated with Cause, or resigns without Good Reason, the employee will forfeit any remaining and unvested Options and/or RSUs.
  - o For purposes hereof, (a) "**Cause**" shall be defined in a manner that is consistent with its definition under existing management employment agreements, and (b) "**Good Reason**" shall be defined in a manner consistent with its definition under existing management employment agreements, excluding any component of such definition relating to reductions in the budget over which the employee has authority.

| | |
|---|---|
| **Board of Directors:** | The initial Board of Directors of Reorganized Holdings (the "**New Board**") will be a 9 member board comprised of (i) the Chief Executive Officer, (ii) 3 directors designated by Ares (provided that one such board selection shall be subject to the written consent of Franklin, which consent shall not be unreasonably withheld), (iii) 3 directors designated by Franklin, in the cases of clauses (ii) and (iii) for so long as Ares and Franklin, respectively, is included in the definition of "Requisite Third Lien Noteholders," and, if Ares or Franklin is not so included, then its three (3) directors shall be designated by Requisite Third Lien Noteholders (and if Franklin is not so included, it shall also lose its consent right to one of Ares' board selections set forth above), (iv) 1 director designated by the Requisite Unsecured Noteholders (the "**Unsecured Director**"), and (v) 1 existing director designated by the Chief Executive Officer, which shall be reasonably acceptable to the Requisite Unsecured Noteholders and Requisite Third Lien Noteholders. The New Board will have a three-tiered structure classified into staggered 3-year terms, with two directors initially serving a one-year term, four directors (including the Unsecured Director) initially serving a two-year term, and three directors initially serving a three-year term. The members of the New Board will be identified no later than at the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code. On the |

10

| | |
|---|---|
| | Effective Date, the terms of the current members of the boards of directors of Holdings will expire. |
| **Charter; Bylaws:** | The charter, bylaws, limited liability company agreements and other organizational documents of each Reorganized Company's corporate entity will be amended or amended and restated by the Reorganized Company in a manner reasonably satisfactory to the Requisite Third Lien Noteholders, the Requisite Unsecured Noteholders and the Convertible Noteholder and consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable. |
| **Cancellation of Notes, Interests, Instruments, Certificates and other Documents:** | Except as provided herein and in connection with the Amended Revolving Credit Agreement and the Second Lien Notes, on the Effective Date, all notes, instruments, certificates evidencing debt to, or equity interests in, the Company, including, without limitation, the Third Lien Notes, the Unsecured Notes, the Convertible Note, the Preferred Stock, the Existing Equity Interests and the Existing Warrants, will be cancelled and obligations of the Company thereunder will be discharged. In addition, on the Effective Date, any registration rights or similar agreements with respect to Existing Equity Interests will also be cancelled and any obligations of the Company thereunder will be discharged. |
| **Vesting of Assets:** | On the Effective Date, and if applicable, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Company's Estates will vest in the Reorganized Company free and clear of all claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. |
| **Compromise and Settlement:** | The Plan will contain customary provisions for the compromise and settlement of claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of allowed claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such claims and interests in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. |
| **Compensation and Benefit Plans:** | All material employee compensation and benefit plans of the Company in effect as of June 1, 2016, will be deemed to be assumed under the Plan.[4] |
| **Survival of Indemnification Obligations and D&O Insurance:** | Any obligations of the Company pursuant to its corporate charters, bylaws, limited liability company agreements or other organizational documents to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the |

---

[4] All senior management employment agreements to be modified, if necessary, to provide for one time waiver to ensure that restructuring transactions under the Plan do not trigger a change of control thereunder. There will be no material changes to the terms of the Company's benefit plans prior to the Effective Date not otherwise contemplated by this Term Sheet.

11

| | |
|---|---|
| | Company will not be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Company. In addition, after the Effective Date, the Reorganized Company will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect as of June 1, 2016, and all members, managers, directors and officers of the Company who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date. |
| **Director and Officer Liability Policy:** | To the extent the Company plans to extend existing insurance coverage or purchase new insurance coverage covering its current and former officers and directors from claims and causes of action of any third party (including without limitation any holder of a claim) that remain unreleased as of the Effective Date, such extended or newly purchased insurance will be in such amounts, for such terms or periods of time, and placed with such insurers as are determined by the Company with the reasonable consent of the Requisite Creditors. |
| **Conditions to Effectiveness:** | The Plan will be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are reasonably satisfactory to the Company and the Requisite Creditors, including the following:<br><br>1. the Definitive Documents (except as provided in number 5 below) will contain terms and conditions consistent in all respects with this Term Sheet and the Restructuring Support Agreement and will otherwise be reasonably satisfactory in form and substance to the Requisite Creditors;<br><br>2. the Bankruptcy Court will have entered the Confirmation Order, and such Confirmation Order will not have been reversed, stayed or modified;<br><br>3. the Restructuring Support Agreement will not have been terminated, and will be in full force and effect;<br><br>4. all Restructuring Expenses will have been paid in full in Cash;<br><br>5. the Amended Revolving Credit Agreement, including all documentation related thereto, will each be in form and substance (a) reasonably satisfactory to the Requisite Unsecured Noteholders, and (b) satisfactory to the Company and the Requisite Third Lien Noteholders, and will have been consummated; and<br><br>6. all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.<br><br>The conditions to effectiveness may be waived in writing by the Company together with the Requisite Creditors. |
| **Releases:** | The Plan will provide for standard releases (including from the holders of Claims, Interests and from the Company) with language substantially to the effect of the |

WEIL:\95739370\10\51351.0003

following:

Releases by the Company.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged, to the maximum extent permitted by law, by the Company, the Reorganized Company, and the Estates from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Company, the Reorganized Company, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company, the Reorganized Company, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other person, based on or relating to, or in any manner arising from, in whole or in part, the Company, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company or the Reorganized Company, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Company and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct.

Releases by Holders of Claims and Interests.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged, to the maximum extent permitted by law, by (i) the holders of all Claims or Interests who vote to accept the Plan, (ii) the holders of Claims or Interests that are unimpaired under the Plan, (iii) the holders of Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, and (iv) the holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth herein, from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Company, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or

13

| | |
|---|---|
| | collectively) or on behalf of the holder of any Claim or Interest or other person, based on or relating to, or in any manner arising from, in whole or in part, the Company, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company or the Reorganized Company, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Company and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes fraud, gross negligence or willful misconduct. |
| **Exculpation:** | The Plan will contain standard exculpation provisions with language substantially to the effect of the following: <br><br> Exculpation.  To the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, this Plan, or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence or willful misconduct. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Discharge of the Company:** | The Plan will contain standard discharge provisions with language substantially to the effect of the following: <br><br> Effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all claims and interests will be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Company or any of its assets, property, or Estates; (b) the Plan will bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all claims and interests will be satisfied, discharged, and released in full, and the Company's liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities will be precluded from asserting against the Company, the Company's Estates, the Reorganized Company, its successors and assigns, and its assets and properties any other claims or interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. |

14

| | |
|---|---|
| **Injunction:** | The Plan will contain standard injunction provisions with language substantially to the effect of the following:<br>From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order. |
| **Definitive Documents and Due Diligence:** | This Term Sheet is indicative, and any final agreement will be subject to the Definitive Documents. The Definitive Documents will contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |
| **Securities Exemptions:** | Notwithstanding the foregoing, the issuance and distribution under the Plan of (i) the New Common Shares to the Third Lien Noteholders, Unsecured Noteholders, the Convertible Noteholder and holders of Existing Equity Interests, and (ii) the New Warrants to the Unsecured Noteholders and the Convertible Noteholder and the New Common Shares issuable upon exercise thereof will be exempt from registration under the Securities Act or applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code and/or any other applicable exemptions. |
| **Tax Structure:** | To the extent possible, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial structure for the Company and their equity holders post-transaction as determined by the Company with the written consent of the Requisite Third Lien Noteholders (with such consent not to be unreasonably withheld). |
| **Avoidance Actions:** | The Reorganized Company will retain all rights to commence and pursue any causes of action that are expressly preserved and not released under the Plan, it being understood that the Reorganized Company will not retain any claims or causes of action against the Released Parties, subject to the carveout for any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence or willful misconduct. |
| **Restructuring Expenses:** | The Company agrees to pay the reasonable out-of-pocket fees, costs and expenses incurred by each of the Revolving Credit Agreement Agent and each of the Consenting Creditors, and expenses of their respective legal and financial advisors (but no more than one legal counsel, one local counsel in each appropriate jurisdiction and one financial advisor for each of the Revolving Credit Agreement Agent and the Consenting Third Lien Noteholders, and the Consenting Unsecured Noteholders, the Convertible Noteholder, and the Consenting Preferred Holders) (collectively, the "***Restructuring Expenses***"). All such Restructuring Expenses incurred and invoiced up to the Commencement Date shall be paid in full in cash prior to the Commencement Date. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (a) resolution of claims, (b) allowance of compensation and expenses for pre- |

| | |
|---|---|
| | Effective Date services, (c) resolution of motions, adversary proceedings or other contested matters, (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements and (e) other purposes. |
| **Resolution of Disputed Claims:** | The Plan will provide customary procedures for the resolution of disputed Claims, including the ability (but not requirement) to establish a claims bar date pursuant to an order of the Bankruptcy Court.   Once resolved, the claimants will receive distributions, if any, in accordance with the provisions of the Plan and the classification of their Allowed Claim. |

16

## ANNEX A

**Certain Defined Terms**

| Defined Terms | |
|---|---|
| *"Accredited Investor"* | An Accredited Investor as defined in Rule 501 of Regulation D under the Securities Act. |
| *"Administrative Expense Claim"* | A Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred from and after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Company (such as wages, salaries or commissions for services, and payments for goods and other services and leased premises); (b) Fee Claims; (c) the Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of the title 28 of the United States Code, 28 U.S.C. §§1-1401. |
| *"Allowed"* | With reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance has been interposed within the time period set forth in the Plan, or (ii) as to which any objection has been determined by a final order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest as to which the liability of the Company and the amount thereof are determined by a final order of a court of competent jurisdiction other than the Bankruptcy Court, or (c) any Claim or Interest expressly allowed under the Plan; provided, however, that notwithstanding the foregoing, the Reorganized Company will retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| *"Ares"* | Ares Management LLC together with any funds or managed accounts affiliated with, or managed by, Ares Management LLC or an affiliate. |
| *"Cash"* | Legal tender of the United States of America. |
| *"Cause of Action"* | Any action, claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim. |
| *"Claim"* | A "claim," as defined in section 101(5) of the Bankruptcy Code. |
| *"Class"* | Any group of Claims or Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *"Confirmation Hearing"* | A hearing at which the Bankruptcy Court will confirm the Plan, as applicable. |
| *"Disputed or Disallowed* | Any Claim or Interest that is not yet Allowed. |

| Defined Terms | |
|---|---|
| *"Claim or Interest"* | |
| *"Eligible Third Lien Noteholder"* | A Third Lien Noteholder that, as of a certain date set forth in the Disclosure Statement, is an Accredited Investor and certifies to that effect, or the Company reasonably believes is an Accredited Investor. |
| *"Eligible Unsecured Noteholder"* | An Unsecured Noteholder that, as of a certain date set forth in the Disclosure Statement, is an Accredited Investor and certifies to that effect, or the Company reasonably believes is an Accredited Investor. |
| *"Estate(s)"* | Individually or collectively, the estate or estates of the Company created under section 541 of the Bankruptcy Code. |
| *"Exculpated Parties"* | Collectively:  (a) the Company; (b) the Revolving Credit Agreement Agent; (c) the Revolving Credit Agreement Lenders; (d) the other Secured Parties under and as defined in the Revolving Credit Agreement; (e) the Consenting Third Lien Noteholders; (f) the Consenting Unsecured Noteholders; (g) the Convertible Noteholder; (h) the Consenting Preferred Holders; (i) the Third Lien Note Trustee; (j) the Unsecured Note Trustee; and (k) with respect to each of the foregoing entities in clauses (a) through (j), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees. |
| *"Existing Warrants"* | Any warrants or other options to purchase common stock or units or any other Interests in any of the Company, including, without limitation, those certain five year warrants to purchase 7.3 million shares of Holdings' common stock issued pursuant to HALRES LLC pursuant to the Securities Purchase Agreement. |
| *"Fee Claim"* | A Claim for professional services rendered or costs incurred on or after the Commencement Date and on or prior to the Effective Date by professional persons retained by the Company or any statutory committee appointed in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases. |
| *"Franklin"* | Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts. |
| *"Holdings Certificate of Incorporation"* | The Amended and Restated Certificate of Incorporation of Holdings dated May 6, 2015, as amended, modified or otherwise supplemented from time to time. |
| *"Interest"* | Any ownership interest in the Company, including all common stock or units, preferred stock or units or other instruments evidencing an ownership interest in the Company, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in any of the Company's corporate entities that existed immediately before the Effective Date. |
| *"Intercompany Claim"* | Any Claim against any of the Company's entities held by another of the Company's entities. |

2

| Defined Terms | |
|---|---|
| *"Intercompany Interest"* | An Interest in any of the Company's entities held by another of the Company's entities or an Interest in the Company held by an affiliate of the Company (other than any Preferred Stock or Existing Equity Interest in Holdings). |
| *"Other Secured Claim"* | A secured Claim, other than an Administrative Expense Claim, a Priority Tax Claim, a Revolving Credit Agreement Claim, a Second Lien Note Claim or a Third Lien Note Claim. |
| *"Priority Non-Tax Claim"* | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code. |
| *"Priority Tax Claim"* | Any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *"Released Parties"* | Collectively:  (a) the Company; (b) the Revolving Credit Agreement Agent; (c) the Revolving Credit Agreement Lenders; (d) the other Secured Parties under and as defined in the Revolving Credit Agreement; (e) the Consenting Third Lien Noteholders; (f) the Consenting Unsecured Noteholders; (g) the Convertible Noteholder; (h) the Consenting Preferred Holders; (i) the Third Lien Note Trustee; (j) the Unsecured Note Trustee; and (k) with respect to each of the foregoing entities in clauses (a) through (j), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees. |
| *"Reorganized Company"* | The Company as reorganized under the Plan, if applicable. |
| *"Revolving Credit Agreement Agent"* | JP Morgan Chase Bank, N.A., in its capacity as administrative agent under the Revolving Credit Agreement. |
| *"Revolving Credit Agreement Lenders"* | The lenders from time to time party to the Revolving Credit Agreement as lenders thereunder, including former lenders and any applicable assignees and participants thereof. |
| *"Third Lien Note Trustee"* | U.S. Bank National Association in its capacity as trustee under the Third Lien Indenture, and its successors and assigns, and collateral trustee under the Third Lien Security Agreement. |
| *"Third Lien Security Agreement"* | The Third Lien Security Agreement, dated as of September 10, 2015, between and among Holdings, each of the guarantors named therein, and U.S. Bank, National Association, as collateral trustee. |

WEIL:\95739370\10\51351.0003

| Defined Terms | |
|---|---|
| *"Unsecured Note Trustee"* | U.S. Bank, National Association, as indenture trustee under each of the Unsecured Indentures, and its successors and assigns. |
| *"Warrant Record Date"* | The deadline under the Plan for holders of Existing Warrants to exercise their respective rights to purchase common stock in Holdings and receive the treatment afforded to Existing Equity Interests under the Plan, which shall be set by the Company. |

## <u>EXHIBIT B</u>

## **FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS**

This Joinder Agreement to the Restructuring Support Agreement, dated as of [•], 2016 (as amended, supplemented or otherwise modified from time to time, the "<u>Agreement</u>"), by and among Halcón Resources Corporation and its subsidiaries party thereto, and the holders of the principal amounts outstanding under the [Third Lien Notes / Unsecured Notes / Convertible Note / Preferred Stock] (together with their respective successors and permitted assigns, the "<u>Consenting Creditors</u>" and each, a "<u>Consenting Creditor</u>") is executed and delivered by _____ (the "<u>Joining Party</u>") as of _____, 2016. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Note Claims and/or Preferred Stock held by such Joining Party.

2.  <u>Representations and Warranties</u>.  With respect to [the aggregate principal amount of Third Lien Notes / Unsecured Notes / Convertible Note] [the number of shares of Preferred Stock], in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 7</u> of the Agreement to each other Party to the Agreement.

3.  <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING CREDITOR]**

By:_____

Name:

Title:

Principal Amount of the Third Lien Notes:  $_____

Principal Amount of the Unsecured Notes:  $_____

Principal Amount of the Convertible Note: $_____

Number of Shares of Preferred Stock:       _____

Notice Address:

_____

_____

_____

Fax: _____

Attention:       _____

Email:       _____

Acknowledged:

**HALĆON RESOURCES CORPORATION**

By:_____

Name:

Title:

**CONSENT AND AMENDMENT**
**TO RESTRUCTURING SUPPORT AGREEMENT**

THIS CONSENT AND AMENDMENT dated as of July 22, 2016 (this "Amendment") is entered into by and among (i) Halcón Resources Corporation ("Holdings" and, together with certain of its subsidiaries that are parties hereto and listed on Schedule 1 hereto, the "Company") and (ii) the undersigned Consenting Creditors comprising the Requisite Creditors. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the RSA (as defined below).

WHEREAS, the Parties entered into a certain Restructuring Support Agreement dated as of June 9, 2016 (the "RSA").

AND WHEREAS, the Parties wish to amend certain provisions of the RSA and consent to certain matters with respect to the Second Lien Notes.

AND WHEREAS, the Parties wish to take such actions necessary to give effect to the foregoing.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein and in the RSA, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

Section 1.    Amendment to Term Sheet.  With respect to the Term Sheet, the first sentence of the last paragraph under the heading "Restructuring Summary" is hereby amended and restated in its entirety as follows:

"No later than two (2) business days prior to the Commencement Date, the Company will pay via wire transfer cash interest with respect to the (i) Third Lien Noteholders through the later of May 15, 2016 and the date on which interest and/or dividends are paid on the Unsecured Notes, the Convertible Note or the Preferred Stock and (ii) Unsecured Noteholders through the later of May 15, 2016 and the date on which interest and/or dividends are paid on the Third Lien Notes, the Convertible Note or the Preferred Stock, and on the date of such interest payments, the Company will notify the respective advisors to the Requisite Third Lien Noteholders and the Requisite Unsecured Noteholders of the making of such payments."

Section 2.    Amendment to RSA.  Section 4 of the RSA is hereby amended by adding the following paragraph at the end of such section:

"(c)   The Plan shall not specify how distributions will be allocated between principal and interest, and the Company shall amend the Plan dated as of June 20, 2016 to remove any references to distributions being allocated to principal or

interest, including by removing Section 6.11, no later than three (3) business days before the Confirmation Hearing."

Section 3.    <u>Consent</u>. The Company and the undersigned Consenting Creditors hereby agree to the treatment of the Second Lien Notes, including without limitation, the related amendment to the Second Lien Notes and Second Lien Indentures, as set forth on the term sheet attached hereto as **Exhibit A**.

Section 4.    <u>Miscellaneous</u>.

4.1    This Amendment shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto and shall become effective and binding on all Parties upon receipt by the Company of executed signature pages from each of (i) the Requisite Third Lien Noteholders, (ii) the Requisite Unsecured Noteholders, (iii) the Convertible Noteholder and (iv) the Requisite Preferred Holders.

4.2    Except as specifically set forth herein, the terms of the RSA shall remain in full force and effect and are hereby ratified and confirmed.

4.3    This Amendment may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Amendment delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed and delivered as of the day and year first written above.

**HALĆON PARTIES**

**HALĆON RESOURCES CORPORATION**

By:_____
     Name:  Floyd Wilson
     Title:   Chairman of the Board and Chief
             Executive Officer

**HALCÓN HOLDINGS, INC.**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HK RESOURCES, LLC**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**THE 7711 CORPORATION**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HALCÓN GULF STATES, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**HALCÓN LOUISIANA OPERATING, L.P.**

By:   Halcón Gulf States, LLC,
      its general partner

By: _____
      Name:  Floyd Wilson
      Title:   Chief Executive Officer

**HALCÓN FIELD SERVICES, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   President and Chief Executive Officer

**HALCÓN ENERGY PROPERTIES, INC.**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HALCÓN OPERATING CO., INC.**

By: _____
      Name: Floyd Wilson
      Title:   Chief Executive Officer

**HALCÓN WILLISTON I, LLC**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HALCÓN WILLISTON II, LLC**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HALCÓN RESOURCES OPERATING, INC.**

By: _____

Name: Floyd Wilson

Title:   Chief Executive Officer

**HRC ENERGY LOUISIANA, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**HRC ENERGY RESOURCES (WV), INC.**

By: _____

Name: Floyd Wilson

Title:   Chief Executive Officer

**HRC PRODUCTION COMPANY**

By: _____

   Name: Floyd Wilson
   Title:   Chief Executive Officer

**HALCÓN ENERGY HOLDINGS, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**HRC ENERGY, LLC**

By: _____
Name: Floyd Wilson
Title:   Chief Executive Officer

**HK ENERGY, LLC**

By:          _____

     Name:  Floyd Wilson

     Title:   Chief Executive Officer

**HK LOUISIANA OPERATING, LLC**

By: _____

Name:  Floyd Wilson

Title:    Chief Executive Officer

**HK OIL & GAS, LLC**

By: _____
     Name:  Floyd Wilson
     Title:   Chief Executive Officer

**HK ENERGY OPERATING, LLC**

By: _____
    Name: Floyd Wilson
    Title:   Chief Executive Officer

**HRC OPERATING, LLC**

By: _____
    Name:  Floyd Wilson
    Title:   Chief Executive Officer

**CONSENTING CREDITOR**

ARES DYNAMIC CREDIT ALLOCATION FUND, INC.

BY:    ARES CAPITAL MANAGEMENT II LLC, ITS ADVISER

By: _____
     Name:  Jeff Moore
     Title:  Vice President

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**

ARES STRATEGIC INVESTMENT PARTNERS LTD.

BY:    ARES STRATEGIC INVESTMENT MANAGEMENT LLC, AS
       INVESTMENT MANAGER

By:_____
       Name:  **Jeff Moore**
       Title:  **Vice President**

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**


FUTURE FUND BOARD OF GUARDIANS

BY:   ARES ENHANCED LOAN INVESTMENT STRATEGY ADVISOR IV, L.P., ITS
      INVESTMENT MANAGER (ON BEHALF OF THE ASIP II SUB-ACCOUNT)

BY:   ARES ENHANCED LOAN INVESTMENT STRATEGY ADVISOR IV GP, LLC,
      ITS GENERAL PARTNER


By: _____

Name:  **Jeff Moore**
Title:  **Vice President**


Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**

ASIP (HOLDCO) IV S.À.R.L.

BY:    ASIP OPERATING MANAGER IV LLC, ITS INVESTMENT MANAGER


By: _____
     Name: **Jeff Moore**
     Title: **Vice President**

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**


ARES MULTI-STRATEGY CREDIT FUND V (H), L.P.

BY:    ARES MSCF V (H) MANAGEMENT LLC, ITS MANAGER


By: _____
    Name:  **Jeff Moore**
    Title:  **Vice President**


Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**

TRANSATLANTIC REINSURANCE COMPANY

BY:    ARES ASIP VII MANAGEMENT, L.P., ITS PORTFOLIO MANAGER

BY:    ARES ASIP VII GP, LLC, ITS GENERAL PARTNER


By:    _____
         Name: Jeff Moore
         Title: Vice President


Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**


RSUI INDEMNITY COMPANY

BY:    ARES ASIP VII MANAGEMENT, L.P., ITS PORTFOLIO MANAGER

BY:    ARES ASIP VII GP, LLC, ITS GENERAL PARTNER


By:_____
    Name: Jeff Moore
    Title: Vice President


Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**

ARES SPECIAL SITUATIONS FUND III, L.P.

BY:    ASSF OPERATING MANAGER III, LLC, ITS MANAGER

By: _____
    Name: **Jeff Moore**
    Title:  **Vice President**

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

## CONSENTING CREDITOR

ARES SPECIAL SITUATIONS FUND IV, L.P.

BY:    ASSF OPERATING MANAGER IV, L.P., ITS MANAGER


By:_____
Name: Jeff Moore
Title: **Vice President**


Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4137
Attention:  Jeff Moore
Email:  moore@aresmgmt.com

**CONSENTING CREDITOR**

AF IV US BD HOLDINGS, L.P.

By: _____

    Name:  **Nate Walton**
    Title:  **Chief Financial Officer**

Notice Address:
**ARES MANAGEMENT LLC**
**2000 Avenue of the Stars**
**12th Floor**
**Los Angeles, California 90067**

Phone:  (310) 201-4121
Attention:  Nate Walton
Email:  walton@aresmgmt.com

**CONSENTING CREDITOR**


FRANKLIN ADVISERS, INC., as investment manager on behalf of certain funds and accounts


By: _Se Voyles_

     Name:  **Glenn Voyles**
     Title:  **Vice President**


Notice Address:
**Franklin Advisers, Inc.**
**One Franklin Pkwy.**
**San Mateo, CA 94403**

Fax:  (650) 312-2070
Attention:  Bryant Dieffenbacher; Christopher Chen
Email:  bryant.dieffenbacher@franklintempleton.com
       chris.chen@franklintempleton.com

**CONSENTING CREDITOR**

**TYRUS CAPITAL EVENT MASTER FUND LIMITED**
by its agent, Tyrus Capital S.A.M.

By: 

Name: Mark Madden

Title: Director

Notice Address:
c/o Tyrus Capital S.A.M.
4 Avenue de Roqueville
98000 Monaco


Fax: +377 9999 5090
Attention: Head of Legal
Email: opsteam@tyruscap.mc; legal@tyruscap.mc

**CONSENTING CREDITOR**

**EACH ENTITY LISTED ON EXHIBIT A HERETO**

**By: Putnam Investment Management, LLC, as investment manager**

By: 

Name: Norman P. Boucher

Title: Portfolio Manager

Notice Address:
c/o Putnam Investments
One Post Office Square
Boston, MA 02109
Attention: Office of the General Counsel

Fax: (617) 760-1625
Attention: Stephen M. Gianelli
Email: stephen_gianelli@putnam.com

A copy of the Agreement and Declaration of Trust of each Consenting Creditor listed on Exhibit A hereto is on file with the Secretary of the Commonwealth of Massachusetts and notice is hereby given that this instrument is executed on behalf of the Trustees of each such Consenting Creditor as Trustees and not individually and that the obligations of this instrument are not binding on any of the Trustees or officers or shareholders individually, but are binding only on the assets or property of each such Consenting Creditor with respect to its obligations hereunder. Furthermore, notice is given that the assets and liabilities of each series of each such Consenting Creditor that is a series company are separate and distinct and that the obligations of or arising out of this instrument are several and not joint and are binding only on the assets or property of each series with respect to its obligations hereunder.

Exhibit A

Putnam Investment Management, LLC



**CONSENTING CREDITOR**

**EACH ENTITY LISTED ON EXHIBIT A HERETO**

**By: The Putnam Advisory Company, LLC, as investment manager**

By: 

Name: Norman P. Boucher

Title: Portfolio Manager

Notice Address:
c/o Putnam Investments
One Post Office Square
Boston, MA 02109
Attention: Office of the General Counsel

Fax: (617) 760-1625
Attention: Stephen M. Gianelli
Email: stephen_gianelli@putnam.com

Exhibit A

The Putnam Advisory Company, LLC



**CONSENTING CREDITOR**

**EACH ENTITY LISTED ON EXHIBIT A HERETO**

**By: Putnam Fiduciary Trust Company, as investment manager**

By: 

Name: Norman P. Boucher

Title: Portfolio Manager

Notice Address:
c/o Putnam Investments
One Post Office Square
Boston, MA 02109
Attention: Office of the General Counsel

Fax: (617) 760-1625
Attention: Stephen M. Gianelli
Email: stephen_gianelli@putnam.com

Exhibit A

Putnam Fiduciary Trust Company



**CONSENTING CREDITOR**

**HALRES LLC**

By: 

Name: Floyd C. Wilson

Title:   President

Notice Address:

3811 Turtle Creek Blvd., Suite 1000
Dallas, Texas 75219


Fax:  214.599.0200
Attention: Mark A. Welsh IV
Email:  mwelsh@encapinvestments.com

**CONSENTING CREDITOR**

**CANADA PENSION PLAN INVESTMENT BOARD**

By: 

Name: Mark Roth

Title: Managing Director, Head of Business Management

<u>Notice Address</u>:

One Queen Street East, Suite 2500
Toronto, Ontario M5C 2W5

Fax:
Attention:
Email:



# Delaware Investments®
A member of Macquarie Group

MACQUARIE

2005 Market St.
Philadelphia, PA 19103-7094

**Consenting Creditor**

**Delaware Investment Advisers, a series of Delaware Management Business Trust, on behalf of each of the accounts on Appendix A for which it is designated as investment adviser, severally and not jointly**

By: *Wayne A. Anglace*
Name: Wayne A. Anglace
Title:   Vice President/Portfolio Manager

**Delaware Investments Fund Advisers, a series of Delaware Management Business Trust, on behalf of each of the accounts on Appendix A for which it is designated as investment adviser, severally and not jointly**

By: *Wayne A. Anglace*
Name: Wayne A. Anglace
Title:   Vice President/Portfolio Manager

**Delaware Management Company, a series of Delaware Management Business Trust, on behalf of each of the accounts on Appendix A for which it is designated as investment adviser, severally and not jointly**

By: *Wayne A. Anglace*
Name: Wayne A. Anglace
Title:   Vice President/Portfolio Manager

Notice Address:
c/o Delaware Investments
2005 Market Street
Philadelphia, PA 19103
Attn:  Wayne Anglace, with a copy to General Counsel
Fax: 215-255-1640
Email: wayne.anglace@delinvest.com

Signature Page to Consent and Amendment to Restructuring Support Agreement

Appendix A



Signature Page to Consent and Amendment to Restructuring Support Agreement

902216_1

**CONSENTING CREDITOR**

[•]

By: [•]

Name: [•] Christopher Kuehner

Title: [•] Compliance Officer

█████████████████████████

Notice Address: Equity Specialists, LLC
[•]    111 W. Jackson  20st Floor
        Chicago IL  60604

Fax: [•]
Attention: [•]
Email: [•] ~~Compliance~~ Compliance @ eqtc.com

**CONSENTING CREDITOR**



Floyd C. Wilson

Notice Address:

c/o Halcón Resources Corporation
1000 Louisiana Street, Suite 6700
Houston, Texas 77002
Fax: 713.589.8020
Attention: Floyd C. Wilson
Email: fwilson@halconresources.com

**CONSENTING CREDITOR**



James W. Christmas

<u>Notice Address</u>:

1089 Oceanfront
Long Beach, New York 11561

Fax:
Attention:
Email: jchristmas@halconresources.com

**CONSENTING CREDITOR**

**Manulife Asset Management (US) LLC**

By: 

Name: **Jeffrey Given**

Title: **Senior Managing Director**

Notice Address:

197 Clarendon Street
Boston, MA 02116

Fax: 617-375-1837
Attention: Dennis F. McCafferty
Email: dmccafferty@manulifeam.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer Diversified High Income Trust**
By:  Pioneer Investment Management, Inc., its adviser



By: _____

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109

Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer Funds – U.S. High Yield**
By:  Pioneer Investment Management, Inc., its adviser



By: _____

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109

Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

## CONSENTING CREDITOR

**Pioneer High Income Trust**
By:  Pioneer Investment Management, Inc., its adviser



By: _____

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer High Yield Fund**
By:  Pioneer Investment Management, Inc., its adviser



By:  _____

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

**<u>CONSENTING CREDITOR</u>**

**ING Partners, Inc.– VY Pioneer High Yield Portfolio**
By:  Pioneer Investment Management, Inc., its adviser



By:

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

<u>Notice Address:</u>

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

## CONSENTING CREDITOR

**Pioneer Funds – Global High Yield**
By:  Pioneer Investment Management, Inc., its adviser

By: _____

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

████████████████████████████████████████

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Pioneer Multi-Asset Income Fund**
By:  Pioneer Investment Management, Inc., its adviser

By: 

Name: Anthony J. Koenig, Jr.

Title: Senior Vice President

Notice Address:

Pioneer Investment Management, Inc.
60 State Street
Boston, MA 02109


Fax: 617-528-6845
Attention:  Will Taylor
Email: William.taylor@pioneerinvestments.com

SIGNATURE PAGE TO CONSENT AND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

**CONSENTING CREDITOR**

**Thornburg Investment Income Builder**

By: 

Name: **Jason Brady**

Title: **Portfolio Manager, President & CEO**

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506

Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**CONSENTING CREDITOR**

**Thornburg Strategic Income Fund**

By: 

Name: **Jason Brady**

Title: **Portfolio Manager, President & CEO**

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506


Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**<u>CONSENTING CREDITOR</u>**

**Delaware Public Employees' Retirement System**

By: 

Name: **Jason Brady**

Title: **Portfolio Manager, President & CEO**

<u>Notice Address:</u>
2300 North Ridgetop RD
Santa Fe, NM 87506

Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

**CONSENTING CREDITOR**

**Arlington Country Employees' Retirement System**



By:

Name: **Jason Brady**

Title: **Portfolio Manager, President & CEO**

██████████████████████████████

Notice Address:
2300 North Ridgetop RD
Santa Fe, NM 87506


Fax: 505.467.7175
Attention: Leon Sandersfeld
Email: lsandersfeld@thornburg.com

## <u>EXHIBIT A</u>

**Second Lien Note Amendment Term Sheet**

# HALCÓN RESOURCES CORPORATION
# TERM SHEET

## JULY 22, 2016

This term sheet sets forth the principal terms of a proposed amendment ("***Amendment***") to the Second Lien Note Indentures (as defined below) to be implemented pursuant to a consent solicitation, consistent with the terms set forth herein.  Reference is hereby made to that certain restructuring support agreement dated June 9, 2016, by and among the Company and the Consenting Creditors (the "***Restructuring Support Agreement***").[1]

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.  THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY.**

**THE TERMS SET FORTH HEREIN ARE FOR DISCUSSION PURPOSES ONLY AND REMAIN SUBJECT TO APPROVAL BY THE LENDERS UNDER THE REVOLVING CREDIT AGREEMENT, THE REQUISITE CREDITORS UNDER THE RESTRUCTURING SUPPORT AGREEMENT, AND THE BOARD OF DIRECTORS OF THE COMPANY.**

| **Transaction Overview** |
|---|

| | |
|---|---|
| **Notes and Indentures to be Amended:** | The Company is prepared to enter into the Amendment, consistent with the terms set forth herein, to: (a) the 8.625% Senior Secured Notes (the "***8.625% Second Lien Notes***") issued under that certain indenture, dated as of May 1, 2015, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as trustee (as amended, modified, or otherwise supplemented from time to time, the  "***8.625% Second Lien Note Indenture***") and (b) the 12.0% Senior Secured Notes (the "***12.0% Second Lien Notes***" and, together with the 8.625% Second Lien Notes, the "***Second Lien Notes***" and the holders of such Second Lien Notes, the "***Second Lien Noteholders***") issued under that certain indenture, dated as of December 21, 2015, by and among Holdings, as issuer, each of the guarantors named therein, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time, the  "***12.0% Second Lien Note Indenture***" and, together with the 8.625% Second Lien Note Indenture, the "***Second Lien Note Indentures***"). |
| **Proposed Amendments:** | On or as soon as reasonably practicable following the Effective Date of the Plan, the Second Lien Note Indentures and any the other applicable Note Documents (as defined in the Second Lien Note Indenture) will be amended as follows: |
| | <u>Incurrence of Indebtedness/Lien Covenants</u> |
| | ▪  Section 4.3(b)(1): Section 4.3(b)(1)(a)(i) to be amended and restated as $900.0 million. The remaining provisions of Section 4.3(b)(1) shall remain unchanged. |

---

[1] Capitalized terms used but not otherwise herein defined have the meanings ascribed to them in the Restructuring Support Agreement or the Second Lien Note Indentures, as applicable.

| | |
|---|---|
| | ▪ Section 4.3(b)(3): $150 million Parity Lien Debt basket to be deleted.<br><br>▪ Section 4.5: Subsection (14) of the definition of Permitted Liens to be amended to delete any references to other Parity Lien Debt.<br><br>Restricted Payments Covenant<br><br>▪ Section 4.4(b)(3): Amend Section 4.4(b)(3) to adjust the start date for measuring the Consolidated Net Income builder basket period from April 1, 2015, to the beginning of the fiscal quarter after the Effective Date of the Plan.<br><br>▪ Subsection 4.4: Amend the definition of Restricted Payment to include any prepayments of Junior Lien Debt or unsecured Indebtedness incurred under Credit Facilities.<br><br>▪ Section 4.4(c)(14): $250 million basket for prepayments of unsecured notes to be deleted. |
| **Noteholder Professionals:** | Prior to the Petition Date, but subject to the occurrence of the Support Effective Date, the Company agrees to pay the reasonable fees and expenses incurred through and including the Support Effective Date of each of Centerview Partners LLC, as financial advisor to the ad hoc group of Second Lien Noteholders (the "***Ad Hoc Group***"), and O'Melveny & Myers LLP, as counsel to the Ad Hoc Group (collectively, the "***Noteholder Advisors***"); provided, however, that the reasonable fees and expenses of the Noteholder Advisors shall not exceed $500,000.00 in the aggregate. |
| **Consent Fee:** | In addition to the Amendment, in consideration for the Consenting Noteholder Obligations set forth below, the Company agrees to pay:<br><br>(a) to each holder of 8.625% Second Lien Notes that agrees to the Amendment and is either party to the Lock-up Agreement (as defined below) or does not object or take any action in contravention to the Plan, a fee equal to 1.25% of the aggregate principal amount of such holder's outstanding 8.625% Second Lien Notes, subject to the occurrence of the Effective Date of the Plan and the effectiveness of the Amendment (the "***8.625% Note Consent Fee***"); and<br><br>(b) to each holder of 12.0% Second Lien Notes that agrees to the Amendment and is either party to the Lock-up Agreement or does not object or take any action in contravention to the Plan, a fee equal to 1.25% of the aggregate principal amount of such holder's outstanding 12.0% Second Lien Notes, subject to the occurrence of the Effective Date of the Plan (the "***12.0% Note Consent Fee***" and, together with the 8.625% Note Consent Fee, the "***Consent Fees***");<br><br>provided, however, that the Consent Fees shall only be paid if the Effective Date occurs within the  milestones set forth in the Restructuring Support Agreement as in effect on the date hereof and without regard to any amendments of such milestones although the balance of this Term Sheet shall remain in effect. |
| **Agreements of the Consenting Second Lien Noteholders:** | Subject to the occurrence of the Support Effective Date (as herein defined), each holder of Second Lien Notes that agrees to the Amendment agrees to:<br>• timely submit its consent to the Amendment;<br>• support and take such commercially reasonable actions necessary or reasonably requested by the Company to obtain approval of the Disclosure Statement, and confirmation and consummation of the Plan and the Restructuring, including any debtor-in-possession financing for the Company that includes a "roll up" of the Revolving Credit Agreement Claims and any other transactions contemplated by the Plan; |

|  | • not directly or indirectly, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, and the confirmation and consummation of the Plan and the Restructuring, including any debtor-in-possession financing that includes a "roll up" of the Revolving Credit Agreement Claims and any other transactions contemplated by the Plan; and<br><br>• not transfer any of its Second Lien Note Claims unless such transferee agrees to be bound by the terms set forth herein and notifies the Company within two (2) business days of such transfer (collectively, the "***Consenting Noteholder Obligations***"). |
|---|---|
| **Support Effective Date:** | The date by which the Company and holders of not less than 51% of the outstanding principal amount of the Second Lien Notes execute the Lock-up Agreement (the "***Support Effective Date***"). For purposes of this Term Sheet, "Lock-up Agreement" means a lock-up or similar agreement consistent with the terms set forth herein. |
| **Implementation:** | To be implemented through a consent solicitation to be commenced by the Company on or as soon as reasonably practicable following the Effective Date of the Plan but in no event later than thirty (30) days following the Effective Date. |
| **Disclosure:** | The terms of the Amendment, including the Company's obligation to solicit consents for the Amendment from holders of the Second Lien Notes on or as soon as reasonably practicable following the Effective Date, shall be described in the solicitation procedures motion filed in the Chapter 11 Cases. |