# EXHIBIT B

**Engagement Letter**

PJT Partners


January 29, 2016

Gary T. Holtzer
Partner
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Dear Mr. Holtzer:

This letter confirms the understanding and agreement (the "**Agreement**") between PJT Partners LP ("**PJT Partners**") and Weil, Gotshal & Manges LLP ("**Counsel**"), as counsel to Halcón Resources Corporation ("**Halcón**" and together with its subsidiaries, the "**Company**") regarding the retention of PJT Partners on an exclusive basis, with respect to services contemplated by this letter, by Counsel for the benefit of the Company effective as of February [1], 2016 (the "**Effective Date**") as its investment banker for the purposes set forth herein.

Under this Agreement, PJT Partners will provide investment banking services to Counsel in connection with a possible Restructuring (as defined below), and will assist the Company in analyzing, structuring, negotiating and effecting the Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term "**Restructuring**" shall mean, collectively, (i) any restructuring, reorganization (whether or not pursuant to chapter 11 of the United States Bankruptcy Code ("**Chapter 11**")) and/or recapitalization of the Company and/or sale or other disposition of substantially all of the assets or the equity of the Company in connection with a Chapter 11 case, affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, and preferred stock (collectively, the "**Obligations**"), and/or (ii) any complete or partial repurchase, refinancing, extension or repayment by the Company of any of the Obligations.

The investment banking services to be rendered by PJT Partners will include the following:

  (a)  assist in the evaluation of the Company's businesses and prospects;

  (b)  assist in the development of the Company's long-term business plan and related financial projections;

  (c)  assist in the development of financial data and presentations to the Company's Board of Directors, various creditors and other third parties;

  (d)  analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

  (e)  analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;

- (f) provide strategic advice with regard to restructuring or refinancing the Company's Obligations;
- (g) evaluate the Company's debt capacity and alternative capital structures;
- (h) participate in negotiations among the Company and its creditors, suppliers, lessors and other interested parties;
- (i) value securities offered by the Company in connection with a Restructuring;
- (j) advise the Company and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;
- (k) assist in arranging financing for the Company, as requested;
- (l) perform and provide a valuation of the Company;
- (m) provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services; and
- (n) provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring, as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, PJT Partners shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. PJT Partners makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. PJT Partners is retained under this Agreement solely to provide advice regarding a Restructuring, and is not being retained to provide "crisis management" or any legal, tax, accounting or actuarial advice. It is understood and agreed that nothing contained herein shall constitute a commitment, express or implied, on the part of PJT Partners to underwrite, purchase or place any securities, in a financing or otherwise.

Counsel shall in no event be obligated to pay any compensation, expense, reimbursement, indemnification or other amounts payable pursuant to this Agreement or otherwise in connection with PJT Partners' engagement hereunder. PJT Partners is being retained by Counsel to provide financial advice to assist Counsel in Counsel's provision of legal services to the Company and will report to and take direction from Counsel notwithstanding that PJT Partners' fees and expenses will be paid by the Company. PJT Partners acknowledges that Counsel has requested that PJT Partners bill the Company directly and that the Company pay PJT Partners directly for any amounts owed hereunder, and PJT Partners has agreed to such request. PJT Partners further acknowledges that (a) in connection with the foregoing, the Company has executed and delivered to PJT Partners this Agreement and the Indemnification Agreement dated as of the date hereof and attached hereto as Attachment A, pursuant to which the Company is obligated to pay all amounts owed to PJT Partners hereunder and thereunder, and (b) for the avoidance of doubt, notwithstanding anything herein to the contrary, Counsel shall not be responsible for any such amounts and PJT Partners shall look only to the Company for payment hereunder.

The Company will pay the following fees to PJT Partners for its investment banking services:

- (i) a monthly advisory fee (the "**Monthly Fee**") in the amount of $175,000, per month, in cash, with the first Monthly Fee payable upon the execution of this Agreement by both parties and additional installments of such Monthly Fee payable in advance on each monthly anniversary of the Effective Date;

(ii) A capital raising fee (the "**Capital Raising Fee**") for any financing arranged by PJT Partners if requested by the Company in writing, which will be earned and payable upon receipt of a binding commitment letter. If access to the financing is limited by orders of the bankruptcy court, a proportionate fee shall be payable with respect to each available commitment (irrespective of availability blocks, borrowing base, or other similar restrictions). The Capital Raising Fee will be mutually agreed by the parties;

(iii) an additional fee (the "**Restructuring Fee**") equal to $10,000,000. Except as otherwise provided herein, a Restructuring shall be deemed to have been consummated upon (a) the binding execution, effectiveness and consummation of all necessary waivers, consents, amendments or restructuring agreements between the Company and its creditors involving the compromise of the face amount of such Obligations or the conversion of all or a portion of such Obligations into alternative securities, including equity, in the case of an out-of-court restructuring, however, any such transaction must include a compromise or conversion of the face amount of at least 30% of the aggregate second lien notes, the aggregate third lien notes or the aggregate senior unsecured notes, excluding from such calculation in each case any notes owned by the Company as of February 15, 2016; (b) the confirmation and consummation of a Plan of Reorganization pursuant to an order of the Bankruptcy Court, in the case of an in-court restructuring; or (c) in the case of a sale or other disposition of all or substantially all of the assets or equity of the Company in connection with a Chapter 11 case, upon the closing of such sale. The Restructuring Fee will be:

    (I) earned on the earliest of:

        (w) consummation of the Restructuring,

        (x) in the event the Company attempts to implement the Restructuring in whole or in part by means of an exchange offer, then upon consummation of the exchange offer,

        (y) in the event that the Company attempts to implement the Restructuring by means of a pre-negotiated plan of reorganization under Chapter 11, the receipt of sufficient commitments, agreements or other expressions of intention to accept such plan that the Company elects to file a Chapter 11 case and therein represent to the Bankruptcy Court hearing such case that the Company will seek to confirm a plan based on the pre-negotiated plan and confirmation and consummation of such plan, and

        (z) in the event that the Company solicits acceptances for a prepackaged plan of reorganization under Chapter 11 to implement the Restructuring, and so long as at least one class of creditors impaired by such plan has accepted such plan on the date established as the voting deadline for such acceptances or rejections, then upon confirmation and consummation of such plan, and

        (aa) in the case of a sale or other disposition of all or substantially all of the assets or equity of the Company in connection with a Chapter 11 case, upon distribution of proceeds in respect of the Obligations;

    (II) payable, in immediately available funds, on the earliest of:

        (A) consummation of the Restructuring,

      (B)    consummation of the exchange offer,

      (C)    the first business day immediately following in the case of clauses "(y)" or "(z)" above, consummation of the pre-negotiated plan or prepackaged plan of reorganization as applicable, and

      (D)    in the case of a sale or other disposition of all or substantially all the assets or equity of the Company in connection with a Chapter 11 case, upon distribution of proceeds in respect of the Obligations.

Notwithstanding the foregoing, (a) a Restructuring specifically shall be deemed to exclude any assumption at face value of Obligations in connection with the sale or disposition of any subsidiaries, joint ventures, assets or lines of business of the Company and (b) the restructured Obligations shall exclude any Obligations in respect of which a Restructuring Fee has previously been paid; and

  (iv)    reimbursement of all reasonable, documented out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable, documented fees and expenses of PJT Partners' counsel (without the requirement that the retention of such counsel be approved by the court in any Bankruptcy Case) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses. In connection therewith the Company shall pay PJT Partners on the Effective Date and maintain thereafter a $100,000 expense advance for which PJT Partners shall account upon termination of this Agreement.

In the event that the Company is or becomes a debtor under Chapter 11, the Company shall use its commercially reasonable efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "**Bankruptcy Court**") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (A) this Agreement, including the attached indemnification agreement, and (B) PJT Partners' retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply PJT Partners with a draft of such application and any proposed order authorizing PJT Partners' retention sufficiently in advance of the filing of such application and proposed order to enable PJT Partners and its counsel to review and comment thereon.

PJT Partners shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under Chapter 11 unless PJT Partners' retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order entered by the Bankruptcy Court within 45 days of the filing of the retention application that is no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to PJT Partners in all respects. If neither the Company nor PJT Partners have obtained such an order within such 45-day period, or such order is later reversed, vacated or set aside for any reason, PJT Partners may terminate this Agreement.

The Company will use its commercially reasonable efforts to ensure that PJT Partners' post-petition compensation, expense reimbursements and payment received pursuant to the provisions of Attachment A shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more cash

page 4

collateral and/or financing orders entered by the Bankruptcy Court. Following entry of an order authorizing PJT Partners' retention, the Company will assist PJT Partners in preparing, filing and serving fee statements, interim fee applications, and a final fee application. The Company will support PJT Partners' fee applications that are consistent with this Agreement in papers filed with the Bankruptcy Court and during any Bankruptcy Court hearing. The Company will pay promptly the fees and expenses of PJT Partners, in each case, which are both (i) owed pursuant to this Agreement and (ii) approved by the Bankruptcy Court in accordance with the orders of the Bankruptcy Court.

PJT Partners acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, PJT Partners' fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of Chapter 11 of the Bankruptcy Code and any applicable fee and expense guideline orders; provided, however, that PJT Partners shall not be required to maintain time records and, provided further, that PJT Partners shall not be required to maintain receipts for expenses in amounts less than $75. In the event that the Company becomes a debtor under Chapter 11 and PJT Partners' engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of PJT Partners hereunder as promptly as practicable in accordance with the terms hereof and any retention order. Prior to commencing a Chapter 11 case, the Company shall pay all invoiced amounts to PJT Partners in immediately available funds by wire transfer.

With respect to PJT Partners' retention under sections 327 and 328 of the Bankruptcy Code, the Company acknowledges and agrees that PJT Partners' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of PJT Partners' engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of PJT Partners' services hereunder could not be measured merely by reference to the number of hours to be expended by PJT Partners' professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of PJT Partners and its professionals hereunder over the term of this engagement, and in light of the fact that such commitment may foreclose other opportunities for PJT Partners and that the actual time and commitment required of PJT Partners and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues which PJT Partners may be required to address in the performance of its services hereunder, PJT Partners' commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for PJT Partners' services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder (including the Monthly Fee, Capital Raising Fee, and the Restructuring Fee) are reasonable under the standards set forth in 11 U.S.C. Section 328(a).

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by PJT Partners at the request of Counsel or the Company, including the arranging of debt or equity capital (except as provided above), issuing fairness opinions or any other specific services not set forth in this Agreement. The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between PJT Partners and the appropriate party.

Except as contemplated by the terms hereof or as required by applicable law, regulation or legal process, for a period of one year from the date hereof, PJT Partners shall keep confidential all

material non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with PJT Partners' performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential. For the avoidance of doubt, PJT Partners may provide nonpublic Information (as defined below) to prospective transaction parties as contemplated by this Agreement, subject to such parties executing appropriate confidentiality agreements.

Counsel will furnish or request that the Company furnish to PJT Partners such information regarding the Company as PJT Partners reasonably requests and believes appropriate to its assignment (all such information so furnished being the "**Information**"). Counsel further agrees that it will request that the Company furnish PJT Partners with reasonable access to the Company and its directors, officers, employees, accountants, counsel and other advisers. To the best of the Company's knowledge, the Information will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. During the term of the engagement, the Company shall inform PJT Partners promptly upon becoming aware of any material developments relating to the Company which the Company reasonably expects may impact on the proposed Restructuring or if the Company becomes aware that any Information provided to PJT Partners is, or has become, untrue, unfair, inaccurate or misleading in any material respect. Furthermore, the Company warrants and undertakes to PJT Partners in respect of all Information supplied by the Company, that the Company has not obtained any such Information other than by lawful means and that disclosure to PJT Partners will not breach any agreement or duty of confidentiality owed to third parties. The Company and Counsel recognize and confirm that PJT Partners (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment.

In the event that the Information belonging to the Company is stored electronically on PJT Partners' computer systems, PJT Partners shall not be liable for any damages resulting from unauthorized access, misuse or alteration of such information by persons not acting on its behalf, provided that PJT Partners exercises the same degree of care in protecting the confidentiality of, and in preventing unauthorized access to, the Company's information that it exercises with regard to its own most sensitive proprietary information.

Except as required by applicable law, any advice to be provided by PJT Partners under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgment, in any filings in a Chapter 11 proceeding) without the prior consent of PJT Partners, not to be unreasonably withheld. In the event disclosure is required by subpoena or court order, the Company will provide PJT Partners with reasonable advance notice and permit PJT Partners to comments on the form and content of the disclosure. All services, advice and information and reports provided by PJT Partners to Counsel and the Company in connection with this assignment shall be for the sole benefit of Counsel and the Company and shall not be relied upon by any other person.

PJT Partners acknowledges and agrees that the work product produced by PJT Partners pursuant to this Agreement is for the purpose of facilitating the rendering by Counsel of legal advice to the Company and constitutes attorney work product, and that any communication to Counsel, including, without limitation, any correspondence, analyses, reports and related

WEIL.\95611725\6\US.NY

materials that PJT Partners prepares, constitutes confidential and privileged communications and PJT Partners will not disclose the same to any other person except as requested by Counsel or as required by applicable law.

The Company acknowledges and agrees that PJT Partners will provide its investment banking services exclusively for the benefit of the Board of Directors and senior management of the Company and not the Company's shareholders or other constituencies. The Board of Directors and senior management will make all decisions for the Company regarding whether and how the Company will pursue a Restructuring and on what terms and by what process. In so doing, the Board of Directors and senior management will also obtain the advice of the Company's legal, tax and other business advisors and consider such other factors which they consider appropriate before exercising their independent business judgment in respect of a Restructuring. The Company further acknowledges and agrees that PJT Partners has been retained to act solely as investment banker to Counsel for the benefit of the Company and does not in such capacity act as a fiduciary for the Company or any other person. PJT Partners shall act as an independent contractor and any duties of PJT Partners arising out of its engagement pursuant to this Agreement shall be owed solely to the Company.

In consideration of PJT Partners' agreement to provide investment banking services hereunder, the Company will indemnify PJT Partners and its agents, representatives, members and employees pursuant to the indemnification agreement attached to this Agreement as Attachment A. PJT Partners acknowledges that Counsel has no obligation to indemnify PJT Partners.

PJT Partners' engagement hereunder may be terminated upon 10 days' written notice without cause by either Counsel, the Company or PJT Partners; termination for cause by either party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of PJT Partners as an independent contractor, the limitation as to whom PJT Partners shall owe any duties, and any other provision of this Agreement that, by its terms, survives termination, will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A or PJT Partners' confidentiality obligations hereunder. Without limiting the foregoing, PJT Partners shall be entitled to the Restructuring Fee in the event that at any time prior to the expiration of 12 months following the termination of this Agreement a definitive agreement with respect to a Restructuring for which a Restructuring Fee would otherwise have been earned pursuant to the terms hereof is executed and a Restructuring for which a Restructuring Fee would otherwise have been earned pursuant to the terms hereof is thereafter consummated; provided, however, that notwithstanding the foregoing, if PJT Partners terminates its engagement hereunder for cause, then the tail period shall be 12 months; provided, further, however that if the Company terminates the engagement hereunder for cause or PJT Partners terminates the engagement without cause, PJT Partners shall not be entitled to such Restructuring Fee.

The Company represents that neither it nor any of its affiliates under common control, nor, to the knowledge of the Company, any of their respective directors or officers, is an individual or entity ("**Person**") that is, or is owned or controlled by a Person that is: (i) a Person with whom dealings are prohibited or restricted under U.S. economic sanctions (including those administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control and the U.S. Department of State) or under sanctions imposed by the United Nations Security Council, Canada, the European Union, or member countries of the European Union ; (ii) a Person subject to anti-money laundering prohibitions, restrictions, or sanctions imposed by the United States, Canada, the European Union, member countries of the European Union, or any

other relevant jurisdiction; or (iii) to the knowledge of the Company, not in compliance in all material respects with all applicable anti-money laundering laws and Sanctions laws.

The Company should be aware that PJT Partners and/or its affiliates may be providing or may in the future provide financial or other services to other parties with conflicting interests. Consistent with PJT Partners' policy to hold in confidence the affairs of its clients, PJT Partners will not use confidential information obtained from the Company, Counsel or other representatives of the Company except in connection with PJT Partners' services to, and PJT Partners' relationship with, the Company, nor will PJT Partners use on the Company's behalf or have any obligation to disclose or otherwise have any liability with respect to any confidential information obtained from any other client on a confidential basis. Notwithstanding anything to the contrary provided elsewhere herein, the Company expressly acknowledges and agrees that none of the provisions of this Agreement shall in away restrict PJT Partners from being engaged or mandated by any third party, or otherwise participating or assisting with any transaction involving any other party so long as such engagement does not relate to this engagement.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect or impair such provision or the remaining provisions of this Agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement and any dispute or claim that may arise out of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

The Company hereby agrees that any action or proceeding brought by Counsel or the Company against PJT Partners or by PJT Partners against the Company or Counsel, in each case based hereon or arising out of PJT Partners' engagement hereunder, shall be brought and maintained by such party exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York; provided, if the Company commences a Chapter 11 case, all legal proceedings pertaining to this engagement arising after such case is commenced may be brought in the Bankruptcy Court handling such case. The parties irrevocably submits to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of PJT Partners' engagement hereunder and irrevocably agrees to be bound by any judgment rendered thereby in connection with such action or proceedings. Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection it may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. A facsimile of a signed copy of this Agreement or other copy made by reliable mechanical means may be relied upon as an original.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to PJT Partners the duplicate copy of this Agreement and as to the Company the indemnification agreement attached hereto as Attachment A.

Very truly yours,

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____

Name: Peter Laurinaitis
Title:   Partner


Accepted and Agreed to as
of the date first written above:

WEIL, GOTSHAL & MANGES LLP

By: _____
Name: Gary Holtzer
Title:   Partner


HALCÓN RESOURCES CORPORATION

By: _____
Name: David S. Elkouri
Title:   Executive Vice President
         Corporate Strategy & Chief Legal Officer

Rev. 01.06.2016

ATTACHMENT A

January 29, 2016

PJT Partners LP
280 Park Avenue
New York, NY 10017

INDEMNIFICATION AGREEMENT

Ladies and Gentlemen:

This letter will confirm that our counsel Weil, Gotshal & Manges, LLP ("**Counsel**") has engaged PJT Partners LP ("**PJT Partners**") to advise and assist Halcón Resources Corporation ("**Halcón**") in connection with the matters referred to in the letter of agreement, dated as of February 1, 2016, by and between PJT Partners, Counsel and the Company (the "**Engagement Letter**). In connection with the engagement of PJT Partners to advise and assist the Company as described in the attached Engagement Letter, in the event that PJT Partners becomes involved in any capacity in any claim, suit, action, proceeding, investigation or inquiry (including, without limitation, any shareholder or derivative action or arbitration proceeding) (collectively, a "**Proceeding**") in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter, including, without limitation, related services and activities prior to the date of the Engagement Letter, the Company agrees to indemnify, defend and hold PJT Partners and its affiliates, and their respective current and former directors, officers, agents, employees, attorneys and other representatives and the successors and assigns of all of the foregoing persons (each an "**Indemnified Party**") harmless to the fullest extent permitted by law, from and against any losses, claims, damages, fines, penalties, liabilities and expenses ("**Losses**") in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter, including, without limitation, related services and activities prior to the date of the Engagement Letter, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that such Losses resulted solely from the gross negligence, bad faith or willful misconduct of such Indemnified Party. In addition, in the event that any Indemnified Party becomes involved in any capacity in any Proceeding (regardless of whether or not such or any Indemnified Party is a party to or the subject of such Proceeding) in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter (including, without limitation, in enforcing the Engagement Letter), the Company will reimburse such Indemnified Party for its reasonable, documented legal and other expenses (including the cost of any investigation and preparation) as such expenses are incurred by such Indemnified Party in connection therewith; provided, if it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that Losses resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party, such Indemnified Party shall return to the Company such reimbursed amounts.

If such indemnification were not to be available due to a finding that the applicable Losses resulted from the gross negligence, bad faith or willful misconduct of any Indemnified Party, the Company agrees to contribute to the Losses involved in the proportion appropriate to reflect the relative benefits received or sought to be received by the Company and its security holders and affiliates and other constituencies, on the one hand, and the Indemnified Party, on the other hand, in connection with the matters contemplated by the Engagement Letter, or, if such allocation is determined by a court or arbitral tribunal to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of the Company or its security holders and affiliates or other constituencies, on the one hand, and of the Indemnified Parties, on the other hand; provided, however, that, to the extent permitted by applicable law, the Indemnified Parties shall not be responsible for amounts which in the aggregate are in excess of the amount of all fees actually received by PTJ Partners from the Company in connection with the engagement. The Company agrees that for the purposes of this paragraph the relative benefits received, or sought to be received, by the Company and its security holders and affiliates and other constituencies, on the one hand, and the Indemnified Party, on the other hand, in connection with the matters contemplated by the Engagement Letter shall be deemed to be in the same proportion that the total value received or paid or contemplated to be received or paid by the Company or its security holders or affiliates and other constituencies, as the case may be, as a result of or in connection with the matters (whether or not consummated) for which PJT Partners has been retained to perform financial services bears to the fees paid to PJT Partners under the Engagement Letter; provided, that in no event shall the Company contribute less than the amount necessary to assure that the Indemnified Parties, taken together, are not liable for Losses in excess of the amount of fees actually received by PJT Partners pursuant to the Engagement Letter (exclusive of amounts paid for reimbursement of expenses under the Engagement Letter).

The Company agrees that no Indemnified Party shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter, including, without limitation, related services and activities prior to the date of the Engagement Letter, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that any Losses incurred by the Company resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Party.

If any Proceeding shall be brought, threatened or asserted against an Indemnified Party in respect of which indemnity or contribution may be sought against the Company, PJT Partners shall promptly notify the Company in writing; provided that failure to so notify the Company shall not relieve the Company from any liability which the Company may have on account of this indemnity or otherwise, except to the extent the Company shall have been actually materially prejudiced by such failure. The Company, upon the written request of such Indemnified Party, shall or, upon written notice to such Indemnified Party, may elect to, assume the defense of such Proceeding, at the Company's own expense, with counsel reasonably satisfactory to such Indemnified Party. Such Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the Company has agreed in writing to pay such fees and expenses, (b) the Company has failed to assume the defense, pursue the defense reasonably diligently or to employ counsel in a timely manner, (c) outside counsel to such Indemnified Party has advised such Indemnified Party that in such Proceeding there is an actual or potential conflict of interest or a conflict on any material issue between the Company's position and the position of such Indemnified Party or (d) the named parties to any such Proceeding (including any impleaded parties) include such Indemnified Party and the Company, and outside counsel to such Indemnified Party has advised such

Indemnified Party that there may be one or more legal defenses available to such Indemnified Party which are different from or in addition to those available to the Company.

The Company agrees that, without PJT Partners' prior written consent (which shall not be unreasonably withheld, conditioned or delayed), it will not settle, compromise or consent to the entry of any judgment in any pending or threatened Proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party to such Proceeding), unless such settlement, compromise or consent (a) includes an explicit and unconditional release from the settling, compromising or consenting party of each Indemnified Party from all liability arising out of such Proceeding and (b) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, due care, loyalty, expertise or reputation of any Indemnified Party or any action or inaction by each Indemnified Party. No Indemnified Party seeking indemnification, reimbursement or contribution under this letter agreement will, without the Company's prior written consent (which shall not be unreasonably withheld, conditioned or delayed), settle, compromise, consent to the entry of any judgment or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification, reimbursement or contribution may be sought.

The Company's reimbursement, indemnification and contribution obligations under this letter agreement shall be in addition to any liability which the Company may otherwise have at law or in equity, shall not be limited by any rights PJT Partners or any other Indemnified Party may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, PJT Partners and any other Indemnified Party.

This letter agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. A facsimile of a signed copy of this letter agreement or other copy made by reliable mechanical means may be relied upon as an original.

[SIGNATURE PAGE FOLLOWS]

The provisions of this agreement shall apply to the Engagement, as well as any additional engagement of PJT Partners by us in connection with the matters which are the subject of the Engagement, and any modification of the Engagement or additional engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter and the confidentiality agreement attached to the Engagement Letter shall be governed by, and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

HALCÓN RESOURCES CORPORATION

By: _____
Name: David S. Elkouri
Title: Executive Vice President, Corporate Strategy & Chief Legal Officer

Accepted and Agreed to as
of the date first written above:

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____
Name: Peter Laurinaitis
Title: Partner