**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------x
                                                 :

**In re**                               :       **Chapter 11**
                                             :

**HALCÓN RESOURCES**        :       **Case No. 16-11724 (BLS)**
**CORPORATION,** *et al.,*       :
                                           :       **Jointly Administered**

**Debtors.[1]**                :
-------------------------------------------------------x    **RE: Docket No. 185**

### NOTICE OF FILING PLAN SUPPLEMENT IN SUPPORT OF AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION OF HALCÓN RESOURCES CORPORATION, *ET AL.* UNDER <u>CHAPTER 11 OF THE BANKRUPTCY CODE</u>

**PLEASE TAKE NOTICE** that, in accordance with Section 10.12 of the

*Amended Joint Prepackaged Plan of Reorganization of Halcón Resources Corporation,* et al.

*Under Chapter 11 of the Bankruptcy Code*, dated September 2, 2016 [Docket No. 185] (as may

be amended, modified or supplemented from time to time, the "**Plan**[2]"), Halcón Resources

Corporation ("**Holdings**") and certain of its subsidiaries and affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby file the

Plan Supplement, consisting of the following documents:

| | |
|---|---|
| Exhibit 1 | Amended Organizational Documents |
| Exhibit 2 | Amended Revolving Credit Agreement |
| Exhibit 3 | New Warrant Agreement |
| Exhibit 4 | Lease Amendments |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Halcón Resources Corporation (0684); Halcón Holdings, Inc. (5102); HK Resources, LLC (9194); The 7711 Corporation (4003); Halcón Gulf States, LLC (2976); Halcón Louisiana Operating, L.P. (9727); Halcón Field Services, LLC (0280); Halcón Energy Properties, Inc. (5292); Halcón Operating Co., Inc. (3588); Halcón Williston I, LLC (9550); Halcón Williston II, LLC (9676); Halcón Resources Operating, Inc. (4856); HRC Energy Louisiana, LLC (1433); HRC Energy Resources (WV), Inc. (2713); HRC Production Company (3501); Halcón Energy Holdings, LLC (0538); HRC Energy, LLC (5010); HK Energy, LLC (8956); HK Louisiana Operating, LLC (4549); HK Oil & Gas, LLC (0502); HK Energy Operating, LLC (8107); HRC Operating, LLC (5129). The Debtors' mailing address is 1000 Louisiana Street, Suite 6700, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Plan.

01:19222907.1

| Exhibit 5 | Amended Schedule of Rejected Contracts |
| Exhibit 6 | Management Incentive Plan |
| Exhibit 7 | Registration Rights Agreement |
| Exhibit 8 | Members of the New Board of Reorganized Holdings |
| Exhibit 9 | New Common Shares Allocation Schedule |

**PLEASE TAKE FURTHER NOTICE that the documents contained in the Plan Supplement are integral to and part of the Plan, and, if the Plan is confirmed, shall be approved in the order confirming the Plan.**

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider confirmation of the Plan (and in conjunction therewith, approval of the Plan Supplement) (the "**Confirmation Hearing**") shall be held on **September 8, 2016 at 10:30 a.m. (Eastern Time)**, before the Honorable Brennan Linehan Shannon, United States Bankruptcy Judge, in Courtroom No. 1 of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing.

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are not final, are subject to ongoing review and change, and remain subject to approval in accordance with the Plan.  The Debtors reserve the right to alter, amend, modify or supplement any of the documents contained in the Plan Supplement, including, without limitation, adding or removing any contracts or unexpired leases from the Schedule of Rejected Contracts.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan and the Disclosure Statement can be viewed for free at the website for the Debtors' claims agent, Epiq Bankruptcy Solutions, LLC ("**Epiq**"), at http://dm.epiq11.com/Halcon.  Additionally, copies of

01:19222907.1

the Plan and Disclosure Statement are available upon request by contacting Epiq at at (646) 282-

2400 or (866) 734-9393 (toll free), or sending an electronic mail message to

tabulation@epiqsystems.com with "Halcón" in the subject line or by accessing the Bankruptcy

Court's website: www.deb.uscourts.gov.  A PACER password and login are needed to access

documents on the Bankruptcy Court's website.  A PACER password can be obtained at

http://www.pacer.psc.uscourts.gov.

Dated:  September 2, 2016
        Wilmington, Delaware

/s/ Jaime Luton Chapman
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Jaime Luton Chapman (No. 4936)
Patrick A. Jackson (No. 4976)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253

-and-

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer
Joseph H. Smolinsky
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

*Attorneys for the Debtors and Debtors in Possession*

01:19222907.1

# EXHIBIT 1 TO PLAN SUPPLEMENT

# AMENDED ORGANIZATIONAL DOCUMENTS

WEIL:\95834806\3\51351.0003

WEIL DRAFT OF 9/2/16

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
HALCÓN RESOURCES CORPORATION**

Halcón Resources Corporation, a Delaware corporation (the "*Corporation*"), organized and existing under the provisions of the Delaware General Corporation Law (the "*DGCL*"), hereby certifies as follows:

1.      The present name of the Corporation is Halcón Resources Corporation.  The Corporation was originally incorporated under the name Tremisis Energy Acquisition Corporation.

2.      The original certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on February 5, 2004.  An amended and restated certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on February 8, 2012, with amendments thereto filed on February 9, 2012, with an effective date of February 10, 2012, January 17, 2013, May 23, 2013, and May 22, 2014.  A second amended and restated certificate of incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on May 6, 2015, with an amendment thereto filed on December 22, 2015, with an effective date of December 24, 2015 (the "*Certificate of Incorporation*").

3.      This Amended and Restated Certificate of Incorporation restates and integrates and further amends the Certificate of Incorporation by, among other things, amending all of the articles of the Certificate of Incorporation, and has been duly adopted pursuant to the Amended Joint Prepackaged Plan of Reorganization of Halcón Resources Corporation, et al., dated September 2, 2016 (as may be amended, supplemented, or modified from time to time, the "*Plan*"), which was confirmed by order of the United States Bankruptcy Court for the District of Delaware entered September [8], 2016, and thereby has been approved pursuant to Section 303 of the DGCL.

4.      The Certificate of Designations, Preferences, Rights and Limitations of 5.75% Series A Convertible Perpetual Preferred Stock of the Corporation (the "*Series A Preferred Stock*"), filed with the Secretary of State of the State of Delaware on June 17, 2013, has been cancelled pursuant to the Plan, and no shares of Series A Preferred Stock are outstanding.

5.      This Amended and Restated Certificate of Incorporation shall become effective as of September [9], 2016.

6.      The text of the Certificate of Incorporation is hereby restated and integrated and further amended to read in its entirety as follows:

WEIL:\95821606\8\51351.0003

## AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION
## OF
## HALCÓN RESOURCES CORPORATION

**FIRST:** The name of the corporation is Halcón Resources Corporation (the "*Corporation*").

**SECOND:** The Corporation's registered office in the State of Delaware is located at 1675 S. State Street, Suite 13, Dover, Kent County, Delaware 19901.  The name of its registered agent at such address is Capitol Services, Inc.

**THIRD:** The purpose of the Corporation shall be to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law as the same exists or may hereafter be amended (the "*DGCL*").

**FOURTH:** The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 1,001,000,000, of which 1,000,000,000 shares shall be common stock, par value $0.0001 per share ("*Common Stock*") and 1,000,000 shares shall be preferred stock, par value $0.0001 per share ("*Preferred Stock*"*).*

A.    Preferred Stock.  The Board of Directors is expressly granted authority to issue shares of the Preferred Stock, in one or more series, and to fix for each such series such voting powers, full or limited, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issue of such series (a "*Preferred Stock Designation*") and as may be permitted by the DGCL.  The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors (the "*Voting Stock*"), voting together as a single class, without a separate vote of the holders of the Preferred Stock, or any series thereof, unless a vote of any such holders is required pursuant to any Preferred Stock Designation.

B.    Common Stock.  Except as otherwise required by law or as otherwise provided in any Preferred Stock Designation, the holders of the Common Stock shall exclusively possess all voting power and each share of Common Stock shall have one vote.

C.    No Non-Voting Equity.  To the extent provided by Section 1123(a)(6) of chapter 11 of title 11 of the United States Code, the Corporation shall not be permitted to issue any non-voting equity securities; provided, however, that this provision (i) shall have no further force or effect beyond that requirement under Section 1123 of the United States Code, (ii) shall have no force and effect, if any, only for so long as Section 1123 of the United States Code is in effect and applicable to the Corporation and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

2

D.    HSR Restriction.    Notwithstanding any provision herein to the contrary, in connection with any acquisition of common stock (and/or any other voting securities of the Corporation) as to which the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "*HSR Act*"), would, but for this paragraph, be applicable, any person or entity (as defined under the HSR Act) acquiring such common stock (and/or other voting securities of the Corporation) shall have no right to vote such common stock or voting securities until such person or entity has complied with the filing and waiting period requirements of the HSR Act.

**FIFTH:** The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to the authority and powers conferred upon the Board of Directors by the DGCL or other provisions of this Certificate of Incorporation, the Board of Directors is hereby authorized and empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject to the provisions of the DGCL, this Certificate of Incorporation and the bylaws of the Corporation; provided, however, that no bylaws hereafter adopted by the stockholders of the Corporation, or any amendments thereto, shall invalidate any prior act of the Board of Directors that would have been valid if such bylaws or amendment had not been adopted.

A.    Term of Office.    The term of office of the members of the Board of Directors shall be classified with respect to the time for which each such member severally holds office into three classes: Class A, Class B and Class C. Class A shall initially consist of two (2) directors to be elected for a term expiring at the annual meeting of the stockholders to be held in 2017. Class B shall initially consist of four (4) directors (including one (1) director designated by the Requisite Unsecured Noteholders (as such term is defined in that certain Restructuring Support Agreement, dated as of June 9, 2016, by and among the Corporation and the Consenting Creditors party thereto)) to be elected for a term expiring at the annual meeting of the stockholders to be held in 2018. Class C shall initially consist of three (3) directors to be elected for a term expiring at the annual meeting of the stockholders to be held in 2019. Each director shall hold office until his or her successor is elected and qualified or until such director's earlier resignation, removal from office, death or incapacity. At each annual meeting of the stockholders commencing in 2017, the successors of the class of directors whose term expires at that meeting shall be elected to hold office for a term expiring at the annual meeting of the stockholders held in the third year following the year of their election. The Board of Directors shall have the right to reassign directors to Classes A, B and C, other than with respect to such initial classification set forth above.

B.    Vacancies.    Except as the DGCL may otherwise require, in the interim between annual meetings of the stockholders, any vacancies in the Board of Directors, including vacancies resulting from the removal of directors for cause, may be filled by the vote of the remaining directors then in office, although less than a quorum, and each director so chosen shall hold office for the unexpired portion of the full term of the director whose vacancy has been filled, or as otherwise provided by the Board of Directors.

C.    Removal of Directors by Stockholders.    Subject to any rights, contractual or otherwise, of any group or groups of shareholders to designate (and to remove such designee) a director to the Board of Directors, pursuant to Section 141(k) of the DGCL, any director or the entire Board of Directors may be removed, with or without cause, by a majority of the shares

3

then entitled to vote at an election of directors; <u>provided</u>, that the director designated by the Requisite Unsecured Noteholders as referred to in paragraph A above may only be removed prior to the expiration of such director's initial term with cause. In case any one or more directors be so removed, new directors may be elected at the same time for the unexpired portion of the full term of the director or directors so removed.

**SIXTH:** The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

A.      Election of directors need not be by written ballot unless the bylaws of the Corporation so provide.

B.      The Board of Directors shall have the power, without the assent or vote of the stockholders, to make, alter, amend, change, add to or repeal the bylaws of the Corporation as provided in the bylaws of the Corporation and without any action on the part of the stockholders, except as may be otherwise provided by applicable law.

C.      The directors in their discretion may submit any contract or act for approval or ratification at any annual meeting of the stockholders or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the stock of the Corporation which is represented in person or by proxy at such meeting and entitled to vote threat (provided that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and binding upon the Corporation and upon all the stockholders as though it had been approved or ratified by every stockholder of the Corporation, whether or not the contract or act would otherwise be open to legal attack because of directors' interests, or for any other reason.

D.      In addition to the powers and authorities hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation; subject, nevertheless, to the provisions of the statutes of Delaware, of this Certificate of Incorporation, and to any bylaws from time to time made by stockholders; provided, however, that no bylaw so made shall invalidate any prior act of the directors which would have been valid if such bylaw had not been made.

**SEVENTH:** A.      A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.  Any repeal or modification of this paragraph A by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation with respect to events occurring prior to the time of such repeal or modification.

4

WEIL:\95821606\8\51351.0003

B.    The Corporation, to the full extent permitted by Section 145 of the DGCL, as amended from time to time, shall indemnify all persons whom it may indemnify pursuant thereto.  Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized hereby.

**EIGHTH:** Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, employee or other agent of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

[Remainder of Page Intentionally Left Blank]

WEIL:\95821606\8\51351.0003

IN WITNESS WHEREOF, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of the Corporation on this [●] day of [●], 2016.

HALCÓN RESOURCES CORPORATION


By: _____
Name:
Title:

[Signature Page to Amended and Restated Certificate of Incorporation – Halcón Resources Corporation]

WEIL:\95821606\8\51351.0003

**AMENDMENT NO. 1 TO THE
FIFTH AMENDED AND RESTATED BYLAWS OF
HALCÓN RESOURCES CORPORATION
(a Delaware corporation)**

This Amendment No. 1 (this "Amendment") to the Fifth Amended and Restated Bylaws (as in effect as of the date hereof) (the "Bylaws") of Halcón Resources Corporation, a Delaware corporation, is effective as of September [9], 2016.

**Amendments to the Bylaws**

1.      Article II, Section 2.6 of the Bylaws is hereby amended and restated in its entirety by replacing such section with the following:

"2.6    Voting.    Unless otherwise required by law, the Certificate of Incorporation or these Bylaws, any question brought before any meeting of stockholders shall be decided by the vote of the holders of a majority of the stock represented at any such meeting and entitled to vote thereat; provided that if as of a date that is 14 days in advance of the date the Corporation files its definitive proxy statement (regardless of whether or not thereafter revised or supplemented) with the Securities and Exchange Commission the number of nominees exceeds the number of directors to be elected, the directors shall be elected by the vote of the holders of a plurality of the stock represented at any such meeting and entitled to vote on the election of directors. Each stockholder represented at a meeting of stockholders shall be entitled to cast one vote for each share of the capital stock entitled to vote thereat held by such stockholder, unless otherwise provided by the Certificate of Incorporation. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize any person or persons to act for him by proxy. All proxies shall be executed in writing and shall be filed with the Secretary of the Corporation not later than the day on which exercised.   No proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of stockholders, in his discretion, may require that any votes cast at such meeting shall be cast by written ballot.

2.      Article III, Section 3.2 of the Bylaws is hereby amended and restated in its entirety by replacing such section with the following:

"3.2    Election; Term of Office; Resignation; Removal; Vacancies. Each director shall hold office until the next annual meeting of stockholders at which his or her class stands for election or until such director's earlier resignation, removal from office, death or incapacity. Unless otherwise provided in the Certificate of Incorporation, vacancies and newly created directorships resulting from any increase in the authorized number of directors or from any other cause may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director, and each director so chosen shall hold office until the next annual meeting at which such appointed director's class stands for election and until such director's successor shall be duly elected and shall qualify, or until such director's earlier resignation, removal from office, death or incapacity."

WEIL:\95822783\3\51351.0003

3.      Article V, Section 5.1 of the Bylaws is hereby amended and restated in its entirety by replacing such section with the following:

"5.1      Stock Certificates; Uncertificated Shares.    Every holder of stock in the Corporation shall be entitled to have a certificate signed, in the name of the Corporation by any two authorized officers of the Corporation representing the number of shares registered in certificate form.    Any or all the signatures on the certificate may be a facsimile."

4.      Effect upon the Bylaws.    Except as specifically set forth herein, the Bylaws shall remain in full force and effect, and is hereby ratified and confirmed.

**EXHIBIT 2 TO PLAN SUPPLEMENT**

**AMENDED REVOLVING CREDIT AGREEMENT**

WEIL:\95834806\3\51351.0003

**EXECUTION VERSION**

**SENIOR SECURED REVOLVING CREDIT AGREEMENT**

**DATED AS OF**
**[●], 2016**

**AMONG**

**HALCÓN RESOURCES CORPORATION,**
**AS BORROWER,**

**JPMORGAN CHASE BANK, N.A.,**
**AS ADMINISTRATIVE AGENT,**

**AND**

**THE LENDERS PARTY HERETO**

---

**JPMORGAN CHASE BANK, N.A., WELLS FARGO SECURITIES, LLC, BARCLAYS BANK PLC AND BMO CAPITAL MARKETS**
**AS JOINT LEAD ARRANGERS AND JOINT BOOKRUNNERS**

---

509265-1666-Active.19779355.12

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01   Terms Defined Above ................................................................................2
Section 1.02   Certain Defined Terms ..............................................................................2
Section 1.03   Types of Loans and Borrowings ..............................................................32
Section 1.04   Terms Generally; Rules of Construction..................................................32
Section 1.05   Accounting Terms and Determinations; GAAP........................................32

## ARTICLE II
## THE CREDITS

Section 2.01   Commitments.............................................................................................33
Section 2.02   Loans and Borrowings ..............................................................................33
Section 2.03   Requests for Borrowings...........................................................................34
Section 2.04   Interest Elections.......................................................................................35
Section 2.05   Funding of Borrowings .............................................................................36
Section 2.06   Termination and Reduction of Aggregate Maximum Credit Amounts......37
Section 2.07   Borrowing Base.........................................................................................37
Section 2.08   Borrowing Base Adjustment Provisions. ..................................................39
Section 2.09   Letters of Credit ........................................................................................40

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01   Repayment of Loans ..................................................................................44
Section 3.02   Interest.......................................................................................................44
Section 3.03   Alternate Rate of Interest ..........................................................................45
Section 3.04   Prepayments. .............................................................................................45
Section 3.05   Fees ...........................................................................................................47

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01   Payments Generally; Pro Rata Treatment; Sharing of Set-offs..................48
Section 4.02   Presumption of Payment by the Borrower .................................................49
Section 4.03   Certain Deductions by the Administrative Agent .......................................49
Section 4.04   Disposition of Proceeds ............................................................................50
Section 4.05   Payments and Deductions to a Defaulting Lender......................................50

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01   Increased Costs .........................................................................................52
Section 5.02   Break Funding Payments ..........................................................................53
Section 5.03   Taxes .........................................................................................................53
Section 5.04   Mitigation Obligations; Replacement of Lenders ......................................56

## ARTICLE VI
## CONDITIONS PRECEDENT

Section 6.01   Closing Date...............................................................................................57
Section 6.02   Each Credit Event ......................................................................................60

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

Section 7.01   Organization; Powers.................................................................................61
Section 7.02   Authority; Enforceability ...........................................................................61

509265-1666-Active.19779355.12

Section 7.03  Approvals; No Conflicts ................................................................................ 61
Section 7.04  Financial Condition; No Material Adverse Effect ........................................ 62
Section 7.05  Litigation. ...................................................................................................... 62
Section 7.06  Environmental Matters .................................................................................. 63
Section 7.07  Compliance with the Laws and Agreements; No Defaults ........................... 64
Section 7.08  Investment Company Act ............................................................................... 64
Section 7.09  Taxes ............................................................................................................. 64
Section 7.10  ERISA ........................................................................................................... 64
Section 7.11  Disclosure; No Material Misstatements ....................................................... 65
Section 7.12  Insurance ...................................................................................................... 65
Section 7.13  Restriction on Liens ...................................................................................... 65
Section 7.14  Subsidiaries .................................................................................................. 65
Section 7.15  Location of Business and Offices .................................................................. 66
Section 7.16  Properties; Titles, Etc ................................................................................... 66
Section 7.17  Maintenance of Properties ............................................................................ 67
Section 7.18  Gas Imbalances, Prepayments ...................................................................... 67
Section 7.19  Marketing of Production ............................................................................... 67
Section 7.20  Swap Agreements .......................................................................................... 68
Section 7.21  Use of Loans and Letters of Credit .............................................................. 68
Section 7.22  Solvency ........................................................................................................ 68
Section 7.23  Money Laundering ........................................................................................ 68
Section 7.24  Foreign Corrupt Practices ............................................................................ 69
Section 7.25  Anti-Corruption Laws; Sanctions; OFAC .................................................... 69
Section 7.26  EEA Financial Institutions ........................................................................... 69

ARTICLE VIII
AFFIRMATIVE COVENANTS

Section 8.01  Financial Statements; Other Information ...................................................... 69
Section 8.02  Notices of Material Events ............................................................................ 73
Section 8.03  Existence; Conduct of Business ..................................................................... 73
Section 8.04  Payment of Obligations ................................................................................. 73
Section 8.05  Performance of Obligations under Loan Documents ..................................... 74
Section 8.06  Operation and Maintenance of Properties .................................................... 74
Section 8.07  Insurance ...................................................................................................... 74
Section 8.08  Books and Records; Inspection Rights .......................................................... 75
Section 8.09  Compliance with Laws ................................................................................... 75
Section 8.10  Environmental Matters .................................................................................. 75
Section 8.11  Further Assurances ....................................................................................... 76
Section 8.12  Reserve Reports ............................................................................................ 76
Section 8.13  Title Information ............................................................................................ 77
Section 8.14  Additional Collateral; Additional Guarantors ............................................. 78
Section 8.15  ERISA Compliance ........................................................................................ 79
Section 8.16  Account Control Agreements; Location of Proceeds of Loans ...................... 79
Section 8.17  Unrestricted Subsidiaries ............................................................................. 79
Section 8.18  Marketing Activities ...................................................................................... 80
Section 8.19  Keepwell ........................................................................................................ 80

ARTICLE IX
NEGATIVE COVENANTS

Section 9.01  Financial Covenants ...................................................................................... 80
Section 9.02  Indebtedness .................................................................................................. 81

ii

Section 9.03    Liens................................................................................................83
Section 9.04    Restricted Payments; Repayment of Second Lien Notes; Restrictions on Amendments of Permitted Unsecured Indebtedness and Permitted Junior indebtedness ...........................................................................83
Section 9.05    Investments, Loans and Advances ..........................................................84
Section 9.06    Designation and Conversion of Restricted and Unrestricted Subsidiaries; Indebtedness of Unrestricted Subsidiaries...................................86
Section 9.07    Nature of Business; International Operations ..........................................86
Section 9.08    Reserved...............................................................................................86
Section 9.09    Proceeds of Loans ................................................................................86
Section 9.10    ERISA Compliance...............................................................................87
Section 9.11    Sale or Discount of Receivables ...........................................................87
Section 9.12    Merger, Etc...........................................................................................87
Section 9.13    Sale of Properties .................................................................................88
Section 9.14    Environmental Matters..........................................................................89
Section 9.15    Transactions with Affiliates ..................................................................89
Section 9.16    Subsidiaries ..........................................................................................89
Section 9.17    Negative Pledge Agreements; Dividend Restrictions .............................89
Section 9.18    Gas Imbalances, Take-or-Pay or Other Prepayments ............................90
Section 9.19    Swap Agreements .................................................................................90

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01    Events of Default ................................................................................91
Section 10.02    Remedies..............................................................................................93

## ARTICLE XI
## THE AGENTS

Section 11.01    Appointment; Powers.............................................................................94
Section 11.02    Duties and Obligations of Administrative Agent.....................................95
Section 11.03    Action by Administrative Agent .............................................................95
Section 11.04    Reliance by Administrative Agent ..........................................................96
Section 11.05    Subagents .............................................................................................96
Section 11.06    Resignation of Agents............................................................................96
Section 11.07    Agents as Lenders .................................................................................97
Section 11.08    No Reliance............................................................................................97
Section 11.09    Administrative Agent May File Proofs of Claim......................................97
Section 11.10    Authority of Administrative Agent to Release Collateral and Liens ..........98
Section 11.11    The Arrangers, the Syndication Agent and the Documentation Agent........98
Section 11.12    Credit Bidding.......................................................................................98

## ARTICLE XII
## MISCELLANEOUS

Section 12.01    Notices .................................................................................................99
Section 12.02    Waivers; Amendments...........................................................................100
Section 12.03    Expenses, Indemnity; Damage Waiver ...................................................102
Section 12.04    Successors and Assigns..........................................................................104
Section 12.05    Survival; Revival; Reinstatement............................................................107
Section 12.06    Counterparts; Integration; Effectiveness.................................................108
Section 12.07    Severability ..........................................................................................108
Section 12.08    Right of Setoff......................................................................................108

509265-1666-Active.19779355.12

iv

Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL ................................................................ 109
Section 12.10    Headings ................................................................................................... 110
Section 12.11    Confidentiality ......................................................................................... 110
Section 12.12    Interest Rate Limitation ........................................................................... 111
Section 12.13    EXCULPATION PROVISIONS ............................................................. 112
Section 12.14    Collateral Matters; Swap Agreements ..................................................... 112
Section 12.15    No Third Party Beneficiaries ................................................................... 112
Section 12.16    USA Patriot Act Notice ........................................................................... 112
Section 12.17    Flood Insurance Provisions ...................................................................... 112
Section 12.18    No Fiduciary Duty ................................................................................... 113
Section 12.19    Releases .................................................................................................... 113
Section 12.20    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .............. 113

509265-1666-Active.19779355.12

**ANNEXES, EXHIBITS AND SCHEDULES**

Annex I                  List of Maximum Credit Amounts

Exhibit A                Form of Note
Exhibit B                Form of Borrowing Request
Exhibit C                Form of Interest Election Request
Exhibit D                Form of Compliance Certificate
Exhibit E                Security Instruments
Exhibit F                Form of Assignment and Assumption
Exhibit G-1              Form of U.S. Tax Compliance Certificate
                         (Foreign Lenders; not partnerships)
Exhibit G-2              Form of U.S. Tax Compliance Certificate
                         (Foreign Participants; not partnerships)
Exhibit G-3              Form of U.S. Tax Compliance Certificate
                         (Foreign Participants; partnerships)
Exhibit G-4              Form of U.S. Tax Compliance Certificate
                         (Foreign Lenders; partnerships)
Exhibit H                Form of Solvency Certificate
Exhibit I                Form of Perfection Certificate
Exhibit J                Form of Reserve Report Certificate
Exhibit K                Form of Guaranty and Collateral Agreement

Schedule 1.02(a)         Existing Letters of Credit
Schedule 1.02(b)         Existing Secured Swap Agreements
Schedule 7.05            Litigation
Schedule 7.14            Subsidiaries and Partnerships; Unrestricted Subsidiaries
Schedule 7.18            Gas Imbalances
Schedule 7.19            Marketing Contracts
Schedule 7.20            Swap Agreements
Schedule 9.02            Existing Indebtedness
Schedule 9.03            Existing Liens
Schedule 9.05            Investments

509265-1666-Active.19779355.12

**THIS SENIOR SECURED REVOLVING CREDIT AGREEMENT** (this "Agreement') dated as of [●], 2016 is among Halcón Resources Corporation, a corporation duly formed and existing under the laws of the State of Delaware and as reorganized pursuant to the Plan of Reorganization referred to below (the "Borrower"); each of the Lenders and other parties from time to time party hereto; and JPMorgan Chase Bank, N.A. (in its individual capacity, "JPMorgan"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent").

## R E C I T A L S

A.    Reference is made to that certain (a) Senior Revolving Credit Agreement, dated as of February 8, 2012 (as amended, supplemented, restated or otherwise modified prior to the date hereof, the "Pre-Petition Credit Agreement"), among the Borrower, the lenders and other parties from time to time party thereto and JPMorgan, as administrative agent and (b) Restructuring Support Agreement, dated as of June 9, 2016, among the Borrower, certain subsidiaries of the Borrower and certain of the holders of the Third Lien Notes, the Unsecured Notes, the Convertible Notes and the Preferred Equity (in each case, as defined in the DIP Credit Agreement referenced below) (as amended, supplemented or otherwise modified in a manner satisfactory to the Majority Lenders, the "Restructuring Support Agreement"). Pursuant to the Restructuring Support Agreement, the Borrower and the other parties thereto agreed to a restructuring of the Borrower and its Subsidiaries.

B.    In furtherance of the Restructuring Support Agreement, (a) on July 27, 2016 (the "Petition Date"), the Borrower and certain of its Subsidiaries (collectively, the "Debtors") filed voluntary petitions to commence cases (the "Chapter 11 Cases") under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code and (b) on August 1, 2016, the Borrower entered into a debtor in possession credit agreement (as amended, supplemented or otherwise modified prior to the date hereof, the "DIP Credit Agreement") with JPMorgan, as administrative agent, and the lenders and other parties party thereto, pursuant to which the lenders party thereto (the "DIP Lenders") agreed to make available a $600.0 million debtor-in-possession revolving credit facility (the "DIP Facility"), subject to the terms and conditions therein.

C.    Pursuant to the orders of the Bankruptcy Court approving the DIP Facility (the "DIP Orders"), all of the obligations under the Pre-Petition Credit Agreement, together with certain outstanding swap agreements with lenders thereunder and affiliates thereof were accorded superpriority administrative claim status in the Chapter 11 Cases and were secured by Liens on the DIP Collateral under, and as defined in, the DIP Orders, in each case as more fully set forth in the DIP Orders.

D.    In furtherance of the Restructuring Support Agreement, the Debtors filed the Approved Plan (as defined in the DIP Credit Agreement and as used herein, the "Plan of Reorganization") with the Bankruptcy Court on [●], 2016, and the Disclosure Statement (as defined in the DIP Credit Agreement and as used herein, the "Disclosure Statement") with the Bankruptcy Court on [●], 2016.

E.    On [●], 2016, the Bankruptcy Court entered the Confirmation Order (as defined in the DIP Credit Agreement and as used herein, the "Confirmation Order") confirming the Plan of Reorganization, which Confirmation Order *inter alia* authorized and approved the refinancing, refunding and Debtors' entry into and performance under this Agreement.

F.    Pursuant to the DIP Credit Agreement, the DIP Facility and all obligations outstanding thereunder shall be refunded, refinanced and repaid in full by a conversion or roll-over

1

thereof into the credit facility under this Agreement with the Loans and Letters of Credit deemed made hereunder, subject to satisfaction (or waiver) of the conditions precedent set forth in Section 2.12 of the DIP Credit Agreement and Article VI hereof, including without limitation, the consummation of the Plan of Reorganization.

G.    In consideration of the foregoing and the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01    Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"2020 Second Lien Notes" means, the Borrower's 8.625% Senior Secured Notes due 2020 pursuant to the 2020 Second Lien Notes Indenture.

"2020 Second Lien Notes Indenture" means, the Indenture, dated as of May 1, 2015, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented, restated or otherwise modified as of the Closing Date, and thereafter as may be further amended, supplemented, restated or otherwise modified in accordance with the terms hereof.

"2022 Second Lien Notes" means the Borrower's 12.0% Second Lien Senior Secured Notes due 2022 pursuant to the 2022 Second Lien Notes Indenture.

"2022 Second Lien Notes Indenture" means, the Indenture, dated as of December 21, 2015, among the Borrower, the Restricted Subsidiaries party thereto and U.S. Bank National Association, as trustee, as amended, supplemented, restated or otherwise modified as of the Closing Date, and thereafter as may be further amended, supplemented, restated or otherwise modified in accordance with the terms hereof.

"ABR" means, when used in reference to any Loan or Borrowing, whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Accounting Change" has the meaning assigned to such term in Section 1.05.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate *per annum* (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" has the meaning assigned to such term in the preamble hereto.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

2

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agents" means, collectively, the Administrative Agent, the Syndication Agent and the Documentation Agent; and "Agent" shall mean either the Administrative Agent, the Syndication Agent or any Documentation Agent, as the context requires.

"Aggregate Maximum Credit Amounts" at any time shall equal the sum of the Maximum Credit Amounts of all Lenders, as the same may be reduced or terminated pursuant to Section 2.06. The Aggregate Maximum Credit Amounts on the Closing Date is $600.0 million.

"Agreement" means this Senior Secured Revolving Credit Agreement, including the Schedules and Exhibits hereto, as the same may be amended, supplemented or modified from time to time.

"Alternate Base Rate" means, for any day, a rate *per annum* (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.0% and (c) the Adjusted LIBO Rate for an Interest Period of one month on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.0%.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  In no event shall the Alternate Base Rate be negative.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Margin" means, for any day, with respect to any ABR Loan or Eurodollar Loan or the Commitment Fee Rate, as the case may be, the rate *per annum* set forth in the Borrowing Base Utilization Percentage grid below based upon the Borrowing Base Utilization Percentage then in effect:

| Level | Borrowing Base Utilization Percentage | Eurodollar Loans | ABR Loans | Commitment Fee Rate |
|-------|--------------------------------------|------------------|-----------|---------------------|
| 1 | ≥ 90% | 3.75% | 2.75% | 0.50% |
| 2 | ≥ 75% < 90% | 3.50% | 2.50% | 0.50% |
| 3 | ≥ 50% < 75% | 3.25% | 2.25% | 0.50% |
| 4 | ≥ 25% < 50% | 3.00% | 2.00% | 0.50% |
| 5 | < 25% | 2.75% | 1.75% | 0.50% |

Each change in the Applicable Margin or Commitment Fee Rate shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change; provided, however, that if at any time the Borrower fails to

3

deliver a Reserve Report pursuant to Section 8.12(a), then the "Applicable Margin" and "Commitment Fee Rate" mean the rate *per annum* set forth on the grid when the Borrowing Base Utilization Percentage is at its highest level.

"Applicable Percentage" means, with respect to any Lender, the percentage of the Aggregate Maximum Credit Amounts represented by such Lender's Maximum Credit Amount as such percentage as of the Closing Date is set forth on Annex I.

"Approved Counterparty" means (a) any Lender or any Affiliate of a Lender or (b) any other Person whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher.

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means Netherland, Sewell & Associates, Inc. and any other independent petroleum engineers reasonably acceptable to the Administrative Agent.

"Arrangers" means, collectively, JPMorgan, Wells Fargo Securities, LLC, Barclays Bank PLC and BMO Capital Markets, in their capacities as joint lead arrangers and joint bookrunners.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability Period" means the period from and including the Closing Date to but excluding the Termination Date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products" means treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services).

"Bank Products Provider" means any Lender or Affiliate of a Lender that provides Bank Products to the Borrower or any Restricted Subsidiary.

"Bankruptcy Code" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

4

"Bankruptcy Event" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base" means at any time an amount equal to the amount determined in accordance with Section 2.07, as the same may be redetermined or adjusted from time to time pursuant to the Borrowing Base Adjustment Provisions.

"Borrowing Base Adjustment Provisions" means Section 2.08(a), Section 2.08(b), Section 2.08(c) and any other provision hereunder which adjusts (as opposed to redetermines) the amount of the Borrowing Base.

"Borrowing Base Cap" means an amount equal to 65% of the discounted future net revenue before state or federal income taxes from Proved Reserves of the Borrower and its Restricted Subsidiaries calculated using Modified ACNTA Prices (after giving effect to commodity derivatives contracts in effect as of the date of determination) but otherwise calculated in accordance with SEC guidelines, as estimated in the most recent Reserve Report after giving effect to exploration and production activities, acquisitions, dispositions and production since the date of such Reserve Report in the same manner as would be given in calculating Modified ACNTA.

"Borrowing Base Deficiency" occurs if, at any time, the total Revolving Credit Exposures exceeds the total Commitments then in effect; provided, that, for purposes of determining the existence and amount of any Borrowing Base Deficiency, obligations under any Letter of Credit will not be deemed to be outstanding to the extent such obligations are cash collateralized in the manner set forth in Section 2.09(j).

"Borrowing Base Properties" means the Oil and Gas Properties that (a) are included in the Initial Reserve Report and thereafter in the most recently delivered Reserve Report delivered pursuant to Section 8.12 and (b) are given Borrowing Base credit.

"Borrowing Base Utilization Percentage" means, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

5

509265-1666-Active.19779355.12

"Borrowing Base Value" means, with respect to any Oil and Gas Property or any Swap Agreement, the value attributed to such asset in connection with the most recent determination of the Borrowing Base as reasonably determined by the Administrative Agent.

"Borrowing Request" means a request by the Borrower, substantially in the form of Exhibit B, for a Borrowing in accordance with Section 2.03.

"Building" has the meaning assigned to such term in Section 12.17.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed; and if such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Cash Equivalent" means cash held in US dollars and all Investments of the type identified in Section 9.05(c) through Section 9.05(f).

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Restricted Subsidiaries.

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person (other than a Permitted Holder) or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC (other than a group of Permitted Holders) thereunder as in effect on the Closing Date) of Equity Interests representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower, (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were not (i) directors of the Borrower on the Closing Date, (ii) nominated or appointed by the board of directors of the Borrower nor (iii) approved by the board of directors of the Borrower as director candidates prior to their election or (c) a Specified Change of Control shall have occurred.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 5.01(b)), by any lending office of such Lender or by such Lender's or the Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant

6

to Basel III (but not Basel II), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, issued, adopted, promulgated or implemented.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Closing Date" means [●], 2016 which, is the date on which the conditions specified in Section 6.01 are satisfied (or waived in accordance with Section 12.02).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Instrument.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make or continue Loans and to acquire participations in Letters of Credit hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) modified from time to time pursuant to Section 2.06 and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b). The amount representing each Lender's Commitment shall, at any time, be the lesser of such Lender's Maximum Credit Amount and such Lender's Applicable Percentage of the then effective Borrowing Base.

"Commitment Fee Rate" has the meaning assigned to such term in the definition of "Applicable Margin".

"Commodities Account" has the meaning assigned to such term in the UCC.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means the Compliance Certificate, signed by a Financial Officer, substantially in the form of Exhibit D.

"Confirmation Order" has the meaning assigned to such term in the recitals hereto.

"Consolidated Cash Balance" means, at any time, (a) the aggregate amount of cash and cash equivalents, marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds, commercial paper and Cash Equivalents, in each case, held or owned by (either directly or indirectly), credited to the account of or would otherwise be required to be reflected as an asset on the balance sheet of the Borrower and its Restricted Subsidiaries less (b) the sum of (i) any restricted cash or Cash Equivalents to pay royalty obligations, working interest obligations, suspense payments, severance taxes, payroll, payroll taxes, other taxes, employee wage and benefit payments and trust and fiduciary obligations or other obligations of the Borrower or any Restricted Subsidiary to third parties and for which the Borrower or such Restricted Subsidiary has issued checks or has initiated wires or ACH transfers (or will issue checks or initiate wires or ACH transfers within fifteen (15) days in order to make such payments), (ii) other amounts for which the Borrower or such Restricted Subsidiary has issued checks or has initiated wires or ACH transfers but which have not yet been subtracted from the balance in the relevant account of the Borrower or such Restricted Subsidiary and (iii) while and to the extent refundable, any cash or Cash Equivalents of the Borrower or any Restricted Subsidiary constituting

7

purchase price deposits held in escrow pursuant to a binding and enforceable purchase and sale agreement with a third party containing customary provisions regarding the payment and refunding of such deposits.

"Consolidated Cash Balance Threshold" means $100.0 million.

"Consolidated Net Income" means, with respect to the Borrower and its Consolidated Restricted Subsidiaries for any period, the aggregate of the net income (or loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; provided that there shall be excluded therefrom:

(a)    the net income (or loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting, except to the extent of the amount of dividends or distributions actually paid in cash during such period by such other Person to the Borrower or to a Consolidated Restricted Subsidiary;

(b)    the net income of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument or Governmental Requirement applicable to that Restricted Subsidiary or its stockholders;

(c)    any gains or losses attributable to any write-ups or write-downs of assets, including ceiling test write-downs;

(d)    any unrealized non-cash gains or losses or charges in respect of hedge or non-hedge derivatives resulting from the application of ASC 815;

(e)    any gain (or loss), together with any related provision for Taxes on such gain (or loss), realized in connection with: (a) any Disposition which is not made in the ordinary course of business or (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries;

(f)    any extraordinary or non-recurring gain (or loss), together with any related provision for Taxes on such extraordinary or non-recurring gain (or loss);

(g)    any income attributable to cancellation or early extinguishment of any Indebtedness of the Borrower or any Consolidated Restricted Subsidiaries; and

(h)    any non-cash compensation charge arising from any grant of stock, stock options or other equity-based awards.

"Consolidated Restricted Subsidiaries" means any Restricted Subsidiaries that are Consolidated Subsidiaries.

"Consolidated Subsidiaries" means, as to any Person, each Subsidiary of such Person (whether now existing or hereafter created or acquired) the financial statements of which shall be (or should have been) consolidated with the financial statements of such Person in accordance with GAAP.

509265-1666-Active.19779355.12

"Consolidated Total Net Debt" means as of any date of determination, the aggregate principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries, without duplication, outstanding on such date, in an amount that would be reflected on a consolidated balance sheet (excluding the notes thereto) prepared as of such date on a consolidated basis in accordance with GAAP but only to the extent such Indebtedness comprises Indebtedness for borrowed money, obligations in respect of Capital Leases and debt obligations evidenced by bonds, notes, debentures, promissory notes or similar instruments (including, for the avoidance of doubt, deferred purchase price obligations that would be reflected as debt on a consolidated balance sheet (excluding the notes thereto) prepared as of such date on a consolidated basis in accordance with GAAP, to the extent such deferred purchase price obligations are then due and payable), and any obligations in respect of drawn letters of credit minus the aggregate amount of all Unrestricted Cash that would be listed on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries at such date; provided that Consolidated Total Net Debt shall not include Indebtedness in respect of obligations under Swap Agreements, other than to the extent such obligations are due and payable and not paid on such date, or, undrawn (or if drawn, to the extent cash collateralized in the manner set forth in Section 2.09(j)) letters of credit, bank guarantees and performance or similar bonds.

"Consolidated Unrestricted Subsidiaries" means any Unrestricted Subsidiaries that are Consolidated Subsidiaries.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means a deposit account control agreement or securities account control agreement (or similar agreement), as applicable, in form and substance reasonably satisfactory to the Administrative Agent, executed by the applicable Loan Party, the Administrative Agent and the relevant financial institution party thereto. Such agreement shall provide a first priority perfected Lien (subject to Excepted Liens set forth in clause (e) of the definition thereof) in favor of the Administrative Agent, for the benefit of the Secured Parties, in the applicable Loan Party's Deposit Account and/or Securities Account.

"Controlled Account" means (a) a Deposit Account, Securities Account or Commodities Account that is subject to a Control Agreement or (b) in the sole discretion of the Administrative Agent, a Deposit Account, Securities Account or Commodities Account maintained with the Administrative Agent or on which the Administrative Agent has a perfected first priority Lien (subject to Excepted Liens set forth in clause (e) of the definition thereof).

"Current Assets" means, as of any date of determination, without duplication, the sum of all amounts that would, in accordance with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date, plus the unused Commitments, but excluding all non-cash assets under FASB ASC Topic 815 and any deferred income tax.

"Current Liabilities" means, as of any date of determination, without duplication, the sum of all amounts that would, in accordance with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries on

9

such date, but excluding (a) all non-cash obligations under FASB ASC Topic 815, (b) the current portion of the then outstanding aggregate principal amount of the Loans under this Agreement, (c) any deferred tax liabilities and (d) any current maturities of long-term Indebtedness.

"Current Ratio" means, for any date of determination, the ratio of (a) Current Assets as of the last day of the most recently ended fiscal quarter (which may be such date of determination) to (b) Current Liabilities on such day.

"Debtors" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender, as reasonably determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans or participations in Letters of Credit within three (3) Business Days of the date required to be funded by it hereunder, unless with respect to the Loans, the subject of a good faith dispute, (b) notified the Borrower, the Administrative Agent, the Issuing Bank or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement, unless the reason such Lender is not complying with such obligations is due to a good faith dispute with regard to such obligations, (c) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three (3) Business Days of the date when due, unless the subject of a good faith dispute, (d) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, provided that a Lender shall not be a Defaulting Lender solely by virtue of (i) the ownership or acquisition of any Equity Interest in such Lender or parent company thereof by a Governmental Authority or agency thereof or (ii) due to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or its parent company under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation), or (e) has, or has a direct or indirect parent company that has, become the subject of a Bankruptcy Event or Bail-In Action.

"Deficiency Date" has the meaning assigned to such term in Section 3.04(c)(ii).

"Deposit Account" has the meaning assigned to such term in the UCC.

"DIP Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"DIP Facility" has the meaning assigned to such term in the recitals hereto.

"DIP Lenders" has the meaning assigned to such term in the recitals hereto.

"Disclosure Statement" has the meaning assigned to such term in the recitals hereto.

10

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer, condemnation or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Indebtedness or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, on or prior to the date that is one year after the Maturity Date.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Restricted Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EBITDA" means, for any period, an amount determined for the Borrower and its Consolidated Restricted Subsidiaries equal to the sum of Consolidated Net Income for such period plus the following expenses or charges to the extent deducted from Consolidated Net Income in such period: (a) interest, (b) income taxes, (c) depreciation, (d) depletion, (e) amortization, (f) all other non-cash charges, (g) the amount of non-recurring expenses and charges in an amount not to exceed 10% of EBITDA (prior to giving effect to such addbacks) for such period in the aggregate during such time and (h) any fees, expenses and other transaction costs which are incurred through June 30, 2017, in connection with the Transactions, the "Transactions" (as defined in the DIP Credit Agreement), the Chapter 11 Cases and the other transactions contemplated hereby or thereby, minus all non-cash income (including cancellation of indebtedness income) to the extent included in Consolidated Net Income.

"ECP" means any Person who qualifies as an "eligible contract participant" under Section 2(e) of the Commodity Exchange Act.

"EEA Financial Institution" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Engineering Reports" has the meaning assigned to such term in Section 2.07(c)(i).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to health, safety the environment or the preservation or reclamation of natural resources, in effect in any and all jurisdictions in which the Borrower or any Restricted Subsidiary is conducting or at any time has conducted business, or where any Property of the Borrower or any Restricted Subsidiary is located, including without limitation, the Oil Pollution Act of 1990 ("OPA"), as amended, the Clean Air Act, as

11

amended, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, the Federal Water Pollution Control Act, as amended, the Occupational Safety and Health Act of 1970, as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Safe Drinking Water Act, as amended, the Toxic Substances Control Act, as amended, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Hazardous Materials Transportation Act, as amended, and other environmental conservation or protection Governmental Requirements. For the purpose of this definition, (i) the term "oil" shall have the meaning specified in OPA, (ii) the terms "hazardous substance" and "release" (or "threatened release") have the meanings specified in CERCLA, (iii) the terms "solid waste" and "disposal" (or "disposed") have the meanings specified in RCRA and (iv) the term "oil and gas waste" shall have the meaning specified in Section 91.1011 of the Texas Natural Resources Code ("Section 91.1011"); provided, however, that (a) in the event either OPA, CERCLA, RCRA or Section 91.1011 is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and (b) to the extent the laws of the state or other jurisdiction in which any Property of the Borrower or any Restricted Subsidiary is located establish a meaning for "oil," "hazardous substance," "release," "solid waste," "disposal" or "oil and gas waste" which is broader than that specified in either OPA, CERCLA, RCRA or Section 91.1011, such broader meaning shall apply.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 10.01.

"Excepted Liens" means: (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (c) landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of obligations that are not more than sixty (60) days delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (d) contractual Liens which arise in the ordinary course of

12

business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not more than sixty (60) days delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (e) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of its Restricted Subsidiaries to provide collateral to the depository institution; (f) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any Restricted Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, which in the aggregate do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Restricted Subsidiary or materially impair the value of such Property subject thereto; (g) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (h) judgment and attachment Liens not giving rise to an Event of Default, provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced; (i) Liens arising from UCC financing statement filings regarding operating leases entered into in the ordinary course of business covering only the Property under any such operating lease; (j) Liens listed on the exhibits to the Security Instruments with respect to the Oil and Gas Properties of Borrower and each of its Restricted Subsidiaries, so long as such Liens (1) do not reduce the Net Revenues Interest (or "NRI" or terms of similar effect) attributable to any well, unit or lease included in the Oil and Gas Properties of Borrower and its Restricted Subsidiaries, materially below that shown on such exhibits to the Security Instruments or (2) increase the Working Interest (or "WI" or terms of similar effect) attributable to any well, unit or lease included in the Oil and Gas Properties of Borrower and its Restricted Subsidiaries, materially above that shown on such exhibits to the Security Instruments; and (k) Liens pursuant to merger agreements, stock purchase agreements, asset sale agreements and similar agreements (1) limiting the transfer of properties and assets pending the consummation of the  subject transaction, or (2) in respect of earnest money deposits, good faith deposits, purchase price adjustment and indemnity escrows and similar deposit or escrow arrangements made or established thereunder; provided, further that Liens described in clauses (a) through (e) shall remain "Excepted Liens" only for so long as no action to enforce such Lien has been commenced and no intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of such Excepted Liens.

"Excluded Accounts" means (a) Deposit Accounts the balance of which consists exclusively of (i) withheld income Taxes and federal, state or local employment Taxes required to be paid

13

to the Internal Revenue Service or state or local Governmental Authorities with respect to employees of the Borrower or any Restricted Subsidiary, (ii) amounts required to be paid over to an employee benefit plan on behalf of or for the benefit of employees of the Borrower or any Restricted Subsidiary, (iii) amounts set aside for payroll and the payment of accrued employee benefits, medical, dental and employee benefits claims to employees of the Borrower or any Restricted Subsidiary, (iv) amounts constituting purchase price deposits held in escrow pursuant to a purchase and sale agreement with a third party containing customary provisions regarding the payment and refunding of such deposits, (v) amounts held in escrow or in trust pending litigation or other settlement claims, and (vi) amounts held in trust or as fiduciaries for third parties in respect of such third party's ratable share of the revenues of Oil and Gas Properties and (b) other accounts so long as the aggregate balance for all such bank accounts excluded pursuant to this clause (b) on any day shall not exceed $7.5 million.

"Excluded Swap Obligation" means (as such definition may be modified from time to time as agreed by the Borrower and the Administrative Agent), with respect to any Guarantor, any Swap Obligation, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order thereunder (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one Swap Agreement, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Agreements for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Guarantor hereunder or under any other Loan Document, (a) income, branch profits or franchise taxes imposed on (or measured by) its net income by any jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) in the case of a Lender (other than an assignee pursuant to a request by the Borrower under Section 5.04(b)), any United States federal withholding Tax that is imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such federal withholding Tax pursuant to Section 5.03, (c) Taxes attributable to such Lender's failure to comply with Section 5.03(e) and (d) any United States federal withholding Tax that is imposed under FATCA.

"Existing Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of May 1, 2015, among the Administrative Agent, U.S. Bank National Association, as trustee, and the Borrower, as amended, supplemented or otherwise modified as of the date hereof and reinstated pursuant to the Plan of Reorganization and the Confirmation Order, and as hereafter amended, supplemented or otherwise modified from time to time.

"Existing Letters of Credit" means the letters of credit described on Schedule 1.02(a) that are outstanding under the DIP Credit Agreement immediately prior to giving effect to the Closing Date and which, on the Closing Date, shall be refunded, refinanced or replaced and deemed issued under this Agreement.

14

"Existing Loans" means the Loans under, and as defined in, the Pre-Petition Credit Agreement that are outstanding immediately prior to giving effect to the Closing Date and, which, on the Closing Date, shall be deemed made under this Agreement.

"Existing Secured Swap Agreements" means the Swap Agreements described on Schedule 1.02(b), which shall be secured with the Secured Obligations pursuant to this Agreement and the other Loan Documents.

"Exit Facility" means the revolving credit facility provided under this Agreement.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement between the United States and any other such jurisdiction that facilitates the implementation of the foregoing.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person.  Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Statements" means the financial statement or statements of the Borrower and its Consolidated Subsidiaries referred to in Section 7.04(a).

"Foreign Lender" means any Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.05.

"Gas Balancing Obligations" means those obligations set forth on Schedule 7.18.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Borrower, any Restricted Subsidiary, any of their Properties, any Agent, the Issuing Bank or any Lender.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including, without

15

limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantors" means, collectively:

(a) as of the Closing Date, each of the Restricted Subsidiaries set forth on Schedule 7.14 hereto; and

(b)     following the Closing Date, each other Material Domestic Subsidiary or other Domestic Subsidiary that guarantees the Secured Obligations pursuant to Section 8.14(b).

"Guaranty Agreement" means a Guaranty and Collateral Agreement substantially in the form of Exhibit K and executed by the Guarantors.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans or on other Secured Obligations under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Impacted Interest Period" has the meaning assigned to such term in the definition of "LIBO Rate".

"Indebtedness" means, for any Person, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Indebtedness (as defined in the other clauses of this definition) of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Person, whether or not such Indebtedness is assumed by such Person; (g) all Indebtedness (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise assures a creditor against loss of the Indebtedness (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Indebtedness and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of others or to purchase the Indebtedness or Property of others; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments for periods in excess of 120 days prior to the day of delivery, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services whether or

16

509265-1666-Active.19779355.12

not such goods or services are actually received or utilized by such Person; (k) any Indebtedness of a partnership for which such Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment.  The Indebtedness of any Person shall include all obligations of such Person of the character described above to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Person under GAAP; provided, however, the contingent obligations of Borrower or any Subsidiary of Borrower pursuant to any purchase and sale agreement, stock purchase agreement, merger agreement or similar agreement shall not constitute "Indebtedness" within this definition so long as none of the same contains an obligation to pay money over time.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning assigned to such term in Section 12.03(b).

"Information" has the meaning assigned to such term in Section 12.11.

"Initial Reserve Report" means the report of [●] dated as of [●], 2016, with respect to certain Oil and Gas Properties of the Borrower and its Restricted Subsidiaries as of [●], 2016.

"Interest Election Request" means a request by the Borrower substantially in the form of Exhibit C to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each March, June, September and December (or, if an Event of Default is in existence, the last day of each calendar month) and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender, twelve months) thereafter, as the Borrower may elect in its Borrowing Request or Interest Election Request, as applicable, given with respect thereto; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which would extend beyond the Maturity Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Redetermination" has the meaning assigned to such term in Section 2.07(b).

"Interim Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.07(d).

509265-1666-Active.19779355.12

"Interpolated Rate" means, at any time, for any Interest Period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person (including any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale); (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Indebtedness of, purchase or other acquisition of any other Indebtedness of, or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory, goods, supplies or services sold by such Person in the ordinary course of business); or (c) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Issuing Bank" means JPMorgan, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.09(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"JPMorgan" has the meaning assigned to such term in the preamble hereto.

"LC Availability Requirements" has the meaning assigned to such term in Section 2.09(a).

"LC Commitment" means, at any time, an amount equal to 10% of the Borrowing Base in effect at such time.  For the avoidance of doubt, the LC Commitment is part of, and not in addition to, the aggregate Commitments.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lender Parent" means, with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a subsidiary.

"Lenders" means the Persons listed on Annex I and any Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

18

"Letter of Credit" means any letter of credit issued or deemed issued pursuant to this Agreement, including, for the avoidance of doubt, the Existing Letters of Credit.

"Letter of Credit Agreements" means all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower, with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any applicable Interest Period (and with respect to clause (c) of the definition of "Alternate Base Rate", for an Interest Period of one month), the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for dollars) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as shall be selected by the Administrative Agent in its reasonable discretion), in each case (the "LIBO Screen Rate") as of the Specified Time on the Quotation Day for such Interest Period; provided that, (a) if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement and (b) if the LIBO Screen Rate shall not be available at such time for a period equal in length to such Interest Period (an "Impacted Interest Period"), then the LIBO Rate shall be the Interpolated Rate at such time; provided further, that, if any Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.  Notwithstanding the foregoing, to the extent that "LIBO Rate" or "Adjusted LIBO Rate" is used in connection with an ABR Borrowing, such rate shall be determined as modified by the definition of Alternate Base Rate.

"LIBO Screen Rate" has the meaning assigned to such term in the definition of "LIBO Rate".

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties.  The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower and its Restricted Subsidiaries shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidity" means, as of any date of determination, the sum of (without duplication) (a) the unused Commitments then available to be drawn in accordance with this Agreement and (b) the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and the other Loan Parties at such time (it being understood that unrestricted cash shall (i) exclude any cash and Cash Equivalents which are subject to a Lien in favor of any Person unless such Liens are subordinated to a Lien in favor of the Administrative Agent pursuant to the Existing Intercreditor Agreement or otherwise in a manner satisfactory to the Administrative Agent and (ii) include all cash and Cash Equivalents held in a Controlled Account).

19

"Loan Documents" means this Agreement, the Notes, if any, the Letter of Credit Agreements, the Letters of Credit, the Existing Intercreditor Agreement, any other intercreditor agreement entered into pursuant to the terms of this Agreement and the Security Instruments.

"Loan Party" means, collectively, the Borrower and each Guarantor.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Lock Up Agreement" means that certain Lock Up Agreement, dated as of July 22, 2016, as in effect on the date hereof, by and among, *inter alios*, the Borrower, the other loan parties party thereto and certain holders of the Second Lien Notes party thereto.

"Lock Up Agreement Term Sheet" means, the Term Sheet as defined in the Lock Up Agreement and attached thereto as Exhibit A.

"Majority Lenders" means (a) at any time while no Loans or LC Exposure is outstanding, Lenders having more than fifty percent (50%) of the Aggregate Maximum Credit Amounts or (b) at any time while any Loans or LC Exposure are outstanding, Lenders holding more than fifty percent (50%) of the outstanding aggregate principal amount of the Loans or participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Material Adverse Effect" means, after giving effect to the entry of the Confirmation Order in each case, excluding any event occurring on or prior to the entry of the Confirmation Order, a material adverse effect on (a) the business, financial condition, operations, performance, properties of the Borrower, the Guarantors and their respective Restricted Subsidiaries, taken as a whole, (b) the ability of the Loan Parties to perform their respective material obligations under the Loan Documents, or (c) the ability of the Administrative Agent, the Issuing Bank and the Lenders to enforce the Loan Documents.

"Material Domestic Subsidiary" means, as of any date, any Domestic Subsidiary that (a) is a Wholly-Owned Subsidiary and (b) together with its Restricted Subsidiaries, owns Property having a fair market value of $1.0 million or more.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate outstanding principal amount exceeding $10.0 million. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means the earlier of (i) the day that is the fifth (5th) anniversary of the Petition Date, which is [_], 2021 and (ii) the 120th day prior to the stated maturity date of the 2020 Second Lien Notes if such notes have not been refinanced, redeemed or repaid in full on or prior to such 120th day; provided that, in either case of clauses (i) or (ii), if such day is not a Business Day, then the Maturity Date shall be the immediately preceding Business Day.

"Maximum Credit Amount" means, as to each Lender, the amount set forth opposite such Lender's name on Annex I under the caption "Maximum Credit Amounts", as the same may be (a) reduced or terminated from time to time in connection with a reduction or termination of the Aggregate

20

Maximum Credit Amounts pursuant to Section 2.06(a) or (b) modified from time to time pursuant to any assignment permitted by Section 12.04(b).

"Modified ACNTA" has the meaning assigned such term in the Second Lien Indenture as in effect on the date hereof, and any component definition used therein has the meaning set forth in the Second Lien Indenture as of the date hereof.

"Modified ACNTA Prices" has the meaning assigned such term in the Second Lien Indenture as in effect on the date hereof, and any component definition used therein has the meaning set forth in the Second Lien Indenture as of the date hereof

"Money Laundering Laws" has the meaning assigned such term in Section 7.23.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgage" means each of the mortgages or deeds of trust executed by any one or more Loan Parties for the benefit of the Secured Parties as security for the Secured Obligations, together with any supplements, modifications or amendments thereto and assumptions or assignments of the obligations thereunder by any Loan Party.  "Mortgages" shall mean all of such Mortgages collectively.

"Mortgaged Property" means any Property owned by any Loan Party which is subject to the Liens existing and to exist under the terms of the Security Instruments.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in section 3(37) or 4001 (a)(3) of ERISA.

"Net Cash Proceeds" means in connection with any  issuance or sale of Equity Interests, debt securities or instruments, the incurrence or issuance of Indebtedness, any Disposition of Property, any Unwind of Swap Agreements, or Casualty Event, the aggregate cash proceeds received from such issuance, sale, incurrence, Disposition, Unwind or Casualty Event, as applicable, net of, unless the Loans have been declared or become due and payable as a result of an Event of Default described in Section 10.01(h) or Section 10.01(i) (or after the occurrence and during the continuation of an Event of Default described in Section 10.01(h) or Section 10.01(i)), attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"New Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(d).

"New Indebtedness" has the meaning assigned to such term in the definition of Permitted Refinancing Indebtedness.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Recourse Indebtedness" means any Indebtedness of any Unrestricted Subsidiary, in each case in respect of which: (a) the holder or holders thereof (i) shall have recourse only to, and shall have the right to require the obligations of such Unrestricted Subsidiary to be performed, satisfied, and paid only out of, the Property of such Unrestricted Subsidiary and/or one or more of its Subsidiaries (but only to the extent that such Subsidiaries are Unrestricted Subsidiaries) and/or any other Person (other than Borrower and/or any Restricted Subsidiary) and (ii) shall have no direct or indirect recourse (including by

21

way of guaranty, support or indemnity) to the Borrower or any Restricted Subsidiary or to any of the Property of Borrower or any Restricted Subsidiary (other than Equity Interests of such Unrestricted Subsidiary), whether for principal, interest, fees, expenses or otherwise; and (b) the terms and conditions relating to the non-recourse nature of such Indebtedness are in form and substance reasonably acceptable to the Administrative Agent.

"Notes" means the promissory notes of the Borrower as requested by a Lender and described in Section 2.02(d) and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or Property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement and any other Loan Document.

"Participant" has the meaning set forth in Section 12.04(c)(i)

"Participant Register" has the meaning set forth in Section 12.04(c)(i).

"Patriot Act" has the meaning assigned to such term in Section 7.23.

"Payment in Full" means (a) the Commitments have expired or been terminated, (b) the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been indefeasibly paid in full in cash (other than contingent indemnification obligations), (c) all Letters of Credit shall have expired or terminated (or are cash collateralized or otherwise secured to the satisfaction of the Issuing Bank) and all LC Disbursements shall have been reimbursed and (d) all amounts due under Secured Swap Agreements shall have been

22

indefeasibly paid in full in cash (or such Secured Swap Agreements are cash collateralized or otherwise secured to the satisfaction of the Secured Swap Provider).

"Perfection Certificate" means a perfection certificate substantially in the form of Exhibit I.

"Permitted Holders" means Ares Management L.P., Franklin Templeton Investments and each of their respective Affiliates (but excluding any operating portfolio companies of the foregoing persons).

"Permitted Junior Indebtedness" means any Indebtedness secured by a Lien ranking junior to the Lien securing the Secured Obligations that is issued or incurred by the Borrower or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed $50.0 million and any guarantees thereof by the Guarantors (including any Persons becoming Guarantors simultaneously with the incurrence of such Indebtedness):

(a)    the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the 180th day after the Maturity Date (other than customary offers to purchase upon a change of control, and customary acceleration rights after an event of default) and, by its terms, do not restrict the prepayment or repayment of the Secured Obligations,

(b)    the covenants, events of default and guarantees which (other than "market" interest rate, fees, funding discounts and redemption or prepayment premiums as determined at the time of issuance or incurrence of any such Indebtedness), are not more restrictive on the Borrower and each of its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence),

(c)    if such Indebtedness is subordinated Indebtedness in right of payment, the terms of such Indebtedness provide for customary subordination of such Indebtedness to the Secured Obligations,

(d)    the holders of the obligations secured thereby (or a representative or trustee on their behalf) shall have entered into an intercreditor agreement (which, for avoidance of doubt, shall provide that the Liens securing such obligations shall rank junior to the Liens securing the Secured Obligations and shall only be secured by the same or a subset of the collateral that secures the Secured Obligations),

(e)    no Subsidiary of the Borrower (other than a Guarantor or a Person who becomes a Guarantor in connection therewith) is an obligor under such Indebtedness;

provided that:

(i)    at the time of, and after giving effect to, the incurrence of such Indebtedness (i) no Default or Event of Default has occurred and is continuing,

(ii)    after giving *pro forma* effect to such issuance or incurrence, the Borrower would be in compliance with the Total Net Indebtedness Leverage Ratio as of the last day of the four fiscal quarter period for which financial statements have been delivered pursuant to Section 8.01(a) and Section 8.01(b) (it being understood that for purposes of calculating the Total Net Indebtedness Leverage Ratio, Consolidated Total Net Debt shall give *pro forma* effect to the

23

incurrence of such Indebtedness and any other Indebtedness incurred through such date of determination) in effect at the time of such issuance or incurrence minus 0.25x, and

(iii)   at such time, the Borrowing Base is adjusted as contemplated by Section 2.08(c) and the Borrower makes any prepayment required under Section 3.04(c)(iii).

"Permitted Refinancing Indebtedness" means Indebtedness (for purposes of this definition, "New Indebtedness") incurred in exchange for, or proceeds of which are used to refinance, all of any other Indebtedness (the "Refinanced Indebtedness"); provided that:

(a)   such New Indebtedness is in an aggregate principal amount not in excess of the sum of (i) the aggregate principal amount then outstanding of the Refinanced Indebtedness (or, if the Refinanced Indebtedness is exchanged or acquired for an amount less than the principal amount thereof to be due and payable upon a declaration of acceleration thereof, such lesser amount) and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such exchange or refinancing,

(b)   such New Indebtedness has a stated maturity no earlier than the stated maturity of the Refinanced Indebtedness and an average life no shorter than the average life of the Refinanced Indebtedness and does not, by its terms, restrict the prepayment or repayment of the Secured Obligations,

(c)   such New Indebtedness contains covenants, events of default and guarantees which (other than "market" interest rate, fees, funding discounts and redemption or prepayment premiums as determined at the time of issuance or incurrence of any such Indebtedness) are not more restrictive on the Borrower and each of its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence),

(d)   no Subsidiary of the Borrower (other than a Guarantor or a Person who becomes a Guarantor in connection therewith) is an obligor under such New Indebtedness,

(e)   to the extent such New Indebtedness is secured and the applicable Refinanced Debt is subject to an intercreditor agreement, the holders of such New Indebtedness (or a representative or trustee on their behalf) shall have entered into an intercreditor agreement which, for avoidance of doubt, shall provide that the Liens securing such obligations shall rank junior to the Liens securing the Secured Obligations (if applicable, to at least the same extent as the Refinanced Indebtedness) and shall only be secured by the same or a subset of the collateral that secures the Secured Obligations, and

(f)   such New Indebtedness (and any guarantees thereof) is subordinated in right of payment to the Secured Obligations (or, if applicable, the Guaranty Agreement) to at least the same extent as the Refinanced Indebtedness and otherwise on terms satisfactory to the Administrative Agent.

"Permitted Unsecured Indebtedness" means unsecured senior, senior subordinated or subordinated Indebtedness issued or incurred by the Borrower and any guarantees thereof by the Guarantors (including any Persons becoming Guarantors simultaneously with the incurrence of such Indebtedness):

(a)   that does not restrict, by its terms, the prepayment or repayment of the Secured Obligations,

24

(b)    that has terms which do not provide for the maturity of such Indebtedness to be or any scheduled repayment, mandatory redemption or sinking fund obligation to occur prior to 180 days after the Maturity Date (other than customary offers to purchase upon a change of control and customary acceleration rights after an event of default),

(c)    where the covenants, events of default and guarantees which (other than "market" interest rate, fees, funding discounts and redemption or prepayment premiums as determined at the time of issuance or incurrence of any such Indebtedness) are not more restrictive on the Borrower and each of its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence),

(d)    where, if such Indebtedness is subordinated Indebtedness in right of payment, the terms of such Indebtedness provide for customary subordination of such Indebtedness to the Secured Obligations,

(e)    where no Subsidiary of the Borrower (other than a Guarantor or a Person who becomes a Guarantor in connection therewith) is an obligor under such Indebtedness;

provided that:

(i)    at the time of, and after giving effect to, the incurrence of such Indebtedness (i) no Default or Event of Default has occurred and is continuing,

(ii)    after giving *pro forma* effect to such incurrence, the Borrower would be in compliance with the Total Net Indebtedness Leverage Ratio as of the last day of the four fiscal quarter period for which financial statements have been delivered pursuant to Section 8.01(a) and Section 8.01(b) (it being understood that for purposes of calculating the Total Net Indebtedness Leverage Ratio, Consolidated Total Net Debt shall give *pro forma* effect to the incurrence of such Indebtedness and any other Indebtedness incurred through such date of determination) in effect at the time of such incurrence minus 0.25x, and

(iii)    at the time of the issuance or incurrence of such Indebtedness, the Borrowing Base is adjusted as contemplated by Section 2.08(c) and the Borrower makes any prepayment required under Section 3.04(c)(iii).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means any employee pension benefit plan, as defined in section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Borrower or a Subsidiary or an ERISA Affiliate.

"Plan of Reorganization" has the meaning assigned to such term in the recitals hereto.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the recitals hereto.

25

"Prime Rate" means the rate of interest *per annum* publicly announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective. Such rate is set by the Administrative Agent as a general reference rate of interest, taking into account such factors as the Administrative Agent may deem appropriate; it being understood that many of the Administrative Agent's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that the Administrative Agent may make various commercial or other loans at rates of interest having no relationship to such rate.

"Projected Production" means, as of any date of determination, the internally forecasted production of each of crude oil, natural gas liquids and natural gas, calculated on a barrel of oil equivalent basis, of the Borrower and its Restricted Subsidiaries, or in the case of a Proposed Acquisition, from the Oil and Gas Properties subject of such Proposed Acquisition, for each month for the period of the next 24 months commencing on the first day of the calendar month immediately following such date of determination.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proposed Acquisition" has the meaning assigned to such term in Section 9.19(a)(iii).

"Proposed Borrowing Base" has the meaning assigned to such term in Section 2.07(c)(i).

"Proposed Borrowing Base Notice" has the meaning assigned to such term in Section 2.07(c)(ii).

"Proved Reserves" means oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves."

"Public-Sider" means a Lender whose representatives may trade in securities of the Borrower or any of their respective Subsidiaries while in possession of the financial statements provided by the Borrower under the terms of this Agreement, and has notified the Administrative Agent in writing that such Lender wishes to receive only information consisting exclusively of information with respect to the Borrower and its Affiliates that is either publicly available or not material with respect to the Borrower and its Affiliates, any of their respective securities for purposes of United States federal and state securities laws.

"PV-9" means, on any date of determination, with respect to any Proved Reserves expected to be produced from any Borrowing Base Properties, the net present value, discounted at 9% per annum, of the future net revenues expected to accrue to the Borrower's and the other Restricted Subsidiaries' collective interests in such Proved Reserves during the remaining expected economic lives of such reserves, calculated in accordance with the most recent bank price deck provided to the Borrower by the Administrative Agent.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each of the Borrower, any Restricted Subsidiary and any Guarantor that has total assets exceeding $10.0 million at the time such Swap Obligation is incurred or such other person as constitutes an ECP under the Commodity Exchange Act or any regulations promulgated thereunder.

26

"Quotation Day" means, with respect to any Eurodollar Loan for any Interest Period, two (2) Business Days prior to the commencement of such Impacted Interest Period.

"Redemption" means with respect to any Indebtedness, the repurchase, redemption, prepayment, repayment, defeasance, purchase or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Indebtedness; provided, however, the term "Redemption" shall not include early termination of a Swap Agreement due to an ISDA "Termination Event" to the extent the amount due at such termination exceeds $10.0 million. "Redeem" has the correlative meaning thereto.

"Redetermination Date" means, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.07(d).

"Register" has the meaning assigned to such term in Section 12.04(b)(iv).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Remedial Work" has the meaning assigned to such term in Section 8.10(a).

"Required Lenders" means (a) at any time while no Loans or LC Exposure are outstanding, Lenders having at least sixty-six and two thirds percent (66-2/3%) of the Aggregate Maximum Credit Amounts; and (b) at any time while any Loans or LC Exposure are outstanding, Lenders holding at least sixty-six and two thirds percent (66-2/3%) of the outstanding aggregate principal amount of such Loans or participation interests in Letters of Credit (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(c)).

"Reserve Report" means the Initial Reserve Report and any other subsequent report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th (or such other date in the event of an Interim Redetermination) the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions consistent with SEC reporting requirements at the time.

"Reserve Report Certificate" has the meaning assigned to such term in Section 8.12(c).

"Responsible Officer" means, as to any Person, the Chief Executive Officer, the President, the Chief Operating Officer, any Financial Officer, Chief Legal Officer or Executive Vice President-Finance and Administration of such Person. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in any Person, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the

27

purchase, redemption, retirement, acquisition, cancellation or termination of (a) any such Equity Interests or (b) any option, warrant or other right to acquire any such Equity Interests.

"Restricted Subsidiary" means any Subsidiary of the Borrower that is not an Unrestricted Subsidiary.

"Restructuring Support Agreement" has the meaning assigned to such term in the recitals hereto.

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans, its LC Exposure and all other reimbursement obligations under the Exit Facility at such time.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (as of the Closing Date, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"Scheduled Redetermination" has the meaning assigned to such term in Section 2.07(b).

"Scheduled Redetermination Date" means the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.07(d).

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Second Lien Indenture" means, collectively, (a) the 2020 Second Lien Notes Indenture and (b) the 2022 Second Lien Notes Indenture.

"Second Lien Modifications" means the amendments, changes and other modifications set forth in the Lock Up Agreement Term Sheet under the title "Proposed Amendments", in each case, on substantially similar terms in all material respects set forth therein.

"Second Lien Notes" means, collectively (a) the 2020 Second Lien Notes and (b) the 2022 Second Lien Notes.

28

"Secured Obligations" means any and all amounts owing or to be owing by the Borrower, any Restricted Subsidiary or any Guarantor (whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising (including interest and fees accruing after the maturity of the Loans and LC Disbursements or the termination of the Secured Swap Agreements and interest accruing after the filing of any petition for bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding); provided that solely with respect to any Loan Party that is not an "eligible contract participant" under the Commodity Exchange Act, Excluded Swap Obligations of such Loan Party shall in any event be excluded from "Secured Obligations" owing by such Loan Party): (a) to the Administrative Agent, the Issuing Bank or any Lender under any Loan Document, (b) to any Secured Swap Provider, (c) to any Bank Products Provider and (d) all renewals, extensions and/or rearrangements of any of the foregoing.

"Secured Parties" means, collectively, the Administrative Agent, the Issuing Bank, the Lenders, each Bank Products Provider, each Secured Swap Provider and any other Person owed Secured Obligations. "Secured Party" means any of the foregoing individually.

"Secured Swap Agreement" means a Swap Agreement between (a) any Loan Party and (b) a Secured Swap Provider, which shall include, for the avoidance of doubt, the Existing Secured Swap Agreements.

"Secured Swap Provider" means, with respect to any Swap Agreement, (a) a Lender or an Affiliate of a Lender who is the counterparty to such Swap Agreement with a Loan Party and (b) any Person who was a Lender or an Affiliate of a Lender at the time when such Person entered into such Swap Agreement who is a counterparty to any such Swap Agreement with a Loan Party; provided that any such Secured Swap Provider that ceases to be a Lender or an Affiliate of a Lender shall continue to be a "Secured Swap Provider" for purposes of the Loan Documents to the extent that such Secured Swap Provider entered into a Secured Swap Agreement with the Borrower or any of its Subsidiaries prior to the date hereof or at the time such Secured Swap Provider was a Lender (or Affiliate of a Lender) hereunder and such Secured Swap Agreement remains in effect and there are remaining obligations under such Secured Swap Agreement (but excluding any transactions, confirms, or trades entered into after such Person ceases to be a Lender or an Affiliate of a Lender) (it being understood that if such Swap Agreement is novated or otherwise transferred by such Person to a third party that is not a Lender or an Affiliate of a Lender, such third party shall not constitute a Secured Swap Provider).

"Securities Account" has the meaning assigned to such term in the UCC.

"Security Instruments" means (a) the Guaranty Agreement, (b) Mortgages, (c) any Perfection Certificate, (d) any Control Agreement, (e) the other agreements, instruments or certificates described or referred to in Exhibit E and (f) any and all other agreements, instruments or certificates now or hereafter executed and delivered by the Borrower or any other Person (other than Swap Agreements with the Lenders or any Affiliate of a Lender or participation or similar agreements between any Lender and any other lender or creditor with respect to any Secured Obligations pursuant to this Agreement), in each case in connection with, or as security for the payment or performance of the Secured Obligations, the Loans, the Notes, if any, this Agreement, or reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Solvency Certificate" means a solvency certificate signed by a Financial Officer in substantially the form of Exhibit H hereto.

29

"Specified Change of Control" means a "Change of Control" (or any other defined term having a similar purpose or meaning) as defined in the Second Lien Notes, any Permitted Unsecured Indebtedness or Permitted Junior Indebtedness or any Permitted Refinancing Indebtedness of any of the foregoing, in each case, solely to the extent that the aggregate outstanding principal amount of such Second Lien Notes, Permitted Unsecured Indebtedness or Permitted Junior Indebtedness, or such Permitted Refinancing Indebtedness in respect of the foregoing exceeds $10.0 million.

"Specified Indebtedness" has the meaning assigned to such term in Section 9.04(b).

"Specified Time" means 11:00 A.M., London time.

"Statutory Reserve Rate" means a fraction (expressed as a decimal) not to exceed the number one, the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any basis, marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority of the Board or any other Governmental Authority having jurisdiction for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means: (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, manager or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Borrower or one or more of its Subsidiaries or by the Borrower and one or more of its Subsidiaries and (b) any partnership of which the Borrower or any of its Restricted Subsidiaries is a general partner. Unless otherwise indicated herein, each reference to the term "Subsidiary" shall mean a Subsidiary of the Borrower.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction, collar or option or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more interest rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Synthetic Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the Person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early

30

509265-1666-Active.19779355.12

termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" means the earlier of the Maturity Date and the date of termination of the Commitments.

"Total Net Indebtedness Leverage Ratio" means the financial covenant of the Borrower set forth in Section 9.01(a).

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of its obligations under this Agreement, each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant of Liens by the Borrower on Mortgaged Properties and other Properties pursuant to the Security Instruments and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Secured Obligations and the other obligations under the Guaranty Agreement by such Guarantor and such Guarantor's grant of the security interests and provision of collateral thereunder, and the grant of Liens by such Guarantor on Mortgaged Properties and other Properties pursuant to the Security Instruments.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"UCC" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any collateral.

"Unrestricted Cash" means cash and Cash Equivalents of the Borrower or any of its Restricted Subsidiaries that would not appear as "restricted" (or would appear as "restricted" in favor of the Administrative Agent or any Lender) on a consolidated balance sheet of the Borrower or any of its Restricted Subsidiaries.

"Unrestricted Subsidiary" means any Subsidiary of the Borrower designated as such on Schedule 7.14 or which the Borrower has designated in writing to the Administrative Agent to be an Unrestricted Subsidiary pursuant to Section 9.06.

"Unwind" means, with respect to any transaction under a Swap Agreement, the early termination, unwind, or cancelation of any transaction under such Swap Agreement. "Unwound" shall have a meaning correlative to the foregoing.

"U.S. Person" has the meaning given in Section 7701(a)(30) of the Code.

"Wholly-Owned Subsidiary" means any Restricted Subsidiary of which all of the outstanding Equity Interests (other than any directors' qualifying shares mandated by applicable law), on a fully-diluted basis, are owned by the Borrower or one or more of the Wholly-Owned Subsidiaries or by the Borrower and one or more of the Wholly-Owned Subsidiaries.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.03    Types of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan" or a "Eurodollar Borrowing").

Section 1.04    Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained herein), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.  The use of the phrase "subject to" as used in connection with Excepted Liens or otherwise and the permitted existence of any Excepted Liens or any other Liens shall not be interpreted to expressly or impliedly subordinate any Liens granted in favor of the Administrative Agent and the other Secured Parties as there is no intention to subordinate the Liens granted in favor of the Administrative Agent and the other Secured Parties.  No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.05    Accounting Terms and Determinations; GAAP.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared, in accordance with GAAP (subject to the impact of "fresh start" accounting), applied on a basis consistent with the Financial Statements, except for Accounting Changes (as defined below) with which the Borrower's independent certified public accountants concur and which are disclosed to the Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a).  In the event that any "Accounting Change" shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in good faith in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Majority Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation,

32

pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

## ARTICLE II
## THE CREDITS

Section 2.01   Commitments.   Subject to the terms and conditions set forth herein, (a) the Existing Loans shall be refunded, refinanced, replaced and deemed made hereunder and, on and after the Closing Date, shall constitute Loans for all purposes hereunder and under the Loan Documents and (b) on and after the Closing Date, each Lender agrees to make Loans to the Borrower from time to time on any Business Day during the Availability Period in an aggregate principal amount that will not result in (i) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment or (ii) the total Revolving Credit Exposures exceeding the total Commitments.   Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02   Loans and Borrowings.

(a)   Borrowings; Several Obligations.   Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.   The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)   Types of Loans.   Subject to the terms of this Agreement, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.   Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)   Minimum Amounts; Limitation on Number of Borrowings.   At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $1.0 million and not less than $1.0 million.   At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $1.0 million and not less than $1.0 million; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.09(e).   Borrowings of more than one Type may be outstanding at the same time, provided that there shall not at any time be more than a total of eight (8) Eurodollar Borrowings outstanding.   Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

(d)   Notes.   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.   The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.   The entries made in the accounts maintained pursuant to this Section 2.02(d) shall be *prima facie* evidence of the existence and

509265-1666-Active.19779355.12

amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.  Any Lender may request that Loans made by it be evidenced by a Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a Note payable to such Lender and substantially in the form of Exhibit A dated, in the case of (i) any Lender party hereto as of the date of this Agreement, as of the date of this Agreement or (ii) any Lender that becomes a party hereto pursuant to an Assignment and Assumption, as of the effective date of the Assignment and Assumption, payable to such Lender in a principal amount equal to its Maximum Credit Amount as in effect on such date, and otherwise duly completed.  Thereafter, the Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 12.04) be represented by one or more Notes in such form payable to the payee named therein (or, if such Note is a registered note, to such payee and its registered assigns).  In the event that any Lender's Maximum Credit Amount increases or decreases for any reason (whether pursuant to Section 2.06, Section 12.04(b) or otherwise), the Borrower shall deliver or cause to be delivered on the effective date of such increase or decrease, a new Note payable to such Lender in a principal amount equal to its Maximum Credit Amount after giving effect to such increase or decrease, and otherwise duly completed. The date, amount, Type, interest rate and, if applicable, Interest Period of each Loan made by each Lender, and all payments made on account of the principal thereof, shall be recorded by such Lender on its books for its Note, and, prior to any transfer, may be endorsed by such Lender on a schedule attached to such Note or any continuation thereof or on any separate record maintained by such Lender.  Failure to make any such notation or to attach a schedule shall not affect any Lender's or the Borrower's rights or obligations in respect of such Loans or affect the validity of such transfer by any Lender of its Note.

Section 2.03     Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone, fax (or transmit by electronic communication, if arrangements for doing so have been approved by the Administrative Agent) (a) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 12:00 noon, New York City time, on the date of the proposed Borrowing; provided that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.09(e).  Each such telephonic (or electronic communication) Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower.  Each such telephonic, electronic communication, and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)      the aggregate amount of the requested Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(v)      the amount of the then effective Borrowing Base, the amount of the Consolidated Cash Balance (without regard to the requested Borrowing), the *pro forma* amount of the Consolidated Cash Balance (giving effect to the requested Borrowing), the current total Revolving Credit Exposures (without regard to the requested Borrowing) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Borrowing); and

34

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Each Borrowing Request shall constitute a representation that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposures to exceed (i) the total Commitments and (ii) the "Priority Lien Cap" (as defined in the Existing Intercreditor Agreement).

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04     Interest Elections.

(a)     Conversion and Continuance.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.04.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     Interest Election Requests.  To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone, fax (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic (or electronic communication) Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower.

(c)     Information in Interest Election Requests.  Each telephonic, electronic communication and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and Section 2.04(c)(iv) shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

35

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Notice to Lenders by the Administrative Agent. Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election. If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing: (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05    Funding of Borrowings.

(a)    Funding by Lenders. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to a Controlled Account designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.09(e) shall be remitted by the Administrative Agent to the Issuing Bank. Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)    Presumption of Funding by the Lenders. Unless the Administrative Agent shall have received notice from a Lender prior to 10:00 A.M. New York City time on the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to the requested Borrowing. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

36

Section 2.06    Termination and Reduction of Aggregate Maximum Credit Amounts.

(a)    Scheduled Termination of Commitments.    Unless previously terminated, the Commitments shall terminate on the Maturity Date.    If at any time the Aggregate Maximum Credit Amounts are terminated or reduced to zero, then the Commitments shall terminate on the effective date of such termination or reduction.

(b)    Optional Termination and Reduction of Aggregate Credit Amounts.

(i)    The Borrower may at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts; provided that (A) each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $5.0 million and not less than $10.0 million and (B) the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 3.04(c), the total Revolving Credit Exposures would exceed the total Commitments.

(ii)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Maximum Credit Amounts under Section 2.06(b)(i) at least three (3) Business Days prior to the effective date of such termination or reduction or such shorter time as the Administrative Agent may agree in writing, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section 2.06(b)(ii) shall be irrevocable; provided that a notice of termination of the Aggregate Maximum Credit Amounts delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit or debt facilities, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Aggregate Maximum Credit Amounts shall be permanent and may not be reinstated. Each reduction of the Aggregate Maximum Credit Amounts shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07    Borrowing Base.

(a)    Initial Borrowing Base.  For the period from and including the Closing Date to but excluding the first Redetermination Date, the amount of the Borrowing Base shall be $600.0 million. Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments from time to time pursuant to the Borrowing Base Adjustment Provisions.

(b)    Scheduled and Interim Redeterminations.  The Borrowing Base shall be first redetermined on May 1, 2017 and semi-annually thereafter in accordance with this Section 2.07(b) (each such redetermination, a "Scheduled Redetermination").  Subject to Section 2.07(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders on May 1st and November 1st of each year, commencing May 1, 2017.  In addition, the Borrower may, by notifying the Administrative Agent thereof, and the Administrative Agent may, at the direction of the Required Lenders, by notifying the Borrower thereof, in each case, one time during each period between any two consecutive Scheduled Redeterminations, each elect to cause the Borrowing Base to be redetermined (an "Interim Redetermination") in accordance with this Section 2.07; provided that neither the Borrower, nor the Administrative Agent and the Required Lenders, shall have a right to request an Interim Redetermination prior to the first Scheduled Redetermination.

(c)    Scheduled and Interim Redetermination Procedure.

37

(i)    Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows: upon receipt by the Administrative Agent of (A) the Reserve Report for such redetermination and the related Reserve Report Certificate (unless waived by the Administrative Agent in the case of an Interim Redetermination) and (B) such other reports, data and supplemental information, including, the information provided pursuant to Section 8.12(c), as may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such Reserve Report Certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall, in good faith, propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including, without limitation, the status of title information with respect to the Oil and Gas Properties as described in the Engineering Reports and the existence of any other Indebtedness) as the Administrative Agent deems appropriate and consistent with its normal oil and gas lending criteria as it exists at the particular time.  In no event shall the Proposed Borrowing Base at such time exceed the Aggregate Maximum Credit Amounts.

(ii)    The Administrative Agent shall thereafter notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice"):

(A)    in the case of a Scheduled Redetermination (I) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Sections 8.12(a) and Section 8.12(c), in a timely and complete manner, then on or before April 15th or October 15th, as the case may be, of such year following the date of delivery or (II) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Sections 8.12(a) and Section 8.12(c), in a timely and complete manner, then promptly after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.07(c); and

(B)    in the case of an Interim Redetermination, promptly, and in any event, within fifteen (15) days after the Administrative Agent has received the required Engineering Reports (or such later date to which the Borrower and the Administrative Agent may agree in its sole discretion).

(iii)    Any Proposed Borrowing Base that would (A) increase the Borrowing Base then in effect must be approved by all Lenders as provided in this Section 2.07(c)(iii) and (B) decrease or maintain the Borrowing Base then in effect must be approved by the Required Lenders as provided in this Section 2.07(c)(iii).  Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have fifteen (15) days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base.  If, at the end of such 15-day period, all of the Lenders, in the case of a Proposed Borrowing Base that would increase the Borrowing Base then in effect, or the Required Lenders, in the case of a Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect, have approved, as aforesaid, then the Proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in Section 2.07(d).  If, however, at the end of such 15-day period, all of the Lenders or Required Lenders, as applicable, have not approved, as aforesaid, then the Administrative Agent shall poll the Lenders to ascertain the highest Borrowing Base then acceptable to the Required Lenders for purposes of this Section 2.07(c) and, so long as such amount does not increase the Borrowing Base then in effect, such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d) (provided that, if the Administrative Agent shall have polled the Lenders and ascertained that the highest Borrowing Base then acceptable to all of the Lenders increases the Borrowing Base then in effect, such amount shall become the new Borrowing Base, effective on the date specified in Section 2.07(d)).

38

(d)    Effectiveness of a Redetermined Borrowing Base.    After a redetermined Borrowing Base is approved by all of the Lenders or the Required Lenders, as applicable, pursuant to Section 2.07(c)(iii), the Administrative Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Bank and the Lenders:

(i)    in the case of a Scheduled Redetermination, (1) if the Administrative Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and Section 8.12(c), in a timely and complete manner, then on May 1st or November 1st of each year, as applicable, following such notice (or as soon as possible thereafter, pursuant to the procedures set forth in Section 2.07(c)(iii)), or (2) if the Administrative Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 8.12(a) and Section 8.12(c), in a timely and complete manner, then on the Business Day next succeeding delivery of such New Borrowing Base Notice; and

(ii)    in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such New Borrowing Base Notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base pursuant to the Borrowing Base Adjustment Provisions, whichever occurs first.    Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

Section 2.08    Borrowing Base Adjustment Provisions.

(a)    Reduction of Borrowing Base Upon Asset Dispositions and Termination of Swap Positions.    If the Borrower or a Restricted Subsidiary Disposes of (or any Casualty Event occurs in respect of) Oil and Gas Properties (but excluding any Disposition to a Loan Party or from a non-Loan Party to a non-Loan Party, in each case, subject to prior written notice to the extent required by Section 8.01(k)) or any Equity Interests in any Person owning Oil and Gas Properties (but excluding any Disposition to a Loan Party or from a non-Loan Party to a non-Loan Party, in each case, subject to prior written notice to the extent required by Section 8.01(k)), or Unwinds Swap Agreements and (i) the Borrowing Base Value attributable to such Oil and Gas Property Disposed of or subject to such Casualty Event (or the Oil and Gas Properties owned by Borrower or a Restricted Subsidiary whose Equity Interests were sold) plus (ii) the Borrowing Base Value attributable to such Unwound Swap Agreements, since the later of (x) the last Redetermination Date and (y) the last adjustment of the Borrowing Base pursuant to this Section 2.08(a) is in excess of ten percent (10%) of the Borrowing Base as then in effect, individually or in the aggregate, then the Required Lenders shall have the right to adjust the Borrowing Base by an amount equal to the Borrowing Base Value attributable to such Oil and Gas Properties (or such Oil and Gas Properties owned by any Subsidiary whose Equity Interests were sold) or such Unwound Swap Agreement in the current Borrowing Base and (if the Required Lenders in fact elect to make such adjustment) the Administrative Agent shall promptly inform the Borrower of the amount of the adjusted Borrowing Base. For the purposes of this Section 2.08(a), a Disposition of Oil and Gas Properties shall be deemed to include the designation of a Restricted Subsidiary owning Oil and Gas Properties as an Unrestricted Subsidiary and the Disposition of Oil and Gas Properties, or Equity Interests in any Person owning Oil and Gas Properties, to an Unrestricted Subsidiary.

(b)    Reduction of Borrowing Base Related to Title.    If the Administrative Agent or Required Lenders have adjusted the Borrowing Base in accordance with Section 8.13(c), so that, after

39

giving effect to such reduction, the Borrower will satisfy the requirements of Section 8.13(c), the Administrative Agent shall promptly notify the Borrower in writing and, upon receipt of such notice, the new Borrowing Base will simultaneously become effective.

(c)    Reduction of Borrowing Base Upon Incurrence of Permitted Junior Indebtedness and/or Permitted Unsecured Indebtedness. Upon the issuance or incurrence of any Permitted Junior Indebtedness or any Permitted Unsecured Indebtedness (in each case, other than Junior Indebtedness or Permitted Unsecured Indebtedness constituting Permitted Refinancing Indebtedness incurred to refinance such Indebtedness), the Borrowing Base then in effect shall be automatically reduced by an amount equal to the product of 0.25 multiplied by the stated principal amount of such Permitted Unsecured Indebtedness or  Permitted Junior Indebtedness, as applicable, without regard to any original issue discount, and the Borrowing Base as so reduced shall become the new Borrowing Base on the Business Day of such issuance or incurrence.

Section 2.09    Letters of Credit.

(a)    General. Subject to the terms and conditions set forth herein, (i) the Existing Letters of Credit shall be refunded, refinanced, replaced and deemed issued hereunder and, on and after the Closing Date, shall constitute Letters of Credit for all purposes hereunder and under the Loan Documents and (ii) on and after the Closing Date, the Borrower may request the issuance of dollar denominated Letters of Credit for its own account or for the account of any of its Restricted Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the period from the Closing Date until the day which is five (5) Business Days prior to the end of the Availability Period; provided that, in addition to the conditions set forth in Section 6.02, the Borrower may not request the issuance, amendment, renewal or extension of Letters of Credit hereunder if (x) the LC Exposure would exceed the LC Commitment or (y) the Revolving Credit Exposure of any Lender would exceed the Commitment of such Lender (collectively, the "LC Availability Requirements"). In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension unless otherwise consented to by the Issuing Bank) a notice:

(i)    requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)    specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)    specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.09(c));

(iv)    specifying the amount of such Letter of Credit;

509265-1666-Active.19779355.12

(v)        specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)        specifying the amount of the then effective Borrowing Base and whether a Borrowing Base Deficiency exists at such time, the current total Revolving Credit Exposures (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation that, after giving effect to the requested issuance, amendment, renewal or extension, as applicable, the LC Availability Requirements will be satisfied on the date of such issuance, amendment, renewal or extension.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.

(c)        Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date.

(d)        Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.09(e), or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.09(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, the existence of a Borrowing Base Deficiency or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)        Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 12:00 noon, New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that if such LC Disbursement is equal to or greater than $1.0 million, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such LC Disbursement be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to

41

make such payment shall be discharged and replaced by the resulting ABR Borrowing. If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, *mutatis mutandis*, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.09(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.09(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear. Any payment made by a Lender pursuant to this Section 2.09(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    Obligations Absolute.    The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.09(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or any other Loan Document, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply substantially with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.09(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder. Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its reasonable discretion, either accept and make payment upon such documents without responsibility for further investigation, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    Disbursement Procedures.    The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone

42

(confirmed by telecopy) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)    Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.09(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate *per annum* then applicable to ABR Loans.  Interest accrued pursuant to this Section 2.09(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to Section 2.09(e) to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)    Replacement of the Issuing Bank.  The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b).  From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall also be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require.  After the replacement of the Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.  Subject to the appointment and acceptance of a successor Issuing Bank which is reasonably acceptable to the Borrower, any Issuing Bank may resign as an Issuing Bank at any time upon thirty (30) days' prior written notice to the Administrative Agent, the Borrower and the Lenders, in which case, such Issuing Bank shall be replaced in accordance with this Section 2.09(i).

(j)    Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.09(j), (ii) the LC Exposure exceeds the LC Commitment at any time, (iii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c) or (iv) the Borrower is required to cash collateralize a Defaulting Lender's LC Exposure pursuant to Section 4.05, then the Borrower shall deposit, in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to 105% of (A) in the case of an Event of Default, the LC Exposure (net of any cash collateral already held at the applicable time by the Administrative Agent with respect to such LC Exposure), (B) in the case of the LC Exposure exceeding the LC Commitment, the amount of such excess, (C) in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon and (D) in the case that the Borrower is required to cash collateralize a Defaulting Lender's LC Exposure, the amount required by Section 4.05; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Restricted Subsidiary described in Section 10.01(h) or Section 10.01(i).  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority and continuing perfected security interest in and

43

Lien on such account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in such account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.  The Borrower's obligation to deposit amounts pursuant to this Section 2.09(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a Letter of Credit, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of its Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Borrower's and the Guarantor's obligations under this Agreement and the other Loan Documents.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account.  Interest or profits, if any, on such deposit shall accumulate in such account.  Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors under this Agreement or the other Loan Documents.  If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

## ARTICLE III
## PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01   Repayment of Loans.   The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02   Interest.

(a)   ABR Loans.  The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)   Eurodollar Loans.  The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)   Post-Default Rate.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, then all Loans and other amounts outstanding, shall bear interest, after as well as before judgment, at a rate per annum equal to two percent (2%) plus the applicable interest rate (or, in the event there is no applicable rate, two percent (2%) plus the Applicable Margin then in effect applicable to ABR Loans as provided in Section 3.02(a)), but in no event to exceed the Highest Lawful Rate.

509265-1666-Active.19779355.12

(d)     <u>Interest Payment Dates</u>.   Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; <u>provided</u> that (i) interest accrued pursuant to <u>Section 3.02(c)</u> shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)     <u>Interest Rate Computations</u>.   All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).   The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03     <u>Alternate Rate of Interest</u>.   If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means (including, without limitation, by means of an Interpolated Rate) do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(b)     the Administrative Agent shall have received notice from the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective (and such Borrowing shall be automatically converted into ABR Loans on the last day of the applicable Interest Period), and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made either (x) as an ABR Borrowing or (y) subject to the prior written consent of the Borrower, at an alternate rate of interest determined by the Majority Lenders as their cost of funds.

Section 3.04     <u>Prepayments.</u>

(a)     <u>Optional Prepayments</u>.   The Borrower shall have the right at any time and from time to time to prepay, without premium or penalty (except with respect to any amounts due under <u>Section 5.02</u>) any Borrowing in whole or in part, subject to prior notice in accordance with <u>Section 3.04(b)</u>.

45

(b)      Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone and/or fax (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 12:00 noon, New York City time, one (1) Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02 and any amounts due under Section 5.02.

(c)      Mandatory Prepayments.

(i)      Upon Optional Termination and Reduction.  If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to Section 2.06(b), there is a Borrowing Base Deficiency, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such Borrowing Base Deficiency, and (B) if any Borrowing Base Deficiency remains after prepaying all such Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.09(j).

(ii)      Upon Redeterminations and Title Related Borrowing Base Adjustment. If there is a Borrowing Base Deficiency (A) on any Redetermination Date as a result of any redetermination of the Borrowing Base in accordance with Section 2.07 or (B) as a result of a Borrowing Base adjustment pursuant to Section 2.08(b), then upon such Redetermination Date or the occurrence of such Borrowing Base adjustment (such date, the "Deficiency Date"), the Borrower shall, within five (5) Business Days of the Deficiency Date, inform the Administrative Agent that it intends to do one or more of the following (provided that, if the Borrower fails to elect any of the following actions within such five (5) Business Day period, it shall be deemed to have elected option (A) hereof):

(A)      within forty-five (45) days following such Deficiency Date (1) prepay the Borrowings in an aggregate principal amount equal to such Borrowing Base Deficiency and (2) if any Borrowing Base Deficiency remains after prepaying all of the Borrowings as a result of any LC Exposure, cash collateralize as provided in Section 2.09(j),

(B)      commencing on the 30th day after such Deficiency Date and continuing on the same day of each month for the next three months thereafter (or if any such day is not a Business Day, the immediately preceding Business Day), prepay the Borrowings in an amount equal to one-fourth (1/4th) of such Borrowing Base Deficiency so that the Borrowing Base Deficiency is reduced to zero within 120 days of the Deficiency Date, or

(C)      within forty-five (45) days following such Deficiency Date, submit and pledge as Collateral additional Oil and Gas Properties or other collateral reasonably acceptable to the Administrative Agent, owned by the Borrower or any of the other Loan Parties in connection with the determination of the Borrowing Base, which the Administrative Agent and the Required Lenders deem reasonably satisfactory, in their sole discretion, to eliminate such Borrowing Base Deficiency;

46

provided that, notwithstanding the options set forth above, in all cases, the Borrowing Base Deficiency must be eliminated on or prior to the Termination Date.  If, because of LC Exposure, a Borrowing Base Deficiency remains after prepaying all of the Loans, the Borrower shall cash collateralize Letters of Credit in an amount equal to such remaining Borrowing Base Deficiency as provided in Section 2.09(j).

(iii)    Upon Certain Adjustments. If there is a Borrowing Base Deficiency, as a result of Borrowing Base adjustment pursuant to the Borrowing Base Adjustment Provisions (other than Section 2.08(b)), then upon the occurrence of such Borrowing Base adjustment the Borrower shall (A) prepay the Borrowings in an aggregate principal amount equal to such Borrowing Base Deficiency and (B) if any Borrowing Base Deficiency remains after prepaying all of the Borrowings as a result of an LC Exposure, pay to the Administrative Agent on behalf of the Lenders an amount equal to such remaining Borrowing Base Deficiency to be held as cash collateral as provided in Section 2.09(j).

(iv)    Application of Prepayments to Types of Borrowings. Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied, first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto.

(v)    Application in Connection with Consolidated Cash Balance.  If, at any time, (i) the Borrower has outstanding Borrowings or Letters of Credit or reimbursement obligations in respect of Letters of Credit that are outstanding and (ii) the Consolidated Cash Balance exceeds the Consolidated Cash Balance Threshold as of the close of business on the most recently ended Business Day, then the Borrower shall, within two Business Days, (A) prepay the Borrowings in an aggregate principal amount equal to such excess and (B) if any excess remains after prepaying all of the Borrowings as a result of outstanding LC Exposure, pay to the Administrative Agent an amount equal to such excess to be held as cash collateral as provided in Section 2.09(j).

(vi)    Interest to be Paid with Prepayments. Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied ratably to the Loans included in the prepaid Borrowings. Prepayments pursuant to this Section 3.04(c) shall be accompanied by accrued interest to the extent required by Section 3.02.

(d)    No Premium or Penalty.  Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

Section 3.05    Fees.

(a)    Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the applicable Commitment Fee Rate on the average daily unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.  Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

47

(b)    <u>Letter of Credit Fees</u>.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Loans on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.15% *per annum* on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the date of this Agreement to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, <u>provided</u> that in no event shall such fee be less than $125 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of March, June, September and December of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the date of this Agreement; <u>provided</u> that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.  Any other fees payable to the Issuing Bank pursuant to this <u>Section 3.05(b)</u> shall be payable within ten (10) days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    <u>Administrative Agent Fees</u>.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and the Administrative Agent.

## ARTICLE IV
## PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01    <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)    <u>Payments by the Borrower</u>.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under <u>Section 5.01</u>, <u>Section 5.02</u>, <u>Section 5.03</u> or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon, but shall be considered received on the date paid for purposes of <u>Section 10.01</u>.  All such payments shall be made to the Administrative Agent at its offices specified in <u>Section 12.01</u>, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to <u>Section 5.01</u>, <u>Section 5.02</u>, <u>Section 5.03</u> and <u>Section 12.03</u> shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

48

(b)      Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in LC Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in LC Disbursements and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this Section 4.01(c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 4.02      Presumption of Payment by the Borrower.    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03      Certain Deductions by the Administrative Agent.  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(b), Section 2.09(d), Section 2.09(e) or Section 4.02 then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

49

Section 4.04    Disposition of Proceeds.   The Security Instruments contain an assignment by the Borrower and/or the Guarantors to and in favor of the Administrative Agent for the benefit of the Secured Parties of all of the Borrower's or each Guarantor's interest in and to production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property. The Security Instruments further provide in general for the application of such proceeds to the satisfaction of the Secured Obligations and other obligations described therein and secured thereby. Notwithstanding the assignment contained in such Security Instruments, unless and until an Event of Default has occurred and is continuing, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Restricted Subsidiaries and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary or advisable to cause such proceeds to be paid to the Borrower and/or such Restricted Subsidiaries.

Section 4.05    Payments and Deductions to a Defaulting Lender.

(a)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(b), Section 2.09(d), Section 2.09(e) or Section 4.02 then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid in cash.

(b)    If a Defaulting Lender as a result of the exercise of a set-off shall have received a payment in respect of its Revolving Credit Exposure which results in its Revolving Credit Exposure being less than its Applicable Percentage of the aggregate Revolving Credit Exposures, then no payments will be made to such Defaulting Lender until such time as all amounts due and owing to the Lenders have been equalized in accordance with each Lender's respective *pro rata* share of the aggregate Revolving Credit Exposures.   Further, if at any time prior to the acceleration or maturity of the Loans, the Administrative Agent shall receive any payment in respect of principal of a Loan or a reimbursement of an LC Disbursement while one or more Defaulting Lenders shall be party to this Agreement, the Administrative Agent shall apply such payment first to the Borrowing(s) for which such Defaulting Lender(s) shall have failed to fund its *pro rata* share until such time as such Borrowing(s) are paid in full or each Lender (including each Defaulting Lender) is owed its Applicable Percentage of all Loans then outstanding.   After acceleration or maturity of the Loans, subject to the first sentence of this Section 4.05(b), all principal will be paid ratably as provided in Section 10.02(c).

(c)    Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(i)    Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 3.05.

(ii)    The Commitment, the Maximum Credit Amount, the outstanding principal balance of the Loans and participation interests in Letters of Credit of such Defaulting Lender shall not be included in determining whether all Lenders or the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 12.02), provided that any waiver, amendment or modification requiring the consent of each affected Lender and which affects such Defaulting Lender, shall require the consent of such Defaulting Lender; and provided further that any redetermination or affirmation of the Borrowing Base shall occur without participation of a

50

Defaulting Lender, but the Commitments (*i.e.*, the Applicable Percentage of the Borrowing Base of a Defaulting Lender) may not be increased without the consent of such Defaulting Lender.

(iii)    If any LC Exposure exists at the time a Lender becomes a Defaulting Lender then:

(A)    all or any part of such LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent (1) the sum of all Non-Defaulting Lenders' Revolving Credit Exposures plus such Defaulting Lender's LC Exposure does not exceed the total of all Non-Defaulting Lenders' Commitments, (2) the sum of each Non-Defaulting Lender's Revolving Credit Exposure plus its reallocated share of such Defaulting Lender's LC Exposure does not exceed such Non-Defaulting Lender's Commitment, and (3) the conditions set forth in Section 6.02 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, then the Borrower shall, within one (1) Business Day following notice by the Administrative Agent, cash collateralize such Defaulting Lender's LC Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with the procedures set forth in Section 2.09(e) for so long as such LC Exposure is outstanding;

(C)    if the Borrower cash collateralizes any portion of such Defaulting Lender's LC Exposure pursuant to this Section 4.05 then the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.05(b) with respect to such Defaulting Lender's LC Exposure during the period such Defaulting Lender's LC Exposure is cash collateralized;

(D)    if the LC Exposure of the Non-Defaulting Lenders is reallocated pursuant to Section 4.05, then the fees payable to the Lenders pursuant to Section 3.05(a) and Section 3.05(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Applicable Percentages; or

(E)    if any Defaulting Lender's LC Exposure is neither cash collateralized nor reallocated pursuant to Section 4.05(c)(iii), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all commitment fees that otherwise would have been payable to such Defaulting Lender (solely with respect to the portion of such Defaulting Lender's Commitment that was utilized by such LC Exposure) and letter of credit fees payable under Section 3.05(b) with respect to such Defaulting Lender's LC Exposure shall be payable to the Issuing Bank until such LC Exposure is cash collateralized and/or reallocated.

(d)    So long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Commitments of the Non-Defaulting Lenders and/or cash collateral will be provided by the Borrower in accordance with Section 4.05, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.09(d) (and Defaulting Lenders shall not participate therein).

(e)    If (i) a Bankruptcy Event or a Bail-In Action with respect to a Lender Parent of any Lender shall occur following the date hereof and for so long as such event shall continue or (ii) the Issuing Bank has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Issuing Bank shall not be required to issue, extend, renew or increase any Letter of Credit, unless the Issuing Bank shall have entered into arrangements with the Borrower or such Lender, satisfactory to the Issuing Bank to defease any risk to it in respect of such Lender hereunder.

51

509265-1666-Active.19779355.12

(f)    In the event that the Administrative Agent, the Borrower and the Issuing Bank each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the LC Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment and on such date such Lender shall purchase at par such of the Loans or participations in Letters of Credit of the other Lenders as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Applicable Percentage.

## ARTICLE V
## INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES

Section 5.01    Increased Costs.

(a)    Eurodollar Changes in Law.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except  any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    shall subject any Lender or Issuing Bank to any Taxes (other than (A) Indemnified Taxes or Other Taxes indemnified under Section 5.03 and (B) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or Issuing Bank of making, converting into, continuing or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or Issuing Bank such additional amount or amounts as will compensate such Lender or Issuing Bank for such additional costs incurred or reduction suffered.

(b)    Capital and Liquidity Requirements.  If any Lender or the Issuing Bank determines that any Change in Law regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)    Certificates.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) or Section 5.01(b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

52

509265-1666-Active.19779355.12

(d)     Effect of Failure or Delay in Requesting Compensation.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 5.02     Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 5.04(b), then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

Section 5.03     Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower or any Guarantor under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable law. If a withholding agent shall be required under applicable law (as determined in the good faith discretion by the applicable withholding agent) to deduct any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions, (ii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 5.03), the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made.

(b)     Payment of Other Taxes by the Borrower.  The Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for such Other Taxes.

53

(c)      Indemnification by the Borrower.  The Borrower and Guarantors shall jointly and severally indemnify the Administrative Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender, on or with respect to any payment by or on account of any obligation of the Borrower hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.03) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate of the Administrative Agent, a Lender as to the amount of such payment or liability under this Section 5.03 shall be delivered to the Borrower and shall be conclusive absent manifest error.

(d)      Evidence of Payments.  As soon as practicable after any payment of Taxes by the Borrower or a Guarantor to a Governmental Authority pursuant to this Section 5.03, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      Foreign Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments under this Agreement or any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by a Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by such Borrower or the Administrative Agent as will enable such Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(e)(i)(A), (i)(B) and (i)(D) below) shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)      Without limiting the generality of the foregoing:

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-

54

8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that (A) such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (B) the interest payments in question are not effectively connected with a U.S. trade or business conducted by such Foreign Lender or are effectively connected but are not includible in the Foreign Lender's gross income for U.S. federal income tax purposes under an income tax treaty (a "U.S. Tax Compliance Certificate") and (y) executed originals of  IRS Form W-8BEN or W-8BEN-E; or

(4)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership), executed originals of IRS Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such beneficial owner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

55

(f)        Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that the Borrower or Guarantors have not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Borrower and Guarantors to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 5.03(f).

(g)        Tax Refunds.  If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 5.03, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 5.03 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 5.03 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(h)        For purposes of this Section 5.03, the term Lender shall include the Issuing Bank.

Section 5.04        Mitigation Obligations; Replacement of Lenders.

(a)        Designation of Different Lending Office.  If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or Section 5.03, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)        Replacement of Lenders.  If (i) any Lender requests compensation under Section 5.01, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, (iii) any Lender becomes a Defaulting Lender or (iv) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that requires the consent of all the Lenders (or the affected Lenders and such Lender is an affected Lender) pursuant to Section 12.02 and with respect to which the Lenders holding at least eighty-five percent (85%) of the outstanding aggregate principal amount of the Loans or participation interests in

56

Letters of Credit have consented, then the Borrower may, at its sole expense, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 12.04(b)), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (1) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (2) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (3) in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(c)    Replacement for Borrowing Base Increase.  If a Lender does not approve a proposed Borrowing Base increase which has been approved by the Lenders holding at least eighty-five percent (85%) of the outstanding aggregate principal amount of the Loans or participation interests in Letters of Credit, then the Borrower may, at its sole expense, within three (3) Business Days after the Borrower receives the New Borrowing Base Notice with respect to such increase, at the discretion of such existing Lender either:

(A)    cause such existing Lender to assign and delegate, without recourse, all its interests, rights and obligations under this Agreement to one or more assignees proposed by the Borrower that shall assume such obligations (which assignees may be another Lender, if a Lender accepts such assignment), provided that such existing Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee(s) (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), or

(B)    cause such existing Lender to reduce its Maximum Credit Amount based upon a new Applicable Percentage for such existing Lender that is calculated by dividing such existing Lender's then outstanding Revolving Credit Exposure by the Borrowing Base determined after the increase of the Borrowing Base and assigning the balance of its Maximum Credit Amount to an assignee or assignees proposed by the Borrower that shall assume such amount of the assigning Lender's Maximum Credit Amount (which assignee may be another Lender, if a Lender accepts such assignment).

Any such replacement of an existing Lender or partial assignment of an existing Lender's Maximum Credit Amount shall be in accordance with and subject to the restrictions contained in Section 12.04(b).

**ARTICLE VI**
**CONDITIONS PRECEDENT**

Section 6.01    Closing Date.  The effectiveness of the conversion or rolling over of the aggregate amount of the Existing Loans and the aggregate amount of commitments under the DIP Facility into Loans and commitments under the Exit Facility and the obligation of the Lenders to make (or to be deemed to have made) Loans and of the Issuing Bank to issue (or to be deemed to have issued) Letters of Credit on the Closing Date shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 12.02):

57

(a)      Credit Agreement. The Loan Documents shall be in form and substance reasonably satisfactory to the Borrower and the Administrative Agent and in connection therewith the Administrative Agent shall have received from each party hereto counterparts (in such number as may be requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(b)      Loan Documents.

(i)      Execution of Security Instruments. The Administrative Agent shall have received from each party thereto counterparts (in such number as may be requested by the Administrative Agent) of the Security Instruments, including the Guaranty Agreement and Perfection Certificate, described on Exhibit E that have been executed and delivered by a Responsible Officer of each party thereto. (A) The Administrative Agent shall be reasonably satisfied that, upon recording the Mortgages, the reaffirmation agreements or other documents reasonably satisfactory to the Administrative Agent, if any, in each case, in the appropriate filing offices, it shall have a first priority Lien on at least 95% of the PV-9 of the Borrowing Base Properties and (B) the Borrower shall have executed and delivered Control Agreements in connection with its Deposit Accounts or Securities Accounts (other than any Excluded Accounts), as applicable.

(ii)      Filings, Registrations and Recordings. Each Security Instrument and any other document (including any UCC financing statement) required by any Security Instrument or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral, prior and superior in right to any other Person shall be in proper form for filing, registration or recordation.

(iii)      Pledged Stock; Stock Powers; Pledged Notes. The Administrative Agent shall have received (A) the certificates (if any) representing the shares of Equity Interests required to be pledged pursuant to the Guaranty Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (B) each promissory note (if any) required to be pledged to the Administrative Agent pursuant to the Guaranty Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(c)      Fees. All fees required to be paid to the Administrative Agent and the Lenders on or before the Closing Date shall have been paid. All reasonable and documented out-of-pocket fees and expenses (including reasonable and documented fees and expenses of outside counsel) required to be paid to the Administrative Agent and the Lenders on or before the Closing Date shall have been paid.

(d)      Bankruptcy Court Documentation. The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall have become a final order and shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that would reasonably be expected to adversely affect the interests of the Secured Parties and the Confirmation Order shall have *inter alia* authorized and approved the Borrower and its Restricted Subsidiaries to execute, deliver and perform under the Loan Documents and included a customary release for the DIP Lenders to the extent such release is not included in the Plan of Reorganization. The Plan of Reorganization and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan of Reorganization shall have been (or concurrently with the occurrence of the Closing Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with applicable law and the Bankruptcy Court and regulatory approvals. The respective Indebtedness or obligations of the Loan Parties and any Liens securing such Indebtedness or obligations that are outstanding immediately

58

after the consummation of the Plan of Reorganization shall not exceed the amount contemplated by the Plan of Reorganization.

(e)   Solvency Certificate.   The Administrative Agent shall have received the Solvency Certificate (after giving effect to the Plan of Reorganization) from a Financial Officer.

(f)   Secretary's Certificates.   The Administrative Agent shall have received a certificate of a Responsible Officer of each Loan Party setting forth (i) resolutions of its board of directors or other appropriate governing body with respect to the authorization of such Loan Party to execute and deliver the Loan Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of such Loan Party (A) who are authorized to sign the Loan Documents to which such Loan Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such authorized officers and (iv) the articles or certificate of incorporation and by-laws or other applicable organizational documents of such Loan Party, certified by such Responsible Officer as being true and complete.   The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from such Loan Party to the contrary.

(g)   Legal Opinions.   The Administrative Agent shall have received an opinion of (i) Weil, Gotshal & Manges LLP, counsel for the Loan Parties and (ii) local counsel in any jurisdictions where Security Instruments will be recorded to perfect first priority Liens on any Borrowing Base Properties, in each case in form and of substance reasonably acceptable to the Administrative Agent.

(h)   Exit Facility Conversion Date.   The Closing Date shall occur not later than the Maturity Date (as defined in the DIP Credit Agreement).

(i)   Financial Statements.   (i) To the extent not otherwise included in the Disclosure Statement, the Administrative Agent shall have received a *pro forma* consolidated balance sheet and any other applicable financial statements of the Borrower and its Restricted Subsidiaries as of the most recent month and fiscal quarter ended prior to the Closing Date for which financial statements are available and (ii) the Administrative Agent shall have received any *pro forma* consolidated balance sheet and any other applicable financial statements of the Borrower and its Restricted Subsidiaries that are included in the disclosure statement relating to the Plan of Reorganization; provided that, in each case, for purposes of such financial statements, working capital expenditures will not be required to be included in such financial statements.

(j)   Approvals and Consents. The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that, after giving effect to the Confirmation Order and the Plan of Reorganization, all necessary governmental and third party consents and approvals necessary in connection with the Exit Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any materially adverse conditions that are not reasonably acceptable to the Administrative Agent) and shall remain in effect; and no material applicable law or regulation shall prevent the Loan Parties' performance of their obligations under the Exit Facility or the transactions contemplated thereby.

(k)   Insurance. The Administrative Agent shall have received a certificate of insurance coverage of the Borrower evidencing that the Borrower is carrying insurance in accordance with Section 7.12.

59

(l)    No Default Under the DIP Facility.  No "Default" or "Event of Default" shall have occurred and be continuing under the DIP Facility.

(m)    DIP Facility Obligations.  All Secured Obligations under and as defined in the DIP Credit Agreement shall have been (or concurrently with the Closing Date shall be) refunded, refinanced, rolled over, entitled to be secured with the Secured Obligations pursuant to this Agreement and the other Loan Documents or repaid in full in cash with Loans made or deemed made, and  Letters of Credit issued or deemed issued, as applicable, under this Agreement.

(n)    Lien Searches.  The Administrative Agent shall have received appropriate UCC searches reflecting no prior Liens encumbering the Properties of the Borrower and the Loan Parties other than those being released on or prior to the Closing Date and those permitted by Section 9.03.

(o)    Minimum Liquidity.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying that after giving effect to any Borrowings as of the Closing Date, the Borrower has Liquidity of not less than $225.0 million on the Closing Date.

(p)    Patriot Act.  Each Lender who has requested in writing the same at least ten (10) Business Days prior to the Closing Date shall have received, at least three (3) Business Days prior to the Closing Date, "know your customer" and similar information.

(q)    Title Information.   The Administrative Agent shall have received title information as the Administrative Agent may reasonably require, reasonably satisfactory to the Administrative Agent, setting forth the status of title to at least 85% of the PV-9 of the Borrowing Base Properties.

(r)    Initial Reserve Report.  The Administrative Agent shall have received the Initial Reserve Report accompanied by a certificate covering the matters described in Section 8.12(c)(i), Section 8.12(c)(ii), Section 8.12(c)(iii), Section 8.12(c)(v) and Section 8.12(c)(vi).

(s)    Corporate Status; Good Standing Certificates.  The Administrative Agent shall have received certificates of the appropriate State agencies with respect to the existence, qualification and good standing of each Loan Party in each jurisdiction where any such Loan Party is organized or owns Borrowing Base Properties.

The Administrative Agent shall notify the Borrower and the Lenders of the Closing Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 12.02) at or prior to 5:00 p.m., New York City time, on [●], 2016 (and, in the event such conditions are not so satisfied or waived, the Commitments shall terminate at such time).

Section 6.02    Each Credit Event.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding on the Closing Date), and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

60

(b)    All representations and warranties of the Loan Parties in each applicable Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, with the same effect as though made on and as of such date, except in the case of any representation and warranty which (A) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (B) is qualified by a materiality or Material Adverse Effect standard in which case such representation and warranty shall be true and correct in all respects.

(c)    (i) the Consolidated Cash Balance immediately prior to such Borrowing and (ii) the *pro forma* Consolidated Cash Balance, immediately after giving effect to such Borrowing, shall not exceed the Consolidated Cash Balance Threshold.

(d)    The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit (or an amendment, extension or renewal of a Letter of Credit) in accordance with Section 2.09(b), as applicable.

Each request for such Borrowing or for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.02(a) through Section 6.02(c).

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lenders that:

Section 7.01    Organization; Powers.  Each of the Borrower and the Restricted Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02    Authority; Enforceability.  After giving effect to the Confirmation Order and the Plan of Reorganization, the Transactions are within the Borrower's and each Guarantor's constituent powers and have been duly authorized by all necessary corporate, limited liability company or partnership, and, if required, stockholder action (including, without limitation, any action required to be taken by any class of directors of the Borrower, whether interested or disinterested, in order to ensure the due authorization of the Transactions).  Each Loan Document to which a Loan Party is a party has been duly executed and delivered by the Borrower and such Guarantor and constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03    Approvals; No Conflicts.  After giving effect to the Confirmation Order and the Plan of Reorganization, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been

61

509265-1666-Active.19779355.12

obtained or made and are in full force and effect other than (i) the recording and filing of the Security Instruments as required by this Agreement and (ii) those third party approvals or consents which, if not made or obtained, would not cause a Default hereunder, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any Restricted Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any Restricted Subsidiary or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Restricted Subsidiary and (d) will not result in the creation or imposition of any Lien on any Property of the Borrower or any Restricted Subsidiary (other than the Liens created by the Loan Documents).

Section 7.04    Financial Condition; No Material Adverse Effect.

(a)    The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the fiscal year ended December 31, 2015, reported on by Deloitte & Touche LLP, independent public accountants, and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended [●].  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its Consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.

(b)    Since [●][1], (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of the Borrower and its Restricted Subsidiaries has been conducted only in the ordinary course consistent with past business practices.

(c)    Neither the Borrower nor any Restricted Subsidiary has on the date hereof any material Indebtedness (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments (other than the Gas Balancing Obligations and the Swap Agreements listed on Schedule 7.20) which are not referred to or reflected or provided for in the Financial Statements.

(d)    The Borrower has heretofore furnished to the Lenders its *pro forma* consolidated balance sheet as of the Closing Date after giving *pro forma* effect to the transactions contemplated by this Agreement, including the repayment of the DIP Credit Agreement.  Such *pro forma* balance sheet presents fairly, in all material respects, the *pro forma* balance sheet of the Borrower and its Consolidated Subsidiaries as of such date in accordance with GAAP.

Section 7.05    Litigation.

(a)    After giving effect to the Confirmation Order and the Plan of Reorganization and except as set forth on Schedule 7.05, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any Restricted Subsidiary (i) not fully covered by insurance (except for normal deductibles) as to which there is a reasonable possibility of an adverse determination that, if adversely determined, could reasonably be expected, individually or in the

---

[1] To be the date of the most recent quarterly financial statements delivered prior to the Closing Date.

aggregate, to result in a Material Adverse Effect or (ii) that involve any Loan Document or the Transactions.

(b)     Since the date of this Agreement, there has been no change in the status of the matters disclosed in Schedule 7.05 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

Section 7.06   Environmental Matters.   Except as could not be reasonably expected to have a Material Adverse Effect (or with respect to (b), (c), (d) and (e) below, where the failure to take such actions could not be reasonably expected to have a Material Adverse Effect):

(a)     neither any Property of the Borrower or any Restricted Subsidiary nor the operations conducted thereon violate any order or requirement of any court or Governmental Authority or any Environmental Laws.

(b)     no Property of the Borrower or any Restricted Subsidiary nor the operations currently conducted thereon or, to the knowledge of the Borrower, by any prior owner or operator of such Property or operation, are in violation of or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or to any remedial obligations under Environmental Laws.

(c)     all notices, permits, licenses, exemptions, approvals or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Property of the Borrower and each Restricted Subsidiary, including, without limitation, past or present treatment, storage, disposal or release of a hazardous substance, oil and gas waste or solid waste into the environment, have been duly obtained or filed, and the Borrower and each Restricted Subsidiary are in compliance with the terms and conditions of all such notices, permits, licenses and similar authorizations.

(d)     all hazardous substances, solid waste and oil and gas waste, if any, generated at any and all Property of the Borrower or any Restricted Subsidiary have in the past been transported, treated and disposed of in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and, to the knowledge of the Borrower, all such transport carriers and treatment and disposal facilities have been and are operating in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws.

(e)     the Borrower has taken all steps reasonably necessary to determine and has determined that no oil, hazardous substances, solid waste or oil and gas waste, have been disposed of or otherwise released and there has been no threatened release of any oil, hazardous substances, solid waste or oil and gas waste on or to any Property of the Borrower or any Restricted Subsidiary except in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment.

(f)     to the extent applicable, all Property of the Borrower and each Restricted Subsidiary currently satisfies all design, operation, and equipment requirements imposed by the OPA, and the Borrower does not have any reason to believe that such Property, to the extent subject to the OPA, will not be able to maintain compliance with the OPA requirements during the term of this Agreement.

63

(g)      neither the Borrower nor any Restricted Subsidiary has any known contingent liability or Remedial Work in connection with any release or threatened release of any oil, hazardous substance, solid waste or oil and gas waste into the environment.

Section 7.07      Compliance with the Laws and Agreements; No Defaults.

(a)      After giving effect to the Confirmation Order and the Plan of Reorganization, each of the Borrower and each Restricted Subsidiary is in compliance with all Governmental Requirements applicable to it or its Property and all agreements and other instruments binding upon it or its Property, and possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of its Property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)      No Default has occurred and is continuing.

Section 7.08      Investment Company Act.      Neither the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09      Taxes.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.  The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of Taxes and other governmental charges are, in the reasonable opinion of the Borrower, adequate.  No Tax Lien has been filed and, to the knowledge of the Borrower, no claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10      ERISA.

(a)      Except as could not reasonably be expected to result in a Material Adverse Effect, the Borrower, the Subsidiaries and each ERISA Affiliate have complied in all respects with ERISA and, where applicable, the Code regarding each Plan.

(b)      Except as could not reasonably be expected to result in a Material Adverse Effect, each Plan is, and has been, established and maintained in substantial compliance with its terms, ERISA and, where applicable, the Code.

(c)      Except as could not reasonably be expected to result in a Material Adverse Effect, no act, omission or transaction has occurred which could result in imposition on the Borrower, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under section 409 of ERISA.

(d)      Except as could not reasonably be expected to result in a Material Adverse Effect, full payment when due has been made of all amounts which the Borrower, the Subsidiaries or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof.

64

(e)      Neither the Borrower, nor any of the Subsidiaries sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Borrower, or a Subsidiary in its sole discretion at any time without any material liability other than the payment of accrued benefits under such plan.

(f)      Neither the Borrower, the Subsidiaries nor any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 7.11    Disclosure; No Material Misstatements.    None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower or any Restricted Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time (it being understood that actual results may vary from the projected financial information).  There is no fact peculiar to the Borrower or any Restricted Subsidiary which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Borrower or any Restricted Subsidiary on the date hereof in connection with the transactions contemplated hereby.  No statements or conclusions exist in any Reserve Report which are based upon or include misleading information or which fail to take into account material information regarding the matters reported therein to the extent such misstatement, misleading information or failure could reasonably be expected to have a Material Adverse Effect.

Section 7.12    Insurance.    The Borrower has, and has caused all its Restricted Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and its Restricted Subsidiaries.  The Administrative Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Administrative Agent has been named as loss payee with respect to Property loss insurance.

Section 7.13    Restriction on Liens.    After giving effect to the Confirmation Order and the Plan of Reorganization, neither the Borrower nor any of the Restricted Subsidiaries is a party to any material agreement or arrangement (other than Capital Leases creating Liens permitted by Section 9.03(c), but then only on the Property subject of such Capital Lease), or subject to any order, judgment, writ or decree, which either restricts or purports to restrict its ability to grant Liens to the Administrative Agent and the Lenders on or in respect of their Properties to secure the Secured Obligations and the Loan Documents.

Section 7.14    Subsidiaries.    Except as set forth on Schedule 7.14 or as disclosed in writing to the Administrative Agent (which shall promptly furnish a copy to the Lenders), which shall be a supplement to Schedule 7.14, the Borrower has no Subsidiaries and the Borrower has no Foreign Subsidiaries.  Schedule 7.14, as may be supplemented from time to time, identifies each Subsidiary as

509265-1666-Active.19779355.12

either Restricted or Unrestricted, and each Restricted Subsidiary on such schedule is a Wholly-Owned Subsidiary.

Section 7.15    Location of Business and Offices.    After giving effect to the Confirmation Order and the Plan of Reorganization, the Borrower's jurisdiction of organization is Delaware; the name of the Borrower as listed in the public records of its jurisdiction of organization is Halcón Resources Corporation; and the organizational identification number of the Borrower in its jurisdiction of organization is 3761452 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(m) in accordance with Section 12.01).  The Borrower's principal place of business and chief executive offices are located at the address specified in Section 12.01 (or as set forth in a notice delivered pursuant to Section 8.01(m) and Section 12.01(c)).  Each Restricted Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14 (or as set forth in a notice delivered pursuant to Section 8.01(m)).

Section 7.16    Properties; Titles, Etc.    After giving effect to the Confirmation Order and the Plan of Reorganization:

(a)    Each of the Borrower and the Restricted Subsidiaries has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report and good title to all its other personal Properties, in each case, free and clear of all Liens except Liens permitted by Section 9.03.  After giving full effect to the Excepted Liens, the Borrower or the Restricted Subsidiary specified as the owner owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such Property.

(b)    All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases, which could reasonably be expected to have a Material Adverse Effect.

(c)    The rights and Properties presently owned, leased or licensed by the Borrower and the Restricted Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Restricted Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)    All of the Properties of the Borrower and the Restricted Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except for any such failure to maintain such Properties, individually or in the aggregate, that could not reasonably be expected to result in a Material Adverse Effect.

(e)    The Borrower and each Restricted Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and

66

the use thereof by the Borrower and such Restricted Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Borrower and its Restricted Subsidiaries either own or have valid licenses or other rights to use all databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons, with such exceptions as could not reasonably be expected to have a Material Adverse Effect.

Section 7.17    Maintenance of Properties.  After giving effect to the filing of the Chapter 11 Cases, except for such acts or failures to act as could not be reasonably expected to have a Material Adverse Effect, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and its Restricted Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries.  Specifically in connection with the foregoing, except for those as could not be reasonably expected to have a Material Adverse Effect, (i) no Oil and Gas Property of the Borrower or any Restricted Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Restricted Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements, and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such Restricted Subsidiary.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of its Restricted Subsidiaries that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of its Restricted Subsidiaries, in a manner consistent with the Borrower's or its Restricted Subsidiaries' past practices (other than those the failure of which to maintain in accordance with this Section 7.17 could not reasonably be expected to have a Material Adverse Effect).

Section 7.18    Gas Imbalances, Prepayments.  Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no gas imbalances, take or pay or other prepayments which would require the Borrower or any of its Restricted Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor exceeding a volume equal to 2% of the total proved reserves (on an mcf equivalent basis) set forth in the most recently delivered Reserve Report in the aggregate.

Section 7.19    Marketing of Production.  Except for contracts listed and in effect on the date hereof on Schedule 7.19, and thereafter either disclosed in writing to the Administrative Agent or included in the most recently delivered Reserve Report (with respect to all of which contracts the Borrower represents that it or its Restricted Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on sixty (60) days' notice or less without penalty or detriment for the sale of production from the Borrower's or its Restricted Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase production, whether or not the same are currently

67

being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20   Swap Agreements.  Schedule 7.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(e), sets forth, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 7.21   Use of Loans and Letters of Credit.  The proceeds of the Loans and the Letters of Credit shall be used (a) to refund, refinance and replace the Existing Loans and Existing Letters of Credit outstanding on the Closing Date, (b) to fund the Loan Parties' emergence from the Chapter 11 Cases, (c) to provide for working capital and other general corporate purposes, including to fund any interest payments under the Second Lien Notes as and to the extent set forth in the Confirmation Order and for lease acquisitions, exploration and production operations, development (including the drilling and completion of producing wells) and acquisitions of Oil and Gas Properties permitted hereunder, (d) for payments contemplated by the Plan of Reorganization (consistent with the Restructuring Support Agreement) and (e) for fees and expenses related to the Transactions.  The Borrower and its Subsidiaries are not engaged principally, or as one of its or their important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying margin stock (within the meaning of Regulation T, U or X of the Board).  No part of the proceeds of any Loan or Letter of Credit will be used for any purpose which violates the provisions of Regulations T, U or X of the Board.

Section 7.22   Solvency.  After giving effect to the consummation of the Plan of Reorganization, the Transactions and the other transactions contemplated hereby and thereby (including at the time of and immediately after giving effect to any Borrowing or the issuance, amendment, renewal or extension of any Letter of Credit, as applicable),  (a) the aggregate assets (after giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement), at a fair valuation, of the Borrower and the Guarantors, taken as a whole, will exceed the aggregate debt and liabilities (including subordinated liabilities) of the Borrower and the Guarantors on a consolidated basis, as the debt and liabilities (including subordinated liabilities) become absolute and mature, (b) each of the Borrower and the Guarantors will not have incurred or intended to incur, and will not believe that it will incur, debt and liabilities (including subordinated liabilities) beyond its ability to pay such debt and liabilities (including subordinated liabilities) (after taking into account the timing and amounts of cash to be received by each of the Borrower and the Guarantors and the amounts to be payable on or in respect of its liabilities, and giving effect to amounts that could reasonably be received by reason of indemnity, offset, insurance or any similar arrangement) as such debt and liabilities (including subordinated liabilities) become absolute and mature and (c) each of the Borrower and the Guarantors will not have (and will have no reason to believe that it will have thereafter) unreasonably small capital for the conduct of its business.

Section 7.23   Money Laundering.  The operations of the Borrower and its Subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements including those of the Bank Secrecy Act, as amended by the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), and the applicable anti-money laundering statutes of jurisdictions where the Borrower and its Subsidiaries conduct business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws"), and no material action, suit or proceeding by or before any court or governmental

68

agency, authority or body or any arbitrator involving the Borrower or any of its Subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Borrower, threatened.

Section 7.24    <u>Foreign Corrupt Practices</u>.    Neither the Borrower nor any of its Subsidiaries, nor any director, officer, agent or employee of the Borrower or any of its Subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a material violation by such Persons of the FCPA, including without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA; and, the Borrower and its Subsidiaries have conducted their business in material compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 7.25    <u>Anti-Corruption Laws; Sanctions; OFAC</u>.

(a)    The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws and applicable Sanctions.

(b)    The Borrower, its Subsidiaries, their respective officers and employees and, to the knowledge of the Borrower, its directors and agents are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.

(c)    None of (i) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.    The Borrower will not directly or, to its knowledge, indirectly use the proceeds from the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person currently subject to any applicable Sanctions.

Section 7.26    <u>EEA Financial Institutions</u>.    Neither the Borrower nor any of its Restricted Subsidiaries is an EEA Financial Institution.

### ARTICLE VIII
### AFFIRMATIVE COVENANTS

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 8.01    <u>Financial Statements; Other Information</u>.    The Borrower will furnish to the Administrative Agent and each Lender:

(a)    <u>Annual Financial Statements</u>.    As soon as available, but in any event in accordance with then applicable law and not later than ninety (90) days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2016, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case (other than after the implementation of "fresh start" accounting) in comparative form the figures for the previous fiscal year, all reported on by independent

509265-1666-Active.19779355.12

public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit, except for any such qualification or exception resulting solely from the impending maturity date of the Loans) to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)     Quarterly Financial Statements.     As soon as available, but in any event in accordance with then applicable law and not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case (other than after the implementation of "fresh start" accounting) in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

The Borrower represents and warrants that the Borrower and each of its Subsidiaries file the financial statements provided under Section 8.01(a) and Section 8.01(b) with the SEC and/or make such financial statements available to potential holders of their 144A securities, and, accordingly, unless the Borrower has marked such financial statements as "PRIVATE", the Borrower hereby (1) authorizes the Administrative Agent to make the financial statements to be provided under Section 8.01(a) and Section 8.01(b), along with the Loan Documents, available to Public-Siders and (2) agrees that at the time such financial statements are provided hereunder, they shall already have been made available to holders of its securities.  The Borrower will not request that any other material be posted to Public-Siders without expressly representing and warranting to the Administrative Agent in writing that (1) such materials do not constitute material non-public information within the meaning of the federal securities laws or (2) make such materials that do constitute material non-public information within the meaning of the federal securities laws publicly available by press release or public filing with the SEC.

(c)     Certificate of Financial Officer -- Compliance.     Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a Compliance Certificate (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) certifying that the Borrower has been in compliance with Section 9.01 at such times during the period covered by such financial statements as required therein and in connection therewith, setting forth reasonably detailed calculations demonstrating compliance with Section 8.13(b) and Section 9.01 and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)     Certificate of Financial Officer -- Consolidating Information.     If, at any time, all of the Consolidated Subsidiaries of the Borrower are not Consolidated Restricted Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all Consolidated Unrestricted Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Borrower.

70

(e)     <u>Certificate of Financial Officer – Swap Agreements</u>.  Concurrently with any delivery of any Reserve Report or at such other times as may be reasonably requested by the Administrative Agent, a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of the calendar month preceding the delivery of such Reserve Report, a true and complete list of all Swap Agreements of the Borrower and each Restricted Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), any new credit support agreements relating thereto not listed on <u>Schedule 7.20</u>, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(f)     <u>Certificate of Insurer – Insurance Coverage</u>.  Concurrently with any delivery of financial statements under <u>Section 8.01(a)</u>, a certificate of insurance coverage from each insurer with respect to the insurance required by <u>Section 8.07</u>, in form and substance satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(g)     <u>Other Accounting Reports</u>.  Promptly upon receipt thereof, a copy of each other material report or opinion submitted to the Borrower or any of its Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower or any such Subsidiary, and a copy of any response by the Borrower or any such Subsidiary, or the Board of Directors of the Borrower or any such Subsidiary, to such material report or opinion.

(h)     <u>SEC and Other Filings; Reports to Shareholders</u>.  Promptly after the same become publicly available, and upon the request of the Lenders, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC, or with any national securities exchange and distributed by the Borrower to its shareholders.  Documents required to be delivered pursuant to <u>Sections 8.01(a)</u>, <u>Section 8.01(b)</u> and this <u>Section 8.01(h)</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which the Administrative Agent receives notice from the Borrower, electronically or in writing, that such documents have been posted to EDGAR and/or on its home page on the worldwide web (or such other free, publicly-accessible internet database that may be established and maintained by the SEC as a substitute for, or successor to, EDGAR).

(i)     <u>Notices Under Material Instruments</u>.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this <u>Section 8.01</u>.

(j)     <u>Lists of Purchasers</u>.  Concurrently with the delivery of the annual financial statements in accordance with <u>Section 8.01(a)</u>, a list of Persons who purchased at least 70% of the aggregate production of Hydrocarbons from the Borrower and its Restricted Subsidiaries during the year presented in such annual financial statements.

(k)     <u>Notice of Sales of Oil and Gas Properties and Unwinds of Swap Agreements</u>.  In the event the Borrower or any Restricted Subsidiary intends to sell, transfer, assign or otherwise Dispose of at least the greater of $10.0 million or 5% of the then effective Borrowing Base worth of any Oil and Gas Properties, Swap Agreements or any Equity Interests in any Restricted Subsidiary in accordance with <u>Section 9.13</u> which are included in the then current Borrowing Base, prior written notice of such Disposition or Unwind, the price thereof and the anticipated date of closing.

71

(l)    <u>Notice of Casualty Events</u>.  Prompt written notice, and in any event within three (3) Business Days after the Borrower obtains knowledge of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event having a fair market value in excess of $10.0 million.

(m)    <u>Information Regarding Borrower and Guarantors</u>.  Prompt written notice (and in any event within ten (10) days after the occurrence) of any change (i) in a Loan Party's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Loan Party's chief executive office or principal place of business, (iii) in the Loan Party's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Loan Party's jurisdiction of organization, and (v) in the Loan Party's federal taxpayer identification number.

(n)    <u>Production Report and Lease Operating Statements</u>.  Within sixty (60) days after the end of each fiscal quarter, a report setting forth, for each calendar month during the then current fiscal year to the end of such fiscal quarter on a production date basis, the volume of production and sales attributable to production for which cash activity has been recorded (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month.

(o)    <u>Notices of Certain Changes</u>.  Promptly, but in any event within thirty (30) days after the execution thereof, copies of any amendment, modification or supplement to the certificate or articles of incorporation, by-laws, any preferred stock designation or any other organic document of the Borrower or any Restricted Subsidiary.

(p)    <u>Swap Agreement Projections</u>.  No later than forty-five (45) days after the end of each fiscal quarter, the Borrower shall either (i) certify, represent and warrant that the internally forecasted production from the Oil and Gas Properties of the Borrower and the Restricted Subsidiaries for all months in which the Borrower or one of its Restricted Subsidiaries has Swap Agreements equals or exceeds their prior month's production of each of crude oil and natural gas, calculated separately, or (ii) deliver an additional detailed forecasted production of each of crude oil and natural gas, calculated separately, for the next 48 months or if any Swap Agreements have a tenor in excess of 48 months, for a period corresponding to the tenor of such Swap Agreements.

(q)    <u>Issuance and Incurrences of Indebtedness</u>.  Five (5) Business Days prior written notice of the incurrence by the Borrower or any Restricted Subsidiary of any Permitted Unsecured Indebtedness, Permitted Junior Indebtedness, Permitted Refinancing Debt or, if in excess of $10.0 million, any other Indebtedness as well as the amount thereof, the anticipated closing date and definitive documentation for the foregoing and any other related information reasonably requested.

(r)    <u>Calculation of Modified ACNTA</u>.  The Borrower shall provide a certificate of a Responsible Officer to the Administrative Agent with the delivery of each Reserve Report certifying as to the Modified ACNTA and containing a copy of the calculation for such and certifying that the Borrower has not granted Liens to secure Debt in excess of the amount permitted under each Second Lien Indenture or in excess of the Priority Lien Cap (as such term is defined in each Second Lien Indenture).

(s)    <u>Amount of Borrowing Base Cap, Second Lien Notes and Parity Lien Debt</u>.  The Borrower shall deliver a certificate of a Responsible Officer with the delivery of each Reserve Report pursuant to <u>Section 8.12(a)</u> and <u>Section 8.12(b)</u> certifying as to the Borrowing Base Cap as of such date,

509265-1666-Active.19779355.12

including a copy of the calculation for such and setting forth as of such date the outstanding principal amount of Second Lien Notes.

(t)    Other Requested Information.  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary (including, without limitation, any Plan and any reports or other information required to be filed by the Borrower or any of the Subsidiaries under ERISA in respect of any Plan), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may reasonably request.

(u)    Delivery of Information Electronically.  Notices to the Administrative Agent and the Lenders under this Section 8.01 may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent, including broadcast email to the Lenders that the available information has been made available to the Lenders on either the Borrower's IntraLinks page or the Borrower's website as notified by the Borrower from time to time.

Section 8.02    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    Defaults. The occurrence of any Default or Event of Default;

(b)    Governmental Matters. The filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to the Lenders that could reasonably be expected to be adversely determined and result in liability in excess of the greater of $10.0 million or 5% of the then effective Borrowing Base not fully covered by insurance, subject to normal deductibles; and

(c)    any other development that results in, or could reasonably be expected to result in a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 8.03    Existence; Conduct of Business.  The Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which its Oil and Gas Properties is located or the ownership of its Properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.12.

Section 8.04    Payment of Obligations.  After giving effect to the Confirmation Order and the Plan of Reorganization, the Borrower will, and will cause each Restricted Subsidiary to, pay its obligations, including Tax liabilities of the Borrower and all of its Subsidiaries before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make

73

payment pending such contest could not reasonably be expected to result in a Material Adverse Effect or result in the seizure or levy of any Property of the Borrower or any Subsidiary.

Section 8.05   Performance of Obligations under Loan Documents.   The Borrower will pay the Loans according to the reading, tenor and effect thereof, and the Borrower will, and will cause each Restricted Subsidiary to, do and perform every act and discharge all of the obligations to be performed and discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06   Operation and Maintenance of Properties.   Except for matters that could not reasonably be expected to result in a Material Adverse Effect, the Borrower, at its own expense, will, and will cause each Restricted Subsidiary to:

(a)      operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom.

(b)      keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its Oil and Gas Properties and other Properties, including, without limitation, all equipment, machinery and facilities.

(c)      promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

(d)      promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties.

(e)      to the extent the Borrower is not the operator of any Property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07   Insurance.   The Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent and the Lenders as "additional insureds" and provide that the insurer will use commercially reasonable efforts to give at least thirty (30) days prior notice of any cancellation to the Administrative Agent, but in any event not less than ten (10) days prior notice of such cancellation.

74

Section 8.08    Books and Records; Inspection Rights.  The Borrower will, and will cause each Restricted Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each Restricted Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.

Section 8.09    Compliance with Laws.

(a)    The Borrower will, and will cause each Restricted Subsidiary to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its Property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrower will maintain in effect and enforce policies and procedures regarding compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 8.10    Environmental Matters.

(a)    The Borrower shall at its sole expense: (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not dispose of or otherwise release, and shall cause each Subsidiary not to dispose of or otherwise release, any oil, oil and gas waste, hazardous substance, or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' Properties or any other Property to the extent caused by the Borrower's or any of its Subsidiaries' operations except in compliance with applicable Environmental Laws, the disposal or release of which could reasonably be expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all notices, permits, licenses, exemptions, approvals, registrations or other authorizations, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or its Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other release of any oil, oil and gas waste, hazardous substance or solid waste on, under, about or from any of the Borrower's or its Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; and (v) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and its Subsidiaries' obligations under this Section 8.10(a) are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)    The Borrower will promptly, but in no event later than five (5) days after the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any landowner or other third party against the Borrower or its Subsidiaries or their Properties

75

of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower reasonably anticipates that such action will result in liability (whether individually or in the aggregate) in excess of $25.0 million, not fully covered by insurance, subject to normal deductibles.

(c)    The Borrower will, and will cause each Subsidiary to, provide environmental audits and tests in accordance with American Society of Testing Materials standards upon request by the Administrative Agent and the Lenders and no more than once per year in the absence of any Event of Default (or as otherwise required to be obtained by the Administrative Agent or the Lenders by any Governmental Authority), in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11    Further Assurances.

(a)    The Borrower at its expense will, and will cause each Restricted Subsidiary to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower or any Restricted Subsidiary, as the case may be, in the Loan Documents, including the Notes, if requested, or to further evidence and more fully describe the collateral intended as security for the Secured Obligations, or to correct any omissions in this Agreement or the Security Instruments, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement or any of the Security Instruments or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Administrative Agent, to ensure that the Administrative Agent, on behalf of the Secured Parties, has a perfected security interest in all assets of the Loan Parties.  In addition, at the Administrative Agent's reasonable written request, the Borrower, at its sole expense, shall enter into any Security Instruments to evidence the Liens on the Collateral and provide any information requested to identify any Collateral, including an updated Perfection Certificate, exhibits to Mortgages in form and substance reasonably satisfactory to the Administrative Agent (which such exhibits shall be in recordable form for the applicable jurisdiction) or any other information reasonably requested in connection with the identification of any Collateral.

(b)    The Borrower hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged Property without the signature of the Borrower or any other Guarantor where permitted by law.  A carbon, photographic or other reproduction of the Security Instruments or any financing statement covering the Mortgaged Property or any part thereof shall be sufficient as a financing statement where permitted by law.

Section 8.12    Reserve Reports.

(a)    On or before April 1st and October 1st of each year, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Borrower and its Subsidiaries as of the immediately preceding December 31st and June 30th, as applicable.  The Reserve Report as of December 31st of each year shall be prepared by one or more Approved Petroleum Engineers, and the June 30th Reserve Report of each year shall be prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with the procedures used in the immediately preceding December 31st Reserve Report.

76

(b)    In the event of an Interim Redetermination, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report prepared by or under the supervision of the chief engineer of the Borrower who shall certify such Reserve Report to be true and accurate in all material respects and to have been prepared in accordance with the procedures used in the immediately preceding December 31st Reserve Report with an "as of" date as required by the Administrative Agent as soon as possible, but in any event no later than thirty (30) days following the receipt of such request.

(c)    With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent and the Lenders a Reserve Report Certificate substantially in the form of Exhibit J from a Responsible Officer certifying that in all material respects: (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects, (ii) the Borrower or its Restricted Subsidiaries owns good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report and such Properties are free of all Liens except for Liens permitted by Section 9.03, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any Restricted Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of their Oil and Gas Properties have been sold since the date of the last Borrowing Base determination except as set forth on an exhibit to the certificate, which exhibit shall list all of its Oil and Gas Properties sold other than Hydrocarbons sold in the ordinary course of business and in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.19 had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties and demonstrating that the Borrower is in compliance with Section 8.14 (the certificate described herein, the "Reserve Report Certificate").

Section 8.13    Title Information.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12(a), to the extent requested by the Administrative Agent, the Borrower shall deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Borrowing Base Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least 85% of the PV-9 of the Borrowing Base Properties.

(b)    If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within ninety (90) days (or such longer period of time as may be acceptable to the Administrative Agent in its sole discretion) of written notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, either (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information, (ii) substitute acceptable Mortgaged Properties with no title defects or exceptions except for Excepted Liens (other than Excepted Liens described in clauses (e), (g) and (h) of such definition) having an equivalent value or (iii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, reasonably satisfactory title information on at least 85% of the PV-9 of the Borrowing Base Properties.

509265-1666-Active.19779355.12

(c)    If the Borrower is unable to cure any title defect requested by the Administrative Agent or the Lenders to be cured within the period of time required by clause (b) above or the Borrower does not comply with the requirements to provide acceptable title information covering at least 85% of the PV-9 of the Borrowing Base Properties, such default shall not be a Default, but instead the Administrative Agent and/or the Required Lenders shall have the right to exercise the following remedy in their sole discretion from time to time, and any failure to so exercise this remedy at any time shall not be a waiver as to future exercise of the remedy by the Administrative Agent or the Required Lenders. To the extent that the Administrative Agent or the Required Lenders are not satisfied with title to any Mortgaged Property after such period of time has elapsed, such unacceptable Mortgaged Property shall not count towards the 85% requirement, and the Administrative Agent may send a written notice to the Borrower and the Lenders that the then outstanding Borrowing Base shall be reduced by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide acceptable title information covering at least 85% of the PV-9 of the Borrowing Base Properties evaluated by such Reserve Report. This new Borrowing Base shall become effective in accordance with Section 2.08(b).

Section 8.14    Additional Collateral; Additional Guarantors.

(a)    In connection with each redetermination of the Borrowing Base (including, for the avoidance of doubt, any Interim Redetermination), the Borrower shall review the Reserve Report and the list of current Mortgaged Properties (as described in Section 8.12(c)(vi)) to ascertain whether the Mortgaged Properties represent at least 95% of the PV-9 of the Borrowing Base Properties after giving effect to exploration and production activities, acquisitions, dispositions and production. In the event that the Mortgaged Properties do not represent at least 95% of the PV-9 of the Borrowing Base Properties, then the Borrower shall, and shall cause its Restricted Subsidiaries to, grant, within thirty (30) days of delivery of the Reserve Report Certificate required under Section 8.12(c), to the Administrative Agent as security for the Secured Obligations a first-priority Lien interest (subject only to Excepted Liens of the type described in clauses (a) to (d) and (f) of the definition thereof, but subject to the provisos at the end of such definition) on additional Oil and Gas Properties not already subject to a Lien of the Security Instruments such that after giving effect thereto, the Mortgaged Properties will represent at least 95% of the PV-9 of the Borrowing Base Properties. All such Liens will be created and perfected by and in accordance with the provisions of deeds of trust, security agreements and financing statements or other Security Instruments, all in form and substance reasonably satisfactory to the Administrative Agent and in sufficient executed (and acknowledged where necessary or appropriate) counterparts for recording purposes. In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its Oil and Gas Properties and such Restricted Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with Section 8.14(b).

(b)    In the event that (i) the Borrower determines that any Restricted Subsidiary is a Material Domestic Subsidiary or (ii) any Domestic Subsidiary incurs or guarantees any Material Indebtedness, the Borrower shall promptly cause such Restricted Subsidiary to guarantee and secure the Secured Obligations pursuant to the Guaranty Agreement. In connection with any such guaranty and security interest grant, the Borrower shall, or shall cause (A) such Subsidiary to, execute and deliver a supplement to the Guaranty Agreement executed by such Subsidiary, (B) the owners of the Equity Interests of such Subsidiary who are Loan Parties to pledge all of the Equity Interests of such new Subsidiary (including, without limitation, delivery of original stock certificates evidencing the Equity Interests of such Subsidiary, together with an appropriate undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

78

(c)     In the event that the Borrower or any Domestic Subsidiary becomes the owner of a Foreign Subsidiary which has total assets in excess of $10.0 million, then the Borrower shall promptly, or shall cause such Domestic Subsidiary to promptly, guarantee the Secured Obligations pursuant to the Guaranty Agreement.  In connection with any such guaranty, the Borrower shall, or shall cause such Domestic Subsidiary to, (i) execute and deliver a supplement to the Guaranty Agreement, (ii) pledge 65% of all the voting Equity Interests of such Foreign Subsidiary and 100% of the nonvoting Equity Interests of such Foreign Subsidiary (including, without limitation, delivery of original stock certificates evidencing such Equity Interests of such Foreign Subsidiary, together with appropriate stock powers for each certificate duly executed in blank by the registered owner thereof) and (iii) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

(d)     The Borrower will not, and will not permit any Restricted Subsidiary to, grant a Lien on any Property to secure the Second Lien Notes which is not already granted to secure the Secured Obligations under the Security Instruments without first (i) giving at least ten (10) days'(or such earlier time as may be agreed by the Administrative Agent in its sole discretion) prior written notice to the Administrative Agent thereof and (ii) granting to the Administrative Agent to secure the Secured Obligations a first-priority, perfected Lien on the same Property pursuant to Security Instruments in form and substance reasonably satisfactory to the Administrative Agent; provided that Excepted Liens may exist.  In connection therewith, the Borrower shall, or shall cause its Restricted Subsidiaries to, execute and deliver such other additional closing documents, certificates and legal opinions of the type customarily given with regard to such matters as shall reasonably be requested by the Administrative Agent.

Section 8.15     ERISA Compliance.  The Borrower will promptly furnish and will cause the Subsidiaries to promptly furnish to the Administrative Agent (i) promptly after the filing thereof with the United States Secretary of Labor or the Internal Revenue Service, copies of each annual and other report with respect to each Plan, other than a Multiemployer Plan, or any trust created thereunder, and (ii) promptly upon becoming aware of the occurrence of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the Code, in connection with any Plan, other than a Multiemployer Plan, or any trust created thereunder, a written notice signed by the President or the principal Financial Officer or the Subsidiary, as the case may be, specifying the nature thereof, what action the Borrower or the Subsidiary is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service or the Department of Labor with respect thereto if such action could reasonably be expected to result in liability to the Borrower, the Guarantors or their respective Subsidiaries (whether individually of in the aggregate) in excess of the greater of $10.0 million or 5% of the then effective Borrowing Base.

Section 8.16     Account Control Agreements; Location of Proceeds of Loans.

(a)     The Borrower will, and will cause each other Loan Party to, in connection with any Deposit Account and/or any Securities Account (other than Excluded Accounts for so long as it is an Excluded Account) established, held or maintained on or after the Closing Date promptly, but in any event within twenty (20) Business Days (or such later date as the Administrative Agent may agree in its sole discretion) of the establishment of such account, cause such account to be a Controlled Account.

(b)     The Borrower will, and will cause each Loan Party to, until the proceeds of any Loans are transferred to a third party in accordance with the Loan Documents, hold the proceeds of any Loans made under this Agreement in a Controlled Account.

Section 8.17     Unrestricted Subsidiaries.  The Borrower:

79

(a)      will cause the management, business and affairs of each of the Borrower and its Restricted Subsidiaries to be conducted in such a manner (including, without limitation, by keeping separate books of account, furnishing separate financial statements of Unrestricted Subsidiaries to creditors and potential creditors thereof and by not permitting Properties of the Borrower and its respective Restricted Subsidiaries to be commingled) so that each Unrestricted Subsidiary that is a corporation will be treated as a corporate entity separate and distinct from Borrower and the Restricted Subsidiaries.

(b)      will not, and will not permit any of the Restricted Subsidiaries to, incur, assume, guarantee or be or become liable for any Indebtedness of any of the Unrestricted Subsidiaries.

(c)      will not permit any Unrestricted Subsidiary to hold any Equity Interest in, or any Indebtedness of, the Borrower or any Restricted Subsidiary.

Section 8.18      Marketing Activities.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than (i) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from their proved Oil and Gas Properties during the period of such contract, (ii) contracts for the sale of Hydrocarbons scheduled or reasonably estimated to be produced from proved Oil and Gas Properties of third parties during the period of such contract associated with the Oil and Gas Properties of the Borrower and its Restricted Subsidiaries that the Borrower or one of its Restricted Subsidiaries has the right to market pursuant to joint operating agreements, unitization agreements or other similar contracts that are usual and customary in the oil and gas business and (iii) other contracts for the purchase and/or sale of Hydrocarbons of third parties (A) which have generally offsetting provisions (*i.e.*, corresponding pricing mechanics, delivery dates and points and volumes) such that no "position" is taken and (B) for which appropriate credit support has been taken to alleviate the material credit risks of the counterparty thereto.

Section 8.19      Keepwell.  The Borrower will, and will cause each Guarantor to, provide such funds or other support as may be needed from time to time by the Borrower or any Guarantor, as applicable, to honor all of its obligations under this Agreement and any other Loan Document in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 8.19 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 8.19, or otherwise under this Agreement or any other Loan Document, as it relates to the Borrower, any Restricted Subsidiary or any Guarantor, as applicable, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Loan Party under this Section shall remain in full force and effect until Payment in Full.  The Borrower intends that this Section 8.19 constitute, and this Section 8.19 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit the Borrower and any Guarantor, as applicable, for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**ARTICLE IX**
**NEGATIVE COVENANTS**

Until Payment in Full, the Borrower covenants and agrees with the Lenders that:

Section 9.01      Financial Covenants.

(a)      Total Net Indebtedness Leverage Ratio.  The Borrower will not, as of the last day of each fiscal quarter set forth below, permit the ratio of Consolidated Total Net Debt as of such last day

80

to EBITDA for the period of four fiscal quarters ending on such last day to exceed the ratio set forth below opposite such fiscal quarter:

| Fiscal Quarter Ending | Ratio |
|---|---|
| [September 30, 2016] | 4.75 to 1.00 |
| December 31, 2016 | 4.75 to 1.00 |
| March 31, 2017 | 4.75 to 1.00 |
| June 30, 2017 | 4.75 to 1.00 |
| September 30, 2017 | 4.50 to 1.00 |
| December 31, 2017 | 4.50 to 1.00 |
| March 31, 2018 | 4.50 to 1.00 |
| June 30, 2018 | 4.50 to 1.00 |
| September 30, 2018 | 4.50 to 1.00 |
| December 31, 2018 | 4.50 to 1.00 |
| March 31, 2019 and at the last day of each Fiscal Quarter thereafter until the Maturity Date | 4.00 to 1.00 |

(b)    Current Ratio.  Beginning with the fiscal quarter ending [_____], the Borrower will not, as of the last day of any fiscal quarter, permit its Current Ratio as of such last day to be less than 1.00 to 1.00.

(c)    Equity Cure. In the event that the Borrower fails to comply with Section 9.01(a) for any four fiscal quarter period, then until the expiration of the fifteenth (15th) Business Day following delivery of financial statements with respect to the applicable fiscal quarter or fiscal year ending on the last day of such period, the Borrower shall be permitted to cure such failure to comply by requesting that such financial covenant be recalculated by increasing EBITDA of the fiscal quarter most recently ended by an amount equal to cash equity contributions (which shall be in the form of common equity or, if on terms and conditions reasonably acceptable to the Administrative Agent, preferred equity) received by Borrower from its equity holders needed to bring the Borrower in compliance with Section 9.01(a). If, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the financial covenant set forth in Section 9.01(a), the Borrower shall be deemed to have satisfied the requirements of such applicable financial covenant as of the relevant earlier required date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of any such covenant that had occurred shall be deemed cured for purposes of this Agreement and the other Loan Documents. The Borrower may not exercise the equity cure right described in this Section 9.01(c) more than (i) twice in any period of four (4) consecutive fiscal quarters or (ii) more than four (4) times in the aggregate during the term of this Agreement. The proceeds of such equity issuance or capital contributions shall be counted as EBITDA solely for the purpose of compliance with the financial covenant set forth in Section 9.01(a) and shall not be included for any other purpose hereunder.

Section 9.02    Indebtedness.  The Borrower will not, and will not permit any Restricted Subsidiary to, incur, create, assume or suffer to exist any Indebtedness, except:

81

509265-1666-Active.19779355.12

(a)    the Loans, any Notes or other Secured Obligations arising under the Loan Documents or any Secured Swap Agreement any guaranty of or suretyship arrangement for the Loans, any Notes or other Secured Obligations arising under the Loan Documents, and any deferred put premiums associated with Swap Agreements entered into with an Approved Counterparty;

(b)    any Indebtedness of the Borrower and its Restricted Subsidiaries existing on the date hereof and that is set forth on Schedule 9.02;

(c)    accounts payable and accrued expenses, liabilities or other obligations to pay the deferred purchase price of Property or services, from time to time incurred in the ordinary course of business which are not greater than sixty (60) days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(d)    Indebtedness (including guarantees) under Capital Leases, provided that the aggregate amount of such Indebtedness and Indebtedness incurred pursuant to Section 9.02(i) and Section 9.02(l) does not exceed the greater of $30.0 million or 10% of the then effective Borrowing Base at any one time outstanding;

(e)    Indebtedness associated with worker's compensation claims, performance, bid, surety or similar bonds or surety obligations required by Governmental Requirements or third parties in connection with the operation of the Oil and Gas Properties;

(f)    intercompany Indebtedness between the Borrower and any Restricted Subsidiary or between Restricted Subsidiaries to the extent permitted by Section 9.05(g); provided that such Indebtedness is not held, assigned, transferred, negotiated or pledged to any Person other than a Loan Party, and, provided further, that any such Indebtedness owed by either the Borrower or a Guarantor shall be subordinated to the Secured Obligations on terms set forth in the Guaranty Agreement;

(g)    endorsements of negotiable instruments for collection in the ordinary course of business;

(h)    Indebtedness incurred to finance insurance premiums;

(i)    Indebtedness incurred solely for the purpose of financing the acquisition, construction or improvement of any fixed or capital assets, including Indebtedness assumed in connection with the acquisition of such assets; provided that (i) the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (ii) the aggregate amount of such Indebtedness and Indebtedness incurred pursuant to Section 9.02(d) and Section 9.02(l) does not exceed the greater of $30.0 million or 10% of the then effective Borrowing Base at any one time outstanding;

(j)    Indebtedness in respect of the Second Lien Notes not to exceed $850.0 million in the aggregate at any one time outstanding and any Permitted Refinancing Indebtedness of such Indebtedness;

(k)    Indebtedness of the Borrower in respect of Permitted Unsecured Indebtedness and Permitted Junior Indebtedness and, in each case, any Permitted Refinancing Indebtedness of such Indebtedness; and

509265-1666-Active.19779355.12

(l)       other Indebtedness, provided that the aggregate amount of such Indebtedness and other Indebtedness incurred pursuant to Section 9.02(d) and Section 9.02(i) does not exceed the greater of $30.0 million or 10% of the then effective Borrowing Base at any one time outstanding.

Section 9.03    Liens.  The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)       Liens securing the payment of any Secured Obligations;

(b)       (i) Liens existing on the Closing Date and set forth on Schedule 9.03 and (ii) Excepted Liens;

(c)       Liens securing (i) Capital Leases permitted by Section 9.02(d) but only on the Property under lease and (ii) Indebtedness for any fixed or capital assets pursuant to Section 9.02(i) but only on the fixed or capital assets financed by such Indebtedness;

(d)       Liens securing Indebtedness permitted by Section 9.02(h) or other obligations related to the payment of insurance premiums; provided that such Liens do not extend to any Property of the Borrower or its Restricted Subsidiaries other than Property of the type customarily subject to such Liens (including rights under the insurance policies purchased by such premiums);

(e)       Liens on (i) cash and securities and (ii) other Property not constituting Collateral for the Secured Obligations or Properties used in determining the Borrowing Base and not otherwise permitted by the foregoing clauses of this Section 9.03; provided that the aggregate principal or face amount of all Indebtedness secured under this Section 9.03(e) shall not exceed the greater of $15.0 million or 5% of the then effective Borrowing Base at any time;

(f)       Liens securing Second Lien Notes permitted by Section 9.02(j) (or any Permitted Refinancing Indebtedness in respect thereof); and

(g)       Liens securing Permitted Junior Indebtedness (or any Permitted Refinancing Indebtedness in respect thereof) permitted by Section 9.02(k).

Section 9.04    Restricted Payments; Repayment of Second Lien Notes; Restrictions on Amendments of Permitted Unsecured Indebtedness and Permitted Junior indebtedness .

(a)       Restricted Payments.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders or make any distribution of its Property to its Equity Interest holders, except (i) the Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its Equity Interests (other than Disqualified Capital Stock), (ii) Subsidiaries may declare and pay dividends or any other distributions to the Borrower or any Guarantor with respect to their Equity Interests, (iii) [reserved], (iv) Restricted Payments in connection with stock option plans or other benefit plans for management or employees of the Borrower and its Subsidiaries, (v) the Borrower may make Restricted Payments in connection with the termination of its directors' or employees' option agreements or restricted stock agreements under any of Borrower's incentive stock plans provided, however, that the aggregate amounts paid in respect thereof do not exceed $5.0 million, and (vi) the Borrower may (a) declare and pay in respect of preferred Equity Interests (which are not Disqualified Capital Stock) regularly scheduled dividends in additional Equity Interests (which are not Disqualified

83

Capital Stock) as and when the same accrue and are payable at the stated dividend rate, (b) issue Equity Interests (which are not Disqualified Capital Stock) in connection with a conversion of such preferred Equity Interests into other Equity Interests, and (c) make cash payments in lieu of fractional shares in connection with any such conversion of preferred Equity Interests.

(b)     Redemptions.  The Borrower will not, and will not permit any Restricted Subsidiary to, prior to the date that is ninety-one (91) days after the Maturity Date, call, make or offer to make any optional or voluntary Redemption of or otherwise optionally or voluntarily Redeem (whether in whole or in part), (i) the Second Lien Notes, (ii) any Permitted Unsecured Indebtedness, (iii) any Permitted Junior indebtedness and (iv) any Permitted Refinancing Indebtedness in respect of the foregoing (such Indebtedness, collectively, the "Specified Indebtedness"); provided that the Borrower may Redeem such Specified Indebtedness with the proceeds of any Permitted Refinancing Indebtedness in respect thereof or with the Net Cash Proceeds of any sale of Equity Interests (other than Disqualified Capital Stock) of the Borrower so long as no Default, Event of Default or Borrowing Base Deficiency has occurred and is continuing or would occur as a result of such Redemption.  Notwithstanding anything herein or in any other Loan Document to the contrary, the Borrower shall be permitted to pay the Consent Fees (as defined in the Lock Up Agreement Term Sheet).

(c)     Amendments. The Borrower will not, and will not permit any of its Restricted Subsidiaries to amend, modify, waive or otherwise change, consent or agree to any amendment, modification, waiver or other change to any Specified Indebtedness if doing so would (i) increase the rate of interest thereon or (ii) (A) cause such Specified Indebtedness to not meet the requirements set forth in the definition of Permitted Refinancing Indebtedness and Permitted Junior Indebtedness or Permitted Unsecured Indebtedness, as applicable (tested as if such Specified Indebtedness were being issued or incurred at such time) and (B) with respect to any other Specified Indebtedness, shorten the average maturity or average life of such Specified Indebtedness; provided that the foregoing shall not prohibit the execution of supplemental indentures to add guarantors if required by the terms of the Second Lien Indenture provided such Person complies with Section 8.14(d).  Notwithstanding anything herein or in any other Loan Document to the contrary, the Second Lien Modifications shall be permitted.

Section 9.05     Investments, Loans and Advances.  The Borrower will not, and will not permit any Restricted Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)     Investments on the Closing Date and set forth on Schedule 9.05;

(b)     accounts receivable arising in the ordinary course of business;

(c)     direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof;

(d)     commercial paper maturing within one year from the date of creation thereof rated in one of the two highest grades by S&P or Moody's;

(e)     deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100.0 million (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively or, in the case of any

84

Foreign Subsidiary, a bank organized in a jurisdiction in which the Foreign Subsidiary conducts operations having in excess of $500.0 million (or its equivalent in another currency);

(f)        deposits in money market funds investing primarily in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e);

(g)        Investments (i) made by the Borrower in or to the Guarantors, (ii) made by any Restricted Subsidiary in or to the Borrower or any Guarantor and (iii) made by the Borrower or any Restricted Subsidiary in or to all other Domestic Subsidiaries which are not Guarantors in an aggregate amount at any one time outstanding not to exceed, when added to the aggregate amount of Investments outstanding under the immediately following clause, $25.0 million, (iv) made by the Borrower or any Restricted Subsidiary in or to any Foreign Subsidiary in an aggregate amount at any one time outstanding not to exceed, when added to the aggregate amount of Investments outstanding under the immediately preceding clause, $25.0 million and (v) made by a Foreign Subsidiary to any other Foreign Subsidiary;

(h)        subject to the limits in Section 9.07, Investments (including, without limitation, capital contributions) in general or limited partnerships or other types of entities (each a "venture") entered into by the Borrower or a Restricted Subsidiary with others in the ordinary course of business; provided that (i) any such venture is engaged exclusively in oil and gas exploration, development, production, processing and related activities, including transportation, (ii) the interest in such venture is acquired in the ordinary course of business and on fair and reasonable terms and (iii) such venture interests acquired and capital contributions made (valued as of the date such interest was acquired or the contribution made) do not exceed, in the aggregate at any time outstanding an amount equal to the greater of $15.0 million or 5% of the then effective Borrowing Base;

(i)        subject to the limits in Section 9.07, Investments in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America and Canada;

(j)        loans or advances to employees, officers or directors in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries, in each case only as permitted by applicable law, including Section 402 of the Sarbanes Oxley Act of 2002, but in any event not to exceed $2.5 million in the aggregate at any time;

(k)        Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 9.05 owing to the Borrower or any Restricted Subsidiary as a result of a bankruptcy or other insolvency proceeding of the obligor in respect of such debts or upon the enforcement of any Lien in favor of the Borrower or any of its Restricted Subsidiaries; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 9.05(k) exceeds $5.0 million;

(l)        Investments in the form of loans to third parties for the sole purpose of purchasing Oil and Gas Properties pursuant to a like kind or reverse like kind exchange in accordance with Rule 1031 of the Code provided that (i) such loans shall not exceed $100.0 million of principal outstanding at any one time; (ii) at all times during which such loans are outstanding the amount of unused total Commitments shall not be less than 25% of the then effective Borrowing Base; and (iii) the Oil and Gas Properties acquired with such loans shall not be included in the determination of the Borrowing Base until the Borrower or a Restricted Subsidiary takes title to such Oil and Gas Property upon consummation of the exchange; and

85

(m)     Other Investments (including investments in Unrestricted Subsidiaries) not to exceed the greater of $30.0 million or 5% of the then effective Borrowing Base.

Section 9.06   Designation and Conversion of Restricted and Unrestricted Subsidiaries; Indebtedness of Unrestricted Subsidiaries.

(a)     Unless designated as an Unrestricted Subsidiary on Schedule 7.14 as of the date hereof or thereafter, assuming compliance with Section 9.06(b), any Person that becomes a Subsidiary of the Borrower or any of its Restricted Subsidiaries shall be classified as a Restricted Subsidiary.

(b)     The Borrower may designate by written notification thereof to the Administrative Agent, any Restricted Subsidiary, including a newly formed or newly acquired Subsidiary, as an Unrestricted Subsidiary if (i) prior, and after giving effect, to such designation, neither a Default, Event of Default nor a Borrowing Base Deficiency would exist, (ii) the representations and warranties of the Borrower and its Restricted Subsidiaries contained in each of the Loan Documents are true and correct in all material respects on and as of such date as if made on and as of the date of such designation (or, if stated to have been made expressly as of an earlier date, were true and correct as of such date), (iii) the designation of any Restricted Subsidiary as an Unrestricted Subsidiary and any Disposition of Property to an Unrestricted Subsidiary is (A) deemed to be an Investment in an Unrestricted Subsidiary in an amount equal to the fair market value as of the date of such designation or Disposition of the Borrower's direct and indirect ownership interest in such Subsidiary and such Investment would be permitted to be made at the time of such designation under Section 9.05(g) and Section 9.05(l) and (B) deemed to be a Disposition as of the date of designation or Disposition and (iv) prior, and after giving effect, to such designation, the Borrower is in pro forma compliance with Section 9.01(a) and Section 9.01(b).  Except as provided in this Section 9.06(b), no Restricted Subsidiary may be redesignated as an Unrestricted Subsidiary.

(c)     The Borrower may designate any Unrestricted Subsidiary to be a Restricted Subsidiary if after giving effect to such designation, (i) the representations and warranties of the Borrower and its Restricted Subsidiaries contained in each of the Loan Documents are true and correct on and as of such date as if made on and as of the date of such redesignation (or, if stated to have been made expressly as of an earlier date, were true and correct as of such date), (ii) no Default would exist and (iii) the Borrower complies with the requirements of Section 8.14, Section 8.17 and Section 9.16.  Any such designation shall be treated as a cash dividend in an amount equal to the lesser of the fair market value of the Borrower's direct and indirect ownership interest in such Subsidiary or the amount of the Borrower's cash investment previously made for purposes of the limitation on Investments under Section 9.05(l).

(d)     The Borrower shall not permit the aggregate principal amount of all Non-Recourse Indebtedness outstanding at any one time to exceed 10% of the then effective Borrowing Base.

Section 9.07   Nature of Business; International Operations.   Neither the Borrower nor any Restricted Subsidiary will allow any material change to be made in the character of its business (a) as an independent oil and gas exploration, development and production company, and (b) activities incidental to the foregoing.  From and after the date hereof, the Borrower and its Domestic Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States or Canada.

Section 9.08   Reserved.

Section 9.09   Proceeds of Loans.

509265-1666-Active.19779355.12

(a)     The Borrower will not permit the proceeds of the Loans to be used for any purpose other than those permitted by Section 7.21.  Neither the Borrower nor any Person acting on behalf of the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board or to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.  If requested by the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

(b)     The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country to the extent such activities, businesses or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.10     ERISA Compliance. The Borrower will not, and will not permit any Subsidiary to, at any time:

(a)     engage, or permit any ERISA Affiliate to engage, in any transaction in connection with which the Borrower, a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i), (l) or (m) of section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code, if either of which would have a Material Adverse Effect.

(b)     fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any such Plan, agreement relating thereto or applicable law, the Borrower, a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto, if such failure could reasonably be expected to have a Material Adverse Effect.

(c)     contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to (i) any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability other than the payment of accrued benefits under such plan, or (ii) any employee pension benefit plan, as defined in section 3(2) of ERISA, that is subject to Title IV of ERISA, section 302 of ERISA or section 412 of the Code.

Section 9.11     Sale or Discount of Receivables.  Except for (a) receivables obtained by the Borrower or any Restricted Subsidiary out of the ordinary course of business or (b) the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction, neither the Borrower nor any Restricted Subsidiary will discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.12     Merger, Etc.  The Borrower will not, and will not permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to

87

merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property (except as permitted by Section 9.13) to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve; provided that the Borrower or any Restricted Subsidiary may participate in a consolidation with any other Person; provided that:

(a)  any Restricted Subsidiary (including a Foreign Subsidiary) may participate in a consolidation with the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or any other Restricted Subsidiary that is a Domestic Subsidiary (provided that if one of such parties to the consolidation is a Foreign Subsidiary, such Domestic Subsidiary shall be the continuing or surviving Person) and if one of such Restricted Subsidiaries is a Wholly-Owned Subsidiary, then the surviving Person shall be a Wholly-Owned Subsidiary; and

(b)  any Foreign Subsidiary of the Borrower may participate in a consolidation with any one or more Foreign Subsidiaries; provided that if one of such Foreign Subsidiaries is a Wholly-Owned Subsidiary, the survivor shall be a Wholly-Owned Subsidiary.

Section 9.13   Sale of Properties.  The Borrower will not, and will not permit any Restricted Subsidiary to, sell, assign, farm-out, convey or otherwise transfer any Property except for:

(a)  the sale of Hydrocarbons and geological and seismic data in the ordinary course of business;

(b)  farmouts of undeveloped acreage and assignments in connection with such farmouts;

(c)  the sale or transfer of Property that is no longer necessary for the business of the Borrower or such Restricted Subsidiary or is replaced by Property of at least comparable value and use;

(d)  the sale, transfer or other disposition of Equity Interests in Unrestricted Subsidiaries;

(e)  the sale or other Disposition (including Casualty Events) of any Oil and Gas Property or any interest therein or any Restricted Subsidiary owning Oil and Gas Properties included in the Borrowing Base or the Unwind of Swap Agreements; provided that (i) 75% of the consideration received in respect of any such sale or other Disposition with a purchase price exceeding $5.0 million shall be cash or other Oil and Gas Properties (provided that if a Borrowing Base Deficiency exists at such time then 100% of the cash consideration received in respect of any such sale or other Disposition shall be applied as a prepayment to reduce the Borrowing Base Deficiency), (ii) the consideration received in respect of any such sale or other Disposition shall be equal to or greater than the fair market value of the asset subject of such sale or other Disposition, and if such fair market value is greater than $10.0 million, the Borrower shall deliver a certificate of a Responsible Officer of the Borrower certifying to the fair market value and that the board of directors of the Borrower has reasonably determined such and (iii) if any such sale or other Disposition is of a Restricted Subsidiary owning Oil and Gas Properties, such sale or other Disposition shall include all the Equity Interests owned by the Borrower and its Restricted Subsidiaries of such Restricted Subsidiary;

(f)  sales and other transfers of Properties between the Borrower and any Restricted Subsidiary or between any Restricted Subsidiary and any other Restricted Subsidiary; and

509265-1666-Active.19779355.12

(g)    if no Default, Event of Default or Borrowing Base Deficiency then exists, sales and other dispositions of Properties not otherwise permitted above having a fair market value not to exceed the greater of $30.0 million or 5% of the then effective Borrowing Base during any 12-month period.

Section 9.14    Environmental Matters.   The Borrower will not, and will not permit any Restricted Subsidiary to, cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations or remedial obligations could reasonably be expected to have a Material Adverse Effect.

Section 9.15    Transactions with Affiliates.   The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors) unless such transactions are otherwise permitted under this Agreement and are upon fair and reasonable terms no less favorable to it than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

Section 9.16    Subsidiaries.   The Borrower will not, and will not permit any Restricted Subsidiary to, create or acquire any additional Restricted Subsidiary or redesignate an Unrestricted Subsidiary as a Restricted Subsidiary unless the Borrower gives written notice to the Administrative Agent of such creation or acquisition and complies with Section 8.14(b) and Section 8.14(c).   The Borrower shall not, and shall not permit any Restricted Subsidiary to, sell, assign or otherwise Dispose of any Equity Interests in any Restricted Subsidiary except (i) in connection with the issuance of director qualifying shares, (ii) in connection with any transactions permitted under Section 9.12, Section 9.13(e) or Section 9.13(f), and (iii) other sales, assignments or other dispositions of any Equity Interests in Restricted Subsidiaries having an aggregate fair market value not to exceed $5.0 million during any fiscal year.

Section 9.17    Negative Pledge Agreements; Dividend Restrictions.    The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any contract, agreement or understanding which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property in favor of the Administrative Agent and the Lenders or restricts any Restricted Subsidiary from paying dividends or making distributions to the Borrower or any Guarantor, or which requires the consent of or notice to other Persons in connection therewith; provided, however, the preceding restrictions will not apply to encumbrances or restrictions arising under or by reason of (a) this Agreement or the Security Instruments, (b) any leases, licenses or similar contracts as they affect any Property or Lien subject to a lease or license, (c) any contract, agreement or understanding creating Liens on Capital Leases permitted by Section 9.03(c) (but only to the extent related to the Property on which such Liens were created) and (d) any restriction with respect to a Subsidiary imposed pursuant to an agreement entered into for the direct or indirect sale or disposition of all or substantially all of the equity or Property of such Subsidiary (or the Property that is subject to such restriction) pending the closing of such sale or disposition to the extent such sale is permitted under this Agreement, (e) customary provisions with respect to the distribution of Property in joint venture agreements, (f) prohibitions, encumbrances or other restrictions imposed by Governmental Requirements, (g) in the case of any Subsidiary that is a Wholly-Owned Subsidiary of the Borrower, prohibitions, encumbrances or restrictions imposed by its organizational documents or any related joint venture or similar agreement, provided that such prohibitions, encumbrances or restrictions apply only to such Subsidiary and to any Equity Interests in such Subsidiary but only with respect to granting, conveying, creation or imposition of any Lien and (h) prohibitions, encumbrances or other restrictions imposed by

509265-1666-Active.19779355.12

any agreement relating to secured Indebtedness permitted by Section 9.02(i), provided that such prohibitions, encumbrances or other restrictions apply only to the assets securing such Indebtedness or Second Lien Notes permitted by Section 9.02(j) or Permitted Junior Indebtedness permitted by Section 9.02(k).

Section 9.18   Gas Imbalances, Take-or-Pay or Other Prepayments.   The Borrower will not allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Restricted Subsidiary that would require the Borrower or such Restricted Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed a volume equal to 2% of the total proved reserves (on an mcf equivalent basis) set forth in the most recently delivered Reserve Report in the aggregate.

Section 9.19   Swap Agreements.

(a)   The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Swap Agreements with any Person other than:

(i)   Swap Agreements in respect of commodities entered into not for speculative purposes (i) with an Approved Counterparty and (ii) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect, other than puts, floors and basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not exceed, as of the date such Swap Agreement is executed, (A) 85% of the Projected Production for each month during the period during which such Swap Agreement is in effect for crude oil, natural gas liquids and natural gas, for the period of 24 months following the date such Swap Agreement is executed and (B) 85% of the reasonably anticipated Hydrocarbon production from the total Proved Reserves of the Borrower and its Restricted Subsidiaries (as forecast based upon the most recently delivered Reserve Report), each month during the period during which such Swap Agreement is in effect for crude oil, natural gas liquids and natural gas, calculated on a barrel of oil equivalent basis, for the period of 25 to 66 months following the date such Swap Agreement is executed;

(ii)   Swap Agreements in respect of interest rates with an Approved Counterparty, as follows: (i) Swap Agreements effectively converting interest rates from fixed to floating, the notional amounts of which (when aggregated and netted with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from fixed to floating) do not exceed 50% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a fixed rate and (ii) Swap Agreements effectively converting interest rates from floating to fixed, the notional amounts of which (when aggregated and netted with all other Swap Agreements of the Borrower and its Restricted Subsidiaries then in effect effectively converting interest rates from floating to fixed) do not exceed 75% of the then outstanding principal amount of the Borrower's Indebtedness for borrowed money which bears interest at a floating rate and

(iii)   In addition to Swap Agreements under Section 9.19(a)(i) and without further limitation, in connection with a proposed acquisition of Oil and Gas Properties or Equity Interests of a Person owning Oil and Gas Properties (a "Proposed Acquisition"), the Borrower or any Restricted Subsidiary may also enter into incremental Swap Agreements with respect to the reasonably anticipated projected production from the Oil and Gas Properties subject of the Proposed Acquisition so long as (i) the Borrower or a Restricted Subsidiary has signed a definitive acquisition agreement in connection with a Proposed Acquisition and (ii) the aggregate notional volumes associated with such incremental Swap Agreements do not exceed (A) 85% of the Projected Production associated with the Oil and Gas Properties subject of such Proposed Acquisition for each month during the period during which each such Swap Agreement is in effect, for each of crude oil, natural gas liquids and natural gas, calculated on a

90

barrel of oil equivalent basis, for the period of 24 months following the date such incremental Swap Agreement is executed and (B) 85% of the reasonably anticipated Hydrocarbon production from the total Proved Reserves associated with the Oil and Gas Properties subject of such Proposed Acquisition (as forecast based upon the reserve report for the Oil and Gas Properties subject of such Proposed Acquisition which has been delivered to the Lenders) for each month during the period during which each such Swap Agreement is in effect, for each of crude oil, natural gas liquids and natural gas, calculated on a barrel of oil equivalent basis, for the period of 25 to 48 months following the date such incremental Swap Agreement is executed.  The Borrower may permit such incremental Swap Agreements to remain in place so long as none of the following has occurred: (1) undrawn availability during the period prior to the completion or termination of such acquisition has been reduced to less than 10% of the then effective Borrowing Base, (2) the thirtieth (30th) day after such acquisition has terminated has passed or (3) the 120th day after such definitive acquisition agreement was executed has passed and the acquisition has not been consummated.  If such incremental Swap Agreements are not permitted to remain in place pursuant to the preceding sentence, the Borrower shall promptly terminate or Unwind such Swap Agreements.

(b)     In no event shall any Swap Agreement contain any requirement, agreement or covenant for the Borrower or any Restricted Subsidiary to post collateral or margin to secure their obligations under such Swap Agreement or to cover market exposures except to the extent permitted by Section 9.03(e).

(c)     No Swap Agreement in respect of commodities shall be terminated, Unwound, cancelled or otherwise Disposed of by the Borrower or any Restricted Subsidiary except (i) to the extent permitted by Section 9.13 and (ii) subject to Section 2.08(a), the Borrower or any Restricted Subsidiary may terminate, transfer or create any offsetting positions in respect of any commodity swap positions (whether evidenced by a floor, put or Swap Agreement) from time to time; provided that the Borrower shall provide reasonable prior notice to the Administrative Agent with respect to any such termination, transfer or creation of off-setting positions for any Swap Agreements upon which the Lenders relied in determining the Borrowing Base.

(d)     If, after the end of any fiscal quarter of the Borrower, the aggregate volume of all Swap Agreements in respect of commodities for which settlement payments were calculated in such fiscal quarter (other than basis differential swaps on volumes hedged by other Swap Agreements) exceeded, or will exceed, 100% of actual production of crude oil, natural gas and natural gas liquids, calculated separately, in such fiscal quarter, then the Borrower shall within twenty (20) Business Days following the last day of such fiscal quarter (or such later time to which the Administrative Agent may agree in its sole discretion) terminate, create off-setting positions, allocate volumes to other production the Borrower or any Subsidiary is marketing, or otherwise Unwind existing Swap Agreements such that, at such time, future hedging volumes will not exceed 100% of reasonably anticipated projected production from proved, developed producing Oil and Gas Properties for each of crude oil, natural gas and natural gas liquids, calculated separately, for the then-current and any succeeding fiscal quarter.

## ARTICLE X
## EVENTS OF DEFAULT; REMEDIES

Section 10.01    Events of Default.  one or more of the following events shall constitute an "Event of Default":

(a)     the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise.

91

(b)     the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in Section 10.01(a)) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days.

(c)     any representation or warranty made or deemed made by or on behalf of the Borrower or any Restricted Subsidiary in or in connection with any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made.

(d)     the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 8.02(a), Section 8.03 (with respect to Borrower's or any Restricted Subsidiary's existence only), Section 8.16 or in Article IX.

(e)     the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b), or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of thirty (30) days after the earlier to occur of (A) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (B) a Responsible Officer of the Borrower or such Restricted Subsidiary otherwise becoming aware of such default.

(f)     the Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness prior to the longer of (i) three (3) Business Days after the same shall become due and payable or (ii) the expiration of any applicable grace or notice period, if any, specified in the relevant document for such Material Indebtedness.

(g)     any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (after giving effect to any applicable notice periods, if any, and any applicable grace periods) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Borrower or any Restricted Subsidiary to make an offer in respect thereof.

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Restricted Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for thirty (30) days or an order or decree approving or ordering any of the foregoing shall be entered.

(i)     the Borrower or any Restricted Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition

92

described in Section 10.01(h), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

(j)    the Borrower or any Restricted Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due.

(k)    one or more judgments for the payment of money in an aggregate amount in excess of the greater of $10.0 million or 5% of the then effective Borrowing Base (to the extent not covered by independent third party insurance provided by reputable insurers as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Restricted Subsidiary to enforce any such judgment.

(l)    the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower or a Guarantor party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby, except to the extent permitted by the terms of this Agreement, or the Borrower or any Restricted Subsidiary or any of their Affiliates shall so state in writing.

(m)    Other than as contemplated by the Plan of Reorganization on the effective date thereof, a Change in Control shall occur.

(n)    the Existing Intercreditor Agreement or any other intercreditor agreement entered into pursuant to the terms of this Agreement shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with its terms against Borrower or any party thereto or any holder of any Second Lien Notes or Permitted Junior Indebtedness, as applicable, or shall be repudiated in writing by any of them, or cause the Liens of the Second Lien Notes or any Permitted Junior Indebtedness to be senior or pari passu in right to the Liens securing the Secured Obligation, or any payment by Borrower or any Guarantor in violation of the terms of the Existing Intercreditor Agreement or such other intercreditor agreement.

Section 10.02    Remedies.

(a)    In the case of an Event of Default other than one described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), at any time thereafter during the continuance of such Event of Default, the Administrative Agent, at the direction of the Majority Lenders, shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate the Commitments and/or the LC Commitments, and thereupon the Commitments and/or the LC Commitments shall terminate immediately, and (ii) declare the Notes, if any, and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower and the Guarantors accrued hereunder and under the Loans, the Notes, if any, and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the

93

LC Exposure as provided in Section 2.09(j)), shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Loan Party; and in case of an Event of Default described in Section 10.01(h), Section 10.01(i) or Section 10.01(j), the Commitments shall automatically terminate and the Notes, if any, and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and the other obligations of the Borrower and the Guarantors accrued hereunder and under the Loans, the Notes, if any, and the other Loan Documents (including, without limitation, the payment of cash collateral to secure the LC Exposure as provided in Section 2.09(j)), shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Loan Party.

(b)    In the case of the occurrence and continuation of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)    All proceeds realized from the liquidation or other Disposition of collateral or otherwise received after maturity of the Loans, whether from the Borrower, another Loan Party, by acceleration or otherwise, shall be applied:

(i)    first, to payment or reimbursement of expenses and indemnities provided for in this Agreement and the Security Instruments;

(ii)    second, to accrued interest on the Loans;

(iii)    third, *pro rata* to principal outstanding on the Loans and Secured Obligations referred to in clauses (b) and (c) of the definition of "Secured Obligations";

(iv)    fourth, to any other Secured Obligations;

(v)    fifth, to serve as cash collateral to be held by the Administrative Agent to secure the LC Exposure; and any excess shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

(d)    In the case of the occurrence of an Event of Default which results in the Commitments terminating then the Borrowing Base shall automatically and concurrently be reduced to $0.

## ARTICLE XI
## THE AGENTS

Section 11.01    Appointment; Powers.    Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.    Each Lender (and each Person that becomes a Lender hereunder pursuant to Section 12.04) hereby authorizes and directs the Administrative Agent to enter into the Loan Documents, including without limitation, the Security Instruments, on behalf of such Lender, in each case, as needed to effectuate the transactions permitted by this Agreement and agrees that the Administrative Agent may take such actions on its behalf as is contemplated by the terms of such applicable Security Instrument. Without limiting the provisions of Section 11.02 and Section 12.03, each Lender hereby consents to the Administrative Agent and any successor serving in such capacity and agrees not to assert any claim (including as a result of any conflict of interest) against the Administrative

94

Agent, or any such successor, arising from the role of the Administrative Agent or such successor under the Loan Documents so long as it is either acting in accordance with the terms of such documents and otherwise has not engaged in gross negligence or willful misconduct.

Section 11.02   Duties and Obligations of Administrative Agent.   The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing (the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; rather, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except as provided in Section 11.03, and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or under any other Loan Document or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in any other Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or as to those conditions precedent expressly required to be to the Administrative Agent's satisfaction, (vi) the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrower and its Subsidiaries or any other obligor or guarantor, or (vii) any failure by the Borrower or any other Person (other than itself) to perform any of its obligations hereunder or under any other Loan Document or the performance or observance of any covenants, agreements or other terms or conditions set forth herein or therein.  For purposes of determining compliance with the conditions specified in Article VI, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed closing date specifying its objection thereto.

Section 11.03   Action by Administrative Agent.   The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 2.07(b), Section 5.04(b), Section 8.13(c) or Section 12.02) and in all cases the Administrative Agent shall be fully justified in failing or refusing to act hereunder or under any other Loan Documents unless it shall (a) receive written instructions from the Majority Lenders or the Lenders, as applicable, (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 2.07(b), Section 5.04(b), Section 8.13(c) or Section 12.02) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action, provided that no indemnity shall be provided for

95

any liabilities or losses determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent. The instructions as aforesaid and any action taken or failure to act pursuant thereto by the Administrative Agent shall be binding on all of the Lenders. If a Default or Event of Default has occurred and is continuing, then the Administrative Agent shall take such action with respect to such Default or Event of Default as shall be directed by the requisite Lenders in the written instructions (with indemnities) described in this Section 11.03, provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders. In no event, however, shall the Administrative Agent be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, the Loan Documents or applicable law. If a Default has occurred and is continuing, neither the Syndication Agent nor any Documentation Agent shall have any obligation to perform any act in respect thereof. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Majority Lenders or the Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 2.07(b), Section 5.04(b), Section 8.13(c) or Section 12.02), and otherwise no Agent shall be liable for any action taken or not taken by it hereunder or under any other Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith INCLUDING ITS OWN ORDINARY NEGLIGENCE, except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.

Section 11.04    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon and each of the Borrower, the Lenders and the Issuing Bank hereby waives the right to dispute the Administrative Agent's record of such statement, except in the case of gross negligence or willful misconduct by the Administrative Agent. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Agents may deem and treat the payee of the Note, if any, as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof permitted hereunder shall have been filed with the Administrative Agent.

Section 11.05    Subagents. The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding Sections of this Article XI shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06    Resignation of Agents. Subject to the appointment and acceptance of a successor Agent as provided in this Section 11.06, any Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower. Upon any such resignation, the Majority Lenders shall have the right, with the consent of the Borrower, which consent shall not be unreasonably withheld or delayed (provided that no such consent of the Borrower shall be required upon the occurrence and during the continuance of an Event of Default under Section 10.01(a), Section 10.01(b), Section 10.01(h) or Section

96

10.01(i)), to appoint a successor from among the Lenders.  If no successor shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Agent from among the Lenders, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the Agent's resignation hereunder, the provisions of this Article XI and Section 12.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.

Section 11.07    Agents as Lenders.  Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Section 11.08    No Reliance.    Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and each other Loan Document to which it is a party.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document, any related agreement or any document furnished hereunder or thereunder.  The Agents shall not be required to keep themselves informed as to the performance or observance by the Borrower or any of its Subsidiaries of this Agreement, the Loan Documents or any other document referred to or provided for herein or to inspect the Properties or books of the Borrower or its Subsidiaries.  Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent or the Arrangers shall have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower (or any of its Affiliates) which may come into the possession of such Agent or any of its Affiliates.  In this regard, each Lender acknowledges that Simpson, Thacher & Bartlett LLP is acting in this transaction as special counsel to the Administrative Agent only, except to the extent otherwise expressly stated in any legal opinion or any Loan Document.  Each other party hereto will consult with its own legal counsel to the extent that it deems necessary in connection with the Loan Documents and the matters contemplated therein.

Section 11.09    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of its Subsidiaries, the Administrative Agent irrespective of whether the principal of any Loan or LC Disbursement shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Disbursements and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims

97

of the Lenders, the Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 12.03) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 12.03.

Except as specifically contemplated herein, nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or other Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Secured Obligations or the rights of any Lender or other Secured Party or to authorize the Administrative Agent to vote in respect of the claim of any Lender or other Secured Party in any such proceeding.

Section 11.10    Authority of Administrative Agent to Release Collateral and Liens. Each Lender, the Issuing Bank and each other Secured Party hereby authorizes the Administrative Agent to release any collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents (including irrevocably authorizing the Administrative Agent to comply with the provisions of Section 12.19 (without requirement of notice to or consent of any Person except as expressly required by Section 12.02(b)).  Each Lender and the Issuing Bank hereby authorizes the Administrative Agent to execute and deliver to the Borrower, at the Borrower's sole cost and expense, any and all (a) releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrower in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of Section 9.13 or is otherwise authorized by the terms of the Loan Documents, (b) releases from the Guaranty Agreement of any Subsidiary that is sold or otherwise disposed of as permitted by the terms of Section 9.13 or as otherwise specifically authorized by the terms of the Loan Documents and (c) other releases of collateral that may be specifically authorized by the terms of the Loan Documents.

Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 11.10 or Section 12.19.

Section 11.11    The Arrangers, the Syndication Agent and the Documentation Agent.  The Arrangers, the Syndication Agent and the Documentation Agent shall have no duties, responsibilities or liabilities under this Agreement and the other Loan Documents other than their duties, responsibilities and liabilities in their capacity as Lenders hereunder.

Section 11.12    Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Secured Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral

98

(a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Secured Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be credit bid by the Administrative Agent at the direction of the Majority Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any Disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Majority Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in Section 12.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Secured Obligations shall automatically be reassigned to the Secured Parties *pro rata* and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.  For the avoidance of doubt, Secured Obligations under a Secured Swap Agreement shall not be subject to a credit bid without the prior written consent of the relevant Secured Swap Provider.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for

99

509265-1666-Active.19779355.12

herein shall be in writing (i) delivered by hand or overnight courier service, mailed by certified or registered mail, (ii) sent by telecopy or (iii) sent by email, as follows:

(A)     if to the Borrower, to it at 1000 Louisiana St., Suite 6905, Houston, TX 77002, Attention: Mark J. Mize, Phone No. (832) 538-0303, Fax No. (832) 538-0220; and

(B)     if to the Administrative Agent, to it at 1 Chase Tower, 10 South Dearborn, IL1-0010, Chicago, Illinois 60603 Attention:  Leonida Mischke, Phone No. (312) 385-7055, Fax No. (312) 385-7096, and for all other correspondence other than borrowings, continuation, conversion and Letter of Credit requests 712 Main, 12th Floor, Houston, Texas 77002, Attention of Ronald Dierker (Fax No. (713) 216-7794); and

(C)     if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II, Article III, Article IV and Article V unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.   All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 12.02   Waivers; Amendments.

(a)     No failure on the part of the Administrative Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.   The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.   No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.   Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

(b)     Subject to Section 4.05, neither this Agreement nor any provision hereof nor any Security Instrument nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; provided that no such agreement shall

100

(i)      increase the Maximum Credit Amount or Commitment of any Lender without the written consent of such Lender affected thereby,

(ii)      increase the Borrowing Base without the written consent of each of the Lenders, decrease or maintain the Borrowing Base without the consent of the Required Lenders; provided that a Scheduled Redetermination and the delivery of a Reserve Report may be postponed by the Required Lenders; provided further that it is understood that any waiver (or amendment or modification that would have the effect of a waiver) of the right of the Required Lenders to adjust (through a reduction of) the Borrowing Base or the amount of such adjustment in the form of a reduction to the Borrowing Base pursuant to the Borrowing Base Adjustment Provisions in connection with the occurrence of a relevant event giving rise to such right shall require the consent of the Required Lenders,

(iii)      reduce the principal amount of the Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Secured Obligations hereunder or under any other Loan Document, without the written consent of each Lender or Secured Swap Provider directly and adversely affected thereby (except in connection with any amendment or waiver of the applicability of any post-default increase in interest rates, which shall be effective with the written consent of the Majority Lenders),

(iv)      postpone the scheduled date of payment or prepayment of the principal amount of the Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Secured Obligations hereunder or under any other Loan Document, reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date, or extend the expiry date of any Letter of Credit beyond the then current Maturity Date without the written consent of each Lender directly and adversely affected thereby,

(v)      change Section 4.01(b) or Section 4.01(c) in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender directly and adversely affected thereby,

(vi)      waive or amend Section 3.04(c) or Section 6.01 or change the definition of "Applicable Percentage", without the written consent of each Lender directly and adversely affected thereby,

(vii)      release any Guarantor (except as set forth in the Guaranty Agreement or pursuant to a transaction permitted hereby) or release a substantial portion of the collateral (other than as provided in Section 11.10), in each case, without the written consent of each directly and adversely affected Lender (other than any Defaulting Lender) or Secured Swap Provider,

(viii)      modify the terms of Section 10.02(c), Section 12.14 or Section 12.19 without the written consent of (A) each Lender directly and adversely affected thereby and the consent of each Person that is directly and adversely affected hereby and (B) a party to a Swap Agreement secured by the Security Instruments which is not a Lender (or an Affiliate of a Lender) at the time of, or after giving effect to, such agreement; provided that any waiver, amendment or modification to any Security Instrument that results in the Secured Swap Obligations secured by such Security Instrument no longer being secured thereby on an equal and ratable basis with the principal of the Loans, or any amendment, modification or change to the definition of the terms "Existing Secured Swap Agreement," "Payment in Full," "Secured Swap Agreement" or "Secured Swap Provider," shall also require the written consent of each Secured Swap Party directly and adversely affected thereby, or

101

509265-1666-Active.19779355.12

(ix)     change (A) any of the provisions of this Section 12.02(b) without the written consent of each Lender or other Secured Swap Provider directly and adversely affected thereby, (B) the definitions of "Majority Lenders," "Required Lenders" or reduce the voting rights of any Lender, without the written consent of each directly and adversely affected Lender (other than any Defaulting Lender), (C) any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender directly and adversely affected thereby; provided that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Issuing Bank, as the case may be.

Notwithstanding the foregoing, any supplement to Schedule 7.14 (Subsidiaries) shall be effective simply by delivering to the Administrative Agent a supplemental schedule clearly marked as such and, upon receipt, the Administrative Agent will promptly deliver a copy thereof to the Lenders.

(c)     Notwithstanding anything to the contrary contained in the Loan Documents, the Administrative Agent and the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender in order to (i) correct, amend, cure or resolve any minor ambiguity, omission, defect, typographical error, inconsistency or other manifest error therein, (ii) add a guarantor or collateral or otherwise enhance the rights and benefits of the Lenders, (iii) make minor administrative or operational changes not adverse to any Lender or (iv) adhere to any local Governmental Requirement on advice of local counsel.

(d)     Notwithstanding anything to the contrary contained in any Loan Documents, the Commitment of any Defaulting Lender may not be increased without its consent (it being understood, for avoidance of doubt, that no Defaulting Lender shall have any right to approve or disapprove any increase, decrease or reaffirmation of the Borrowing Base) and the Administrative Agent may with the consent of the Borrower amend, modify or supplement the Loan Documents to effectuate an increase to the Borrowing Base where such Defaulting Lender does not consent to an increase to its Commitment, including not increasing the Borrowing Base by the portion thereof applicable to the Defaulting Lender.

Section 12.03   Expenses, Indemnity; Damage Waiver.

(a)     The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel and other outside consultants for the Administrative Agent (provided that counsel shall be limited to (x) one (1) counsel to such Persons, taken as a whole, one (1) local counsel in each relevant jurisdiction and one (1) regulatory counsel to all such Persons with respect to a relevant regulatory matter, taken as a whole and (y), solely in the event of a conflict of interest, one (1) additional counsel (and, if necessary, one (1) regulatory counsel and one (1) local counsel in each relevant jurisdiction or for each matter) to each group of similarly situated affected indemnified persons), the reasonable travel, photocopy, mailing, courier, telephone and other similar expenses, including all IntraLinks expenses, and the cost of environmental assessments and audits and surveys and appraisals, in connection with the syndication of this Agreement, the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof and including advice of counsel to the Administrative Agent as to the rights and duties of the Administrative Agent and the Lenders with respect thereto) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent or any Lender in connection with any filing, registration, recording

509265-1666-Active.19779355.12

or perfection of any security interest contemplated by this Agreement or any Security Instrument or any other document referred to therein or conducting of title reviews, mortgage matches and collateral reviews, (iii) all reasonable and documented out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Issuing Bank or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including its rights under this Section 12.03, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)     THE BORROWER SHALL INDEMNIFY EACH AGENT, THE ISSUING BANK, THE ARRANGERS AND EACH LENDER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES, INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE (PROVIDED THAT COUNSEL SHALL BE LIMITED TO (X) ONE (1) COUNSEL TO SUCH INDEMNITEES, TAKEN AS A WHOLE, ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION AND ONE (1) REGULATORY COUNSEL TO ALL SUCH INDEMNITEES WITH RESPECT TO A RELEVANT REGULATORY MATTER, TAKEN AS A WHOLE AND (Y), SOLELY IN THE EVENT OF A CONFLICT OF INTEREST, ONE (1) ADDITIONAL COUNSEL (AND, IF NECESSARY, ONE (1) REGULATORY COUNSEL AND ONE (1) LOCAL COUNSEL IN EACH RELEVANT JURISDICTION OR FOR EACH MATTER) TO EACH GROUP OF SIMILARLY SITUATED AFFECTED INDEMNITEES), INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (i) THE EXECUTION OR DELIVERY OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR BY ANY OTHER LOAN DOCUMENT, (ii) THE FAILURE OF THE BORROWER OR ANY RESTRICTED SUBSIDIARY TO COMPLY WITH THE TERMS OF ANY LOAN DOCUMENT, INCLUDING THIS AGREEMENT, OR WITH ANY GOVERNMENTAL REQUIREMENT, (iii) ANY INACCURACY OF ANY REPRESENTATION OR ANY BREACH OF ANY WARRANTY OR COVENANT OF THE BORROWER OR ANY GUARANTOR SET FORTH IN ANY OF THE LOAN DOCUMENTS OR ANY INSTRUMENTS, DOCUMENTS OR CERTIFICATIONS DELIVERED IN CONNECTION THEREWITH, (iv) ANY LOAN OR LETTER OF CREDIT OR THE USE OF THE PROCEEDS THEREFROM, INCLUDING, WITHOUT LIMITATION, (A) ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT, OR (B) THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (v) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (vi) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND ITS SUBSIDIARIES BY THE BORROWER AND ITS SUBSIDIARIES, (vii) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS, (viii) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION,

103

THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES, (ix) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (x) THE PAST OWNERSHIP BY THE BORROWER OR ANY SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, (xi) THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY OR ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF ITS SUBSIDIARIES, (xii) ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF ITS SUBSIDIARIES, OR (xiii) ANY OTHER ENVIRONMENTAL, HEALTH OR SAFETY CONDITION IN CONNECTION WITH THE LOAN DOCUMENTS, OR (xiv) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING THAT MAY BE BROUGHT BY THE BORROWER, ANY GUARANTOR, ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OTHER PERSON OR ENTITY, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, AND SUCH INDEMNITY SHALL EXTEND TO EACH INDEMNITEE NOTWITHSTANDING THE SOLE OR CONCURRENT NEGLIGENCE OF EVERY KIND OR CHARACTER WHATSOEVER, WHETHER ACTIVE OR PASSIVE, WHETHER AN AFFIRMATIVE ACT OR AN OMISSION, INCLUDING WITHOUT LIMITATION, ALL TYPES OF NEGLIGENT CONDUCT IDENTIFIED IN THE RESTATEMENT (SECOND) OF TORTS OF ONE OR MORE OF THE INDEMNITEES OR BY REASON OF STRICT LIABILITY IMPOSED WITHOUT FAULT ON ANY ONE OR MORE OF THE INDEMNITEES; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to any Agent or the Issuing Bank under Section 12.03(a) or Section 12.03(b), each Lender severally agrees to pay to such Agent or the Issuing Bank, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent or the Issuing Bank in its capacity as such.

(d)     All amounts due under this Section 12.03 shall be payable not later than five (5) days after written demand therefor.

Section 12.04    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or

104

otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 12.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 12.04(c)) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in Section 12.04(b)(ii), any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)    the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee, and provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof; and

(B)    the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment to an assignee that is a Lender or an Affiliate of a Lender immediately prior to giving effect to such assignment.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5.0 million unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(E)    the assignee must not be a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), a Defaulting Lender or an Affiliate or a Subsidiary of the Borrower or any other Loan Party.

(iii)    Subject to Section 12.04(b)(iv), and the acceptance and recording thereof, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be

105

a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 5.01, Section 5.02, Section 5.03 and Section 12.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.04(c).

(iv)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Maximum Credit Amount of, and principal amount of (and stated interest on) the Loans and LC Disbursements owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Issuing Bank(s) and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice. In connection with any changes to the Register, if necessary, the Administrative Agent will reflect the revisions on Annex I and, at its election, forward a copy of such revised Annex I to the Borrower, the Issuing Bank and each Lender.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 12.04(b) and any written consent to such assignment required by Section 12.04(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 12.04(b).

(c)     (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or the Issuing Bank, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (i), (iii), (iv), (v), (vi) and (vii) of the proviso to Section 12.02(b) that affects such Participant and for which such Lender would have consent rights. In addition such agreement must provide that the Participant be bound by the provisions of Section 12.03. Subject to Section 12.04(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 5.01, Section 5.02 and Section 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(e) (it being understood that the documentation required under Section 5.03(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its

106

interest by assignment pursuant to Section 12.04(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 4.01(c) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 5.01 or Section 5.03 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank or any other central bank having jurisdiction over such Lender, and this Section 12.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Notwithstanding any other provisions of this Section 12.04, no transfer or assignment of the interests or obligations of any Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower and the Guarantors to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 12.05     Survival; Revival; Reinstatement.

(a)     All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until Payment in Full.  The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof.

(b)    To the extent that any payments on the Secured Obligations or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Secured Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each Loan Document shall continue in full force and effect.  In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Administrative Agent and the Lenders and other Secured Parties to effect such reinstatement.

Section 12.06    Counterparts; Integration; Effectiveness.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)    **This Agreement and the other Loan Documents represent the final agreement among the parties hereto and thereto and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.**

(c)    Except as provided in Section 6.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.07    Severability.  Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (of whatsoever kind, including, without limitations obligations under Swap Agreements) at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any Restricted Subsidiary against any of and all the obligations of the Borrower or any Restricted Subsidiary owed to such Lender now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations may be unmatured; provided that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.  The rights of each Lender under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender or its Affiliates may have; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 10.02(c) and, pending such payment,

108

shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, Issuing Bank(s) and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, Issuing Bank(s) and their respective Affiliates under this Section 12.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender, Issuing Bank(s) or their respective Affiliates may have. Each Lender and Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09    GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)    THIS AGREEMENT, THE NOTES (IF ANY) AND ANY LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY, AND CITY OF NEW YORK, BOROUGH OF MANHATTAN, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS; PROVIDED, THAT NOTHING CONTAINED HEREIN OR IN ANY OTHER LOAN DOCUMENT WILL PREVENT ANY PARTY FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE LOAN DOCUMENTS IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.    EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

(c)    EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 12.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 12.01 (OR ITS ASSIGNMENT AND ASSUMPTION), SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING.    NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d)    EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO

509265-1666-Active.19779355.12

THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES (PROVIDED, THAT THIS WAIVER SHALL NOT LIMIT RECOVERY BY AN INDEMNITEE PURSUANT TO SECTION 12.03 FOR INDEMNIFICATION OF EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES PAID TO, OR ASSERTED BY, A THIRD PARTY); (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OF COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (iv) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 12.09.

Section 12.10   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11   Confidentiality.  Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any Swap Agreement or any credit insurance provider, in each case relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 12.11 or (ii) becomes available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Borrower.  For the purposes of this Section 12.11, "Information" means all information received from the Borrower or any Restricted Subsidiary relating to the Borrower or any Restricted Subsidiary and their businesses, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Borrower or a Restricted Subsidiary; provided that, in the case of information received from the Borrower or any Restricted Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed

110

compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 12.12   Interest Rate Limitation.  It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Loans, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (ii) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Secured Obligations (or, to the extent that the principal amount of the Secured Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans, until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from

111

time to time in effect.   Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13   EXCULPATION PROVISIONS.   EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.   EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14   Collateral Matters; Swap Agreements.   The benefit of the Security Instruments and of the provisions of this Agreement relating to any collateral securing the Secured Obligations shall also extend to and be available on a *pro rata* basis to any Person under any Swap Agreement between the Borrower or any Restricted Subsidiary and such Person if either (a) at the time such Swap Agreement was entered into, such Person was a Lender or Affiliate of a Lender hereunder or (b) such Swap Agreement was in effect on the Closing Date and such Person or its Affiliate was a Lender on the Closing Date, in each case, after giving effect to all netting arrangements relating to such Swap Agreements.   Except as set forth in this Agreement, no Person shall have any voting rights under any Loan Document as a result of the existence of obligations owed to it under any such Swap Agreements.

Section 12.15   No Third Party Beneficiaries.   This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, any Subsidiary of the Borrower, any obligor, contractor, subcontractor, supplier or materialsman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever.   There are no third party beneficiaries.

Section 12.16   USA Patriot Act Notice.   Each Lender hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and other Loan Parties, which information includes the name and address of the Borrower and other Loan Parties and other information that will allow such Lender to identify the Borrower and other Loan Parties in accordance with the Patriot Act.

Section 12.17   Flood Insurance Provisions.   Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, in no event is or will any enclosed structure (having two walls and a roof) or manufactured mobile home (each, a "Building") be included as Collateral nor included in the definition of "Mortgaged Property", and no Building is hereby nor shall be encumbered by a Mortgage, this Agreement or any other Loan Document.

112

Section 12.18   No Fiduciary Duty.  Each Lender and their Affiliates (collectively, solely for purposes of this Section 12.18, the "Lenders"), may have economic interests that conflict with those of the Borrower and its Subsidiaries and their stockholders and/or their affiliates.  The Borrower, for itself and on behalf of its Subsidiaries, agrees that nothing in this Agreement or the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and the Borrower or its Subsidiaries, their stockholders or their affiliates, on the other.  The Borrower, for itself and on behalf of its Subsidiaries, acknowledges and agrees that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrower and its Subsidiaries, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of the Borrower or its Subsidiaries, their stockholders or their affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise Borrower or its Subsidiaries, their stockholders or their affiliates on other matters) or any other obligation to the Borrower or any of its Subsidiaries except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of the Borrower or any of its Subsidiaries, their management, stockholders, creditors or any other Person.  The Borrower, for itself and its Subsidiaries, acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Borrower, for itself and its Subsidiaries, agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Borrower or Subsidiary, in connection with such transaction or the process leading thereto.

Section 12.19   Releases

(a)   Release Upon Payment in Full.  Upon Payment in Full, the Administrative Agent, at the written request and expense of the Borrower, will promptly release, reassign and transfer the Collateral to the Loan Parties.

(a)   Further Assurances.  If any of the Collateral shall be sold, transferred or otherwise Disposed of by the Borrower or any Restricted Subsidiary in a transaction permitted by the Loan Documents and such Collateral shall no longer constitute or be required to be Collateral under the Loan Documents, then the Administrative Agent, at the request and sole expense of the Borrower and the applicable Restricted Subsidiary, shall promptly execute and deliver all releases or other documents reasonably necessary or desirable for the release of the Liens created by the applicable Security Instrument on such Collateral.  At the request and sole expense of the Borrower, a Loan Party shall be released from its obligations under the Loan Documents in the event that all the capital stock or other Equity Interests of such Loan Party shall be sold, transferred or otherwise disposed of in a transaction permitted by the Loan Documents and such Equity Interests shall no longer constitute or be required to be Collateral under the Loan Documents.

Section 12.20   Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

113

509265-1666-Active.19779355.12

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[SIGNATURES BEGIN NEXT PAGE]

114

509265-1666-Active.19779355.12

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

BORROWER:                                    **HALCÓN RESOURCES CORPORATION**

By: _____
    Name:
    Title:

509265-1666-Active.19779355.12

ADMINISTRATIVE AGENT, ISSUING
BANK AND LENDER:

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent, Issuing Bank and Lender

By: _____
    Name:
    Title:

Signature Page to Credit Agreement

**WELLS FARGO BANK, N.A.**,
as a Lender

By: _____
    Name:
    Title:

509265-1666-Active.19779355.12

**BANK OF AMERICA, N.A.,**
as a Lender

By: _____
      Name:
      Title:

509265-1666-Active.19779355.12

**BMO HARRIS FINANCING, INC.,**
as a Lender

By: _____
     Name:
     Title:

509265-1666-Active.19779355.12

**BARCLAYS BANK PLC,**
as a Lender

By: _____
     Name:
     Title:

509265-1666-Active.19779355.12

**BNP PARIBAS**
as a Lender

By: _____
      Name:
      Title:

509265-1666-Active.19779355.12

**CAPITAL ONE, NATIONAL ASSOCIATION,**
as a Lender

By: _____
    Name:
    Title:

509265-1666-Active.19779355.12

**COMERICA BANK,**
as a Lender

By: _____
　　　Name:
　　　Title:

**CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,**
as a Lender

By: _____
     Name:
     Title:

Signature Page to Credit Agreement

**GOLDMAN SACHS LENDING PARTNERS LLC,**
as a Lender

By: _____
     Name:
     Title:

509265-1666-Active.19779355.12

**ING CAPITAL LLC,**
as a Lender

By: _____
      Name:
      Title:

Signature Page to Credit Agreement

509265-1666-Active.19779355.12

**NATIXIS,**
as a Lender

By:  _____
       Name:
       Title:

509265-1666-Active.19779355.12

**ROYAL BANK OF CANADA,**
as a Lender

By: _____
      Name:
      Title:

509265-1666-Active.19779355.12

**SUNTRUST BANK,**
as a Lender

By: _____
      Name:
      Title:

509265-1666-Active.19779355.12

**ANNEX I**
**LIST OF MAXIMUM CREDIT AMOUNTS**

**Aggregate Maximum Credit Amounts**

| Name of Lender | Applicable Percentage | Maximum Credit Amount |
|---|---|---|
| JPMorgan Chase Bank, N.A. | 10.4772% | |
| Wells Fargo Bank, N.A. | 10.4772% | |
| Barclays Bank plc | 9.8263% | |
| BMO Harris Financing, Inc. | 9.8263% | |
| Bank of America, N.A. | 6.7357% | |
| Capital One, National Association | 6.7357% | |
| Natixis | 6.7357% | |
| Royal Bank of Canada | 6.7357% | |
| SunTrust Bank | 6.7357% | |
| BNP Paribas | 5.7734% | |
| ING Capital LLC | 5.7734% | |
| Goldman Sachs Lending Partners LLC | 5.6376% | |
| Credit Suisse AG, Cayman Islands Branch | 5.0886% | |
| Comerica Bank | 3.4415% | |
| **TOTAL** | **100.0000%** | |

509265-1666-Active.19779355.12

# EXHIBIT 3 TO PLAN SUPPLEMENT

# NEW WARRANT AGREEMENT

WEIL:\95834806\3\51351.0003

**WEIL DRAFT 9/1/16**

WARRANT AGREEMENT

between

HALCÓN RESOURCES CORPORATION,

AS ISSUER

and

U.S. BANK NATIONAL ASSOCIATION,

AS WARRANT AGENT

September [9], 2016

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| SECTION 1. | CERTAIN DEFINED TERMS | 1 |
| SECTION 2. | APPOINTMENT OF WARRANT AGENT | 3 |
| SECTION 3. | ISSUANCE OF WARRANTS; FORM, EXECUTION AND DELIVERY | 3 |
| SECTION 4. | TRANSFER OR EXCHANGE | 5 |
| SECTION 5. | DURATION AND EXERCISE OF WARRANTS | 6 |
| SECTION 6. | ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF SHARES PURCHASABLE OR NUMBER OF WARRANTS | 10 |
| SECTION 7. | CANCELLATION OF WARRANTS | 13 |
| SECTION 8. | MUTILATED OR MISSING WARRANT CERTIFICATES | 13 |
| SECTION 9. | MERGER, CONSOLIDATION, ETC. | 13 |
| SECTION 10. | RESERVATION OF SHARES; CERTAIN ACTIONS | 14 |
| SECTION 11. | NOTIFICATION OF CERTAIN EVENTS; CORPORATE ACTION | 14 |
| SECTION 12. | WARRANT AGENT | 15 |
| SECTION 13. | WARRANTHOLDER NOT DEEMED A STOCKHOLDER | 20 |
| SECTION 14. | NOTICES TO COMPANY AND WARRANT AGENT | 20 |
| SECTION 15. | SUPPLEMENTS AND AMENDMENTS | 21 |
| SECTION 16. | TERMINATION | 21 |
| SECTION 17. | GOVERNING LAW AND CONSENT TO FORUM | 21 |
| SECTION 18. | WAIVER OF JURY TRIAL | 21 |
| SECTION 19. | BENEFITS OF THIS AGREEMENT | 22 |
| SECTION 20. | COUNTERPARTS | 22 |
| SECTION 21. | HEADINGS | 22 |

EXHIBIT A     FORM OF GLOBAL WARRANT CERTIFICATE
EXHIBIT B     FORM OF ASSIGNMENT

WEIL:\95745763\13\51351.0003

This WARRANT AGREEMENT (this "Agreement") is dated as of September [9], 2016, between Halcón Resources Corporation, a Delaware corporation, as issuer (the "Company"), and U.S. Bank National Association, as warrant agent (the "Warrant Agent").

W I T N E S S E T H

WHEREAS, in connection with the financial restructuring of the Company, and certain of its subsidiaries (collectively, the "Debtors") pursuant to the Debtors' Joint Prepackaged Plan of Reorganization (the "Plan") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.*, the Company has agreed to issue warrants (the "Warrants") which, in the aggregate, are exercisable to purchase up to 4,736,842 shares ("Shares") of the Company's common stock, par value $0.0001 per share, subject to adjustment as provided herein (the "Common Stock");

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, exercise and cancellation of the Warrants;

WHEREAS, the Warrant Agent, at the request of the Company, has agreed to act as the agent of the Company in connection with the issuance, transfer, exchange, replacement and exercise of the Warrants as provided herein;

WHEREAS, the Company desires to enter into this Agreement to set forth the terms and conditions of the Warrants and the rights of the holders thereof.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.    Certain Defined Terms.  Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Section.

"Agreement" has the meaning specified in the preamble hereof.

"Appropriate Officers" has the meaning specified in Section 3(c) hereto.

"Business Day" means any date other than a Saturday or a Sunday or a day on which commercial banking institutions in New York City, New York are authorized or required by law to be closed; provided that, in determining the period within which certificates or Warrants are to be issued and delivered at a time when shares of Common Stock (or Other Securities) are listed or admitted to trading on any national securities exchange or in the over-the-counter market and in determining Market Price of any securities listed or admitted to trading on any national securities exchange or in the over-the-counter market, "Business Day" shall mean any day when the principal exchange on which such securities are then listed or admitted to trading is open for trading or, if such securities are traded in the over-the counter market in the United States, such market is open for trading.

"Cashless Exercise" has the meaning specified in Section 5(c) hereto.

"Common Stock" has the meaning specified in the recitals hereto.

"Depository" has the meaning specified in Section 3(b) hereto.

"Effective Date" has the meaning specified in the Plan.

"Exercise Price" means the initial Exercise Price for the Warrants as set forth in Section 5(b) hereto, as it may be adjusted from time to time as provided herein.

"Expiration Date" has the meaning specified in Section 5(a) hereto.

"Ex-Date" means, when used with respect to any issuance of or distribution in respect of the Common Stock or any Other Securities, the first date on which the Common Stock or such Other Securities trade without the right to receive such issuance or distribution.

"Global Warrant Certificate" has the meaning specified in Section 3(b) hereto.

"Holder" means the beneficial holder or beneficial holders of Global Warrant Certificates.

"Market Price" means with respect to Common Stock or any Other Security the VWAP of a share or single unit of such securities for the last five trading days immediately preceding the date of measurement, or, if the security is not listed or quoted on the New York Stock Exchange, NASDAQ Stock Market, or a U.S. national or regional securities exchange, the average of the reported closing bid and asked prices of such security on such dates in the over-the-counter market or comparable system as shown by a system of automated dissemination of quotations of securities prices then in common use comparable to the National Association of Securities Dealers, Inc. Automated Quotations System; provided, however, that if no such sales price or bid and asked prices have been quoted during the 20-day period immediately preceding the date of measurement (or such lesser number of Business Days or such common stock shall have been listed, quoted or traded) or there is otherwise no established trading market for such security, then "Market Price" means the value of such Common Stock or Other Security as determined reasonably and in good faith by the Board of Directors of the Company.

"Other Securities" or "Other Security" means any stock (other than Common Stock) and other securities of the Company or any other Person that the Holders of the Warrants at any time shall be entitled to receive or shall have received, upon the exercise of the Warrants, in lieu of or in addition to Common Stock, or that at any time shall be issuable or shall have been issued in exchange for or in replacement of Common Stock or Other Securities.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust or other entity.

"Plan" has the meaning specified in the recitals hereto.

"Settlement Date" means the date that is three Business Days after a Warrant Exercise Notice is delivered.

2

"Shares" has the meaning specified in the recitals hereto.

"VWAP" means for any trading day, the price for securities (including Common Stock) determined by the daily volume weighted average price per unit of securities for such trading day on the trading market on which such securities are then listed or quoted, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session), or if such securities are not listed or quoted on the New York Stock Exchange or NASDAQ Stock Market, as reported by the principal U.S. national or regional securities exchange on which such securities are then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 P.M., New York City time (or 15 minutes following the end of any extension of the regular trading session), on such trading day.

"Warrant Agent" has the meaning specified in the preamble hereof and shall include any successor Warrant Agent hereunder.

"Warrant Agent Office" has the meaning specified in Section 4(e) hereto.

"Warrant Exercise Notice" has the meaning specified Section 5(c) hereto.

"Warrant Register" has the meaning specified in Section 3(d) hereto.

"Warrants" has the meaning specified in the recitals hereto.

"Warrant Shares" has the meaning specified in Section 3(a) hereto.

SECTION 2.     Appointment of Warrant Agent.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Agreement; and the Warrant Agent hereby accepts such appointment, upon the terms and conditions hereinafter set forth.

SECTION 3.     Issuance of Warrants; Form, Execution and Delivery.

(a)     Issuance of Warrants.  On the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, the Warrants will be issued by the Company in the amounts and to the recipients specified in the Plan.  Such Warrants shall be, upon issuance, duly authorized and validly issued. In accordance with Section 4 hereof and the Plan, the Company will cause to be issued to the Depository (as defined below), one or more Global Warrant Certificates (as defined below) evidencing the Warrants.  Each Warrant evidenced thereby entitles the Holder, upon proper exercise and payment of the Exercise Price, to receive from the Company, as adjusted as provided herein, one share of Common Stock at the Exercise Price.  The shares of Common Stock (as provided pursuant to Section 6 hereof) or Other Securities deliverable upon proper exercise of the Warrants are referred to herein as the "Warrant Shares".  The maximum number of Warrant Shares shall be 4,736,842 shares, as such amount may be adjusted from time to time pursuant to this Agreement.  The Company shall promptly notify the Warrant Agent in writing upon the occurrence of the Effective Date and, if such notification is given orally, the Company shall confirm the same in writing on or prior to the

3

Business Day next following.  Until such notice is received by the Warrant Agent, the Warrant Agent may presume conclusively for all purposes that the Effective Date has not occurred.

(b)    Form of Warrant.  Subject to Section 4 of this Agreement, the Warrants shall be issued in the form of one or more global certificates (the "Global Warrant Certificates"), the forms of election to exercise and of assignment to be printed on the reverse thereof, in substantially the form set forth in Exhibits A and B attached hereto, respectively.  The Global Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with the rules and regulations of the Depository (as hereinafter defined), any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may be determined, consistently herewith, by the Appropriate Officers executing such Global Warrant Certificates, as evidenced by their execution of the Global Warrant Certificates, which shall be reasonably acceptable to the Warrant Agent.  The Global Warrant Certificates shall be deposited on or after the date hereof with or on behalf of The Depository Trust Company (the "Depository") and registered in the name of Cede & Co., as the Depository's nominee and their respective successors.  Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c)    Execution of Warrants.  Global Warrant Certificates shall be signed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, Chief Financial Officer, Treasurer or any Executive Vice President (each, an "Appropriate Officer"), and by the Secretary or any Assistant Secretary.  Each such signature upon the Global Warrant Certificates may be in the form of a facsimile or electronic signature of any such Appropriate Officer, Secretary, and any Assistant Secretary and may be imprinted or otherwise reproduced on the Global Warrant Certificates and for that purpose the Company may adopt and use the facsimile or electronic signature of any Appropriate Officer, Secretary, and any Assistant Secretary who shall have been an Appropriate Officer, Secretary, or an Assistant Secretary at the time of entering into this Agreement.  If any Appropriate Officer, Secretary, or any Assistant Secretary who shall have signed any of the Global Warrant Certificates shall cease to be such Appropriate Officer, Secretary, or an Assistant Secretary before the Global Warrant Certificates so signed shall have been countersigned by the Warrant Agent or disposed of by the Company, such Global Warrant Certificates nevertheless may be countersigned and delivered or disposed of as though such Appropriate Officer, Secretary, or Assistant Secretary had not ceased to be such Appropriate Officer, Secretary, or Assistant Secretary of the Company; and any Global Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Global Warrant Certificate, shall be a proper Appropriate Officer, Secretary, or Assistant Secretary of the Company to sign such Global Warrant Certificate, although at the date of the execution of this Agreement any such person was not such Appropriate Officer, Secretary, or Assistant Secretary.  Global Warrant Certificates shall be dated the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

4

(d)    Countersignature.  Upon receipt of a written order of the Company and the Global Warrant Certificates duly executed on behalf of the Company, the Warrant Agent, on behalf of the Company, shall countersign one or more Global Warrant Certificates evidencing the Warrants and shall deliver such Global Warrant Certificates to or upon the written order of the Company.  Such written order of the Company shall specifically state the number of Warrants that are to be issued as a Global Warrant Certificate.  Each Warrant shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.  Each Holder of Warrants shall be bound by all of the terms and provisions of this Agreement (a copy of which is available on request to the Secretary of the Company) and any amendments thereto as fully and effectively as if such Holder had signed the same.  No Global Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Global Warrant Certificate has been countersigned by the manual, facsimile or electronic signature of the Warrant Agent.  Such signature by the Warrant Agent upon any Global Warrant Certificate executed by the Company shall be conclusive evidence that such Global Warrant Certificate so countersigned has been duly issued hereunder.  The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register any Global Warrant Certificates and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Section 4 of this Agreement, all in form satisfactory to the Company and the Warrant Agent.  The Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder of the Warrant in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made. Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, the Warrant Agent and the Company may deem and treat the person in whose name any Warrant is registered as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing made in a Global Warrant Certificate by anyone), for the purpose of any exercise thereof, any distribution to the Holder of the Warrant thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

SECTION 4.    Transfer or Exchange.

(a)    Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein.  The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depository, in accordance with this Agreement and the procedures of the Depository therefor.

(b)    Restrictions on Transfer and Exchange of Global Warrant Certificates.  Notwithstanding any other provisions of this Agreement, a Global Warrant Certificate may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

5

WEIL:\95745763\13\51351.0003

(c)      Cancellation of Global Warrant Certificate.  At such time as all beneficial interests in Global Warrant Certificates have been exchanged for Common Stock in accordance herewith, redeemed, repurchased or cancelled, all Global Warrant Certificates shall be returned to, or cancelled and retained pursuant to applicable law by, the Warrant Agent, upon written instructions from the Company reasonably satisfactory to the Warrant Agent.

(d)      Obligations with Respect to Transfers and Exchanges of Warrants.

(i)      To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent is hereby authorized to countersign, in accordance with the provisions of this Section 4, Global Warrant Certificates, as required pursuant to the provisions of this Section 4 and for the purpose of any distribution of additional Global Warrant Certificates contemplated by Section 6 hereof.

(ii)      All Global Warrant Certificates issued upon any registration of transfer or exchange shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Global Warrant Certificates surrendered upon such registration of transfer or exchange.

(iii)      So long as the Depository, or its nominee, is the registered owner of a Global Warrant Certificate, the Depository or such nominee, as the case may be, will be considered the sole owner or Holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Agreement, including, without limitation, for the purposes of (a) giving notices with respect to such Warrants, and (b) registering transfers with respect to such Warrants. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(iv)      The Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Warrants in the Warrant Register, upon surrender of Global Warrant Certificates, representing such Warrants at the Warrant Agent Office referred to in Section 14 hereof (the "Warrant Agent Office"), duly endorsed, and accompanied by a completed form of assignment substantially in the form attached as Exhibit B hereto duly signed by the Holder thereof or by the duly appointed legal representative thereof or by his attorney, duly authorized in writing, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.  Upon any such registration of transfer, a new Global Warrant Certificate shall be issued to the transferee.

(v)      The Warrant Agent shall not undertake the duties and obligations of a stock transfer agent under this Agreement, or otherwise, including, without limitation, the duty to receive, issue or transfer Shares of the Company's Common Stock.

SECTION 5.      Duration and Exercise of Warrants.

(a)      Expiration Date.  The Warrants shall expire on September [9], 2020, at 5:00 p.m., New York City time, which is the fourth (4th) anniversary of the Effective Date of the

6

Plan (the "Expiration Date").  After 5:00 p.m. New York City time on the Expiration Date, the Warrants will become void and of no value, and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time.

        (b)      Exercise Price.  On the Effective Date, the Exercise Price for the Warrants shall be $14.04 per Share (subject to adjustment pursuant to Section 6 hereof).

        (c)      Manner of Exercise.

        (i)      *Cash Payment*. Subject to the provisions of this Agreement, including the adjustments contained in Section 6, each Warrant shall entitle the Holder thereof to purchase from the Company (and the Company shall issue and sell to such Holder) one fully paid and nonassessable Share evidenced by the Global Warrant Certificate at a price equal to the Exercise Price.  All or any of the Warrants represented by a Global Warrant Certificate may be exercised by the registered Holder thereof during normal business hours on any Business Day, by delivering  (A) written notice of such election ("Warrant Exercise Notice") to exercise the Warrants to the Company and the Warrant Agent at the addresses set forth in Section 14 no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall be substantially in the form set forth in Exhibit A; and (B) by no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, such Warrants to the Warrant Agent by book-entry transfer through the facilities of the Depository, if such Warrants are represented by a Global Warrant Certificate. Such Global Warrant Certificate and the documents referred to in clauses (A) and (B) of the immediately preceding sentence shall be accompanied by payment in full in respect of each Warrant that is exercised, which shall be made by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer to the Warrant Agent of the Exercise Amount in immediately available funds. Such payment shall be in an amount equal to the product of the number of shares of Common Stock designated in such subscription form multiplied by the Exercise Price for the Warrants being exercised, in each case as adjusted herein.  Upon such surrender and payment, such Holder shall thereupon be entitled to receive the number of duly authorized, validly issued, fully paid and nonassessable Shares (or Other Securities) determined as provided in Section 3, and as and if adjusted pursuant to Section 6.

        (ii)      *Cashless Exercise*.  Provided the Common Stock is then listed or admitted for trading on a national securities exchange or an over-the-counter market or comparable system, and subject to the provisions of this Agreement, the holder shall have the right, in lieu of paying the Exercise Price in cash, to instruct the Company to reduce the number of shares of Common Stock issuable pursuant to the exercise of the Warrants (the "Cashless Exercise") in accordance with the following formula:

$$N = P \div M$$

where:

$N$  =  the number of shares of Common Stock to be subtracted from the aggregate number of shares of Common Stock issuable upon exercise of the Warrants;

WEIL:\95745763\13\51351.0003

P   =   the aggregate Exercise Price which would otherwise be payable in cash for all of the shares of Common Stock for which the Warrants are being exercised; and

M   =   the Market Price of a share of Common Stock determined as of the Business Day immediately preceding the day the Warrant Exercise Notice is delivered to the Warrant Agent.

If the Exercise Price exceeds the Market Price at the time of exercise, then no shares of Common Stock will be issuable via the Cashless Exercise.

(d)        The number of shares of Common Stock to be issued on such exercise will be determined by the Company (with written notice thereof to the Warrant Agent) using the formula set forth in Section 5(c).  The Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company's determination of the number of shares of Common Stock to be issued on such exercise is accurate or correct, nor shall the Warrant Agent have any duty or obligation to take any action with regard to such warrant exercise prior to being notified by the Company of the relevant number of shares of Common Stock to be issued.

(e)        Each Warrant not exercised pursuant to this Agreement on or prior to the Expiration Date shall become void and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of 5:00 p.m., New York City time, on the Expiration Date.

(f)        Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(g)        The Warrant Agent shall:

(i)        examine all Warrant Exercise Notices and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether, on their face, such Warrant Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)        endeavor to inform the Company of and cooperate with and assist the Company in resolving any reconciliation  problems between  the Warrant  Exercise  Notices received  and delivery of Warrants to the Warrant Agent's account;

(iii)        advise the Company, no later than five Business Days after receipt of a Warrant Exercise Notice, of (x) the receipt of such Warrant Exercise Notice and the number of Warrants exercised in accordance with the terms and conditions of this Agreement, (y) the instructions with respect to delivery of the Shares deliverable upon such exercise, subject to the timely receipt from the Depository of the necessary information, and (z) such other information as the Company shall reasonably require;

(iv)        if requested by the Company and provided with the Common Stock and all other necessary information by or on behalf of the Company for delivery to the Depository, liaise

8

with the Depository and effect such delivery to the relevant accounts at the Depository in accordance with its requirements; and

(v)     as soon as practicable, pay to the Company all funds received by the Warrant Agent in payment of the aggregate Exercise Price.

(h)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in its sole discretion in good faith, which determination shall be final and binding.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's gross negligence, willful misconduct or bad faith (each as determined by a final, non-appealable judgment of a court of competent jurisdiction), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by the Company.  The Company reserves the right to reject any and all Warrant Exercise Notices not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful as determined in good faith.  Such determination by the Company shall be final and binding on the Holders, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise of Warrants.  Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(i)     As soon as reasonably practicable after the exercise of any Warrant (and in any event not later than 10 Business Days thereafter), the Company shall issue, or otherwise deliver,  in authorized denominations to or upon the order of the Holder, if such Holder holds the Warrants being exercised through the Depository's book-entry transfer facilities, by same-day or next-day credit to the Depository for the account of such Holder or for the account of a participant in the Depository the number of Shares to which such Holder is entitled, in each case registered in such name and delivered to such account as directed in the Warrant Exercise Notice by such Holder or by the direct participant in the Depository through which such Holder is acting.

If fewer than all of the Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise of Warrants are exercised at any time prior to the Expiration Date, the Warrant Agent shall cause a notation to be made to the records maintained by the Depository.  The Person in whose name any certificate or certificates for the Warrant Shares are to be issued (or such Warrant Shares are to be registered, in the case of a book-entry transfer) upon exercise of a Warrant shall be deemed to have become the holder of record of such Warrant Shares on the date such Warrant Exercise Notice is delivered.

(j)     Notwithstanding any adjustment pursuant to Section 6 in the number of Shares or Other Securities purchasable upon the exercise of a Warrant, the Company shall not be required to issue Warrants to purchase fractions of Shares or Other Securities, or to issue fractions of Shares or Other Securities upon exercise of the Warrants, or to distribute certificates which evidence fractional Shares.  In the event of an adjustment that results in a Warrant becoming exercisable for fractional Shares, the number of Shares or other securities subject to

9

such Warrant shall be adjusted upward or downward to the nearest whole number of Shares or Other Securities (with one half rounded up). All Warrants held by a holder shall be aggregated for purposes of determining any such adjustment.

(k)    If all of the Warrants evidenced by a Global Warrant Certificate have been exercised, such Global Warrant Certificate shall be cancelled by the Warrant Agent.  Such cancelled Global Warrant Certificate shall then be disposed of by or at the direction of the Company in accordance with applicable law.  The Warrant Agent shall (x) advise an authorized representative of the Company as directed by the Company by the end of each day or on the next Business Day following each day on which Warrants were exercised, of (i) the number of Shares issued upon exercise of a Warrant, (ii) the notation to the records of the Depository reflecting the balance, if any, of the Shares issuable after such exercise of the Warrant and (iii) such other information as the Company shall reasonably require and (y) concurrently pay to the Company all funds received by the Warrant Agent in payment of the aggregate Exercise Price.  The Warrant Agent shall confirm such information to the Company in writing as promptly as practicable.

(l)    The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of Warrants; provided, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder of the Warrants underlying such Warrant Shares, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

(m)    The Warrant Agent shall keep copies of this Agreement and any notices given or received hereunder for a period no longer than seven (7) years from the Effective Date.

SECTION 6.    Adjustment of Exercise Price and Number of Shares Purchasable or Number of Warrants.

(a)    Stock Dividends, Subdivisions and Combinations of Shares.  If after the date hereof the number of outstanding shares of Common Stock is increased by a dividend or share distribution to all holders of Common Stock, in each case payable in shares of Common Stock, or by a subdivision, combination or other reclassification of shares of Common Stock, then, in the case of such events, the amount of Common Stock issuable for each Warrant and the Exercise Price will be adjusted as follows:  on the day following the date fixed for the determination of holders of shares of Common Stock entitled to receive such dividend or share distribution, and in the cases of subdivisions, combinations and other reclassifications, on the day following the effective date thereof:  (a) the Exercise Price in effect immediately prior to such action shall be adjusted to a new Exercise Price that bears the same relationship to the Exercise Price in effect immediately prior to such event as the total number of shares of Common Stock outstanding immediately prior to such action bears to the total number of shares of Common Stock outstanding immediately after such event, and (b) the number of Shares of Common Stock purchasable upon the exercise of any Warrant after such event shall be the number of Shares of

10

Common Stock obtained by multiplying the number of Shares of Common Stock purchasable immediately prior to such adjustment upon the exercise of such Warrant by the Exercise Price in effect immediately prior to such adjustment and dividing the product so obtained by the Exercise Price in effect after such adjustment. A distribution to holders of the Common Stock of rights expiring less than thirty (30) days after the issuance thereof entitling holders to purchase shares of Common Stock at a price per share less than the Market Price shall be deemed a dividend of a number of shares of Common Stock equal to the product of (i) the number of shares of Common Stock actually issued in such distribution (or actually issued under any issued rights that are convertible into or exercisable for the Common Stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Common Stock paid to exercise such rights divided by (y) the Market Price, and the amount of Common Stock issuable for each Warrant and the Exercise Price will be adjusted in accordance with the foregoing sentence.  For purposes of this Section 6(a), if the rights constitute securities convertible into or exercisable for Common Stock, in determining the price payable for Common Stock, there shall be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion.

(b)    Distributions.  If after the date hereof the Company shall distribute to all holders of its shares of Common Stock evidences of its indebtedness or assets (excluding cash distributions made as a dividend payable out of earnings or out of surplus legally available for dividends under the laws of the jurisdiction of incorporation of the Company) or rights to subscribe for shares of Common Stock expiring at least thirty (30) days after the issuance thereof, then in each such case (i) the Exercise Price in effect on the trading day immediately following the close of business on the record date for such distribution shall be decreased to an amount determined by multiplying such Exercise Price by a fraction, the numerator of which is the Market Price of a share of the Common Stock on the trading day immediately prior to the Ex-Date less the Market Price of the assets or evidences of indebtedness so distributed or of such subscription rights per share of Common Stock outstanding on the trading day immediately prior to the Ex-Date (determined for such purpose on the basis of the aggregate assets, evidences of indebtedness and/or rights distributed with respect to one share of Common Stock as if, for purposes of the definition of "Market Price", such assets, evidences of indebtedness and/or rights were an "Other Security") (as determined by the Board of Directors of the Company, whose determination shall be conclusive, and described in a statement filed with the Warrant Agent) and the denominator of which is the Market Price of a share of Common Stock on the trading day immediately prior to the Ex-Date and (ii) the number of Shares of Common Stock purchasable upon the exercise of any Warrant after such event shall be the number of Shares of Common Stock obtained by multiplying the number of Shares of Common Stock purchasable immediately prior to such adjustment upon the exercise of such Warrant by the Exercise Price in effect immediately prior to such adjustment and dividing the product so obtained by the Exercise Price in effect after such adjustment.  Such adjustments shall be made whenever any such distribution is made, and shall become effective retroactively on the date immediately after the record date for the determination of stockholders entitled to receive such distribution.

(c)    Adjustments for Mergers and Consolidations.  In case the Company, after the date hereof, shall merge, consolidate or otherwise engage in a recapitalization, reclassification, reorganization or business combination with another Person, then, in the case of any such transaction, proper provision shall be made so that, upon the basis and terms and in the

11

manner provided in this Agreement, the Holders of the Warrants, upon the exercise thereof at any time after the consummation of such transaction (subject to the Expiration Date), shall be entitled to receive (at the aggregate Exercise Price in effect at the time of the transaction for all Common Stock or Other Securities issuable upon such exercise immediately prior to such consummation), in lieu of the Common Stock or Other Securities issuable upon such exercise prior to such consummation, the greatest amount of securities, cash or other property to which such Holder would have been entitled as a holder of Common Stock (or Other Securities) upon such consummation if such Holder had exercised the rights represented by the Warrants held by such Holder immediately prior thereto, subject to adjustments (subsequent to such consummation) as nearly equivalent as possible to the adjustments provided for in Sections 6(a) and 6(b) above; provided, however, that each Holder, at the election of the Company, may be required at the consummation of any such transaction to receive solely cash in an amount determined reasonably and in good faith by the board of directors of the Company to equal the excess of (i) the product of (A) the value of the per share consideration to be received by the holders of the Common Stock (or Other Securities) in such transaction multiplied by (B) the number of Shares subject to the Warrants held by such Holder, over (ii) the aggregate Exercise Price payable by such Holder upon exercise in full of such Warrants, and upon consummation of such transaction the Holders shall surrender all Global Warrant Certificates to the Warrant Agent for cancellation.

(d)    Notice of Adjustment in Exercise Price.  Whenever the Exercise Price and securities issuable shall be adjusted as provided in this Section 6, the Company shall forthwith file with the Warrant Agent a statement, signed by an Appropriate Officer, stating in detail the facts requiring such adjustment, the Exercise Price that will be effective after such adjustment and the impact of such adjustment on the number and kind of securities issuable upon exercise of the Warrants.  The Company shall also cause a notice setting forth any such adjustments to be sent by mail, first class, postage prepaid, to each registered Holder at its address appearing on the Warrant Register.  The Warrant Agent shall have no duty with respect to any statement filed with it except to keep the same on file and available for inspection by registered Holders of Warrants during reasonable business hours.  The Warrant Agent shall not at any time be under any duty or responsibility to any Holder of a Warrant to determine whether any facts exist which may require any adjustment to the Exercise Price or securities issuable, or with respect to the nature or extent of any adjustment of the Exercise Price or securities issuable when made or with respect to the method employed in making such adjustment.

(e)    Other Notices.  In case the Company after the date hereof shall propose to take any action of the type described in subsections (a), (b) or (c) of this Section 6, the Company shall give notice to the Warrant Agent and to each registered Holder in the manner set forth in subsection (d) of this Section 6, which notice shall specify, in the case of action of the type specified in subsection (a) or (b), the date on which a record shall be taken with respect to any such action.  Such notice shall be given, in the case of any action of the type specified in subsection (a) or (b), at least ten (10) days prior to the record date with respect thereto.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.  Where appropriate, such notice may be given in advance and may be included as part of a notice required to be mailed under the provisions of subsection (d) of this Section 6.

12

WEIL:\95745763\13\51351.0003

(f)    No Change in Warrant Terms on Adjustment.  Irrespective of any adjustments in the Exercise Price or the number of Shares (or any inclusion of Other Securities) issuable upon exercise, Warrants theretofore or thereafter issued may continue to express the same prices and number of shares as are stated in the similar Warrants issuable initially, or at some subsequent time, pursuant to this Agreement, and the Exercise Price and such number of shares issuable upon exercise specified thereon shall be deemed to have been so adjusted.

(g)    Treasury Shares.  Shares of Common Stock at any time owned by the Company shall not be deemed to be outstanding for the purposes of any computation under this Section 6.

SECTION 7.    Cancellation of Warrants.  The Warrant Agent shall cancel all Global Warrant Certificates surrendered for exchange, substitution, transfer or exercise in whole or in part.  Such cancelled Global Warrant Certificates shall thereafter be disposed of by the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

SECTION 8.    Mutilated or Missing Global Warrant Certificates.  Upon receipt by the Company and the Warrant Agent from any Holder of evidence reasonably satisfactory to them of the ownership of and the loss, theft, destruction or mutilation of such Holder's Global Warrant Certificate and a surety bond or indemnity reasonably satisfactory to them, and in case of mutilation upon surrender and cancellation thereof, the Company will execute and the Warrant Agent will countersign and deliver in lieu hereof a new Global Warrant Certificate of like tenor and representing an equal number of Warrants to such Holder; provided in the case of mutilation, no bond or indemnity shall be required if such Global Warrant Certificate in identifiable form is surrendered to the Company or the Warrant Agent for cancellation.  Upon the issuance of any new Global Warrant Certificate under this Section 8, the Company may require the payment of a sum sufficient to cover any stamp tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the reasonable fees and expenses of the Warrant Agent) in connection therewith.  Every new Global Warrant Certificate executed and delivered pursuant to this Section 8 in lieu of any lost, stolen or destroyed Global Warrant Certificate shall be entitled to the same benefits of this Agreement equally and proportionately with any and all other Global Warrant Certificates, whether or not the allegedly lost, stolen or destroyed Global Warrant Certificate shall be at any time enforceable by anyone.  The provisions of this Section 8 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, stolen or destroyed Global Warrant Certificates.

SECTION 9.    Merger, Consolidation, Etc.  Notwithstanding anything contained herein to the contrary, the Company will not effect a merger or consolidation unless, prior to the consummation of such transaction, each Person (other than the Company) that may be required to deliver any Common Stock, Other Securities, securities, cash or property upon the exercise of any Warrant as provided herein shall assume, by written instrument delivered to the Warrant Agent, the obligations of the Company under this Agreement and under each of the Warrants, including, without limitation, the obligation to deliver such shares of Common Stock, Other Securities, cash or property as may be required pursuant to Section 6 hereof or the certificate or articles of incorporation or other constituent document, and shall provide for adjustments equivalent to the adjustments provided for in Section 6 hereof.

13

SECTION 10.   <u>Reservation of Shares; Certain Actions</u>.

(a)   <u>Reservation of Shares</u>.  The Company shall at all times reserve and keep available, free from preemptive rights, out of its authorized but unissued Common Stock (or out of authorized Other Securities), solely for issuance and delivery upon exercise of Warrants, the full number of Shares (and Other Securities) from time to time issuable upon the exercise of all Warrants and any other outstanding warrants, options or similar rights, from time to time outstanding.  All Shares (and Other Securities) shall be duly authorized and, when issued upon such exercise, shall be duly and validly issued, and (in the case of Shares) fully paid and nonassessable, free from all taxes, liens, charges, security interests, encumbrances and other restrictions created by or through the Company and issued without violation (i) of any preemptive or similar rights of any stockholder of the Company and (ii) by the Company of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which the shares of Common Stock or Other Securities constituting Warrant Shares may be listed at the time of such exercise.

(b)   <u>Certain Actions</u>.  Before taking any action that would cause an adjustment pursuant to Section 6 reducing any Exercise Price below the then par value (if any) of the Shares issuable upon exercise of the Warrants, the Company will take any reasonable corporate action that may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable Shares at such Exercise Price as so adjusted.

SECTION 11.   <u>Notification of Certain Events; Corporate Action</u>.  In the event of:

(a)   any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (excluding cash distributions made as a dividend payable out of earnings or out of surplus legally available for dividends under the laws of the jurisdiction of incorporation of the Company) or other distribution of any kind, or any right to subscribe for, purchase or otherwise acquire any shares of stock of any class or any other securities or property, or to receive any other right or interest of any kind; or

(b)   (A) any capital reorganization of the Company, (B) any reclassification of the capital shares of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a subdivision or combination), (C) the consolidation or merger of the Company with or into any other corporation (other than a consolidation or merger in which the Company is the continuing corporation and which does not result in any change in the shares of Common Stock), (iv) the sale or transfer of the properties and assets of the Company as, or substantially as, an entirety to another Person, or (v) an exchange offer for Common Stock (or Other Securities); or

(c)   the voluntary or involuntary dissolution, liquidation, or winding up of the Company,

the Company shall cause to be filed with the Warrant Agent and mailed to each Holder a notice specifying (x) the date or expected date on which any such record is to be taken for the purpose

14

of such dividend, distribution or right, and the amount and character of any such dividend, distribution or right, if a record is not to be taken, the date as of which the holders of Common Stock of record to be entitled to such dividend, distribution, or right are to be determined, and the amount and character of such dividend, distribution or right, or (y) the date or expected date on which any such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up is expected to become effective, and the time, if any such time is to be fixed, as of which holders of record of Common Stock (or Other Securities) shall be entitled to exchange their shares of Common Stock (or Other Securities) for the securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, transfer, exchange offer, dissolution, liquidation or winding up. Such notice shall be delivered not less than twenty (20) days prior to such date therein specified, in the case of any such date referred to in clause (x) of the preceding sentence, and not less than thirty (30) days prior to such date therein specified, in the case of any such date referred to in clause (y) of the preceding sentence.  Failure to give such notice within the time provided or any defect therein shall not affect the legality or validity of any such action.

SECTION 12.    Warrant Agent.  The Warrant Agent undertakes the duties and obligations imposed by this Agreement upon the terms and conditions set forth in this Section 12.

(a)    Limitation on Liability.  The Warrant Agent shall not by countersigning Global Warrant Certificates or by any other act hereunder be accountable with respect to or be deemed to make any representations as to the validity or authorization of the Warrants or the Global Warrant Certificates (except as to its countersignature thereon), as to the validity, authorization or value (or kind or amount) of any Common Stock or of any Other Securities or other property delivered or deliverable upon exercise of any Warrant, or as to the purchase price of such Common Stock, securities or other property.  The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Global Warrant Certificates or for any action taken, suffered or omitted by the Warrant Agent in good faith in the belief that any Global Warrant Certificate or any other document or any signature is genuine or properly authorized, (ii) be responsible for determining whether any facts exist that may require any adjustment of the purchase price and the number of Shares purchasable upon exercise of Warrants, or with respect to the nature or extent of any such adjustments when made, or with respect to the method of adjustment employed, (iii) be responsible for any failure on the part of the Company to issue, transfer or deliver any Common Stock or Other Securities or property upon the surrender of any Warrant for the purpose of exercise or to comply with any other of the Company's covenants and obligations contained in this Agreement or in the Global Warrant Certificates or (iv) be liable for any action taken, suffered or omitted to be taken in connection with this Agreement, except for its own bad faith, gross negligence or willful misconduct. Notwithstanding anything in this Agreement to the contrary, in no event shall the Warrant Agent be liable for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of the loss or damage and regardless of the form of the action.  Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent.

15

(b)    Instructions. The Warrant Agent is hereby authorized to accept advice or instructions with respect to the performance of its duties hereunder from an Appropriate Officer and to apply to any such officer for advice or instructions. The Warrant Agent shall be fully protected and authorized in relying upon the most recent advice or instructions received by any such officer. The Warrant Agent shall not be liable for any action taken, suffered or omitted by it in accordance with the advice or instructions of any such officer, except to the extent that such action or omission resulted directly from the Warrant Agent's gross negligence, bad faith or willful misconduct.

(c)    Agents. The Warrant Agent may execute and exercise any of the rights and powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, provided reasonable care has been exercised in the selection and in the continued employment of such attorney, agent or employee. The Warrant Agent shall not be under any obligation or duty to institute, appear in, or defend any action, suit or legal proceeding in respect hereof, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider necessary. The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against the Warrant Agent arising out of or in connection with this Agreement.

(d)    Cooperation. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further acts, instruments and assurances as may reasonably be required by the Warrant Agent in order to enable the Warrant Agent to carry out or perform its duties under this Agreement.

(e)    Agent Only. The Warrant Agent shall act solely as agent for the Company in accordance with the terms and conditions hereof and does not assume any obligation or relationship of agency or trust with any of the owners or holders of the Warrants. The Warrant Agent shall not be liable except for the performance of such duties as are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against the Warrant Agent, whose duties and obligations shall be determined solely by the express provisions hereof.

(f)    Right to Counsel. The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Company), and the Warrant Agent shall incur no liability or responsibility to the Company or to any Warrant Holder for any action taken, suffered or omitted by the Warrant Agent in good faith in accordance with the opinion or advice of such counsel.

(g)    Compensation. The Company agrees to pay the Warrant Agent reasonable compensation for all services rendered by it hereunder and to reimburse the Warrant Agent for its reasonable expenses hereunder (including reasonable counsel fees and expenses), and further agrees to indemnify the Warrant Agent and hold it harmless against any and all liabilities, including, but not limited to, any judgments, costs and reasonable counsel fees, for any action taken, suffered or omitted by the Warrant Agent in connection with the acceptance, administration, exercise and performance of its duties under this Agreement and the Warrants, except for any such liabilities that arise as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct.

16

(h)     Accounting.  The Warrant Agent shall account promptly to the Company with respect to Warrants exercised and concurrently pay to the Company all moneys received by the Warrant Agent on behalf of the Company on the purchase of shares of Common Stock (or Other Securities) through the exercise of Warrants.  The Warrant Agent shall advise the Company by telephone at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to such account.  The Warrant Agent shall as soon as practicable confirm such telephone advice to the Company in writing.

(i)     No Conflict.  Subject to applicable law, the Warrant Agent and any stockholder, affiliate, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement.  Subject to applicable law, nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person.  Nothing in this Agreement shall be deemed to prevent the Warrant Agent from acting as trustee under an indenture.

(j)     Resignation; Termination.  The Warrant Agent may resign its duties and be discharged from all further duties and liabilities hereunder (except liabilities arising as a result of the Warrant Agent's bad faith, gross negligence or willful misconduct) after giving thirty (30) days' prior written notice to the Company.  The Company may remove the Warrant Agent upon thirty (30) calendar days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as have been caused by the Warrant Agent's bad faith, gross negligence or willful misconduct.  The Company shall cause to be mailed promptly (by first class mail, postage prepaid) to each registered Holder of a Warrant at such Holder's last address as shown on the register of the Company, at the Company's expense, a copy of such notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal the Company shall promptly appoint in writing a new warrant agent.  If the Company shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new warrant agent.  Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Any successor warrant agent, whether appointed by the Company or by such a court, shall be (i) a Person, incorporated under the laws of the United States or of any state thereof and authorized under such laws to conduct a shareholder services business, be subject to supervision and examination by Federal or state authority, and have a combined capital and surplus of not less than $100,000,000 as set forth in its most recent published annual report of condition; or (ii) an affiliate of such a Person described above.  After acceptance in writing of such appointment by the new warrant agent it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the expense of the Company and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment the Company shall file notice thereof with the resigning or removed Warrant Agent and shall forthwith cause a copy of such notice to be mailed (by first class, postage

17

WEIL:\95745763\13\51351.0003

prepaid) to each registered Holder of a Warrant at such Holder's last address as shown on the register of the Company.  Failure to give any notice provided for in this Section 12(j), or any defect in any such notice, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new warrant agent, as the case may be.

(k)      <u>Merger, Consolidation or Change of Name of Warrant Agent</u>.  Any corporation into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation succeeding to the all or substantially all of the agency business of the Warrant Agent or any new warrant agent shall be the successor to the Warrant Agent hereunder without the execution or filing of any document or my further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Warrant Agent under the provisions of Section 12(j).  If at the time such successor to the Warrant Agent shall succeed under this Agreement, any of the Global Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if at that time any of the Global Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Agreement.  If at any time the name of the Warrant Agent shall be changed and at such time any of the Warrants shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrants shall not have been countersigned, the Warrant Agent may countersign such Warrants either in its prior name or in its changed name; and in all such cases such Warrants shall have the full force provided in the Warrants and in this Agreement.

(l)      <u>Indemnity</u>.  The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct or bad faith (which gross negligence, willful misconduct or bad faith must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction).  The Company agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability, suit, action, proceeding, judgment, claim, settlement, cost or expense (including reasonable counsel fees and expenses), incurred without gross negligence, willful misconduct or bad faith on the part of the Warrant Agent (which gross negligence, willful misconduct or bad faith must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction), for any action taken, suffered or omitted by the Warrant Agent in connection with the preparation, delivery, acceptance, administration, execution and amendment of this Agreement and the exercise and performance of its duties hereunder, including the costs and expenses of defending against any claim of liability arising therefrom, directly or indirectly.  The Warrant Agent shall not be obligated to expend or risk its own funds to take any action which it believes would expose it to expense or liability or to a risk of incurring expense of liability, unless it has been furnished with assurance of repayment or indemnity satisfactory to it.  No provision in this Agreement shall be construed to relieve the Warrant Agent from liability for its own gross negligence, willful misconduct or bad faith (which gross negligence, willful misconduct or bad faith must be determined by a final, non-appealable order, judgment, decree or ruling of a court of competent jurisdiction).

18

(m)   <u>Exclusions</u>.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible or have any duty to make any calculation or adjustment, or to determine when any calculation or adjustment required under the provisions hereof should be made, how it should be made or what it should be, or have any responsibility or liability for the manner, method or amount of any such calculation or adjustment or the ascertaining of the existence of facts that would require any such calculation or adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant to be issued pursuant to this Agreement or as to whether any Warrant will, when issued, be valid and fully paid and nonassessable.

(n)   <u>No Liability for Interest</u>.  The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement.

(o)   <u>No Liability for Invalidity</u>.  The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Warrant Agent) or with respect to the validity or execution of the Global Warrant Certificates (except its countersignature thereon).

(p)   <u>No Responsibilities for Recitals</u>.  The recitals contained herein and in the Global Warrant Certificates (except as to the Warrant Agent's countersignature thereon) shall be taken as the statements of the Company, and the Warrant Agent assumes no responsibility hereby for the correctness of the same.

(q)   <u>No Implied Obligations</u>.  The Warrant Agent shall be obligated to perform such duties as are explicitly set forth herein and no implied duties or obligations shall be read into this Agreement against the Warrant Agent.  The Warrant Agent shall not be under any obligation to take any action hereunder that may involve it in any expense or liability, the payment of which within a reasonable time is not, in its opinion, assured to it.  The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Global Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issuance and sale, or exercise, of the Warrants.  The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in any Global Warrant Certificate or in the case of the receipt of any written demand from a Holder with respect to such default, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or, to make any demand upon the Company.

(r)   <u>Force Majeure</u>.  In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military

19

disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

SECTION 13.    Severability.  In the event that any one or more of the provisions contained herein or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, that if any such excluded term, provision, covenant or restriction shall materially adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately.  Furthermore, subject to the preceding sentence, in lieu of any such invalid, illegal or unenforceable provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms and commercial effect to such invalid, illegal or unenforceable provision as may be possible and be valid and enforceable.

SECTION 14.    Warrantholder Not Deemed a Stockholder.  Prior to the exercise of the Warrants represented thereby no Holder of a Global Warrant Certificate, as such, shall be entitled to any rights of a stockholder of the Company, including, but not limited to, the right to vote, to receive dividends or other distributions, to exercise any preemptive right or, except as otherwise provided herein, to receive notice as stockholders in respect of the meetings of stockholders or for the election of directors of the Company or any other matter.

SECTION 15.    Notices to Company and Warrant Agent.  All notices, requests or demands authorized by this Agreement to be given or made by the Warrant Agent or by any registered Holder of any Warrant to or on the Company or the Warrant Agent to be effective shall be in writing (including by telecopy), and shall be deemed to have been duly given or made when delivered by hand, or two Business Days after being delivered to a recognized courier (whose stated terms of delivery are two business days or less to the destination such notice), or five days after being deposited in the mail, or, in the case of facsimile or email notice, when received, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

> Halcón Resources Corporation
> 1000 Louisiana Street
> Suite 6700
> Houston, Texas 77002
> Fax:  (713) 589-8019
> Attn: David S. Elkouri
> Email: delkouri@halconresources.com

If the Company shall fail to maintain such office or agency or shall fail to give such notice of any change in the location thereof, presentation may be made and notices and demands may be served at the principal office of the Warrant Agent.

Any notice pursuant to this Agreement to be given by the Company or by any registered Holder of any Warrant to the Warrant Agent shall be sufficiently given if sent by first-class mail, postage prepaid, or by facsimile or email notice, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

20

U.S. Bank National Association
5555 San Felipe
Suite 1150
Houston, Texas 77056
Fax:  713.235.9213
Attn:  Steven A. Finklea
Email:  steven.finklea@usbank.com

The Warrant Agent maintains the Warrant Agent's Principal Office at the above address.

SECTION 16.    Supplements and Amendments.  The Company and the Warrant Agent may from time to time supplement or amend this Agreement (a) without the approval of any Holders of Warrants in order to cure any ambiguity, manifest error or other mistake in this Agreement, or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company and the Warrant Agent may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders of the Warrants in any material respect or (b) with the prior written consent of Holders of the Warrants exercisable for a majority of the Shares then issuable upon exercise of the Warrants then outstanding; provided that each amendment or supplement that decreases the Warrant Agent's rights or increases its duties and responsibilities hereunder shall also require the prior written consent of the Warrant Agent.  Notwithstanding the foregoing, the consent of each Holder of a Warrant affected shall be required for any amendment pursuant to which the Exercise Price would be increased or the number of Shares (or Other Securities) purchasable upon exercise of Warrants would be decreased (other than pursuant to adjustments provided herein) or the Expiration Date would be shortened.  Upon execution and delivery of any amendment pursuant to this Section 15, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Global Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

SECTION 17.    Termination.  This Agreement shall terminate on the Expiration Date.  Notwithstanding the foregoing, this Agreement will terminate on any earlier date when all Warrants have been exercised.  The provisions of Section 12 shall survive such termination.

SECTION 18.    Governing Law and Consent to Forum.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed within the State of New York. Each of the Company and the Warrant Agent hereby irrevocably submits to the jurisdiction of any New York State court sitting in the City of New York or any Federal Court sitting in the City of New York with respect to any suit, action or proceeding arising out of or relating to this Agreement, and each irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Nothing herein shall affect the right of any Person to serve process in any manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other jurisdiction.

SECTION 19.    Waiver of Jury Trial.  The parties hereto waive all right to trial by jury in any action or proceeding to enforce or defend any rights hereunder.

21

SECTION 20.   <u>Benefits of this Agreement</u>.  Nothing in this Agreement shall be construed to give to any Person or corporation other than the Company, the Warrant Agent and the registered Holders of the Warrants (who are express third party beneficiaries of this Agreement) any legal or equitable right, remedy or claim under this Agreement, and this Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the registered Holders of the Warrants.

SECTION 21.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

SECTION 22.   <u>Headings</u>.  The headings of sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof and in no way modify or restrict any of the terms or provisions hereof.

*[signature page follows]*

WEIL:\95745763\13\51351.0003

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

HALCÓN RESOURCES CORPORATION

By_____
    Name:
    Title:

U.S. BANK NATIONAL ASSOCIATION

By_____
    Name:
    Title:

[Signature Page to Warrant Agreement]

**EXHIBIT A**

**FORM OF FACE OF GLOBAL WARRANT CERTIFICATE**

VOID AFTER 5:00 P.M., New York City Time, September [9], 2020

This Global Warrant Certificate is deposited with or on behalf of The Depository Trust Company (the "Depository") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 4(g) of the Warrant Agreement and (ii) this Global Warrant Certificate may be transferred to a successor Depository with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depository to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depository (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depository), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depository or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Section 4 of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the exercise of the Warrant will be recorded on the books of the Company until such provisions have been complied with.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

A-1

WEIL:\95745763\13\51351.0003

CUSIP No. _____

ISIN No. _____

WARRANT TO PURCHASE

SHARES OF COMMON STOCK

HALCÓN RESOURCES CORPORATION

GLOBAL WARRANT TO PURCHASE COMMON STOCK

FORM OF FACE OF WARRANT CERTIFICATE
VOID AFTER 5:00 P.M., New York City Time, September [9], 2020

This Warrant Certificate ("Warrant Certificate") certifies that or its registered assigns is the registered holder of a Warrant (the "Warrant") of Halcón Resources Corporation, a Delaware corporation (the "Company"), to purchase the number of shares (the "Shares") of common stock, par value $0.0001 per share (the "Common Stock"), of the Company set forth above. This warrant expires on the date that is the four year anniversary of the Effective Date (such date, the "Expiration Date"), and entitles the holder to purchase from the Company the number of fully paid and non-assessable Shares set forth above at the exercise price (the "Exercise Price") multiplied by the number of Shares set forth above, payable to the Company either by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose, no later than 5:00 p.m., New York City time, on the business day immediately prior to the settlement date, which settlement date is three Business days after a Warrant Exercise Notice is delivered (the "Settlement Date"). The initial Exercise Price shall be $_____.

In lieu of paying the Exercise Price as set forth in the preceding paragraph, subject to the provisions of the Warrant Agreement (as defined on the reverse hereof), each Warrant shall entitle the holder thereof, at the election of such holder, to exercise the Warrant by authorizing the Company to withhold from issuance a number of Shares issuable upon exercise of the Warrant which when multiplied by the Market Price of the Common Stock is equal to the aggregate Exercise Price for the number of Shares for which the Warrant is being exercised (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld Shares shall no longer be issuable under the Warrant.

The Exercise Price and the number of Shares purchasable upon exercise of this Warrant are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

No Warrant may be exercised prior to the date of the Warrant Agreement or after the Expiration Date.

After the Expiration Date, the Warrants will become wholly void and of no value.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL

A-2

A-3

FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, the Company has caused this Warrant Certificate to be executed by its duly authorized officer.

Dated: _____

HALCÓN RESOURCES CORPORATION

By:_____
Name:
Title:

U.S. Bank National Association
as Warrant Agent

By:_____
Name:
Title:

A-3

WEIL:\95745763\13\51351.0003

FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE
HALCÓN RESOURCES CORPORATION

The Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Warrants to purchase shares of Common Stock issued pursuant to that certain Warrant Agreement, dated as of the Effective Date of the Plan (the "Warrant Agreement"), duly executed and delivered by the Company and U.S. Bank National Association, as Warrant Agent (the "Warrant Agent"). The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the holders (the words "holders" or "holder" meaning the registered holders or registered holder) of the Warrants. A copy of the Warrant Agreement may be inspected at the Warrant Agent office and is available upon written request addressed to the Company. All capitalized terms used on the face of this Warrant Certificate herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Warrants may be exercised to purchase Warrant Shares from the Company from the date of the Warrant Agreement through 5:00 p.m., New York City time, on the Expiration Date, at the Exercise Price set forth on the face hereof, subject to adjustment as described in the Warrant Agreement. Subject to the terms and conditions set forth herein and in the Warrant Agreement, the holder of the Warrant evidenced by this Warrant Certificate may exercise such Warrant by:

(i) providing written notice of such election ("Warrant Exercise Notice") to exercise the Warrant to the Company and the Warrant Agent at the addresses set forth in the Warrant Agreement, by hand or by facsimile, no later than 5:00 p.m., New York City time, on the Expiration Date, which Warrant Exercise Notice shall substantially be in the form of an election to purchase shares of Common Stock set forth herein, properly completed and executed by the holder; (ii) delivering no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date, the Warrant Certificates evidencing such Warrants to the Warrant Agent; and (iii) paying the Exercise Price, together with any applicable taxes and governmental charges.

In lieu of paying the Exercise Price as set forth in the preceding paragraph, subject to the provisions of the Warrant Agreement, each Warrant shall entitle the holder thereof, at the election of such holder, to exercise the Warrant by authorizing the Company to withhold from issuance a number of shares of Common Stock issuable upon exercise of the Warrant which when multiplied by the Market Price of the Common Stock is equal to the aggregate Exercise Price for the number of Shares for which the Warrant is being exercised (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld shares shall no longer be issuable under the Warrant.

In the event that upon any exercise of the Warrant evidenced hereby the number of shares of Common Stock actually purchased shall be less than the total number of shares of Common Stock purchasable upon exercise of the Warrant evidenced hereby, there shall be issued to the holder hereof, or such holder's assignee, a new Warrant Certificate evidencing a Warrant to purchase the shares of Common Stock not so purchased. No adjustment shall be made for any cash dividends on any shares of Common Stock issuable upon exercise of this Warrant. After the Expiration Date, unexercised Warrants shall become wholly void and of no value.

The Company shall not be required to issue fractional shares of Common Stock or any certificates that evidence fractional Shares.

A-4

WEIL:\95745763\13\51351.0003

A-5

Warrant Certificates, when surrendered by book-entry delivery through the facilities of the Depository, may be exchanged, in the manner and subject to the limitations provided in the Warrant Agreement, but without payment of any service charge, for another Warrant Certificate or Warrant Certificates of like tenor evidencing a Warrant to purchase in the aggregate a like number of shares of Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

[Balance of page intentionally remains blank]

A-5

A-6

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE]

SCHEDULE OF INCREASES OR DECREASES IN GLOBAL WARRANT CERTIFICATE

The following increases or decreases in this Global Warrant have been made:

| Date | Amount of decrease in the number of shares issuable upon exercise of the Warrants represented by this Global Warrant | Amount of increase in number of shares issuable upon exercise of the Warrants represented by this Global Warrant | Number of shares issuable upon exercise of the Warrants represented by this Global Security following such decrease or increase | Signature of authorized officer of the Depositary |
|---|---|---|---|---|
|  |  |  |  |  |

A-6

FORM OF ELECTION TO EXERCISE WARRANT FOR
WARRANT HOLDERS HOLDING WARRANTS
THROUGH THE DEPOSITORY TRUST COMPANY

TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY

HALCÓN RESOURCES CORPORATION

Warrants to Purchase _____ Shares of Common Stock

(TO BE EXECUTED UPON EXERCISE OF THE WARRANT)

The undersigned hereby irrevocably elects to exercise the right, represented by Warrants to purchase shares of Common Stock of Halcón Resources Corporation (the "Company") held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depository"), to purchase _____ newly issued shares of Common Stock of the Company at the Exercise Price of $_____ per share.

The undersigned represents, warrants and promises that it has the full power and authority to exercise and deliver the Warrants exercised hereby.  The undersigned represents, warrants and promises that it has delivered or will deliver in payment for such shares $_____ by certified or official bank or bank cashier's check payable to the order of the Company, or by wire transfer in immediately available funds of the aggregate Exercise Price to an account of the Warrant Agent specified in writing by the Warrant Agent for such purpose or through a cashless exercise (as described below), no later than 5:00 p.m., New York City time, on the Business Day immediately prior to the Settlement Date.

Please check if the undersigned, in lieu of paying the Exercise Price as set forth in the preceding paragraph, elects to exercise the Warrant by authorizing the Company to withhold from issuance a number of shares of Common Stock issuable upon exercise of the Warrant which when multiplied by the Market Price of the Common Stock is equal to the aggregate Exercise Price for the number of Shares for which the Warrant is being exercised (assuming the Exercise Price for all such Shares was being paid in cash), and such withheld shares of Common Stock shall no longer be issuable under the Warrant.

The undersigned requests that the shares of Common Stock purchased hereby be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below, provided that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

Dated: _____

NOTE: THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE.  THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY: _____

A-7

(PLEASE PRINT)

ADDRESS: _____

CONTACT NAME: _____

ADDRESS: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE):

FAX (INCLUDING INTERNATIONAL CODE):

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

ACCOUNT FROM WHICH WARRANTS ARE BEING DELIVERED:

DEPOSITORY ACCOUNT NO."

WARRANT EXERCISE NOTICES WILL ONLY BE VALID IF DELIVERED IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THIS NOTIFICATION (OR AS OTHERWISE DIRECTED), MARKED TO THE ATTENTION OF "WARRANT EXERCISE".  WARRANT HOLDER DELIVERING WARRANTS, IF OTHER THAN THE DIRECT DTC PARTICIPANT DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME: _____

(PLEASE PRINT)

CONTACT NAME: _____

TELEPHONE (INCLUDING INTERNATIONAL CODE): _____

FAX (INCLUDING INTERNATIONAL CODE): _____

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

ACCOUNT TO WHICH THE SHARES OF COMMON STOCK ARE TO BE CREDITED:

DEPOSITORY ACCOUNT

NO.: _____

FILL IN FOR DELIVERY OF THE COMMON STOCK, IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:

NAME:_____

(PLEASE PRINT)

ADDRESS:
_____

A-8

WEIL:\95745763\13\51351.0003

A-9

CONTACT

NAME:_____

TELEPHONE (INCLUDING INTERNATIONAL CODE):

FAX (INCLUDING INTERNATIONAL CODE):

SOCIAL SECURITY OR OTHER TAXPAYER IDENTIFICATION NUMBER (IF APPLICABLE):

_____

NUMBER OF SHARES OF COMMON STOCK FOR WHICH WARRANT IS BEING EXERCISED

(ONLY ONE EXERCISE PER WARRANT EXERCISE NOTICE)

Signature: _____

Name: _____

Capacity in which

Signing: _____

Signature Guaranteed

BY: _____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

A-9

EXHIBIT B

FORM OF ASSIGNMENT

(TO BE EXECUTED BY THE REGISTERED HOLDER
IF SUCH HOLDER DESIRES TO TRANSFER A WARRANT)

FOR VALUE RECEIVED, the undersigned registered holder hereby sells, assigns and transfers unto

_____

Name of Assignee

_____Address

of Assignee

Warrants to purchase _____ shares of Common Stock held by the undersigned, together with all right, title and interest therein, and does irrevocably constitute and appoint attorney, to transfer such Warrants on the books of the Warrant Agent, with full power of substitution.

_____   _____

Dated Signature

_____

Social Security or Other Taxpayer

Identification Number of Assignee

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Company's transfer agent.

# EXHIBIT 4 TO PLAN SUPPLEMENT

# LEASE AMENDMENTS

WEIL:\95834806\3\51351.0003

**FIRST AMENDMENT OF LEASE**

BETWEEN:        **BOP 1801 CALIFORNIA STREET LLC**
                **BOP 1801 CALIFORNIA STREET II LLC**
                both Delaware limited liability companies
                1801 California Street, Suite 200
                Denver, Colorado 80202    ("Landlord")

AND:            **HALCON RESOURCES CORPORATION**
                a Delaware corporation
                1801 California Street, Suite 3500
                Denver, Colorado 80202                      ("Tenant")

FOR PREMISES IN:    **1801 CALIFORNIA STREET**
                    Denver, Colorado 80202                  ("Building")

DATE:               August _____, 2016

LANDLORD AND TENANT, in consideration of the covenants herein contained, hereby agree as follows:

1.      Definitions. In this First Amendment of Lease ("Amendment"):

(a)     "Lease," collectively, means the Lease of Office Space between Landlord and Tenant dated March 12, 2013, as amended by this First Amendment of Lease of even date hereof, including all Exhibits attached to the foregoing, covering the Premises.

(b)     "Bankruptcy Code" means Title 11 of the United States Code.

(c)     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

(d)     "Bankruptcy Plan" means the chapter 11 plan of reorganization filed in the Chapter 11 Cases on July 27, 2016 (as amended, modified or supplemented from time to time),, which Bankruptcy Plan shall expressly include the assumption of the Lease by Tenant.

(e)     "Chapter 11 Cases" means the chapter 11 cases for Tenant and certain of its subsidiaries jointly administered under the lead case In re Halcón Resources Corp., et al., Case No. 16-11724 (BLS) pending before the Bankruptcy Court.

(f)     "Current Premises," means 43,829 rentable square feet of space on the 34th and 35th floor of the Building,

(g)     "Reduced Premises" means 21,897 rentable square feet located on the 35th floor of the Building.

(h)     "Reduced Premises Rent Commencement Date" means the first day following the Surrender Date, as defined hereafter.

(i)     "Surrender Date" means on the Effective Date, as defined hereafter.

(j)     "Surrendered Premises" means the 21,932 rentable square feet on the 34th floor of the Building effective on the Surrender Date.

(k)     "Premises" means for all purposes under the Lease the Reduced Premises commencing on the Surrender Date.

(l)     "Effective Date" means the effective date of the Bankruptcy Plan (but in no event earlier than September 8, 2016), including the approval of this First Amendment, whereupon all terms and conditions of this Amendment shall control.

As of the Effective Date, to the extent applicable, individual definitions set forth above shall replace the same definitions set forth in the Lease. All other words and phrases, unless otherwise defined herein, have the meanings attributed to them in the Lease.

2.     <u>Defined Terms</u>.  The definitions contained in Paragraph 1 above are incorporated herein by reference.

3.     Mutual Release. Upon Landlord's receipt of Tenant's ███████████████████ ██████████████████████ payment referenced in Paragraph 10 below, each of the Parties hereby waives, releases and forever discharges the other Party from any and all claims (as defined in the Bankruptcy Code), rights, damages, suits and remedies arising out of or relating to the Surrendered Premises or any amounts incurred in re-leasing the 34th floor to Lewis, Bess, Williams & Weese P.C. ("LBWW Lease") (including any improvement allowance, free rent and brokerage commissions related to the LBWW Lease) or any other tenant related to the Surrendered Premises.

4.     <u>Surrendered Premises</u>.  Effective on the Surrender Date, Tenant's rights, including any right to occupancy, and interest in the Surrendered Premises shall terminate, and Tenant shall surrender the Surrendered Premises in the condition required by Article 12.00 of the Lease, including the obligation to remove and repair any Tenant signage installed outside of the Surrendered Premises. Until the Surrender Date, all terms and conditions of the Lease, other than the reduction of Annual Rent and Occupancy Costs as described in Paragraphs 5 and 6 below, shall apply to the Surrendered Premises. Tenant's right to terminate the Surrendered Premises is expressly contingent upon the confirmation of the Bankruptcy Plan and the occurrence of the Effective Date (as defined in the Bankruptcy Plan), and there exists no monetary Event of Default prior to the Surrender Date. In the event the Bankruptcy Plan is not approved as required herein, or a monetary Event of Default occurs prior to the Surrender Date, or Tenant's failure to deliver the Surrendered Premises in the condition required by the Lease, then Tenant's right to surrender the Premises shall lapse and be of no further force and effect, and the Lease shall remain in effect throughout the remainder of the Term.

5. <u>Annual Rent</u>.  Until the Reduced Premises Rent Commencement Date, Tenant shall be obligated for the payment of Annual Rent on the Current Premises pursuant to Paragraph 4 of the Lease. Tenant shall have the right to offset that portion of the September Rent on the Current Premises paid by Tenant that is allocable to the Surrendered Premises for the period from the Reduced Premises Commencement Date through September 30, 2016, against the monthly installment of October Rent due on the Reduced Premises as described hereafter. On the Reduced Premises Rent Commencement Date, Article 4.01 of the Lease (as modified by Paragraph 4 of the Ninth Amendment) is hereby deleted and replaced with the following.

**4.01 Annual Rent**. Tenant shall pay to Landlord as Annual Rent for the Premises in the following amounts for the time periods respectively set forth below:

| Time Period | Rate Per Square Foot | Annual Rent | Monthly Rent |
|---|---|---|---|
| Reduced Premises Rent Commencement Date through 07/31/17 | ███ | ███ | ███ |
| 08/01/17 – 07/31/18 | ███ | ███ | ███ |
| 08/01/18 – 07/31/19 | ███ | ███ | ███ |
| 08/01/19 – 07/31/20 | ███ | ███ | ███ |
| 08/01/20 – 07/31/21 | ███ | ███ | ███ |
| 08/01/21 – 07/31/22 | ███ | ███ | ███ |
| 08/01/22 – 07/31/23 | ███ | ███ | ███ |
| 08/01/23 – 07/31/24 | ███ | ███ | ███ |

Each installment of Annual Rent shall be due on or before the first day of each month during the Extended Term without notice or setoff pursuant to Section 4.01 of the Original Lease, except as otherwise expressly provided in the Lease.

6. <u>Occupancy Costs</u>. Commencing on the Reduced Premises Rent Commencement Date and continuing through the remainder of the Term, Tenant shall be obligated for the payment of Occupancy Costs on the Reduced Premises in the manner provided in Article 4.02 of the Lease.  Until the Reduced Premises Rent Commencement Date, Tenant shall be obligated for the payment of Occupancy Costs on the Current Premises.  The current Occupancy Costs as of the Effective Date is estimated to be ███ per rentable square foot.

7. <u>Expansion Option</u>. Article 25.00 of the Lease, relating to Tenant's "Expansion Option" is deleted in its entirety, and is no longer of any force or effect.

8 <u>Right of First Refusal</u>. Article 26.00 of the Lease, relating to Tenant's "Right of First Refusal" is deleted in its entirety and is no longer of any force or effect.

9.    Termination Right.  Article 27.00 of the Lease, relating to Tenant's " Termination Option," shall remain in full force and effect.

10.    Letter of Credit.   Pursuant to Section 28.13 of the Lease, Landlord, as beneficiary, currently holds a Letter of Credit in the name of Tenant, with a current balance of ███ ██████████████████████████████████.  Subject to the terms and conditions of this Paragraph, Landlord and Tenant agree to modify the terms and conditions of the Letter of Credit.  In consideration of Landlord accepting the Surrendered Premises from Tenant, Tenant will wire to Landlord ███████████████████████ ████████████ within three (3) business days after the Effective Date, and Landlord will agree to reduce the Letter of Credit to a face value of ████████████████████████ ██████████████████████.   The Letter of Credit shall be subject to, and satisfy the terms in Section 28.13; provided the Letter of Credit shall no longer be automatically reduced, and shall remain for the remainder of the Term as security for Tenant's future performance under the terms and conditions of the Lease.

11.    Brokerage Commission. Landlord and Tenant each agree to indemnify and hold the other harmless from and against all brokers' fees and commissions, including Brokers (as defined hereafter), or other real estate commissions or fees incurred by the indemnifying party or arising out of its activities with respect to this First Amendment. Landlord is represented by Cushman and Wakefield and Tenant is represented by Avison Young (collectively the "Brokers"). Landlord and Tenant each hereby represent and warrant to the other that it does not recognize and has not used any broker other than the Brokers with respect to this First Amendment and the negotiation hereof.

12.    Parking.   As of the Effective Date, Tenant's parking spaces as described in Section 28.25 of the Lease shall be reduced to 18 parking spaces.  The remaining terms and conditions of Paragraph 16 shall remain in full force and effect.

13.    Confirmation of Existing Terms. Except as specifically provided herein, the terms and conditions of the Lease are confirmed and continue in full force and effect.

14.    Binding Effect. This First Amendment shall be binding on the heirs, administrators, successors and assigns (as the case may be) of the parties hereto, and shall be binding upon the parties only on such date as Landlord and Tenant both execute this First Amendment.

    **IN WITNESS OF THIS FIRST AMENDMENT OF LEASE**, Landlord and Tenant have properly executed it as of the date set out on page one.


LANDLORD:                              TENANT:

**BOP 1801 CALIFORNIA STREET LLC      HALCON RESOURCES CORPORATION
BOP  1801 CALIFORNIA STREET II LLC**



By:    _____        By:_____
Name:  David Sternberg                 Name: _____
Title:    Executive Vice President     Title: _____

## SECOND AMENDMENT TO OFFICE LEASE

This Second Amendment to Office Lease (this "Amendment"), by and between **1000 LOUISIANA, LP**, a Delaware limited partnership ("Landlord"), and **HALCÓN RESOURCES CORPORATION,** a Delaware corporation ("Tenant"), is made and entered into effective as of the ___ day of _____, 2016 (the "Effective Date").

## WITNESSETH

**WHEREAS**, Landlord and Halcon Resources LLC, a Delaware limited liability company, predecessor in interest with respect to Tenant, did heretofore enter into that certain Office Lease dated January 25, 2012 (the "Original Lease"), which Original Lease was amended by that certain First Amendment to Office Lease dated May 18, 2012 (the "First Amendment") (said Original Lease and First Amendment, and as same may have otherwise been heretofore amended, being hereinafter collectively referred to as the "Lease"); and

**WHEREAS**, under and pursuant to the terms of the Lease, Tenant is leasing from Landlord certain office space containing approximately 104,133 square feet of Rentable Area (the "Existing Premises"), which Existing Premises is comprised of (i) approximately 25,826 square feet of Rentable Area located on the 62nd floor of the Building (defined below) (the "62nd Floor Premises"), (ii) approximately 26,094 square feet of Rentable Area located on the 63rd floor of the Building (the "63rd Floor Premises"), (iii) approximately 26,094 square feet of Rentable Area located on the 64th floor of the Building (the "64th Floor Premises"), and (iv) approximately 26,119 square feet of Rentable Area located on the 67th floor of the Building (the "67th Floor Premises"), all of which Existing Premises is located in that certain office building commonly known as "Wells Fargo Plaza" (the "Building"), which Building is located at 1000 Louisiana Street, Houston, Texas 77002, as more particularly described in the Lease; and

**WHEREAS**, the Lease was further heretofore amended by that certain Temporary Office Space License by and between Landlord and Tenant dated September 25, 2012, as amended by that certain First Amendment to Temporary Office Space License dated November 19, 2012, that certain Second Amendment to Temporary Office Space License dated April 30, 2013, and that certain Third Amendment to Temporary Office Space License dated September 30, 2013 (collectively, the "Temporary License"), regarding a License (defined therein) granted to Tenant (as Licensee thereunder) for the use of Temporary Space (defined therein); however, such Temporary License did heretofore expire and terminate upon its terms and is of no further force or effect;

**WHEREAS,** Tenant heretofore filed a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and desires, in connection therewith, to assume the Lease as modified herein pursuant to Sections 365 and/or 1123(b)(2) of the Bankruptcy Code. In connection with the assumption of the Lease, as modified herein, Landlord and Tenant have agreed, among other things, to reduce the Premises by, and accordingly surrender to Landlord, the 62nd Floor Premises, the 63rd Floor Premises and the 64th Floor Premises (such 62nd Floor Premises, 63rd Floor Premises and 64th Floor Premises being collectively referred to herein as the "Recapture Space"), to add to the remaining Premises the 15th Floor Premises (defined below), to amend the term of the Lease, and to otherwise amend

Second Amendment to Office Lease – Page 1

the Lease, and Landlord has agreed thereto conditioned upon the terms and conditions of this Amendment, all upon and subject to the terms, limitations and conditions set forth in this Amendment; and

**WHEREAS,** Landlord and Tenant accordingly desire to amend the Lease as and upon the terms and conditions hereinafter specified.

**NOW, THEREFORE**, for and in consideration of the above and foregoing premises and the mutual covenants and agreements set forth hereinbelow, together with other good and valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged by each of the parties hereto, Landlord and Tenant do hereby agree that the Lease shall be and is hereby amended as follows:

1.      **Defined Terms**.  Terms defined in the Lease and delineated herein by initial capital letters shall have the same meaning ascribed thereto in the Lease, except to the extent that the meaning of such term is specifically modified by the provisions of this Amendment.  In addition, terms not defined in the Lease but defined in this Amendment will, when delineated with initial capital letters, have the meanings ascribed to them in this Amendment.  Terms and phrases which are not delineated by initial capital letters and terms and phrases which are delineated by initial capital letters but which are not defined in the Lease or in this Amendment shall have the meanings commonly ascribed thereto.  The above and foregoing premises and recitals are incorporated in this Amendment and made a part hereof for all purposes, including incorporation of the definitions contained therein.  The term "Lease", as used in the Lease and in this Amendment, shall, from and after the Effective Date hereof, mean the Lease as modified by this Amendment.

2.      **Bankruptcy Conditions**.  In the event (the date on which all of the following requirements have been met being referred to herein as the "Bankruptcy Date", and all of the following requirements being collectively referred to herein as the "Bankruptcy Conditions"):

(a)      On or before September 7, 2016, Tenant shall amend or modify its Joint *Prepackaged Plan of Reorganization of Halcon Resources Corporation, et al. Under Chapter 11 of the Bankruptcy Code* (the "Plan") dated June 20, 2016, which is currently pending before the United States Bankruptcy Court for the District of Delaware  (the "Bankruptcy Court") to provide that the Lease, as modified herein, shall be assumed by Tenant pursuant to Sections 365 and/or 1123(b)(2) of the Bankruptcy Code.  The above discussed amendment or modification to the Plan shall provide that: (i) the Lease, as modified by this Amendment, shall be assumed under the Plan pursuant to sections 365(a) or 1123(b) of the Bankruptcy Code, as applicable; (ii) adequate assurance of future performance, as required under section 365(b)(1)(C) of the Bankruptcy Code, has been provided to Landlord in the form of an irrevocable post-petition letter of credit for the benefit of Landlord in the amount of ███████████ (the "LOC") in form acceptable to Landlord, and issued by an institution reasonably acceptable to Landlord, the term of which shall be for the full Term of the Lease (as amended below), which may be via a one year term from the effective date as defined in the Plan (the "Plan Effective Date") with automatic extensions or renewals thereof for subsequent one-year periods for the remaining Term of the Lease (as amended below), and in the event same is not so

Second Amendment to Office Lease – Page 2

extended or renewed Landlord shall have the right to draw on the then-existing LOC as set forth below (and in no event shall the LOC or any proceeds thereof be construed as a "security deposit" under any applicable federal, state or local laws, ordinances, rules or regulations or any interpretation of the foregoing); and (iii) Tenant shall pay to Landlord, on, or within thirty (30) days following, the Plan Effective Date, the amount of ██████ ████████████ (the "Modification/Cure Fee") in immediately available funds and without any deduction whatsoever, as consideration for the agreements of Landlord and Tenant pursuant to this Amendment, and in full and final satisfaction of Tenant's obligation to cure all defaults under the Lease pursuant to Section 365(b) of the Bankruptcy Code;

(b)     Tenant obtains an order from the Bankruptcy Court confirming the Plan that specifically authorizes the assumption to the Lease, as modified herein, pursuant to Sections 365 and/or 1123(b)(2) of the Bankruptcy Code, and which approves the conditions set forth in subparagraph (a) above;

(c)     The Plan Effective Date shall have occurred;

(d)     Tenant procures the LOC for the benefit of Landlord, and as adequate assurance of future performance as required by Section 365(b)(1)(C) of the Bankruptcy Code, on or before the Plan Effective Date, and the LOC is in full force and effect as of the Plan Effective Date; and

(e)     Tenant delivers the Modification/Cure Fee in immediately available funds and without any deduction whatsoever to Landlord on, or within thirty (30) days following, the Plan Effective Date;

then the terms of this Amendment shall serve to amend the Lease effective upon the Bankruptcy Date (it being acknowledged and agreed that the terms of this Amendment are expressly contingent and conditioned on all of the Bankruptcy Conditions being met). In the event any of the Bankruptcy Conditions are not met by the date contemplated for such applicable requirement as set forth above, unless modified or amended in accordance with the terms herein, this Amendment shall automatically upon such applicable date be null and void and of no further force or effect. Upon the request of either party given to the other party hereto following the Bankruptcy Date, Landlord and Tenant shall confirm the actual Bankruptcy Date (and any other dates related thereto as requested by such party, such as the Expiration Date [defined below] and the dates for the anniversaries of the Bankruptcy Date for purposes of Paragraphs 3 and 11(a) of this Amendment) in writing.

3.     **Letter of Credit.**  Without limitation to the foregoing, Landlord and Tenant acknowledge that the exact date of the expiration of the Term of the Lease will be unknown until the occurrence of the Bankruptcy Date, and as set forth above the term of the LOC must be for the entire Term of the Lease (as amended below), which may be via a one year term from the Plan Effective Date with automatic renewals or extensions for subsequent one-year periods for the remaining Term of the Lease (as amended below); accordingly, Tenant shall cause the LOC

Second Amendment to Office Lease – Page 3

(if same is not then for the entire Term of the Lease) to be extended or renewed (or replaced with a new LOC in accordance herewith for the full Term) for subsequent one-year periods for the remaining Term of the Lease (as amended below) so that the term of the LOC is accordingly the entire Term of the Lease, and deliver same to Landlord no less than sixty (60) days prior to the expiration of the then existing LOC, failing which Landlord may draw upon the then existing LOC at any time within the sixty (60) day period prior to the expiration of the then existing LOC.  If Landlord ever draws upon the LOC, Tenant must immediately deliver to Landlord either (at Landlord's option) an endorsement of the issuer of the LOC reinstating the credit for the portion thereof used by Landlord or an additional LOC conforming to the requirements of this Amendment for the LOC in an amount equal to the reduced portion of the original LOC used by Landlord, and if Tenant fails to comply with the foregoing, notwithstanding anything to the contrary contained in the Lease, the same shall constitute an uncurable event of default by Tenant (and no further notice or cure rights shall apply thereto).  Tenant must not assign or encumber the LOC in any manner, and Landlord will not be bound by any purported assignment or encumbrance.

Subject to the terms and conditions hereof, the LOC required hereunder shall be reduced on each anniversary of the Bankruptcy Date by ▮▮▮▮▮▮▮ (i.e., so that such LOC is then reduced to the amount shown on the following chart), so long as: (a) no monetary default or failure by Tenant has occurred under the Lease prior to such anniversary date (whether or not subsequently cured); and (b) no non-monetary default or failure by Tenant has occurred and is continuing under the Lease as of such anniversary date, and such default or failure by Tenant has not been cured (or waived by Landlord in writing) in accordance with the Lease by such anniversary date; in which event Tenant shall be permitted to cause the bank or other financial institution issuing such LOC to limit such LOC accordingly (in form and content reasonably acceptable to Landlord):

| | |
|---|---|
| 1st anniversary of Bankruptcy Date: | ▮▮▮▮ |
| 2nd anniversary of Bankruptcy Date: | |
| 3rd anniversary of Bankruptcy Date: | |

In the event the LOC is not reduced pursuant to this Paragraph 3 of this Amendment at any such time because of a monetary default or failure by Tenant under the Lease prior to the applicable anniversary date, or because of a continuing non-monetary default or failure by Tenant under the Lease on an applicable anniversary date which has not been cured (or waived by Landlord in writing) in accordance with the Lease by such anniversary date, then the LOC shall not be subject to any further reduction and shall continue to remain in full force and effect throughout the then remaining Term of the Lease.

Second Amendment to Office Lease – Page 4

4.       **Security Deposit.**   As further adequate assurance of future performance, as required under section 365(b)(1)(C) of the Bankruptcy Code, Landlord shall retain the Security Deposit provided for in the Lease; provided, however, notwithstanding anything in the Lease to the contrary, upon or following the Bankruptcy Date, Landlord shall have the right to reimburse itself for Landlord's reasonable and documented attorneys' fees incurred in connection with this Amendment and/or any other matters related to Tenant's Petition, the Plan, or the bankruptcy matters related thereto, from such Security Deposit, and such Security Deposit shall be reduced accordingly; provided further, however, that except as expressly set forth herein in this Section 4, Landlord shall not be permitted to set off or otherwise reimburse itself from the Security Deposit for any amounts owed with respect to the Modification/Cure Fee, and Landlord shall not be permitted to setoff or otherwise reimburse itself from the Security Deposit any amounts with respect to the Recapture Space (unless arising after the Bankruptcy Date, such as in the event of Tenant's failure to comply with the terms of Paragraph 8 of this Amendment).  Upon Tenant's request, Landlord will notify Tenant as to the remaining amount of the Security Deposit after such reimbursement.

5.       **Waiver of Cure Requirement and Preservation of Unsecured Claim.**   Except as specifically set for above, and subject specifically to the Bankruptcy Conditions being met as set forth above, Landlord hereby waives its right to demand that Tenant cure any other existing (i.e., existing as of the Effective Date hereof) monetary defaults under the Lease in connection with sections 365(b)(1)(A) or 1123(b) of the Bankruptcy Code.  In the even the Bankruptcy Conditions are not met and the Plan Effective Date does not occur in accordance with the terms hereof, Landlord hereby reserves all rights to file and prosecute a proof of claim with the Bankruptcy Court asserting a general unsecured claim for all damages arising from the modification of the Lease in accordance with Sections 501 and 502 of the Bankruptcy Code.

6.       **Pre-assumption Performance of Lease Terms.**   Tenant shall promptly perform all monetary or non-monetary obligations under the Lease through the Bankruptcy Date.  To the extent that Tenant fails to promptly perform all monetary or non-monetary obligations under the Lease through the Bankruptcy Date, Landlord shall have an allowed administrative claim pursuant to section 503 of the Bankruptcy Code in the amount of any undisputed post-Petition default by Tenant.  Notwithstanding anything to the contrary in the Lease, Tenant shall retain the furniture located within the 63rd Floor Premises and the 64th Floor Premises, and Tenant may retain, at Tenant's election, the furniture located within the 62nd Floor Premises.  Tenant shall remove and dispose of any furniture that Tenant elects not to retain at Tenant's cost upon or prior to the Bankruptcy Date.  Tenant further agrees not to contest any Application for Allowance of Administrative Claim pursuant to section 503 of the Bankruptcy Code that Landlord may file with the Bankruptcy Court in connection with any undisputed post-Petition default under the Lease.

7.       **Lease Term.**   Landlord and Tenant hereby acknowledge and agree that, notwithstanding anything in the Lease to the contrary, the term of the Lease is currently scheduled to expire on July 31, 2020 (the "Existing Expiration Date").  Subject to the Bankruptcy Conditions being met as set forth above, effective upon the Bankruptcy Date, the term of the Lease shall be amended to expire at 11:59 p.m. (Central Standard Time) on that date which is the day before the third (3rd) anniversary of the Bankruptcy Date (the "Expiration Date"), unless the Lease is sooner terminated in accordance with the provisions of the Lease.

Second Amendment to Office Lease – Page 5

Accordingly, any references to the "term" or "Term" of the Lease, or the "Lease Term", shall, from and after the Bankruptcy Date, be amended accordingly. Any terms of the Lease to the contrary are hereby amended accordingly.

8.  **Reduction of Premises; Surrender of Recapture Space.** Subject to the Bankruptcy Conditions being met as set forth above, effective upon the Bankruptcy Date, the Premises shall be amended and reduced to remove therefrom the Recapture Space. Accordingly, Tenant shall vacate and surrender possession of the Recapture Space to Landlord upon or prior to the Bankruptcy Date in accordance with the terms of the Lease applicable to the surrender requirements upon the expiration or termination of the Lease, and upon such Bankruptcy Date the Lease shall be terminated with respect to such Recapture Space only (it being agreed that such termination shall in no event affect Tenant's lease of the remainder of the Premises pursuant to the Lease) and Tenant shall not have any further rights or obligations with respect the Recapture Space from or after such Bankruptcy Date (except any such obligations which have accrued but not been completed as of such Bankruptcy Date or which expressly survive the expiration or termination of the Lease, and further except as is otherwise expressly set forth in this Paragraph 8 of this Amendment). In the event Tenant fails to so vacate and surrender possession of the Recapture Space upon or prior to the Bankruptcy Date in accordance with the Lease, then Tenant shall be holding over in the Recapture Space and in default under the Lease. During any such period of holding over, without limitation to any other rights or remedies of Landlord due thereto as set forth in the Lease, at law or in equity (including Landlord's right to regain possession by action at law or equity), the terms of the Lease applicable to any such holding over (including, without limitation, Article 13 of the Original Lease) shall apply thereto.

9.  **Additional Premises**. Subject to the Bankruptcy Conditions being met as set forth above, effective upon the Bankruptcy Date, the Premises shall be amended to add thereto that certain approximately 25,128 square feet of Rentable Area located on the 15th floor of the Building (the "15th Floor Premises"), which 15th Floor Premises is further depicted on Exhibit "B" attached hereto and made a part hereof for all purposes, and Tenant's lease thereof shall be upon the terms and conditions of the Lease, as amended hereby. Notwithstanding anything to the contrary contained herein, on and after the Effective Date, Tenant shall have access to the 15th Floor Premises in order to conduct its move and prepare the space for occupancy (but not to otherwise commence its occupancy thereof). Such early access shall terminate upon the earlier to occur of (a) the Bankruptcy Date, or (b) the date of the nullification and voiding of this Amendment in the event any of the Bankruptcy Conditions are not met by the date contemplated therefor as set forth above (unless modified or amended in accordance with the terms herein), if applicable. During such early entry, Tenant shall be deemed to be obligated by all of the terms, covenants, provisions, and conditions of the Lease, except the requirements to pay Base Rent and any other monthly charges charged by Landlord thereunder.

10.  **New Premises**. Subject to the Bankruptcy Conditions being met as set forth above, effective upon the Bankruptcy Date, it is agreed that (and any provisions of the Lease to the contrary are hereby amended as necessary to effectuate the terms of this Paragraph 10 of this Amendment):

(a)  the Premises leased by Tenant pursuant to the Lease (and accordingly the term "Premises" for all purposes under the Lease) shall be the area comprised of the 15th

Second Amendment to Office Lease – Page 6

Floor Premises and the 67th Floor Premises (such 15th Floor Premises and 67th Floor Premises also being collectively referred to herein as the "New Premises"), which New Premises is comprised of approximately 51,247 square feet of Rentable Area.

(b)    the "Tenant's Pro Rata Share", as such term is defined and used in the Lease, shall be 2.9773% (which calculation is based on a fraction having as its numerator the 51,247 square feet of Rentable Area comprising the New Premises and as its denominator the 1,721,242 square feet of Rentable Area comprising the Building), subject to adjustment in the event that the Rentable Area of the Premises and/or the Building are revised.

11.    **Base Rent; Other Charges and Obligations**.

(a)    New Premises.    Subject to the Bankruptcy Conditions being met as set forth above, the Base Rent due and payable pursuant to the Lease for the New Premises from and after the Bankruptcy Date shall be as follows:

| Period from/to | Annual Base Rent Rate per Square Foot of Rentable Area | Monthly Base Rent Amounts |
|---|---|---|
| Bankruptcy Date – day before 1st anniversary of Bankruptcy Date | ███████████ | ███████████ |
| 1st anniversary of Bankruptcy Date – day before 2nd anniversary of Bankruptcy Date | ███████████ | ███████████ |
| 2nd anniversary of Bankruptcy Date – day before 3rd anniversary of Bankruptcy Date | ███████████ | ███████████ |

Tenant shall have the right to offset any portion of Base Rent theretofore paid by Tenant with respect to the Existing Premises that is allocable to the Recapture Space for any time period after the Bankruptcy Date, which amounts may be offset against the monthly installment of Base Rent due with respect to the New Premises for the following month (i.e., the month following the Bankruptcy Date).

(b)    Rent Adjustment.    At all times during the Term, the Base Rent for the Premises shall continue to be adjusted by the Rent Adjustment as further set forth in Article Four of the Lease.

12.    **Condition of Premises**.    Tenant shall lease the New Premises from and after the Effective Date hereof in its "AS IS, WHERE IS, WITH ALL FAULTS" condition and **TENANT HEREBY WAIVES ALL CLAIMS RELATING TO THE CONDITION OF**

Second Amendment to Office Lease – Page 7

**THE PREMISES.  TENANT ACKNOWLEDGES AND AGREES THAT, EXCEPT AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN THE LEASE, NEITHER LANDLORD NOR ANY EMPLOYEE, AGENT, CONTRACTOR, PROPERTY MANAGER OR REPRESENTATIVE OF LANDLORD HAS MADE ANY REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE HABITABILITY, MERCHANTABILITY, SUITABILITY, QUALITY, CONDITION OR FITNESS FOR ANY PARTICULAR PURPOSE (COLLECTIVELY, THE "DISCLAIMED WARRANTIES") WITH REGARD TO THE PREMISES OR THE BUILDING; AND TENANT HEREBY WAIVES, TO THE EXTENT PERMITTED BY LAW, THE DISCLAIMED WARRANTIES WITH REGARD TO THE PREMISES AND THE BUILDING.**  No agreement of Landlord to alter, remodel, decorate, clean or improve the New Premises or the Building and no representation regarding the condition of the New Premises or the Building has been made by or on behalf of Landlord to Tenant, except as may be specifically stated in the Lease.  Any improvements contemplated to be made to the Premises by Landlord prior to the Effective Date of this Amendment, and any construction allowance or similar payments due to Tenant, if any, have heretofore been completed and/or paid in accordance with the Lease, or Tenant hereby waives any rights or claims with respect thereto, and in no event shall any such provisions apply from or after the Effective Date hereof, or with respect to the New Premises.  Tenant agrees, following the request of Landlord made at any time following Tenant's occupancy of the 15th Floor Premises, to execute an Acceptance of Premises Memorandum in form reasonably requested by Landlord.

13.     **Parking**.  Subject to the Bankruptcy Conditions being met as set forth above, from and after Bankruptcy Date, Tenant shall have the parking rights set forth in Exhibit "A" attached hereto and made a part hereof for all purposes, which parking rights shall supersede and replace any and all parking rights of Tenant otherwise contemplated by the Lease (which other parking rights shall accordingly be deleted effective upon the Bankruptcy Date in their entirety and shall thereafter be of no further force or effect).

14.     **Signage**.  Subject to the Bankruptcy Conditions being met as set forth above, effective upon the Bankruptcy Date, Section 8 of the First Amendment shall be deleted in its entirety, it being agreed that Tenant shall have no further rights with respect to the Monument Sign (and any provisions of the Lease to the contrary are amended effective as of the Bankruptcy Date as necessary to effectuate the terms of this Paragraph 14 of this Amendment).

15.     **Preferential Rights**.  Subject to the Bankruptcy Conditions being met as set forth above, effective upon the Bankruptcy Date, Exhibit "F" (Right of First Refusal) attached to the First Amendment and Exhibit "G" (Renewal Option) attached to the Original Lease shall be deleted in their entirety and Tenant shall have no further rights with respect thereto; and accordingly, Tenant acknowledges and agrees that, notwithstanding anything in the Lease to the contrary, from and after the Bankruptcy Date Tenant will have no rights to renew or extend the term of the Lease, to lease additional space within the Building by expansion, right of first refusal, right of first offer or similar right, to contract or reduce the Premises, or to terminate the Lease (except in certain events of casualty or condemnation to the extent otherwise expressly set forth in the Lease), or any other similar rights, and any other such rights shall be deleted in their entirety effective upon the Bankruptcy Date and shall thereafter be of no further force or effect.

Second Amendment to Office Lease – Page 8

16.    **Exculpation.**  Tenant hereby acknowledges and agrees that no member, partner or other constituent party of Landlord, as Landlord may now or hereafter be constituted, nor any of their respective members, partners, shareholders, directors, officers or other principals or agents, shall have any personal liability to Tenant (and/or any person or entity claiming under, by or through Tenant) for or upon any action, claim, suit or demand brought under or pursuant to the terms and conditions of the Lease and/or arising out of the use or occupancy by Tenant of the Premises.  Notwithstanding anything to the contrary, Tenant agrees, on its behalf and on behalf of its successors and assigns, that any liability or obligation of Landlord under the Lease shall only be enforced against Landlord's equity interest in the Property up to a maximum of ██ ████████████████████████████ and Tenant shall not seek personal judgment or levy against or upon any other assets of the Landlord or against any assets of any current or future member, partner or other constituent party of Landlord, or of any of their respective members, partners, shareholders, directors, officers or other principals or agents, for any amounts due or which may become due under or by reason of the Lease or for the performance of any of the obligations of Landlord under the Lease.

17.    **Confidentiality**.  Tenant and Tenant's employees, agents, representatives, and brokers agree to keep the terms of this Amendment (and the Lease) strictly confidential, and shall not disclose, directly or indirectly, such terms to any person or party without first obtaining the prior written consent of Landlord; provided, however, that such consent shall not be required for any disclosure to the extent reasonably required (i) when compelled by applicable laws, regulations or court orders, or in compliance with any of the same, or (ii) in connection with any action by Tenant pursuant to which Tenant is enforcing its rights or remedies under the Lease. Notwithstanding the forgoing, the Tenant shall be authorized to attach a copy of the Lease and the Amendment to the Plan, and/or to present the Lease and the Amendment as an exhibit at a hearing before the Bankruptcy Court on the Plan.

18.    **OFAC.**

Landlord advises Tenant hereby that the purpose of this Paragraph 18 is to provide to the Landlord information and assurances to enable Landlord to comply with the law relating to OFAC.

Tenant hereby represents, warrants and covenants to Landlord, either  that (i) Tenant is  regulated by the SEC, FINRA or the Federal Reserve (a "Regulated Entity") or (ii) neither Tenant nor any person or entity that directly or indirectly (a) controls Tenant or (b) has an ownership interest in Tenant of twenty-five percent (25%) or more, appears on the list of Specially Designated Nationals and Blocked Persons ("OFAC List") published by the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury.

If, in connection with the Lease, there is one or more Guarantors of Tenant's obligations under the Lease, then Tenant further represents, warrants and covenants either that (i) any such Guarantor is a Regulated Entity or (ii) neither Guarantor nor any person or entity that directly or indirectly (a) controls such Guarantor or (b) has an ownership interest in such Guarantor of twenty-five percent (25%) or more, appears on the OFAC List.

Tenant covenants that during the term of the Lease it shall provide Landlord information reasonably requested by Landlord including without limitation, organizational structural charts and organizational documents which Landlord may deem to be necessary ("Tenant OFAC Information")  in order for Landlord to confirm Tenant's continuing compliance with the provisions of this Paragraph 18.   Tenant represents and warrants that the Tenant OFAC Information it has provided or shall provide to Landlord or Landlord's Broker in connection with the Lease or the execution of this Amendment is true and complete.

19.    **Commissions**.    Tenant represents that except for CBRE, Inc. ("Landlord's Broker"), it has dealt with no broker, agent or other person in connection with this Amendment and that other than Landlord's Broker, no broker, agent or other person brought about this Amendment, and **Tenant shall indemnify and hold Landlord and the Indemnitees harmless from and against any and all claims, losses, costs or expenses (including attorneys' fees and expenses) by any broker (other than Landlord's Broker), agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to the transaction contemplated by this Amendment**.   The provisions of this Paragraph 19 of this Amendment shall survive the expiration or termination of the term of the Lease or any renewal or extension thereof.

20.    **Miscellaneous**.   Except as expressly amended by the provisions hereof, the terms and provisions contained in the Lease shall continue to govern the rights and obligations of the parties; and all provisions and covenants in the Lease shall remain in full force and effect as stated therein, except to the extent specifically modified by the provisions of this Amendment. This Amendment and the Lease shall be construed as one instrument.  In that regard, the Lease and this Amendment, including all exhibits and addenda to each such document, constitute the entire agreement between the parties relative to the subject matter hereof and thereof and supersede all prior and contemporaneous agreements and understandings of Landlord and Tenant in connection therewith.   As used herein, words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders, and words used herein imparting a singular number shall mean and include the plural number and vice versa.  No inference in favor of or against any party shall be drawn from the fact that such party has drafted any provision of this Amendment or that such provisions have been drafted on behalf of said party.

21.    **Intentionally deleted.**

22.    **Headings.**  The headings of sections are for convenience only and do not define, limit or construe the contents of such sections or subsections.   References made in this Amendment to numbered paragraphs, articles, sections and subsections shall refer to the numbered paragraphs, articles, sections or subsections of the Lease unless otherwise indicated.

23.    **Tenant Estoppel.**  Tenant hereby confirms and ratifies the Lease, as amended hereby, and acknowledges that Landlord is not in default under the Lease as of the date this Amendment is executed by Tenant.

24.    **Multiple Counterparts**.  To facilitate execution hereof, this Amendment may be executed in one or more counterparts as may be convenient or required, and an executed copy of this Amendment delivered by facsimile or electronic mail transmittal shall have the effect of an

Second Amendment to Office Lease – Page 10

original, executed instrument.  All counterparts of this Amendment shall collectively constitute a single instrument; but, in making proof of this Amendment, it shall not be necessary to produce or account for more than one such counterpart.  It shall not be necessary for the signature of, or on behalf of, each party hereto, or that the signature of all persons required to bind any such party, appear on each counterpart of this Amendment.  Each signature page to any counterpart of this Amendment may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart of this Amendment identical thereto except having attached to it additional signature pages.

25.    **Authority**.

Tenant represents and warrants to Landlord that it has full authority and power to enter into and perform its obligations under this Amendment, that the person executing this Amendment is fully empowered to do so, and that no consent or authorization is necessary from any third party. Landlord may request that Tenant provide Landlord evidence of Tenant's authority.  If there is more than one Tenant or if Tenant is comprised of more than one party or entity, the obligations imposed upon Tenant shall be joint and several obligations of all the parties and entities, and requests or demands from any one person or entity comprising Tenant shall be deemed to have been made by all such persons or entities.  Notices to any one person or entity shall be deemed to have been given to all persons and entities.

26.    **Exhibits**.  The following exhibits are attached hereto and incorporated herein and made a part of this Amendment for all purposes:

Exhibit A – Parking
Exhibit B – 15th Floor Premises

[Remainder of page intentionally left blank.]

Second Amendment to Office Lease – Page 11

**NOTICE OF INDEMNIFICATION**:  **THE PARTIES TO THIS AMENDMENT HEREBY ACKNOWLEDGE AND AGREE THAT THE LEASE (INCLUDING THIS AMENDMENT) CONTAIN CERTAIN INDEMNIFICATION PROVISIONS, INCLUDING, WITHOUT LIMITATION, AS SET FORTH IN PARAGRAPH 19 OF THIS AMENDMENT AND EXHIBIT A ATTACHED HERETO.**

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Amendment as of the last day and year written below, to be effective as of the Effective Date set forth above.

**LANDLORD:**

**1000 LOUISIANA, LP**,
a Delaware limited partnership

By:    1000 Louisiana GP, LLC,
       a Delaware limited liability company,
       its general partner

       By:    WFP 1000 Holding Company, LP,
              a Delaware limited partnership,
              its sole member

              By:    WFP 1000 Holding Company GP, LLC,
                     a Delaware limited liability company,
                     its general partner

                     By:    Metropolitan Life Insurance
                           Company, its sole member

                     By: _____
                     Name: _____
                     Title: _____
                     Date: _____

**TENANT**:

**HALCÓN RESOURCES CORPORATION**,
a Delaware corporation


By:
Name:
Title:
Date:

**EXHIBIT A**

TO
SECOND AMENDMENT TO OFFICE LEASE
BETWEEN
1000 LOUISIANA, LP, AS LANDLORD,
AND
HALCON RESOURCES CORPORATION, AS TENANT

PARKING

This <u>Exhibit "A"</u> ("<u>Parking Exhibit</u>") describes and specifies Tenant's non-exclusive right to use:

      (a)      twelve (12) valet parking permits ("<u>Valet Spaces</u>") in the Building Parking Garage (defined below);

      (b)      four (4) reserved parking spaces (the "<u>Reserved Spaces</u>") in the Building Parking Garage, which Reserved Spaces shall be located on level P1 of such Building Parking Garage in a location designated by Landlord;

      (c)      four (4) unreserved parking spaces (the "<u>Building Unreserved Spaces</u>") in the Building Parking Garage; and

      (d)      thirty nine (39) unreserved parking spaces in the Offsite Garage, defined below (the "<u>Offsite Unreserved Spaces</u>") (such Offsite Unreserved Spaces, together with the Building Unreserved Spaces, being collectively referred to herein as the "<u>Unreserved Spaces</u>") (which Valet Spaces, Reserved Spaces and Unreserved Spaces are herein collectively referred to as the "<u>Spaces</u>")

      all upon the terms and conditions set forth below (collectively, "<u>Tenant's Parking Allotment</u>").

      As used herein, the term "<u>Building Parking Garage</u>" shall mean and refer to the parking garage located beneath the Building, and the term "<u>Offsite Garage</u>" shall mean and refer to the parking garage located at 1311 Louisiana Street. The Building Parking Garage and Offsite Garage shall further be referred to herein individually and collectively as the "<u>Parking Garage</u>". Notwithstanding the foregoing or anything herein seemingly to the contrary, Tenant acknowledges and agrees that although the Valet Spaces are designated hereby as being located in the Building Parking Garage, the cars parked in connection therewith may actually be parked in spaces within other parking garages, lots or areas.

      1.      <u>Definitions</u>. The terms which are defined in the Lease shall have the same meaning in this Parking Exhibit.

      2.      <u>Grant and Rental Fee</u>. Provided no event of default has occurred and is continuing under the Lease, Tenant shall be permitted the use of the Spaces and Tenant shall contract and pay for the Spaces, during the Lease Term, at such monthly rates (together with any

Exhibit A – Page 1

applicable tax thereon) and subject to such terms, conditions, and regulations as are, from time to time, promulgated by Landlord or the manager of the Parking Garage, as applicable, and charged or applicable to patrons of the Parking Garage for spaces similarly situated therein. The currently monthly rates are as follows (which remain subject to change as set forth above):

| **Type of Space** | **Currently Monthly Rate** |
|---|---|
| Valet Spaces | |
| Reserved Spaces | |
| Building Unreserved Spaces | |
| Offsite Unreserved Spaces | |

3.      Tenant's Failure to Use Spaces.  In the event that Tenant (after the Commencement Date and at any time during the Term) fails to utilize all or any of the Spaces, Landlord shall have no further obligation to make available to Tenant the Spaces not utilized. The failure, for any reason, of Landlord to provide or make available such Spaces to Tenant or the inability of Tenant to utilize all or any portion of the Spaces shall under no circumstances be deemed a default by Landlord under the Lease so as to permit Tenant to terminate the Lease, in whole or in part.

4.      Risk.  All motor vehicles (including all contents thereof) shall be parked in the Spaces at the sole risk of Tenant, its employees, agents, invitees and licensees, it being expressly agreed and understood that Landlord has no duty to insure any of said motor vehicles (including the contents thereof), and that Landlord is not responsible for the protection and security of such vehicles. Landlord shall have no liability whatsoever for any property damage and/or personal injury which might occur as a result of or in connection with the parking of said motor vehicles in any of the Spaces, and **TENANT HEREBY AGREES TO INDEMNIFY AND HOLD HARMLESS THE INDEMNITEES FROM AND AGAINST ANY AND ALL COSTS, CLAIMS, EXPENSES, AND/OR CAUSES OF ACTION (INCLUDING ATTORNEYS' FEES AND EXPENSES) WHICH SUCH INDEMNITEES MAY INCUR IN CONNECTION WITH OR ARISING OUT OF TENANT'S USE OF THE SPACES PURSUANT TO THIS AGREEMENT, WHICH OBLIGATIONS SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THE LEASE (INCLUDING ANY TERMINATION OF THIS AMENDMENT).**

5.      No Bailment.  It is further agreed that this Parking Exhibit shall not be deemed to create a bailment between the parties hereto, it being expressly agreed and understood that the only relationship created between Landlord and Tenant hereby is that of licensor and licensee, respectively.

6.      Rules and Regulations.  In its use of the Spaces, Tenant shall follow all of the Rules and Regulations of the Building applicable thereto, and any rules and regulations

Exhibit A – Page 2

promulgated by Landlord or the manager of the Parking Garage, as applicable, as each may be amended from time to time.  Upon the occurrence of any breach of any such rules or regulations, failure to make parking rental payments due hereunder, or default by Tenant under the Lease, Landlord shall be entitled to terminate this Parking Exhibit, in which event Tenant's right to utilize the Spaces shall thereupon automatically cease.

7.	Access.  Landlord shall be entitled to utilize whatever access device Landlord deems necessary (including but not limited to the issuance of parking stickers or access cards), to assure that only those persons who have contracted to use spaces in the Parking Garage are using the parking spaces therein.  Landlord currently limits access to the Parking Garage through the use of a parking entry card system, the cards for which shall be provided by Landlord.  Landlord agrees to provide to Tenant with such number of parking entry cards as reasonably requested by Tenant.  Tenant further agrees to surrender all parking entry cards in its possession upon the expiration or earlier termination of the Lease.  Landlord shall be entitled to cancel any lost or stolen cards of which it becomes aware.  Tenant shall promptly notify Landlord of any lost or stolen cards.  Tenant shall pay Landlord for each additional card(s) or for each replacement card(s) for any card(s) lost by or stolen from Tenant, in such amount as Landlord shall, from time to time determine, the present charge for such lost or stolen cards being $25.00 per card.  Tenant acknowledges that the parking entry card may also be the same as the master entry card used for access to the Building during other than normal business hours, and to the extent the cards are the same, agrees that the provisions of Section 7.04 of the Original Lease shall also be applicable and in the event of a conflict with the provisions of this Parking Exhibit, the provisions of Section 7.04 shall control.  In the event Tenant, its agents or employees wrongfully park in any of the Parking Garage's spaces, Landlord shall be entitled and is hereby authorized to have any such vehicle towed away, at Tenant's sole risk and expense, and Landlord is further authorized to charge Tenant $25.00 for each such occurrence.  Tenant hereby agrees to pay all amounts falling due hereunder upon demand therefor, and the failure to pay any such amount shall additionally be deemed an event of default hereunder and under the Lease, entitling Landlord to all of its rights and remedies hereunder and thereunder.

8.	Relocation.  In its sole discretion, Landlord shall have the right to relocate any of the Spaces (other than any Reserved Spaces) designated within any particular Parking Garage to any other Parking Garage and/or any other replacement parking garage.

Exhibit A – Page 3

**EXHIBIT B**

TO
SECOND AMENDMENT TO OFFICE LEASE
BETWEEN
1000 LOUISIANA, LP, AS LANDLORD,
AND
HALCON RESOURCES CORPORATION, AS TENANT

15TH FLOOR PREMISES

[The depiction of the 15th Floor Premises follows this cover page.]



Exhibit B – Page 2

4816-3505-0033v.5

53999-81 8/31/2016

# EXHIBIT 5 TO PLAN SUPPLEMENT

# AMENDED SCHEDULE OF REJECTED CONTRACTS

**Exhibit B**

**<u>Schedule of Executory Contracts to be Rejected</u>**

| Property | Non-Debtor Counterparty | Debtor Counterparty | Lease or Sublease | Lease Commencement Date | Description |
|---|---|---|---|---|---|
| Wells Fargo Plaza, Suite 6600 | Cathexis Holdings DE, LLC<br>1000 Louisiana Street, Suite 7000<br>Houston, Texas 77002 | Halcón Resources Corp. | Lease | November 1, 2012 | Office space |
| 600 Cranberry Woods Dr., Suite 300, Cranberry, PA | McKnight Property Management, LLC<br>310 Grant Street, Suite 2400<br>Pittsburgh, PA 15219 | Halcón Resources Corp. | Lease | August 1, 2013 | Office space |
| 600 Cranberry Woods Dr., Suite 300, Cranberry, PA | Prodigo Solutions, Inc.<br>600 Cranberry Woods Drive, Suite 300<br>Cranberry Township, PA 16066 | Halcón Resources Corp. | Sublease | August 1, 2015 | Office space |
| 5100 E Skelly Drive, Suite 600, Tulsa, OK | KBS Meridian Tower, LLC<br>620 Newport Center Drive, Suite 1300<br>Newport Beach, CA 92660 | Halcón Resources Corp. | Lease | November 1, 2013 | Office space |
| 5100 E Skelly Drive, Suite 600, Tulsa, OK | RAM Energy, LLC<br>5100 E. Skelly Drive, Suite 650<br>Tulsa, Oklahoma 74135 | Halcón Resources Corp. | Sublease | June 16, 2014 | Office space |

# EXHIBIT 6 TO PLAN SUPPLEMENT

# MANAGEMENT INCENTIVE PLAN

WEIL:\95834806\3\51351.0003

**HALCÓN RESOURCES CORPORATION**
**2016 LONG-TERM INCENTIVE PLAN**

ARTICLE I
PURPOSE

SECTION 1.1.   *Establishment.* Halcón Resources Corporation, a Delaware corporation (the "Company"), has established this Halcón Resources Corporation 2016 Long-Term Incentive Plan (the "Plan"), effective as of September [8], 2016 (the "Effective Date").[1] Unless terminated earlier by the Board pursuant to Section 13.1, the Plan shall terminate as to the granting of new Awards on the day prior to the tenth anniversary of the Effective Date. The Plan shall continue in effect as long as Awards remain outstanding under the Plan and all matters relating to the administration of the Plan have been settled.

SECTION 1.2.   *Purpose.* The purposes of the Plan are to create incentives which are designed to motivate Participants to put forth maximum effort toward the success and growth of the Company and to enable the Company and its Affiliated Entities and Subsidiaries to attract and retain experienced individuals who by their position, ability and diligence are able to make important contributions to the Company's success, and thereby to enhance shareholder value. Toward these objectives, the Plan provides for the grant of Options, Restricted Stock Awards, Restricted Stock Units, SARs, Performance Units, Performance Bonuses, Stock Awards and Other Incentive Awards to Eligible Employees and the grant of Nonqualified Stock Options, Restricted Stock Awards, Restricted Stock Units, SARs, Performance Units, Stock Awards and Other Incentive Awards to Consultants and Eligible Directors, subject to the conditions set forth in the Plan.

SECTION 1.3.   *Shares Subject to the Plan.* Subject to the limitations set forth herein, Awards may be made under this Plan for a total of 10,000,000 shares of the Company's Common Stock. The limitations of this Section 1.3 shall be subject to the adjustment provisions of Article XII.

ARTICLE II
DEFINITIONS

SECTION 2.1.   "*162(m) Requirements*" shall have the meaning ascribed to such term on Exhibit A hereto.

SECTION 2.2.   "*Affiliated Entity*" means any corporation, partnership, limited liability company or other form of legal entity in which a majority of the partnership or other similar interest thereof is owned or controlled, directly or indirectly, by the Company or one or more of its Subsidiaries or Affiliated Entities or a combination thereof. For purposes hereof, the Company, a Subsidiary or an Affiliated Entity shall be deemed to have a majority ownership interest in a partnership or limited liability company if the Company, such Subsidiary or Affiliated Entity shall be allocated a majority of partnership or limited liability company gains or losses or shall be or control a managing director or a general partner of such partnership or limited liability company.

SECTION 2.3.   "*Award*" means, individually or collectively, any Option, Restricted Stock Award, Restricted Stock Unit, SAR, Performance Unit, Performance Bonus, Stock Award or Other Incentive Award granted under the Plan to an Eligible Employee by the Committee or any Nonqualified Stock Option, Performance Unit, SAR, Restricted Stock Award, Restricted Stock Unit, Stock Award or

---

[1] Note to Draft: To reflect date on which all conditions to effectiveness of prepackaged bankruptcy plan have been satisfied or waived.

Other Incentive Award granted under the Plan to a Consultant or an Eligible Director by the Committee pursuant to such terms, conditions, restrictions, and/or limitations, if any, as the Committee may establish by the Award Agreement or otherwise.

SECTION 2.4.    "*Award Agreement*" means any written (including electronic) instrument that establishes the terms, conditions, restrictions, and/or limitations applicable to an Award in addition to those established by this Plan and by the Committee's exercise of its administrative powers.

SECTION 2.5.    "*Board*" means the Board of Directors of the Company.

SECTION 2.6.    "*Cash Dividend Right*" means a contingent right, granted in tandem with a specific Restricted Stock Unit Award, to receive an amount in cash equal to the cash distributions made by the Company with respect to a share of Common Stock during the period such Award is outstanding.

SECTION 2.7.    "*Change of Control Event*" means each of the following:

(a)    Any transaction in which shares of voting securities of the Company representing more than 50% of the total combined voting power of all outstanding voting securities of the Company are issued by the Company, or sold or transferred by the shareholders of the Company as a result of which those persons and entities who beneficially owned voting securities of the Company representing more than 50% of the total combined voting power of all outstanding voting securities of the Company immediately prior to such transaction cease to beneficially own voting securities of the Company representing more than 50% of the total combined voting power of all outstanding voting securities of the Company immediately after such transaction;

(b)    The merger or consolidation of the Company with or into another entity as a result of which those persons and entities who beneficially owned voting securities of the Company representing more than 50% of the total combined voting power of all outstanding voting securities of the Company immediately prior to such merger or consolidation cease to beneficially own voting securities of the Company representing more than 50% of the total combined voting power of all outstanding voting securities of the surviving corporation or resulting entity immediately after such merger of consolidation; or

(c)    The sale of all or substantially all of the Company's assets to an entity of which those persons and entities who beneficially owned voting securities of the Company representing more than 50% of the total combined voting power of all outstanding voting securities of the Company immediately prior to such asset sale do not beneficially own voting securities of the purchasing entity representing more than 50% of the total combined voting power of all outstanding voting securities of the purchasing entity immediately after such asset sale.

SECTION 2.8.    "*Code*" means the Internal Revenue Code of 1986, as amended. References in the Plan to any section of the Code shall be deemed to include any amendments or successor provisions to such section and any regulations under such section.

SECTION 2.9.    "*Committee*" means (i) a committee, comprised of no fewer than two members of the Board, appointed by the Board by resolution to administer the Plan as provided in Section 3.1, or (ii) if no such committee has been appointed, the Board.

SECTION 2.10.    "*Common Stock*" means the common stock, par value $0.0001 per share, of the Company, and after substitution, such other stock as shall be substituted therefore as provided in Article XII.

2

SECTION 2.11.  "*Consultant*" means any person, other than a member of the Board, who is engaged by the Company, a Subsidiary or an Affiliated Entity to render consulting or advisory services.

SECTION 2.12.  "*Date of Grant*" means the date on which the grant of an Award is authorized by the Committee or such later date as may be specified by the Committee.

SECTION 2.13.  "*Disability*" means the Participant is unable to continue employment by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months. For purposes of this Plan, the determination of Disability shall be made in the sole and absolute discretion of the Committee.

SECTION 2.14.  "*Dividend Unit Right*" means a contingent right, granted in tandem with a specific Restricted Stock Unit Award, to have an additional number of Restricted Stock Units credited to a Participant in respect of the Award equal to the number of shares of Common Stock that could be purchased at Fair Market Value with the amount of each cash distribution made by the Company with respect to a share of Common Stock during the period such Award is outstanding.

SECTION 2.15.  "*Eligible Employee*" means any employee of the Company, a Subsidiary, or an Affiliated Entity as approved by the Committee.

SECTION 2.16.  "*Eligible Director*" means any member of the Board who is not an employee of the Company, a Subsidiary or an Affiliated Entity or a Consultant.

SECTION 2.17.  "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

SECTION 2.18.  "*Fair Market Value*" means (a) during such time as the Common Stock is both registered under Section 12 of the Exchange Act and listed upon an established stock exchange or automated quotation system, the closing sales price of the Common Stock (or the closing bid, if no sales were reported) as quoted by an established stock exchange or automated quotation system on the day for which such value is to be determined, or, if there was no quoted price for such day, then for the last preceding business day on which there was a quoted price as reported in *The Wall Street Journal* or such other sources as the Committee deems reliable, or (b) during any such time as the Common Stock cannot be valued pursuant to (a) above, (i) with respect to Incentive Stock Options, the fair market value of the Common Stock as determined in good faith by the Committee within the meaning of Section 422 of the Code or (ii) the fair market value of the Common Stock as determined in good faith by the Committee using a "reasonable application of a reasonable valuation method" within the meaning of Treasury Regulation Section 1.409A-1(b)(5)(iv)(B) or other applicable valuation rules under the Code or other applicable law.

SECTION 2.19.  "*Incentive Stock Option*" means an Option that is intended to be an "incentive stock option" within the meaning of Section 422 of the Code.

SECTION 2.20.  "*Nonqualified Stock Option*" means an Option which is not an Incentive Stock Option.

SECTION 2.21.  "*Other Incentive Award*" means an incentive award granted to an Eligible Employee, Consultant or Eligible Director under Article XI of the Plan.

SECTION 2.22.  "*Option*" means an Award granted under Article V of the Plan and includes both Nonqualified Stock Options and Incentive Stock Options to purchase shares of Common Stock.

3

SECTION 2.23.  "*Participant*" means an Eligible Employee, a Consultant or an Eligible Director to whom an Award has been granted by the Committee under the Plan.

SECTION 2.24.  "*Performance Bonus*" means the bonus which may be granted to Eligible Employees under Article X of the Plan.

SECTION 2.25.  "*Performance Units*" means those monetary units and/or units representing notional shares of Common Stock that may be granted to Eligible Employees, Consultants or Eligible Directors pursuant to Article IX hereof.

SECTION 2.26.  "*Plan*" means the Halcón Resources Corporation 2016 Long-Term Incentive Plan.

SECTION 2.27.  "*Restriction Period*" means the period during which an Award remains subject to time- and/or performance-based restrictions.

SECTION 2.28.  "*Restricted Stock Award*" means an Award granted to an Eligible Employee, Consultant or Eligible Director under Article VI of the Plan.

SECTION 2.29.  "*Restricted Stock Unit*" means an Award granted to an Eligible Employee, Consultant or Eligible Director under Article VII of the Plan.

SECTION 2.30.  "*Retirement*" means the termination of an Eligible Employee's employment with the Company, a Subsidiary or an Affiliated Entity on or after attaining age 62.

SECTION 2.31.  "*SAR*" means a stock appreciation right granted to an Eligible Employee, Consultant or Eligible Director under Article VIII of the Plan.

SECTION 2.32.  "*Stock Award*" means an Award granted to an Eligible Employee, Consultant or Eligible Director under Article XI of the Plan.

SECTION 2.33.  "*Subsidiary*" means a "subsidiary corporation" of the Company, as defined in Section 424(f) of the Code.

ARTICLE III
ADMINISTRATION

SECTION 3.1.  *Administration of the Plan*. The Board shall administer the Plan. The Board may, by resolution, appoint a Committee to administer the Plan and delegate its powers described under this Section 3.1 for purposes of Awards granted to Eligible Employees and Consultants. If determined to be necessary by the Board, each Committee member shall satisfy the requirements for (i) an "independent director" under rules adopted by the New York Stock Exchange or other principal exchange on which the Common Stock is then listed, (ii) a "nonemployee director" within the meaning of Rule 16b-3 under the Exchange Act and (iii) an "outside director" under Section 162(m) of the Code. Notwithstanding the foregoing, the mere fact that a Committee member shall fail to qualify under any of the foregoing requirements shall not invalidate any Award made by the Committee that is otherwise validly made under the Plan. Neither the Company nor any member of the Committee shall be liable for any action or determination made in good faith by the Committee with respect to the Plan or any Award thereunder. The acts of the Committee shall be either (i) acts of a majority of the members of the Committee present at any meeting at which a quorum is present or (ii) acts approved by all of the members of the Committee

4

without a meeting. A majority of the Committee shall constitute a quorum. The Committee's determinations under the Plan need not be uniform and may be made selectively among Participants, whether or not such Participants are similarly situated. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any Eligible Employee of the Company, the Company's independent certified public accountants or any executive compensation consultant or other professional retained by the Company or the Committee to assist in the administration of the Plan. The Company shall effect the granting of Awards under the Plan, in accordance with the determinations made by the Committee, by execution of written agreements and/or other instruments in such form as is approved by the Committee. Subject to the provisions of the Plan, the Committee shall have exclusive power to:

(a)     Select Eligible Employees and Consultants to participate in the Plan.

(b)     Determine the time or times when Awards will be made to Eligible Employees or Consultants.

(c)     Determine the form of an Award, whether an Incentive Stock Option, Nonqualified Stock Option, Restricted Stock Award, Restricted Stock Unit, SAR, Performance Unit, Performance Bonus, Stock Award or Other Incentive Award, the number of shares of Common Stock, Performance Units or Restricted Stock Units subject to the Award, the amount and all the terms, conditions (including performance requirements), restrictions and/or limitations, if any, of an Award, including the time and conditions of exercise or vesting, and the terms of any Award Agreement, which may include the waiver or amendment of prior terms and conditions or acceleration or early vesting or payment of an Award.

(d)     Determine whether Awards will be granted singly or in combination.

(e)     Adopt rules for the administration, interpretation and application of the Plan as are consistent therewith, and interpret, amend or revoke any such rules.

(f)     Correct any defect(s) or omission(s) or reconcile any ambiguity(ies) or inconsistency(ies) in the Plan or any Award granted thereunder.

(g)     Make all other decisions and determinations it deems advisable for the administration of the Plan.

(h)     Decide all disputes arising in connection with the Plan and otherwise supervise the administration of the Plan.

(i)     Take any and all other action it deems necessary or advisable for the proper operation or administration of the Plan.

SECTION 3.2.    *Administration of Grants to Eligible Directors.* The Board shall have the exclusive power to select Eligible Directors to participate in the Plan and to determine the number of Nonqualified Stock Options, Performance Units, Restricted Stock Units, SARs, Stock Awards, Other Incentive Awards or the number of shares of Common Stock subject to a Restricted Stock Award awarded to Eligible Directors selected for participation. If the Board appoints a separate committee to administer the Plan, it may delegate to such committee administration of all other aspects of the Awards made to Eligible Directors.

5

SECTION 3.3.    *Committee to Make Rules and Interpret Plan*. The Committee in its sole discretion shall have the authority, subject to the provisions of the Plan, to establish, adopt, or revise such rules and regulations and to make all such determinations relating to the Plan, as it may deem necessary or advisable for the administration of the Plan. The Committee's interpretation of the Plan or any Awards and all decisions and determinations by the Committee with respect to the Plan shall be final, binding, and conclusive on all parties.

SECTION 3.4.    *Delegation by Committee*. Except to the extent prohibited by applicable law or the rules of any stock exchange on which the Common Stock is listed, the Committee may allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities and powers to any person or persons selected by it. Any such allocation or delegation may be revoked by the Committee at any time.

SECTION 3.5.    *Section 162(m) Provisions*. In the event that the Committee determines that it is appropriate that an Award granted under the Plan qualify for the exemption from Section 162(m) of the Code for "qualified performance-based compensation", a committee composed of two or more "outside directors" within the meaning of Section 162(m) of the Code shall make determinations as to the grant of the Award, all performance targets applicable thereto, and all other applicable provisions of the Plan as necessary in order for such Award to satisfy the "qualified performance based compensation" requirements of Section 162(m) of the Code

## ARTICLE IV
## GRANT OF AWARDS

SECTION 4.1.    *Grant of Awards*. Awards granted under this Plan shall be subject to the following conditions:

(a)    Subject to Article XII, (i) the aggregate number of shares of Common Stock made subject to the grant of Options and/or SARs to any Eligible Employee in any calendar year may not exceed 5,000,000, and (ii) the maximum aggregate number of shares that may be issued under the Plan through Incentive Stock Options is 10,000,000.

(b)    Subject to Article XII, the aggregate number of shares of Common Stock made subject to the grant of Restricted Stock Awards, Restricted Stock Unit Awards, Performance Unit Awards, Performance Bonus Awards, Stock Awards and Other Incentive Awards to any Eligible Employee in any calendar year which are intended to constitute "performance-based compensation" within the meanings of Section 162(m) of the Code may not exceed 10,000,000.

(c)    The maximum amount made subject to the grant of Performance Bonus Awards to any Eligible Employee in any calendar year may not exceed $5,000,000.

(d)    Any shares of Common Stock related to Awards which terminate by expiration, forfeiture, cancellation or otherwise without the issuance of shares of Common Stock or are exchanged in the Committee's discretion for Awards not involving the issuance of shares of Common Stock, shall be available again for grant under the Plan and shall not be counted against the shares authorized under Section 1.3. Any shares of Common Stock issued as Restricted Stock Awards that subsequently are forfeited without vesting shall again be available for grant under the Plan and shall not be counted against the shares authorized under Section 1.3. Any Awards that, pursuant to the terms of the applicable Award Agreement, are to be settled in cash, whether or not denominated in or determined with reference to shares of Common Stock (for example, SARs,

6

Performance Units or Restricted Stock Units to be settled in cash), shall not be counted against the shares authorized under Section 1.3.

(e) Common Stock delivered by the Company in payment of an Award authorized under Articles V and VI of the Plan may be authorized and unissued Common Stock or Common Stock held in the treasury of the Company, but, for avoidance of doubt, shall not be available again for grant under the Plan.

(f) The Committee shall, in its sole discretion, determine the manner in which fractional shares arising under this Plan shall be treated.

(g) Separate certificates or a book-entry registration representing Common Stock shall be delivered to a Participant upon the exercise of any Option.

(h) Except for adjustments pursuant to Article XII or reductions of the Exercise Price approved by the Company's stockholders, the Exercise Price for any outstanding Option or SAR may not be decreased after the date of grant nor may an outstanding Option or SAR granted under the Plan be surrendered to the Company as consideration for the grant of a replacement Option or SAR with a lower exercise price or any other award under the Plan. Except as approved by the Company's shareholders, in no event shall any Option or SAR granted under the Plan be surrendered to the Company in consideration for a cash payment if, at the time of such surrender, the Exercise Price of the Option or SAR is greater than the then current Fair Market Value of a share of Common Stock.

(i) Eligible Directors and Consultants may only be granted Nonqualified Stock Options, Restricted Stock Awards, Restricted Stock Units, SARs, Performance Units, Stock Awards or Other Incentive Awards under this Plan.

(j) The maximum term of any Award shall be ten years.

(k) If an Award is denominated in Common Stock but an equivalent amount of cash is delivered in lieu of delivery of shares of Common Stock, any limitations in this Section 4.1 shall be applied based on the methodology used by the Committee to convert the number of shares of Common Stock into cash. If an Award is denominated in cash but an equivalent number of shares of Common Stock are delivered in lieu of delivery of cash, any limitations in this Section 4.1 shall be applied based on the methodology used by the Committee to convert the cash to shares of Common Stock.

ARTICLE V
STOCK OPTIONS

SECTION 5.1. *Grant of Options*. The Committee may, from time to time, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant Options to Eligible Employees. These Options may be Incentive Stock Options or Nonqualified Stock Options, or a combination of both. The Committee may, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant Nonqualified Stock Options to Eligible Directors and Consultants. Each grant of an Option shall be evidenced by an Award Agreement executed by the Company and the Participant, and shall contain such terms and conditions and be in such form as the Committee may from time to time approve, subject to the requirements of Section 5.2. An Option will be deemed to be a Nonqualified Stock Option unless it is specifically designated by the Committee as an Incentive Stock Option. Any Stock Option that is intended to constitute an Incentive Stock Option shall satisfy any other

7

requirements of Code Section 422 and, to the extent such Option does not satisfy such requirements, the Option shall be treated as a Nonqualified Stock Option. The Shares subject to any Option granted to a Participant under the Plan shall qualify as "service recipient stock" with respect to such Participant for purposes of Section 409A of the Code.

SECTION 5.2.   *Conditions of Options*. Each Option so granted shall be subject to the following conditions:

(a)   *Exercise Price*. As limited by Section 5.2(e) below, each Option shall state the exercise price, which shall be set by the Committee at the Date of Grant; provided, however, no Option shall be granted at an exercise price which is less than the Fair Market Value of the Common Stock on the Date of Grant unless the Option is granted through the assumption of, or in substitution for, outstanding awards previously granted to individuals who became Eligible Employees (or other service providers) as a result of a merger, consolidation, acquisition or other corporate transaction involving the Company which complies with Treasury Regulation § 1.409A-1(b)(5)(v)(D).

(b)   *Form of Payment*. The exercise price of an Option may be paid (i) in cash or by check, bank draft or money order payable to the order of the Company; (ii) subject to prior approval by the Committee in its discretion, by delivering previously acquired shares of Common Stock having an aggregate Fair Market Value on the date of payment equal to the amount of the exercise price, but only to the extent such exercise of an Option would not result in an adverse accounting charge to the Company for financial accounting purposes with respect to the shares used to pay the exercise price unless otherwise determined by the Committee; (iii) subject to prior approval by the Committee in its discretion, by withholding shares of Common Stock which otherwise would be acquired on exercise having an aggregate Fair Market Value on the date of payment equal to the amount of the exercise price; or (iv) subject to prior approval by the Committee in its discretion, by a combination of the foregoing. In addition to the foregoing, the Committee may permit an Option granted under the Plan to be exercised by a broker-dealer acting on behalf of a Participant through procedures approved by the Committee. Such procedures may include a broker either (A) selling all of the shares of Common Stock received when an Option is exercised and paying the Participant the proceeds of the sale (minus the exercise price, withholding taxes and any fees due to the broker) or (B) selling enough of the shares of Common Stock received upon exercise of the Option to cover the exercise price, withholding taxes and any fees due to the broker and delivering to the Participant (either directly or through the Company) a stock certificate for the remaining shares of Common Stock.

(c)   *Exercise of Options*.

(i)   Options granted under the Plan shall be exercisable, in whole or in such installments and at such times, and shall expire at such time, as shall be provided by the Committee in the Award Agreement. Exercise of an Option shall be by written notice to the Senior Vice President, Human Resources of the Company (or such other officer as may be designated by the Committee) in advance of such exercise stating the election to exercise in the form and manner determined by the Committee. Every share of Common Stock acquired through the exercise of an Option shall be deemed to be fully paid at the time of exercise and payment of the exercise price.

(ii)   Unless otherwise provided in an Award Agreement or determined by the Committee, the following provisions will apply to the exercisability of Options following

WEIL:\95763735\4\51351.0003

the termination of a Participant's employment or service with the Company, a Subsidiary or an Affiliated Entity:

(A)    If an Eligible Employee's employment with the Company, the Subsidiaries and the Affiliated Entities terminates as a result of death, Disability or Retirement, the Eligible Employee (or personal representative in the case of death) shall be entitled to purchase all or any part of the shares subject to any (i) vested Incentive Stock Option for a period of up to three months from such date of termination (one year in the case of death or Disability in lieu of the three-month period) and (ii) vested Nonqualified Stock Option during the remaining term of the Option. If an Eligible Employee's employment terminates for any other reason, except for cause (as determined by the Committee), the Eligible Employee shall be entitled to purchase all or any part of the shares subject to any vested Option for a period of up to three months from such date of termination. In no event shall any Option be exercisable past the term of the Option.

(B)    In the event a Consultant ceases to provide services to the Company, the Subsidiaries and the Affiliated Entities, or an Eligible Director ceases to serve as a director of the Company, the unvested portion of any Option shall be forfeited unless otherwise accelerated pursuant to the terms of the Consultant's or Eligible Director's Award Agreement or by the Committee. The Consultant or Eligible Director shall have a period of three years following the date he or she ceases to provide consulting services or ceases to be a director, as applicable, to exercise any Nonqualified Stock Options which are otherwise exercisable on his or her date of termination of service.

(d)    *Other Terms and Conditions*. Among other conditions that may be imposed by the Committee, if deemed appropriate, are those relating to (i) the period or periods and the conditions of exercisability of any Option; (ii) the minimum periods during which Participants must be employed by or in service to the Company, its Subsidiaries, or an Affiliated Entity, or must hold Options before they may be exercised; (iii) the minimum periods during which shares acquired upon exercise must be held before sale or transfer shall be permitted; (iv) conditions under which such Options or shares may be subject to forfeiture; (v) the frequency of exercise or the minimum or maximum number of shares that may be acquired at any one time; (vi) the achievement by the Company of specified performance criteria; and (vii) non-compete and protection of business matters.

(e)    *Special Restrictions Relating to Incentive Stock Options*.

(i)    Options issued in the form of Incentive Stock Options shall only be granted to Eligible Employees of the Company or a Subsidiary.

(ii)    No Incentive Stock Option shall be granted to an Eligible Employee who owns or who would own immediately before the grant of such Incentive Stock Option more than 10% of the combined voting power of the Company or its Subsidiaries or a "parent corporation," unless (A) at the time such Incentive Stock Option is granted the exercise price is at least 110% of the Fair Market Value of a share of Common Stock on the Date of Grant and (B) such Option by its terms is not exercisable after the expiration of five years from the Date of Grant. For purposes of this Section 5.2(e), "parent corporation" means a "parent corporation" of the Company, as defined in Section 424(e) of the Code.

9

(iii)    To the extent that the aggregate Fair Market Value (determined at the time an Incentive Stock Option is granted) of shares of Common Stock with respect to which Incentive Stock Options are exercisable for the first time by an individual during any calendar year under all incentive stock option plans of the Company and its Subsidiaries and parent corporations exceeds $100,000, such excess Incentive Stock Options shall be treated as Nonqualified Stock Options. The Committee shall determine, in accordance with applicable provisions of the Code, Treasury Regulations and other administrative pronouncements, which of a Participant's Options will not constitute Incentive Stock Options because of such limitation and shall notify the Participant of such determination as soon as practicable after such determination is made.

(iv)    Each Participant awarded an Incentive Stock Option shall notify the Company in writing immediately after the date he or she makes a disqualifying disposition of any shares of Common Stock acquired pursuant to the exercise of such Incentive Stock Option. A disqualifying disposition is any disposition (including any sale) of such Common Stock before the later of (i) two years after the Date of Grant of the Incentive Stock Option or (ii) one year after the date of exercise of the Incentive Stock Option.

(v)    Except in the case of death, an Option will not be treated as an Incentive Stock Option unless at all times beginning on the Date of Grant and ending on the day three months (one year in the case of a Participant who is "disabled" within the meaning of Section 22(e)(3) of the Code) before the date of exercise of the Option, the Participant is an employee of the Company or a parent corporation of the Company or a Subsidiary (or a corporation or a parent corporation or subsidiary corporation of such corporation issuing or assuming an Option in a transaction to which Section 424(a) of the Code applies).

(f)    *Application of Funds*. The proceeds received by the Company from the sale of Common Stock pursuant to Options will be used for general corporate purposes.

(g)    *Shareholder Rights*. No Participant shall have a right as a shareholder with respect to any share of Common Stock subject to an Option prior to purchase of such shares of Common Stock by exercise of the Option.

ARTICLE VI
RESTRICTED STOCK AWARDS

SECTION 6.1.    *Grant of Restricted Stock Awards*. The Committee may, from time to time, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant a Restricted Stock Award to Eligible Employees, Consultants or Eligible Directors. Restricted Stock Awards shall be awarded in such number and at such times during the term of the Plan as the Committee shall determine. Each Restricted Stock Award shall be subject to an Award Agreement setting forth the terms of such Restricted Stock Award and may be evidenced in such manner as the Committee deems appropriate, including, without limitation, a book-entry registration or issuance of a stock certificate or certificates.

SECTION 6.2.    *Conditions of Restricted Stock Awards*. The grant of a Restricted Stock Award shall be subject to the following:

10

(a)    *Restriction Period*. Restricted Stock Awards shall be subject to such time- and/or performance-based restrictions as the Committee shall determine and set forth in the applicable Award Agreement. Restricted Stock Awards granted to an Eligible Employee may require the holder to remain in the employment of the Company, a Subsidiary, or an Affiliated Entity for a prescribed period. Restricted Stock Awards granted to Consultants or Eligible Directors may require the holder to provide continued services to the Company for a period of time. In addition to or in lieu of any time vesting conditions determined by the Committee, vesting and/or the grant of Restricted Stock Awards may be subject to the achievement by the Company of specified performance criteria, which may, without limitation, be based upon the Company's achievement of all or any of the operational, financial or stock performance criteria set forth on Exhibit A annexed hereto, in all events as may from time to time be established by the Committee. The Committee also will determine whether the Award is intended to satisfy the 162(m) Requirements, as described in Exhibit A. Upon the fulfillment of any specified vesting conditions, the Restriction Period shall expire, and the restrictions imposed by the Committee shall lapse with respect to the shares of Common Stock covered by the Restricted Stock Award or portion thereof.

(b)    *Restrictions*. The holder of a Restricted Stock Award may not sell, transfer, pledge, exchange, hypothecate, or otherwise dispose of the shares of Common Stock represented by the Restricted Stock Award during the applicable Restriction Period. The Committee shall impose such other restrictions and conditions on any shares of Common Stock covered by a Restricted Stock Award as it may deem advisable including, without limitation, restrictions under applicable federal or state securities laws, and may legend the certificates representing shares of Common Stock covered by a Restricted Stock Award to give appropriate notice of such restrictions.

(c)    *Rights as Shareholders*. During any Restriction Period, the Committee may, in its discretion, grant to the holder of a Restricted Stock Award all or any of the rights of a shareholder with respect to the shares, including, but not by way of limitation, the right to vote such shares and to receive dividends. If any dividends or other distributions are paid in shares of Common Stock, all such shares shall be subject to the same restrictions on transferability as the shares of Common Stock covered by the Restricted Stock Award with respect to which they were paid.

## ARTICLE VII
## RESTRICTED STOCK UNITS

SECTION 7.1.    *Grant of Restricted Stock Units.* The Committee may, from time to time, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant Restricted Stock Units to Eligible Employees, Consultants or Eligible Directors. Restricted Stock Units shall be awarded in such number and at such times during the term of the Plan as the Committee shall determine. Each Award of Restricted Stock Units shall be subject to an Award Agreement setting forth the terms of such Award of Restricted Stock Units. A Participant shall not be required to make any payment for Restricted Stock Units.

SECTION 7.2.    *Conditions of Restricted Stock Units*. The grant of Restricted Stock Units shall be subject to the following:

(a)    *Restriction Period*. Restricted Stock Units shall be subject to such time- and/or performance-based restrictions as the Committee shall determine and set forth in the applicable Award Agreement. Restricted Stock Units granted to an Eligible Employee may require the holder to remain in the employment of the Company, a Subsidiary, or an Affiliated Entity for a

11

prescribed period. Restricted Stock Units granted to Consultants or Eligible Directors may require the holder to provide continued services to the Company for a period of time. In addition to or in lieu of any time vesting conditions determined by the Committee, vesting and/or the grant of Restricted Stock Units may be subject to the achievement by the Company of specified performance criteria, which may, without limitation, be based upon the Company's achievement of all or any of the operational, financial or stock performance criteria set forth on Exhibit A annexed hereto, in all events as may from time to time be established by the Committee. The Committee also will determine whether the Award is intended to satisfy the 162(m) Requirements, as described in Exhibit A. Upon the fulfillment of any specified vesting conditions, the Restriction Period shall expire, and the restrictions imposed by the Committee shall lapse with respect to the Restricted Stock Units.

(b)      *Lapse of Restrictions*. The Participant shall be entitled to receive one share of Common Stock or an amount of cash equal to the Fair Market Value of one share of Common Stock, as provided in the Award Agreement upon settlement of a Restricted Stock Unit for which the restrictions have lapsed.

(c)      *Cash Dividend Rights and Dividend Unit Rights*. The Committee may, in its sole discretion, grant a tandem Cash Dividend Right or Dividend Unit Right grant with respect to Restricted Stock Units. A grant of Cash Dividend Rights may provide that such Cash Dividend Rights shall be paid directly to the Participant at the time of payment of related dividend, be credited to a bookkeeping account subject to the same vesting and payment provisions as the tandem Award (with or without interest in the sole discretion of the Committee), or be subject to such other provisions or restrictions as determined by the Committee in its sole discretion. A grant of Dividend Unit Rights shall be subject to the same vesting and payment provisions as the tandem Award.

ARTICLE VIII
STOCK APPRECIATION RIGHTS

SECTION 8.1.    *Grant of SARs*. The Committee may from time to time, in its sole discretion, subject to the provisions of the Plan and subject to other terms and conditions as the Committee may determine, grant a SAR to any Eligible Employee, Consultant or Eligible Director. Each grant of a SAR shall be evidenced by an Award Agreement executed by the Company and the Participant and shall contain such terms and conditions and be in such form as the Committee may from time to time approve, subject to the requirements of the Plan. The exercise price of the SAR shall not be less than the Fair Market Value of a share of Common Stock on the Date of Grant of the SAR.

SECTION 8.2.    *Exercise and Payment*. SARs granted under the Plan shall be exercisable in whole or in installments and at such times as shall be provided by the Committee in the Award Agreement. Exercise of a SAR shall be by written notice to the Senior Vice President, Human Resources of the Company at least two business days in advance of such exercise. The amount payable with respect to each SAR shall be equal in value to the excess, if any, of the Fair Market Value of a share of Common Stock on the exercise date over the exercise price of the SAR. Payment of amounts attributable to a SAR shall be made in cash or in shares of Common Stock, as provided by the terms of the applicable Award Agreement.

12

ARTICLE IX
PERFORMANCE UNITS

SECTION 9.1.   *Grant of Awards*. The Committee may, from time to time, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant Performance Units to Eligible Employees, Consultants and Eligible Directors. Each Award of Performance Units shall be evidenced by an Award Agreement executed by the Company and the Participant, and shall contain such terms and conditions and be in such form as the Committee may from time to time approve, subject to the requirements of Section 9.2.

SECTION 9.2.   *Conditions of Awards*. Each Award of Performance Units shall be subject to the following conditions:

(a)   *Establishment of Award Terms*. Each Award shall state the target, maximum and minimum value of each Performance Unit payable upon the achievement of performance goals.

(b)   *Achievement of Performance Goals*. The Committee shall establish performance targets for each Award for a period of no less than a year based upon such operational, financial or performance criteria determined by the Committee, and determine whether the Award is intended to satisfy the 162(m) Requirements, as described in Exhibit A. The Committee shall also establish such other terms and conditions as it deems appropriate to such Award. The Award may be paid out in cash or Common Stock as determined in the sole discretion of the Committee

ARTICLE X
PERFORMANCE BONUS

SECTION 10.1.   *Grant of Performance Bonus*. The Committee may from time to time, subject to the provisions of the Plan and such other terms and conditions as the Committee may determine, grant a Performance Bonus to certain Eligible Employees selected for participation. The Committee will determine the amount that may be earned as a Performance Bonus in any period of one year or more upon the achievement of one or more performance targets established by the Committee. The Committee shall select the applicable performance target(s) for each period in which a Performance Bonus is awarded. The performance target(s) shall be based upon such operational, financial or performance criteria determined by the Committee. The Committee also will determine whether the Award is intended to satisfy the 162(m) Requirements, as described in Exhibit A.

SECTION 10.2.   *Payment of Performance Bonus*. In order for any Participant to be entitled to payment of a Performance Bonus, the applicable performance target(s) established by the Committee must first be obtained or exceeded. Payment of a Performance Bonus shall be made within 60 days of the Committee's certification that the performance target(s) has been achieved and, in any event, within 2.5 months of the year following the year in which the Performance Bonus is earned. Payment of a Performance Bonus may be made in cash or shares of Common Stock, as provided by the terms of the applicable Award Agreement.

ARTICLE XI
STOCK AWARDS AND OTHER INCENTIVE AWARDS

SECTION 11.1.   *Grant of Stock Awards*. The Committee may, from time to time, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant Stock Awards of shares of Common Stock not subject to vesting or forfeiture restrictions to Eligible Employees,

13

Consultants or Eligible Directors. Stock Awards shall be awarded with respect to such number of shares of Common Stock and at such times during the term of the Plan as the Committee shall determine. Each Stock Award shall be subject to an Award Agreement setting forth the terms of such Stock Award. The Committee may in its sole discretion require a Participant to pay a stipulated purchase price for each share of Common Stock covered by a Stock Award.

SECTION 11.2.  *Grant of Other Incentive Awards*. The Committee may, from time to time, subject to the provisions of the Plan and such other terms and conditions as it may determine, grant Other Incentive Awards to Eligible Employees, Consultants or Eligible Directors. Other Incentive Awards may be granted based upon, payable in or otherwise related to, in whole or in part, shares of Common Stock if the Committee, in its sole discretion, determines that such Other Incentive Awards are consistent with the purposes of the Plan. Such Awards may include, but are not limited to, Common Stock awarded as a bonus, dividend equivalents, convertible or exchangeable debt securities, other rights convertible or exchangeable into Common Stock, purchase rights for Common Stock, Awards with value and payment contingent upon the Company's performance or any other factors designated by the Committee, and Awards valued by reference to the book value of Common Stock or the value of securities of or the performance of specified subsidiaries. Long-term cash Awards also may be made under the Plan. Cash Awards also may be granted as an element of or a supplement to any Awards permitted under the Plan. Awards may also be granted in lieu of obligations to pay cash or deliver other property under the Plan or under other plans or compensation arrangements, subject to any applicable provision under Section 16 of the Exchange Act. Each grant of an Other Incentive Award shall be evidenced by an Award Agreement that shall specify the amount of the Other Incentive Award and the terms, conditions, restrictions and limitations applicable to such Award. Payment of Other Incentive Awards shall be made at such times and in such form, which may be cash, shares of Common Stock or other property (or a combination thereof), as established by the Committee, subject to the terms of the Plan.

ARTICLE XII
STOCK ADJUSTMENTS

SECTION 12.1.  *Recapitalizations and Reorganizations*. In the event that the shares of Common Stock, as constituted on the Effective Date, shall be changed into or exchanged for a different number or kind of shares of stock or other securities of the Company or of another corporation (whether by reason of merger, consolidation, recapitalization, reclassification, stock split, spin-off, combination of shares or otherwise), or if the number of such shares of Common Stock shall be increased through the payment of a stock dividend, or an extraordinary dividend on the shares of Common Stock, or if rights or warrants to purchase securities of the Company shall be issued to holders of all outstanding Common Stock, then the maximum number and kind of shares of Common Stock available for issuance under the Plan, the maximum number and kind of shares of Common Stock for which any individual may receive Awards in any calendar year under the Plan, the number and kind of shares of Common Stock covered by outstanding Awards, and the price per share or the applicable market value or performance target of such Awards will be appropriately adjusted by the Committee to reflect any increase or decrease in the number of, or change in the kind or value of, issued shares of Common Stock to preclude, to the extent practicable, the enlargement or dilution of rights under such Awards. Notwithstanding the provisions of this Section, (i) the number and kind of shares of Common Stock available for issuance as Incentive Stock Options under the Plan shall be adjusted only in accordance with the applicable provisions of Sections 422 and 424 of the Code and the regulations thereunder, and (ii) outstanding Awards and Award Agreements shall be adjusted in accordance with (A) Sections 422 and 424 of the Code and the regulations thereunder with respect to Incentive Stock Options and (B) Section 409A of the Code with respect to Nonqualified Stock Options, SARs and, to the extent applicable, other Awards. In the event there shall be any other change in the number or kind of the outstanding shares of Common Stock, or any stock or other securities into which the Common Stock shall have been changed or for which it shall have

WEIL:\95763735\4\51351.0003

been exchanged, then if the Committee shall, in its sole discretion, determine that such change equitably requires an adjustment in the shares available under and subject to the Plan, or in any Award, theretofore granted, such adjustments shall be made in accordance with such determination. No fractional shares of Common Stock or units of other securities shall be issued pursuant to any such adjustment, and any fractions resulting from any such adjustment shall be eliminated in each case by rounding downward to the nearest whole share.

SECTION 12.2. *Adjustments Upon Change of Control Event*. Upon the occurrence of a Change of Control Event, the Committee, in its sole discretion, without the consent of any Participant or holder of the Award, and on such terms and conditions as it deems appropriate, may take any one or more of the following actions in connection with such Change in Control Event:

(a)    provide for either (i) the termination of any Award in exchange for an amount of cash, if any, equal to the amount that would have been attained upon the realization of the Participant's rights (and, for the avoidance of doubt, if as of the date of the occurrence of such transaction or event the Committee determines in good faith that no amount would have been attained upon the realization of the Participant's rights, then such Award may be terminated by the Committee without payment) or (ii) the replacement of such Award with other rights or property selected by the Committee in its sole discretion;

(b)    provide that such Award be assumed by a successor or survivor entity, or a parent or subsidiary thereof, or be exchanged for similar rights or awards covering the equity of the successor or survivor, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of equity interests and prices;

(c)    make adjustments in the number and type of Common Stock (or other securities or property) subject to outstanding Awards, and in the number and kind of outstanding Awards or in the terms and conditions of, and the vesting criteria included in, outstanding Awards, or both;

(d)    provide that such Award shall be payable, notwithstanding anything to the contrary in the Plan or the applicable Award Agreement; and/or

(e)    provide that the Award cannot become payable after such event, i.e., shall terminate upon such event.

Notwithstanding the foregoing, any such action contemplated under this Section shall be effective only to the extent that such action will not cause any Award that is designed to satisfy Section 409A of the Code to fail to satisfy such section.

## ARTICLE XIII
### GENERAL

SECTION 13.1. *Amendment or Termination of Plan*. The Board, in its sole discretion, may alter, suspend or terminate the Plan, or any part thereof, at any time and for any reason; provided, however, that if an amendment to the Plan (i) would materially increase the aggregate number of shares of Common Stock available under the Plan (except by operation of Article XII), (ii) would materially modify the requirements as to eligibility for participation in the Plan, (iii) would materially increase the benefits to Participants provided by the Plan, (iv) would modify the provisions of Section 4.1(h), or (v) must otherwise be approved by shareholders of the Company in order to comply with applicable law or the rules of the New York Stock Exchange or, if the Common Stock is not traded on the New York Stock Exchange, the principal national securities exchange upon which the Common Stock is traded or quoted,

15

then such amendment will be subject to shareholder approval and will not be effective unless and until such approval has been obtained, subject to any other requirement of shareholder approval required by applicable law, rule or regulation, including without limitation, Section 422 of the Code and the rules of the applicable securities exchange.

SECTION 13.2.  *Transferability*.

(a)      Except as provided in Section 13.2(b) hereof or as otherwise determined by the Committee, Awards under the Plan shall not be assignable or transferable by the Participant, and shall not be subject in any manner to assignment, alienation, pledge, encumbrance or charge. Notwithstanding the foregoing, in the event of the death of a Participant, except as otherwise provided by the Committee in an Award Agreement, an outstanding Award may be exercised by or shall become payable to the Participant's legatee or legatees of such Award designated under the Participant's last will or by such Participant's executors, personal representatives or distributees of such Award in accordance with the Participant's will or the laws of descent and distribution. The Committee may provide in the terms of an Award Agreement or in any other manner prescribed by the Committee that the Participant shall have the right to designate a beneficiary or beneficiaries who shall be entitled to any rights, payments or other benefits specified under an Award following the Participant's death.

(b)      The Committee may, in its discretion, authorize all or a portion of the Nonqualified Stock Options granted under this Plan to be on terms which permit transfer by the Participant to (i) the ex-spouse of the Participant pursuant to the terms of a domestic relations order, (ii) the spouse, children or grandchildren of the Participant ("Immediate Family Members"), (iii) a trust or trusts for the exclusive benefit of such Immediate Family Members, or (iv) a partnership or limited liability company in which such Immediate Family Members are the only partners or members. In addition there may be no consideration for any such transfer. The Award Agreement pursuant to which such Nonqualified Stock Options are granted expressly provides for transferability in a manner consistent with this paragraph. Subsequent transfers of transferred Nonqualified Stock Options shall be prohibited except as set forth below in this Section 13.2. Following transfer, any such Nonqualified Stock Options shall continue to be subject to the same terms and conditions as were applicable immediately prior to transfer, provided that for purposes of Section 5.2(c)(ii) or similar provisions of an Award Agreement the term "Participant" shall be deemed to refer to the transferee. The events of termination of employment of Section 5.2(c)(ii) or similar provisions of an Award Agreement shall continue to be applied with respect to the original Participant, following which the Nonqualified Stock Options shall be exercisable by the transferee only to the extent, and for the periods specified in Section 5.2(c)(ii). No transfer pursuant to this Section 13.2 shall be effective to bind the Company unless the Company shall have been furnished with written notice of such transfer together with such other documents regarding the transfer as the Committee shall request. With the exception of a transfer in compliance with the foregoing provisions of this Section 13.2, all other types of Awards authorized under this Plan shall be transferable only by will or the laws of descent and distribution; however, no such transfer shall be effective to bind the Company unless the Committee has been furnished with written notice of such transfer and an authenticated copy of the will and/or such other evidence as the Committee may deem necessary to establish the validity of the transfer and the acceptance by the transferee of the terms and conditions of such Award.

SECTION 13.3.  *Withholding Taxes*. Unless otherwise paid by the Participant, the Company, its Subsidiaries or any of its Affiliated Entities shall be entitled to deduct from any payment under the Plan, regardless of the form of such payment, the amount of all applicable income and employment taxes

16

required by law to be withheld with respect to such payment, may require the Participant to pay to it such tax prior to and as a condition of the making of such payment, and shall be entitled to deduct from any other compensation payable to the Participant any withholding obligations with respect to Awards. In accordance with any applicable administrative guidelines it establishes, the Committee may allow a Participant to pay the amount of taxes required by law to be withheld from an Award by (i) directing the Company to withhold from any payment of the Award a number of shares of Common Stock having a Fair Market Value on the date of payment equal to the amount of the required withholding taxes or (ii) delivering to the Company previously owned shares of Common Stock having a Fair Market Value on the date of payment equal to the amount of the required withholding taxes. However, any payment made by the Participant pursuant to either of the foregoing clauses (i) or (ii) shall not be permitted if it would result in an adverse accounting charge with respect to such shares used to pay such taxes unless otherwise approved by the Committee.

SECTION 13.4.   *Amendments to Awards*. Subject to the limitations of Article IV and the other terms and conditions of the Plan, such as the prohibition on repricing of Options, the Committee may at any time unilaterally amend the terms of any Award Agreement, whether or not currently exercisable or vested, to the extent it deems appropriate. However, amendments which are adverse to the Participant shall require the Participant's consent.

SECTION 13.5.   *Regulatory Approval and Listings.* In the sole discretion of the Committee, the Company shall use its best efforts to file with the Securities and Exchange Commission and keep continuously effective, a Registration Statement on Form S-8 with respect to shares of Common Stock subject to Awards hereunder. Notwithstanding anything contained in this Plan to the contrary, the Company shall have no obligation to issue shares of Common Stock under this Plan prior to the obtaining of any approval from, or satisfaction of any waiting period or other condition imposed by, any governmental agency which the Committee shall, in its sole discretion, determine to be necessary or advisable. In addition, and notwithstanding anything contained in this Plan to the contrary, at such time as the Company is subject to the reporting requirements of Section 12 of the Exchange Act, the Company shall have no obligation to issue shares of Common Stock under this Plan prior to:

(a)    the admission of such shares to listing on the stock exchange on which the Common Stock may be listed; and

(b)    the completion of any registration or other qualification of such shares under any state or federal law or ruling of any governmental body which the Committee shall, in its sole discretion, determine to be necessary or advisable.

SECTION 13.6.   *Right to Continued Employment or Other Service*. Participation in the Plan shall not give any Eligible Employee, Consultant or Eligible Director any right to remain in the employ or other service of the Company, any Subsidiary, or any Affiliated Entity. The Company or, in the case of employment or other service with a Subsidiary or an Affiliated Entity, the Subsidiary or Affiliated Entity reserves the right to terminate any Eligible Employee, Consultant or Eligible Director at any time. Further, the adoption of this Plan shall not be deemed to give any Eligible Employee, Consultant, Eligible Director or any other individual any right to be selected as a Participant or to be granted an Award.

SECTION 13.7.   *Reliance on Reports*. Each member of the Board shall be fully justified in relying or acting in good faith upon any report made by the independent public accountants of the Company and its Subsidiaries and upon any other information furnished in connection with the Plan by any person or persons other than himself or herself. In no event shall any person who is or shall have been a member of the Board be liable for any determination made or other action taken or any omission to act in reliance upon any such report or information or for any action taken, including the furnishing of

17

information, or failure to act, if in good faith.

SECTION 13.8.   *Construction.* Masculine pronouns and other words of masculine gender shall refer to both men and women. The titles and headings of the sections in the Plan are for the convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

SECTION 13.9.   *Governing Law.* The Plan shall be governed by and construed in accordance with the laws of the State of Texas except as superseded by applicable federal law.

SECTION 13.10. *Other Laws.* The Committee may refuse to issue or transfer any shares of Common Stock or other consideration under an Award if, acting in its sole discretion, it determines that the issuance or transfer of such shares or such other consideration might violate any applicable law or regulation or entitle the Company to recover the same under Section 16(b) of the Exchange Act, and any payment tendered to the Company by a Participant, other holder or beneficiary in connection with the exercise of such Award shall be promptly refunded to the relevant Participant, holder or beneficiary. In addition, by accepting or exercising any Award granted under the Plan (or any predecessor plan), the Participant agrees to abide and be bound by any policies adopted by the Company pursuant to Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and any rules or exchange listing standards promulgated thereunder calling for the repayment and/or forfeiture of any Award or payment resulting from an accounting restatement. Such repayment and/or forfeiture provisions shall apply whether or not the Participant is employed by or affiliated with the Company.

SECTION 13.11. *No Trust or Fund Created.* Neither the Plan nor an Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company and a Participant or any other person. To the extent that a Participant acquires the right to receive payments from the Company pursuant to an Award, such right shall be no greater than the right of any general unsecured creditor of the Company.

SECTION 13.12. *Section 409A of the Code.*

(a)      To the extent applicable, it is intended that the Plan and all Awards hereunder comply with, or be exempt from, the requirements of Section 409A of the Code and the Treasury Regulations and other guidance issued thereunder, and that the Plan and all Award Agreements shall be interpreted and applied by the Committee in a manner consistent therewith. In the event that any (i) provision of the Plan or an Award Agreement, (ii) Award, payment, transaction or (iii) other action or arrangement contemplated by the provisions of the Plan is determined by the Committee to not comply with the applicable requirements of Section 409A of the Code and the Treasury Regulations and other guidance issued thereunder, the Committee shall have the authority to take such actions and to make such changes to the Plan or an Award Agreement as the Committee deems necessary to comply with such requirements without the consent of the Participant.

(b)      No payment that constitutes deferred compensation under Section 409A of the Code that would otherwise be made under the Plan or an Award Agreement upon a termination of employment or other service will be made or provided unless and until such termination is also a "separation from service," as determined in accordance with Section 409A of the Code.

(c)      Notwithstanding the foregoing or anything elsewhere in the Plan or an Award Agreement to the contrary, if a Participant is a "specified employee" as defined in Section 409A of the Code at the time of termination of service with respect to an Award, then solely to the

18

extent necessary to avoid the imposition of any additional tax under Section 409A of the Code, the commencement of any payments or benefits under the Award shall be deferred until the date that is six months plus one day following the date of the Participant's termination or, if earlier, the Participant's death (or such other period as required to comply with Section 409A).

(d)    In no event whatsoever shall the Company be liable for any additional tax, interest or penalties that may be imposed on a Participant by Section 409A of the Code or any damages for failing to comply with Section 409A of the Code.

*    *    *

WEIL:\95763735\4\51351.0003

**EXHIBIT A**

**2016 Long-Term Incentive Plan**
**Performance Criteria**

The performance criteria to be used for purposes of Awards shall be set in the Committee's sole discretion and may be described in terms of objectives that are related to the individual Participant or objectives that are Company-wide or related to a subsidiary, division, department, region, function or business unit of the Company in which the Participant is employed or with respect to which the Participant performs services, and may consist of one or more or any combination of the following criteria:

Operational Criteria may include:
• Reserve additions/replacements
• Finding & development costs
• Production volume
• Production costs
• Production growth

Financial Criteria may include:
• Earnings (Net income, Earnings before interest, taxes, depreciation and amortization ("EBITDA"), Earnings per share)
• Cash flow
• Operating income
• General and Administrative Expenses
• Debt to equity ratio
• Debt to cash flow
• Debt to EBITDA
• EBITDA to Interest Expense
• Return on Assets
• Return on Equity
• Return on Invested Capital
• Profit returns/margins
• Midstream margins

Stock Performance Criteria:
• Stock price appreciation
• Total shareholder return
• Relative stock price performance

Code Section 162(m) Requirements. The Committee will have the discretion to determine whether all or any portion of a Restricted Stock Award, Restricted Stock Unit Award, Performance Unit Award, Performance Bonus Award, Stock Award or Other Incentive Award is intended to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code (the "162(m) Requirements"). The performance criteria for any such Award that is intended to satisfy the 162(m) Requirements shall be established in writing by the Committee based on one or more performance criteria listed in this Exhibit A not later than 90 days after commencement of the performance period with respect to such Award or any such other date as may be required or permitted for "performance-based compensation" under the 162(m) Requirements, provided that the outcome of the performance in respect of the goals remains substantially uncertain as of such time. At the time of the grant of an Award and to the extent permitted under Code Section 162(m) and regulations thereunder for an Award intended to

A-1

A-2

satisfy the 162(m) Requirements, the Committee may provide for the manner in which the performance goals will be measured in light of specified corporate transactions, extraordinary events, accounting changes and other similar occurrences. All determinations made by the Committee as to the establishment or achievement of performance goals, or the final settlement of an Award intended to satisfy the 162(m) Requirements shall be made in writing.

Certification and Negative Discretion. Before payment is made in relation to any Award that is intended to satisfy the 162(m) Requirements, the Committee shall certify the extent to which the performance goals and other material terms of the Award have been satisfied, and the Committee in its sole discretion shall have the authority to reduce, but not to increase, the amount payable and/or the number of shares of Common Stock to be granted, issued, retained or vested pursuant to any such Award.

Committee. In the case of an Award intended to meet the 162(m) Requirements, the Committee shall be composed of two or more "outside directors" within the meaning of Section 162(m) of the Code, and the Committee may not delegate its duties with respect to such Awards.

A-2

# EXHIBIT 7 TO PLAN SUPPLEMENT

# REGISTRATION RIGHTS AGREEMENT

WEIL:\95834806\3\51351.0003

*WEIL DRAFT 9/2/16*

# HALCÓN RESOURCES CORPORATION

# <u>REGISTRATION RIGHTS AGREEMENT</u>

[●], 2016

THIS REGISTRATION RIGHTS AGREEMENT (this "<u>Agreement</u>") dated as of [●], 2016, is made by and among Halcón Resources Corporation, a Delaware corporation (the "<u>Company</u>"), and each of the Persons identified as a "<u>Holder</u>" on <u>Schedule I</u> attached hereto and their successors and assigns as provided for in Section 9(g) hereto (collectively, the "<u>Holders</u>").

In connection with and pursuant to the Debtors' Amended Joint Prepackaged Plan of Reorganization, dated August __, 2016 (the "<u>Plan</u>"), under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101 *et. seq.* for the Company and certain of its subsidiaries who are debtors and debtors-in-possession in the chapter 11 case captioned *In re Halcón Resources Corporation, et al.*, Case No. 16-[●] pending and jointly administered in the Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), the Company has issued shares (such shares, the "<u>New Shares</u>") of common stock of the reorganized or restructured Halcón Resources Corporation (the "<u>New Common Stock</u>") to the Holders.

"<u>Registrable Securities</u>" means the New Shares, as held by any Holder and including any additional shares of New Common Stock acquired by any Holder after the date hereof and in each case, if the shares of New Common Stock would, in the hands of such Holder, not be freely transferable in accordance with the intended method of disposition under Rule 144 under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), without regard to any volume or manner of sale requirements. As to any particular Registrable Securities, once issued, such securities shall cease to be Registrable Securities when (i) the Resale Shelf Registration Statement (as defined below) shall have become effective under the Securities Act and such securities shall have been disposed of in accordance therewith or (ii) such Registrable Securities shall have ceased to be outstanding.

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      <u>Resale Shelf Registration Statement</u>.

(a)      The Company shall file, as promptly as practicable, but in any event within 30 days, following the earlier to occur of (i) the Company filing its 2016 Annual Report on Form 10-K with the Securities and Exchange Commission (the "<u>Commission</u>") and (ii) the Company meeting the eligibility requirements to file a registration statement on Form S-3, a shelf registration statement (the "<u>Resale Shelf Registration Statement</u>") providing for the registration of, and the sale on a continuous or delayed basis by the Electing Holders (as defined below in Section 3(a)(iii)) of all Registrable Securities, pursuant to Rule 415 of the Securities Act or any similar rule that may be adopted by the Commission. The Company agrees to use commercially reasonable efforts to cause the Resale Shelf Registration Statement to become

effective as promptly as practicable following such filing (the date of such effectiveness, the "Effective Time").

(b)     Subject to the Company's right to suspend the Resale Shelf Registration Statement pursuant to Section 1(d) below, the Company agrees to use commercially reasonable efforts to keep the Resale Shelf Registration Statement continuously effective under the Securities Act in order to permit the Prospectus to be usable by the Electing Holders until such time as there are no longer any Registrable Securities (such period, the "Effective Period").

(c)     After the Effective Time, within 10 Business Days after receipt of a duly completed and signed Notice and Questionnaire (as defined below) from any Holder that is not then an Electing Holder, together with any other information as may be reasonably requested in writing by the Company from such Holder, the Company shall file such amendments to the Resale Shelf Registration Statement or supplements to the Prospectus as are reasonably necessary to permit such Holder to deliver the Prospectus to purchasers of Registrable Securities (subject to the Company's right to suspend the use of the Resale Shelf Registration Statement or the Prospectus as set forth in Section 1(d)); *provided*, that in no event shall the Company be required to file more than one such amendment or supplement in any 90-day period.

(d)     The Company may delay or suspend the use of the Resale Shelf Registration Statement or the use of the Prospectus used in connection therewith if the Board of Directors of the Company shall have determined in good faith that because of valid business reasons, including the acquisition or divestiture of assets, pending corporate developments, public filings with the Commission and similar events, it is in the best interests of the Company to delay or suspend such use, and prior to delaying or suspending such use the Company provides the Holders with written notice of such delay or suspension, which notice need not specify the nature of the event giving rise to such delay or suspension; *provided* that the aggregate duration for any periods during which use of the Resale Shelf Registration Statement or the Prospectus is delayed or suspended (each such period, a "Suspension Period") shall not exceed 60 consecutive calendar days, and shall not exceed 90 calendar days in the aggregate in any consecutive twelve-month period.

(e)     The Electing Holders holding a majority of the Registrable Securities (the "Required Holders") shall be entitled to request underwritten offerings of the Registrable Securities pursuant to the Resale Shelf Registration Statement; *provided*, that the Company shall not be obligated to complete (i) more than two underwritten offerings during the Effective Period and (ii) more than one underwritten offering in any 180-day period. Upon receipt of such a request from the Required Holders, the Company shall provide all Holders of Registrable Securities written notice of the request, which notice shall inform such Holders that they have the opportunity to participate in the underwritten offering. The Required Holders shall have the right to select the managing underwriter(s) to administer any underwritten offering, subject to the prior approval of the Company, which approval shall not be unreasonably withheld. Except as provided in this Section 1(f), there shall otherwise be no limitation on the number of sales or takedowns off of the Resale Shelf Registration Statement.

2

2.      Holdback Agreement.

(a)      In connection with any underwritten offering, the Company and the Electing Holders participating in such underwritten offering (i) agree not to directly or indirectly offer, sell, pledge, contract to sell (including any short sale), grant any option to purchase or otherwise dispose of any equity securities or securities convertible into equity securities of the Company or enter into any hedging transaction relating to any such securities (each a "Prohibited Sale") during the seven days prior to and during the 60-day period beginning on the closing date of such underwritten offering (except as part of such underwritten offering or, with respect to the Company, pursuant to registrations on Form S-4 or S-8 or any successor form), unless the underwriters managing the underwritten offering otherwise agree (such period, the "Holdback Period"), and (ii) except as otherwise permitted by the Required Holders, the Company shall use commercially reasonable efforts to cause each of its directors and officers that is a holder of such equity securities or securities convertible into equity securities purchased from the Company at any time after the date of this Agreement (other than in a registered public offering) to agree not to effect any Prohibited Sale (including sales pursuant to Rule 144) of any such securities during such Holdback Period except as part of such underwritten offering, if otherwise permitted, unless the underwriters managing the underwritten offering otherwise agree. If (x) the Company issues an earnings release or other material news or a material event relating to the Company and its subsidiaries occurs during the last 17 days of the Holdback Period or (y) prior to the expiration of the Holdback Period, the Company announces that it will release earnings results during the 16-day period beginning upon the expiration of the Holdback Period, then to the extent necessary for a managing or co-managing underwriter of an underwritten offering required hereunder to comply with FINRA Rule 2711(f)(4), the Holdback Period shall be extended until 18 days after the earnings release or the occurrence of the material news or event, as the case may be (such period referred to herein as the "Holdback Extension").  The Company may impose stop-transfer instructions with respect to its securities that are subject to the foregoing restriction until the end of such period, including any period of Holdback Extension.

(b)      Notwithstanding any other provision contained in this Agreement, the Company shall not include in any underwritten offering any portion of New Common Stock held by any officers, directors or employees of the Company or any of its subsidiaries the inclusion of which the underwriter of such underwritten offering, as the case may be, determines is likely to adversely affect such offering.

3.      Registration Procedures.  The Company shall effect the registration and sale of the Registrable Securities in accordance with the intended method of disposition set forth in, and pursuant to, the Resale Shelf Registration Statement and the following provisions shall apply in connection therewith:

(a)      (i)      Within 10 Business Days of the filing of the Resale Shelf Registration Statement, the Company shall mail the Notice and Questionnaire to the Holders of Registrable Securities.  No Holder shall be entitled to be named as a selling securityholder in the Resale Shelf Registration Statement as of the Effective Time, and no Holder shall be entitled to use the Prospectus for resales of Registrable Securities at any time, unless such Holder has returned a duly completed and signed Notice and Questionnaire to the Company by the deadline

3

US-DOCS\44852057.4

for response set forth therein and provided any other information reasonably requested in writing by the Company.

(ii)    After the Effective Time of the Resale Shelf Registration Statement, the Company shall, upon the request of any Holder of Registrable Securities that is not then an Electing Holder, promptly send a Notice and Questionnaire to such Holder. The Company shall not be required to take any action to name such Holder as a selling securityholder in the Resale Shelf Registration Statement or to enable such Holder to use the Prospectus for resales of Registrable Securities until such Holder has returned a duly completed and signed Notice and Questionnaire to the Company, in which case the Company's obligations shall be as set forth in Section 1(d) above.

(iii)    The term "Electing Holder" shall mean any Holder of Registrable Securities that has returned a duly completed and signed Notice and Questionnaire to the Company in accordance with Section 3(a)(i) or 3(a)(ii) hereof.

(iv)    Each Electing Holder agrees to furnish promptly to the Company all information required to be disclosed in order to make information previously furnished to the Company by such holder not materially misleading and any other information regarding such holder and the distribution of such holder's Registrable Securities as the Company may from time to time reasonably request in writing.

The Company will as expeditiously as possible:

(b)    upon request by a Holder, before filing the Resale Shelf Registration Statement or Prospectus or any amendments or supplements thereto, furnish to such Holder all such documents proposed to be filed requested by such Holder, which documents shall be subject to the review of such Holder and its counsel.  The Company shall use commercially reasonable efforts to reflect the comments that such Holder or its counsel may reasonably propose;

(c)    notify in writing each Holder of Registrable Securities of the effectiveness of the Resale Shelf Registration Statement and prepare and file with the Commission such amendments and supplements to such Resale Shelf Registration Statement and Prospectus as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Resale Shelf Registration Statement until such time as there are no longer any Registrable Securities;

(d)    furnish to each seller of Registrable Securities thereunder such number of copies of the Resale Shelf Registration Statement, each amendment and supplement thereto, the Prospectus and such other documents as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such seller;

(e)    use commercially reasonable efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests and do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the

4

US-DOCS\44852057.4

Registrable Securities owned by such seller (*provided* that the Company shall not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(e), (ii) subject itself to taxation in any such jurisdiction or (iii) consent to general service of process in any such jurisdiction);

(f)     notify in writing each seller of such Registrable Securities (i) promptly after it receives notice thereof, of the date and time when the Resale Shelf Registration Statement and each post-effective amendment thereto has become effective or a Prospectus has been filed and when any registration or qualification has become effective under a state securities or blue sky law or any exemption thereunder has been obtained, (ii) promptly after receipt thereof, of any request by the Commission for the amendment or supplementing of the Resale Shelf Registration Statement or Prospectus or for additional information, and (iii) at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, of any event as a result of which, the Prospectus (x) contains an untrue statement of a material fact or omits any fact necessary to make the statements therein not misleading in light of the circumstances under which they were made or (y) is otherwise not legally available to support sales of Registrable Securities;

(g)     prepare and file promptly with the Commission, and notify the Electing Holders of Registrable Securities prior to the filing of, such amendments or supplements to such Resale Shelf Registration Statement or Prospectus as may be necessary to correct any statements or omissions if, at the time when a Prospectus is required to be delivered under the Securities Act, any event has occurred as the result of which the Prospectus would include an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and, in case any of such holders or any underwriter for any such holders is required to deliver a Prospectus at a time when the Prospectus then in circulation is not in compliance with the Securities Act or the rules and regulations promulgated thereunder, the Company shall use commercially reasonable efforts to prepare promptly upon request of any such holder or underwriter such amendments or supplements to such Resale Shelf Registration Statement and Prospectus as may be necessary in order for the Prospectus to comply with the requirements of the Securities Act and such rules and regulations; provided, that the Company shall not be required to take such action during any Suspension Period.  If the Company notifies the Electing Holders of the occurrence of any event or the existence of any state of facts contemplated by Section 1(d) or Section 3(f) above, each such Holder shall suspend the use of the such Resale Shelf Registration Statement and the Prospectus until the requisite changes to the Prospectus have been made and shall keep confidential any such communication received by it from the Company;

(h)     provide a transfer agent and registrar for all such Registrable Securities not later than the Effective Time;

(i)     enter into and perform such customary agreements (including underwriting agreements in customary form) and take all such other actions as the Electing Holders holding a majority of the applicable Registrable Securities or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including participation in "road shows", investor presentations and marketing events);

5

(j)    make available for inspection by any underwriter participating in an underwritten offering, and any attorney, accountant, or other agent retained by any such underwriter, all reasonably requested financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such underwriter, attorney, accountant, or agent in connection with such underwritten offering and assist and, at the request of any participating underwriter, use commercially reasonable efforts to cause such officers or directors to participate in presentations to prospective purchasers; *provided*, that such Persons shall first agree in writing with the Company that (x) all records, information and documents that are designated in writing by the Company, in good faith, as confidential shall be kept confidential by such Persons, unless such disclosure is required to be made in connection with a court proceeding or required by law, or such records, information or documents become available to the public generally or through a third party without an accompanying obligation of confidentiality and (y) they shall use such records, information and documents solely for the purposes of exercising rights under this Agreement and they shall not engage in trading any securities of the Company until the Company makes such material non-public information publicly available;

(k)    take all reasonable actions to ensure that any Free-Writing Prospectus utilized in connection with any underwritten offering hereunder complies in all material respects with the Securities Act, is filed in accordance with the Securities Act to the extent required thereby, is retained in accordance with the Securities Act to the extent required thereby and, when taken together with the related prospectus, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(l)    otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its securityholders, as soon as reasonably practicable, an earnings statement covering the period of at least 12 months beginning with the first day of the Company's first full calendar quarter after the Effective Time, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder;

(m)    use commercially reasonable efforts to prevent the issuance of any stop order suspending the effectiveness of such Resale Shelf Registration Statement, or of any order suspending or preventing the use of the Prospectus or suspending the qualification of any securities included in the Resale Shelf Registration Statement for sale in any jurisdiction, and in the event of the issuance of any such stop order or other such order the Company shall advise the Electing Holders of such stop order or other such order promptly after it shall receive notice or obtain knowledge thereof and shall use commercially reasonable efforts promptly to obtain the withdrawal of such order;

(n)    in connection with an underwritten offering, obtain comfort letters, dated the pricing and closing dates under the underwriting agreement and addressed to the underwriters, from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by comfort letters; and

6

(o)    if such registration is an underwritten offering, provide a legal opinion of the Company's counsel, dated the closing date under the underwriting agreement, with respect to the Resale Shelf Registration Statement, each amendment and supplement thereto, the Prospectus (including the preliminary prospectus) and such other documents relating thereto in customary form and covering such matters of the type customarily covered by such opinions, which opinions shall be addressed to the underwriters.  The Company may require each seller of Registrable Securities participating in such underwritten offering to furnish the Company such information regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

4.    Registration Expenses.

(a)    Except as otherwise provided herein, all expenses incident to the Company's performance of or compliance with Sections 1, 3 and 6 of this Agreement, including all registration and filing fees, fees and expenses of compliance with securities or blue sky laws, printing expenses, travel expenses, filing expenses, messenger and delivery expenses, fees and disbursements of custodians, and fees and disbursements of counsel for the Company and of all independent certified public accountants, underwriters including, if necessary, a "qualified independent underwriter" within the meaning of the rules of the Financial Industry Regulatory Authority, Inc. (in each case, excluding discounts and commissions), and other Persons retained by the Company or by the Electing Holders or their affiliates on behalf of the Company (all such expenses being herein called "Registration Expenses"), shall be borne by the Company, including that the Company shall pay its internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit or quarterly review, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by the Company are then listed.  Each Electing Holder that sells securities pursuant to an underwritten offering shall bear and pay all underwriting discounts and commissions applicable to the securities sold for such Holder's account.

(b)    In connection with the Resale Shelf Registration Statement, the Company shall reimburse the Electing Holders for the reasonable fees and disbursements of one counsel chosen by the Electing Holders holding a majority of the Registrable Securities.

5.    Indemnification.

(a)    The Company agrees to indemnify and hold harmless, to the fullest extent permitted by law, each Holder, its officers, directors, managers, agents, and employees and each Person who controls such Holder (within the meaning of the Securities Act) (each an "Indemnitee" and, collectively, the "Indemnitees") against any losses, claims, damages, liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorneys' fees), to which such Indemnitee may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by or result from (i) any untrue or alleged untrue statement of material fact contained (A) in the Resale Shelf Registration Statement, Prospectus or preliminary prospectus or any amendment thereof or supplement thereto or (B) in any application or other document or communication (in

7

this Section 5 collectively called an "application") executed by or on behalf of the Company or based upon written information furnished by or on behalf of the Company filed in any jurisdiction in order to qualify any securities covered by the Resale Shelf Registration Statement under the "blue sky" or securities laws thereof, or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, and the Company will reimburse each such Indemnitee for any reasonable legal or any other reasonable expenses incurred by him, her or it in connection with investigating or defending any such loss, claim, damage, expense, liability, action or proceeding; provided, however, that the Company shall not be liable in any such case to any such Person to the extent that any such loss, claim, damage, liability (or action or proceeding in respect thereof) or expense arises out of, is based upon, is caused by or results from an untrue statement or alleged untrue statement, or omission or alleged omission, made in the Resale Shelf Registration Statement, the Prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in reliance upon, and in conformity with, written information prepared and furnished to the Company by such Holder expressly for use therein.  In connection with an underwritten offering, the Company shall provide a customary indemnity to indemnify the underwriters, their officers and directors and each Person who controls such underwriters (within the meaning of the Securities Act) to the same extent as provided above with respect to the indemnification of the Holders.

(b)    In connection with the Resale Shelf Registration Statement, each Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with the Resale Shelf Registration Statement or Prospectus and, to the fullest extent permitted by law, shall indemnify and hold harmless the other Holders and the Company, and their respective directors, officers, agents and employees and each other Person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities, joint or several, together with reasonable costs and expenses (including reasonable attorney's fees), to which such indemnified party may become subject under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of, are based upon, are caused by or result from (i) any untrue or alleged untrue statement of material fact contained in the Resale Shelf Registration Statement, Prospectus or preliminary prospectus or any amendment thereof or supplement thereto or in any application or (ii) any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but in each case only to the extent that such untrue statement or omission is made in the Resale Shelf Registration Statement, the Prospectus or preliminary prospectus or any amendment or supplement thereto, or in any application, in each case, in reliance upon and in conformity with written information prepared and furnished to the Company by such Holder expressly for use therein; provided, however, that the obligation to indemnify will be several and not joint, as to each Holder and will be limited to the net amount of proceeds received by such holder from the sale of Registrable Securities pursuant to the Resale Shelf Registration Statement.

(c)    Any Person entitled to indemnification hereunder will (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any Person's right to indemnification hereunder to the extent such failure has not prejudiced the indemnifying

8

party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party.  The indemnifying party will not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent will not be unreasonably withheld, conditioned or delayed).  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim.

(d)    The indemnifying party shall not, except with the approval of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to each indemnified party of a release from all liability in respect to such claim or litigation without any payment or consideration provided by such indemnified party.

(e)    If the indemnification provided for in this Section 5 is unavailable to or is insufficient to hold harmless an indemnified party under the provisions above in respect to any losses, claims, damages or liabilities referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative fault of the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the Resale Shelf Registration Statement on the other hand or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative faults referred to in clause (i) above but also the relative benefit of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the Resale Shelf Registration Statement on the other in connection with the Resale Shelf Registration Statement or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by the Company on the one hand and the sellers of Registrable Securities and any other sellers participating in the Resale Shelf Registration Statement on the other shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) to the Company bear to the total net proceeds from the offering (before deducting expenses) to the sellers of Registrable Securities and any other sellers participating in the Resale Shelf Registration Statement.  The relative fault of the Company on the one hand and of the sellers of Registrable Securities and any other sellers participating in the Resale Shelf Registration Statement on the other shall be determined by reference to, among other things, whether the untrue statement or alleged omission to state a material fact relates to information supplied by the Company or by the sellers of Registrable Securities or other sellers participating in the Resale Shelf Registration Statement and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the sellers of Registrable Securities agree that it would not be just and equitable if contribution pursuant to this Section 5 were determined by pro rata

9

allocation (even if the sellers of Registrable Securities were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 5, no seller of Registrable Securities shall be required to contribute any amount in excess of the net proceeds received by such seller from the sale of Registrable Securities covered by the the Resale Shelf Registration Statement filed pursuant hereto. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(f)    The indemnification and contribution by any such party provided for under this Agreement shall be in addition to any other rights to indemnification or contribution which any indemnified party may have pursuant to law or contract and will remain in full force and effect regardless of any investigation made or omitted by or on behalf of the indemnified party or any officer, director or controlling Person of such indemnified party and will survive the transfer of securities.

6.    Participation in Underwritten Registrations.

(a)    No Electing Holder may participate in any underwritten offering unless such Holder (i) agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting arrangements approved by the Electing Holder or Electing Holders entitled hereunder to approve such arrangements (including pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriter(s), *provided* that no Electing Holder will be required to sell more than the amount of Registrable Securities that such holder has requested the Company to include in any underwritten offering) and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.

(b)    Each Electing Holder that is participating in any underwritten offering hereunder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(f), such Person will forthwith discontinue the disposition of its Registrable Securities pursuant to the Resale Shelf Registration Statement until such holder's receipt of the copies of a supplemented or amended Prospectus as contemplated by Section 3(f).

7.    Current Public Information. At all times after the Company has filed the Resale Shelf Registration Statement, the Company shall, except as otherwise agreed to in writing by the Required Holders, file all reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder, and will take such further action as any Holder or Holders of Registrable Securities may reasonably request, all to the extent required to enable such Holders to sell Registrable Securities pursuant to Rule 144 adopted by the Commission under the Securities Act (as such rule may be amended from time to time) or any similar rule or regulation hereafter adopted by the Commission.

US-DOCS\44852057.4

8.    Definitions.

"Agreement" has the meaning set forth in the preamble.

"application" has the meaning set forth in Section 5.

"Bankruptcy Court" has the meaning set forth in the preamble.

"Commission" has the meaning set forth in Section 1(a).

"Commitment Agreement" has the meaning set forth in the preamble.

"Company" has the meaning set forth the preamble.

"Effective Period" has the meaning set forth in Section 1(b).

"Effective Time" has the meaning set forth in Section 1(a).

"Electing Holder" has the meaning set forth in Section 3(a)(iii).

"Exchange Act" has the meaning set forth in Section 4(a).

"Free Writing Prospectus" means a free-writing prospectus, as defined in Rule 405 of the Securities Act.

"Holdback Extension" has the meaning set forth in Section 2(a).

"Holdback Period" has the meaning set forth in Section 2(a).

"Holder(s)" has the meaning set forth in the preamble.

"Indemnittee" and "Indemnitees" have the meanings set forth in Section 5(a).

"New Common Stock" has the meaning set forth in the preamble.

"New Shares" has the meaning set forth in the preamble.

"Notice and Questionnaire" means a Notice and Questionnaire substantially in the form of Appendix A hereto.

"Person" means an individual, a partnership, a joint venture, an association, a joint stock company, a corporation, a limited liability company, a trust, an unincorporated organization, an investment fund, any other business entity or a governmental entity or any department, agency or political subdivision thereof.

"Plan" has the meaning set forth in the preamble.

"Prohibited Sale" has the meaning set forth in Section 2(a).

11

US-DOCS\44852057.4

"<u>Prospectus</u>" means the prospectus (including, without limitation, any preliminary prospectus, any final prospectus and any prospectus that discloses information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A, 430B or 430C under the Securities Act) included in the Resale Shelf Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by the Resale Shelf Registration Statement and by all other amendments and supplements to such prospectus, including all material incorporated by reference in such prospectus and all documents filed after the date of such prospectus by the Company under the Exchange Act and incorporated by reference therein.

"<u>Registration Expenses</u>" has the meaning set forth in Section 4(a).

"<u>Registrable Securities</u>" has the meaning set forth in the preamble.

"<u>Required Holders</u>" has the meaning set forth in Section 1(e).

"<u>Resale Shelf Registration Statement</u>"  has the meaning set forth in Section 1(a).

"<u>Securities Act</u>" has the meaning set forth in the preamble.

"<u>Suspension Period</u>" has the meaning set forth in Section 1(d).

"<u>underwritten offering</u>" means an offering in which Registrable Securities are sold to one or more underwriters (as defined in Section 2(a)(11) of the Securities Act) for resale to the public.

9.   <u>Miscellaneous</u>.

(a)   <u>Notices</u>.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) sent by electronic mail or facsimile to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if sent by before 5:00 p.m. local time of the recipient on a business day, and otherwise on the next business day, or (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the Company at the address set forth below and to any other recipient at the address indicated on the <u>Schedule I</u> attached hereto or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  The Company's address is as follows:

> Halcón Resources Corporation
> 1000 Louisiana Street
> Suite 6700
> Houston, Texas 77002
> Attention: David S. Elkouri
> Facsimile:  (713) 589-8019
> Email: delkouri@halconresources.com

12

A copy of each notice hereunder (which shall not constitute notice) to a Holder shall be sent to:

> Latham & Watkins LLP
> 330 N. Wabash Ave.
> Suite 2800
> Chicago, IL  60611
> Attention: Richard Levy, Esq.
> Facsimile:  (312) 993-9767

(b)    No Inconsistent Agreements.  The Company will not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders of Registrable Securities in this Agreement.

(c)    Calculation of Percentage; Securities Held by the Company. Whenever the consent or approval of Holders of a specified percentage of Registrable Securities is required hereunder, Registrable Securities held by the Company or its affiliates (other than Holders of Registrable Securities if such Holders are deemed to be affiliates solely by reason of their holdings of such Registrable Securities) shall not be counted in determining whether such consent or approval was given by the Holders of such required percentage.

(d)    Adjustments Affecting Registrable Securities.  The Company will not take any action, or permit any change to occur, with respect to its securities which would materially and adversely affect the ability of the Holders of Registrable Securities to include such Registrable Securities in the Resale Shelf Registration Statement undertaken pursuant to this Agreement or which would materially and adversely affect the marketability of such Registrable Securities in such registration (including effecting a stock split, combination of shares or other recapitalization).

(e)    Remedies.   Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(f)    Amendments and Waivers.   Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or the Holders unless such modification, amendment or waiver is approved in writing by the Company and the Required Holders.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition, and shall not affect the right of such party thereafter to enforce each and every provision in accordance with its terms.  An

13

amendment or modification of this Agreement to add a party hereto and to grant such party registration rights will be effective against the Company and all Holders of Registrable Securities if such modification, amendment or waiver is approved in writing by the Company and the Required Holders.

(g)    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto (and the Persons specifically identified in Section 5) and their respective successors and assigns.  In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement agreeing to be bound by its terms.

(h)    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(i)    Entire Agreement.  Except as otherwise expressly set forth herein, this document embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

(j)    Counterparts; Facsimile Signature.  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same Agreement.  This Agreement may be executed by facsimile signature or by .pdf or similar attachment to electronic mail.

(k)    Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(l)    Governing Law.  All issues and questions concerning the relative rights and obligations of the Company and the Holders under this Agreement and the construction, validity, interpretation and enforceability of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

(m)    Mutual Waiver of Jury Trial.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND

14

US-DOCS\44852057.4

THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(n)     Business Days.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief-executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

* * * * *

15

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first set forth above.

HALCÓN RESOURCES CORPORATION


By: _____
    Name:
    Title:

The foregoing Registration
Rights Agreement is hereby confirmed
and accepted as of the date first
set forth above.

HOLDERS

Name: _____

        By:_____

            Name: _____

            Title: _____

Address:    _____

            _____

[Signature Page to Registration Rights Agreement]

## Schedule I
### Holders

| Name and Address of Holder | Number of New Shares |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## Appendix A

### Notice and Questionnaire

The undersigned beneficial holder of common stock, par value $0.0001 per share, of Halcón Resources Corporation (the "Company"), which are Registrable Securities, understands that the Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (the "Resale Shelf Registration Statement") for the registration and resale under Rule 415 of the Securities Act of 1933, as amended (the "Securities Act"), of the Registrable Securities, in accordance with the terms of the registration rights agreement, dated as of [●], 2016 (the "Registration Rights Agreement"), among the Company and the Holders named therein. A copy of the Registration Rights Agreement is available from the Company upon request at the address set forth below. All capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Registration Rights Agreement.

Each Holder is entitled to the benefits of the Registration Rights Agreement in accordance with Section 9(g) of the Registration Rights Agreement. In order to sell, or otherwise dispose of, any Registrable Securities pursuant to the Resale Shelf Registration Statement, a Holder of Registrable Securities generally will be required to be named as a selling securityholder in the related prospectus, deliver a prospectus to purchasers of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such Holder (including certain indemnification provisions as described below). Holders that do not complete this Notice and Questionnaire and deliver it to the Company as provided below will not be named as selling securityholders in the prospectus and, therefore, will not be permitted to sell any Registrable Securities pursuant to the Resale Shelf Registration Statement.

Certain legal consequences arise from being named as a selling securityholder in the Resale Shelf Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling securityholder in the Resale Shelf Registration Statement and the related prospectus.

### NOTICE

The undersigned Holder (the "Selling Securityholder") of Registrable Securities hereby gives notice to the Company of its intention to sell or otherwise dispose of Registrable Securities beneficially owned by it and listed below in Item 3 (unless otherwise specified under such Item 3) pursuant to the Resale Shelf Registration Statement. The undersigned, by signing and returning this Notice and Questionnaire, understands that it will be bound by the terms and conditions of this Notice and Questionnaire and the Registration Rights Agreement.

Pursuant to the Registration Rights Agreement, the undersigned has agreed to indemnify and hold harmless the Company's directors and officers and each person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against certain losses insofar as such losses arise in connection with statements concerning the undersigned that are made in the Resale Shelf Registration Statement or the related prospectus in reliance upon the information provided in this Notice and Questionnaire.

A-1

US-DOCS\44852057.4WEIL:\95825296\4\51351.0003

A-2

If the Selling Securityholder transfers all or any portion of the Registrable Securities listed in Item 3 below after the date on which such information is provided to the Company, the Selling Securityholder agrees to notify the transferee(s) at the time of the transfer of its rights and obligations under this Notice and Questionnaire and the Registration Rights Agreement.

### QUESTIONNAIRE

Please respond to every item, even if your response is "none." If you need more space for any response, please attach additional sheets of paper. Please be sure to indicate your name and the number of the item being responded to on each such additional sheet of paper, and to sign each such additional sheet of paper before attaching it to this Questionnaire. Please note that you may be asked to answer additional questions depending on your responses to the following questions.

If you have any questions about the contents of this Questionnaire or as to who should complete this Questionnaire, please contact the [●] of the Company at telephone number: [●].

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate and complete:

1.     Your Identity and Background as the Beneficial Owner of the Registrable Securities.

(a)     Your full legal name:

_____

(b)     Your business address (including street address) (or residence if no business address), telephone number and facsimile number:

Address:_____

_____

Telephone No.:_____

Fax No.:_____

(c)     Are you a broker-dealer registered pursuant to Section 15 of the Exchange Act?

Yes.

No.

US-DOCS\44852057.4WEIL:\95825296\4\51351.0003

(d)    If your response to Item 1(c) above is no, are you an "affiliate" of a broker-dealer registered pursuant to Section 15 of the Exchange Act?

      Yes.

      No.

For the purposes of this Item 1(d), an "affiliate" of a registered broker-dealer includes any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such broker-dealer, and does not include any individuals employed by such broker-dealer or its affiliates.

(e)    Full legal name of person through which you hold the Registrable Securities (i.e., name of your broker or the DTC participant, if applicable, through which your Registrable Securities are held):

Name of Broker:_____

DTC No.:_____

Contact person:_____

Telephone No.:_____

2.    Your Relationship with the Company.

(a)    Have you or any of your affiliates, officers, directors or principal equity holders (owners of 5% or more of the equity securities of the undersigned) held any position or office or have you had any other material relationship with the Company (or its predecessors or affiliates) within the past three years?

      Yes.

      No.

(b)    If your response to Item 2(a) above is yes, please state the nature and duration of your relationship with the Company:

_____

_____

3.    Your Interest in the Registrable Securities.

(a)    State the type and amount of Registrable Securities beneficially owned by you:

_____

A-3

State the CUSIP No(s). of such Registrable Securities beneficially owned by you:

_____

(b)     State the type and amount of Registrable Securities beneficially owned by you to be sold or otherwise disposed of pursuant to the Resale Shelf Registration Statement (if an amount other than all of the Registrable Securities set forth in your response to Item 3(a) above):

_____

State the CUSIP No(s). of such Registrable Securities beneficially owned by you:

_____

(c)     Other than as set forth in your response to Item 3(a) above, do you beneficially own any other securities of the Company?

　　　Yes.

　　　No.

(d)     If your answer to Item 3(b) above is yes, state the type, the aggregate amount and CUSIP No. of such other securities of the Company beneficially owned by you:

Type:_____

Aggregate amount:_____

CUSIP No.:_____

(e)     Did you acquire the securities listed in Item 3(a) above in the ordinary course of business?

　　　Yes.

　　　No.

(f)     At the time of your purchase of the securities listed in Item 3(a) above, did you have any agreements or understandings, direct or indirect, with any person to distribute the securities?

　　　Yes.

　　　No.

A-4

A-5

(g)    If your response to Item 3(f) above is yes, please describe such agreements or understandings:

_____

_____

4.    Nature of your Beneficial Ownership.

(a)    Check if the beneficial owner set forth in your response to Item 1(a) is any of the below:

(i)    A reporting company under the Exchange Act.

(ii)    A majority-owned subsidiary of a reporting company under the Exchange Act.

(iii)    A registered investment fund under the 1940 Act.

(b)    If the beneficial owner of the Registrable Securities set forth in your response to Item I (a) above is a limited partnership, state the names of the general partner(s) of such limited partnership:

_____

_____

(i)    With respect to each general partner listed in Item 4(b) above who is not a natural person and is not publicly-held, name each shareholder (or holder of partnership interests, if applicable) of such general partner. If any of these named shareholders are not natural persons or publicly-held entities, please provide the same information. This process should be repeated until you reach natural persons or a publicly-held entity.

_____

_____

A-5

A-6

(c)    Name your controlling shareholder(s) (the "Controlling Entity"). If the Controlling Entity is not a natural person and is not a publicly-held entity, name each shareholder of such Controlling Entity. If any of these named shareholders are not natural persons or publicly-held entities, please provide the same information. This process should be repeated until you reach natural persons or a publicly-held entity.

(i)    (A) Full legal name of Controlling Entity(ies) or natural person(s) who has/have sole or shared voting or dispositive power over the Registrable Securities:

_____

_____

(B) Business address (including street address) (or residence if no business address), telephone number and facsimile number of such person(s):

Address:_____

_____

Telephone No.:_____

_____

Fax No.:_____

_____

(C) Name of shareholders:

_____

(ii)    (A) Full legal name of Controlling Entity(ies):

_____

A-6

(B) Business address (including street address) (or residence if no business address), telephone number and facsimile number of such person(s):

Address:_____

_____

_____

Telephone No.:_____

_____

_____

Fax No.:_____

_____

_____

(iii)   Name of shareholders:

_____

_____

5.   Plan of Distribution.

Except as set forth below, the undersigned (including its donees or pledgees) intends to distribute the Registrable Securities listed above in Item 3 pursuant to the Resale Shelf Registration Statement only as follows (if at all): Such Registrable Securities may be sold from time to time directly by the undersigned or, alternatively, through underwriters, broker-dealers or agents. If the Registrable Securities are sold through underwriters, broker-dealers or agents, the Selling Securityholder will be responsible for underwriting discounts or commissions or agents' commissions. Such Registrable Securities may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale or at negotiated prices. Such sales may be effected in transactions (which may involve block transactions) (i) on any national securities exchange or quotation service on which the Registrable Securities may be listed or quoted at the time of sale, (ii) in the over-the-counter market, or (iii) in transactions otherwise than on such exchanges or services or in the over-the-counter market. The Selling Securityholder may pledge or grant a security interest in some or all of the Registrable Securities owned by it and, if it defaults in the performance of its secured obligations, the pledgees or secured parties may offer and sell the Registrable Securities from time to time pursuant to the prospectus. The Selling Securityholder also may transfer and donate the Registrable Securities in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling securityholder for purposes of the prospectus.

A-7

State any exceptions here:

_____

_____

*Note:* In no event will such method(s) of distribution take the form of an underwritten offering of the Registrable Securities without the prior written agreement of the Company.

The undersigned acknowledges its obligation to comply with the provisions of the Exchange Act and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or regulations), in connection with any offering of Registrable Securities pursuant to the Registration Rights Agreement. The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

The undersigned beneficial owner and selling securityholder hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons as set forth therein. Pursuant to the Registration Rights Agreement, the Company has agreed under certain circumstances to indemnify the undersigned beneficial owner and selling securityholder against certain liabilities.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law for inclusion in the Resale Shelf Registration Statement, the undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Resale Shelf Registration Statement remains effective.

All notices to the beneficial owner hereunder and pursuant to the Registration Rights Agreement shall be made in writing to the undersigned at the address set forth in Item 1(b) of this Notice and Questionnaire.

By signing below, the undersigned acknowledges that it is the beneficial owner of the Registrable Securities set forth herein, represents that the information provided herein is accurate, consents to the disclosure of the information contained in this Notice and Questionnaire and the inclusion of such information in the Resale Shelf Registration Statement and the related prospectus. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the Resale Shelf Registration Statement and the related prospectus.

Once this Notice and Questionnaire is executed by the undersigned beneficial owner and received by the Company, the terms of this Notice and Questionnaire, and the representations and warranties contained herein, shall be binding on, shall inure to the benefit of and shall be enforceable by the respective successors, heirs, personal representatives and assigns of the Company and the undersigned beneficial owner. This Notice and Questionnaire shall be governed in all respects by the laws of the State of New York, without giving effect to rules governing the conflict of laws.

A-8

A-9

**IN WITNESS WHEREOF**, the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

NAME OF BENEFICIAL OWNER:

_____
*(Please Print)*

Signature:_____

Date:_____

**PLEASE RETURN THE COMPLETED AND EXECUTED NOTICE AND QUESTIONNAIRE TO ACCURIDE CORPORATION AS FOLLOWS:**

Halcón Resources Corporation
[●]
[●]
[●]
Attention:  [●]

A-9

US-DOCS\44852057.4WEIL:\95825296\4\51351.0003

**EXHIBIT 8 TO PLAN SUPPLEMENT**

**MEMBERS OF THE NEW BOARD OF
REORGANIZED HOLDINGS**

WEIL:\95834806\3\51351.0003

## COMPOSITION OF NEW BOARD OF
## DIRECTORS OF HALCÓN RESOURCES CORPORATION

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors hereby disclose the following relevant information regarding each of the nine (9) members of the new board of directors of Halcón Resources Corporation (the "**Company**") that will take office on the Effective Date of the Plan:

**William J. Campbell**.  Mr. Campbell is the Managing Director and Co-owner of CB Energy, LLC, an independent oil and gas exploration company founded in 1997.  He has over thirty two years of experience in the legal, investment and energy industries with a diverse background in management, finance, legal, land and marketing.  Since 2006, Mr. Campbell has served as owner and managing director of PPPCo-CB Energy, LLC, a Houston, Texas-based private oil and gas exploration and production company.  From 1991 to 1996, Mr. Campbell served as Principal, Vice President and Corporate Counsel of Houston, Texas-based Fremont Energy Corporation, a Bechtel Family company, where Mr. Campbell managed the company's domestic and international energy asset portfolio and directed the company's commercial, banking, and legal activities, and from 1985 through 1991, Mr. Campbell served as Counsel and Manager for Bechtel Investments, Inc. in Houston, Texas, managing its oil and gas marketing and land/legal operations.  Mr. Campbell was also the first representative of Bechtel in the J.P. Morgan Corporate Finance Program, New York, New York (1988).  In addition, Mr. Campbell represented Bechtel's outside oil and gas interests by serving as a Director on the boards of BecField Drilling Services, the then largest independent horizontal and directional drilling company in the United States, CurveDrill, Inc. and PetroSource Corporation, a refining and marketing company with annual revenues over $500 million.  Mr. Campbell started his professional career at the Houston, Texas law firm of Reynolds, Allen & Cook.  Mr. Campbell

has a Doctorate of Jurisprudence (J.D.) and holds a Bachelor of Business Administration Degree

(BBA) in Petroleum Land Management/Finance from the University of Texas in Austin, Texas.

Mr. Campbell is active in community and civic affairs.  His service includes:  The Kinkaid

School Board of Trustees of Houston since 2007, and its Advancement, Finance & Building

Committees since 2002; the Board of Directors of the Houston Country Club from 2005 to 2007;

the Institute for Molecular Medicine as a Founding Trustee and Scientific Advisory Board

Member since 2001; the Development Board of the University of Texas Health Science Center

since 1991- *Chair Emeritus* 2002-2003; the Advisory Boards of Tanglewood Bank, NA and the

Amegy Bank of Texas, N.A. since 1998; the Endowment Board, Jr. Warden and Senior Council

Representative of St. Martin's Episcopal Church since 2004;  the Board of Directors and

Treasurer of the Daniel and Edith Ripley Foundation since 2005; the Board of Directors of the

Bayou City Pump Inc. since 2010; the Board of Directors of Erin Energy Corporation and its

Audit and Compensation Committees since 2011; the Advance Team Board of M.D. Anderson

since 2005; the Texas Children's Hospital Individuals Committee since 2005; the Memorial

Hermann System Board of Directors and its Finance and Chairman-Governance Committees and

Memorial Hermann Foundation since 2011 and a Member of the Texas Bar Association.

**James W. Christmas** became a director in February 2012. Mr. Christmas began

serving as a director of Petrohawk Energy Corporation on July 12, 2006, effective upon the

merger of KCS Energy, Inc. ("KCS") into Petrohawk. He continued to serve as a director, and as

Vice Chairman of the Board of Directors, for Petrohawk until BHP Billiton acquired all of

Petrohawk in August 2011. He also served on the Audit Committee and the Nominating and

Corporate Governance Committee. Mr. Christmas served as a member of the Board of Directors

of Petrohawk, a wholly-owned subsidiary of BHP Billiton, and as chair of the Financial

2

Reporting Committee of such board until September 2014. He also serves on the Advisory Board of the Tobin School of Business of St. John's University. Mr. Christmas serves as a director of Rice Energy, as chairman of its audit committee and a member of its compensation committee, and as a director and member of the audit committee and compensation committee of Yuma Energy. He served as President and Chief Executive Officer of KCS from 1988 until April 2003 and Chairman of the Board and Chief Executive Officer of KCS until its merger into Petrohawk. Mr. Christmas was a Certified Public Accountant in New York and was with Arthur Andersen & Co. from 1970 until 1978 before leaving to join National Utilities & Industries ("NUI"), a diversified energy company, as Vice President and Controller. He remained with NUI until 1988, when NUI spun out its unregulated activities that ultimately became part of KCS. As an auditor and audit manager, controller and in his role as CEO of KCS, Mr. Christmas was directly or indirectly responsible for financial reporting and compliance with SEC regulations, and as such has extensive experience in reviewing and evaluating financial reports, as well as in evaluating executive and board performance and in recruiting directors.

**Michael L. Clark**. Mr. Clark is a Chartered Financial Analyst (CFA) Charterholder with seventeen years of investing experience focusing on basic materials and oilfield services and equipment equities. Mr. Clark served as a Retired Partner of SIR Capital Management, LLC from 2014 until his retirement in 2016 and from 2008 to 2013, as a Portfolio Manager and Partner. Prior to that, Mr. Clark valued energy equities as a portfolio manager at Satellite Asset Management, LLC from 2005 to 2007 and as an equity research analyst at SAC Capital Management from 2003 to 2005 and at Merrill Lynch from 1996 to 2002. Mr. Clark began his career at Deloitte & Touche, LLP, becoming a CPA and Senior Auditor within its Securities Industry Auditing Group. He graduated cum laude from the University of

Pennsylvania with a Bachelor of Arts in Economics and earned a Masters of Business Administration in Finance and Economics from New York University's Stern School of Business.

**Thomas R. Fuller** became a director in February 2012. Mr. Fuller served as a director at Petrohawk Energy Corporation from March 6, 2006 until BHP Billiton acquired Petrohawk in August 2011. Mr. Fuller served on Petrohawk's Reserves Committee and was the Chairman of the Nominating and Corporate Governance Committee. Since December 1988, Mr. Fuller has been a principal of Diverse Energy Management Co. (or related "Diverse" companies), a private upstream acquisition, drilling and production company which also invests in other energy-related companies. Mr. Fuller has earned degrees from the University of Wyoming and the Louisiana State University School of Banking of the South and is a Registered Professional Engineer in Texas. He has 48 years of experience as a petroleum engineer, specializing in economic and reserves evaluation. He has served as an employee, officer, partner or director of various companies, including ExxonMobil, First City National Bank, Hillin Oil Co., Diverse Energy Management Co. and Rimco Royalty Partners. In February 2015, Mr. Fuller became a director of Azure Midstream Partners LP, a public company traded on the NYSE, and serves as a member of its Audit Committee. Mr. Fuller also serves as a director of privately held Azure Midstream Holdings. Mr. Fuller also has extensive experience in energy-related merger and acquisition transactions, having generated and closed over 90 producing property acquisitions during his career. As a primary lending officer to many independent energy companies, Mr. Fuller has extensive experience in analyzing and evaluating financial, business and operational strategies for energy companies.

4

**Darryl Schall**.  Mr. Schall is a Partner and Portfolio Manager in the Ares Private Equity Group, where he is responsible for managing Ares' special situations strategy.  He also serves as a Vice President of Ares Dynamic Credit Allocation Fund, Inc. ("ARDC"), a NYSE-listed, closed end fund managed by an affiliate of Ares.  Additionally, he serves on the Investment Committee for the Ares Special Situations funds.  Prior to joining Ares in 2009, Mr. Schall worked at Tudor Investment Corporation, where he focused on managing distressed and high yield investments.  Previously, Mr. Schall was a Managing Director and Director of High Yield Research at Trust Company of the West, where he focused on managing portfolios of distressed and high yield debt.  In addition, Mr. Schall was a Senior Research Analyst and Senior Vice President at Dabney/Resnick & Wagner, Inc., a boutique investment firm specializing in high yield and distressed debt.  Previously, Mr. Schall was an Investment Banking Associate of the Corporate Finance Department of Drexel Burnham Lambert Inc. and was a Supervising Senior Accountant with KPMG Peat Mawick.  Mr. Schall holds a B.A., cum laude, from the University of California, Los Angeles, in History and an M.B. A. from the University of Chicago. Mr. Schall also is a Certified Public Accountant.

**Ronald D. Scott**.  Mr. Scott has over thirty years oil and gas industry experience. Most recently, from 2013 to 2016, Mr. Scott served as President and CEO of True Oil Company, a private equity backed oil and gas firm.  Prior to that, from 1996 to 2012, he served as President and Chief Operating Officer of Midland, Texas-based Henry Petroleum and its successor companies, Henry Resources and HPC Energy.  During this time, Mr. Scott successfully led the sale and re-start of multiple companies.  Beginning his career with Exxon Corporation, from 1983 to 1995, Mr. Scott held various supervisory and managerial assignments in Engineering, Operations, Planning and Financial Accounting and Reporting.  In addition to the Permian Basin,

5

he had assignments covering operational areas in the Gulf Coast/Gulf of Mexico region, California and the Rocky Mountains. Mr. Scott was the Technical Manager for Exxon's multi-billion dollar onshore operations in the Western United States and prior to joining Henry Petroleum. Mr. Scott serves as a Director of Blackbrush Oil and Gas and Pardus Oil and Gas and as the Vice President of the Board of the Henry Foundation, a founding member of Educate Midland and on the Chamber of Commerce. Mr. Scott holds Master and Bachelor of Science degrees in Engineering from New Mexico State University and is a Registered Petroleum Engineer in the State of Texas.

**Eric G. Takaha**. Prior to his retirement in 2016, Mr. Takaha served as a Portfolio Manager, Senior Vice President and Director of the Corporate and High Yield Group at Franklin Templeton Investments. He also served as a member of the firm's Fixed Income Policy Committee, which helped guide investment strategies for multi-sector fixed income accounts. At Franklin Templeton Investments, Mr. Takaha managed multiple fixed income portfolios, with a focus on those with corporate credit investments, as well as overseeing and directing the firm's group of high yield and investment grade credit analysts as they formulated investment recommendations. He originally joined Franklin Templeton Investments in 1989, and served as a research analyst covering a number of different industries. Mr. Takaha currently serves as Treasurer and on the Board of the Redwood City Educational Foundation, on the Finance Committee for Make A Wish (San Francisco), on the Investment Sub-Committee for Catholic Charities (San Francisco) and as a mentor in the Friends for Youth organization. He received his B.S. from the University of California Berkeley in 1989 and his M.B.A from Stanford University in 1996. Mr. Takaha is a Chartered Financial Analyst (CFA) Charterholder since 1993 and

6

serves as a member of the CFA Society of San Francisco, the CFA Institute and the Standard Business School Alumni Association.

**Nathan W. Walton**.  Mr. Walton is a Partner in the Ares Private Equity Group and joined the firm in 2006.  Additionally, he serves on the Investment Committee for Ares EIF funds.  Mr. Walton has experience managing investments in, and serving on the Boards of Directors of, companies operating in various industries, including in the oil and natural gas exploration and production industry.  Currently, Mr. Walton serves on the Boards of Directors of Clayton Williams Energy, Inc. and the parent company of BlackBrush Oil & Gas, L.P.  Mr. Walton holds a B.A. from Princeton University in Politics and an M.B.A. from the Stanford Graduate School of Business.

**Floyd C. Wilson** became Chairman and Chief Executive Officer in February 2012. Prior to February 2012, he was President of HALRES LLC, an oil and natural gas company that he founded in October 2011. Mr. Wilson served as Chairman of the Board and Chief Executive Officer of Petrohawk Energy Corporation from May 25, 2004 until BHP Billiton acquired Petrohawk for $15.1 billion, including assumed debt, in August 2011. Mr. Wilson also served as President of Petrohawk from May 25, 2004 until September 8, 2009. Prior to May 25, 2004, he was President and Chief Executive Officer of PHAWK, LLC which he founded in June 2003. Mr. Wilson was the Chairman and Chief Executive Officer of 3TEC Energy Corporation from August 1999 until its merger with Plains Exploration & Production Company in June 2003. Mr. Wilson founded W/E Energy Company L.L.C., formerly known as 3TEC Energy Company L.L.C. in 1998 and served as its President until August 1999. Mr. Wilson began his career in the energy business in Houston, Texas in 1970 as a completion engineer. He moved to Wichita, Kansas in 1976 to start an oil and gas operating company, one of several private energy ventures

which preceded the formation of Hugoton Energy Corporation in 1987, where he served as

Chairman, President and Chief Executive Officer. In 1994, Hugoton completed an initial public

offering and was merged into Chesapeake Energy Corporation in 1998.

# EXHIBIT 9 TO PLAN SUPPLEMENT

# NEW COMMON SHARES ALLOCATION SCHEDULE

WEIL:\95834806\3\51351.0003

**Pro Forma Shares Outstanding**

| Pro Forma Ownership Summary | | | | | | |
|---|---|---|---|---|---|---|
| Holder | Shares Excluding MIP & Warrants | % Ownership | Including MIP Excluding Warrants | % Ownership | Including MIP Including Warrants | % Ownership |
| New Shares issued to Current HK Shareholders | 3,600,000 | 4.0% | 3,600,000 | 3.6% | 3,600,000 | 3.4% |
| New Shares Issued Under MIP | | 0.0% | 10,000,000 | 10.0% | 10,000,000 | 9.5% |
| New Shares Issued to 3L Holders | 68,850,000 | 76.5% | 68,850,000 | 68.9% | 68,850,000 | 65.7% |
| New Shares Issued to Unsecured Holders | 13,950,000 | 15.5% | 13,950,000 | 14.0% | 13,950,000 | 13.3% |
| New Shares Issued to Convert Holders | 3,600,000 | 4.0% | 3,600,000 | 3.6% | 3,600,000 | 3.4% |
| New Warrants Issued to Unsecured Holders | | 0.0% | | 0.0% | 3,789,474 | 3.6% |
| New Warrants Issued to Convert Holders | | 0.0% | | 0.0% | 947,368 | 0.9% |
| **Total** | **90,000,000** | **100.0%** | **100,000,000** | **100.0%** | **104,736,842** | **100.0%** |